## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

SAFARI CLUB INTERNATIONAL and NATIONAL RIFLE ASSOCIATION
OF AMERICA, Plaintiffs-Appellants,

v.

SALLY M. R. JEWELL, in her official capacity as
United States Secretary of the Interior, *et al.*,
Defendants-Appellees
_____

On Appeal from the United States District Court for the District of Columbia
(No. 14-00670-RCL)
_____

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS
## SAFARI CLUB INTERNATIONAL AND
## NATIONAL RIFLE ASSOCIATION OF AMERICA

Anna M. Seidman
Douglas S. Burdin
Jeremy E. Clare
Safari Club International
501 Second Street NE
Washington, D.C.  20002
Tel:  202-543-8733
Fax:  202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org

*Counsel for Safari Club International*

Christopher A. Conte
Michael T. Jean
National Rifle Association of
America/ILA
11250 Waples Mill Rd., 5N
Fairfax, Virginia 22030
Tel:  703-267-1166
Fax:  703-267-1164
cconte@nrahq.org
mjean@nrahq.org

*Counsel for National Rifle
Association of America*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The following information is provided pursuant to D.C. Circuit Rule 28(a)(1).

## A. Parties

<u>Plaintiffs-Appellants</u>:

Safari Club International;

National Rifle Association of America.

<u>Defendants-Appellees</u>:

Sally M. R. Jewell, in her official capacity as Secretary of the U.S. Department of the Interior;

Daniel Ashe, in his official capacity as Director of the U.S. Fish and Wildlife Service;

The United States Department of the Interior; and

The United States Fish and Wildlife Service.

## B. Rulings Under Review

Appellants seek review of the Order and Memorandum Opinion entered on December 26, 2014 (Dkts. No. 47 and 48, respectively) in Case No. 14-00670 by Judge Royce C. Lamberth of the U.S. District Court for the District of Columbia. The Order and Memorandum Opinion granted in part the Federal Appellees' motion to dismiss. The court dismissed Plaintiffs-Appellants Safari Club International and National Rifle Association of America's ("SCI/NRA") claims

related to the U.S. Fish and Wildlife Service's ban on the importation of elephants from Tanzania.  Because the district court also denied the portion of the Federal Defendants-Appellees' motion to dismiss related to SCI/NRA's challenge to the decision to ban the importation of elephants from Zimbabwe, those claims are not part of this appeal.

## C.    Related Cases

This case has previously been before this Court on SCI/NRA's appeal of the district court's denial of their motion for a preliminary injunction.  SCI/NRA voluntarily dismissed that appeal before this Court rendered an opinion.

**CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF/APPELLANT
SAFARI CLUB INTERNATIONAL**

In accordance with Federal R. App. P. 26.1 and D.C. Circuit Rule 26.1, counsel of record for Safari Club International ("SCI") certifies that SCI is a 501(c)(4) corporation and has no parent companies, subsidiaries or affiliates that have any outstanding securities in the hands of the public. SCI's missions include the conservation of wildlife, protection of the hunter, and education of the public concerning hunting and its use as a conservation tool. These representations are made so that judges of this Court may determine the need for recusal.

**CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF/APPELLANT
NATIONAL RIFLE ASSOCIATION OF AMERICA**

In accordance with Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, counsel of record for the National Rifle Association of America ("NRA") certifies that the NRA is a not-for-profit membership association incorporated in New York. The NRA's mission includes promoting hunter safety, and to promote and defend hunting as a shooting sport and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources. The NRA is not publicly traded and has no parent corporation, and there is no publicly held corporation that owns 10 percent or more of its stock.

These representations are made so that judges of this Court may determine the need for recusal.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF/
APPELLANT SAFARI CLUB INTERNATIONAL .................................... iv

CORPORATE DISCLOSURE STATEMENT OF  PLAINTIFF/
APPELLANT NATIONAL RIFLE ASSOCIATION OF AMERICA ......... iv

TABLE OF AUTHORITIES ...................................................................... viii

GLOSSARY OF TERMS ........................................................................... xi

I.    INTRODUCTION ................................................................................1

II.   JURISDICTIONAL STATEMENT ...................................................3

III.  STATEMENT OF ISSUES PRESENTED FOR REVIEW ...............4

IV.  STATEMENT OF THE CASE ...........................................................5

   A.    The Regulatory History and Current Legal Status
          of African Elephants in Tanzania ...........................................5

   B.    The Tanzania Importation Ban ................................................8

   C.    The Tanzania Importation Ban Causes Harm to
          SCI/NRA Members and to the Organizations ....................11

          1.    Loss to Conservation Efforts ....................................12

          2.    Loss to SCI/NRA ......................................................16

   D.    Procedural History of the Case ............................................17

V.   SUMMARY OF ARGUMENT ........................................................18

VI.  ARGUMENT ....................................................................................20

   A.    Standard of Review ..............................................................20

   B.    The Tanzania Importation Ban Is Reviewable Final
          Agency Action Because It Increases the Burden on
          Those Who Seek a Permit, It Harms Those Who
          Have no Reason to Apply for a Permit, Applying for

a Permit Would Be Futile, and the Exhaustion
Requirement Does Not Apply ............................................................22

    1.    The Tanzania Ban Marked the Consummation
of the Service's Decision-Making Process,
Qualifies as a Binding Norm, and Creates
New Obligations on Applicants ................................................24

    2.    The Tanzania Ban Is Having a Direct Effect on
the Day-to-Day Businesses of SCI/NRA Members
Who Do Not Want or Require Permits ....................................30

    3.    The District Court Erred in Finding That Applying
for a Permit Would Not Be Futile ...........................................31

        a.    Hunters Who Apply For Permits in the Manner
That They Did Prior to April 4, 2014 Will
Not Receive a Permit ......................................................32

        b.    Exhaustion of Remedies Also Was Futile Because
Hunters/Importers Could Not Overcome the New
Informational Hurdles Imposed by the Service ..............38

    4.    The Exhaustion Requirement Does Not Apply .......................41

  C.    SCI/NRA Have Standing to Bring Their Claims. ...............................43

VII.  CONCLUSION...............................................................................................46

CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION..........................................................................48

CERTIFICATE OF SERVICE ............................................................................49

ADDENDUM .....................................................................................................50

# TABLE OF AUTHORITIES

## Cases

Abbott Labs. v. Gardner, 387 U.S. 136 (1967)........................................29

Abdelfattah v. U.S. Dep't of Homeland Sec., 787 F.3d 524
    (D.C. Cir. 2015) ................................................................................21

Action for Children's Television v. FCC, 564 F.2d 458
    (D.C. Cir. 1977) ................................................................................32

*Appalachian Power Co. v. EPA, 208 F.3d 1015 (D.C. Cir. 2000) ............ 25, 27,44

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ................................................22

Atherton v. D.C. Off. of Mayor, 567 F.3d 672 (D.C. Cir. 2009) ............................21

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ..........................................22

Bennett v. Spear, 520 U.S. 154 (1997) ................................................23

Califano v. Sanders, 430 U.S. 99 (1977) ................................................29

Ciba-Geigy Corp. v. EPA, 801 F.2d 430 (D.C. Cir. 1986)....................................29

Comm. for GI Rights v. Callaway, 518 F.2d 466 (D.C. Cir. 1975) .......................41

*CropLife Am. v. EPA, 329 F.3d 876 (D.C. Cir. 2003)................................. 26, 43

Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,
    452 F.3d 798 (D.C. Cir. 2006)..........................................................23

Cutler v. Hayes, 818 F.2d 879 (D.C. Cir. 1987)....................................31

Foman v. Davis, 371 U.S. 178 (1962) ................................................33

Found. on Econ. Trends v. Heckler, 756 F.2d 143 (D.C. Cir. 1985) .....................32

Franklin v. Mass., 505 U.S. 788 (1992)................................................23

Friends of Animals v. Kempthorne, 452 F. Supp. 2d 64 (D.D.C. 2006)................44

FTC v. Standard Oil Co., 449 U.S. 232 (1980) ................................................23

Hormel v. Helvering, 312 U.S. 552 (1941) ................................................32

In re Polar Bear Endangered Species Act Listing and 4(d) R. Litig.,
    627 F. Supp. 2d 16 (D.D.C. 2009)..........................................................45

LaRoque v. Holder, 650 F.3d 777 (D.C. Cir. 2011)..............................................21

Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940
    (9th Cir. 2005)..................................................................................33

*Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ................................... 21, 43

McGuire v. Strange, 83 F. Supp. 3d 1231 (M.D. Ala. 2015) ................................44

Meredith v. Fed. Mine Safety and Health Review Comm'n,
   177 F.3d 1042 (D.C. Cir. 1999) ................................................ 28-29

Muir v. Navy Fed. Credit Union, 529 F.3d 1100 (D.C. Cir. 2008) ........................21

Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell, 77 F. Supp.
   3d 103 (D.D.C. 2015) ................................................................42

Nat'l Min. Ass'n v. Jackson, 768 F. Supp. 2d 34 (D.D.C. 2011) ...........................44

Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.,
   745 F.3d 1219 (D.C. Cir. 2014) ....................................................29

*Randolph-Sheppard Vendors of Am. v. Weinberger, 795 F.2d 90
   (D.C. Cir. 1986) ...................................................................41

Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety
   Comm'n, 324 F.3d 726 (D.C. Cir. 2003) .............................................21

Role Models Am., Inc. v. White, 317 F.3d 327 (D.C. Cir. 2003) .................. 28, 29

Sackett v. EPA, —— U.S. ——, 132 S.Ct. 1367 (2012) .......................................25

Singh v. Ashcroft, 362 F.3d 1164, 1169 (9th Cir. 2004) ..................................40

Stewart v. Nat'l Educ. Ass'n, 471 F.3d 169 (D.C. Cir. 2006) ............................21

Tooley v. Napolitano, 556 F.3d 836 (D.C. Cir. 2009) ................................. 21-22

Trudeau v. FTC, 456 F.3d 178 (D.C. Cir. 2006) ..........................................23

UDC Chairs Chapter, Am. Ass'n of U. Professors v. Bd. of Trustees
   of U. of D.C., 56 F.3d 1469 (D.C. Cir. 1995) ......................................21

Warth v. Seldin, 422 U.S. 490 (1975) ...................................................21

Wildearth Guardians v. Salazar, 272 F.R.D. 4 (D.D.C. 2010) ..............................45

Wilderness Soc'y v. Norton, 434 F.3d 584 (D.C. Cir. 2006) ...............................23

## Statutes

5 U.S.C. § 701 ..........................................................................4

5 U.S.C. § 702 ..........................................................................4

5 U.S.C. § 703 ..........................................................................4

5 U.S.C. § 704 ..........................................................................4

5 U.S.C. § 705 ..........................................................................4

5 U.S.C. § 706 ..........................................................................4

16 U.S.C. §1533 .........................................................................5

28 U.S.C. § 1291 ........................................................................4

28 U.S.C. § 1331 ........................................................................4

28 U.S.C. § 2201 ........................................................................4

28 U.S.C. § 2202 ....................................................................4

**Rules**

Fed. R. Civ. P. 54(b) ...........................................................3

**Treatises**

CITES text, Article III ........................................................8

Convention on International Trade of Endangered Species of Fauna
  and Flora, 27 U.S.T. 1087...............................................5

Res. Conf. 2.11 (Annex 1) ..................................................7

Res. Conf. 2.11 (rev. 1)........................................................7

**Regulations**

50 C.F.R. § 17.40(e)............................................................6

43 Fed. Reg. 20499 (May 12, 1978) ..................................5

57 Fed. Reg. 35473 (Aug. 10, 1992)................................6, 7

*60 Fed. Reg. 12969 (Mar. 9, 1995)......................... 8, 25, 34

*Authorities Principally Relied On

# GLOSSARY OF TERMS

| | |
|---|---|
| App. | Appendix |
| AR | Administrative Record in the district court for the Tanzania importation decision |
| CITES | Convention on International Trade of Endangered Species of Fauna and Flora |
| DA | Deferred Appendix |
| Decl. | Declaration |
| Dkt. | Docket |
| ESA | Endangered Species Act |
| Federal Appellees | Federal Appellees Secretary of the Interior, Sally Jewell *et al.* |
| Mem. Opinion | Memorandum Opinion entered on December 26, 2014 (Dkt. No. 48) in Case No. 14-00670 |
| non-detriment finding | A finding made, in accordance with CITES requirements, that the import of a specimen will be for purposes which are not detrimental to the survival of the species involved. |
| SAC | Second Amended Complaint by SCI/NRA in district court |
| SCI/NRA | Safari Club International and the National Rifle Association of America |

| | |
|---|---|
| Service | United States Fish and Wildlife Service |
| Special Rule | Regulation that provides criteria for the importation of legally hunted African elephants into the United States.  50 C.F.R. § 17.40(e). |
| 2013 Tanzania Non-detriment Finding | General Advice on Importation of Sport-hunted Trophies and Articles for Personal Use or Display that Were Made from Sport-hunted Trophies of African Elephants from Tanzania, for the Calendar Year 2013 |
| 2014 Tanzania Non-detriment Finding | General Advice on Importation of Sport-hunted Trophies of African Elephants taken in Tanzania in Calendar Year 2014 |
| 2014 Tanzania Enhancement Finding | Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Tanzania during 2014 |

# I.    INTRODUCTION

Plaintiffs-Appellants Safari Club International and the National Rifle Association of America ("SCI/NRA") appeal a ruling of the U.S. District Court for the District of Columbia that dismissed their claims challenging an April 4, 2014 ban on the importation of sport-hunted elephants from Tanzania, imposed by the Secretary of the Interior, Sally Jewell *et al.*, ("Federal Appellees").  The district court dismissed those claims based on its conclusions that (1) SCI/NRA had not exhausted their administrative remedies and the challenged actions were not final because no member of SCI/NRA had applied for an import permit, and (2) the process involved in applying for such permits would not constitute a futile effort. For many SCI/NRA members, however, the decision of the U.S. Fish and Wildlife Service ("Service") not to allow the importation of legally hunted elephants from Tanzania was final for at least four reasons.

First, the decision immediately created a new binding norm by increasing the regulatory burden on those U.S. citizens who wanted to apply for an import permit.  Prior to the April 4, 2014 importation ban decision, applicants could rely on consistent, longstanding determinations made by the Service that (a) the importation of elephants from Tanzania would not be detrimental to the survival of the species, and (b) the importation enhanced the survival of the species.  On April 4, 2014, the Service imposed upon those applicants a new duty to overcome the

Service's new negative findings by providing proof of their own that differed from the information on which the Service relied in making the unfavorable findings.

Second, many SCI/NRA members who had no reason to apply for an import permit – such as outfitters, guides, and taxidermists – were nonetheless harmed by the importation ban because U.S. hunters were cancelling hunts due to the ban. This was the very result that the Service encouraged and hoped for in instituting the ban. For these SCI/NRA members, the Service's decisions – in the form of unfavorable non-detriment and enhancement findings – were final agency actions.

Third, the exhaustion requirement does not make the decisions non-final because resort to the administrative process would be futile. The Service, with all its resources and knowledge, was unable to make favorable non-detriment and enhancement findings for Tanzania in 2014. The Service imposed upon individual hunter/importer permit applicants a nearly impossible task of meeting the Service's new standards for persuading the Service to reverse its decisions and to instead make favorable non-detriment and enhancement findings. For example, from April 4, 2014 forward, the Service conditioned the issuance of permits on the individual hunter/importer's ability to provide information about elephant mortality due to poaching, and elephant birth rates in Tanzania—information that is unobtainable. Under such circumstances, a hunter/importer's attempt to apply for a permit would be futile.

Fourth, resort to the administrative process is not necessary because it would not address the claims SCI/NRA make here. SCI/NRA challenge the processes and standards that the Service has established for issuing importation permits for Tanzania elephants. These processes and standards would not be at issue in individual permit proceedings. In such circumstances, courts have excused the exhaustion requirement.

For these reasons, the district court erred in dismissing SCI/NRA's Tanzania claims. This Court should reverse the district court's determination that SCI/NRA did not challenge a final agency decision and that SCI/NRA failed to exhaust their administrative remedies before challenging the Tanzania importation ban decision.

## II.    JURISDICTIONAL STATEMENT

This is an appeal from the district court's December 26, 2014 Order and Memorandum Opinion ("Mem. Opinion") dismissing SCI/NRA's claims related to the importation ban on elephants sport-hunted in Tanzania in 2014. Deferred Appendix ("DA") ____, Dkts. 47-48. As the district court did not dismiss the separate claims related to an importation ban of sport-hunted elephants from Zimbabwe, SCI/NRA moved, under Fed. R. Civ. P. 54(b), for an order to certify for immediate appeal the portions of the Mem. Opinion that dismissed claims related to the Tanzania importation ban. Dkt. 53. On April 9, 2015, the district court granted that motion, made findings explaining why the dismissed claims

should be certified for immediate appeal, and finalized that portion of the Mem. Opinion for purposes of appeal. DA____, Dkt. 65, Certification Memorandum Opinion at 8. SCI/NRA filed a timely Notice of Appeal on June 4, 2015. Dkt. 69.

This Court has jurisdiction under 28 U.S.C. § 1291 to consider this appeal. The district court had jurisdiction over this action under the Administrative Procedure Act, 5 U.S.C. §§ 702, 706 (judicial review of final agency action and inaction) and 28 U.S.C. § 1331 (federal question jurisdiction), and had the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202, and 5 U.S.C. §§ 701-706.

## III. STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether the district court erred in finding that SCI/NRA did not state a claim.

Whether the district court erred in determining that SCI/NRA members had not exhausted administrative remedies by failing to apply for importation permits, even though the agency's final actions immediately harmed many members, including those who suffered an increased regulatory burden and those who had no reason to seek importation permits.

Whether the district court erred in finding that it would not be futile for SCI/NRA members to seek permits for the importation of sport-hunted elephants

from Tanzania such that they would be excused from the prudential requirement of exhausting this administrative remedy.

Whether exhaustion of administrative remedies is not necessary because the claims that SCI/NRA have brought here would not be implicated in that administrative proceeding.

Whether SCI/NRA have standing.[1]

## IV.  STATEMENT OF THE CASE

### A.  The Regulatory History and Current Legal Status of African Elephants in Tanzania

African elephants (*Loxodonta africana*) are found throughout much of Africa, but the majority live in southern and eastern Africa, including Tanzania. The wildlife management authorities of Tanzania allow the hunting of elephants in Tanzania.  The regulation of imports of those legally hunted elephants into the United States rests with the Service.  The criteria for importation depend upon the listing status of the elephants under the Convention on International Trade of Endangered Species of Fauna and Flora ("CITES"), 27 U.S.T. 1087, and the Endangered Species Act ("ESA"), 16 U.S.C. §1533.  Elephants in Tanzania are listed on CITES Appendix I.  The Service has designated all African elephants as threatened under the ESA.  43 Fed. Reg. 20499 (May 12, 1978).  Because of their

_____

[1] Pertinent statutes, regulations, and other authorities are in the Addendum.

status as both a CITES Appendix I and ESA threatened species, the U.S. has required two different findings as a prerequisite to the importation of elephants from Tanzania – a finding that the importation enhances the survival of the species and a finding that the importation is not detrimental to the species' survival.

In 1978, the Service promulgated a regulation that established the criteria for the importation of legally hunted African elephants into the United States. 50 C.F.R. § 17.40(e) ("Special Rule"). In 1992, the Service amended the Special Rule to include a provision that allowed the importation of sport-hunted elephants as long as CITES requirements were fulfilled and the elephant was appropriately marked. 57 Fed. Reg. 35473, 35485 (Aug. 10, 1992). At the time of the 1992 amendment to the Special Rule, CITES required that for Appendix I species, including elephants, the importing country needed to make a determination that the sport-hunting of the animal would enhance the survival of the species. The Service's Special Rule matched that CITES enhancement of survival requirement.[2]

> CITES requirements included a determination that the killing of elephants for sport-hunting enhances the survival of the species by providing financial support programs for elephant conservation. This requirement is retained in the final revised special rule for the import of sport-hunted trophies from threatened populations that are on CITES appendix I.

---

[2] The Federal Register notice accompanying the Special Rule noted that sport-hunting "provide[s] important revenues for elephant conservation to range states." 57 Fed. Reg. at 35485.

57 Fed. Reg. at 35485; CITES Res. Conf. 2.11 (Annex 1) (Addendum).

In 1994, the parties to CITES amended Res. Conf. 2.11 (Rev. 1) (Addendum) and removed the enhancement of survival requirement from the resolution. From that point forward and continuing, CITES no longer imposes an enhancement of survival requirement for the importation of species on either Appendix I or II, including for the importation of elephants from Tanzania.

Without explanation of any kind, the Service failed to make a parallel change to the Special Rule's enhancement of survival finding requirement for the importation of elephants. The Service retained the enhancement of survival finding requirement, yet never gave the public an opportunity to comment on its decision to diverge from the CITES model and to thereby increase the U.S. requirements for elephant importation. From the time it established that heightened obligation, until the date that it imposed the importation ban on April 4, 2014, the Service never wavered from its factual finding that the hunting and importation of elephants from Tanzania enhanced the survival of the species.

The CITES Treaty obligations – implemented by the Service in the U.S. through regulations – imposes a separate requirement for the importation of Tanzania's elephants because they are listed on CITES Appendix I. The CITES Treaty and federal regulations require the importing country to make a finding that the "import will be for purposes which are not detrimental to the survival of the

species involved," also known as a non-detriment finding. CITES text, Article III (Addendum).[3] Since at least as early as 1993, the Service consistently determined that the importation of elephants from Tanzania was not detrimental to the survival of the species. 60 Fed. Reg. 12969, 12969-70 (Mar. 9, 1995).

All this changed on April 4, 2014.

## B. The Tanzania Importation Ban

On April 4, 2014, the Service announced, in a press release posted on the Service's website, an immediate suspension of the importation of sport-hunted African elephants taken in Tanzania (and Zimbabwe) during 2014. DA___, App. at 58.[4] The Service imposed the importation ban for Tanzania based on: (1) a February 21, 2014 determination from the Service's Scientific Authority that it could not make a finding that the hunting of elephants in Tanzania would not be detrimental to the survival of the species ("2014 Tanzania Non-detriment

---

[3] For Appendix I and II listed species, CITES (and the Service) requires that the exporting country also make a finding that the "export will not be detrimental to the survival of the species."

[4] "DA" refers to the Deferred Appendix the parties will prepare following briefing. The district court relied on various documents from the preliminary injunction proceeding exhibits, some of which are also contained in the administrative record for this case. *See, e.g.,* Mem. Opinion at 5, DA___. "App." refers to the appendix of record documents in the appeal of the preliminary injunction denial. "AR" refers to the administrative record created by the Service for the 2014 Tanzania importation ban decision and contains the document number in the index provided by Federal Appellees. These citations are included here to facilitate the preparation of the Deferred Appendix.

Finding"), DA____, AR159; and (2) a March 27, 2014 determination from the Service's Management Authority (Branch of Permits) that the importation of sport-hunted trophies from Tanzania is not likely to enhance the survival of the species ("2014 Tanzania Enhancement Finding"),  DA____, AR204.  The Service gave no prior notice of an impending decision to the public or to Tanzania.  The Service did not make the 2014 Tanzania Enhancement Finding, 2014 Tanzania Non-detriment Finding, or import ban decision available to the public for review and comment and did not publish those documents in the Federal Register.

The 2014 Tanzania Non-detriment Finding focused on the *take* of elephants generally, both for legal and illegal purposes, instead of on the question of whether the *importation* of sport-hunted elephants for the personal use of the hunters would be for *purposes* that are detrimental to the survival of the species.  DA___, AR159; *see also* Second Amended Complaint ("SAC"), ¶¶58-60, 136-37, DA____.[5]  The 2014 Tanzania Non-detriment Finding did not examine the role that sport hunting plays in decreasing and discouraging poaching in Tanzania.  It also did not address how the presence of hunters, outfitters and their staff in the field provides a

_____

[5] SCI/NRA cites to the Second Amended Complaint ("SAC") in this brief because the district court granted SCI/NRA's motion to amend in the same Memorandum Opinion in which the court dismissed the Tanzania claims, DA____, Mem. Opinion at 11, making the SAC the version of the complaint before the district court when the district court certified the Tanzania claims.  DA____, Dkt. 65, Certification Memorandum Opinion at 8.  In any event, the allegations regarding Tanzania are essentially the same in the SAC and First Amended Complaint.

deterrent to poachers or how the infusion of revenue generated by the hunting and other activities of U.S. hunters encourages local communities to guard against poaching. The 2014 Tanzania Non-detriment Finding omitted this analysis and merely addressed sport hunting as an "additional" source of mortality. DA___, AR159. The 2014 Tanzania Non-detriment Finding also failed to analyze the impact an importation ban would have on elephant conservation in Tanzania. *Id.*

The documents that the Service published at or around the time that the agency implemented the importation ban revealed that the Service imposed the ban with the express intent of reducing the number of U.S. hunters going to Tanzania to hunt elephants. Not only did the Service expect that the ban would discourage U.S. hunters from following through with planned elephants hunts, but the agency actually *recommended* that U.S. hunters cancel their hunts. The Questions and Answers page that the Service posted on its website offered the following hypothetical question from a U.S. hunter and the Service's response:

> **I have already purchased a hunt in Tanzania or Zimbabwe. How do I get my money back?**
>
> We encourage you to contact your hunting outfitter to discuss options. While you can still participate in a hunt in 2014, you currently are not able to import the trophy. In addition, given the current conservation concerns for elephants in Tanzania and Zimbabwe, *we strongly advise that you reconsider taking part in an elephant hunt in either of these countries at this time.*

DA____, App. at 61 (second emphasis added); *see* SAC, ¶44 (referencing press release and Q&A), DA____.  In the press release used to announce the ban, the Service stated that the intended purpose of the importation bans was to reduce the harvest of elephants "additional to" those killed by poachers:

> Sport hunting, as part of a sound management program, can provide benefits to conservation. Yet, given the current situation in Tanzania, and given the uncertainty with regard to elephants in Zimbabwe, the Service is not assured that the benefits of sport hunting will be realized in those countries. Further, the Service is concerned that ***additional killing of elephants*** in Tanzania, even if legal, is not sustainable at this time, and the same may be true for Zimbabwe.

DA____, App. at 58 (emphasis added).[6]

### C.  The Tanzania Importation Ban Causes Harm to SCI/NRA Members and to the Organizations

The importation ban for Tanzania's elephants immediately caused and will continue to cause significant and concrete harm to hunter/conservationist members of SCI/NRA who booked elephant hunts from 2014 forward in Tanzania and to the organizations themselves.[7]  SCI/NRA both alleged these harms in its complaint and

---

[6] SCI/NRA use the term "harvest" to denote the killing of an animal during hunting.  "Hunting," on the other hand, is the activity of pursuing legal game, which sometimes is unsuccessful and does not result in the killing of the animal.

[7] *See generally* DA____, Declarations of Robert Joseph Johnson, App. at 243; Robert Allen Sakuta, App. at 246; Walter Allen Tarpley, App. at 238; Scott Petty Jr., App. at 240; and Robert Bruce Rhyne, App. at 186.  Although the district court disposed of the Tanzania claims on a motion to dismiss, SCI/NRA had an opportunity to file declarations demonstrating harms to each organization and its members as part of the preliminary injunction proceedings.  These declarations

in declarations submitted with their motion for a preliminary injunction. DA___, SAC, ¶¶13-20 (harms to SCI/NRA and their members), 21-26 (harms to NRA and its members). As outlined in the declarations, some members harmed by the importation ban had already paid deposits and bought plane tickets. DA____, Tarpley Decl., App. at 238, ¶6; Petty Decl., App. at 241-42, ¶¶12, 15; Johnson Decl., App. at 244, ¶11; Sakuta Decl., App. at 247, ¶6; DA____, SAC, ¶¶14, 23. In some cases, their significant investments in their hunts cannot be recovered. *See, e.g.,* DA____, Sakuta Decl., App. at 247, ¶8. Rhyne Decl., App. at 186, ¶11.

The importation ban also adversely affected outfitters, professional hunters, and booking agents who are SCI and/or NRA members. DA___, SAC, ¶¶15-16, 24. As outlined in the declarations, these individuals and their companies lost business due to the Tanzania importation ban imposed by the Service. DA_____, Carter Decl., App. at 220, ¶¶19-20; Angelides Decl., App. at 252, ¶¶12-14.

### 1. Loss to Conservation Efforts

All of these SCI/NRA members suffered and continue to suffer from the damage to elephant conservation caused by the ban. By purposely discouraging U.S. hunters from elephant hunting in Tanzania, the Service has undermined

---

demonstrate the facts and inferences that can be drawn from the complaint's allegations. In addition, SCI/NRA relied on these declarations in briefing the motion to dismiss. *See, e.g.,* Dkt. 22. The district court relied on declarations filed by the Federal Appellees in dismissing SCI/NRA's claims. *See, e.g.,* Mem. Opinion at 3-4 (relying on declarations of Gnam and Van Norman), DA___.

elephant conservation and has deprived Tanzania and those who operate hunting businesses in Tanzania of the resources used to conserve the African elephant. Hunting revenues from U.S. hunters finance, in significant part, anti-poaching efforts in Tanzania. DA____, Petty Decl., App. at 241, ¶13; DA____, SAC, ¶¶17, 25. The mere presence of hunters in the field in Tanzania also deters poachers:

> First, if hunters find poaching camps, the camps are destroyed. Second, professional hunters and trackers employed by the hunters always talk to the local communities about poaching and where it might be happening. Third, everyone in hunting groups look out for non-hunting activities in the areas in which they hunt. Fourth, government game scouts, paid for by the hunter, accompany all hunts.

DA____, Johnson Decl., App. at 244, ¶9; *see also* DA____, McDonnold Decl., App. at 207, ¶6 (SCI member and his hunting group apprehended six poachers for the Tanzania authorities).

U.S. hunting revenues also contribute to elephant conservation by providing resources for local communities. Meat from elephant hunts are donated to the communities. DA____, Tarpley Decl., App. at 239, ¶9; DA____, SAC, ¶17. Other resources include funding for schools and wells. DA____, Tarpley Decl., App. at 239, ¶9. These resources encourage local communities to tolerate the elephant despite its destructive tendencies.

The hunting businesses that operate in Tanzania involve themselves heavily in elephant conservation and rely on hunter fees to finance these projects. For example, the Robin Hurt Wildlife Foundation is engaged in anti-poaching efforts

and works with the Tanzanian government's anti-poaching efforts.  DA____, Hurt

Decl., App. at 248, ¶5.  The Foundation participates in a community benefits

program that encourages local social tolerance for the elephant:

> Because these communities are beneficiaries of revenue generated by
> hunted animals, they have a vested interest in those animals, and are
> pro-wildlife conservation for all species in respective areas.  Without
> benefit schemes such as ours, communities are not usually tolerant of
> direct wildlife clashes that cause crop and livestock damage.  Hunting
> and the revenue hunting brings contribute to help pacify those
> feelings.

DA____, Hurt Decl., App. at 249, ¶9; *see also* DA____, Angelides Decl., App. at

252, ¶¶8-9.  The importation ban has seriously jeopardized their efforts.

> The hunting business is a huge employer and provider to the local
> economies.  For this reason, Tanzania can justify keeping wilderness
> as wilderness and therefore a home for all wildlife.  By depriving U.S.
> hunters of an important element of the elephant's value, the U.S.
> government has all but taken the hunter out of the field.  By removing
> the hunter and the money he brings into Tanzania, the U.S.
> government respectively reduces our financial ability to patrol and
> manage these areas.

DA____, Hurt Decl., App. at 249, ¶11.

The Service is well aware of the significant role that U.S. hunters play in

Tanzanian elephant conservation.  In the 2014 Tanzania Enhancement Finding, the

Service acknowledged:

> U.S. hunters are the primary recipients of licenses in Tanzania.  It is
> the belief of these hunters, as well as the [Division of Management
> Authority], that the funds generated from these licenses are being used
> for conservation purposes.

2014 Tanzania Enhancement Finding at 8-9, DA____, AR204.  Even though the

Service decided they could not issue a positive enhancement finding in 2014 for

Tanzania, due in part to concerns over what percentage of the proceeds from U.S.

hunting was being dedicated to conservation, the Service nevertheless

acknowledged that at least *some* portion of the money generated by U.S. hunters

continues to fund elephant conservation.  *Id.*  In the 2013 non-detriment finding for

Tanzania, in which the Service found that the importation of sport-hunted

elephants from Tanzania would not be detrimental to the survival of the species,

the Service offered greater detail about the role that U.S. sport-hunting revenue

plays in Tanzania's elephant conservation:

> According to the Ministry of Natural Resources and Tourism *(in litt.,*
> 2008), 25% of the revenue accrued from the sport hunting of
> elephants goes to the conservation and protection of African elephants
> and other wildlife species through the Tanzania Wildlife Protection
> Fund, and 25% of the game fees received from hunters is given to the
> local communities in the areas where the sport hunting took place.
> More than 90% of the revenue of the Tanzania Wildlife Protection
> Fund is generated from fees associated with sport-hunting activities.
> Law enforcement for wildlife and wildlife products, including ivory,
> is primarily undertaken by a special antipoaching unit, which is
> largely subsidized by the Tanzania Wildlife Protection Fund (CoP16
> Prop, 11).

General Advice on Importation of Sport-hunted Trophies and Articles for

Personal Use or Display that Were Made from Sport-hunted Trophies of African

Elephants from Tanzania, for the Calendar Year 2013 ("2013 Tanzania Non-

detriment Finding") at 4, DA____, App. at 344.  By purposefully depriving

Tanzania and Tanzanian hunting operations of the revenues generated from U.S. hunters, the Service removed an acknowledged and major source of the funds available for elephant conservation. By doing so, the Service has directly, greatly and certainly harmed elephant conservation in Tanzania. The Service's actions have harmed SCI/NRA's and their members' interests in conserving Tanzania's elephants.

### 2. Loss to SCI/NRA

SCI and NRA, as organizations, have suffered injury as a result of the elephant importation ban. SCI/NRA collectively represent millions of hunters worldwide and have missions that involve the protection of the rights of the hunter and the conservation of wildlife. *See, e.g.,* DA____, Goodenow Decl., App. at 137, ¶¶4-5. SCI/NRA support "sustainable use" conservation – an approach that recognizes that the utilization of wildlife often produces benefits and provides incentives for conservation. *Id.,* ¶7; SAC, ¶¶11-13, 17, 21-22, 25. African elephant hunting in Tanzania is a prime example of that sustainable use model. By imposing the importation ban, the Service has purposely discouraged U.S. hunters from visiting Tanzania for elephant hunting and has consequently deprived the hunting community and Tanzania of resources that are essential to conservation efforts. As a result, SCI/NRA are harmed and will continue to be harmed by the inevitable increased poaching, loss of habitat, and social intolerance that is actively

undermining elephant conservation.  DA____, SAC, ¶¶17-18; DA____, Goodenow Decl., App. at 138, ¶15.

### D.    Procedural History of the Case

SCI filed a complaint in the U.S. District Court for the District of Columbia on April 21, 2014.  Dkt. 1.  On April 30, 2014, SCI filed a motion for a preliminary injunction, asking that the Tanzania (and Zimbabwe) importation ban be enjoined for the duration of the litigation.  Dkt. 4.  After the district court narrowed the issues, Federal Appellees filed their Memorandum in Opposition to the Motion for a Preliminary Injunction on May 13, 2014.  Dkt. 10.[8]

On May 16, 2014, SCI filed an Amended Complaint that joined the National Rifle Association of America as a plaintiff.  Dkt. 13.  On that same date, SCI/NRA filed a Reply to Federal Appellees' Opposition to the Motion for a Preliminary Injunction.  Dkt. 14.

On June 6, 2014, the district court issued a Memorandum Opinion and Order denying SCI/NRA's motion for a preliminary injunction.  Dkt. 24.  SCI/NRA

---

[8] On the same date, Federal Appellees filed a Motion to Dismiss for lack of jurisdiction.  Dkt. 11.  On May 27, 2014, SCI/NRA filed their Memorandum in Opposition to Federal Appellees' Motion to Dismiss.  Dkt. 22.  Federal Appellees filed their Reply on June 5, 2014.  Dkt. 23.  In the Memorandum Opinion issued on June 6, 2014 that denied SCI/NRA's preliminary injunction motion, the district court explained that it was taking Federal Appellees' motion to dismiss under advisement.

noticed the appeal of the district court's ruling on June 17, 2014.  Dkt. 29.  After this Court held oral argument, SCI/NRA filed an unopposed motion to dismiss this appeal, citing concerns that the appeal would delay resolution of claims still pending before the district court.  Case No. 14-5152, Dkt. 1520554.  This Court granted that motion.  *Id.,* Dkt. 1521324.

On December 26, 2014, the district court granted the Federal Appellees' motion to dismiss the three claims related to the Tanzania importation ban, but denied the motion as to the claims related to the Zimbabwe importation ban.  DA____, Dkt. 47-48, Order and Memorandum Opinion.  Upon motion by SCI/NRA, the district court certified the three dismissed Tanzania claims for immediate appeal on April 9, 2015.  DA____, Dkt. 65.  SCI/NRA timely appealed the dismissal of those claims on June 4, 2015.  Dkt. 69.

## V.    SUMMARY OF ARGUMENT

The district court erroneously determined that SCI/NRA failed to state a claim upon which relief can be granted.  The court made that ruling based on the incorrect determination that the Tanzania import ban decision that SCI/NRA challenged was not a final agency action and that resort to the administrative permit and appeal process would not be futile.  This was error for at least four reasons.

First, the Service's action constituted a firm and final decision as it created new and more onerous administrative and informational burdens on permit applicants.

Second, the Service's action purposely harmed individuals who provide hunting services in Tanzania (*e.g.,* guides and outfitters) by discouraging U.S. hunters from hunting in Tanzania. These individuals would never have need to apply for an importation permit. The importation ban decision was final to them when issued.

Third, the district court erroneously ruled that SCI/NRA had failed to exhaust its administrative remedies before filing suit because no SCI or NRA member had applied for and been denied a permit to import a legally sport-hunted elephant from Tanzania. But the Service established insurmountable informational standards that individual permit applicants had never before been required to meet and conditioned the issuance of permits on information that could not be obtained. This caused an immediate injury to potential applicants. Because of the nature of these standards and requirements, any attempt to engage in the administrative process would be futile.

Fourth, SCI/NRA did not seek to overturn a Service decision on any specific import permit application and instead sought to challenge the processes and standards by which all permits would be considered. These issues would not be at

issue in the permit application process.  Resort to that process would not address these issues and therefore would not serve the purposes of the exhaustion requirement.

Finally, SCI/NRA have standing to bring these claims and this appeal because the importation ban harmed their members' interests in hunting and importing elephants from Tanzania.  The ban also harmed those who provide elephant hunting services in Tanzania by discouraging U.S. hunters from hunting in Tanzania.  As the Service is continuing the illegal practices challenged in this case, setting aside those standards and processes would remedy these harms.

## VI.    ARGUMENT

### A.    Standard of Review

This Court reviews the district court's dismissal *de novo* and must accept SCI/NRA's factual allegations as true, draw reasonable inferences in SCI/NRA's favor, and presume that general allegations embrace necessary specific facts.  As this Court has explained:

> We review *de novo* the district court's dismissal for … failure to state a claim upon which relief can be granted. … .  At this stage of the litigation, we "must accept as true all material allegations of the complaint," drawing all reasonable inferences from those allegations in plaintiffs' favor, … and "presum[ing] that general allegations embrace those specific facts that are necessary to support the claim," ….

*LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011), *citing Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008); *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006); *Warth v. Seldin,* 422 U.S. 490, 501 (1975); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) (internal quotation marks omitted); *see also Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 529 (D.C. Cir. 2015); *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n,* 324 F.3d 726, 731 (D.C. Cir. 2003) (reviewing dismissal based on lack of finality).  The *de novo* standard also applies to review of the district court ruling on the futility of exhausting administrative remedies.  *See UDC Chairs Chapter, Am. Ass'n of U. Professors v. Bd. of Trustees of U. of D.C.*, 56 F.3d 1469, 1471, 1475-76 (D.C. Cir. 1995) (after extensive *de novo* review, D.C. Circuit reached its own conclusions on whether "resort to the grievance procedures would have been futile, ….").

Determining whether a party has stated claims for relief does not involve a strict standard.  A court "may not grant a motion to dismiss for failure to state a claim 'even if it strikes a savvy judge that ... recovery is very remote and unlikely.' 'So long as the pleadings suggest a "plausible" scenario to "sho[w] that the pleader is entitled to relief," a court may not dismiss.'"  *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009), *quoting Tooley v. Napolitano*, 556 F.3d 836,

839 (D.C. Cir. 2009) *(quoting Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557

(2007)) (internal quotation marks and citation omitted).  This means that:

> [t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. … A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. … The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. … Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal citations omitted).  SCI/NRA

met these standards.

> ### B.     The Tanzania Importation Ban Is Reviewable Final Agency Action Because It Increases the Burden on Those Who Seek a Permit, It Harms Those Who Have no Reason to Apply for a Permit, Applying for a Permit Would Be Futile, and the Exhaustion Requirement Does Not Apply

The Service's April 4, 2014 decision to ban importation of elephants from

Tanzania constitutes final agency action for at least four reasons.  First, the

importation ban determination qualifies as a binding norm that dictates the

requisite threshold of information that SCI/NRA members must provide and

creates new obligations for them to fulfill before they could ever obtain an

importation permit.  Second, SCI/NRA members who do not intend to import

elephants or apply for permits have been directly harmed by the importation ban.

Third, participation in and exhaustion of the administrative process would be futile.

And fourth, that administrative process would not resolve or inform the legal claims at issue here and therefore need not be engaged.

The question of finality is not jurisdictional. Instead, the issue of finality relates to whether plaintiffs state a cause of action. *Trudeau v. FTC,* 456 F.3d 178, 184-85 (D.C. Cir. 2006). To be final and reviewable, agency action must satisfy two criteria. First, it must "mark the 'consummation' of the agency's decisionmaking process" and "must not be of a merely tentative or interlocutory nature." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin*., 452 F.3d 798, 806 (D.C. Cir. 2006), *quoting Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). To determine finality, courts look to see whether the challenged agency action established a "binding norm" as opposed to an "unreviewable statement of policy." *Id., quoting Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006). Second, the agency's action "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id*. A core question a court must consider is whether the result of the agency's decision-making "will directly affect the parties." *Franklin v. Mass.*, 505 U.S. 788, 797 (1992). An agency's action is final if it is "'definitive'" and has a "'direct and immediate ... effect on the day-to-day business'" of the party challenging it. *FTC v. Standard Oil Co.*, 449 U.S. 232, 239 (1980) (citations omitted).

1. **The Tanzania Ban Marked the Consummation of the Service's Decision-Making Process, Qualifies as a Binding Norm, and Creates New Obligations on Applicants**

The Service's importation ban decision was the product of final findings, made by two separate divisions of the Service, that immediately harmed applicants for importation permits. DA____, SAC, ¶58. On February 21, 2014, the Scientific Authority of the Service finalized their decision not to issue a non-detriment finding for elephant trophy importation from Tanzania, and on March 27, 2014, the Management Authority of the Service finalized their finding that the importation of sport-hunting trophies from Tanzania was not likely to enhance the survival of the species. *Id.; supra.* Section IV.B. Positive findings of these types had served as the basis of the Service's two decades-long practice of consistently approving the importation of sport-hunted elephants harvested in Tanzania.

Based on two new negative findings, the Service "suspended" the importation of elephants from Tanzania. The decision was the culmination of their decision-making, which effectively reversed over 20 years of a consistent approach to elephant importation.

The mere fact that the Service could, at some point in the future, revise their two determinations about the importation of elephants from Tanzania – if and when they receive the information they have tasked hunters with producing – does not undermine the finality of the April 4, 2014 importation ban. Finality exists

even if the agency's decision is subject to future change. "[A]ll laws are subject to change . . . . The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." *Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1022 (D.C. Cir. 2000) (EPA guidance document concerning state permit programs under the Clean Air Act qualified as final agency action); *see also Sackett v. EPA,* ⎯⎯ U.S. ⎯⎯, 132 S.Ct. 1367, 1372 (2012) ("The mere possibility that an agency might reconsider ... does not suffice to make an otherwise final agency action nonfinal.").

In addition, the importation ban qualifies as a "binding norm." From at least 1993 until April 3, 2014, the Service made positive enhancement of survival and non-detriment findings for elephants hunted in and imported from Tanzania. 60 Fed. Reg. 12969, 12969-70 (Mar. 9, 1995). For that reason, prior to April 4, 2014, a permit applicant could rely on the information already within the Service's possession for the enhancement of survival and non-detriment determinations that are prerequisites to the issuance of import permits. To satisfy these two aspects of the permit process between 1993 and April 3, 2014, the individual permit applicant did not have to submit additional information to overcome pre-existing negative findings.

On April 4, 2014, everything changed. In making the April 4, 2014 determination, the Service, for the first time in over two decades, decided that the

information they had within their possession did not fulfill their unspecified criteria for enhancement of survival and non-detriment findings. As of April 4, 2014, the Service shifted the obligation to produce this information to each individual permit applicant. Now the individual hunter/importer must himself or herself overcome established negative findings and supply – as discussed below – very specific information that is not currently obtainable by individual hunters from the United States.

Courts have held that action imposing such an obligation on the applicant, and the related cost of compliance, is sufficiently final to create standing to challenge the action. For example, this Court found a party had standing and its claims were ripe because the agency directed that the party could no longer use certain third party human studies in evaluating the safety of pesticides. *CropLife Am. v. EPA*, 329 F.3d 876, 883-84 (D.C. Cir. 2003) ("The disputed directive concretely injures petitioners, because it unambiguously precludes the agency's consideration of all third-party human studies, *i.e.,* studies that petitioners previously have been permitted to use to verify the safety of their products."). The party's inability to rely on these studies immediately increased its regulatory burden and was subject to review by the Court, even though the applicant might be able to get approval for its pesticides using other studies.

The actions challenged here are similarly final because they immediately and concretely caused injury to applicants, who now shoulder the new responsibility to prove that the harvest of an elephant enhances the survival of the species and the subsequent importation is not detrimental to the species. Because of the Service's negative findings, the applicant could only satisfy this burden by generating and providing information that the Service itself did not have.

By setting a new standard for the amount and type of information that hunters/importers must submit for the purpose of obtaining permits, the Service has established a new binding norm. The Service has made clear that, without such additional information, they will not issue importation permits. It matters not that the Service refuses to acknowledge the binding nature of their decision.

> [W]e have also recognized that an agency's other pronouncements can, as a practical matter, have a binding effect . . . . If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes "binding."

*Appalachian Power Co.,* 208 F.3d at 1021 (citations omitted). Applicants for importation permits and federal personnel responsible for issuing importation permits may not disregard the April 4, 2014 decision in their conduct regarding the importation of elephants from Tanzania. The Service's decision – that no

elephants will be imported until additional information (of a very specific nature) is submitted – binds all interested persons.

Final agency action on importation of elephants from Tanzania is not contingent on the denial of individual permit applications. The existence of an administrative permit process does not dictate when final decision-making occurs. Decisions that govern how that process will be applied also qualify as final agency action. The Service has already established the standards they will apply to all permit applications.

This Court has looked to the impact of the governmental action on the party to determine finality for purposes of judicial review, even if further action was to occur. For example, in a case involving the disposition of a closed military base, the Court held that:

> the Government's action in this case would be final and reviewable even if the ultimate disposition of Fort Ritchie remained an open question since, according to the Government, potential public benefit conveyees such as [plaintiff] Role Models had only until August 9, 1996, the deadline set in the May 10 newspaper notices, to apply for a conveyance. Role Models' disqualification from seeking a public benefit conveyance after that date constitutes "deni[al] [of] a right" for purposes of APA review.

*Role Models Am., Inc. v. White*, 317 F.3d 327, 332 (D.C. Cir. 2003). The Court further explained that for finality "the question is whether the agency has 'impose[d] an obligation, denie[d] a right, or fixe[d] some legal relationship....'" *Id.* at 331-32, *quoting Meredith v. Fed. Mine Safety and Health Review Comm'n,*

177 F.3d 1042, 1047 (D.C. Cir. 1999) (internal quotation marks and citation omitted); *see also Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 745 F.3d 1219, 1222 (D.C. Cir. 2014), *quoting Role Models Am., Inc.*, 317 F.3d at 331 (a challenged agency action "need not be the last administrative action contemplated by the statutory scheme" to qualify as "final" for the purpose of judicial review).

The Tanzania importation ban is agency action that determines rights and legally obligates applicants to provide information that they did not need to provide prior to April 4, 2014. The U.S. Supreme Court has not adopted the rigid approach to finality that the district court applied. Instead, the Supreme Court has directed the judiciary to address the finality requirement in a "flexible" and "pragmatic" way. *Abbott Labs. v. Gardner,* 387 U.S. 136, 149-50 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 106-07 (1977); *see also Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435-36 (D.C. Cir. 1986). The *Abbott Labs* Court looked to whether the agency's action was "definitive" and whether it imposed a "direct effect on the day-to-day business" of those who challenged the action. 387 U.S. at 151-52.

The practical "day-to-day" effect of the Tanzania importation ban was to increase the burden on those who seek to hunt in Tanzania and import their legally harvested elephants. Since April 4, 2014, hunters/importers bear a new

informational burden to persuade the Service to make the findings the government has already decided it cannot.

For all these reasons, the importation ban is sufficiently final for the purpose of this Court's review and the district court erred in holding otherwise.

> **2. The Tanzania Ban Is Having a Direct Effect on the Day-to-Day Businesses of SCI/NRA Members Who Do Not Want or Require Permits**

In asserting that finality is contingent on the completion of the permit application process, the district court ignored the binding impact the importation ban is having on SCI/NRA members with professional hunting operations in Tanzania. DA___, SAC, ¶¶15-16, 24; *supra.* at Section IV.C. The consequences to these professional hunters' interests arise not from an inability to import elephants, but instead from the Service's efforts to persuade U.S. hunters to cancel their Tanzania elephant hunts. These SCI/NRA members are suffering due to cancellations, decreased bookings, loss of revenue and reduced ability to engage in anti-poaching and other elephant conservation measures. The importation ban decision was directed at these professional hunters, as it was the Service's intent to persuade hunters to cancel the hunts they had booked with these outfitters and guides. *See supra.,* Section IV.B (describing Service's encouragement to hunters to cancel Tanzania elephant hunts).

As the cancellations and a decrease in the number of hunters travelling to Tanzania for elephant hunting are the express purposes of the importation ban and because the Service publicly encouraged cancellations, the importation ban, and not the hunters' logical reactions to them, are the direct and immediate cause of harm to SCI/NRA members who run hunting operations in Tanzania. Resort to an administrative process would not be possible as they have no interest in obtaining import permits and could not appeal what they have not been denied.

### 3. The District Court Erred in Finding That Applying for a Permit Would Not Be Futile

Regardless of the number of applications submitted or the amount of information that SCI/NRA members might attempt to provide in support of any such applications, these efforts would not result in the issuance of importation permits for elephants sport-hunted in Tanzania. Evidence from the Administrative Record and from documents filed by Federal Appellees in the district court proceedings demonstrate that resort to the administrative process could never result in success. Under this circumstance, any failure to exhaust administrative remedies does not make the agency's actions non-final or otherwise bar the lawsuit. *See Cutler v. Hayes*, 818 F.2d 879, 891-92 (D.C. Cir. 1987) ("[T]he exhaustion requirement may be waived by the agency, or disregarded by the court, when application of the doctrine would be futile.").

The exhaustion doctrine is "an exercise of judicial discretion." *Found. on*

*Econ. Trends v. Heckler*, 756 F.2d 143, 156 (D.C. Cir. 1985) (Court excused

plaintiffs from exhausting administrative remedies based on finding that plaintiffs'

concern about environmental review of deliberate release of genetically engineered

organisms was of "great public importance."), *citing Action for Children's*

*Television v. FCC,* 564 F.2d 458, 469 (D.C. Cir. 1977).  The Court may disregard

it in "'exceptional cases or particular circumstances * * * where injustice might

otherwise result,'"  *Id.*, *quoting Hormel v. Helvering,* 312 U.S. 552, 557 (1941).

To require SCI/NRA and their members to go through the motions of attempting to

exhaust those administrative remedies, where such exercise would be futile, would

be an injustice this Court can prevent by reversing the district court's ruling and

directing the lower court to find that SCI/NRA have stated a claim upon which

relief may be granted.

> **a.      Hunters Who Apply For Permits in the Manner That They Did Prior to April 4, 2014 Will Not Receive a Permit**

Prior to April 4, 2014, hunters wishing to import an elephant into the U.S.

from Tanzania could rely on the most recent, and positive, enhancement finding

made by the Service on May 6, 1997 that the importation of legally hunted

elephants in Tanzania would enhance the survival of the species.[9]  DA_____, App.

---

[9] In previous sections of this brief, SCI/NRA refer to positive enhancement findings made by the Service since 1993.  Although the Service has consistently found, since at least 1993, that the importation of elephants from Tanzania enhances the

at 279, Declaration of Timothy Van Norman, Exhibit 1 to Dkt. 11-1, May 13, 2014, at ¶11.[10]

Anyone who wishes to import an elephant into the United States from Tanzania must apply for a permit using Service Form 3-200-19.[11] The form requires the applicant to provide information to demonstrate why the hunting and importation of the elephant would enhance the survival of the species. The form states:

> Please be aware that the U.S. Fish and Wildlife Service may need to make a finding that your activities will enhance or benefit wild populations of the species involved. If you have any information that

---

survival of the species, the Service published the most recent enhancement finding in 1997. Prior to 1997, a permit applicant would have likewise relied upon the enhancement finding most recently made prior to submission of the application.

[10] In support of this appeal, SCI/NRA have relied on documents from the Administrative Record applicable to the FWS's Tanzania importation ban decision, despite the fact that this is an appeal of a district court ruling on a motion to dismiss. The district court made its determination as to whether SCI/NRA stated a claim upon which relief could be granted, by considering documents, outside of the pleadings, that Federal Appellees submitted in support of their motion. DA____. SCI/NRA responded in kind by supporting their defense of their claims with documents beyond the pleading themselves. If this Court makes a determination that it cannot consider these supplementary materials, SCI/NRA request that this Court direct the district court to allow SCI/NRA to amend their complaint to restate or supplement their futility (or any other necessary) arguments regarding the Tanzania claims. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). A "district court's dismissal of a complaint without leave to amend is reviewed de novo and is improper unless it is clear that the complaint could not be saved by any amendment." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005) (reversing district court's dismissal of plaintiff's claims without providing leave to amend).

[11] http://www.fws.gov/forms/3-200-19.pdf (last visited January 25, 2016).

> could support this finding . . . please submit such information on a
> separate page with your application."

All hunters seeking to import an elephant from Tanzania during the period between

May 6, 1997 and April 3, 2014, could fulfill that information request simply by

referring to the existence of the enhancement finding that the Service made for

elephants from Tanzania on May 6, 1997. This all changed on April 4, 2014.

From that date going forward, a hunter/importer could not submit the same type of

permit application that had been sufficient for the previous 17 years. When the

Service reversed its position on whether the hunting and importation of elephants

from Tanzania enhanced the survival of the species, hunters/importers could no

longer rely on the Service's finding to satisfy this requirement. Had he or she done

so, their application would have been denied.

Similarly, prior to April 4, 2014, a hunter/importer needed only to refer to

that year's positive non-detriment finding in order to satisfy the CITES

requirement for importation of elephants from Tanzania. The Service makes these

findings on an annual basis and, since at least 1993, had found no detriment would

occur to the species by allowing importation of sport-hunted elephants from

Tanzania. 60 Fed. Reg. 12969, 12969-70 (Mar. 9, 1995).

Prior to April 4, 2014, the Service last provided a non-detriment finding for

Tanzania on February 26, 2013. *See supra.* Section IV.C.1 (discussing 2013

Tanzania Non-detriment Finding). In that finding, the Service determined that the

importation of sport-hunted elephants from Tanzania **would** be for purposes not

detrimental to the survival of the species.  The Service intended the finding to

apply to all legally hunted elephants imported from Tanzania that met three

criteria:

> 1. The article(s) being imported must be from a sport-hunted trophy
> that the applicant hunted him/herself during calendar year 2013 (i.e.,
> January 1, 2013, through December 31, 2013);
> 2. Import is for personal use or display (not for commercial purposes);
> 3. An appropriate amount of time has elapsed since the hunting of the
> trophy to allow for drying, curing, processing, and/or
> working/manufacturing of the article(s).

2013 Tanzania Non-detriment Finding, DA____, App. at 341.  As long as the

hunter/importer could demonstrate fulfillment of those three criteria, the

hunter/importer had no obligation to produce additional information to demonstrate

non-detriment.

On April 4, 2014, the Service announced the 2014 Tanzania Non-detriment

Finding.  Although the purpose for which hunters would be importing the

elephants had not changed, the Service's finding did change.  For the first time in

at least 21 years, the Service decided that they were:

> unable to determine that the importation of sport-hunted trophies of
> African elephants taken in Tanzania during calendar year 2014 will be
> for purposes that are not detrimental to the survival of the species.

DA____, AR159.  As with the proof of the enhancement of survival criteria,

hunters/importers could no longer rely on the Service's long-standing consistent

country-wide determinations for Tanzania that the importation would fulfill non-detriment purpose prerequisites.

For the first time in over two decades, the Service imposed more burdensome requirements on those who wished to import an elephant from Tanzania. The 2014 Non-detriment Finding explained:

> If permit applications are received that include **new or additional information** showing that elephant management practices by the Government of Tanzania have led to the sustainability of its elephant population on a nation-wide basis, these applications should be referred to the Division of Scientific Authority for consideration on a case-by-case basis.

*Id*. (emphasis added). Similarly, the Service published a press release on its website regarding their 2014 elephant importation actions. The Service stated:

> Given the current situation on the ground in both Tanzania and Zimbabwe, the Service is unable to make positive findings required under the Convention on International Trade in Endangered Species of Fauna and Flora (CITES) and the Endangered Species Act to al1ow import of elephant trophies from these countries. . . . The Service will reevaluate this suspension for calendar year 2015 or **upon receipt of new information** that demonstrates an improved situation for elephants in these countries.

DA\_\_\_, App. at 58-59, "Service Suspends Import of Elephant Trophies from Tanzania and Zimbabwe" (April 4, 2014) (emphasis added).

As a result of these new informational requirements, hunters/importers who submitted applications that would have resulted in an import permit from 1993-2013, would have been denied a permit based upon the exact same applications

from April 4, 2014 forward.  The Service acknowledged the futility of this exercise

in the declaration submitted by Timothy Van Norman:

> At the time the March 27, 2014, Enhancement Finding was made for
> Tanzania, my office had received three applications from U.S. hunters
> requesting authorization to import a sport-hunted elephant trophy
> from Tanzania that was planned to be hunted in 2014.  On April 21,
> 2014, a fourth application to import an elephant trophy from Tanzania
> that was planned to be hunted in 2014 was received by my office. . . .
>
> None of these applicants provided any additional information or any
> information that my office or DSA had not already considered.
> Therefore, based on the finding produced by DSA and the
> Enhancement Finding made by my office, we denied two of the
> applications on April 4, 2014, and one on May 7, 2014.  The fourth
> application was denied on May 12, 2014.

DA____, App. at 279,  ¶¶14, 15.  Mr. Van Norman's declaration demonstrates how

the Service was operating under a foregone conclusion that it would not grant any

permit applications for importation of Tanzanian elephants.  The Service's

"Targeted Communications Strategy on the Suspension of Import of Elephant

Hunting Trophies Taken in Tanzania and Zimbabwe in 2014" concisely stated their

implacable decision:

> Since import permits are required to import a sport-hunted elephant
> trophy from Tanzania, if an import permit application for an elephant
> trophy taken in 2014 is received, the application will be denied.

DA____, AR186.

Since the Service intended to deny permit applications that would have met

Service standards for the preceding 21 years, any hunter/importer who attempted to

comply with the administrative process associated with the submission of such permits would have failed, and so resort to the permit appeal process also would have been futile.

> **b.** **Exhaustion of Remedies Also Was Futile Because Hunters/Importers Could Not Overcome the New Informational Hurdles Imposed by the Service**

The Service not only established a new condition for overcoming the administrative hurdles that already existed for SCI/NRA members wishing to import a sport-hunted elephant from Tanzania – it established an unobtainable condition. The Service's newly imposed obligation for hunters/importers further confirms the futility of engaging in the permit process. The Service conditioned the possibility of their granting permit applications on the applicants' ability to provide very particular information that was unobtainable in 2014 and remains out of reach. According to the Service, the situation that would give rise to such information will not exist until Tanzania modifies its elephant management practices and until population surveys reveal specific results.

The impossibility of the burden the Service placed on hunters/importers was revealed in an April 4, 2014 letter sent by Bryan Arroyo, Assistant Director of the U.S. Fish and Wildlife Service for International Affairs, to Tanzania's Minister of Natural Resources and Tourism. In that letter, Mr. Arroyo expressed the Service's

grave concern about the escalation of elephant poaching throughout Tanzania.

Assistant Director Arroyo issued an ultimatum to Tanzania's wildlife authority:

> In order to allow elephant trophies to be imported in the future, documented total offtake from the elephant population (i.e., all sources of elephant deaths, including poaching, sport-hunting, problem animal control, and natural mortality) would need to be below the elephant's annual population growth rate, ***requiring the poaching rate to be significantly reduced.***

DA_____, App. at 375-76 (emphasis added). Mr. Arroyo's letter revealed that Federal Appellants did not simply seek additional information from permit applicants, but instead intended to require Tanzania to modify its management approach to reduce the number of elephants poached. The Service included the same message in the Talking Points drafted for Director Dan Ashe to make during his calls to the leaders of hunting and conservation organizations, including Safari Club International:

> For elephant imports from Tanzania, which require CITES and ESA findings, we will need to see that the total offtake from the elephant population (i.e., all sources of elephant deaths, including poaching, sport-hunting, problem animal control, and natural mortality) is below the elephant's annual population growth rate. In order for this to happen, the poaching rate must be significantly reduced, and we need to see results that will show this.

DA___, AR192. Because the information required by the Service for the approval of permit applications do not exist, it would be impossible for a hunter/importer to provide the information about such conditions as part of his or her permit application. Individuals who successfully harvest elephants in Tanzania will not

be able to provide the information demanded by the Service until Tanzania satisfies the Service's requirements concerning elephant management and poaching reduction. His or her application for a permit will fail and any appeal of such process will also fail.

The obligation to exhaust administrative process should be excused when the agency whose process is at issue makes it impossible for the applicant to meet the administrative requirements. "[I]t is axiomatic that one need not exhaust administrative remedies that would be futile or impossible to exhaust." *Singh v. Ashcroft*, 362 F.3d 1164, 1169 (9th Cir. 2004) (applicant for asylum not obligated to file a brief clarifying testimony that the Immigration Judge deemed inconsistent because applicant did not have access to the transcript of the testimony).

Federal Appellees have demonstrated an undeniably firm position that any individual who submits an application that once would have fulfilled Service requirements will no longer meet with success. In addition, the new burdens that the Service has imposed require permit applicants to provide information that cannot be obtained. For these reasons, any individual who attempts to obtain a permit either by meeting the previous or present requirements will fail and any attempt to exhaust administrative remedies would be a wasted, useless exercise.

### 4.     The Exhaustion Requirement Does Not Apply

The exhaustion requirement does not even apply to the circumstances of this case because SCI/NRA's legal claims would not be implicated by the permit application process.  For scenarios such as this, the D.C. Circuit has acknowledged the exhaustion of remedies requirement can be excused.

> Despite the general rule that exhaustion of administrative remedies is a predicate to judicial review, courts have developed exceptions to the exhaustion requirement in circumstances where "the reasons supporting the doctrine are found inapplicable."

*Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 104 (D.C. Cir. 1986), *quoting Comm. for GI Rights v. Callaway*, 518 F.2d 466, 474 (D.C. Cir. 1975).

The process of exhausting administrative remedies applies to cases where the administrative exercise will reveal facts essential to the court's eventual deliberation.  The *Randolph-Sheppard* Court explained that exhaustion was intended to promote "[e]ffective and efficient judicial review by ensuring that such review is of a fully developed factual record, and undertaken with the benefit of the agency's exercise of discretion or application of expertise."  *Id*., at 105 (citations omitted).  A factual record for the circumstances behind the proposed importation of a specific elephant, taken by an individual hunter/importer, is not the focus of this case.  SCI/NRA's challenge to the Tanzania importation ban has nothing to do with the facts surrounding the individual circumstances of any particular permit for

41

the importation of an elephant from Tanzania. SCI/NRA's lawsuit challenges the broader standards and processes that the Service adopted for use in evaluating all applications for the importation of elephants from Tanzania. DA____, SAC, ¶135-40.

Consequently, if individual hunters/importers submit their own import permit applications, the Service will consider these applications using incorrect and illegal standards. Whether or not SCI/NRA members include "new or additional information" with their permit applications as required, since April 4, 2014, by the Service, the standards the Service relies on to impose the burden on the applicant to produce such information, will continue to be the same illegal standards. *See Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell*, 77 F. Supp. 3d 103, 112 (D.D.C. 2015) ("And, nothing indicates that administrative appeals might result in the agency overturning its regulation.").

In this matter, the district court erred by failing to recognize that resort to the administrative process associated with permit applications would not redress the injuries that SCI/NRA asserted when they filed this challenge and continue to assert in this appeal. Until such time as this Court or the district court below requires the Service to rectify the illegal characteristics of the standards it uses to assess permit applications for importation of elephants from Tanzania, the exhaustion of remedies requirement remains irrelevant to the challenges made in

this case. For all these reasons, this Court should not require SCI/NRA to exhaust any administrative process as a prerequisite to pursuing their challenges to the Service's ban on the importation of elephants from Tanzania.

## C.    SCI/NRA Have Standing to Bring Their Claims.

For many of the same reasons as discussed above, SCI/NRA have standing. Even though the district court did not decide whether it lacked subject matter jurisdiction (DA____, Mem. Opinion at 16 n.5), SCI/NRA address it here. Standing requires demonstration of injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). SCI/NRA's standing is based on (1) the new regulatory burdens placed on anyone wishing to apply for an importation permit for elephants sport-hunted in Tanzania, and (2) the purposeful (and successful) attempt to encourage U.S. hunters to cancel elephant hunts in Tanzania by banning importation, which harmed outfitters and guides.

As discussed above in regard to finality, this Court found that a party had standing and asserted ripe claims because the agency issued a directive that forbid the party from relying on certain third party human studies in evaluating the safety of pesticides in approval proceedings. *CropLife Am.*, 329 F.3d at 883-84. Other courts have found standing based on an increase in the regulatory burden and cost caused by agency action. In one case, the agency argued that "none of the permit applications subject to the process has been denied by the Corps or vetoed by

EPA." *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 47 (D.D.C. 2011). The plaintiff, on the other hand, asserted that "being subject to this additional, illegal process is itself sufficient injury for standing purposes." *Id.* Based on plaintiff's allegation of an "additional, illegal process," "[t]he Court can and does conclude that at this stage of the proceedings the plaintiff's allegations are sufficient to establish that it has standing to maintain this suit." *Id.* at 47-48; *see also id.* at 44 ("As shown in *Appalachian Power,* a reworking of the permitting process gives rise to legal consequences for companies that must obtain those permits to operate. 208 F.3d at 1023."); *McGuire v. Strange,* 83 F. Supp. 3d 1231, 1244 (M.D. Ala. 2015) (risk that plaintiff "may lose his homeless or indigent status and thus be required to pay the fee is substantial enough to confer standing to challenge the registration-fee requirement.").

Cases from this Circuit concerning the demonstration of standing for purposes of intervening as a defendant support standing here. In one case, the district court found "that the proposed intervenors' claims regarding the costs, delays and uncertainties associated with the denial of intervention satisfy the [intervention standing] standard articulated by this Circuit." *Friends of Animals v. Kempthorne*, 452 F. Supp. 2d 64, 70 (D.D.C. 2006) (SCI had standing to intervene as defendant to protect rule that excused its members from onerous regulatory burdens and permitting associated with raising, breeding, and handling three ESA-

listed antelope species). In another case, the court found intervenor standing where setting aside the agency action would impact the intervenor's interest in even bidding on and securing leases to extract coal. *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 15 (D.D.C. 2010) ("an adverse decision in this action would, at a bare minimum, prevent [defendant-intervenor] Antelope from bidding on, securing, and developing the West Antelope II tracts in the foreseeable future.").

Similarly, the importation ban decisions harm hunters who had to make the difficult decision whether to hunt at all. *See supra.* Section IV.C (discussing decisions made by individual hunters who are SCI/NRA members). The new regulatory burdens and the certainty that the Service would deny importation permits unless applicants generated information the Service itself could not generate discouraged hunters from pursuing their long-planned elephant hunts. Many gave up their hunts. *See In re Polar Bear Endangered Species Act Listing and 4(d) R. Litig.*, 627 F. Supp. 2d 16, 26 (D.D.C. 2009) (finding standing where "the Final Rule makes clear that the only possible response an individual applying for a permit to import a sport-hunted polar bear trophy can reasonably expect to receive is a denial of his or her application.").

As also explained above, the importation ban decisions injures those who have no reason to apply for a permit, including guides, outfitters and professional hunters, all of whom are SCI/NRA members. As intended by the Service, many

hunters cancelled (and will continue to cancel or not book) elephant hunts in Tanzania because of the importation ban. This harms and will continue to harm these SCI/NRA members in the form of lost revenue and business opportunities. These cancellations also undermine these SCI/NRA members' ability to contribute to elephant conservation and anti-poaching efforts, both in terms of monetary contributions and on-the-ground anti-poaching activities.

Setting aside the 2014 importation ban decisions will redress these injuries because the Service has committed the same legal errors in subsequent Tanzania importation bans. The Service would have to withdraw these decisions in light of any court order declaring their actions illegal, which would result in a reversion back to the positive importation findings in place prior to April 4, 2014.[12]

## VII.  CONCLUSION

SCI/NRA have demonstrated that the district court erroneously found that the agency actions challenged here were not final and that SCI/NRA failed to

---

[12] If the Court determines that these claims are moot, the Court should nonetheless review them as they are capable of repetition but will continue to evade review. The Service is making these findings on an annual basis, leaving insufficient time for effective judicial review before the next finding (as arguably occurred here). The new findings contain the same legal flaws as the 2014 findings. Thus, invalidating the 2014 findings would result in an effective reversal of subsequent findings and afford injured parties the opportunity to import sport-hunted elephants from Tanzania and provide outfitting services to those hunters. At the very least, the Court should remand the case to the district court with directions to allow SCI/NRA amend their complaint to add claims challenging the 2015 and upcoming 2016 importation decisions.

exhaust their administrative remedies. The district court also wrongly concluded that resort to the administrative process was required and would not be futile. For these reasons, the Court should reverse the district court's dismissal of SCI/NRA's Tanzania claims and remand to the district court for adjudication on the merits.

Dated: January 29, 2016

Respectfully submitted,

/s/Anna M. Seidman
Anna M. Seidman
Douglas Burdin
Jeremy E. Clare
501 Second Street NE
Washington, D.C.
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org

*Counsel for Plaintiff/Appellant*
*Safari Club International*

/s/ Christopher A. Conte
Christopher A. Conte
Michael T. Jean
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
Facsimile: (703) 267-1164
cconte@nrahq.org
mjean@nrahq.org

*Counsel for Plaintiff/Appellant*
*National Rifle Association of America*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> [X] this brief contains 11,265 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or
>
> [ ] this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> [X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font, or
>
> [ ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

Dated: January 29, 2016

Respectfully submitted,

/s/Anna M. Seidman

*Counsel for Plaintiff/Appellant*
*Safari Club International*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 29th day of January 2016, a true and correct copy of the Opening Brief of Appellants Safari Club International and National Rifle Association of America was electronically filed through the CM/ECF system, which caused all parties to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

/s/ Anna M. Seidman
Anna M. Seidman

*Counsel for Plaintiff/Appellant*
*Safari Club International*

**ADDENDUM**

**TABLE OF CONTENTS**

5 U.S.C. § 701 ......................................................................ADD 1

5 U.S.C. § 702 ......................................................................ADD 2

5 U.S.C. § 703 ......................................................................ADD 2

5 U.S.C. § 704 ......................................................................ADD 3

5 U.S.C. § 705 ......................................................................ADD 3

5 U.S.C. § 706 ......................................................................ADD 4

16 U.S.C. § 1533 ..................................................................ADD 5

28 U.S.C. § 1291 ................................................................ADD 16

28 U.S.C. § 1331 ................................................................ADD 17

28 U.S.C. § 2201 ................................................................ADD 17

28 U.S.C. § 2202 ................................................................ADD 18

50 C.F.R. § 17.40 ...............................................................ADD 18

CITES, Article III ..............................................................ADD 21

CITES, Article IV ..............................................................ADD 23

CITES Res. Conf. 2.11 (Annex 1) .....................................ADD 25

CITES Res. Conf. 2.11 (Rev. 1) ........................................ADD 26

§ 701. Application; definitions

Effective: January 4, 2011

**(a)** This chapter applies, according to the provisions thereof, except to the extent that--

  **(1)** statutes preclude judicial review; or

  **(2)** agency action is committed to agency discretion by law.

**(b)** For the purpose of this chapter--

  **(1)** "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--

    **(A)** the Congress;

    **(B)** the courts of the United States;

    **(C)** the governments of the territories or possessions of the United States;

    **(D)** the government of the District of Columbia;

    **(E)** agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

    **(F)** courts martial and military commissions;

    **(G)** military authority exercised in the field in time of war or in occupied territory; or

    **(H)** functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix; and

  **(2)** "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 392; Pub.L. 103-272, § 5(a), July 5, 1994,

108 Stat. 1373; Pub.L. 111-350, § 5(a)(3), Jan. 4, 2011, 124 Stat. 3841.)

## 5 U.S.C.A. § 702

### § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 392; Pub.L. 94-574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

## 5 U.S.C.A. § 703

### § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 392; Pub.L. 94-574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

## 5 U.S.C.A. § 704

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 392.)

## 5 U.S.C.A. § 705

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.

5 U.S.C.A. § 706

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

   **(1)** compel agency action unlawfully withheld or unreasonably delayed; and

   **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

   **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

   **(B)** contrary to constitutional right, power, privilege, or immunity;

   **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

   **(D)** without observance of procedure required by law;

   **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

   **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

§ 1533. Determination of endangered species and threatened species
Effective: November 24, 2003

(a) Generally

**(1)** The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any of the following factors:

  **(A)** the present or threatened destruction, modification, or curtailment of its habitat or range;

  **(B)** overutilization for commercial, recreational, scientific, or educational purposes;

  **(C)** disease or predation;

  **(D)** the inadequacy of existing regulatory mechanisms; or

  **(E)** other natural or manmade factors affecting its continued existence.

**(2)** With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970--

  **(A)** in any case in which the Secretary of Commerce determines that such species should--

    **(i)** be listed as an endangered species or a threatened species, or

    **(ii)** be changed in status from a threatened species to an endangered species,

    he shall so inform the Secretary of the Interior, who shall list such species in accordance with this section;

  **(B)** in any case in which the Secretary of Commerce determines that such species should--

    **(i)** be removed from any list published pursuant to subsection (c) of this section, or

**(ii)** be changed in status from an endangered species to a threatened species,

he shall recommend such action to the Secretary of the Interior, and the Secretary of the Interior, if he concurs in the recommendation, shall implement such action; and

**(C)** the Secretary of the Interior may not list or remove from any list any such species, and may not change the status of any such species which are listed, without a prior favorable determination made pursuant to this section by the Secretary of Commerce.

**(3)(A)** The Secretary, by regulation promulgated in accordance with subsection (b) of this section and to the maximum extent prudent and determinable--

**(i)** shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

**(ii)** may, from time-to-time thereafter as appropriate, revise such designation.

**(B)(i)** The Secretary shall not designate as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan prepared under section 670a of this title, if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation.

**(ii)** Nothing in this paragraph affects the requirement to consult under section 1536(a)(2) of this title with respect to an agency action (as that term is defined in that section).

**(iii)** Nothing in this paragraph affects the obligation of the Department of Defense to comply with section 1538 of this title, including the prohibition preventing extinction and taking of endangered species and threatened species.

(b) Basis for determinations

**(1)(A)** The Secretary shall make determinations required by subsection (a) (1) of this section solely on the basis of the best scientific and commercial data available

to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

**(B)** In carrying out this section, the Secretary shall give consideration to species which have been--

    **(i)** designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or

    **(ii)** identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

**(2)** The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a) (3) of this section on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

**(3)(A)** To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of Title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c) of this section, the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

**(B)** Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings:

**(i)** The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.

**(ii)** The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).

**(iii)** The petitioned action is warranted, but that--

**(I)** the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

**(II)** expeditious progress is being made to add qualified species to either of the lists published under subsection (c) of this section and to remove from such lists species for which the protections of this chapter are no longer necessary,

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

**(C)(i)** A petition with respect to which a finding is made under subparagraph (B)(iii) shall be treated as a petition that is resubmitted to the Secretary under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

**(ii)** Any negative finding described in subparagraph (A) and any finding described in subparagraph (B) (i) or (iii) shall be subject to judicial review.

**(iii)** The Secretary shall implement a system to monitor effectively the status of all species with respect to which a finding is made under subparagraph (B)(iii) and shall make prompt use of the authority under paragraph 7[1] to prevent a significant risk to the well being of any such species.

**(D)(i)** To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of Title 5, to revise a critical habitat designation, the Secretary shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be

warranted. The Secretary shall promptly publish such finding in the Federal Register.

**(ii)** Within 12 months after receiving a petition that is found under clause (i) to present substantial information indicating that the requested revision may be warranted, the Secretary shall determine how he intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register.

**(4)** Except as provided in paragraphs (5) and (6) of this subsection, the provisions of section 553 of Title 5 (relating to rulemaking procedures), shall apply to any regulation promulgated to carry out the purposes of this chapter.

**(5)** With respect to any regulation proposed by the Secretary to implement a determination, designation, or revision referred to in subsection (a)(1) or (3) of this section, the Secretary shall--

  **(A)** not less than 90 days before the effective date of the regulation--

    **(i)** publish a general notice and the complete text of the proposed regulation in the Federal Register, and

    **(ii)** give actual notice of the proposed regulation (including the complete text of the regulation) to the State agency in each State in which the species is believed to occur, and to each county or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction, thereon;

  **(B)** insofar as practical, and in cooperation with the Secretary of State, give notice of the proposed regulation to each foreign nation in which the species is believed to occur or whose citizens harvest the species on the high seas, and invite the comment of such nation thereon;

  **(C)** give notice of the proposed regulation to such professional scientific organizations as he deems appropriate;

  **(D)** publish a summary of the proposed regulation in a newspaper of general circulation in each area of the United States in which the species is believed to occur; and

**(E)** promptly hold one public hearing on the proposed regulation if any person files a request for such a hearing within 45 days after the date of publication of general notice.

**(6)(A)** Within the one-year period beginning on the date on which general notice is published in accordance with paragraph (5)(A)(i) regarding a proposed regulation, the Secretary shall publish in the Federal Register--

  **(i)** if a determination as to whether a species is an endangered species or a threatened species, or a revision of critical habitat, is involved, either--

    **(I)** a final regulation to implement such determination,

    **(II)** a final regulation to implement such revision or a finding that such revision should not be made,

    **(III)** notice that such one-year period is being extended under subparagraph (B) (i), or

    **(IV)** notice that the proposed regulation is being withdrawn under subparagraph (B) (ii), together with the finding on which such withdrawal is based; or

  **(ii)** subject to subparagraph (C), if a designation of critical habitat is involved, either--

    **(I)** a final regulation to implement such designation, or

    **(II)** notice that such one-year period is being extended under such subparagraph.

**(B)(i)** If the Secretary finds with respect to a proposed regulation referred to in subparagraph (A)(i) that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned, the Secretary may extend the one-year period specified in subparagraph (A) for not more than six months for purposes of soliciting additional data.

**(ii)** If a proposed regulation referred to in subparagraph (A)(i) is not promulgated as a final regulation within such one-year period (or longer period if extension under clause (i) applies) because the Secretary finds that there is not sufficient evidence to justify the action proposed by the regulation, the Secretary shall

immediately withdraw the regulation. The finding on which a withdrawal is based shall be subject to judicial review. The Secretary may not propose a regulation that has previously been withdrawn under this clause unless he determines that sufficient new information is available to warrant such proposal.

**(iii)** If the one-year period specified in subparagraph (A) is extended under clause (i) with respect to a proposed regulation, then before the close of such extended period the Secretary shall publish in the Federal Register either a final regulation to implement the determination or revision concerned, a finding that the revision should not be made, or a notice of withdrawal of the regulation under clause (ii), together with the finding on which the withdrawal is based.

**(C)** A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened, unless the Secretary deems that--

**(i)** it is essential to the conservation of such species that the regulation implementing such determination be promptly published; or

**(ii)** critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

**(7)** Neither paragraph (4), (5), or (6) of this subsection nor section 553 of Title 5 shall apply to any regulation issued by the Secretary in regard to any emergency posing a significant risk to the well-being of any species of fish or wildlife or plants, but only if--

**(A)** at the time of publication of the regulation in the Federal Register the Secretary publishes therein detailed reasons why such regulation is necessary; and

**(B)** in the case such regulation applies to resident species of fish or wildlife, or plants, the Secretary gives actual notice of such regulation to the State agency in each State in which such species is believed to occur.

Such regulation shall, at the discretion of the Secretary, take effect immediately upon the publication of the regulation in the Federal Register. Any regulation promulgated under the authority of this paragraph shall cease to have force and effect at the close of the 240-day period following the date of publication unless, during such 240-day period, the rulemaking procedures which would apply to such regulation without regard to this paragraph are complied with. If at any time after issuing an emergency regulation the Secretary determines, on the basis of the best appropriate data available to him, that substantial evidence does not exist to warrant such regulation, he shall withdraw it.

**(8)** The publication in the Federal Register of any proposed or final regulation which is necessary or appropriate to carry out the purposes of this chapter shall include a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulation; and if such regulation designates or revises critical habitat, such summary shall, to the maximum extent practicable, also include a brief description and evaluation of those activities (whether public or private) which, in the opinion of the Secretary, if undertaken may adversely modify such habitat, or may be affected by such designation.

(c) Lists

**(1)** The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b) of this section.

**(2)** The Secretary shall--

   **(A)** conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

   **(B)** determine on the basis of such review whether any such species should--

**(i)** be removed from such list;

**(ii)** be changed in status from an endangered species to a threatened species; or

**(iii)** be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b) of this section.

(d) Protective regulations

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

(e) Similarity of appearance cases

The Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species even though it is not listed pursuant to this section if he finds that--

**(A)** such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

**(B)** the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

**(C)** such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this chapter.

(f) Recovery plans

**(1)** The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable--

**(A)** give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

**(B)** incorporate in each plan--

**(i)** a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

**(ii)** objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

**(iii)** estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

**(2)** The Secretary, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act.

**(3)** The Secretary shall report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and on the status of all species for which such plans have been developed.

**(4)** The Secretary shall, prior to final approval of a new or revised recovery plan,

provide public notice and an opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan.

**(5)** Each Federal agency shall, prior to implementation of a new or revised recovery plan, consider all information presented during the public comment period under paragraph (4).

(g) Monitoring

**(1)** The Secretary shall implement a system in cooperation with the States to monitor effectively for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary and which, in accordance with the provisions of this section, have been removed from either of the lists published under subsection (c) of this section.

**(2)** The Secretary shall make prompt use of the authority under paragraph $7^1$ of subsection (b) of this section to prevent a significant risk to the well being of any such recovered species.

(h) Agency guidelines; publication in Federal Register; scope; proposals and amendments: notice and opportunity for comments

The Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively. Such guidelines shall include, but are not limited to--

**(1)** procedures for recording the receipt and the disposition of petitions submitted under subsection (b)(3) of this section;

**(2)** criteria for making the findings required under such subsection with respect to petitions;

**(3)** a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of this section; and

**(4)** a system for developing and implementing, on a priority basis, recovery plans under subsection (f) of this section.

The Secretary shall provide to the public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this subsection.

(i) Submission to State agency of justification for regulations inconsistent with State agency's comments or petition

If, in the case of any regulation proposed by the Secretary under the authority of this section, a State agency to which notice thereof was given in accordance with subsection (b)(5)(A)(ii) of this section files comments disagreeing with all or part of the proposed regulation, and the Secretary issues a final regulation which is in conflict with such comments, or if the Secretary fails to adopt a regulation pursuant to an action petitioned by a State agency under subsection (b)(3) of this section, the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments or petition.

(Pub.L. 93-205, § 4, Dec. 28, 1973, 87 Stat. 886; Pub.L. 94-359, § 1, July 12, 1976, 90 Stat. 911; Pub.L. 95-632, §§ 11, 13, Nov. 10, 1978, 92 Stat. 3764, 3766; Pub.L. 96-159, § 3, Dec. 28, 1979, 93 Stat. 1225; Pub.L. 97-304, § 2(a), Oct. 13, 1982, 96 Stat. 1411; Pub.L. 100-478, Title I, §§ 1002 to 1004, Oct. 7, 1988, 102 Stat. 2306; Pub.L. 108-136, Div. A, Title III, § 318, Nov. 24, 2003, 117 Stat. 1433.)


28 U.S.C.A. § 1291
§ 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.


**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 929; Oct. 31, 1951, c. 655, § 48, 65 Stat. 726; July 7, 1958, Pub.L. 85-508, § 12(e), 72 Stat. 348; Apr. 2, 1982, Pub.L. 97-164, Title I, § 124, 96 Stat. 36.)

28 U.S.C.A. § 1331
§ 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 930; July 25, 1958, Pub.L. 85-554, § 1, 72 Stat. 415; Oct. 21, 1976, Pub.L. 94-574, § 2, 90 Stat. 2721; Dec. 1, 1980, Pub.L. 96-486, § 2(a), 94 Stat. 2369.)

28 U.S.C.A. § 2201
§ 2201. Creation of remedy
Effective: March 23, 2010

**(a)** In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

**(b)** For limitations on actions brought with respect to drug patents see section 505 or 512 of the Federal Food, Drug, and Cosmetic Act, or section 351 of the Public Health Service Act.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 964; May 24, 1949, c. 139, § 111, 63 Stat. 105; Aug. 28, 1954, c. 1033, 68 Stat. 890; July 7, 1958, Pub.L. 85-508, § 12(p), 72 Stat. 349; Oct. 4, 1976, Pub.L. 94-455, Title XIII, § 1306(b)(8), 90 Stat. 1719; Nov. 6, 1978, Pub.L. 95-598, Title II, § 249, 92 Stat. 2672; Sept. 24, 1984, Pub.L. 98-417, Title I, § 106, 98 Stat. 1597; Sept. 28, 1988, Pub.L. 100-449, Title IV, § 402(c), 102 Stat. 1884; Nov. 16, 1988, Pub.L. 100-670, Title I, § 107(b), 102 Stat. 3984; Dec. 8, 1993, Pub.L. 103-182, Title IV, § 414(b), 107 Stat. 2147; Mar. 23, 2010, Pub.L. 111-148, Title VII, § 7002(c)(2), 124 Stat. 816.)

28 U.S.C.A. § 2202
§ 2202. Further relief

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 964.)

50 C.F.R. § 17.40
§ 17.40 Special rules—mammals.
Effective: September 14, 2015

…

(e) African elephant (Loxodonta africana)—

(1) Definitions. For the purposes of this paragraph (e):

(i) African elephant shall mean any member of the species Loxodonta africana, whether live or dead, and any part or product thereof.

(ii) Raw ivory means any African elephant tusk, and any piece thereof, the surface of which, polished or unpolished, is unaltered or minimally carved.

(iii) Worked ivory means any African elephant tusk, and any piece thereof,

which is not raw ivory.

(2) Prohibitions. Except as provided in the exceptions in paragraph (e)(3) of this section, it shall be unlawful for any person to:

(i) Import or export any African elephant,

(ii) Possess, sell or offer for sale, receive, deliver, transport ship, or export any African elephant which was illegally imported into the United States,

(iii) Sell or offer for sale any sport-hunted trophy imported into the United States in violation of permit conditions.

(3) Exceptions.

(i) African elephants, other than sport-hunted trophies and raw and worked ivory, may be imported or exported provided all permit requirements of 50 CFR parts 13 and 23 have been complied with.

(ii) Ivory.

(A) Raw or worked ivory (other than sport-hunted trophies) may be imported only if:

(1) it is a bona fide antique of greater than 100 years of age on the day of import, or

(2) It was exported from the United States after being registered with the U.S. Fish and Wildlife Service.

(B) Worked ivory may be exported in accordance with the permit requirements of 50 CFR parts 13 and 23.

(C) Raw ivory may not be exported from the United States for commercial purposes under any circumstances.

(iii) Sport-hunted trophies may be imported into the United States provided:

(A) The trophy originates in a country for which the Service has received notice of that country's African elephant ivory quota for the year of export;

(B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied with;

(C) A determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and

(D) The trophy is legibly marked in accordance with part 23 of this subchapter.

…

**Credits**

[40 FR 44415, Sept. 26, 1975, as amended at 40 FR 53400, Nov. 18, 1975; 41 FR 19226, May 11, 1976; 41 FR 45994, Oct. 19, 1976; 43 FR 9612, Mar. 9, 1978; 43 FR 20504, May 12, 1978; 46 FR 23938, Apr. 29, 1981; 47 FR 4211, Jan. 28, 1982; 47 FR 30787, July 15, 1982; 47 FR 31387, July 20, 1982; 48 FR 34761, Aug. 1, 1983, 48 FR 36265, Aug. 10, 1983; 49 FR 22334, May 29, 1984; 50 FR 35088, Aug. 29, 1985; 50 FR 50793, Dec. 12, 1985; 51 FR 33759, Sept. 23, 1986; 55 FR 9135, March 12, 1990; 56 FR 27443, June 14, 1991; 56 FR 40267, Aug. 14, 1991; 57 FR 594, Jan. 7, 1992; 57 FR 28024, June 23, 1992; 57 FR 35486, Aug. 10, 1992; 57 FR 37478, Aug. 19, 1992; 60 FR 12906, March 9, 1995; 65 FR 16085, March 24, 2000; 66 FR 28130, May 22, 2001; 67 FR 37721, May 30, 2002; 67 FR 61536, Oct. 1, 2002; 68 FR 15872, April 1, 2003; 68 FR 17428, April 9, 2003; 69 FR 29105, May 20, 2004; 70 FR 3493, Jan. 25, 2005; 70 FR 15781, March 29, 2005; 71 FR 46870, Aug. 15, 2006; 72 FR 6103, Feb. 8, 2007; 73 FR 28318, May 15, 2008; 73 FR 39838, July 10, 2008; 73 FR 75358, Dec. 11, 2008; 73 FR 76269, Dec. 16, 2008; 74 FR 15123, April 2, 2009; 74 FR 47486, Sept. 16, 2009; 75 FR 14497, March 26, 2010; 76 FR 47491, Aug. 5, 2011; 76 FR 81726, Dec. 28, 2011; 77 FR 4493, Jan. 30, 2012; 77 FR 46182, Aug. 2, 2012; 78 FR 11788, Feb. 20, 2013; 79 FR 19795, April 9, 2014; 79 FR 30418, May 27, 2014; 79 FR 60378, Oct. 7, 2014; 80 FR 9221, Feb. 20, 2015; 80 FR 18032, April 2, 2015; 80 FR 34524, June 16, 2015; 80 FR 80056, Dec. 23, 2015; 81 FR 1921, Jan. 14, 2016]

SOURCE: 40 FR 44415, Sept. 26, 1975; 52 FR 29780, Aug. 11, 1987; 54 FR 5938, Feb. 7, 1989; 54 FR 38946, Sept. 21, 1989; 55 FR 39416, Sept. 27, 1990; 77 FR 75297, Dec. 19, 2012, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1361–1407; 1531–1544; and 4201–4245, unless otherwise noted.

**Convention on International Trade in Endangered Species of Wild Fauna and Flora**

*Signed at Washington, D.C., on 3 March 1973*
*Amended at Bonn, on 22 June 1979*

The Contracting States,

*Recognizing* that wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems of the earth which must be protected for this and the generations to come;

*Conscious* of the ever-growing value of wild fauna and flora from aesthetic, scientific, cultural, recreational and economic points of view;

*Recognizing* that peoples and States are and should be the best protectors of their own wild fauna and flora;

*Recognizing*, in addition, that international co-operation is essential for the protection of certain species of wild fauna and flora against over-exploitation through international trade;

*Convinced* of the urgency of taking appropriate measures to this end; *Have agreed* as follows:

. . . .

*Article III*

**Regulation of Trade in Specimens of Species Included in Appendix I**

1. All trade in specimens of species included in Appendix I shall be in accordance with the provisions of this Article.

2. The export of any specimen of a species included in Appendix I shall require the prior grant and presentation of an export permit. An export permit shall only be granted when the following conditions have been met:

(a) a Scientific Authority of the State of export has advised that such export will not be detrimental to the survival of that species;

(b) a Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora;

(c) a Management Authority of the State of export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment; and

(d) a Management Authority of the State of export is satisfied that an import permit has been granted for the specimen.

3. The import of any specimen of a species included in Appendix I shall require the prior grant and presentation of an import permit and either an export permit or a re-export certificate. An import permit shall only be granted when the following conditions have been met:

(a) a Scientific Authority of the State of import has advised that the import will be for purposes which are not detrimental to the survival of the species involved;

(b) a Scientific Authority of the State of import is satisfied that the proposed recipient of a living specimen is suitably equipped to house and care for it; and

(c) a Management Authority of the State of import is satisfied that the specimen is not to be used for primarily commercial purposes.

4. The re-export of any specimen of a species included in Appendix I shall require the prior grant and presentation of a re-export certificate. A re-export certificate shall only be granted when the following conditions have been met:

(a) a Management Authority of the State of re-export is satisfied that the specimen was imported into that State in accordance with the provisions of the present Convention;

(b) a Management Authority of the State of re-export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment; and

(c) a Management Authority of the State of re-export is satisfied that an import permit has been granted for any living specimen.

5. The introduction from the sea of any specimen of a species included in Appendix I shall require the prior grant of a certificate from a Management Authority of the State of introduction. A certificate shall only be granted when the following conditions have been met:

(a) a Scientific Authority of the State of introduction advises that the introduction will not be detrimental to the survival of the species involved;

(b) a Management Authority of the State of introduction is satisfied that the proposed recipient of a living specimen is suitably equipped to house and care for it; and

(c) a Management Authority of the State of introduction is satisfied that the specimen is not to be used for primarily commercial purposes.

**Convention on International Trade in Endangered Species of Wild Fauna and Flora**

*Article IV*
**Regulation of Trade in Specimens of Species Included in Appendix II**
1. All trade in specimens of species included in Appendix II shall be in accordance with the provisions of this Article.
2. The export of any specimen of a species included in Appendix II shall require the prior grant and presentation of an export permit. An export permit shall only be granted when the following conditions have been met:

> (a) a Scientific Authority of the State of export has advised that such export will not be detrimental to the survival of that species;
> (b) a Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora; and
> (c) a Management Authority of the State of export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment.
> 3. A Scientific Authority in each Party shall monitor both the export permits granted by that State for specimens of species included in Appendix II and the actual exports of such specimens. Whenever a Scientific Authority determines that the export of specimens of any such species should be limited in order to maintain that species throughout its range at a level consistent with its role in the ecosystems in which it occurs and well above the level at which that species might become eligible for inclusion in Appendix I, the Scientific Authority shall advise the appropriate Management Authority of suitable measures to be taken to limit the grant of export permits for specimens of that species.
> 4. The import of any specimen of a species included in Appendix II shall require the prior presentation of either an export permit or a re-export certificate.
> 5. The re-export of any specimen of a species included in Appendix II shall require the prior grant and presentation of a re-export certificate. A re-export certificate shall only be granted when the following conditions have been met:
>
> (a) a Management Authority of the State of re-export is satisfied that the specimen was imported into that State in accordance with the

provisions of the present Convention; and

(b) a Management Authority of the State of re-export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment.

6. The introduction from the sea of any specimen of a species included in Appendix II shall require the prior grant of a certificate from a Management Authority of the State of introduction. A certificate shall only be granted when the following conditions have been met:

(a) a Scientific Authority of the State of introduction advises that the introduction will not be detrimental to the survival of the species involved; and

(b) a Management Authority of the State of introduction is satisfied that any living specimen will be so handled as to minimize the risk of injury, damage to health or cruel treatment.

7. Certificates referred to in paragraph 6 of this Article may be granted on the advice of a Scientific Authority, in consultation with other national scientific authorities or, when appropriate, international scientific authorities, in respect of periods not exceeding one year for total numbers of specimens to be introduced in such periods.

Conf. 2.11

## Trade in Hunting Trophies of Species Listed in Appendix I

CONSIDERING the need of uniform interpretation of the Convention with regard to hunting trophies;

### THE CONFERENCE OF THE PARTIES TO THE CONVENTION

RECOMMENDS

a) that with the exception of the rare case of exemptions granted under paragraph 3 of Article VII of the Convention, trade in hunting trophies of animals of the species listed in Appendix I be permitted only in accordance with Article III, i.e. accompanied by import and export permits;

b) that the scientific opinions under paragraphs 2 (a) and 3 (a) of Article III of the Convention cover the trade in dead specimens, too;

c) that in order to achieve the envisaged double control (also in the scientific field) by the importing and the exporting country of the trade in Appendix–I specimens, the Scientific Authority have the possibility of comprehensive examination concerning the question of whether the importation is serving a purpose which is not detrimental to the survival of the species. This examination should, if possible, also cover the question of whether the killing of the animals whose trophies are intended for import would enhance the survival of the species; and

d) that the scientific examination by the importing country in accordance with paragraph 3 (a) of Article III of the Convention be carried out independently of the result of the scientific assessment by the exporting country in accordance with paragraph 2 (a) of Article III, and vice versa.

# Conf. 2.11 (Rev.)*

**Trade in hunting trophies
of species listed in Appendix I**

CONSIDERING the need of uniform interpretation of the Convention with regard to hunting trophies;

THE CONFERENCE OF THE PARTIES TO THE CONVENTION

RECOMMENDS that:

a) with the exception of the rare case of exemptions granted under paragraph 3 of Article VII of the Convention, trade in hunting trophies of animals of the species listed in Appendix I be permitted only in accordance with Article III, i.e. accompanied by import and export permits;

b) in order to achieve the envisaged complementary control of trade in Appendix-I species by the importing and exporting countries in the most effective and comprehensive manner, the Scientific Authority of the importing country accept the finding of the Scientific Authority of the exporting country that the exportation of the hunting trophy is not detrimental to the survival of the species, unless there are scientific or management data to indicate otherwise; and

c) the scientific examination by the importing country in accordance with paragraph 3 (a) of Article III of the Convention be carried out independently of the result of the scientific assessment by the exporting country in accordance with paragraph 2 (a) of Article III, and vice versa.

---

*   *Amended at the ninth meeting of the Conference of the Parties.*