No. 15-5170

Oral Argument Not Yet Scheduled

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**SAFARI CLUB INTERNATIONAL,** *et al.,*

*Plaintiffs-Appellants,*

*v.*

**S.M.R. JEWELL, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE INTERIOR,** *et al.,*

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Columbia
(No. 14-0670, Hon. Royce C. Lamberth)

**FEDERAL DEFENDANTS-APPELLEES' ANSWERING BRIEF**

*Of Counsel:*
RUSSELL HUSEN
 U.S. Department of the Interior
 Office of the Solicitor
 Washington, D.C.

JOHN C. CRUDEN
 Assistant Attorney General

MATTHEW LITTLETON
MEREDITH L. FLAX
ANDREA GELATT
ERIKA B. KRANZ
 Attorneys, U.S. Dep't of Justice
 Environment & Natural Res. Div.
 P.O. Box 7415
 Washington, DC 20044
 (202) 307-6105
 erika.kranz@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A)   **Parties and Amici**.  All parties, intervenors, and amici appearing before the district court and in this court are listed in Plaintiffs-Appellants' opening brief.

(B)   **Rulings under Review**.  References to the rulings at issue appear in Plaintiffs-Appellants' opening brief.

(C)   **Related Cases**.  References to Plaintiffs' prior appeal (No. 14-5152) appear in Plaintiffs-Appellants' opening brief.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ....i

TABLE OF AUTHORITIES ......................................................................iii

GLOSSARY ......................................................................................xiii

JURISDICTIONAL STATEMENT............................................................ 1

STATEMENT OF ISSUES...................................................................... 1

STATEMENT OF THE CASE .................................................................. 2

    A.  Legal Background .......................................................... 4

    B.  Statement of Facts and Procedural History .................................. 10

    C.  The Service's New Non-Detriment and Enhancement Findings ..... 18

STANDARD OF REVIEW ..................................................................... 19

SUMMARY OF ARGUMENT ................................................................. 20

ARGUMENT .................................................................................... 22

  I.  Safari Club's 2014 Tanzania claims do not present an Article III case or controversy. ....................................................... 23

    A.  Safari Club's 2014 Tanzania finding claims are moot. .................... 24

    B.  Safari Club lacks standing. ........................................... 31

  II.  The Service's 2014 non-detriment and enhancement findings are not final agency action. ................................................. 49

    A.  The Service's findings are merely a predicate to a final decision...... 49

    B.  Safari Club should not be excused from the finality requirement on futility or other grounds. .......................................... 53

CONCLUSION.................................................................................. 59

CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION

CERTIFICATE OF SERVICE

ADDENDUM (bound separately)

# TABLE OF AUTHORITIES[1]

## Federal Cases

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ............................................................. 26

***Albuquerque Indian Rights v. Lujan*,
  930 F.2d 49 (D.C. Cir. 1991) .................................. 32, 34, 35, 36, 41, 46

*Allen v. Wright*,
  468 U.S. 737 (1984) ...................................................... 31, 47

***Already, LLC v. Nike, Inc.*,
  133 S.Ct. 721 (2013) ..................................................... 23, 24

*Appalachian Power Co. v. Envt'l Prot. Agency*,
  208 F.3d 1015 (D.C. Cir. 2000) ........................................ 55, 56

*Arizonans for Official English v. Arizona*,
  520 U.S. 43 (1997) ............................................................. 18

*Barlow & Haun, Inc. v. United States*,
  805 F.3d 1049 (Fed. Cir. 2015) ........................................... 54

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................... 49

*Bush v. Dist. of Columbia*,
  595 F.3d 384 (D.C. Cir. 2010) ........................................... 18

*Califano v. Sanders*,
  430 U.S. 99, 105 (1977) ..................................................... 26

*Castlewood Prods., L.L.C. v. Norton*,
  365 F.3d 1076 (D.C. Cir. 2004) ............................................. 6

*Catawba Cty., N.C. v. Envt'l Prot. Agency*,
  571 F.3d 20 (D.C. Cir. 2009) ............................................. 54

---

[1] Authorities upon which the Service chiefly relies are marked with asterisks.

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp*,
    333 U.S. 103 (1948) ........................................................... 49

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ........................................................... 56

*Clapper v. Amnesty Intern. USA*,
    133 S.Ct. 1138 (2013) ........................................................ 39

*Croplife Am. v. Envt'l Prot. Agency*,
    329 F.3d 876 (D.C. Cir. 2003) ........................................... 42

*Conservation Force v. Salazar*,
    919 F. Supp. 2d 85 (D.D.C. 2013) .................................... 58

*CTIA-The Wireless Ass'n v. Fed. Commc'ns Comm'n*,
    530 F.3d 984 (D.C. Cir. 2008) ........................................... 57

*Ctr. for Auto Safety v. Dole*,
    595 F. Supp. 98 (D.D.C. 1984) .......................................... 27

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
    452 F.3d 798 (D.C. Cir. 2006) ........................................... 20

*Ctr. for Sci. in the Pub. Interest v. Regan*,
    727 F.2d 1161 (D.C. Cir. 1984)......................................... 27

*Cty. of L.A. v. Shalala*,
    192 F.3d 1005 (D.C. Cir. 2007)......................................... 41

*Darby v. Cisneros*,
    509 U.S. 137 (1993) ........................................................... 52

*Dist. of Columbia v. Heller*,
    554 U.S. 570 (2008) ........................................................... 36

*Fed. Express Corp. v. Air Line Pilots Ass'n*,
    67 F.3d 961 (D.C. Cir. 1995) ............................................. 19

*Fla. Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) (*en banc*)............................ 44

*Forras v. Rauf,*
-- F.3d --, 2016 WL 556683 (D.C. Cir. Feb. 12, 2016) ............. 19–20, 23

*Franks v. Salazar,*
816 F. Supp. 2d 49 (D.D.C. 2011) ................................... 58

*Friends of Animals v. Kempthorne,*
452 F. Supp. 2d 64 (D.D.C. 2006) ................................... 43

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.,*
528 U.S. 167 (2000) ................................................ 27

*Fund for Animals, Inc. v. Norton,*
322 F.3d 728 (D.C. Cir. 2003) ....................................... 39

*Fund for Animals v. U.S. Bureau of Land Mgmt.,*
460 F.3d 13 (D.C. Cir. 2006) ........................................ 49

*Grocery Mfrs. Ass'n v. Envt'l Prot. Agency,*
693 F.3d 169 (D.C. Cir. 2012) ....................................... 38

*Hightower v. City of Boston,*
693 F.3d 61 (1st Cir. 2012) ........................................36, 38

*Holistic Candler & Consumers Ass'n v. Food & Drug Admin.,*
664 F.3d 940 (D.C. Cir. 2012) .....................................51–52

*Hunt v. Wash. State Apple Adver. Comm'n,*
432 U.S. 333 (1977) ................................................. 32

*In re Polar Bear Endangered Species Act Listing and 4(d) Litig.,*
627 F. Supp. 2d 16 (D.D.C. 2009) ................................... 43

*Jackson-Bey v. Hanslmaier,*
115 F.3d 1091 (2d Cir. 1997) ................................. 35, 38, 39

*LaRouche v. Fowler,*
152 F.3d 974 (D.C. Cir. 1998) ....................................... 30

*Lemon v. Geren,*
514 F.3d 1312 (D.C. Cir. 2008)....................................... 25

*Lewis v. Cont'l Bank Corp.*,
    494 U.S. 472 (1990) ............................................................ 30

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
    134 S.Ct. 1377 (2014) ........................................................ 31

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................. 30

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .............................. 31, 38, 44, 46, 47

*Madsen v. Boise State Univ.*,
    976 F.2d 1219 (9th Cir. 1992) ................................ 35, 38, 39

*Marcum v. Salazar*,
    810 F. Supp. 2d 56 (D.D.C. 2011) ..................................... 58

*Marcum v. Salazar,*
    694 F.3d 123 (D.C. Cir. 2012) ............................... 26, 53, 58

*Medellin v. Texas*,
    552 U.S. 491 (2008) ............................................................. 5

*Meredith v. Fed. Mine Safety & Health Review Comm'n*,
    177 F.3d 1042 (D.C. Cir. 1999) .......................................... 56

*Moose Lodge No. 107 v. Irvis*,
    407 U.S. 163 (1972) ..................................................... 34, 36

*Nat'l Ass'n of Clean Water Agencies v. Envt'l Prot. Agency*,
    734 F.3d 1115 (D.C. Cir. 2013) ............................. 16–17, 22

*Nat'l Ass'n of Home Builders v. Envt'l Prot. Agency*,
    667 F.3d 6 (D.C. Cir. 2011) ............................................... 32

*Nat'l Ass'n of Home Builders v. Norton*,
    415 F.3d 8 (D.C. Cir. 2005) .......................................... 49–50

*Nat'l Mining Ass'n v. Jackson*,
    768 F. Supp. 2d 34 (D.D.C. 2011) ..................................... 43

*Nat'l Mining Ass'n v. McCarthy,
    758 F.3d 243 (D.C. Cir. 2014) ................................ 43, 51, 53

Nat'l Taxpayers Union, Inc. v. United States,
    68 F.3d 1428 (D.C. Cir. 1995) ....................................... 48

Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.,
    745 F.3d 1219 (D.C. Cir. 2014)...................................... 56

Or. Nat. Res. Council v. Grossarth,
    979 F.2d 1377 (9th Cir. 1992) ....................................... 29

Palazzolo v. Rhode Island,
    533 U.S. 606 (2001) .................................................... 54

Parker v. Dist. of Columbia,
    478 F.3d 370 (D.C. Cir. 2007) ............................... 35–36, 37

Pennsylvania v. New Jersey,
    426 U.S. 660 (1976) .................................................... 16

People for the Ethical Treatment of Animals, Inc. v. U.S. Fish & Wildlife Serv.,
    59 F. Supp. 3d 91 (D.D.C. 2014) ................................... 26

Port of Bos. Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic,
    400 U.S. 62 (1970) ...................................................... 49

*Pub. Utils. Comm'n of Cal. v. Fed. Energy Regulatory Comm'n,
    236 F.3d 708 (D.C. Cir. 2001) ....................................... 28

Role Models Am., Inc. v. White,
    317 F.3d 327 (D.C. Cir. 2003) ....................................... 55

Sackett v. Envt'l Prot. Agency,
    132 S.Ct. 1367 (2012)................................................... 55

Sierra Club v. Morton,
    405 U.S. 727 (1972) ................................................24, 46

Singh v. Ashcroft,
    362 F.3d 1164 (9th Cir. 2004) ....................................... 57

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
549 U.S. 422 (2007) ............................................................. 17, 20, 22

*Steel Co v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ...........................................................20, 24, 31, 32

*Super Tire Eng'g Co. v. McCorkle*,
416 U.S. 115 (1974) ........................................................................ 28

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ........................................................................ 44

*Tesoro Ref. & Mktg. Co. v. Fed. Energy. Regulatory Comm'n*,
552 F.3d 868 (D.C. Cir. 2009) ........................................................ 55

*Texas v. United States*,
523 U.S. 296 (1998) ........................................................................ 36

*UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Board of Trs. of*
*Univ. of D.C.*, 56 F.3d 1469 (D.C. Cir. 1995) ................................. 54

*United States v. Decastro*,
682 F.3d 160 (2d Cir. 2012) ........................................................36, 39

*United States v. Koczuk*,
252 F.3d 91 (2d Cir. 2001)................................................................. 5

*Utah Shared Access All. v. Carpenter*,
463 F.3d 1125 (10th Cir. 2006) ...................................................... 29

*Valley Forge Christian Coll. v. Ams. United for Separation of Church*
*& State, Inc.*, 454 U.S. 464 (1982) ................................. 23–24, 32, 35, 41

*Warth v. Seldin*,
422 U.S. 490 (1975) ....................................................................32, 36

*Wildearth Guardians v. Salazar*,
272 F.R.D. 4, 15 (D.D.C. 2010)....................................................... 43

*Worth v. Jackson*,
451 F.3d 854 (D.C. Cir. 2006) ........................................................ 23

## **STATUTES**

Administrative Procedure Act ("APA"):

     5 U.S.C. § 702 ........................................................................ 13

     5 U.S.C. § 704 ...................................................................49, 52

     5 U.S.C. § 706 ........................................................................ 13

     5 U.S.C. §§ 551-559, 701–706 .............................................. 13

Endangered Species Act of 1973 ("ESA"):

     16 U.S.C. § 1532(13) ............................................................. 48

     16 U.S.C. § 1533(d) ................................................................. 8

     16 U.S.C. § 1537a ................................................................... 6

     16 U.S.C. § 1538(a)(1) .........................................................8, 48

     16 U.S.C. § 1538(c)(1) ............................................................ 6

     16 U.S.C. § 1539(g) ............................................................... 41

     16 U.S.C. § 1540(f) ................................................................. 6

28 U.S.C. § 1291 ......................................................................... 1

28 U.S.C. § 1331 ......................................................................... 1

## **RULES AND REGULATIONS**

50 C.F.R. § 13.11 ........................................................................ 7

50 C.F.R. § 13.29(a) .................................................................. 52

50 C.F.R. § 13.29(e) .................................................................. 52

50 C.F.R. § 13.29(f) ................................................................... 52

50 C.F.R. § 17.9 .......................................................................... 9

50 C.F.R. § 17.11(h) ................................................................ 8

50 C.F.R. § 17.31(a) ................................................................ 8

50 C.F.R. § 17.31(c) ................................................................ 8

50 C.F.R. § 17.40(e) ............................................................. 9, 50

50 C.F.R. §§ 23.1–23.92 .......................................................... 6

50 C.F.R. § 23.6 ................................................................. 7, 9

50 C.F.R. § 23.7(b) ................................................................ 7

50 C.F.R. § 23.13 ................................................................... 6

50 C.F.R. §§ 23.13–23.36 ...................................................... 50

50 C.F.R. § 23.20(e) ........................................................... 6, 37

50 C.F.R. § 23.33(a) ............................................................... 9

50 C.F.R. § 23.33(b) ............................................................... 7

50 C.F.R. § 23.35(b) ........................................................... 6, 37

50 C.F.R. § 23.35(c) ........................................................ 7, 42, 50

50 C.F.R. § 23.61(c) ........................................................ 7, 41, 42

50 C.F.R. § 23.61(f) ................................................................ 7

Fed. R. Civ. P. 12(b)(1) ......................................................... 17

Fed. R. Civ. P. 12(b)(6) ................................................... 1, 17, 20

## **MISCELLEANEOUS**

U.S. Constitution art. III § 2 ........................... 1, 2, 19, 23, 28, 31, 44

Convention on International Trade in Endangered Species of Wild
    Fauna and Flora (Mar. 3, 1973) ("CITES") ............................. 4

    CITES preamble ................................................................ 4

CITES art. I(a).................................................................................... 5

CITES art. II ................................................................................. 4, 5

CITES art. III, ¶ 2 .............................................................................. 6

CITES art. III, ¶ 3 .......................................................................... 6, 7

CITES art. IV, ¶ 2 .............................................................................. 6

CITES art. IV, ¶ 4 .............................................................................. 6

CITES art. XIV, ¶ 1(a) ....................................................................... 9

Listing of the African Elephant as a Threatened Species,
     43 Fed. Reg. 20,499 (May 12, 1978)...................................... 8

Endangered and Threatened Wildlife and Plants; Retention of Threatened
     Status for the Continental Population of the African Elephant,
     57 Fed. Reg. 35,473 (Aug. 10, 1992) ...................................... 9

Changes in List of Species in Appendices to CITES,
     62 Fed. Reg. 44,627 (Aug. 22, 1997) ...................................... 9

Factsheet: Importing Your Leopard or African Elephant Trophy,
     https://www.fws.gov/international/pdf/factsheet-import-leopard-
     elephant-sport-hunted-trophy-2012.pdf ................................. 6

Federal Fish and Wildlife Permit Application Form
     http://www.fws.gov/forms/3-200-19.pdf.......................................... 10

Enhancement Finding for African Elephants Taken as Sport-hunted Trophies
     in Tanzania in 2015, U.S. Fish & Wildlife Service (July 3, 2015),
     http://www.fws.gov/international/pdf/enhancement-finding-2015-
     elephant-Tanzania.PDF ..............................................................18, 19

General Advice on Importation of Sport-Hunted Trophies of African
     Elephants Taken in Tanzania in the Calendar Year 2015 (July 1, 2016),
     http://www.fws.gov/international/pdf/non-detriment-finding-2015-
     elephant-Tanzania.pdf ....................................................... 18

Sport-Hunted Trophies, U.S. Fish & Wildlife Service,
    http://www.fws.gov/ international/permits/by-activity/sport-hunted-
    trophies.html ...................................................................................... 12

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CITES | Convention on International Trade in Endangered Species of Wild Fauna and Flora |
| ESA | Endangered Species Act |

# JURISDICTIONAL STATEMENT

Plaintiff-Appellant organizations Safari Club International and the National Rifle Association (collectively, "Safari Club") invoked the district court's original jurisdiction under 28 U.S.C. § 1331. Without determining whether it had subject matter jurisdiction over Safari Club's claims, the district court dismissed Safari Club's claims related to Tanzania for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (DA___, Dkt. 48.) The district court granted Safari Club's motion to certify as final the court's dismissal of those claims under Federal Rule of Civil Procedure 54(b) on April 9, 2015. (DA___, Dkt. 65.) This Court has appellate jurisdiction under 28 U.S.C. § 1291. However, as explained below, the U.S. Fish & Wildlife Service ("Service") contends that this Court lacks subject matter jurisdiction under Article III of the U.S. Constitution. *See infra,* Section I, pp. 23–48.

# STATEMENT OF ISSUES

Safari Club challenges the Service's generic findings regarding how sport hunting of African elephants affected that species in Tanzania in 2014. Relevant laws require a person wishing to import a sport-hunted elephant trophy from Tanzania to apply for an import permit from the Service. Safari Club has not alleged that any of its members have, or even could, apply to import the trophy of an African elephant killed in Tanzania in 2014. Instead,

Safari Club challenges the Service's predicate, non-binding, and now-superseded factual findings. This appeal presents the following issues:

1.    Does Safari Club present an Article III case or controversy? More particularly,

    a. Are Safari Club's challenges to the Service's 2014 findings moot where it has not alleged that any member has, or even could, apply for a relevant import permit?

    b. Having not shown that any member has been injured by a permit denial, may Safari Club base its standing on allegations of new administrative burdens and on hunters' voluntary decisions to cancel hunts not regulated by the Service?

2.    Has Safari Club obtained a final agency action that it may properly challenge under the Administrative Procedure Act?

## STATEMENT OF THE CASE

This is an appeal from the district court's dismissal of Safari Club's claims regarding the Service's generic and non-binding factual findings regarding how imports of the trophies of sport-hunted African elephants killed

in Tanzania in 2014 would affect the survival of that species.[2] Specifically, the Service is charged with determining, based on the information before it, whether such an import will enhance and be non-detrimental to the species' survival. After analyzing the available evidence, the Service concluded that it could not make positive findings based on the information before it, and thus could not issue such permits absent new or additional information. Rather than leave prospective applicants in the dark regarding its initial assessment, the Service publicized that assessment so that regulated parties would not be caught off guard.

Safari Club filed suit in district court and moved to preliminarily enjoin the Service from relying on its generic findings to restrict the import of sport-hunted elephant trophies from Tanzania. Safari Club argued that a number of its members would be harmed because—even though they had not applied for import permits—they had plans to hunt, or had U.S. clients who planned to hunt, African elephants in Tanzania in 2014. The district court denied Safari Club's motion because Safari Club had not demonstrated any irreparable harm stemming from the Service's generic factual findings. Safari Club voluntarily

---

[2] Safari Club has also brought claims regarding the import of sport-hunted African elephant trophies from Zimbabwe. Safari Club's Zimbabwe claims remain pending in the district court; they are not at issue in this appeal and thus are not discussed below.

dismissed its appeal of this preliminary injunction denial after oral argument before this Court.

After additional briefing, the district court dismissed Safari Club's Tanzania claims based on its failure to solicit or obtain a final decision from the Service, as no Safari Club member had actually applied for a permit to import a sport-hunted trophy of an elephant killed in Tanzania in 2014.

## A. Legal Background[3]

### 1. Non-detriment Findings Under CITES

The Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087 ("CITES" or "Convention"), is a multilateral treaty to which the United States is a party, *id.* at 1089. The parties to the Convention recognized that "international co-operation is essential for the protection of certain species of wild fauna and flora against over-exploitation through international trade." CITES preamble, *id.* at 1090. The Convention thus aims to regulate international trade in wildlife and plants that are listed in its appendices to ensure that such trade does not threaten the survival of those species in the wild.

The degree of regulation depends upon the particular appendix in which a species is listed. *See* CITES art. II, *id.* at 1092. This appeal concerns African

---

[3] Pertinent statutes, regulations, and other authority are included in a separately-bound addendum.

elephants (*Loxodonta africana*) in Tanzania, which appear in Appendix I.[4]

Species listed in Appendix I, the most protective of the CITES Appendices, are

"threatened with extinction," and thus trade in such species is "subject to

particularly strict regulation in order not to endanger further their survival."[5]

*Id.* A given species may be listed in different appendices for different countries.

*See* CITES art. I(a), *id.* at 1090 (defining "species" to include any

"geographically separate population").

    Because the Convention is not self-executing, *see United States v. Koczuk*,

252 F.3d 91, 93 (2d Cir. 2001), it did not automatically have effect as domestic

law upon ratification by the United States, *see generally Medellin v. Texas*, 552

U.S. 491, 504–05 (2008). "Congress implemented the Convention into U.S.

law in the Endangered Species Act of 1973 ['ESA'], Pub. L. No. 93-205, 87

Stat. 884 (codified as amended at 16 U.S.C. §§ 1531–44 (2000)). The ESA

makes it unlawful to 'engage in any trade in any specimens contrary to the

---

[4] The current CITES appendices are available at
http://www.cites.org/eng/app/appendices.php (last visited Feb. 11, 2016).

[5] Appendix II includes species that are not necessarily threatened with
extinction at present but "may become so unless trade in specimens of such
species is subject to strict regulation." CITES art. II, 27 U.S.T. at 1092.
Appendix III contains those species that a party to the treaty has identified as
"subject to regulation within its jurisdiction for the purpose of preventing or
restricting exploitation, and as needing the cooperation of other parties in the
control of trade." *Id.*

provisions of the Convention.' 16 U.S.C. § 1538(c)(1)." *Castlewood Prods.,*

*L.L.C. v. Norton*, 365 F.3d 1076, 1079 (D.C. Cir. 2004).

Congress directed the Service to effectuate the Convention, 16 U.S.C.

§ 1537a, and the Service used its rulemaking authority under the ESA, *id.*

§ 1540(f), to promulgate regulations implementing the Convention. 50 C.F.R.

§§ 23.1–23.92. Importantly, the Service does not regulate *hunting* in foreign

countries; instead it regulates import, export, and international trade of species

included in the CITES Appendices. *See id.* § 23.13. Under the Service's

regulations, an individual seeking to import a specimen of an Appendix I

species must obtain an import permit. *Id.* §§ 23.20(e), 23.35(b); *see also* CITES

art. III ¶ 3, art. IV ¶ 4, 27 U.S.T. at 1093, 1096.[6] The Service advises hunters

wishing to import protected species to apply for import permits before hunting,

as the Service cannot guarantee that it can grant a permit after the hunter has

taken an animal. *See* Factsheet: Importing Your Leopard or African Elephant

Trophy, https://www.fws.gov/international/pdf/factsheet-import-leopard-

elephant-sport-hunted-trophy-2012.pdf (last accessed Feb. 23, 2016); *see also*

DA___, App. 280 (hunters sometimes apply well before their trip so they can

make adjustments based on the Service's permit decision). Service regulations

---

[6] An export permit from the country of origin also is required for all
listed species. *See* CITES art. III ¶ 2, art. IV ¶ 2, *id*. at 1093, 1095.

do not define a time period within which the Service must act on a permit application, but the Service recommends that hunters submit applications 60 to 90 days before departing. *Id.*; 50 C.F.R. § 13.11.

When applying for an import permit for an Appendix I species, "[t]he applicant must provide sufficient information for [the Service] to find that . . . [t]he proposed import would be for purposes that are not detrimental to the survival of the species." *Id.* § 23.35(c)(1); *see also* CITES art. III, ¶ 3(a), 27 U.S.T. at 1093. The Service's Division of Scientific Authority is in charge of making non-detriment findings. *See* 50 C.F.R. §§ 23.6, 23.7(b), 23.33(b). The Service regulations summarize the types of information that applicants must submit to enable the Service to make such a "non-detriment finding." *Id.* § 23.61(c), (e). For example, the Service will consider whether removal of the animal from the wild was part of "a biologically based sustainable-use management plan that is designed to eliminate over-utilization of the species." *Id.* § 23.61(c)(2). The Service bases its findings on "the best available biological information." *Id.* § 23.61(f). "In cases where insufficient information is available or the factors [supporting non-detriment] are not satisfactorily addressed, [the Service] take[s] precautionary measures and would be unable to make the required finding of non-detriment." *Id.* § 23.61(f)(4). Although the regulations make clear the permit applicant's responsibility to provide

information to support a non-detriment finding, and do not require the Service to make generic country-wide findings, the Service typically makes such findings on a yearly basis to streamline the permit application process and avoid duplication of effort, and revises them as needed based on information provided during the permit process and otherwise.

## 2. Enhancement Findings Under the Endangered Species Act

Independent of the Convention, the ESA itself also generally prohibits the import of species listed as endangered, 16 U.S.C. § 1538(a)(1)(A), and permits the Service to extend that prohibition to species listed as threatened, *id.* § 1533(d). The Service has generally extended the import prohibition to all species listed as threatened by the Service. 50 C.F.R. § 17.31(a). However, where the Service has promulgated a "special rule" for a particular threatened species, the special rule "contain[s] all the applicable prohibitions and exceptions." *Id.* § 17.31(c). The Service has listed the African elephant as threatened, *id.* § 17.11(h),[7] and has promulgated a special rule allowing

---

[7] *See also* Listing of the African Elephant as a Threatened Species, 43 Fed. Reg. 20,499 (May 12, 1978).

importation of sport-hunted African elephant trophies under certain specified conditions, *id.* § 17.40(e).[8]

One condition under the special rule for African elephants is that the Service must determine that "the killing of the animal whose trophy is intended for import would enhance survival of the species." *Id.* § 17.40(e)(3)(iii)(C). This requirement, commonly known as an "enhancement finding," applies in addition to any CITES permitting or other wildlife import requirements. *Id.* § 17.40(e)(3)(iii)(B).[9] The Service makes enhancement findings on a periodic basis for each country that permits exportation of sport-hunted African elephant trophies. *See* Changes in List of Species in Appendices to CITES, 62 Fed. Reg. 44,627, 44,633 (Aug. 22, 1997). In making enhancement findings, the Service "reviews the status of the population and the total management program for the elephant in each country to ensure the program is promoting the conservation of the species." *Id.* The Service's Division of Management Authority, Branch of Permits, is in charge of making enhancement findings. 50 C.F.R. §§ 17.9, 23.6, 23.33(a)(1). Paralleling its ESA

_____

[8] *See also* Endangered and Threatened Wildlife and Plants; Retention of Threatened Status for the Continental Population of the African Elephant, 57 Fed. Reg. 35,473, 35,485 (Aug. 10, 1992).

[9] The Convention does not "affect the right of Parties to adopt . . . stricter domestic measures" regarding species listed in the appendices. CITES art. XIV, ¶ 1(a), 27 U.S.T. at 1108.

mandate, the Service's application for a permit to import a sport-hunted elephant trophy states, "If you [the permit applicant] have any information that could support this [enhancement] finding (e.g., how the funds from license/trophy fees will be spent, what portion of the hunting fee will support conservation), please submit such information on a separate page with your application." *See* Federal Fish and Wildlife Permit Application Form Part E.5 at http://www.fws.gov/forms/3-200-19.pdf (Rev. 02/2014; last visited Feb. 22, 2016).

In sum, as relevant to this case, longstanding regulations permit import of a sport-hunted African elephant trophy from Tanzania under only certain conditions. As relevant here, the prospective importer must apply for an import permit—preferably before the trophy is hunted—and provide sufficient information to allow the Service to make both a positive non-detriment and a positive enhancement finding supporting issuance of that permit.

### B. Statement of Facts and Procedural History

#### 1. The Service's Findings Regarding Sport-Hunted African Elephant Trophies from Tanzania

On April 4, 2014, the Service issued a press release announcing that, unless it received "new information that demonstrate[d] an improved situation for elephants in [Tanzania]," it would "suspen[d] imports of sport-hunted

African elephant trophies taken in Tanzania . . . during calendar year 2014." [10] (DA___, App. 58.)[11] The Service acknowledged that "[l]egal, well-regulated sport hunting, as part of a sound management program, can benefit the conservation of listed species by providing incentives to local communities to conserve the species and by putting much-needed revenue back into conservation. (DA___, App. 59.) But the Service explained that "[q]uestionable management practices, a lack of effective law enforcement and weak governance ha[d] resulted in uncontrolled poaching and catastrophic population declines of African elephants in Tanzania." (DA___, App. 58.) As such, "[a]dditional killing of elephants in [Tanzania], even if legal, is not sustainable and is not currently supporting conservation efforts that contribute toward the recovery of the species." (*Id.*) The Service thus announced that it was at that point "unable to make positive findings required under the [Convention] and the [ESA] to allow import of elephant trophies from these countries." (*Id.*) The Service made clear that it would "reevaluate the suspension for calendar year 2015 or upon receipt of new information that

---

[10] Because the hunting season in Tanzania did not open until July 1, 2014, this finding had no retroactive effect. (DA___, App. 60.)

[11] "App." refers to the parties' appendix prepared during Safari Club's preliminary injunction appeal. "AR" refers to documents in the administrative record filed in the district court.

demonstrates an improved situation for elephants in [Tanzania]." (DA___, App. 59.)

Although the 2014 findings were different from those in previous years, the 2013 non-detriment finding foreshadowed the Agency's 2014 conclusions regarding the status of elephants and elephant management in Tanzania. The 2013 finding noted that one important elephant ecosystem had become "a 'hotspot' for African elephant poaching" that "could affect long-term population sustainability," and that "levels of illegal killing across the African elephants' range are of serious and increasing concern." (DA___, App. 348.) The Service also indicated concern about the efficacy of the Tanzanian government's anti-poaching efforts, specifically about the financial mechanisms in place to support those efforts and the adequacy of enforcement. (DA___, App. 348.)

The Service's press release directed the public to the agency's website for more information about relevant 2014 Tanzania findings. (DA___, App. 59.)[12] On the website, the Service posted the generic negative enhancement finding made by the Division of Management Authority and the generic negative non-detriment finding made by the Division of Scientific Authority. (DA___,

---

[12] *See* Sport-Hunted Trophies, U.S. Fish & Wildlife Service, http://www.fws.gov/international/permits/by-activity/sport-hunted-trophies.html (last visited Feb. 23, 2016).

AR204; DA___, AR159.) Those findings analyzed the evidence available to the Service concerning African elephants in Tanzania. The Division of Scientific Authority's finding, however, explained that "[i]f permit applications are received that include new or additional information showing that elephant management practices by the Government of Tanzania have led to the sustainability of its elephant population on a nation-wide basis, these applications should be referred to the Division of Scientific Authority for consideration on a case-by-case basis." (DA___, AR159 at 001771.) The Division of Management Authority's findings are likewise subject to amendment based on new information. (DA___, App. 279, 283.) The Service thus made clear that, despite its initial announcement that information before it did not support positive findings, it still was accepting and would approve import permit applications that contained information allowing the Service to make those required findings.

### 2.    Safari Club's Suit

Safari Club filed suit on April 21, 2015, citing the district court's jurisdiction under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706, and alleging that the Service's findings and suspension of imports violated the ESA and the APA, 5 U.S.C. §§ 551–59, 701–06. (App. 32–40.) Safari Club then moved for a preliminary injunction and attached declarations

from a number of its members alleging various injuries from the Service's April 4, 2014, announcement. Several of the declarations are from Safari Club members who had planned to hunt African elephants in Tanzania in 2014. None of those members state that they applied for, or were denied, an import permit for 2014. And no member states that he or she had plans to apply for a permit in advance of hunting African elephants in Tanzania. (*See* DA___, App. 187, 238, 241, 244, 247.) Instead, it appears that these members were proceeding on the assumption—based on the Service's grant of permits in previous years—that they would be able to obtain permits after-the-fact as a matter of course.

The hunters describe their belief that sport hunting benefits elephant conservation, explain the importance they place on elephant trophies, and express indecision about whether to cancel their hunts. (*See, e.g.*, DA___, App. 186–87, 207–10, 238–47.) None of the hunters indicated that they had actually cancelled their hunts. And none of the declarants alleged that they had killed or would kill an African elephant in Tanzania in 2014.

Safari Club also submitted declarations from several of its members who are hunting outfitters. The outfitters espoused a belief that sport hunting benefits elephant conservation, expressed concerns that hunters from the United States may cancel their hunts, and describe potential economic losses if

any canceled hunts cannot be resold to hunters from other countries. (*See, e.g.*, DA___, App. 218–21, 248–50, 251–53.) Only one of the outfitters reported a small number of actual cancellations by U.S. hunters for hunts in Tanzania. (DA___, App. 220 ("several" cancellations).) But that outfitter did not state that it was unable to resell the hunts. And none of the outfitters state that they have been unable to sell hunts to U.S. hunters since the April 4, 2014, findings.

### 3. The District Court's Denial of Preliminary Relief and Dismissal for Failure to State a Claim

Along with responding to Safari Club's motion for preliminary injunction, the Service also moved to dismiss Safari Club's claims for lack of subject matter jurisdiction. The Service contended that Safari Club lacked standing because Safari Club did not have members that had applied for or been denied an import permit.

After briefing on Safari Club's motion for preliminary injunction, district court Judge Amy Berman Jackson denied Safari Club's motion because it fell "well short of the legal standard for preliminary relief[,]" particularly because Safari Club had not shown that its members would suffer "grave, imminent, and certain harm" without an injunction. (DA___, Dkt. 24 at 4.) The district court correctly observed that the Service "did not prohibit anyone from hunting African elephants in . . .Tanzania" (DA___, Dkt. 24 at 4), and thus, any harm to the two hunters who canceled their trips was "self-inflicted and,

therefore, not the irreparable harm that supports injunctive relief." (DA___, Dkt. 24 at 8 (citing *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).). The also court noted that U.S. hunters "may still enjoy the recreational benefits of participating in hunts" (DA___, Dkt. 24 at 7). And because "a hunter must successfully shoot an elephant in order to garner a trophy worth importing[,]" the district court found the alleged imminent injury too speculative to support a preliminary injunction. (DA___, Dkt. 24 at 7.) Indeed the court found that the *only* Safari Club members likely to be affected were "the declarants with elephants already in storage," of which were none in Tanzania. (DA___, Dkt. 24 at 7.) And the district court concluded that Safari Club's allegation of harm to it and its members' interests in elephant conservation was "indirect and speculative" because any such harm depended upon multiple intervening contingencies, including whether U.S. hunters choose to cancel their trips. (DA___, Dkt. 24 at 8–9.)

The court similarly found that Safari Club's allegation of economic harm to its outfitter members was "speculative" because the outfitters "do not even know if their clients will cancel or if they will be replaced." (DA___, Dkt. 24 at 11.) The district court thus denied Safari Club's motion and noted that it was taking the Service's motion to dismiss Safari Club's claims for lack of subject matter jurisdiction under advisement. (DA___, Dkt. 24 at 2 n.3.) *See Nat'l Ass'n*

*of Clean Water Agencies v. Envt'l Prot. Agency*, 734 F.3d 1115, 1160 (D.C. Cir. 2013) (court need not address jurisdiction if it can "dispose of [a motion] on another threshold ground that does not require [the court] to reach the merits" (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007)). Safari Club appealed, but voluntarily dismissed its appeal shortly after this Court held oral argument.

Briefing on the Service's motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) continued, and, on December 26, 2014, Judge Royce C. Lamberth[13] dismissed Safari Club's Tanzania claims for failure to state a claim on which relief may be granted. (DA___, Dkt. 48.) The district court highlighted the Service's continued acceptance of permit applications despite the findings. (DA___, Dkt. 48 at 5.) The court found that "the fact that plaintiffs here assert procedural claims does not relieve them of the obligation to exhaust their administrative remedies before filing suit in this case," and that having not done so by seeking and receiving a final agency decision regarding a permit application, Safari Club lacked a viable APA claim. (DA___, Dkt. 48 at 14.) The court declined Safari Club's invitation to waive the exhaustion requirement, holding that Safari Club had not met its burden of demonstrating

---

[13] The case was reassigned to Judge Lamberth on November 17, 2014. (Dkt. 44.)

that "the agency is certain to issue an adverse decision on any permit application." (DA___, Dkt. 48 at 16.) Having decided that it would dismiss Safari Club's Tanzania claims in their entirety, the court did not reach the question of subject matter jurisdiction. (DA___, Dkt. 48 at 16.)

## C. The Service's New Non-Detriment and Enhancement Findings

The record on appeal is general limited to "papers and exhibits filed in the district court," transcripts, and the docket sheet. Fed. R. App. P. 10(a); *Bush v. Dist. of Columbia*, 595 F.3d 384, 388 (D.C. Cir. 2010). However, "[i]t is the duty of counsel to bring to the federal tribunal's attention, '*without delay*,' facts that may raise a question of mootness." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.23 (1997). In July 2015, after the district court dismissed Safari Club's Tanzania claims for failure to state a claim, the Service issued new non-detriment and enhancement findings that apply to elephants taken during 2015. *See* General Advice on Importation of Sport-Hunted Trophies of African Elephants Taken in Tanzania in the Calendar Year 2015 (July 1, 2016) ("2015 Non-Detriment Finding"), *available at* http://www.fws.gov/international/pdf/non-detriment-finding-2015-elephant-Tanzania.pdf (last visited March 3, 2016), and Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Tanzania in 2015, U.S. Fish & Wildlife Service (July 3, 2015) ("2015 Enhancement Finding"),

*available at* http://www.fws.gov/international/pdf/enhancement-finding-2015-elephant-Tanzania.PDF (last visited March 3, 2016). These findings were based in part on new population data and studies not available at the time of the 2014 findings. While the findings describe a number of positive steps taken by the government of Tanzania to improve the situation for elephants, they also report that new data indicate a further, troubling slide in elephant populations. *See* 2015 Non Detriment Finding ¶¶ 27–30. The Service was accordingly unable to make generic 2015 findings that importing sport-hunted elephants was either for purposes that are not detrimental to or enhanced the survival of the species. However, the Service again affirmed that it will re-evaluate its findings if it receives new information. 2015 Non Detriment Finding ¶ 32; 2015 Enhancement Finding 2.

As of this writing, the Service has not made any generic non-detriment or enhancement findings for African elephants killed in Tanzania in calendar year 2016.

## STANDARD OF REVIEW

This Court reviews *de novo* whether a suit involves a case or controversy over which the Court has subject matter jurisdiction under Article III of the U.S. Constitution. *Fed. Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 964 (D.C. Cir. 1995). "[A]ssessing jurisdiction is not a 'legal nicet[y]'; it is an

'essential ingredient' of [this Court's] ability to hear a case." *Forras v. Rauf*, --

F.3d --, 2016 WL 556683 *3 (D.C. Cir. Feb. 12, 2016) (quoting *Steel Co v.

Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)). This Court likewise reviews

*de novo* the dismissal of claims under Federal Rule of Civil Procedure 12(b)(6).

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805

(D.C. Cir. 2006). Where, as here, the district court considers matters outside

the pleadings in granting the agency's motion to dismiss, this Court may

characterize the district court's dismissal as a grant of summary judgment

under Federal Rule of Civil Procedure 56. *Id.* A party is entitled to summary

judgment if there is no genuine issue of material fact and judgment in that

party's favor is proper as a matter of law. *Id.* The Court need not address

jurisdiction specifically if it decides the case on another non-merits ground.

*Sinochem*, 549 U.S. at 431.

## SUMMARY OF ARGUMENT

This appeal is moot because Safari Club cannot be granted any effective

relief on its claims. There is no dispute that the challenged agency actions—

generic factual findings by the Service—applied solely to permit applications

for trophies of African elephants killed in Tanzania in 2014. Safari Club does

not allege that its members killed any elephants in Tanzania in 2014, so there

is no possibility that the Service ever could issue any relevant permits to its

members. Nor does this dispute fall into the narrow exception to mootness for controversies that are capable of repetition yet evade review, for the simple reason that the decision to deny an import permit for a particular year will remain reviewable even when the agency makes new findings that apply to future years.

To the extent that its claims are not moot, Safari Club lacks standing to challenge the Service's generic and non-binding factual findings regarding imports of elephants killed in Tanzania in 2014. The Service made clear that it still would consider all information submitted with individual import permit applications, and Safari Club professes to have such additional information. Yet no Safari Club member even applied for, much less was denied, an import permit. Safari Club therefore has not shown that any of its members were concretely and particularly injured by the factual findings about which it is complaining. Safari Club's alternate theories of standing—based on an allegedly increased administrative burden, abstract harm to its conservation interests, and speculative and attenuated harms to hunting outfitters—are likewise insufficient to confer standing.

Alternatively, this Court may affirm on the grounds that Safari Club has failed to challenge final agency action, as the APA requires. As the district court explained, Safari Club has not demonstrated the futility of engaging in

the agency's well-established process or that the Service is certain to reject all permit applications, regardless of what information Safari Club members may submit. Safari Club cannot obtain judicial review without first presenting its factual and legal arguments to the Service for full consideration.

## ARGUMENT

This Court may dispose of this appeal in either of two ways. The first option is to affirm the district court's dismissal on alternate grounds: lack of subject matter jurisdiction based on mootness or standing. The second option is to affirm the district court's conclusion that Safari Club has not challenged a final agency action.

Although the Service moved to dismiss on jurisdictional grounds, the district court did not address the issue of subject matter jurisdiction. Instead, the court dismissed based on Safari Club's failure to state a claim due its failure to exhaust administrative remedies. The district court's approach was proper because it disposed of the motion on a "threshold ground that [did] not require [it] to reach the merits." *Nat'l Ass'n of Clean Water Agencies*, 734 F.3d at 1160; *see also Sinochem*, 549 U.S. at 431 ("[J]urisdiction is vital only if the court proposes to issue a judgment on the merits."). The district court correctly held that Safari Club has failed to state a claim, and that conclusion alone was sufficient to dismiss Safari Club's Tanzania Claims. (DA___, Dkt. 48 at 16.)

This brief will first address subject matter jurisdiction because that topic typically precedes other issues. *See Forras*, 2016 WL 556683 *3. The Service, however, agrees with the district court that Safari Club clearly failed to exhaust administrative remedies. This Court therefore may follow the district court's mode of analysis and affirm the dismissal of Safari Club's Tanzania claims on that ground.

## I.     Safari Club's 2014 Tanzania claims do not present an Article III case or controversy.

To challenge an administrative agency's final action in federal court, a plaintiff's suit must present a live case or controversy under Article III § 2 of the U.S. Constitution. "Three inter-related judicial doctrines—standing, mootness, and ripeness—ensure that federal courts assert jurisdiction only over 'Cases' and 'Controversies.'" *Worth v. Jackson*, 451 F.3d 854, 855 (D.C. Cir. 2006).

Relevant here, "[a] case becomes moot . . . when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome" such that "the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights" *Already, LLC v. Nike, Inc.*, 133 S.Ct. 721, 726–27 (2013) (internal quotation marks and citations omitted). Standing doctrine limits judicial review to those litigants who "have a direct stake in the outcome" because they can show "'injury in fact' resulting from the action

which they seek to have the court adjudicate." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972)).

Defects in both of these areas deprive this Court and the district court of jurisdiction to consider the merits of Safari Club's claims regarding the Service's 2014 non-detriment and enhancement findings for Tanzania: Safari Club's members will never be subject to the allegedly-improper findings, and Safari Club and its members lack a concrete and particularized injury traceable to agency action. As this Court—and the district court—do not have jurisdiction over Safari Club's 2014 Tanzania claims, this Court may affirm the dismissal of the claims on jurisdictional grounds rather than reach alternate theories for dismissal. *See generally Steel Co.*, 523 U.S. at 94–101.

## A.    Safari Club's 2014 Tanzania finding claims are moot.

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983). Mootness doctrine thus requires that when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," there is no longer an actual controversy fit for judicial review. *Already*, 133 S.Ct. at 726.

Neither this Court nor the district court can afford Safari Club any relief with respect to the 2014 findings, *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) ("A case becomes moot when intervening events make it impossible to grant the prevailing party effective relief." (internal quotation marks omitted)), because Safari Club's members have not applied for and been denied a permit, and the 2014 findings have now been superseded and do not apply to elephants killed in 2015 or future years. The Service's challenged findings apply by their own terms only to African elephants killed in Tanzania during calendar year 2014. (DA___, AR159 at 001771 ("General Advice on Importation of Sport-hunted Trophies of African Elephants taken in Tanzania in the Calendar Year 2014"); DA___, AR 2015 at 003047 ("Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Tanzania during 2014").) Yet despite Safari Club's multiple amendments to its complaint, it has has not alleged that (1) any of its members applied for permits to import a sport-hunted elephant trophy taken in Tanzania in 2014, or (2) any of its members killed an elephant in Tanzania in 2014, for which that member could later seek a permit. As such, there is no indication that Safari Club's members will ever be impacted in a concrete way by the Service's 2014 findings, because there is no indication that those members ever have or ever

will actually submit an import permit application that would lead the Service to apply those findings.[14]

By not applying for a permit or engaging in conduct that would require a permit, Safari Club's members have voluntarily placed themselves outside "the ambit of government oversight," and rendered their claims moot. *Munsell v. Dep't of Agric.*, 509 F.3d 572, 582 (D.C. Cir. 2007). The time that Safari Club's members might in theory have been injured by the Service's findings have now past. *See People for the Ethical Treatment of Animals, Inc. v. U.S. Fish & Wildlife Serv.*, 59 F. Supp. 3d 91, 95 (D.D.C. 2014) (import permit had expired, so claims challenging the permit were moot). In other words, Safari Club has not

---

[14] One can alternately conceive of this problem as a lack of standing; we discuss Safari Club's lack of standing *infra*, Section I.B.

Similarly, the Court may interpret Safari Club members' failure to seek permits to which the Service may have applied its 2014 findings as a failure to ripen their claims. Ripeness doctrine prevents courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and it protects agencies "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Indeed, this Court has held that a plaintiff's strikingly similar claims were not ripe until they had completed the Service's administrative appeal process after being denied an import permit. *Marcum v. Salazar*, 694 F.3d 123, 129–30 (D.C. Cir. 2012).

But because Safari Club has not indicated that its members killed elephants in Tanzania in 2014—and thus could never apply for a relevant permit—we conceive of the jurisdictional deficit as one of mootness, rather than ripeness.

shown that a "threatened injury [is] certainly impending, such as by credibly alleging that its members face "a realistic threat" arising from the Service's findings. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) (internal quotation marks and citations omitted; alteration in original).

Moreover, Safari Club cannot avoid this jurisdictional problem by characterizing some of its claims as general or procedural in nature. Safari Club should still make those general and procedural claims in the context of a live dispute. But, as stated, there is no showing that Safari Club's members will ever file a 2014 permit application, and thus the 2014 findings have no prospective effect. Safari Club's general and procedural challenges are thus most appropriately brought against findings for future years, though still where the organization can show actual injury resulting from the findings. It does not matter that Safari Club may in the future asserts some of the same legal theories about the 2015 finding or future findings. *See Ctr. for Auto Safety v. Dole*, 595 F. Supp. 98, 100 (D.D.C. 2008) ("[T]he mere possibility that the interim and final regulations may share some of the same general shortcomings does not keep the controversy as to the interim regulations alive." (citing *Ctr. for Sci in the Pub. Interest v. Regan*, 727 F.2d 1161, 1166 (D.C. Cir. 1984)). Safari Club's claims regarding the 2014 findings are still moot because those factual

findings, by their own terms, do not apply to sport hunting trophies for future years.

Furthermore, Safari Club's request for declaratory relief does not salvage their claims from the bar imposed by mootness. Indeed, Article III's case and controversy requirements requires the Court to ask "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having legal interest, of sufficient immediacy and reality to warrant the issuance of declaratory judgment." *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974). Where the *Super Tire* plaintiffs had shown "the existence of an immediate and definite governmental action or policy that has adversely affected and continue[d] to affect a present interest," *id.* at 125–26, Safari Club has shown no real, imminent threat stemming from the 2014 findings.

Nor does this appeal implicate the exception to mootness for cases that are capable of repetition yet evading review. A dispute is not capable of repetition unless there is a "reasonable expectation if not a demonstrated probability that petitioners will be subject to the same action." *Pub. Utils. Comm'n of Cal. v. Fed. Energy Regulatory Comm'n*, 236 F.3d 708, 714 (D.C. Cir. 2001) (internal quotation marks omitted). "[C]ourts have interpreted 'same

action' to refer to particular agency policies, regulations, guidelines, or recurrent identical agency actions." *Id.* (collecting cases).

This case is not capable of repetition because the Service will not issue another enhancement finding for Tanzania identical to the 2014 findings. Indeed, in making its 2015 findings, the Service received and analyzed new information concerning elephants and management programs in Tanzania. Any future findings for Tanzania also will necessarily account for that additional information in the context of a different administrative record, and Safari Club may contribute to that record by providing the Service with information it believes should be considered. *See Or. Nat. Res. Council v. Grossarth*, 979 F.2d 1377, 1380 (9th Cir. 1992) (where subject of present litigation is moot and proposed future timber sale would be based on different administrative record, challenge to future sale should be litigated based on its own record). Provided that it can otherwise establish jurisdiction, Safari Club may challenge those future findings in district court. *See Utah Shared Access All. v. Carpenter*, 463 F.3d 1125, 1135 (10th Cir. 2006). While Safari Club conceives of its challenges as general in nature, rather than permit-specific, the Court may best focus on those claims in the context of a live dispute about an actual permit. If and when Safari Club or other plaintiffs bring such a suit, challenges based on future permit applications will not evade review because there is no

time limit for importing a trophy killed in a certain year. For instance, if, going forward, a person applies for and is denied a 2016 import permit, the liveness of that person's permit denial challenge would depend on the continued existence of the *trophy* that the person wished to import. Thus, although the 2016 finding may apply only to animals killed in that calendar year, the fact that a newer finding applies to future years will not limit the court's ability to review the 2016 finding as applied to a 2016 permit application. In other words, simply because a finding may expire by its terms within a year does not necessarily mean that a claim related to that finding need be resolved within the year. This type of claim is thus not one that will evade review due to limitations on the duration of its viability. *Cf. LaRouche v. Fowler*, 152 F.3d 974, 978 (D.C. Cir. 1998) (challenged activity may evade review where it is "*by its very nature short in duration*, so that it could not, or probably would not, be able to be adjudicated while fully live").

Mootness doctrine ensures that the parties "continue to have a 'personal stake in the outcome' of the lawsuit." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 478 (1990) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)). To the extent Safari Club and its members ever had a personal stake in the application of the Service's 2014 findings, that interest has now evaporated due to the passage of time and plaintiffs' failure to experience a concrete injury related to

those findings while they were in place. Safari Club's claims are thus moot with respect to the 2014 findings for Tanzania, and the district court and this Court lack jurisdiction to evaluate the merits of those claims.

## B. Safari Club lacks standing.

Courts are not "continuing monitors of the wisdom and soundness of Executive action." *Allen v. Wright*, 468 U.S. 737, 760 (1984), *abrogated on other grounds by Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377 (2014). Instead, courts adjudicate live cases and controversies and must ensure that plaintiffs have suffered a genuine injury in fact. *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1291 (D.C. Cir. 2007). Injury in fact, for standing purposes, is the "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 650 (1992) (internal quotation marks, citations, and footnote omitted). Plaintiffs must also show that the injury is caused by the complained-of conduct through a "fairly traceable connection." *Steel Co.*, 523 U.S. 83, 103 (1998). And finally, claims must be redressible—"a likelihood that the requested relief will redress the alleged injury." *Id.* Plaintiffs bear the burden of establishing all three of these elements that constitute the core of Article III's case or controversy requirement. *Id.* at 103–04.

These standing requirements ensure that the plaintiff has "'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)). The standing inquiry thus aims to prevent the judicial process from becoming "a vehicle for the vindication of the value interests of concerned bystanders." *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 56 (D.C. Cir. 1991) (quoting *Valley Forge*, 454 U.S. at 473).

Where, as here, an organization asserts standing on behalf of its members, it must demonstrate, among other things, that "its members would otherwise have standing to sue in their own right." *Albuquerque Indian Rights*, 930 F.2d at 53 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). And where an organization asserts standing on its own behalf, it must "allege such a personal stake in the outcome of the controversy as to warrant the invocation of federal-court jurisdiction; that is, it must demonstrate that it has suffered injury in fact . . . constituting . . . more than simply a setback to the organization's abstract social interest." *Nat'l Ass'n of Home Builders v. Envt'l Prot. Agency*, 667 F.3d 6, 11 (D.C. Cir. 2011) (internal

punctuation and citations omitted). Safari Club has ventured several standing theories, but none have merit.[15]

1. **Safari Club has not shown that any of its members have been injured by being denied a 2014 Tanzania import permit.**

Safari Club's failure to show that a single one of its members has applied for and been denied a permit to import an elephant sport hunting trophy from Tanzania in 2014 is fatal to its standing to pursue its claims. Because no member has applied for and been denied a permit, no member has suffered an actual injury as a result of the Service's allegedly-improper non-detriment and enhancement findings or the process leading to those findings. Due to this of this lack of concrete, particular, and redressable injury, Safari Club lacks standing to bring its claims related to the 2014 Tanzania findings, and this Court—and the district court—is without jurisdiction to hear the merits of those claims.

Because Safari Club has put forward no single member that actually applied for a permit to import a 2014 sport-hunted elephant trophy from Tanzania, any harm to one of Safari Club's member's is purely hypothetical. Theoretically (but supported by no allegations or evidence here), a hunter

---

[15] Safari Club has advanced several of these theories under its general argument that it has exhausted administrative remedies, but because they also speak to standing, we address them here.

*might* have killed an elephant in Tanzania in 2014, *might* at some point in the future have sought to import a trophy from that hunt, and *might* be denied a permit to do so, depending on the information that hunter provided in its permit application. But well-settled doctrine does not confer standing on such speculative and abstract grounds. *See Albuquerque Indian Rights*, 930 F.2d at 55–57. Instead, even where a plaintiff seeks to challenge general processes, he or she must actually be aggrieved in a concrete and particularized way.

For instance, in *Albuquerque Indian Rights*, this Court denied standing to an organization because none of its members had "actually applied for" the benefit that the organization was suing over. 930 F.2d at 55–57 (discussing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67 (1972)). Just as here, the plaintiff organization's claim was general in nature: it sought to challenge an agency's refusal to apply an Indian hiring preference to certain employment positions. *Id.* at 52. None of the organization's members, however, had applied for any position with the agency. *Id.* at 52, 55–57. Although the members submitted affidavits stating that they were "interested" and "would have applied" for the positions if they had been advertised with the Indian hiring preference, *id.* at 55–56, this Court held such allegations insufficient to demonstrate standing. "Unadorned statements that [an organization's] members were 'interested' in positions or 'would have applied' for positions . .

. do not satisfy the burden of showing that any of plaintiff's members '*personally* . . . suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendants.'" *Id.* at 57 (quoting *Valley Forge*, 454 U.S. at 472 (alteration omitted)).

Indeed, as the Ninth Circuit has succinctly summarized, "[t]here is a long line of cases . . . that hold that a plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit." *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220 (9th Cir. 1992) (citing, among other authority, *Albuquerque Indian Rights*). "The formal application requirement—as our caselaw establishes—presents a bright line separating those who have suffered from the challenged policy and those who have not." *Id.* at 1222; *see also Jackson-Bey v. Hanslmaier,* 115 F.3d 1091, 1096 (2d Cir. 1997) ("As a general matter, to establish standing to challenge an allegedly [illegal] policy, a plaintiff must submit to the challenged policy.").

Under the same rationale, courts routinely find that an individual lacks standing to challenge a law or rule prohibiting certain conduct where the individual has not applied for or been denied a permit that would allow the conduct in question. *See, e.g.*, *Parker v. Dist. of Columbia*, 478 F.3d 370, 373–74, 375–76 (D.C. Cir. 2007) (four individuals wished to possess handguns, but only the one who had "applied for and been denied a registration certificate to

own a handgun" had standing), *aff'd sub nom. Dist. of Columbia v. Heller*, 554 U.S. 570 (2008); *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) (plaintiff lacked standing because he "failed to apply for a gun license"); *Hightower v. City of Boston*, 693 F.3d 61, 70 (1st Cir. 2012) (no standing because plaintiff had "never applied for [a Class B] license, been denied one, or had such a license revoked"); *see also Moose Lodge No. 207 v. Irvis*, 407 U.S. 163, 166 (1972) (plaintiff lacked standing to challenge organization's discriminatory membership requirements where plaintiff had not sought membership and thus not been subject to discriminatory requirements); *Warth*, 422 U.S. at 503 (plaintiffs lacked standing where they had not themselves sought to construct housing or to live in a particular proposed building, and thus were not subject to a discriminatory ordinance). A "chilling effect" is not enough to confer standing on a plaintiff when that plaintiff has not actually submitted him or herself to an application process, *Moose Lodge*, 407 U.S. at 168, nor may a plaintiff base standing on an allegation that they were "discouraged" from applying, *Albuquerque Indian Rights*, 930 F.2d at 57. Indeed, where a party believes that it may, in theory, be harmed by an incorrect legal interpretation, it should "go ahead" and act as it deems the law requires in order to transform that "speculative" "abstraction" into a reviewable claim. *Texas v. United States*, 523 U.S. 296, 302 (1998).

Under the established regulatory regime that Safari Club seeks to challenge, a person wishing to import a sport-hunted African elephant trophy from Tanzania must apply for an import permit. *See* 50 C.F.R. §§ 23.20(e), 23.35(b). And although the Service announced a general pause on such imports based on the best information known to it, the Service also made clear that it would still process permit applications for Tanzania and would consider any applications that contained "new or additional information" on a "case-by-case basis."[16] (DA___, AR159 at 001771; *see also* DA___, App. 59 (explaining that the Service would reevaluate the suspension "upon receipt of new information"); DA___, App. 283.) As promised, the Service has in fact processed 2014 import applications submitted (by non-Safari Club members) after its general findings.[17] (DA___, App. 280–81.) The way forward for persons interested in importing a sport-hunted elephant trophy is thus clear: now, as before, one cannot obtain a permit without applying for one. Yet having never submitted permit applications for Service review, no Safari Club member has experienced a concrete injury related to its 2014 Tanzania claims.

---

[16] Safari Club insists that the need to submit additional information is itself an injury sufficient to confer standing. We address this argument *infra,* Section I.B.2.

[17] The Service denied these applications because they contained no new or additional information. (DA___, App. 281.)

As such, Safari Club's members who are merely *potential* permit applicants are no different than *Albequerque Indian Rights*'s, *Parker*'s, *Madsen*'s, *Jackson-Bey*'s, and *Hightower*'s non-applicants. And their failure to apply for an import permit breaks any causal connection between the Service's generic and non-binding findings and the alleged harm in failure to receive a permit—any Safari Club member's failure to secure a permit is caused, first and foremost, by a failure to even apply for one. *See Grocery Mfrs. Ass'n v. Envt'l Prot. Agency*, 693 F.3d 169, 177 (D.C. Cir. 2012) ("self-inflicted harm" is not fairly traceable to the challenged government conduct and cannot support standing).

That Safari Club's members *might* have applied for permits if the Service's findings had been different or *might* cancel their hunts as a consequence is insufficient to establish the concrete injury required for standing. *See Lujan*, 504 U.S. at 560. Regardless of the Service's actions, Safari Club's members might never have ended up applying for an import permit. They might have been unsuccessful in killing any elephants to import. As the district court correctly noted, none of the hunters are guaranteed to kill an elephant. (DA___, Dkt. 24 at 7; *see also* DA___, App. 238 (acknowledging hunt may not result in kill), App. 241 (noting previous unsuccessful elephant hunt), App. 242 (same).) Or the hunters may have chosen to cancel their trips for reasons unrelated to the Service's actions.

Moreover, Safari Club has not shown that if its members were to submit the additional information about elephants in Tanzania that they profess to have, the Service would disregard that information. To the contrary, the Service represented that it *would* consider such information in the course of making a permit determination. As such, Safari Club has not met the jurisdictional requirement that "threatened injury must be *certainly impending* to constitute injury in fact, and . . . allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Intern. USA*, 133 S.Ct. 1138, 1147 (2013) (internal quotation marks omitted; emphasis in original); *see also Decastro*, 682 F.3d at 164 (requiring "substantial showing" that submitting an application "would have been futile" to demonstrate standing in absence of application) (quoting *Jackson-Bey*, 115 F.3d at 1096); *Madsen*, 976 F.2d at 1222.

*Fund For Animals, Inc. v. Norton*, on which Safari Club relied heavily in the district court, is distinguishable based on this lack of concrete injury. 322 F.3d 728 (D.C. Cir. 2003). In that case, this Court allowed Mongolia's Natural Resources Department to intervene in a challenge to the Service's decision to withdraw an ESA rulemaking to redesignate a threatened sheep species as endangered and to the Service's issuance of import permits for sheep trophies. Had the plaintiffs in that case received the relief requested, the Service certainly would have listed the sheep as endangered and prohibited or

restricted the import of sheep. The Court found that the Mongolia intervenor had a concrete interest in "sheep that [it] regards as its national property and natural resource" and the Court regarded standing as plain where the challenged action "directly regulates the disposition of a party's property." *Id.* at 734. Reliance on *Fund for Animals* lends no weight to Safari Club's standing argument where its interest is speculative and abstract, and certainly not subject to direct regulation by an only hypothetical future agency action.

As the district court acknowledged (DA___, Dkt. 24 at 7), it is entirely possible that Safari Club's members never will be injured by the Tanzania import restrictions about which Safari Club is complaining. Lacking indefinable, actual, concrete injury, Safari Club is nothing more than a "concerned bystander[]" seeking to vindicate its own "value interests,"

*Albuquerque Indian Rights*, 930 F.2d at 56 (quoting *Valley Forge*, 454 U.S. at 473), and thus lacks standing to bring claims before this Court.[18]

### 2. FWS's findings have not imposed an increased administrative burden, and in any event Safari Club has not shown a concrete injury stemming from the alleged increased regulatory burden.

Safari Club has argued that the burden of having to submit additional information was itself sufficient injury to provide standing. Safari Club's implication that the Service has changed the rules is simply incorrect. No part of CITES, the ESA, or Service regulations guarantees a particular finding regarding import trophies. Instead, import permit applicants have always had the burden to supply information sufficient for the Service to make the necessary findings. *See* 50 C.F.R. § 23.61(c); 16 U.S.C. § 1539(g). As a practical matter, the Service has in the past made and will likely continue to make generalized findings that it applies to all elephant permit applications for

---

[18] Moreover, even if Safari Club were able to establish some concrete harm based on its members' potential future applications for 2014 sport-hunted elephant trophy imports, that speculative injury lacks redressability. CITES and the ESA require positive non-detriment and enhancement findings before the Service may issue an import permit. This Court cannot direct the Service to make specific findings for 2014. *See Cty. of L.A. v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 2007). Vacating the existing generic findings would leave the Service with no generic 2014 findings to apply to 2014 permit applications, as the Service's 2013 findings expired by their own terms. In other words, even if Safari Club's claims were successful, its members would still need to go through a case-by-case permit application process and would retain the burden of demonstrating that the proposed import met CITES and ESA requirements.

Tanzania for a certain time period. But the Service is not required do to that—instead, even before the 2014 findings, "[t]he applicant" must be the one to "provide sufficient information for [the Service] to make a finding of non-detriment." 50 C.F.R. § 23.61(c); *see also id.* § 23.35(c) ("you must provide sufficient information for us to find that your proposed activity . . . would be for purposes that are not detrimental to the survival of the species."). By making public its negative non-detriment and enhancement findings for 2014, the Service indicated to potential permit-seekers the status of its current understanding and made clear its intention to receive and review additional information and permit applications.[19] (DA___, App. 283.)

Safari Club's argument that it has been injured by "informational burdens" (S.C. Br. 19) imposed by the findings relies on cases in which parties had a direct stake in the consequences of final agency decisions and changes to administrative procedures. For instance, this case is wholly unlike *Croplife America v. Environmental Protection Agency*, where the agency's directive "unambiguously precludes the agency's consideration" of certain types of studies. 329 F.3d 876, 994 (D.C. Cir. 2003) (noting that previously the agency had considered such studies on a case-by-case basis). And the district decision

---

[19] Indeed, had the Service made no generic findings for 2014 at all, the applicants would still have been required to submit information to support positive findings if they wished the Service to approve their permits.

in *National Mining Association v. Jackson* is distinguishable because the agency

has not changed the permitting process or imposed "additional processes [] not

contemplated or set forth" in the agency's guidelines or regulations. 768 F.

Supp. 2d 34, 47 (D.D.C. 2011).[20]

Indeed, any case involving a challenge to a new and final rule or

decision is distinguishable on its face. *See Friends of Animals v. Kempthorne*, 452

F. Supp. 2d 64, 70 (D.D.C. 2006) (organization had standing to intervene in

challenge to Service's final decision listing three species as endangered);

*Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 15 (D.D.C. 2010) (coal company

had standing to intervene in challenge to agency's decision to make certain

lands available for mining lease where company had been shown to be likely

successful bidder on those leases); *In re Polar Bear Endangered Species Act Listing

and 4(d) Litig.*, 627 F. Supp. 2d 16, 26 (D.D.C. 2009) (organization had

standing to challenge new "final rule" listing the polar bear as a threatened

species, where rule was "determinative" and meant the "only possible

response" to a permit application was denial). By contrast, here only the

information available to the Service and the agency's general understanding of

---

[20] This Court reversed as to the finality of one of the challenged processes, finding that a guidance document was not a judicially reviewable agency action and that "[i]f and when an applicant is denied a permit, the applicant at that time may challenge the denial of the permit as unlawful." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 247 (D.C. Cir. 2014).

the status of elephants and elephant management in Tanzania have changed;
the required findings, the permitting process, and the applicants' burden
remain the same.

In any event, Safari Club's refusal to engage in the challenged process
deprives it of standing to bring its Tanzania claims. As discussed above, the
organization has not shown that any of its members actually have submitted
themselves to and been injured by this allegedly increased burden, or have
imminent plans to do so. And even where claims are procedural in nature, the
requirement of actual injury remains. *See Lujan*, 504 U.S. at 572–78; *see also
Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc)
("[T]he plaintiff must show that the government act performed without the
procedure in question will cause a distinct risk to a particularized interest of the
plaintiff."). Safari Club cannot use a bare allegation of increased informational
burden to avoid the requirement of an actual, concrete harm, as "a procedural
right *in vacuo* . . . is insufficient to create Article III standing." *Summers v. Earth
Island Inst.*, 555 U.S. 488, 496 (2009).

Similarly, having not shown that its members will actually be harmed by
the alleged "informational burden"—or that any such harm is more than *de
minimus*, given the members' professed knowledge about the status of
elephants—Safari Club also cannot show that its non-injury is redressable by a

court order that, for instance, the Service use different standards in reaching its findings. Simply put, claiming injury by information burden does not allow Safari Club's members to gain standing while sidestepping the requirement that they participate in the permit process that they wish to challenge.

### 3. Safari Club does not otherwise have standing.

Safari Club's briefing suggests various other theories of standing, but none are sufficient to satisfy well-settled standards.

First, to the extent that Safari Club wishes to rely on its and its members' general interests in elephant conservation—on the theory that the Service's findings have led American sport hunters to cancel trips in Tanzania, thereby reducing the funds available to the Tanzanian government for elephant-related conservation efforts—that alleged harm is both too attenuated and self-inflicted. The Service has done nothing to prevent Safari Club or its members from contributing to conservation. Indeed, the Service has done nothing to prevent Safari Club's members from going to Tanzania and sport hunting elephants, and thereby contributing to conservation as they conceive of it. Safari Club or its members may still make financial contributions to conservation organizations or agencies as they see fit. And Safari Club has not demonstrated that the relief it seeks—declaring the Service's findings invalid and preventing the Service "from continuing and/or enforcing the suspension

of the importation of African elephant trophies from Tanzania for 2014"—will aid those conservation goals. Moreover, an organization's general interest in conservation cannot itself confer standing: the organization must show that one of its members would "be 'directly' affected apart from [its] 'special interest in th[e] subject.'" *Lujan*, 504 U.S. at 563 (quoting *Sierra Club*, 405 U.S. at 735). Safari Club has failed to make that showing of a concrete and particularized injury here.

To the extent Safari Club alleges an injury based on its members' possible cancellations of planned hunting trips, that speculative and voluntary action likewise cannot be the basis for standing. *Albuquerque Indian Rights*, 930 F.2d at 57 (holding that a person does not have standing merely by being "discouraged" from taking some action). The Service's findings have not prevented any person from sport hunting elephants in Tanzania. Indeed, some declarants may still hunt elephants, despite the Service's new findings, (*see* DA___, App. 242; DA___, App. 244), and no Safari Club member alleges that he or she actually cancelled a planned 2014 Tanzania elephant hunting trip. Relevant, too, is the fact that Safari Club's members who had planned hunts in 2014 but did not submit import permit applications were apparently willing to risk being unable to import a trophy. (*See* DA___, App. 280 ("By applying before traveling, the hunter can, in many cases, make adjustments to their

hunting trip, if desired based on the [Service] determination on whether a permit can be issued"). A CITES import permit is not a right. And the mere fact that information available to the Service allowed it to make positive findings for past years did not mean that the Service would necessarily be able to make positive findings for 2014 as well. (*See* DA___, App. 342 ("If new information becomes available that suggests that this General Advice is no longer valid, it will be suspended and reconsidered.").)

To the extent Safari Club asserts standing based on its hunting outfitter members rather than hunters themselves—on the theory that the Service's findings might lead hunters to cancel or forego Tanzanian elephant hunting trips, that the hunting outfitters might not be able to find alternate hunters to take their places, and that the outfitters might thereby lose money—that alleged injury is both too speculative and too attenuated to confer standing on Safari Club. The Supreme Court has said, when "as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*," standing will depend on the acts of third parties and standing is "'substantially more difficult to establish.'" *Lujan*, 504 U.S. at 562 (emphasis in original) (quoting *Allen*, 468 U.S. at 758). American hunters may cancel or have canceled their trips for numerous reasons not related to the Service's findings. Tanzanian hunting outfitters may have filled any now-available slots

with hunters from other countries. Safari Club's outfitter members fall far short of the heightened showing required for standing to challenge regulations that apply only to other people.[21]

Lacking concrete injury that can fairly be traced to the Service's actions and redressed by this Court, Safari Club and its members do not have standing under any of its alternate theories.

---

[21] Indeed, as foreigners not directly regulated by the Service, *see* 16 U.S.C. § 1532(13) (defining "person" as anyone subject to United States jurisdiction), 16 U.S.C. § 1538 (a)(1) (restricting activity by "any person subject to the jurisdiction of the United States"), Tanzanian outfitters would not, on their own, have standing to bring this challenge. As such, Safari Club may not rely upon them to demonstrate its own standing. *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1435 (D.C. Cir. 1995) (for organization to establish standing based on its members, it must show that its members would otherwise have standing to sue in their own right).

**II.    The Service's 2014 non-detriment and enhancement findings are not final agency action.**

Finally, and as the district court correctly found, Safari Club has failed to state a claim "because the challenged Tanzania advice and finding are not final agency action given that plaintiffs have failed to exhaust their administrative remedies." (DA___, Dkt. 48 at 16.) Because the Service has not yet been given an opportunity to render a final decision regarding an import permit for any of Safari Club's members, there is no final decision for this Court to review, and the district court was correct to dismiss Safari Club's Tanzania claims.

**A.    The Service's findings are merely a predicate to a final decision.**

The Administrative Procedure Act provides for review of only "final agency action." 5 U.S.C. § 704; *Fund for Animals v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006). An agency action is final where it (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) determines "'rights or obligations'" or is a decision "from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp*, 333 U.S. 103, 113 (1948); *Port of Bos. Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Put another way, "if the practical effect of the agency action is not a *certain change* in the legal obligations of a party, the action is

non-final for the purpose of judicial review." *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005) (emphasis added).

The Service's findings meet neither criterion. The Service's regulations make clear that its enhancement and non-detriment findings are not the consummation of a decision-making process. Rather, they constitute predicate findings made before the Service may issue an import permit for a sport-hunted elephant trophy from Tanzania. *See* 50 C.F.R. § 17.40(e)(3)(iii) (ESA special rule regarding sport-hunted elephant trophies);[22] *id.* §§ 23.13–23.36 (CITES permitting requirements).[23] The Service's documents reach a negative conclusion—the agency is not yet able, based on information before it, to conclude that the import of sport-hunted trophies taken in Tanzania in 2014 would meet CITES and ESA requirements. The Service's inquiry is not over,

---

[22] This provision provides: Sport-hunted trophies may be imported into the United States provided:

(A) The trophy originates in a country for which the Service has received notice of that country's African elephant ivory quota for the year of export;

(B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied with;

(C) A determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and

(D) [Specific marking requirements for the trophies].

[23] The regulation entitled, "What are the requirements for an import permit," sets forth numerous criteria, including sufficient information for the United States Scientific Authority to make a non-detriment finding. 50 C.F.R. § 23.35(c)(1); *see also id.* § 23.61.

however. It can and will review additional information to evaluate whether, based on that information, it can make those required findings. The Service will conduct that evaluation in the context of an individual permit application; if it can make the findings, it will issue a permit. And it is the permit decision, not the findings, from which legal consequences flow: only with an appropriate permit may a person import a sport-hunted elephant trophy from Tanzania.

This Court has addressed similar findings, guidance, and other communications and determined that where there remained a process to be followed and those communications—without further process—had no legal effect, the agencies' action was not final. For instance, this Court recently held that, even where the Environmental Protection Agency issued guidance that plaintiffs interpreted as "the writing [] on the wall about what will be needed to obtain a permit," the guidance was not final agency action because it had no legal effect and did not compel any regulated entity to do anything. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014). Similarly, this Court ruled that warning letters from the Food and Drug Administration to regulated entities instructing them to provide additional information for agency evaluation were not final agency action, as they neither represented a decision determining rights or obligations, nor one from which legal consequences flow. *Holistic Candler & Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 943–44

(D.C. Cir. 2012). Both *National Mining Association* and *Holistic Candler* make clear that the Service's findings here were simply not final agency action. The Service's findings do not prevent a sport-hunter from importing an elephant trophy from Tanzania: only a denial of a sport-hunted trophy import permit can do that.

Put another way, Safari Club's claims are unreviewable because it failed to complete the process of obtaining a final agency action by exhausting its administrative remedies, another prerequisite of a final agency action reviewable under § 704 of the APA. The Supreme Court noted in *Darby v. Cisneros*, 509 U.S. 137, 146 (1993), that an agency action is "final" and "subject to judicial review" when "an aggrieved party has exhausted all administrative remedies expressly prescribed by statute *or agency rule.*" (emphasis added). Indeed, § 704 indicates that agencies may "require[] by rule" "any form of reconsideration" or "an appeal to superior agency authority." 5 U.S.C. § 704.

Here, the Service's regulations provide just such a process for appealing denial of a permit: trophy hunters may "request reconsideration" of the denial of a permit; if reconsideration again leads to denial of the permit, trophy hunters may appeal that decision to the Director of the Service, whose decision "shall constitute the final administrative decision of the Department of the Interior." 50 C.F.R. §§ 13.29(a), 13.29(e), 13.29(f)(3). Indeed, this Court has

specifically held a challenge to the denial of an import permit did not properly challenge final agency action where the applicant's administrative appeal remained pending with the agency. *Marcum v. Salazar*, 694 F.3d 123, 129–30 (D.C. Cir. 2012). This rule applies even though Safari Club has characterized its claims as procedural: in *Marcum*, as here, plaintiffs claimed that the Service's findings required formal notice and comment rulemaking. *Id.* at 126. Safari Club has done even less to obtain a final agency decision than the *Marcum* plaintiffs because Safari Club's declarant members have not applied for, much less been denied, an import permit. Until Safari Club's members have begun and completed this process, they have not obtained a reviewable final agency action.

### B. Safari Club should not be excused from the finality requirement on futility or other grounds.

Safari Club insists that this Court should excuse it from the ordinary requirement of finality on the grounds that it is a "foregone conclusion" that the Service will not grant "any permit." (S.C. Br. 37.) But the fact that Safari Club members believe that they will be unable to convince the Service to issue a permit does not render the Service's decision reviewable. *See Nat'l Mining Ass'n*, 758 F.3d at 253 (even where "the writing is on the wall about what will be needed to obtain a permit," final agency action does not occur until guidance or policy is applied in particular situation). This Court has

specifically found that even a "rebuttable presumption" is not final agency action because of its nonbinding nature. *Catawba Cty., N.C. v. Envt'l Prot. Agency*, 571 F.3d 20, 34 (D.C. Cir. 2009). Indeed, even where a permit applicant believes it knows how the agency will treat its application, without applying and receiving a decision, it has no final decision ripe for judicial review. *See Barlow & Haun, Inc. v. United States*, 805 F.3d 1049, 1058–59 (Fed. Cir. 2015) (even where agency had enunciated general policy against certain type of mining, claims were unripe until plaintiff applied for mining permit because agency retained discretion to review applications on case-by-case basis). Instead, where a process for obtaining a final decision exists, a plaintiff must follow that process to its end. *Cf. Palazzolo v. Rhode Island*, 533 U.S. 606, 620–21 (2001) (in takings context, plaintiff must "follow[] reasonable and necessary steps to allow regulatory agencies to exercise their full discretion" before claim is ripe).

This Court has accordingly held that exhaustion may be excused only in "exceptional circumstances" where exhaustion is "clearly useless." *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Board of Trs. of Univ. of D.C.*, 56 F.3d 1469, 1475 (D.C. Cir. 1995) (internal quotation marks and citations omitted). But Safari Club cites nothing to indicate that the Service is in fact unwilling or unable to consider or approve appropriate permit applications. Instead, as the

district court found, "an adverse decision [is] probable, [but] plaintiffs have not shown that the agency is certain to issue an adverse decision on any permit application." (DA___, Dkt. 48 at 16 (citing *Tesoro Ref. & Mktg. Co. v. Fed. Energy. Regulatory Comm'n*, 552 F.3d 868, 874 (2009)).) This case is thus unlike those that Safari Club cites where an agency lacks the discretion that the Service continues to possess here.

For instance, *Appalachian Power Co. v. Environmental Protection Agency* involved a challenge to an aspect of agency legal "guidance" that was the agency's "settled position" and that it was "bound to apply." 208 F.3d 1015, 1022 (D.C. Cir. 2000). In *Sackett v. Environmental Protection Agency*, the Supreme Court found that the agency's findings were final where they "were not subject to further agency review." 132 S.Ct. 1367, 1372 (2012). And in *Role Models America, Inc. v. White*, the agency's decision to close a military base and transfer it to a private entity was final because it had published its binding record of recession and the plaintiff had no further opportunity to apply for a

conveyance. 317 F.3d 327, 331–32 (D.C. Cir. 2003).[24] In contrast, here the Service has made a fact-based decision that is open to amendment should it receive additional facts. The Service has not "bound" itself to any particular outcome; it has clearly articulated that it will continue to review applications and make case-by-case permit decisions going forward. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (noting the distinction between rules that "implement" a statute, "interpretive rules," and "general statements of policy"). Safari Club's members have not engaged the Service in this process, and so have no final decision to challenge.

Further, citing *Appalachian Power*, Safari Club insists that the Service's findings are, in fact binding, despite the Service's statements that it will review and weigh its findings based on new information. Safari Club offers nothing to support this bare allegation that the Service does not mean what it says, and has certainly not overcome the presumption that the agency will act

---

[24] Plaintiff's other cited cases are no more compelling. *National Treasury Employees Union v. Federal Labor Relations Authority* stands merely for the narrow proposition that an agency's decision on the merits of plaintiffs' claim was final even though an attorney's fee remained undecided. 745 F.3d 1219, 1222 (D.C. Cir. 2014). Here, of course, Safari Club lacks a final agency decision regarding the very core of its claims. And in *Meredith v. Federal Mine Safety and Health Review Commission* this Court found that plaintiff's claims "clearly fall[] outside the heartland of final action" because an administrative judge would be subjecting specific complaints to further record development and review. 177 F.3d 1042, 1047 (D.C. Cir. 1999). As in *Meredith,* Safari Club has not presented a compelling reason to "advert the finality norm." *Id.*

appropriately. *See CTIA-The Wireless Ass'n v. Fed. Commc'ns Comm'n*, 530 F.3d 984, 989 (D.C. Cir. 2008). Moreover, Safari Club's insistence that convincing the Service to make a positive finding is "impossible" is at odds with its members' assertions that poaching rates and elephant mortality are, in fact, low, or that poaching may be easily remedied.[25] (*See, e.g.*, DA___, App. 186–87, 209–10, 238–47.) And Safari Club's argument that the Service has set "unobtainable" standards for information that could support positive findings is not supported by the documents it cites. (*See* S.C. Br. 38–39). The cited letter and talking points did not issue an "ultimatum," they indicates sources of concern and types of documentation that could indicate elephants' improved condition. (DA___, App. 375–76; DA___, AR192 at 003004.) Nothing in these documents bound the Service to a particular permit decision; instead, they provided illustrative examples of what a would-be importer could present to support his or her permit application. Precedent does not support excusing finality in such a case, particularly where Safari Club has demonstrated no hardship or injustice in engaging in the administrative process. As such, the

---

[25] Safari Club relies on *Singh v. Ashcroft*, which involved a party's actual physical inability to comply with an exhaustion requirement. 362 F.3d 1164, 1169 (9th Cir. 2004). That case simply does not compel excuse of the exhaustion requirement where Safari Club merely speculates that it will likely be unable to produce information that will convince the Service to issue a permit, should Safari Club's members actually engage in the required administrative process.

district court appropriately found that the Service's findings were not final agency action properly reviewed under the APA.

Finally, Safari Club argues it should be excused from the finality and exhaustion requirements because engaging in the Service's administrative process is not necessary for its claims. But Safari Club's claims are properly made in the context of a permit application—and indeed this is the only way for Safari Club to gain standing to bring a proper APA claim. The district court has heard several challenges to the Service's trophy import process, such as Safari Club wishes to be heard here, in the context of permit denials. *See, e.g., Franks v. Salazar*, 816 F. Supp. 2d 49 (D.D.C. 2011) (considering claim that Service was required to engage in formal notice and comment rulemaking procedure); *Marcum v. Salazar*, 810 F. Supp. 2d 56 (D.D.C. 2011) (same), *vacated as unripe* 694 F.3d 123 (D.C. Cir. 2012). There is no reason that Safari Club cannot and should not bring its similar claims in the context of an actual permit application.

As the district court correctly noted in a case involving the same permitting regime challenged here, "if the Court were to allow Plaintiffs to circumvent the agency appeal process simply by refusing to participate, it would defeat the very purpose of that process." *Conservation Force v. Salazar*, 919 F. Supp. 2d 85, 91 (D.D.C. 2013). Because Safari Club has demonstrated

no compelling reason to depart from the ordinary rules of administrative law, the district court properly dismissed its claims for lack of finality and failure to exhaust.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's dismissal of Safari Club's claims.

Respectfully submitted,

JOHN CRUDEN
 Assistant Attorney General

 */s Erika B. Kranz*
ERIKA B. KRANZ
 U.S. Department of Justice
 Environment & Natural Res. Div.
 P.O. Box 7415 Ben Franklin Station
March 2016                     Washington, DC 20044
90-8-6-07698                  (202) 307-6105
                                     Erika.kranz@usdoj.gov

## CERTIFICATE OF COMPLIANCE WITH
## TYPE VOLUME LIMITATION

This brief complies with the type volume limitations set forth in Federal

Rule of Appellate Procedure 32(a)(7)(B). Excepting the portions described in

Rule 32(a)(7)(B)(iii), the brief contains 13,394 words.

/s Erika B. Kranz
ERIKA B. KRANZ
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7415 Ben Franklin Station
Washington, DC 20044
(202) 307-6105
erika.kranz@usdoj.gov

**CERTIFICATE OF SERVICE**

On March 4, 2016, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s Erika B. Kranz*
ERIKA B. KRANZ
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7415 Ben Franklin Station
Washington, DC 20044
(202) 307-6105
erika.kranz@usdoj.gov