_____

No. 15-5170
_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SAFARI CLUB INTERNATIONAL and NATIONAL RIFLE ASSOCIATION OF AMERICA, Plaintiffs-Appellants,

v.

SALLY M. R. JEWELL, in her official capacity as
United States Secretary of the Interior, *et al.*,
Defendants-Appellees

_____

On Appeal from the United States District Court for the District of Columbia
(No. 14-00670-RCL)

_____

## APPENDIX

Anna M. Seidman
Douglas S. Burdin
Jeremy E. Clare
Safari Club International
501 Second Street NE
Washington, D.C. 20002
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org

*Counsel for Safari Club International*

Christopher A. Conte
Michael T. Jean
National Rifle Association of
America/ILA
11250 Waples Mill Rd., 5N
Fairfax, Virginia 22030
Tel: 703-267-1166
Fax: 703-267-1164
cconte@nrahq.org
mjean@nrahq.org

*Counsel for National Rifle
Association of America*

# Table of Contents

Docket Entries

   Docket #13 – First Amended Complaint for Declarative and Injunctive Relief...... 1

   Docket #24 – Memorandum Opinion and Order on Motion for Preliminary
              Injunction ......................................................................................... 35

   Docket #47 – Order on Motions to Dismiss and Motion to Amend Complaint .... 47

   Docket #48 – Memorandum Opinion on Motions to Dismiss and Motion to
              Amend Complaint ............................................................................ 48

   Docket #49 – Second Amended and Supplemented Complaint for Declarative and
              Injunctive Relief............................................................................... 69

   Docket #65 – Memorandum Opinion and Order on Motion to Certify the Finality
              of the Court's Dismissal of the Tanzania Claims .......................... 108

   Docket #69 – Notice of Appeal .......................................................................... 116


Administrative Record Entries

   AR 31 – Information Memorandum for the Director, dated January 8, 2014...... 118

   AR 159 – General Advice on Importation of Sport-hunted Trophies of African
            Elephants taken in Tanzania in the Calendar Year 2014..................... 123

   AR 186 – Targeted Communications Strategy, Suspension of Import of Elephant
            Hunting Trophies Taken in Tanzania and Zimbabwe in 2014 ............ 137

   AR 192 – Suspension of Import of Elephant Hunting Trophies Taken in Tanzania
            and Zimbabwe in 2014, Talking Points for Director's Calls April 3,
            2014 ................................................................................................. 144

   AR 204 – Enhancement Finding for African Elephants Taken as Sport-hunted
            Trophies in Tanzania during 2014..................................................... 147


Appendix Entries

   App. 58-59 – Press Release "Service Suspends Import of Elephant Trophies from
              Tanzania and Zimbabwe".............................................................. 161

   App. 60-61 – Suspension of Import of Elephant Hunting Trophies Taken in
              Tanzania and Zimbabwe in 2014 – Questions and Answers ......... 163

App. 137-39 – Declaration of Rew R. Goodenow ................................................. 165

App. 186-87 – Declaration of Robert Bruce Rhyne .............................................. 168

App. 207-08 – Declaration of Craig M. McDonnold ........................................... 170

App. 209-11 – Declaration of Grant F. Dennison ................................................ 172

App. 218-21 – Declaration of Ivan Murray Carter ............................................... 175

App. 238-39 – Declaration of Walter Allen Tarpley ............................................ 179

App. 240-42 – Declaration of Scott Petty Jr. ....................................................... 181

App. 243-45 – Declaration of Robert Joseph Johnson ......................................... 184

App. 246-47 – Declaration of Robert Allen Sakuta ............................................. 187

App. 248-50 – Declaration of Derek Anthony Hurt ............................................. 189

App. 251-53 – Declaration of Michael Andrew Angelides .................................. 192

App. 275-88 – Declaration of Timothy J. Van Norman ....................................... 195

App. 341-54 – General Advice on Importation of Sport-hunted Trophies and
Articles for Personal Use or Display that Were Made from Sport-
hunted Trophies of African Elephants from Tanzania, for the
Calendar Year 2013 ....................................................................... 209

App. 375-404 – Letter from Bryan Arroyo to Lazaro Nyalandu, dated April 4,
2014 (with attachments) ............................................................. 223

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| 501 2nd Street NE | ) | |
| Washington, DC 20002; | ) | |
| NATIONAL RIFLE ASSOCIATION OF | ) | |
| AMERICA | ) | |
| 11250 Waples Mill Rd, 5N | ) | |
| Fairfax, VA 22030 | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. 14-cv-00670 (ABJ) |
| SALLY M. R. JEWELL, in her official | ) | |
| capacity as Secretary of the U.S. | ) | |
| Department of the Interior; | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| an agency of the United States; | ) | |
| DANIEL ASHE, in his official capacity as | ) | |
| Director of the U.S. Fish and Wildlife Service; and | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| an agency of the United States | ) | |
| 1849 C Street, NW | ) | |
| Washington, DC 20240, | ) | |
| | ) | |
|     Defendants. | ) | |

**AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.    For decades U.S. hunters have been able to hunt African elephants in Zimbabwe

and Tanzania and legally import their trophies into the United States.  This hunting and

importation supported elephant conservation by increasing the value of African elephants for

local communities, discouraging poaching for ivory and/or food and providing financial

resources for elephant protection.  On April 4, 2014, without warning or public input, all this

1

**DA 1**

abruptly ended.   The U.S. Fish and Wildlife Service, an agency of the Department of the

Interior, abruptly and immediately suspended the importation of legally sport-hunted African

elephant trophies from Zimbabwe and Tanzania ("trophy importation ban").  With this

Complaint, Plaintiff, Safari Club International and the National Rifle Association of America

("Safari Club"), challenge this April 4, 2014 final action of Defendants Sally M. R. Jewell, in her

official capacity as Secretary of the U.S. Department of the Interior; the U.S. Department of the

Interior; Daniel Ashe, in his official capacity as Director of the U.S. Fish and Wildlife Service;

and the U.S. Fish and Wildlife Service ("Federal Defendants").

> 2. In establishing the trophy importation ban, Federal Defendants acted arbitrarily

and capriciously, violated the law, and abused their discretion by 1) relying on "limited" data and

"anecdotal" evidence and failing to obtain accurate and substantiated information before making

the decision to implement the trophy importation ban; 2) failing to follow the U.S. Fish and

Wildlife Service's ("FWS") own stated procedures for changing its position on whether sport

hunting of elephants in Zimbabwe enhances the survival of the species; 3) imposing and

enforcing a requirement that a finding that enhancing the survival of the African elephant in

Zimbabwe is necessary for the importation of sport-hunted trophies from elephant populations

listed on Convention for International Trade in Endangered Species of Wild Fauna and Flora

("CITES") Appendix II without first providing notice of the requirement and an opportunity for

the public to comment; 4) failing to give the public notice and the opportunity to comment on the

trophy importation ban from Tanzania; 5) imposing and enforcing a requirement that a finding

that enhancing the survival of the African elephant in Tanzania is necessary for the importation

of sport-hunted trophies without first providing notice of the requirement and an opportunity for

DA 2

the public to comment; and 6) applying an incorrect non-detriment finding analysis for the importation of African elephant trophies from Tanzania.

3. Federal Defendants' actions violate the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA").

4. Declaratory and injunctive relief is required to remedy the harm the adoption and implementation of the trophy importation ban has caused and will continue to cause.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under the APA, 5 U.S.C. §§ 702, 706 (judicial review of final agency action and inaction) and 28 U.S.C. § 1331 (federal question jurisdiction).  The Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201, 28 U.S.C. § 2202, and 5 U.S.C. §§ 701-706.

6. Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) as this action is brought against agencies of the United States and against officers of agencies of the United States in their official capacities.  Decisions and actions challenged here were made, at least in part, in this District; Safari Club maintains an office in this District; and no real property is involved.

7. Members of Safari Club are hunters, outfitters, professional hunters, booking agents, taxidermists and others who hunt, guide, arrange for hunts and otherwise rely on hunting for their personal, professional and conservation interests in African elephants and who rely on the ability of U.S. hunters to import African elephant sport-hunted trophies from Zimbabwe and Tanzania into the United States to fulfill those interests.

8. The judicial review provisions of the APA waive the Federal government's sovereign immunity.  5 U.S.C. § 702.

**PARTIES**

9.      Safari Club International, a nonprofit IRC § 501(c)(4) corporation, has

approximately 50,000 members worldwide.  Safari Club's mission is to protect the freedom to

hunt and to promote wildlife conservation worldwide.  Safari Club's purposes include the

following:

- To advocate, preserve and protect the rights of all hunters;
- To promote safe, legal and ethical hunting and related activities;
- To engage in advocacy within the limits imposed by law and regulation, to monitor, support, educate or otherwise take positions on local, national and international legislative, executive, judicial or organizational endeavors that foster and support these purposes and objectives; and
- To inform and educate the public concerning hunting and related activities.

10.      Safari Club works in coordination with the Safari Club International Foundation

("SCIF"), a nonprofit IRC § 501(c)(3) corporation.  SCIF's mission is to fund and manage

worldwide programs dedicated to wildlife conservation, outdoor education and humanitarian

services.  SCIF's purposes include the following:

- To conduct and support scientific and technical studies in the field of wildlife conservation, to assist in the design and development of scientifically sound wildlife programs for the management of wildlife and sustainable use hunting, and to demonstrate the constructive role that hunting and hunters play in the conservation of wildlife and in preserving biodiversity worldwide; and
- To carry out and to support education programs on wildlife conservation, ecology and natural resource management that include a demonstration of the constructive role that hunting and hunters play in natural resource conservation and land management.

11.      Safari Club promotes the principles and practice of sustainable use conservation.

Safari Club and Safari Club members' interests include the sound sustainable use conservation of

African elephants in Zimbabwe and Tanzania.  Safari Club members have an interest in their

ability to hunt those elephants and to import their trophies from successful hunts. Other Safari Club members have an interest in guiding those hunts and being able to sell to U.S. residents elephant hunts that take place in Zimbabwe and Tanzania. Still other Safari Club members have an interest in arranging those hunts, performing the taxidermy on sport-hunted trophies from successful African elephant hunts and conducting other types of business related to African elephant hunting in Zimbabwe and Tanzania. Safari Club members have an interest in the continued ability to participate in the sustainable use conservation of the African elephant, in the long-term survival of the African elephant species, and in preventing poaching from threatening the survival of the species.

12.     Safari Club and members of Safari Club are harmed and aggrieved by the abrupt suspension of the importation of legally sport-hunted African elephant trophies from Zimbabwe and Tanzania. For many, the opportunity to hunt elephant in Zimbabwe and Tanzania is an event of a lifetime that will never be repeated. Most Safari Club members who want to participate in an African elephant hunt wish to bring back the trophy from their successful hunt as a prized memento of a treasured experience. A hunter's inability to import the trophy from his legally sport-hunted African elephant deprives the hunter of an element of the hunting experience to which he or she attributes great value. A great number will not invest in an expensive elephant hunt if they cannot import the symbol of their successful hunt. Many Safari Club members booked upcoming hunts in these countries years in advance, invested significant funds towards the trip, and are or will be unable to recover the funds already expended if and when they cancel their bookings.

13.     Other Safari Club members are outfitters, professional hunters and booking agents who provide African elephant hunts to U.S. residents. These Safari Club members have been

**DA 5**

and will continue to be harmed and aggrieved by the abrupt suspension of African elephant trophy importation for 2014.  These Safari Club members have lost clients and bookings due to the importation ban.  Their livelihoods and ability to remain in business have been drastically affected due to the reduction in the value of elephant hunts, cancellations by U.S. hunters and the lack of interest from U.S. hunters to book future hunts.

14.     Still other Safari Club members are taxidermists and other craftsmen who rely on U.S. hunters for business related to their successfully hunted African elephants.  The loss of U.S. hunters and the inability of U.S. hunters to import their trophies into the U.S. will significantly harm these Safari Club members' businesses and livelihoods.

15.     Safari Club and Safari Club members are aggrieved by the harm that the suspension of trophy importation will cause to African elephant conservation in Zimbabwe and Tanzania.  Safari Club members support sustainable use conservation generally and the role that hunting plays in African elephant conservation specifically.  The trophy importation bans will diminish the number of hunters and potentially the number of outfitting operations present in the field in elephant range in Zimbabwe and Tanzania, which will consequently erase a major deterrent to poaching in these areas.  Fewer U.S. hunters means a reduction in the revenue and elephant meat (contributed by sport-hunters) going to local communities in Zimbabwe and Tanzania.  This loss of a source of income and food will increase the incentives for poaching both by those who kill elephants only to sell the ivory and those who kill elephants only to provide food for their families and communities.

16.     The inability to import trophies combined with the reduction of demand by U.S. hunters will diminish the value of elephants to all but the poachers.  This loss of value will reduce the tolerance of local communities for the destructive tendencies of elephants and will

6

encourage local communities to kill the elephants themselves or facilitate their removal by poachers. Safari Club members will be harmed by the loss of conservation incentives and the ultimate loss of elephants that will result from the importation ban.

17.     Before the April 4, 2014 implementation of the trophy importation ban, Safari Club members could import African elephant trophies from Zimbabwe and Tanzania. Now they cannot import any elephant trophy taken after April 4, 2014, regardless of whether the elephant from which that trophy was taken was hunted in accordance with the laws of the countries that have the authority to regulate the hunting of these animals.

18.     Safari Club and its members possess sufficient interests in the subject matter of this litigation to establish standing. In addition, Safari Club and Safari Club members have suffered concrete injury in fact caused by Federal Defendants' trophy importation ban. A court ruling declaring illegal and enjoining the ban would redress those injuries. Safari Club members could once again import their legally sport-hunted African elephant trophies, guide hunts, sell hunts, process elephant trophies and otherwise engage in activities that are dependent on and/or related to the ability to import African elephant trophies from Zimbabwe and Tanzania. Safari Club and Safari Club members could then continue to participate in activities that help to encourage African elephant conservation in these two countries and to support and finance activities that discourage if not prevent poaching. Safari Club is an aggrieved party and is entitled to judicial review of the actions and inactions challenged here under the APA and ESA.

19.     The National Rifle Association of America (NRA) is a nonprofit corporation incorporated in New York in 1871, operating under § 501(c)(4) of the Internal Revenue Code, with principal offices and place of business in Fairfax, Virginia. NRA's Federal Affairs Office is located in Washington, D.C. Its membership includes approximately 5,000,000 individuals from

**DA 7**

the United States and many of the countries around the world.  Among its purposes and

objectives are, "[t]o promote hunter safety, and to promote and defend hunting as a shooting

sport and as a viable and necessary method of fostering the propagation, growth and

conservation, and wise use of our renewable wildlife resources."  (NRA Bylaws Article II

Section 5).

20.     The NRA has a Director of Conservation, Wildlife and Natural Resources

working from its headquarters in Fairfax, Virginia.  The Director's primary responsibility is to

promote the interests of the hunting community in wildlife management, healthy habitats and

sustainable populations to ensure that these wildlife populations continue to be available to be

enjoyed by NRA members and to protect and sustain hunters' legacy as the primary supporters

of wildlife conservation.

21.     NRA and its members have a strong interest in enhancing the survival of African

elephants in Zimbabwe and Tanzania in a manner that promotes proper wildlife management of

the species.  NRA members have participated in hunts of African elephants in Zimbabwe and

Tanzania and have imported their trophies or attempted to do so but were prevented after

encountering Federal Defendants' trophy importation ban just one day after legally harvesting an

African elephant.  Others have made substantial investments towards future hunts of African

elephants in Zimbabwe and Tanzania which have been placed in jeopardy due to Federal

Defendants' trophy importation ban.

22.     Federal Defendants' trophy importation ban has also negatively impacted NRA

members participating in ancillary fields directly related to the hunting of African elephants in

Zimbabwe.  NRA members involved in the marketing, planning, outfitting and guiding hunts of

**DA 8**

African elephants in Zimbabwe have been forced to cancel trips and reevaluate already booked trips, resulting in current and continuous monetary harm.

23.     Federal Defendants' trophy importation ban threatens sustainable use conservation of the African elephant species directly impacting and damaging NRA members' interests.  In addition to the concrete injury in fact the ban has on the livelihood of NRA members, the long-term survival of the African elephant faces major complications associated with a decrease in NRA member assisted conservation efforts which have contributed to anti-poaching efforts and the survival of the species.  Ensuring a viable population of African elephants in Zimbabwe and Tanzania through sustainable use conservation efforts is of paramount importance to NRA and its members.

24.     NRA and its members possess sufficient interests in the subject matter of this litigation to establish standing.  Federal Defendants' trophy importation ban has caused current and continuous injury upon NRA members.  A court ruling declaring illegal and enjoining the ban would redress those injuries.  NRA members could once again import their legally sport-hunted African elephant trophies, guide and sell hunts and otherwise engage in activities that are dependent on and/or related to the ability to import African elephant trophies from Zimbabwe and Tanzania.  These activities are of cardinal importance to the NRA and its members as they allow for direct participation and support of the African elephant populations in Zimbabwe and Tanzania through sustainable use conservation efforts.  NRA is an aggrieved party and is entitled to judicial review of the actions and inactions challenged here under the APA and ESA.

25.

26.     Defendant Sally M. R. Jewell is the Secretary of the Interior and has ultimate responsibility for the administration of the ESA and the decisions made by the parties to CITES within the United States Department of the Interior.  She is sued in her official capacity.

**DA 9**

27.     Defendant U.S. Department of the Interior is an agency of the federal government that is authorized to administer and implement the ESA and to administer the decisions made by the parties to CITES.

28.     Defendant Daniel Ashe is the Director of the U.S. Fish and Wildlife Service.  He has responsibility for the administration and implementation of the ESA and the decisions made by the parties to CITES, including with regard to the suspension of African elephant trophy importation from Zimbabwe and Tanzania for 2014.  He is sued in his official capacity.

29.     Defendant U.S. Fish and Wildlife Service is an agency within the Department of the Interior that is authorized to administer and implement the ESA and the decisions made by the parties to CITES.

## FACTUAL BACKGROUND

30.     African elephants (loxodonta Africana) are found throughout much of Africa. The majority of African elephants live in southern and eastern Africa, including Zimbabwe and Tanzania.

31.     Currently, all African elephants are listed as threatened under the ESA.  African elephants in Zimbabwe, Namibia, South Africa and Botswana are listed on Appendix II of CITES.  All other African elephants, including those in Tanzania, are listed on Appendix I of CITES.

32.     In 1977, the FWS was petitioned to list the African elephant as endangered under the ESA.  In 1978, the FWS listed all African elephants as threatened under the ESA.  43 Fed. Reg. 20499 (May 12, 1978).  With the listing, the FWS adopted a special rule that regulates the importation of trophies from legally hunted African elephants.  50 C.F.R. § 17.40(e) ("special rule").

**DA 10**

33.     At the seventh CITES Conference of the Parties ("COP") in 1989, the parties to CITES transferred all African elephants from Appendix II to Appendix I.  55 Fed. Reg. 5847 (Feb. 20, 1990).  Pursuant to the CITES Treaty, a country allowing the importation of members of an Appendix I species must make a finding that the "import will be for purposes which are not detrimental to the survival of the species involved." ("Non-detriment finding" or "NDF")  CITES text, Article III.

34.     The FWS received another petition in 1989 to uplist the African elephant from threatened to endangered status, but rejected it.  57 Fed. Reg. 35473 (Aug. 10, 1992).  The FWS amended the special rule to include a provision that allowed the importation of sport-hunted elephant trophies so long as CITES requirements were fulfilled and the trophy was appropriately marked.  57 Fed. Reg. 35473, 35485 (Aug. 10, 1992).  At the time, the parties to CITES required that an enhancement of survival determination be made by the importing country for species listed on Appendix I, including elephants.  The FWS promulgated the special rule to specifically require that same enhancement of survival requirement for the importation of a CITES Appendix I species.  *Id.*

35.     In the Federal Register notice accompanying the special rule, the FWS also recognized that sport-hunting "provide[s] important revenues for elephant conservation to range states." *Id.*

36.     The FWS's Division of Scientific Authority ("DSA") is the designated CITES "Scientific Authority" for the United States.  Before the FWS issues a permit for the importation of a CITES Appendix I species, the DSA makes a non-detriment finding called an "advice."  The DSA gives the advice to the FWS's Division of Management Authority, which makes the decision whether or not to grant the permit.

**DA 11**

37.     At least as early as 1993, the DSA issued general non-detriment advices for African elephants taken from Zimbabwe and South Africa and the FWS allowed the importation of legally taken sport-hunted trophies into the United States.  At least as early as 1993, the DSA issued non-detriment advices for African elephants taken from Tanzania, Namibia and Cameroon and the FWS allowed the importation of legally taken sport-hunted trophies into the United States.  60 Fed. Reg. 12969, 12969-70 (Mar. 9, 1995).

38.     At the tenth COP in 1997, the parties to CITES transferred Zimbabwe's elephants from Appendix I to Appendix II.  The FWS adopted this change in 1998.  63 Fed. Reg. 63210 (Nov. 12, 1998); 62 Fed. Reg. 44627 (Aug. 22, 1997).  Since the parties to CITES determined that, for Appendix II species, the importing country need not make its own NDFs to authorize the importation of sport-hunted trophies of members of the species, the FWS has not made such findings for Zimbabwe's elephants and has not required hunters who import their legally sport-hunted African elephant trophies from Zimbabwe to apply for or obtain an importation permit from the U.S.  CITES text, Article IV.   62 Fed. Reg. 44627, 44633 (Aug. 22, 1997).

39.     In a Federal Register notice published in 1997, the FWS announced that it had made an enhancement finding for African elephants from Zimbabwe.  Further the FWS stated that the enhancement finding for importation of sport-hunted trophies from Zimbabwe would "remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published notice of any change in the Federal Register." *Id.*

40.     As of the filing of this Complaint, the FWS has never published in the Federal Register a notice that the conditions of the special rule are no longer met or a change in the enhancement finding previously in existence for elephants from Zimbabwe.

**DA 12**

41.     Until 2014, the FWS allowed the importation of African elephant sport-hunted trophies from Zimbabwe, Namibia, South Africa, Botswana and Tanzania.  During the eight year period from 2004 to 2011, 1,186 African elephant sport-hunted trophies were imported into the United States from Zimbabwe.  During that same eight year period, 300 African elephant sport-hunted trophies were imported into the United States from Tanzania.

42.     Each year, in accordance with CITES, the range states establish a quota for the number of African elephant sport-hunted trophies that will be allowed to be exported from their country.  For 2014, Zimbabwe's quota is 500 elephants and Tanzania's quota is 200 elephants.

43.     On April 4, 2014, the FWS announced, in a press release posted on the FWS website, an immediate suspension of the importation of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during the 2014 calendar year. http://www.fws.gov/news/ShowNews.cfm?ID=2E6FF2A2-E10F-82BC-DAE08807810E3C6B. The FWS gave no prior notice of this decision to the public.  The FWS did not publish notice of the suspension in the Federal Register.  The FWS did not provide a public comment opportunity.

44.     The press release noted that "[l]egal, well-regulated sport hunting, as part of a sound management program, can benefit the conservation of listed species by providing incentives to local communities to conserve the species and by putting much-needed revenue back into conservation."  Neither the press release nor a brief Question and Answer ("Q and A") webpage that the FWS published on the same day analyzed the role that hunting plays in the conservation of Zimbabwe's elephants or described the role that sport hunters and sport hunting plays in discouraging elephant poaching.  http://www.fws.gov/international/pdf/questions-and-answers-suspension-of-elephant-sport-hunted-trophies.pdf.

45.     The press release and Q and A webpage explained that the FWS based its decision to suspend importation for African elephant trophies from Zimbabwe on "limited" data and "anecdotal" evidence.  Neither the FWS's press release nor the Q and A page indicated that the FWS had obtained the data or evidence for Zimbabwe's suspension from the Scientific or Management Authorities of Zimbabwe.

46.     On April 18, 2014, the FWS announced a modification of the suspension of legally taken African elephant trophies.  By telephone message and letter to Safari Club, the FWS explained that Federal Defendants had revised the complete suspension of trophy importation for Zimbabwe for 2014 and had removed the retroactive portion of the ban that had banned the importation of trophies from the period between January 1, 2014 and April 4, 2014. "We will allow the import of any trophy taken in 2014 up until April 4.  The hunter will need to be able to demonstrate to our Office of Law Enforcement that the hunt occurred before that date in order to import the trophy."  Letter, dated April 18, 2014, from Robert R. Gabel, Chief, Division of Management Authority, U.S. Fish and Wildlife Service to Nelson Freeman, Deputy Director of Governmental Affairs, Safari Club International.

47.     The April 18, 2014 letter confirmed that the FWS had imposed the ban on April 4, 2014 without obtaining information about the status of elephants or the conservation benefits of sport hunting from the Scientific and Management authorities of the government of Zimbabwe. The letter explained:

> I hope everyone understands as well that we are in contact with the Government of Zimbabwe, professional hunters, and others in Zimbabwe, and working through our embassy there, to get the most current information on African elephants in that country, including population status, poaching levels, how hunting programs are currently managed, etc.  If the information we are receiving addresses our concerns sufficiently and shows that hunting continues to be well managed, populations are stable, etc., we may lift the suspension of imports

14

**DA 14**

completely and continue to allow the import of all trophies legally taken in 2014.  We intend to conduct this review as quickly as possible and will get the word out once the review is completed.

*Id.*

48.     The FWS's April 4, 2014 press release indicated that the FWS's decision to ban the importation of elephant trophies in Zimbabwe was based in part on a "widely publicized poisoning last year of 300 elephants in Hwange National Park."  The information upon which the FWS based its trophy importation ban was incorrect.  The number of elephants involved in the Hwange National Park incident was less than half the number reported in the press release.  In addition, the press release did not mention, and apparently Federal Defendants did not take into account, the fact that it was sport-hunting outfitters in Zimbabwe who discovered the poaching and helped finance the effort to capture the poachers.  Without sport-hunting outfitters present in the field, the poachers and the poaching would not have been discovered and stopped.

49.     The trophy importation ban affects only U.S. residents who seek to import their trophies into the U.S.  It has no impact on the export quotas established by Zimbabwe or Tanzania, or on the number of elephants that the governments of the two countries authorize for hunting annually.  Federal Defendants' ban on U.S. importation of African elephant trophies does not control the number of elephants taken in each of those countries each year.

50.     Federal Defendants based their trophy importation ban for Tanzania on a February 21, 2014 determination from the Scientific Authority of the FWS not to issue an NDF for elephant trophy importation from Tanzania and a March 27, 2014 determination from the Management Authority of the FWS that the importation of sport-hunting trophies from Tanzania is not likely to enhance the survival of the species.

51.     The February 21, 2014 decision advising the FWS not to issue an NDF for Tanzania discussed sport hunting but was not based on "a consideration of purpose for which the specimen will be used upon import into the United States."  Instead of determining if the importation of sport-hunted trophies for the personal use of the hunters would pose a detriment to the species, the NDF advice document focused on the take of elephants generally, both for legal and illegal purposes.

> We recognize that sport-hunting, as part of a sound management program, can provide benefits to wildlife conservation and that sport-hunting of elephants is not the primary cause of the decline of elephant populations in Tanzania.  However, given the significant decline in the elephant population due to uncontrolled poaching and questionable management and governance, we are concerned that additional killing of elephants, even if legal, is not sustainable and will not support effective elephant population recovery efforts in Tanzania.

*Id.*

52.     The NDF failed to examine the role that sport-hunting has in decreasing and discouraging poaching in Tanzania.  The NDF did not address how the presence of hunters, outfitters and their staff in the field provides a deterrent to poachers or how the introduction of revenue generated by the hunting and other activities of U.S. hunters encourages local communities to guard against poaching.  The NDF completely avoided this analysis and merely analyzed sport hunting as an "additional" source of take.

53.     Because U.S. hunters are no longer permitted to import their legally sport-hunted African elephant trophies, some have cancelled their elephant hunts in Zimbabwe and Tanzania, and many more will cancel their hunts.  Instead of having the desired effect – to reduce "additional" take of elephants, the ban is likely to have the opposite effect.  The absence of hunters in the field will remove a major deterrent to poaching.  Poachers, freed from the risk of being discovered by hunters, outfitters and their staff, will be encouraged to illegally take more

16

**DA 16**

rather than fewer elephants.  Local residents who have generated income for their families and communities from jobs with hunting operations and other activities associated with the presence of U.S. hunters will no longer have that income.  As a consequence, the elephants that local residents protected for the benefit of the hunters will decline in value to local communities. Poachers who offer money for protection from authorities and for the illegal killing of elephants will take the place of hunters as the source of revenue for local communities.  As a result, more elephants will be poached and fewer elephants will survive.

54.     Sport hunters, with the help of their outfitters and professional hunters, donate much of the meat from the elephants they hunt to the local communities.  Poachers do not.  The loss of U.S. hunters means a loss of important food sources for local residents and increases the likelihood that local residents will themselves kill the elephants to feed their families and communities.

55.     Because the U.S. has no authority to control the number of elephants that can be taken or exported from Zimbabwe and Tanzania, the outfitters and professional hunters who depend on elephant hunts in these countries for their livelihoods will attempt to sell the cancelled hunts to other, non-U.S. hunters who are still able to import trophies into their home countries. While some of the elephant hunts will be resold, the revenue generated from U.S. hunters will not.  Although residents of the United States are not the only hunters who pursue elephants in Zimbabwe and Tanzania, U.S. citizens often pay the highest fees for elephant hunts in Zimbabwe and Tanzania and bring in the most additional revenue to local communities by buying associated goods and services while present for the hunt.  The higher the cost of a hunt, the greater the value the animal has to the local community.  As a result, deterring Americans from hunting elephants in the two countries will lower the value of the elephants.

**DA 17**

56.     Because of the abruptness with which the U.S. announced the ban, some outfitters and professional hunting businesses in these two countries will not be able to survive the economic loss.  Many are likely to go out of business, leaving greater areas of the elephant range without people on the ground, who by their very presence, act as a deterrent to poaching.

57.     In some areas of Zimbabwe, elephant populations are too large for the local communities to tolerate.  Because elephants damage crops and interfere with agricultural and other businesses, they are deemed a nuisance rather than a conservation asset.  Sport hunters bring value to the elephant and the revenue generated by sport hunting increases local tolerance for the species.  In addition, sport hunters help reduce overpopulations where they exist.  The loss of the U.S. hunter will eliminate local incentives to tolerate elephant behavior and will encourage those troubled by elephants to kill the elephants themselves.

58.     Sport hunting discourages many reasons and sources for illegal elephant killings. Without U.S. hunters in the field, the African elephant populations in Zimbabwe and Tanzania are likely to suffer and decrease.

## RELEVANT LAW

**A.      The Endangered Species Act ("ESA") and the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES")**

59.     The ESA provides the FWS with the authority to classify African elephants, including those from Zimbabwe and Tanzania, as a threatened species.  16 U.S.C. §1533(a)(1).

60.     The ESA does not prohibit the importation of sport-hunted trophies from animals designated as threatened.  16 U.S.C. §1538((a)(1)(A).  Instead, the FWS, acting on behalf of the Secretary of the Interior, promulgates regulations governing the importation of threatened species.  16 U.S.C. §1538(a)(1)(G).

61.     Section 4(d) of the ESA authorizes the FWS to issue regulations pertaining to threatened species under limited circumstances.  "Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Accordingly, the FWS may not issue regulations without specifically determining that they are "necessary and advisable for conservation."

62.     In the African Elephant Conservation Act of 1989 ("AECA"), Congress adopted specific legislation intended to focus on the conservation of the species.  16 U.S.C. § 4201 *et seq.* In the AECA, Congress directed the FWS to impose moratoriums against the importation of ivory from countries that did not meet certain criteria, but prohibited the FWS from issuing moratoriums against the importation of sport-hunted trophies:

> Sport-hunted trophies
>
> Individuals may import sport-hunted elephant trophies that they have legally taken in an ivory producing country that has submitted an ivory quota. The Secretary ***shall not establish any moratorium*** under this section, pursuant to a petition or otherwise, which prohibits the importation into the United States of sport-hunted trophies from elephants that are legally taken by the importer or the importer's principal in an ivory producing country that has submitted an ivory quota.

16 U.S.C. § 4222(e) (emphasis added).

63.     In the AECA, Congress singled out the hunting and importation of African elephant trophies as acts that benefit the survival of the species.  Congress specifically found that "[t]here is no evidence that sport hunting is part of the poaching that contributes to the illegal trade in African elephant ivory, and there is evidence that the proper utilization of well-managed elephant populations provides an important source of funding for African elephant conservation programs."  16 U.S.C. § 4202(9).

DA 19

64.     The FWS does not rely on the AECA for its authority to regulate the importation of African elephant trophies but instead takes that authority from the ESA. 16 U.S.C. § 4241.

65.     The FWS's regulation of the importation of African elephants relies on decisions made by both Congress, through the authority given to the FWS in the ESA, and by CITES, through resolutions and other decisions.  50 C.F.R. § 23.1.

66.     CITES is an international agreement between governments.  During conferences held between the party members to the agreement, the parties agree upon decisions and adopt resolutions designed to prevent international trade in specimens of wild animals and plants from threatening the survival of those species.

67.     The United States, Zimbabwe and Tanzania are all parties to CITES.

68.     The parties to CITES placed African elephants from Zimbabwe on Appendix II and those from Tanzania on Appendix I.

69.     Appendix I includes species that the parties to CITES have determined are threatened with extinction and that are or may be affected by trade of that species.  Appendix II includes species that the parties to CITES have determined are not presently threatened with extinction, but may become so if their trade is not regulated.  Appendix II also includes species that the parties to CITES consider in need of being regulated so that trade in certain other Appendix I or II species may be effectively controlled.  50 C.F.R. § 23.4

70.     The ESA and CITES direct the FWS to treat species classified as "threatened" in different ways, depending on whether the species are listed on CITES Appendix I or II.

71.     Article III of the CITES Treaty and CITES Resolution Conf. 10.3 recommend that, for species that are listed on CITES Appendix I, the importing country must make its own

**DA 20**

NDFs.  The FWS has promulgated regulations that require it to make NDFs for the import of Appendix I species.  50 C.F.R. § 23.61.

72.      Articles III and IV of the CITES Treaty and CITES Resolution Conf. 10.3 recommend that exporting countries make findings that the proposed trade of species on both CITES Appendix I and Appendix II will not be detrimental to the survival of the species.

73.      The FWS is required to make different types of NDFs, depending on whether the species in question is being imported or exported.  For NDFs for species being exported from the United States, the FWS examines the potential detriment that could be caused by the "take" of the species from the wild.  In contrast, NDFs for species being imported into the U.S. must examine the potential detriment to the species that could be caused by the purpose for which the animal is being imported into the U.S. The FWS has explained that "[t]he finding for the import of an Appendix-I species is based on a consideration of purpose for which the specimen will be used upon import into the United States."  71 Fed. Reg. 20168, 20195 (Apr. 19, 2006).  An NDF for a sport-hunted trophy must therefore consider whether the personal possession by the hunter who took the animal will itself pose a detriment to the survival of the species.

74.      CITES does not require that the importing country conduct an NDF for species listed on Appendix II.

75.      The ESA states that, for species classified as threatened, that are listed on CITES Appendix II, where the take and exportation of the species comply with all CITES provisions and requirements, a presumption exists that the importation of the species for non-commercial purposes does not violate federal statute or regulation.  16 U.S.C. § 1538(c).

76.     Despite this presumption, the FWS has, by regulation, imposed additional

requirements for the importation of sport-hunted elephant trophies, whether they are listed on

CITES Appendix I or II ("special rule").  50 C.F.R. § 17.40(e)(3)(iii).

> Sport-hunted trophies may be imported into the United States provided:
>
> (A) The trophy originates in a country for which the Service has received notice
> of that country's African elephant ivory quota for the year of export;
>
> (B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied
> with;
>
> (C) A determination is made that the killing of the animal whose trophy is
> intended for import would enhance survival of the species; and
>
> (D) The trophy is legibly marked by means of punch-dies, under a marking and
> registration system established by the country of origin, that includes the
> following information: Country of origin represented by the two-letter code
> established by the International Organization for Standardization (see appendix A
> to chapter I) followed by the registration number assigned to the last two digits of
> the year of registration and the weight of raw ivory to the nearest kilogram. Any
> mark must be placed on the lip mark area and indicated by a flash of color which
> serves as a background for such mark.

77.     The FWS promulgated the special rule on August 10, 1992.  That regulation

created the requirement that the take of the elephant to be imported would enhance the survival

of the species.  57 Fed. Reg. 35473 (Aug. 10, 1992).  At the time that the FWS promulgated the

rule, all African elephants were listed on CITES Appendix I.  In addition, at the time that the

FWS promulgated the special rule, the CITES resolution pertaining to the importation of

Appendix I species contained a requirement for a determination by the importing country that the

take of the animal intended for importation enhanced the survival of the species by financially

benefitting elephant conservation.

> CITES requirements included a determination that the killing of elephants for
> sport-hunting enhances the survival of the species by providing financial support
> programs for elephant conservation. This requirement is retained in the final

revised special rule for the import of sport-hunted trophies from threatened
populations that are on CITES appendix I.

57 Fed. Reg. at 35485; Res. Conf. 2.11. (Annex 1).  The FWS's reason for including the

enhancement of survival requirement was the parallel obligation adopted by CITES.

78.     Since the FWS promulgated the special rule, CITES changed the listing status of

African elephants from Zimbabwe from Appendix I to Appendix II.  Consequently, CITES

would no longer have imposed an enhancement of survival requirement for the species once it

was downlisted to Appendix II.  In addition, at the CITES COP 9 in 1994 the parties to CITES

amended Res. Conf. 2.11 and removed the enhancement of survival finding requirement entirely

from the resolution.  As a result, from that point forward CITES no longer required an

enhancement of survival determination for the importation of elephant trophies from either

Appendix I or Appendix II species and therefore would not have required the finding for

elephants from either Zimbabwe or Tanzania.

79.     The FWS has made no change to its special rule's enhancement of survival

finding requirement for the importation of elephants since including those requirements in the

rule in 1992, despite the fact that the criteria upon which the FWS based its finding requirement

have all disappeared.  The FWS has never explained why the retention of the enhancement

requirement is necessary or advisable for the conservation of elephants listed on Appendix I or

Appendix II of CITES or offered the public an opportunity to comment on the retention of the

enhancement of survival requirement, despite the fact that the FWS's justification for the

imposition of this requirement no longer exists.

80.     Since at least as early as 1993 until April 4, 2014, the FWS has consistently made

NDFs for the importation of sport-hunted African elephant trophies from Tanzania and has

determined that all criteria identified in 50 C.F.R. § 17.40(e)(3)(iii) have been met.

**B.      The Administrative Procedure Act ("APA")**

81.      The APA provides for judicial review of final agency action by persons "aggrieved" by the action.  5 U.S.C. § 702.

82.      It also provides standards applicable when a Federal agency proposes and adopts final rules and regulations.  Those standards include formal notice of the proposed rulemaking and an opportunity to participate in the rulemaking by providing comments through the submission of data, views and/or arguments.  5 U.S.C. § 553; *id.* § 551(4).

83.      The APA authorizes a reviewing court to

>   (1) compel agency action unlawfully withheld or unreasonably delayed; and

>   (2) hold unlawful and set aside agency action, findings, and conclusions found to be--

>>   a.   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

5 U.S.C. § 706.

## CAUSES OF ACTION

### Count I - Violations of the ESA and APA:

### Federal Defendants Illegally Relied on "Limited" and "Anecdotal" Information to Reverse a Longstanding Approach to African Elephant Sport-Hunted Trophy Importation from Zimbabwe

84.      Safari Club/NRA realleges and incorporates by reference all the allegations of paragraphs 1-76 above, as though fully set forth below.

85.      Federal Defendants abruptly suspended the importation of legally sport-hunted African elephant trophies from Zimbabwe after consistently allowing such importations for over two decades.  Federal Defendants made the decision to suspend importation of legally sport-hunted African elephant trophies based on "limited" data and "anecdotal evidence" without first waiting to obtain comprehensive and substantiated data on the issues relevant to the continued

24

importation of those trophies from the Scientific or Management Authorities of Zimbabwe or from others. These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

86.     Federal Defendants abruptly suspended the importation of legally hunted African elephant trophies from Zimbabwe without fully analyzing the role that the presence of sport hunters in the field plays in reducing and discouraging the poaching of elephants in Zimbabwe as well as the economic role that U.S. hunters play in providing Zimbabwe with the financial resources to combat poaching. Federal Defendants did not fully consider the harm to elephant conservation that will result from the absence of U.S. hunters in the field and the loss of revenue from U.S. hunters. These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

87.      Federal Defendants failed to consider that, instead of being additional to the illegal take of elephants by poachers, the legal sport hunting by U.S. hunters in fact reduces the number of elephants illegally killed in Zimbabwe. These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

88.     Federal Defendants failed to adhere to the purpose for which the FWS included the enhancement of survival requirement in the special rule for African elephant trophy importation – to determine whether the sport hunting "enhances the survival of the species by providing financial support programs for elephant conservation." 57 Fed. Reg. 35473, 35485 (Aug. 10, 1992). These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

89.     This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 16 U.S.C. §§ 1533(d) and 1538(c).

**DA 25**

90.     The remedies requested in this Complaint would remedy Safari Club and Safari Club members' injuries, as outlined in this Complaint.

### Count II – Violations of the ESA and APA:

**Federal Defendants Erroneously and Illegally Failed to Justify and to Provide Notice and an Opportunity to Comment on the Decision to Suspend the Importation of African Elephant Trophies from Zimbabwe**

91.     Safari Club/NRA realleges and incorporates by reference all the allegations of paragraphs 1-83, as though fully set forth below.

92.     Federal Defendants abruptly changed their position on April 4, 2014 on the legality of the importation of legally sport-hunted African elephant trophies from Zimbabwe without complying with the process to which they had committed for making such decisions. Federal Defendants' change of position on the enhancement finding and on the legality of the importation of sport-hunted African elephant trophies contradicted the FWS's own announcement on August 22, 1997 that the enhancement finding for Zimbabwe would "remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published a notice of any change in the Federal Register." 62 Fed. Reg. 44627 (Aug. 22, 1997).  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

93.     Federal Defendants announced their decision to suspend the importation of legally sport-hunted African elephant trophies on April 4, 2014 with only a press release and a Q and A webpage published on the FWS's website, and without publishing a Federal Register notice that the conditions of 50 C.F.R. §17.40(e)(3)(iii) are no longer met.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

94.     Federal Defendants also violated APA rulemaking procedures by abruptly suspending the ability of Safari Club/NRA members to import their African elephant trophies from Zimbabwe, without first giving the public advance notice and the opportunity to comment and without providing data to support the finding that the take and importation of legally sport-hunted African elephant trophies continue to enhance the survival of the species.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

95.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

96.     The remedies requested in this Complaint would remedy Safari Club/NRA and Safari Club/NRA members' injuries, as outlined in this Complaint.

### Count III - Violations of the ESA and APA:

**Federal Defendants Illegally Imposed an Enhancement of Survival
Finding Requirement in the Special Rule Pertaining to Trophy
Importation from African Elephants on CITES Appendix II**

97.     Safari Club/NRA realleges and incorporates herein by reference all the allegations of paragraphs 1-89, as though fully set forth below.

98.     Federal Defendants failed to explain why the enhancement finding requirement included in 50 C.F.R. § 17.40(e)(3)(iii) is necessary and advisable for African elephant conservation.  For species classified as "threatened, the ESA authorizes Federal Defendants to issue such regulations deemed "necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Federal Defendants have not explained why the enhancement finding is "necessary and advisable" for African elephant conservation.  This failure to act was arbitrary and capricious, not in accordance with law, and an abuse of discretion.

99.     On August 10, 1992, Federal Defendants instituted the enhancement of survival finding requirement when all African elephants, including Zimbabwe's, were listed on CITES Appendix I and when CITES Res. Conf. 2.11. (Annex 1) required an enhancement finding for the importation of Appendix I species.  Federal Defendants included the enhancement of survival finding requirement in 50 C.F.R. § 17.40(e)(3)(iii) to match that same CITES requirement for Appendix I species.  Despite the fact that in 1994 CITES removed the enhancement of survival finding requirement from its resolution applicable to Appendix I species and in 1997 CITES downlisted African elephants from Zimbabwe to CITES Appendix II, Federal Defendants have never deleted the enhancement of survival finding requirement from § 17.40(e)(3)(iii).  In addition, Federal Defendants have never published a public notice justifying the enhancement of survival requirement for African elephants listed on CITES Appendix II and have never given the public the opportunity to comment on the requirement.  Despite the fact that the status of the species changed and the FWS's original justification for the requirement disappeared, Federal Defendants have never provided proper justification, notice and an opportunity for comment on its decision to modify the basis for imposing an enhancement of survival requirement on an elephant population listed on CITES Appendix II.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

100.     On April 4, 2014, for the first time since imposing the enhancement of survival requirement for the importation of legally sport-hunted African elephants from Zimbabwe, Federal Defendants determined that an enhancement of survival finding could not be made.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.  These April 4, 2014 actions also caused harm to Safari Club/NRA and their members for the first time since Federal Defendants illegally retained the requirement in the special rule.

**DA 28**

101.     This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

102.     The remedies requested in this Complaint would remedy Safari Club/NRA and Safari Club/NRA members' injuries, as outlined in this Complaint.

**Count IV - Violation of the ESA and APA:**

**Federal Defendants Illegally Failed to Provide the Public with Notice and the Opportunity to Comment on the Trophy Importation Ban for Tanzania**

103.     Safari Club/NRA realleges and incorporates herein by reference all the allegations of paragraphs 1-95, as though fully set forth below.

104.     Federal Defendants announced the trophy importation ban for Tanzania in a press release published on the FWS's website and implemented the ban immediately.  Despite the fact that the ban applied to the hunting public generally, and reversed an opportunity available to Safari Club members and others for decades, Federal Defendants failed to publish notice of the ban in the Federal Register and provide the public with an opportunity for comment on a proposed ban.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

105.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

106.     The remedies requested in this Complaint would remedy Safari Club/NRA and Safari Club/NRA members' injuries, as outlined in this Complaint.

**Count V - Violations of the ESA and APA:**

**DA 29**

**Federal Defendants Illegally Imposed an Enhancement of Survival
Finding Requirement in the Special Rule Pertaining to Trophy
Importation from African Elephants on CITES Appendix I**

107.    Safari Club/NRA realleges and incorporates herein by reference all the allegations
of paragraphs 1-99, as though fully set forth below.

108.    Federal Defendants failed to explain why the enhancement finding requirement
included in 50 C.F.R. § 17.40(e)(3)(iii) is necessary and advisable for African elephant
conservation.  For species classified as "threatened," the ESA authorizes Federal Defendants to
issue such regulations deemed "necessary and advisable to provide for the conservation of such
species."  16 U.S.C. §1533(d).  Federal Defendants have not explained why the enhancement
finding is "necessary and advisable" for African elephants listed on CITES Appendix I.  This
failure to act was arbitrary and capricious, not in accordance with law, and an abuse of
discretion.

109.    On August 10, 1992, Federal Defendants instituted the enhancement of survival
finding requirement when CITES Res. Conf. 2.11. (Annex 1) required an enhancement finding
for the importation of Appendix I species.  Federal Defendants included the enhancement of
survival finding requirement in 50 C.F.R. § 17.40(e)(3)(iii) as a result of a parallel CITES
requirement.  Despite the fact that in 1994 CITES removed the enhancement of survival finding
requirement from its resolution applicable to Appendix I species, Federal Defendants never
removed the enhancement of survival finding requirement from § 17.40(e)(3)(iii), never
provided a public notice justifying the retention of the requirement for African elephants,
including those from Tanzania, and never gave the public the opportunity to comment on the
requirement when the reason for the requirement no longer existed.  These actions were arbitrary
and capricious, not in accordance with law, and an abuse of discretion.

**DA 30**

110.     On April 4, 2014, for the first time since imposing the enhancement of survival requirement for the importation of legally sport-hunted African elephants from Tanzania, Federal Defendants determined that an enhancement of survival finding could not be made.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.  These April 4, 2014 actions also caused harm to Safari Club/NRA and their members for the first time since Federal Defendants illegally retained the requirement in the special rule.

111.     This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

112.     The remedies requested in this Complaint would remedy Safari Club/NRA and Safari Club/NRA members' injuries, as outlined in this Complaint.

## Count VI - Violation of the ESA and APA:

### Federal Defendants Illegally Applied the Incorrect Non-Detriment Standard to the Importation of African Elephant Trophies from Tanzania

113.     Safari Club/NRA realleges and incorporates herein by reference all the allegations of paragraphs 1-105, as though fully set forth below.

114.     Federal Defendants failed to conduct the proper NDF assessment for the importation of an Appendix I species.  When considering the potential detriment posed by U.S. importation of legally sport-hunted trophies from Tanzania, Federal Defendants applied the analysis authorized for exportation, rather than importation.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

115.     Federal Defendants wrongfully assessed the potential detrimental impact of both legal and illegal (poaching) take of elephants in Tanzania rather than focusing their NDF assessment on the purpose for which sport-hunted trophy importations would be intended.  In

doing so, Federal Defendants ignored and/or contradicted their own published conclusion that the "finding for the import of an Appendix-I species is based on a consideration of purpose for which the specimen will be used upon import into the United States." 71 Fed. Reg. 20168, 20195 (Apr. 19, 2006).  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

116.    On April 4, 2014, Federal Defendants, for the first time since African elephants in Tanzania were listed as a threatened species, determined that it could not make an NDF for the importation of African elephant sport-hunted trophies and caused Safari Club/NRA and its members harm for the first time.

117.    These actions by Federal Defendants violate the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

118.    The remedies requested in this Complaint would remedy Safari Club/NRA and Safari Club/NRA members' injuries, as outlined in this Complaint.

## PRAYER FOR RELIEF

For the reasons stated above, Safari Club/NRA respectfully requests that the Court grant the following relief:

1.    Declare that Federal Defendants violated the ESA and the APA in suspending the importation of African elephant trophies legally hunted in Zimbabwe between April 5, 2014 to December 31, 2014.

2.    Declare that Federal Defendants violated the ESA and APA in suspending the importation of legally sport-hunted African elephant trophies from Tanzania for 2014.

3.    Declare that Federal Defendants' suspension of the importation of legally sport-hunted African elephant trophies from Zimbabwe was arbitrary and capricious, contrary to law, and an abuse of discretion and therefore the suspension is invalid.

4. Declare that Federal Defendants' suspension of the importation of legally sport-hunted African elephant trophies from Tanzania was arbitrary and capricious, contrary to law, and an abuse of discretion and therefore the suspension is invalid.

5. Enjoin the Federal Defendants from continuing and/or enforcing the suspension of the importation of African elephant trophies from Zimbabwe for 2014.

6. Enjoin the Federal Defendants from continuing and/or enforcing the suspension of the importation of African elephant trophies from Tanzania for 2014.

7. Award Safari Club/NRA the costs of litigation, including reasonable attorneys' fees.

8. Award Safari Club/NRA such other relief that is just and proper.

Dated this 21st day of April 2014.

Respectfully submitted,

/s/ Anna M. Seidman

Anna M. Seidman, Esq. (DC Bar No. 417091)
Douglas S. Burdin, Esq. (DC Bar No. 434107)
Jeremy E. Clare, Esq. (DC Bar No. 1015688)
Safari Club International
501 2nd Street, NE
Washington, DC 20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org

*Counsel for Plaintiff,*
*Safari Club International*

Christopher A. Conte (DC Bar No. 43048)
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
Facsimile: (703) 267-1164
cconte@nrahq.org

*Counsel for Plaintiff,*
*National Rifle Association of America*

**DA 34**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
                                      )
SAFARI CLUB INTERNATIONAL, et al.,    )
                                      )
                Plaintiff,            )
                                      )
        v.                            )     Civil Action No. 14-0670 (ABJ)
                                      )
SALLY M. R. JEWELL, in her official   )
capacity as Secretary of the U.S.     )
Department of the Interior, et al.,   )
                                      )
                Defendants.           )
                                      )
```

**MEMORANDUM OPINION AND ORDER**

Plaintiff Safari Club International brought this lawsuit to challenge two decisions of the United States Fish and Wildlife Service ("FWS") to suspend any importation of sport-hunted African elephant trophies from Zimbabwe and Tanzania in 2014.   Compl. [Dkt. # 1] ¶ 1.[1] Plaintiff alleges that the decisions violate the Endangered Species Act and the Administrative Procedures Act.   *Id.* ¶¶ 77–111.   After filing its complaint, plaintiff filed a motion for a preliminary injunction.   Mot. for Prelim. Inj. [Dkt. # 4] ("Mot."); Mem. of P. & A. in Supp. of

---

1       On May 16, 2014, Safari Club filed an amended complaint to add the National Rifle Association as a plaintiff in the case.   Am. Compl. [Dkt. # 13] ¶¶ 19–24.

DA 35

Mot. for Prelim. Inj. [Dkt. # 4-2] ("Mem.").  The parties have fully briefed the motion,[2] and it is now before the Court.

Safari Club alleges that actions of FWS have irreparably harmed its interests as an organization and the interests of its members.  Because plaintiff has failed to demonstrate the necessary irreparable injury, the Court will deny the motion for a preliminary injunction.[3]

## ANALYSIS

On April 4, 2014, FWS issued a press release announcing "a suspension on imports of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during calendar year 2014."  April 4, 2014 Press Release, Ex. A to Mem. [Dkt. # 4-5].[4]  Plaintiff has challenged the agency's action and moved for a preliminary injunction to restore the pre-suspension status quo pending a ruling on the merits of the lawsuit.

To obtain a preliminary injunction, Safari Club must establish that:  1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm in the absence of preliminary

---

2    Defendants filed an opposition to plaintiff's motion, and pursuant to the schedule established by the Court, simultaneously filed a motion to dismiss for lack of jurisdiction.  *See* Defs.' Opp. to Mot. for Prelim. Inj. and Mem. in Supp. of Cross-Mot. to Dismiss [Dkt. # 10] ("Opp."); Defs.' Mot. to Dismiss [Dkt. # 11].  With leave of Court, plaintiff filed a reply in support of its motion, with supplemental declarations, *see* Pl.'s Reply to Defs.' Opp. to Mot. for Prelim. Inj. [Dkt. # 14] ("Reply"), and defendants filed a surreply in support of their opposition. *See* Defs.' Surreply [Dkt. # 19].

3    The Court recognizes that defendants have raised questions about subject matter jurisdiction in their motion to dismiss.  But the questions are sufficiently close and the lack of irreparable harm sufficiently clear that the Court will proceed to rule on the need for expedition first and take the motion to dismiss under advisement.  The defendants will also have the opportunity to file any other motions under Fed. R. Civ. P. 12(b)(6).

4    FWS later modified the suspension to apply to elephants taken during the 2014 season only after April 4, 2014.  *See* Van Norman Decl., Ex. 1 to Opp. [Dkt. # 10-1] ¶¶ 14–15, 25, 28.

DA 36

relief; 3) the balance of equities tips in its favor; and 4) an injunction serves the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[5]

Injunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Id.* at 22. Failure to show any irreparable harm is grounds for the court to refuse to issue a preliminary injunction, even if the other three factors entering the calculus point in the plaintiff's favor. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also GEO Specialty Chem., Inc. v. Husisian*, 923 F. Supp. 2d 143, 147 (D.D.C. 2013) ("[A] court may refuse to issue an injunction without considering any other factors when irreparable harm is not demonstrated.").

To show irreparable harm, plaintiff must demonstrate that the harm has occurred in the past and is likely to occur again, or that the harm is certain to occur in the near future. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Plaintiff must also show the alleged harm will "directly result" from the action that plaintiff seeks to enjoin. *Id.* The harm "must be both

---

5       A number of circuits, including the D.C. Circuit, have historically evaluated the four factors utilizing what has been referred to as a "sliding scale" approach. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). The Court of Appeals articulated the balancing test as follows: "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak. An injunction may be justified . . . where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). But it is questionable whether this formulation has survived the Supreme Court's 2008 decision in *Winter*. *See Davis*, 571 F.3d at 1295–96 (Kavanaugh, J., and J. Henderson, concurring). In *Winter*, the Supreme Court specifically rejected the Ninth Circuit's reasoning that "when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm." *Winter*, 555 U.S. at 21. The Court found that standard to be "too lenient." *Id.* at 22. Thus, setting the bar at a "relatively slight showing," *CityFed Fin. Corp.*, 58 F.3d at 747, is not likely to pass muster either. But it is not necessary to settle the question of the viability of the sliding scale approach to decide this case. Even when the balancing test was the clear governing standard, the D.C. Circuit warned: "[d]espite this flexibility, we require the moving party to demonstrate at least 'some injury' . . . since '[t]he basis of injunctive relief in the federal courts has always been irreparable harm.'" *Id.*

certain and great" and "actual and not theoretical." *Id.* And, it cannot arise from plaintiff's own actions. *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (holding that litigant cannot "be heard to complain about damage inflicted by its own hand"); *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001) (holding that a "preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted") (citations omitted); *see also Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (no irreparable harm when plaintiffs could avoid harm).

Safari Club alleges that the moratorium on the importation of elephant trophies from two countries in Africa has irreparably harmed the recreational, conservationist, and economic interests of its members and of the Safari Club as an organization. But the motion falls well short of the legal standard for preliminary relief. Plaintiff has not shown that members who plan to travel to Africa and hope to shoot an elephant, or that members who have already successfully accomplished that feat, will suffer grave, imminent, and certain harm because while they may hunt elephants, and they may remember, recount, and record any success they achieve, they will not be permitted – at least for now – to bring home a particularly prized souvenir.

Plaintiff asserts: "[b]y depriving U.S. hunters of an important element of the elephant's value, the U.S. government has all but taken the hunter out of the field." Mem. at 27, quoting Hurt Decl., Ex. XX to Mem. [Dkt. # 4-54] ¶ 11. But that statement overstates the impact of the suspensions. The agency's announcement did not prohibit anyone from hunting African elephants in Zimbabwe or Tanzania or anywhere else; it did not bar plaintiff or its members from organizing elephant hunts or earning income by providing services to hunting enthusiasts; and it did not restrict anyone's ability to support the conservation of elephants. These facts and,

indeed, the declarations supplied by plaintiff's own members, defeat plaintiff's claim of irreparable harm.

## I.   Plaintiff Has Not Shown Irreparable Harm to Recreational Interests

Safari Club asserts that its members have suffered irreparable harm to their recreational interests because the opportunity to import elephants from Tanzania and Zimbabwe has been suspended.  In support of this argument, Safari Club provides numerous declarations from its members.

The record includes declarations from two hunters who began elephant hunts before April 4, 2014, shot and killed elephants after that date, but were prevented from importing their trophies, such as the hides and tusks, because of the suspensions.  Grieb Decl., Ex. U to Mem. [Dkt. # 4-25] ¶¶ 11–12; Whaley Decl., Ex. FF to Mem. [Dkt. # 4-36] ¶¶ 10, 15.[6]

Other members report that they decided to hunt other animals after learning they would not be able to bring home the elephant trophies from hunts scheduled for 2014.  *See* Holdridge Decl., Ex. R to Mem. [Dkt. # 4-22] ¶ 6 ("I had a hunt planned for July 2014 in Zimbabwe for elephant, lion and leopard.  I am no longer going to hunt an elephant due to the trophy importation ban. . . . [M]y outfitter has offered to shift the deposit to other hunts instead."); Capozza Decl., Ex. AA to Mem. [Dkt. # 4-31] ¶¶ 19–20 ("I cancelled the elephant hunt when I learned that I would be unable to import the elephant that I hunted. . . . I was able to rebook another hunt with my safari operator for other species during the same time frame . . . .").

Some members are proceeding with elephant hunts despite the suspensions.  *See* Cheek Decl. Ex. N to Mem. [Dkt. # 4-18] ¶ 13 (stating "I am prepared to go forward with the hunt

---

[6]     These members indicate that their elephants are stored in Zimbabwe, Grieb Decl. ¶ 12, Whaley Decl. ¶ 15, suggesting the elephants may be imported at a later date if FWS reverses course.  *See also* Van Norman Decl. ¶¶ 11, 25 (stating that FWS may amend the challenged findings).  This indicates that these members' inability to import now may not be "irreparable."

despite my concern that I will be unable to import the trophy, but I am hopeful that the [FWS] will rescind the bans"); Beardmore Decl., Ex. L to Mem. [Dkt. # 4-16] ¶ 24 ("Although the government has deprived me and my son of our ability to import our elephant from our hunt, I refuse to seek refunds."); Netzley Decl., Ex. Z to Mem. [Dkt. # 4-30] ¶ 10 ("I will still hunt elephant and just not bring home the trophy.").

Finally, numerous other members with hunts planned for later in the year have not yet decided whether to cancel their trips or not. *See, e.g.*, Didado Decl., Ex. M to Mem. [Dkt. # 4-17] ¶ 13 ("Nothing has been determined or finalized yet, but I am worried that we will need to cancel the trip."); Rawson Decl., Ex. P to Mem. [Dkt. # 4-20] ¶ 17 (stating "I may attempt to cancel"); Ingersoll Decl., Ex. Q to Mem. [Dkt. # 4-21] ¶ 9 ("I have not decided whether I am going to try to cancel this trip."); Buch Decl., Ex. T to Mem. [Dkt. # 4-24] ¶ 17 ("I am not sure what to do at this point."); Condon Decl., Ex. V to Mem. [Dkt. # 4-26] ¶ 20 ("I will likely cancel my hunt."); Nice Decl., Ex. W to Mem. [Dkt. # 4-27] ¶ 11 (stating he "may decide to cancel"); Taylor Decl., Ex. DD to Mem. [Dkt. # 4-34] ¶ 19 ("I am still considering my options with my outfitter."); McDonnold Decl., Ex. JJ to Mem. [Dkt. # 4-40] ¶ 8 ("I do not know if I will continue with my hunt."); Bridges Decl., Ex. CC to Mem. [Dkt. # 4-33] ¶ 11 ("I have not yet decided if I will cancel my 2014 elephant hunt and seek a refund."); Johnson Decl., Ex. VV to Mem. [Dkt. # 4-52] ¶ 12 ("I am considering cancelling my hunt.").

Those who choose to cancel their hunts state they will miss out on the recreational opportunity to hunt elephant, and those who plan to proceed note that if they are successful, they will not be able to bring home the elephants, and therefore they will be deprived of a valuable part of the hunt. *See* Beardmore Decl. ¶ 16 ("[B]eing able to import the successfully hunted elephant from this amazing experience is a significant element and memory of the hunt."). In

DA 40

sum, plaintiff asserts that the import suspensions have "dramatically changed the nature of that hunt," and that hunters have been or will be deprived of "the full enjoyment of the hunt."  Reply at 12.

The Court does not doubt the sincerity of declarants' disappointment and it does not find that the suspensions will have no effect on their overall hunting experience.  But the inability to import elephant trophies does not result in a "certain and great" harm to the recreational interest alleged.  First of all, as plaintiff acknowledges, the FWS suspensions do not prohibit hunters from participating in hunts of African elephants.  *See*, *e.g.*, April 4, 2014 Press Release, Ex. A to Mem.; Mem. at 21 n.7 (explaining that the suspension does not affect the number of elephant hunts in Zimbabwe); Beardmore Decl. ¶ 24 ("[T]he hunt I paid for is still perfectly legal and absolutely necessary.").  Those already on hunts when the suspensions took effect and those who will proceed with their hunts despite the suspensions may still enjoy the recreational benefits of participating in hunts.  *See* Rhyne Decl., Ex. BB to Mem. [Dkt. # 4-32] ¶ 9 (stating that he hunts, in part, for personal enjoyment); Vick Decl., Ex. II to Mem. [Dkt. # 4-39] ¶ 13 (stating he enjoys the intensity of the hunt).  Notwithstanding the "great emotional significance" of an elephant trophy, Reply at 16, hunters may still engage in the core recreational activity of hunting.  So while the "full enjoyment of the hunt" may be diminished, it has not been eliminated.

Second, it is worth noting that a hunter must successfully shoot an elephant in order to garner a trophy worth importing.  So it is not necessarily clear that *any* Safari Club member other than the declarants with elephants already in storage, *see* Grieb Decl. ¶ 12; Whaley Decl. ¶ 15, will be affected by this ban for the rest of 2014.

Moreover, those hunters who chose to rearrange their hunts so that they could hunt other species or who cancelled their trips entirely did so of their own volition.  Thus, any loss of their

recreational interest in participating in hunts did not "directly result" from the FWS suspensions. *Wis. Gas*, 758 F.2d at 674.  Rather, the harm is self-inflicted and, therefore, not the irreparable harm that supports injunctive relief.  *Pennsylvania v. New Jersey*, 426 U.S. at 664.

Finally, since most of the hunter declarants are still considering whether to cancel or change their trips or not, it is uncertain whether any harm will come to their recreational interests at all.  Irreparable harm must be great and certain, not speculative.  *Wis. Gas*, 758 F.2d at 674. For all of these reasons, the Court holds that the FWS suspensions have not caused irreparable harm to plaintiff's recreational interests.

## II.     Plaintiff Has Not Shown Irreparable Harm to Conservation Interests

Safari Club's claim of irreparable harm to its own and its members' conservation interests fails for the same reasons.  Plaintiff and its members state that they support the sustainable use conservation of African elephants though hunting, which contributes to anti-poaching efforts and supports elephant habitat. Mem. at 19–20, 26.  Plaintiff also states that the organized hunts encourage tolerance for elephants within the local communities that derive such benefits as job opportunities and elephant meat from the hunts.  *Id*. at 18–19, 26.  Plaintiff contends that the inability to import irreparably harms these conservation efforts:  fewer elephant hunts will take place; less money will flow to support conservation efforts; and fewer hunters, who deter and sometimes catch poachers, will be in the field to support anti-poaching activities. *Id.* at 21–25, 27–28.

Putting aside the question of whether these generalized policy interests satisfy standing requirements, the fact is that the challenged suspensions do not prohibit U.S. hunters from hunting African elephants in Zimbabwe or Tanzania, so they do not prevent the Safari Club or its members from supporting elephant conservation by participating in or supporting hunts.  Any

**DA 42**

decline in funds available for conservation efforts resulting from hunters' cancellations is the result of hunters' decisions and not the result of the suspensions.   Accordingly, it is not irreparable harm.  *Wis. Gas.*, 758 F.2d at 674; *Pennsylvania*, 426 U.S. at 664.  This is true even if, as plaintiff contends, FWS imposed the suspensions recognizing that Zimbabwe and Tanzania might lose a portion of conservation funding and hunt-generated revenue and that U.S. hunters might cancel hunts.  *See* Reply at 20–21.  Elephant hunts in these two countries are not prohibited, U.S. hunters remain free to participate in those and other hunts, and any decline in elephant conservation efforts arising because of hunters' decisions to cancel their trips is indirect and speculative.  For this reason, the Court holds that plaintiff has not demonstrated irreparable harm to its or its members' conservation interests.

### III.    Plaintiff Has Not Shown Irreparable Harm to Economic Interests

Safari Club also asserts that the suspensions will cause irreparable economic harm to its members.   Plaintiff notes that hunters who cancel or rearrange their hunts because of the suspensions may lose deposits they have already paid towards hunting expeditions, as well as the money they have already spent purchasing such items as airline tickets, firearms, ammunition, training, and video equipment.  Mem. at 15–16, 25.  But any economic harm hunters may suffer arises out of their own decisions to cancel or change their plans and, therefore, it is indirect, self-inflicted, and not irreparable harm.  *Wis. Gas.*, 758 F.2d at 674; *Pennsylvania*, 426 U.S. at 664.

Safari Club also asserts that outfitters and other businesses that support these hunts will be harmed economically due to the suspensions.  *See, e.g.*, Carter Decl., Ex. NN to Mem. [Dkt. # 4-44] ¶ 19 (stating the suspensions have already hurt his business); Barth Decl., Ex. OO to Mem. [Dkt. #4-45] ¶ 13 (same).  It is true that "[t]he loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms."  *Air Transp. Ass'n of*

*Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012).   But the general rule in this Circuit is "that economic harm does not constitute irreparable injury."   *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d at 1295; *see also Wis. Gas.*, 758 F.2d at 674 ("It is . . . well settled that economic loss does not, in and of itself, constitute irreparable harm.").   Courts in this Circuit have recognized that economic loss can constitute irreparable injury only in limited circumstances:  where "monetary loss . . . threatens the very existence of the movant's business," *Wis. Gas.*, 758 F.2d at 674, or where the claimed economic loss is unrecoverable.   *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011).   But the "fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm," *id.*, for the harm must also be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff."   *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000).

Plaintiff does not present any evidence that would indicate that the FWS import suspensions threaten the very existence of any business that supports elephant hunts, nor does it contend that any threatened economic losses are serious in terms of their effect on these businesses.   *See* Reply at 18–19.   Given this, the Court finds that the claim of economic harm to hunting-related businesses does not constitute irreparable harm.   *See Wis. Gas.*, 758 F.2d at 674; *Mylan Pharm.*, 81 F. Supp. 2d at 42.

Plaintiff contends that the financial harms arising from the suspensions "were set in motion and expected by" defendants.   Reply at 19.   But this has nothing to do with the legal requirement that the harm be irreparable.   The law requires that the harm must be "must be both certain and great" and "actual and not theoretical."   *Wis. Gas.*, 758 F.2d at 674.   Here, the outfitters state that they *may* suffer economic losses if hunters cancel expeditions.   *See, e.g.*, Pole Decl., Ex. LL to Mem. [Dkt. # 4-42] ¶ 11 ("My company will potentially lose the income

from nine elephant safaris this year due to the trophy importation ban."); Oosterhuis Decl., Ex. MM to Mem. [Dkt. # 4-43] ¶¶ 14–15 (reporting that he has tried to cancel two clients' hunts, is considering refunding his clients' money, and stating that "[a]t this point, I do not know what we will do"); De Vries Decl., Ex. SS to Mem. [Dkt. # 4-49] ¶ 14 (stating that about eighty percent of his hunting clientele is comprised of U.S. hunters and his business would lose approximately $500,000 if they all cancel).[7]   Outfitters also state that cancelled trips may be rebooked by hunters from other countries, so it is not even certain that cancelled trips will result in lost revenues.   *See*, *e.g.*, Pole Decl. ¶ 13 ("We will attempt to sell our elephant hunts to non-U.S. hunters if necessary."); Carter Decl. ¶ 18 ("[O]utfitters can and will attempt to book elephant hunts with hunters from countries other than the U.S."); Cooke Decl., Ex. QQ to Mem. [Dkt. # 4-47] ¶ 18 ("I will have to try to sell these hunts to citizens of other countries. . . . I believe that the European hunting market is weak, but Russia and especially China are strong, so I will try to sell the hunts there."); Duckworth Decl., Ex. RR to Mem. [Dkt. # 4-48] ¶ 15 ("We will obviously attempt to sell the elephant hunts to non-U.S. hunters . . . .").   Because the outfitters do not even know if their clients will cancel or if they will be replaced, their assertions of economic harm are speculative.

The Court appreciates that there may well be some loss of revenue if U.S. hunters with a particular interest in elephants change their plans.   *See* De Vries Decl. ¶ 15 ("We will never generate the same amount of revenue by selling the hunts to non-U.S. hunters, especially so late

---

7   Some declarants acknowledge that they do not even sell elephant hunts, which suggests any harm caused to their businesses will be minimal.   Hurt Decl. ¶ 7 ("I guide 4-5 hunts each year in which the clients may be entitled to hunt for elephant (if they chose to take this option).   We have not actively sold elephant hunts in recent times, as a management decision, in order to try to encourage the stewardship of older bull for the future."); Angelides Decl., Ex. YY to Mem. [Dkt. # 4-55] ¶ 13 ("I am not a big elephant outfitter, so the harm to my personal business will be minimal.   However, I am likely not going to pursue obtaining the rights to hunt in a new area for elephants, and my business will not grow.").

**DA 45**

in the year.").  But because the import suspensions do not completely prohibit U.S. hunters from

hunting African elephants in Zimbabwe or Tanzania, the Court finds that the economic harm

arising from cancellations are not the direct result of the FWS import suspensions but rather of

the hunters' independent decisions to cancel their hunts.

For all of these reasons, the Court finds that the economic harm alleged by plaintiff does

not rise to the level of the irreparable harm needed to support extraordinary injunctive relief.

## CONCLUSION

For the reasons stated above, plaintiff's motion for a preliminary injunction [Dkt. # 4] is

DENIED.

AMY BERMAN JACKSON
United States District Judge

DATE:   June 6, 2014

**DA 46**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| SAFARI CLUB INTERNATIONAL, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )      Civil Action No. 14-0670 (ABJ) |
| | ) |
| SALLY M. R. JEWELL, in her official | ) |
| capacity as Secretary of the U.S. | ) |
| Department of the Interior, *et al.*, | ) |
| | ) |
| Defendants. | ) |
_____)

## <u>ORDER</u>

Pursuant to Federal Rule of Civil Procedure 58 and for the reasons set forth in the

accompanying memorandum opinion, it is ORDERED that plaintiffs' motion for leave to file a

second amended complaint [Dkt. # 34] is GRANTED; that defendants' supplemental motion to

dismiss the Tanzania claims (Counts 6–8 in the second amended complaint) for failure to state a

claim [Dkt. # 36] is GRANTED; defendants' motion to dismiss the Tanzania claims for lack of

subject matter jurisdiction [Dkt. # 11] is DENIED as moot; and defendants' motions to dismiss

the Zimbabwe claims [Dkts. ## 11, 36] (Counts 1–5 in the second amended complaint) are

DENIED.


/s/ Royce C. Lamberth
ROYCE C. LAMBERTH
United States District Judge


DATE:  December 26, 2014


**DA 47**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                         )
SAFARI CLUB INTERNATIONAL, *et al.*,  )
                                                         )
                        Plaintiffs,            )
                                                         )
            v.                                       )        Civil Action No. 14-0670 (ABJ)
                                                         )
SALLY M. R. JEWELL, in her official     )
capacity as Secretary of the U.S.           )
Department of the Interior, *et al.*,         )
                                                         )
                        Defendants.           )
_____)

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Safari Club International and the National Rifle Association challenge two

determinations issued by the United States Fish and Wildlife Service ("the Service") that

suspended the importation of elephant trophies of sport-hunted elephants from Tanzania and

Zimbabwe in 2014.  Am. Compl. [Dkt. # 13].  Plaintiffs contend that the Service's

determinations violate the Endangered Species Act ("ESA") and the Administrative Procedure

Act ("APA").  Pending before the Court are defendants' motion to dismiss, [Dkt. # 11] ("Mot. to

Dismiss"), and supplemental motion to dismiss, [Dkt. # 36] ("Suppl. Mot. to Dismiss"), and

plaintiffs' motion for leave to file a second amended and supplemented complaint, [Dkt. # 34]

("Mot. to Amend").  The Court will grant defendants' motion to dismiss the Tanzania claims for

failure to state a claim, deny the motion to dismiss the Zimbabwe claims, and grant plaintiffs'

motion for leave to file a second amended complaint.

**BACKGROUND**

I.      **Legal Framework**

The importation of sport-hunted African elephants into the United States is governed by both international convention and U.S. law.

      A.      **The Convention on International Trade in Endangered Species of Wild Fauna and Flora**

International trade in African elephants and other protect wildlife is governed by the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). 27 U.S.T. 1087; T.I.A.S. 8249, Mar. 3, 1973.  This treaty, which establishes requirements for importing and exporting covered species, categorizes species into three appendices, depending on the level of protection each species requires.  Relevant here, Appendix I includes species threatened with extinction, and Appendix II includes species for which trade is controlled to avoid trade incompatible with the species' survival.  African elephants from Tanzania fall under Appendix I, while African elephants from Zimbabwe fall under Appendix II.[1]

The treaty requires signatory states to establish a "Scientific Authority" and a "Management Authority" to make a variety of determinations regarding the propriety of importing and exporting covered species. CITES Art. IX.  Before a country may allow the importation of a species on Appendix I, its Scientific Authority must determine, among other things, that "the import will be for purposes which are not detrimental to the survival of the species" – sometimes referred to as a "non-detriment advice."  CITES, Art. III (3); Am. Compl. ¶ 33.  Previously pursuant to CITES Res. Conf. 2.11. (Annex 1), each country's Management Authority was required to make a determination that importing a species on CITES' Appendix I

---

[1]      The African elephant (Loxodonta Africana) is listed under Appendix I of CITES, except the populations of Botswana, Namibia, South Africa, and Zimbabwe, which are included in Appendix II.  Am. Compl. ¶¶ 30–31.

DA 49

would enhance the survival of the species – sometimes referred to as an "enhancement finding." Am. Compl. ¶¶ 34, 77–78, citing 57 Fed. Reg. 35473, 35485 (Aug. 10, 1992); Res. Conf. 2.11. (Annex 1). The treaty no longer imposes this enhancement finding requirement, but some countries, including the United States, maintain the requirement as part of their domestic law. *See* Am. Compl. ¶¶ 78–79.

## B. The Endangered Species Act

The United States has implemented the CITES treaty through the ESA. 16 U.S.C. §§ 1537a; 1538(c). The Fish and Wildlife Service's Division of Scientific Authority is responsible for issuing non-detriment advices as required by CITES. Decl. of Rosemarie S. Gnam, Ex. 2 to Mot. to Dismiss [Dkt. # 11-2] ¶ 1; *see also* Am. Compl. ¶ 36. The Service's Division of Management Authority is responsible for issuing CITES permits and making enhancement findings as formerly required by CITES and still required by the ESA. Decl. of Timothy Van Norman, Ex. 1 to Mot. to Dismiss [Dkt. # 11-1] ¶¶ 1–2.

Separately, the African elephant is listed as a threatened species under the ESA, and receives protections established by that statute. 43 Fed. Reg. 20499 (May 12, 1978); 50 C.F.R. §17.11(h). Among them, the ESA prohibits the importation of endangered species, and it authorizes the Service to extend that same prohibition to threatened species, like the African elephant, *see* 16 U.S.C. §§ 1538(a)(1), 1533, unless the Service has issued a special rule governing the threatened species, 50 C.F.R. § 17.31. Pursuant to that authority, the Service has issued a special rule governing African elephants. 43 Fed. Reg. 20499, 20502 (May 12, 1978); 47 Fed. Reg. 31384 (July 20, 1982); 57 Fed. Reg. 35473 (Aug. 10, 1992). The special rule allows the importation of sport-hunted African elephants into the United States if a number of conditions are met, including that the Division of Management Authority has made an

DA 50

enhancement finding for the country from which the elephant is being imported.  50 C.F.R. § 17.40(e)(3)(iii)(C).

### C.    Regulatory Requirements for Importing Sport-Hunted African Elephants

Because African elephants from Tanzania are on CITES Appendix I, hunters must obtain import permits to import sport-hunted elephants from that country.  CITES Art. III(3).  The Service has combined the application for a CITES non-detriment advice and an ESA enhancement finding into a single import permit application, which the Service's Division of Management Authority considers on a case-by-case basis.  Defs.' Mem. in Support of Mot. to Dismiss [Dkt. # 11] ("Defs.' Mem.") at 5; Van Norman Decl. ¶¶ 13, 21.

Because African elephants from Zimbabwe are on CITES Appendix II, hunters are not required obtain import permits to import sport-hunted elephants from that country.  CITES Art. IV(2); *see also* 62 Fed. Reg. 44627, 44633 (Aug. 22, 1997) (stating that "an import permit will no longer be required for non-commercial imports of African elephant sport-hunted trophies from [Botswana, Namibia, and Zimbabwe] only").  An enhancement finding is still required under the ESA, however, before sport-hunted elephants from Zimbabwe may be imported into the United States.  50 C.F.R. § 17.40(e)(3)(iii)(C).  These enhancement findings are made on a country-by-country basis.  Defs.' Mem. at 4, citing Van Norman Decl. ¶¶ 2–3.

## II.    The Challenged Determinations

Until 2014, imports of legally sport-hunted African elephants from Tanzania and Zimbabwe had been allowed into the United States.  The Division of Scientific Authority had issued non-detriment advices for African elephants from Tanzania and Zimbabwe since at least 1993, and the Division of Management Authority had made enhancement findings for sport-hunted African elephants from both countries since at least 1993.  Am. Compl. ¶ 37, citing 60 Fed. Reg. 12969, 12969–70 (Mar. 9, 1995); Am. Compl. ¶ 80.  That changed on April 4, 2014,

DA 51

when the Service announced determinations suspending importations of legally sport-hunted

African elephant trophies from Tanzania and Zimbabwe for the remainder of 2014.

### A.   The Tanzania Non-Detriment Advice and Enhancement Finding

On February 21, 2014, the Service's Division of Scientific Authority issued a

memorandum stating that it could not make a non-detriment advice for imports of sport-hunted

elephants from Tanzania.  General Advice on Importation of Sport-hunted Trophies of African

Elephants taken in Tanzania in the Calendar Year 2014, Ex. I to Mot. for Prelim. Inj. [Dkt. #

4-13] ("Tanzania Advice") (explaining that the finding was based on increased poaching in and a

significant decline in elephant populations in Tanzania).  This memorandum was provided to the

Division of Management Authority.  *Id.*

On March 27, 2014, the Division of Management Authority issued a finding that the

importation of sport-hunting trophies from Tanzania is not likely to enhance the survival of the

species.  Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in

Tanzania during 2014, March 27, 2014, Ex. J. to Mot. for Prelim. Inj. [Dkt. # 4-14].

Despite these determinations, the agency continues to accept permit applications:

> If permit applications are received that include new or additional
> information showing that elephant management practices by the
> Government of Tanzania have led to the sustainability of its elephant
> population on a nation-wide basis, these applications should be referred to
> the Division of Scientific Authority for consideration on a case-by-case
> basis.

Tanzania Advice at 1.

On April 4, 2014, the Service announced the suspension of imports of sport-hunted

African elephant trophies from Tanzania during the 2014 calendar year.  Press Release:  Service

Suspends Import of Elephant Trophies from Tanzania and Zimbabwe, Ex. A to Mot. for Prelim.

Inj. [Dkt. # 4-5] ("Press Release").  Also on April 4, 2014, the Service denied the first import

**DA 52**

permit applications for sport-hunted African elephants to be hunted in Tanzania later in 2014. Van Norman Decl. ¶¶ 14–15.

### B.  The Zimbabwe Enhancement Findings

On April 4, 2014, the Service issued an interim enhancement finding for elephants from Zimbabwe, which stated that the Service was "unable to find that the killing of an elephant in Zimbabwe during the 2014 hunting season for the purpose of importing into the United States will enhance the survival of the species." Memorandum: Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014, Ex. D to Mot. for Prelim. Inj. [Dkt. # 4-8] at 1 (emphasis omitted). It announced the suspension of imports of sport-hunted African elephant trophies from Zimbabwe as part of the press release it issued on that date. Press Release. In May 2014, it published a notice of the interim finding in the Federal Register. 79 Fed. Reg. 26986 (May 12, 2014). In July 2014, the Service announced a final enhancement finding, confirming that it was unable issue a positive finding for Zimbabwe. 79 Fed. Reg. 44459 (July 31, 2014); Defs.' Notice [Dkt. # 33] (notifying the Court of the Service's publication of its final finding on sport-hunted elephants from Zimbabwe).

### PROCEDURAL HISTORY

Plaintiff Safari Club International filed suit on April 21, 2014 challenging the Service's Tanzania determinations and Zimbabwe interim enhancement finding. Compl. On April 30, 2014, it filed a motion for a preliminary injunction. Mot. for Prelim. Inj. [Dkt. # 4]. The Court ordered the parties to brief only the issues of irreparable harm and subject matter jurisdiction. Minute Order of May 2, 2014; *see* Defs.' Opp. to Mot. for Prelim. Inj. [Dkt. # 10]/Mot. to Dismiss [Dkt. # 11]; Pl.'s Reply for Prelim. Inj. [Dkt. # 14]; Defs.' Surreply for Prelim. Inj. [Dkt.

**DA 53**

# 19].[2]  The parties then filed their opposition and reply briefs to defendants' motion to dismiss. Pls.' Opp. to Mot. to Dismiss [Dkt. # 22]; Defs.' Reply in Support of Mot. to Dismiss [Dkt. # 23] ("Defs.' Reply for Mot. to Dismiss").  On June 6, 2014, the Court denied the motion for preliminary injunction.  Mem. Op. and Order [Dkt. # 24].[3]

Following that ruling, the Court ordered the parties to file supplemental briefs on the motion to dismiss.  Minute Order, June 16, 2014.  On August 8, 2014, defendants filed a supplemental motion to dismiss, moving to dismiss on grounds for failure to state a claim under Rule 12(b)(6).  Suppl. Mot. to Dismiss.

On August 1, 2014, plaintiffs filed a motion for leave to file a second amended complaint to add claims regarding the Service's announcement on July 23, 2104 that it issued a final enhancement finding on sport-hunted elephants from Zimbabwe.  Mot. to Amend.

The parties filed combined briefs, addressing both defendants' supplemental motion to dismiss and plaintiffs' motion to amend.  *See* Suppl. Mot to Dismiss [Dkt. # 36]/Partial Opp. to Mot to Amend. [Dkt. # 37]; Pls.' Opp. to Suppl. Mot. to Dismiss [Dkt. # 40]/Reply for Mot. to Amend. [Dkt. # 41] ("Pls.' Suppl. Opp."); Defs.' Reply for Suppl. Mot. to Dismiss and Partial Opp. to Motion to Amend [Dkt. # 42].  The Court heard oral argument on the pending motions on November 18, 2014.[4]

---

2       On May 16, 2014, plaintiff filed an amended complaint, which added the National Rifle Association as a plaintiff but made no substantive amendments.  Am. Compl.

3       Plaintiffs appealed the order on the motion for preliminary injunction, Not. of Appeal [Dkt. # 29], but subsequently dismissed the appeal.  *See* Order, *Safari Club Int'l v. Jewell*, D.C. Cir., No. 14-5151, Nov. 7, 2014, Per Curiam (granting unopposed motion to voluntarily dismiss appeal).

4       On November 17, 2014, this case was reassigned from Judge Amy Berman Jackson to Judge Royce C. Lamberth.  Reassignment [Dkt. # 44].

DA 54

**STANDARD OF REVIEW**

**I.     Motion to Amend**

According to Federal Rule of Civil Procedure 15(a)(2), the Court should "freely give

leave [to amend] when justice so requires."  The decision to grant leave to file an amended

pleading is at the discretion of the Court.  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir.

1996).  Such leave is appropriate "in the absence of undue delay, bad faith, undue prejudice to

the opposing party, repeated failure to cure deficiencies, or futility."  *Richardson v. United*

*States*, 193 F.3d 545, 548–49 (D.C. Cir. 1999), citing *Foman v. Davis*, 371 U.S. 178, 182 (1962).

**II.    Motion to Dismiss**

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must

"treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all

inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc.*, 216

F.3d 1111, 1113 (D.C. Cir. 2000), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir.

1979) (citations omitted); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir.

2011).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those

inferences are unsupported by facts alleged in the complaint, nor must the Court accept

plaintiff's legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

   **A.     Subject Matter Jurisdiction**

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a

preponderance of the evidence.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992);

*Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Federal courts are courts

of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction."

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors*

*Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin,

**DA 55**

and end, with an examination of our jurisdiction.").  "[B]ecause subject-matter jurisdiction is 'an

Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-

matter jurisdiction upon a federal court.'"  *Akinseye v. District of Columbia*, 339 F.3d 970, 971

(D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S.

694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a

motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the

complaint."  *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other

grounds*, 482 U.S. 64 (1987).  Rather, "a court may consider such materials outside the pleadings

as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."

*Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert

v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharm.*, *Inc.

v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B. Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in

*Twombly*:  "First, the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a

plausible claim for relief survives a motion to dismiss."  *Id*. at 678–79.

A claim is facially plausible when the pleaded factual content "allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

DA 56

sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 566.

A pleading must offer more than "'labels and conclusions'" or a "'formulaic recitation of the

elements of a cause of action,'" *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Id.*

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed

liberally in the plaintiff's favor, and the Court should grant the plaintiff "the benefit of all

inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d

1271, 1276 (D.C. Cir. 1994).   Nevertheless, the Court need not accept inferences drawn by the

plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court

accept plaintiff's legal conclusions.   *See id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242

(D.C. Cir. 2002).   In ruling upon a motion to dismiss for failure to state a claim, a court may

ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or

incorporated by reference in the complaint, and matters about which the Court may take judicial

notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).

## ANALYSIS

### I.      The Court Will Grant Plaintiffs' Motion to Amend the Complaint

Plaintiffs move for leave to file a second amended complaint to add claims challenging

the July 2014 final enhancement finding for Zimbabwe.  Mot. to Amend.  In response,

defendants stated that they do not object to the proposed amendment to add a challenge to the

merits of the July 2014 Zimbabwe finding.  Suppl. Mot. to Dismiss at 3, n.3.  They stated that the

arguments in their motions to dismiss apply to plaintiffs' original claims to the April 4, 2014

finding as to Zimbabwe, and they oppose the amendment to the extent plaintiffs maintain their

Tanzania claims on the grounds of futility.   *Id.* at 2–3 and n.2.

Federal Rule of Civil Procedure 15 provides that a district court "shall freely give[ ] leave to amend the pleadings under Rule 15(a) when justice requires." *Harris v. Secretary, U.S. Dep't of Veterans Affairs,* 126 F.3d 339, 345 (D.C. Cir. 1997).  The Court makes this determination "on a case by case basis." *Id.* at 344.  The "grant or denial of an opportunity to amend is within the discretion of the District Court," although the refusal to grant the leave without any justifying reason appearing for the denial is an abuse of discretion. *Foman v. Davis,* 371 U.S. at 182.

A court may deny a motion to amend the complaint as futile when the proposed complaint would not survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. *M.K. v. Tenet*, 216 F.R.D. 133, 137 (D.D.C. 2002); *Ruffalo v. Oppenheimer & Co.,* 987 F.2d 129, 131– 32 (2d Cir. 1993) (holding that leave to amend was properly denied on futility grounds since new pleading failed to allege any additional significant facts). *See also 3 Moore's Federal Practice*, § 15.15[3] (Matthew Bender 3d ed. 2000) ("An amendment is futile if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss.").  Defendants urge the Court to deny the motion to amend as to the Tanzania claims and certain of the Zimbabwe claims because amendment would be futile since they cannot survive a motion to dismiss. Suppl. Mot. to Dismiss at 3.

Given that the parties have fully briefed and argued defendants' motions to dismiss both the first amended complaint and the proposed second amended complaint, the Court will grant plaintiffs' motion to amend and considers defendants' futility arguments in the context of the pending motions to dismiss.

## II.    Motions to Dismiss

As explained above, the regulatory requirements for importing sport-hunted elephants from Tanzania differ from those for importing from Zimbabwe, and defendants' asserted

**DA 58**

grounds for dismissal differ with respect to each.  Accordingly, the Court will address the arguments and rule on the applicable counts separately.

>    **A.    The Court will Grant the Motion to Dismiss the Tanzania Claims for Failure to State a Claim.**

Defendants assert various grounds for dismissing plaintiffs' Tanzaniza claims.  They move to dismiss based on Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because, they assert, plaintiffs have no standing:  none of plaintiffs' declarant-members has applied for an import permit and the injury plaintiffs claim is not redressable by the Court.  Defs.' Mem. at 9–15.  They also move to dismiss on Federal Rule of Civil Procedure 12(b)(6) grounds for failure to state a claim:  the Tanzania finding is not final agency action because plaintiffs have not exhausted their administrative remedies by not applying for an import permit.  Suppl. Mot. to Dismiss at 4–7.  Thus, the key factual predicate underpinning both grounds for dismissal is that no plaintiff has applied for or been denied a permit to import a sport-hunted elephant from Tanzania for the relevant period.

Section 704 of the APA provides for judicial review of "final agency action."  5 U.S.C. § 704; *see also Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) (holding that a court may not review a non-final agency action); *Hall v. Sebelius,* 689 F. Supp. 2d 10, 19 (D.D.C. 2009) (noting that a non-final agency action is not subject to judicial review under the APA).  An agency's action is final if it 1) "marks the consummation of the agency's decision making process" and 2) affects the "rights or obligations . . . [or the] legal consequences" of the party seeking review.  *Bennett v. Spear,* 520 U.S. 154, 177–78 (1997); *Domestic Secs. v. SEC,* 333 F.3d 239, 246 (D.C. Cir. 2003); *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. July 11, 2014) (citing *Bennett v. Spear,* 520 U.S. at 177–78).

**DA 59**

Defendants assert that the Tanzania advice and finding are not final agency action because they are not the consummation of the agency's decision making process:  to import sport-hunted elephants from Tanzania, a hunter must apply for and obtain an import permit, and no plaintiff has been denied an import permit and exhausted the administrative remedies for the denial of a permit.  Further, defendants contend that the advice and finding are not one from which rights or obligations have been determined or from which legal consequences flow – they are merely some predicate determinations made before the Service may issue an import permit. Suppl. Mot. to Dismiss at 5.

Plaintiffs counter that the Tanzania finding is a final agency action because it is a binding norm that sets a threshold requirement for a permit, plaintiffs' members who have no intention of applying for import permits, such as hunting outfitters, have been harmed by the advice and finding, and exhausting administrative remedies is futile.  Pls.' Suppl. Opp. at 4–16.

"'Exhaustion of administrative remedies is generally required before filing suit in federal court so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision.'"  *Hidalgo v. FBI*, 344 F.3d 1256, 1258 (D.C. Cir. 2003), quoting *Oglesby v. United States Dep't of the Army,* 920 F.2d 57, 61 (D.C. Cir. 1990).  In a recent case challenging the Service's 2005 decision not to issue a non-detriment advice for sport-hunted elephants from Zambia, this Court held that the Service's process of issuing import permits is an adjudication and not a rulemaking.  *Marcum v. Salazar*, 810 F. Supp. 2d 56, 71 (D.D.C. 2011) *vacated and remanded*, 694 F.3d 123 (D.C. Cir. 2012); *see also Franks v. Salazar*, 816 F. Supp. 2d 49, 59 (D.D.C. 2011).  Given this, and without knowing that the plaintiffs had administratively appealed the challenged permit denials with the agency, the Court granted defendants' motion for summary judgment.  The D.C. Circuit overturned that

DA 60

ruling, finding that because the plaintiffs had not exhausted their administrative remedies, the matter was unripe for judicial review.  694 F.3d 123, 124.

> [I]t is clear that Appellants' action was not ripe for review by the District Court, nor is it ripe for review by this court.  The agency did not take final action on Appellants' permit applications until the FWS Director decided Appellants' administrative appeal, and this did not occur until after the District Court issued its decision.

*Id.* at 129.  The Court of Appeals reached this decision, even though the plaintiffs in that case challenged not only the denial of import permits but also raised claims about procedural defects in the Service's issuance of the non-detriment advice and enhancement finding, as plaintiffs have done here.  *See id.* at 126 (noting that Claim V alleged that the Service applied certain requirements or criteria in a manner that created a new policy or new rule requiring formal public notice and comment rulemaking under the APA and publication in the Federal Register).  Given this binding precedent, the fact that plaintiffs here assert procedural claims does not relieve them of the obligation to exhaust their administrative remedies before filing suit in this case.

Plaintiffs point to the fact that some of their members, like hunting outfitters, for whom "[r]esort to an administrative process would not even be possible" because they do not need import permits, are harmed by the findings nonetheless.  Pls.' Suppl. Opp. at 12.  But the fact that some of plaintiffs' members may suffer harm because of the denial of import permits to hunters does not make the Tanzania advice and finding final agency actions, even if that harm has a "binding impact" on them, as plaintiffs emphasize.  *Id.* at 11.  Again, for an agency's action to be final, it must mark the consummation of the agency's decision making process *and* be one by which the rights or obligations have been determined or from which legal consequences will flow.  *Bennett v. Spear,* 520 U.S. at 177–78.  Even assuming that the Tanzania determinations are one from which the rights or obligations of certain plaintiff members have been determined or from which legal consequences will flow, the fact that the determinations do not mark the

DA 61

consummation of the Service's decision making process because no plaintiffs have applied for permits precludes the Court from concluding that the determinations are final agency action and that plaintiffs' Tanzania claims are ripe.  *See Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012) (stating that "two conditions must be satisfied" for agency action to be final:  the action "must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature" and it "must be one by which rights or obligations have been determined, or from which legal consequences will flow"), cert. denied sub nom. *Holistic Candlers & Consumers Ass'n v. FDA*, 133 S. Ct. 497, 184 L. Ed. 2d 296 (2012); *Domestic Secs. v. SEC,* 333 F.3d 239, 246 (D.C. Cir. 2003) (applying the two part *Bennett* test in determining whether an action by the SEC constituted final agency action); *see also Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (holding that the challenged agency action was not final because it "fail[ed] the first prong of the *Bennett* test of finality, in that it [did] not mark the consummation of the agency's decisionmaking process, but [was] merely the beginning of the decision-making process") (internal quotations omitted).

Plaintiffs correctly note that the exhaustion requirement is not jurisidictional, Pls.' Suppl. Opp. at 4–5, and that the Court may waive the exhaustion requirement if exhaustion through the administrative appeals process would be futile.  *Tesoro Ref. & Mktg. Co. v. FERC*, 552 F.3d 868, 874 (D.C. Cir. 2009) (citations omitted) (holding that the futility exception to the administrative exhaustion requirement applies only "in the most exceptional circumstances" where resort to the agency would be "clearly useless" because of the "*certainty* of an adverse decision") (emphasis in original) (internal citations omitted).  But the "mere probability of administrative denial of the relief requested does not excuse failure to pursue administrative remedies . . . ; rather [plaintiffs]

must show that it is certain that their claim will be denied." *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Board of Trustees of Univ. of D.C.*, 56 F.3d 1469, 1475 (D.C. Cir. 1995) (internal quotation marks and citations omitted).

The Court will not waive the exhaustion requirement in this case because an adverse decision to any permit application is not certain.  The agency has stated that it continues to accept permit applications and will consider any additional evidence applicants provide to the agency.  Van Norman Decl. at ¶ 21 ("individual permit applications . . . will be considered on a case-by-case basis for 2014 and permits will be granted if the applicants can provide evidence that the findings under both laws can be made").  While the hurdle to obtain an import permit is higher now that the agency has declined to issue a non-detriment advice and enhancement finding for Tanzania, making an adverse permitting decision probable, plaintiffs have not shown that the agency is certain to issue an adverse decision on any permit application.  *Tesoro Ref. & Mktg. Co. v. FERC*, 552 F.3d at 874 (futility exception applies only where an adverse decision from the agency is certain); *UDC Chairs Chapter v. Board of Trustees*, 56 F.3d at 1475 (mere "probability of administrative denial of the relief requested does not excuse failure to pursue administrative remedies").

Accordingly, the Court will grant defendants' motion to dismiss the Tanzania claims for failure to state a claim because the challenged Tanzania advice and finding are not final agency action given that plaintiffs have failed to exhaust their administrative remedies.[5]

### B.    The Court will Deny the Motion to Dismiss the Zimbabwe Claims.

As explained above, unlike importing sport-hunted elephants from Tanzania, hunters do not need a permit to import sport-hunted elephants from Zimbabwe because elephants from

---

5    Because this ruling dismisses the Tanzania claims entirely, the Court will deny defendants' motion to dismiss the Tanzania claims for lack of subject matter jurisdiction as moot.

Zimbabwe are on Appendix II of the CITES treaty.   *See* CITES Art. IV(2); *see also* 62 Fed. Reg. 44627, 44633.  Under the ESA, however, the Service must still make a country-wide enhancement finding under the special rule for African elephants before sport-hunted elephants may be imported from Zimbabwe to the United States.  50 C.F.R. § 17.40(e)(3)(iii)(C).

The second amended complaint retains plaintiffs' challenges to the April 4, 2014 interim enhancement finding and adds claims challenging the July 2014 final enhancement finding. Proposed 2d Am. Compl. [Dkt. # 34-2].  It states five counts alleging violations of the ESA and APA, asserting that defendants:

- illegally based the Zimbabwe enhancement findings on a lack of information (Count 1),

- applied an illegal standard in making the enhancement findings (Count 2),

- failed to provide a public notice and comment opportunity before issuing the findings (Count 3),

- improperly imposed an enhancement of survival finding requirement in the special rule governing sport-hunted African elephants on CITES Appendix II (Count 4), and

- illegally refused to find that the importation of sport-hunted elephants from Zimbabwe enhances the species' survival (Count 5).

Proposed 2d Am. Compl. at 27–34, ¶¶ 94–123.

Defendants do not oppose plaintiffs' second amendment of the complaint to the extent that it adds claims challenging the merits of the July 2014 final enhancement finding.  Suppl. Mot. to Dismiss at 8, n.5.  Given the issuance of the final finding, they voluntarily withdraw their arguments that the Zimbabwe claims are unripe or prudentially moot.  *Id.* at 8, n.5.  Finally, defendants maintain their argument that Counts 3 and 4 of the second amended complaint are time barred, *id.*, citing Defs.' Reply for Mot. to Dismiss at 20–22, and that certain of the Zimbabwe claims are moot.  Suppl. Mot. to Dismiss at 8–13.

**DA 64**

**1.   The procedural aspects of Counts 3 and 4 are not time barred.**

Defendants move to dismiss the procedural aspects of Counts 3 and 4 as time barred,[6] citing the six-year statute of limitations for APA claims.  Defs.' Reply for Mot. to Dismiss at 20, citing 28 U.S.C. § 2401(a); *P & V. Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1023 (D.C. Cir. 2008) (stating that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues"); and *Harris v. FAA*, 353 F.3d 1006, 1010 (D.C. Cir. 2004) ("The right of action first accrues on the date of the final agency action.").

Count 3 asserts that defendants were required to provide public notice of the interim and final Zimbabwe findings in the Federal Register and an opportunity to comment before issuing them.  According to defendants, because the Service first issued an enhancement finding for Zimbabwe in 1997 without providing for notice and comment then, the time for plaintiffs to challenge that alleged procedural defects began to run in 1997.  Defs.' Reply for Mot. to Dismiss at 21, citing 62 Fed. Reg. 44,627 (Aug. 22, 1997).  Because it has been more than six years since the agency first issued that finding without notice and comment, defendants argue, the claim now that notice and comment was required is time barred.  *Id.* at 22, citing *JEM Broad. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994) and *NLRB Union v. Fed. Labor Relations Auth.*, 834 F.2d 191, 196 (D.C. Cir. 1987).

Count 4 claims that defendants improperly imposed an enhancement of survival finding requirement in the Service's special rule governing sport-hunted African elephants.  Defendants argue this claim is also time barred.  The Service added the enhancement requirement to the special rule for African elephants in 1992.  Defs.' Reply for Mot. to Dismiss at 20–21, citing 57

---

6      Counts 3 and 4 of the second amended complaint correspond to Counts 2 and 3 of the original and the first amended complaints.

DA 65

Fed. Reg. 35473, 35485 (Aug. 10, 1992).  At that time, elephants from Zimbabwe were on

CITES Appendix I.  *Id.*  When the parties to CITES removed the requirement for an

enhancement determination for Appendix I species in 1994, the Service nonetheless continued to

require enhancement findings under the special rule for African elephants.  *Id.*  And when

African elephants from Zimbabwe were moved from CITES Appendix I to Appendix II in 1998,

the Service still maintained the requirement for enhancement findings under the special rule.  *Id.*

According to defendants, if plaintiffs considered the Service's continued requirement for

enhancement findings in the special rule improper, they should have raised that challenge when

the Service first implemented the special rule in 1992, when it continued to maintain the

requirement in the special rule after it was no longer required under CITES in 1994, and, at the

latest in 1998, when elephants from Zimbabwe were moved from Appendix I to Appendix II.  *Id.*

Because plaintiffs did not do so within the six-year APA statute of limitations, defendants assert,

the claim that the Service illegally imposed an enhancement finding requirement in the special

rule is time barred.  *Id.*

Defendants' arguments are unavailing.  "A cause of action against an administrative

agency 'first accrues,' within the meaning of §2401(a), as soon as (but not before) the person

challenging the agency action can institute and maintain a suit in court."  *Spannaus v. U.S. Dep't

of Justice*, 824 F.2d 52, 56 (D.C. Cir. 1987).  "The right of action first accrues on the date of

the final agency action."  *Harris v. FAA*, 353 F.3d 1006, 1010 (D.C. Cir. 2004).  As explained

above, an agency action is final, and plaintiffs may bring suit, if the two *Bennett* conditions are

met:  the challenged action marks the consummation of the agency's decision making process

and is one by which rights or obligations have been determined or from which legal

consequences will flow.  *See Bennett v. Spear,* 520 U.S. at 177–78.

There is no dispute that the Service's enhancement finding for Zimbabwe is final.  *See* Defs.' Notice; Suppl. Mot. to Dismiss at 3, n.3 (stating defendants do not oppose plaintiffs amending the complaint to add a challenge to the merits of the July 2014 final enhancement finding for Zimbabwe).  In contrast to plaintiffs' Tanzania claims, there is no exhaustion requirement here because plaintiffs are not required to obtain an import permit before importing sport-hunted elephants from Zimbabwe, so the first prong of *Bennett* is satisfied.

The question then is whether the findings determine rights or obligations or result in the flow of legal consequences.  *Bennett* at 177–78.  It is undisputed that plaintiffs were allowed to import sport-hunted elephants from Zimbabwe hunted before April 4, 2014, and that as a result of the challenged Zimbabwe findings, plaintiffs cannot import these elephants from Zimbabwe hunted after that date.  Accordingly, the findings determine plaintiffs' right to import and impose legal consequences on them.  Furthermore, because these plaintiffs were not harmed by either the lack of notice and comment on the original Zimbabwe enhancement finding or the continued requirements for enhancement findings in the special rule, plaintiffs would not have been able to maintain a suit challenging the agency's original 1993 enhancement finding or the special rule's continued requirement for enhancement findings.  Thus, plaintiffs' Zimbabwe claims did not accrue until 2014 when they were prevented from importing their elephants, and their Zimbabwe claims are not time barred.

### 2.   Plaintiffs' argument that the April 2014 interim finding is not moot goes to the merits of their claims.

Finally, defendants argue that the Court should dismiss the claims relating to the April 2014 interim finding because they have been mooted by the agency's July 2014 final finding and none of the mootness exceptions apply.  Suppl. Mot to Dismiss at 8–13.  Plaintiffs contend that their challenges to the interim finding are not moot because the agency did not have the authority

DA 67

to issue the final finding retroactively to April 2014, and as such, the interim finding had binding, legal effect between April 4 and July 31, 2014.  Pls.' Suppl. Opp. at 19–24.

Because the issue of whether the Service has authority to issue an enhancement finding retroactively goes to the scope of the agency's authority under the ESA, the issue goes to the merits of plaintiffs' claims that the findings violate the ESA and APA.  Accordingly, the Court will defer ruling on this issue at this juncture of the proceedings.

## CONCLUSION

For the reasons set forth above, the Court will grant plaintiffs' motion for leave to file a second amended complaint, grant defendants' supplemental motion to dismiss the Tanzania claims (Counts 6–8) for failure to state a claim, and deny defendants' motions to dismiss the Zimbabwe claims (Counts 1–5).  The Court will also deny as moot the motion to dismiss the Tanzania claims for lack of subject matter jurisdiction.  A separate order will issue.

/s/ Royce C. Lamberth
ROYCE C. LAMBERTH
United States District Judge

DATE:  December 26, 2014

**DA 68**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL ) 501 2nd Street NE ) Washington, DC 20002; and ) NATIONAL RIFLE ASSOCIATION OF ) AMERICA ) 11250 Waples Mill Rd, 5N ) Fairfax, VA 22030 ) )     Plaintiffs, ) ) v. ) ) SALLY M. R. JEWELL, in her official ) capacity as Secretary of the U.S. ) Department of the Interior; ) U.S. DEPARTMENT OF THE INTERIOR, ) an agency  of the United States; ) DANIEL ASHE, in his official capacity as ) Director of the U.S. Fish and Wildlife Service; and ) U.S. FISH AND WILDLIFE SERVICE, ) an agency of the United States ) 1849 C Street, NW ) Washington, DC 20240, ) )     Defendants. ) | Civ. No. 14-cv-00670 (ABJ) |

**[PROPOSED] SECOND AMENDED AND SUPPLEMENTED COMPLAINT FOR**
**DECLARATIVE AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.       For decades U.S. hunters have been able to hunt African elephants in Zimbabwe

and Tanzania and import their sport-hunted elephants into the United States.  This hunting and

importation supported elephant conservation by increasing the value of African elephants for

local communities, discouraging poaching for ivory and/or food and providing financial

resources for elephant protection.  On April 4, 2014, without warning or public input, all this

1

**DA 69**

abruptly ended. The U.S. Fish and Wildlife Service ("FWS"), an agency of the U.S. Department

of the Interior, abruptly and immediately suspended the importation of legally sport-hunted

African elephant trophies from Zimbabwe and Tanzania ("importation bans").  Subsequently, the

FWS published a Federal Register notice that announced the decision for Zimbabwe's elephants,

admitted errors in their decision-making process, characterized the Zimbabwe importation ban as

"temporary," promised a new decision on whether to lift the ban by mid-July and left the illegal

ban in place.  On July 23, 2014, the FWS announced that it would not lift the Zimbabwe

importation ban.  The FWS posted its new decision, dated July 22, 2014, on its website and

published that decision in the Federal Register on July 31, 2014.

2.      With this Complaint, Plaintiffs, Safari Club International and National Rifle

Association of America ("SCI/NRA"), challenge the April 4, 2014 and July 22, 2014 actions of

Defendants Sally M. R. Jewell, in her official capacity as Secretary of the U.S. Department of the

Interior; the U.S. Department of the Interior; Daniel Ashe, in his official capacity as Director of

the U.S. Fish and Wildlife Service; and the U.S. Fish and Wildlife Service ("Federal

Defendants").

3.      In establishing the Zimbabwe elephant importation ban, Federal Defendants acted

arbitrarily and capriciously, violated the law, and abused their discretion by 1) relying on

"limited" data and "anecdotal" evidence and failing to obtain accurate and substantiated

information before making and implementing a decision to ban the importation of elephants from

Zimbabwe on April 4, 2014; 2) enforcing an unauthorized and baseless "temporary" ban on

importation of elephants from Zimbabwe between April 4, 2014 and July 31, 2014; 3) applying

an arbitrary standard of enhancement when determining if sport-hunting enhances the survival of

Zimbabwe's elephants; 4) failing to follow their own stated procedures for changing their

**DA 70**

position on whether sport hunting of elephants in Zimbabwe enhances the survival of the species; 5) imposing an importation ban for elephants from Zimbabwe on July 31, 2014 based on lack of information rather than upon "new" information; 6) determining on July 22, 2014 that Zimbabwe elephant conservation and management laws, plans and strategies provided insufficient proof that the importation of sport hunted elephants enhances the survival of the species despite the contradictory finding that those same laws, plans and strategies demonstrated sufficient proof of enhancement of survival from August 22, 1997 through April 3, 2014; 7) failing to give the public notice of and an opportunity to comment on the change in importation status and standards used for determining enhancement of survival; and 8) imposing and enforcing a requirement that a finding that enhancing the survival of the African elephant in Zimbabwe is necessary for the importation of sport-hunted elephants from populations listed on Convention for International Trade in Endangered Species of Wild Fauna and Flora ("CITES") Appendix II without first providing notice of the requirement and an opportunity for the public to comment.

4.      In establishing the Tanzania elephant importation ban, Federal Defendants acted arbitrarily and capriciously, violated the law, and abused their discretion by 1) failing to give the public notice and the opportunity to comment on the Tanzania elephant importation ban; 2) imposing and enforcing a requirement that a finding that enhancing the survival of the African elephant in Tanzania is necessary for the importation of sport-hunted elephants without first providing notice of the requirement and an opportunity for the public to comment; and 3) applying an incorrect non-detriment finding analysis for the importation of African elephants from Tanzania.

5.      Federal Defendants' actions violate the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA").

DA 71

6.      Declaratory and injunctive relief is required to remedy the harm that the adoption and implementation of the importation bans have caused and will continue to cause.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action under the APA, 5 U.S.C. §§ 702, 706 (judicial review of final agency action and inaction) and 28 U.S.C. § 1331 (federal question jurisdiction).  The Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201, 28 U.S.C. § 2202, and 5 U.S.C. §§ 701-706.

8.      Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) as this action is brought against agencies of the United States and against officers of agencies of the United States in their official capacities.  Decisions and actions challenged here were made, at least in part, in this District; Safari Club and the NRA each maintain an office in this District; and no real property is involved.

9.      Members of SCI/NRA are hunters, outfitters, professional hunters, booking agents, taxidermists and others who hunt, guide, arrange for hunts and otherwise rely on hunting for their personal, professional and conservation interests in African elephants and who rely on the ability of U.S. hunters to import sport-hunted African elephants from Zimbabwe and, Tanzania into the United States to fulfill those interests.  Members of SCI/NRA also rely on the ability of U.S. hunters to import sport-hunted African elephants from South Africa and Namibia, two other countries from which CITES allows the export of sport-hunted African elephants.

10.     The judicial review provisions of the APA waive the Federal government's sovereign immunity.  5 U.S.C. § 702.

**DA 72**

## PARTIES

11.     Safari Club International, a nonprofit IRC § 501(c)(4) corporation, has

approximately 50,000 members worldwide.  Safari Club's mission is to protect the freedom to

hunt and to promote wildlife conservation worldwide.  Safari Club's purposes include the

following:

- To advocate, preserve and protect the rights of all hunters;
- To promote safe, legal and ethical hunting and related activities;
- To engage in advocacy within the limits imposed by law and regulation, to monitor, support, educate or otherwise take positions on local, national and international legislative, executive, judicial or organizational endeavors that foster and support these purposes and objectives; and
- To inform and educate the public concerning hunting and related activities.

12.     Safari Club works in coordination with the Safari Club International Foundation

("SCIF"), a nonprofit IRC § 501(c)(3) corporation.  SCIF's mission is to fund and manage

worldwide programs dedicated to wildlife conservation, outdoor education and humanitarian

services.  SCIF's purposes include the following:

- To conduct and support scientific and technical studies in the field of wildlife conservation, to assist in the design and development of scientifically sound wildlife programs for the management of wildlife and sustainable use hunting, and to demonstrate the constructive role that hunting and hunters play in the conservation of wildlife and in preserving biodiversity worldwide; and
- To carry out and to support education programs on wildlife conservation, ecology and natural resource management that include a demonstration of the constructive role that hunting and hunters play in natural resource conservation and land management.

13.     Safari Club promotes the principles and practice of sustainable use conservation.

Safari Club and Safari Club members' interests include the sound sustainable use conservation of

African elephants in Zimbabwe, Tanzania, South Africa and Namibia.  Safari Club members

have an interest in their ability to hunt those elephants and to import the elephants from

successful hunts.  Other Safari Club members have an interest in guiding those hunts and being

DA 73

able to sell to U.S. residents elephant hunts that take place in Zimbabwe, Tanzania, South Africa and Namibia.  Still other Safari Club members have an interest in arranging those hunts, performing the taxidermy on sport-hunted elephants from successful African elephant hunts and conducting other types of business related to African elephant hunting in Zimbabwe, Tanzania, South Africa and Namibia.  Safari Club members have an interest in the continued ability to participate in the sustainable use conservation of the African elephant, in the long-term survival of the African elephant species, and in preventing poaching from threatening the survival of the species.

14.     Safari Club and members of Safari Club are harmed and aggrieved by the abrupt suspension of the importation of legally sport-hunted African elephants from Zimbabwe and Tanzania.  For many, the opportunity to hunt elephant in Zimbabwe and Tanzania is an event of a lifetime that will never be repeated.  Most Safari Club members who want to participate in an African elephant hunt wish to bring back the elephant from their successful hunt as a prized memento of a treasured experience.  A hunter's inability to import his legally sport-hunted African elephant deprives the hunter of an element of the hunting experience to which he or she attributes great value.  A great number will not invest in an expensive elephant hunt if they cannot import the symbol of their successful hunt.  Many Safari Club members booked upcoming hunts in these countries years in advance, invested significant funds towards the trip, and have been or will be unable to recover the funds already expended if and when they cancel their bookings.  Many SCI members experienced greater uncertainty when the Federal Defendants characterized the April 4, 2014 importation ban for Zimbabwe as "temporary" and "interim."  These characterizations made it difficult for them to decide whether to cancel their upcoming hunts or to wait until Federal Defendants decided whether to lift the ban.

**DA 74**

15.     Other Safari Club members are outfitters, professional hunters and booking agents who provide African elephant hunts to U.S. residents.  These Safari Club members have been and will continue to be harmed and aggrieved by the abrupt suspension of African elephant importation for 2014.  These Safari Club members have lost clients and bookings due to the importation bans.  Their livelihoods and ability to remain in business have been drastically affected due to the reduction in the value of elephant hunts, cancellations by U.S. hunters and the lack of interest from U.S. hunters to book future hunts.

16.     Still other Safari Club members are taxidermists and other craftsmen who rely on U.S. hunters for business related to their successfully hunted African elephants.  The loss of U.S. hunters and the inability of U.S. hunters to import their elephants into the U.S. is significantly harming these Safari Club members' businesses and livelihoods.

17.     Safari Club and Safari Club members are aggrieved by the harm that the suspension of elephant importation is causing to African elephant conservation in Zimbabwe and Tanzania.  Safari Club members support sustainable use conservation generally and the role that hunting plays in African elephant conservation specifically.  The elephant importation bans have diminished the number of hunters and outfitting operations present in the field in elephant range in Zimbabwe and Tanzania, which is consequently erasing a major deterrent to poaching in these areas.  Fewer U.S. hunters means a reduction in the revenue and elephant meat (contributed by sport-hunters) going to local communities in Zimbabwe and Tanzania.  This loss of a source of income and food increases the incentives for poaching both by those who kill elephants only to sell the ivory and those who kill elephants only to provide food for their families and communities.

DA 75

18.     The inability to import sport-hunted elephants and the reduction of demand by U.S. hunters is diminishing the value of elephants to all but the poachers.  This loss of value is reducing the tolerance of local communities for the destructive tendencies of elephants and is encouraging local communities to kill the elephants themselves or facilitate their removal by poachers.  Safari Club members are being harmed by the loss of conservation incentives and the ultimate loss of elephants that is resulting from the importation bans.

19.     Before the April 4, 2014 implementation of the elephant importation bans, Safari Club members could import sport-hunted elephants from Zimbabwe and Tanzania.  Now they cannot import any sport-hunted elephant taken after April 4, 2014, regardless of whether the elephant was hunted in accordance with the laws of the countries that have the authority to regulate the hunting of these animals.

20.     Safari Club and its members possess sufficient interests in the subject matter of this litigation to establish standing.  In addition, Safari Club and Safari Club members have suffered concrete injury in fact caused by Federal Defendants' elephant importation bans.  A court ruling declaring illegal and enjoining the bans will redress those injuries.  Safari Club members will be able to import elephants taken in Zimbabwe and Tanzania since April 4, 2014. Safari Club members will once again import their legally sport-hunted African elephants, guide hunts, sell hunts, process elephants and otherwise engage in activities that are dependent on and/or related to the ability to import African elephants from Zimbabwe and Tanzania.  Safari Club and Safari Club members will be able to continue to participate in activities that help to encourage African elephant conservation in these two countries and to support and finance activities that discourage if not prevent poaching.  Safari Club is an aggrieved party and is entitled to judicial review of the actions and inactions challenged here under the APA and ESA.

DA 76

21.     The National Rifle Association of America (NRA) is a nonprofit corporation incorporated in New York in 1871, operating under § 501(c)(4) of the Internal Revenue Code, with principal offices and place of business in Fairfax, Virginia.  NRA's Federal Affairs Office is located in Washington, D.C.  Its membership includes approximately 5,000,000 individuals from the United States and many of the countries around the world.  Among its purposes and objectives are, "[t]o promote hunter safety, and to promote and defend hunting as a shooting sport and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources."  (NRA Bylaws Article II Section 5).

22.     The NRA has a Director of Conservation, Wildlife and Natural Resources working from its headquarters in Fairfax, Virginia.  The Director's primary responsibility is to promote the interests of the hunting community in wildlife management, healthy habitats and sustainable populations to ensure that these wildlife populations continue to be available to be enjoyed by NRA members and to protect and sustain hunters' legacy as the primary supporters of wildlife conservation.

23.     NRA and its members have a strong interest in enhancing the survival of African elephants in Zimbabwe, Tanzania, South Africa and Namibia in a manner that promotes proper wildlife management of the species.  NRA members have participated in hunts of African elephants in Zimbabwe and Tanzania and have imported their elephants or attempted to do so but were prevented after Federal Defendants' elephant importation bans went into effect just one day after the member legally harvested an African elephant.  Others have made substantial investments towards future hunts of African elephants in Zimbabwe and Tanzania that have been placed in jeopardy due to Federal Defendants' elephant importation bans.

**DA 77**

24.     Federal Defendants' elephant importation bans have also negatively impacted NRA members participating in ancillary fields directly related to the hunting of African elephants in Zimbabwe and Tanzania.   NRA members involved in the marketing, planning, outfitting and guiding hunts of African elephants in Zimbabwe and Tanzania have been forced to cancel trips and reevaluate already booked trips, resulting in current and continuous damages.

25.     Federal Defendants' elephant importation bans threaten sustainable use conservation of the African elephant species directly impacting and damaging NRA members' interests.  In addition to the concrete injury in fact the bans have on the livelihood of NRA members, the long-term survival of the African elephant faces major complications associated with a decrease in NRA member assisted conservation efforts that have prevented poaching from threatening the survival of the species.  Ensuring a viable population of African elephants in Zimbabwe and Tanzania through sustainable use conservations efforts is of paramount importance to NRA and its members.

26.     NRA and its members possess sufficient interests in the subject matter of this litigation to establish standing.  Federal Defendants' elephant importation bans have caused current and continuous injury upon NRA members.  A court ruling declaring illegal and enjoining the bans would redress those injuries.  NRA members could once again import their legally sport-hunted African elephants, guide and sell hunts and otherwise engage in activities that are dependent on and/or related to the ability to import African elephants from Zimbabwe and Tanzania.  These activities are of cardinal importance to the NRA and its members as they allow for direct participation and support of the African elephant populations in Zimbabwe and Tanzania through sustainable use conservation efforts.  NRA is an aggrieved party and is entitled to judicial review of the actions and inactions challenged here under the APA and ESA.

**DA 78**

27.     Defendant Sally M. R. Jewell is the Secretary of the Interior and has ultimate responsibility for the administration of the ESA and the decisions made by the parties to CITES within the United States Department of the Interior.  She is sued in her official capacity.

28.     Defendant U.S. Department of the Interior is an agency of the federal government that is authorized to administer and implement the ESA and to administer the decisions made by the parties to CITES.

29.     Defendant Daniel Ashe is the Director of the U.S. Fish and Wildlife Service.  He has responsibility for the administration and implementation of the ESA and the decisions made by the parties to CITES, including with regard to the suspension of African elephant importation from Zimbabwe and Tanzania for 2014.  He is sued in his official capacity.

30.     Defendant U.S. Fish and Wildlife Service is an agency within the Department of the Interior that is authorized to administer and implement the ESA and the decisions made by the parties to CITES.

## FACTUAL BACKGROUND

31.     African elephants (loxodonta Africana) are found throughout much of Africa. The majority of African elephants live in southern and eastern Africa, including Zimbabwe, Tanzania, South Africa and Namibia.

32.     Currently, all African elephants are listed as threatened under the ESA.  African elephants in Zimbabwe, Namibia, South Africa and Botswana are listed on Appendix II of CITES.  All other African elephants, including those in Tanzania, are listed on Appendix I of CITES.

33.     In 1977, the FWS was petitioned to list the African elephant as endangered under the ESA.  In 1978, the FWS listed all African elephants as threatened under the ESA.  43 Fed.

**DA 79**

Reg. 20499 (May 12, 1978).  With the listing, the FWS adopted a special rule that regulates the importation of legally hunted African elephants.  50 C.F.R. § 17.40(e) ("special rule").

34.     At the seventh CITES Conference of the Parties ("COP") in 1989, the parties to CITES transferred all African elephants from Appendix II to Appendix I.  55 Fed. Reg. 5847 (Feb. 20, 1990).  Pursuant to the CITES Treaty, a country allowing the importation of members of an Appendix I species must make a finding that the "import will be for purposes which are not detrimental to the survival of the species involved." ("Non-detriment finding" or "NDF")  CITES text, Article III.

35.     The FWS received another petition in 1989 to uplist the African elephant from threatened to endangered status, but rejected it.  57 Fed. Reg. 35473 (Aug. 10, 1992).  The FWS amended the special rule to include a provision that allowed the importation of sport-hunted elephants so long as CITES requirements were fulfilled and the elephant was appropriately marked.  57 Fed. Reg. 35473, 35485 (Aug. 10, 1992).  At the time, the parties to CITES required that an enhancement of survival determination be made by the importing country for species listed on Appendix I, including elephants.  The FWS promulgated the special rule to specifically require that same enhancement of survival requirement for the importation of a CITES Appendix I species.  *Id.*

36.     In the Federal Register notice accompanying the special rule, the FWS also recognized that sport-hunting "provide[s] important revenues for elephant conservation to range states."  *Id.*

37.     The FWS's Division of Scientific Authority ("DSA") is the designated CITES "Scientific Authority" for the United States.  Before the FWS issues a permit for the importation of a CITES Appendix I species, the DSA makes a non-detriment finding called an "advice."  The

**DA 80**

DSA gives the advice to the FWS's Division of Management Authority, which makes the decision whether or not to grant the permit.

38.     At least as early as 1993, the DSA issued general non-detriment advices for African elephants taken from Zimbabwe and South Africa and the FWS allowed the importation of legally taken sport-hunted elephants into the United States.  At least as early as 1993, the DSA issued non-detriment advices for African elephants taken from Tanzania, Namibia and Cameroon and the FWS allowed the importation of legally taken sport-hunted elephants into the United States.  60 Fed. Reg. 12969, 12969-70 (Mar. 9, 1995).

39.     At the tenth COP in 1997, the parties to CITES transferred Zimbabwe's elephants from Appendix I to Appendix II.  The FWS adopted this change in 1998.  63 Fed. Reg. 63210 (Nov. 12, 1998); 62 Fed. Reg. 44627 (Aug. 22, 1997).  Since the parties to CITES determined that, for Appendix II species, the importing country need not make its own NDFs to authorize the importation of sport-hunted members of the species, the FWS has not made such findings for Zimbabwe's elephants and has not required hunters who import their legally sport-hunted African elephants from Zimbabwe to apply for or obtain an importation permit from the U.S. CITES text, Article IV.   62 Fed. Reg. 44627, 44633 (Aug. 22, 1997).

40.     In a Federal Register notice published in 1997, the FWS announced that it had made an enhancement finding for African elephants from Zimbabwe.  The notice was based upon a July 2, 1997 "Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe" ("1997 Zimbabwe Enhancement Finding").  The Federal Register notice stated that the enhancement finding for importation of sport-hunted elephants from Zimbabwe would "remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published notice of any change in the Federal

DA 81

Register." *Id.* The FWS made the same two commitments for its determinations regarding importation of elephants from Namibia (*id.*) and South Africa. 66 Fed. Reg. 27601, 27609 (May 18, 2001).

41.    Until April 4, 2014, the FWS allowed the importation of sport-hunted elephants from Zimbabwe, Namibia, South Africa, Botswana and Tanzania.  During the eight year period from 2004 to 2011, 1,186 sport-hunted elephants were imported into the United States from Zimbabwe.  During that same eight year period, 300 sport-hunted elephants were imported into the United States from Tanzania.

42.    Each year, in accordance with CITES, the range states establish a quota for the number of sport-hunted elephants that will be allowed to be exported from their country.  For 2014, Zimbabwe's quota is 500 elephants and Tanzania's quota is 200 elephants.

43.    On April 4, 2014, the FWS announced, in a press release posted on the FWS website, an immediate suspension of the importation of sport-hunted elephants taken in Tanzania and Zimbabwe during the 2014 calendar year.

http://www.fws.gov/news/ShowNews.cfm?ID=2E6FF2A2-E10F-82BC-DAE08807810E3C6B. The FWS gave no prior notice of this decision to the public.  The FWS did not publish notice of the suspension in the Federal Register.  The FWS did not provide a public comment opportunity.

44.    The press release noted that "[l]egal, well-regulated sport hunting, as part of a sound management program, can benefit the conservation of listed species by providing incentives to local communities to conserve the species and by putting much-needed revenue back into conservation."  Neither the press release nor a brief Question and Answer ("Q and A") webpage, which the FWS published on the same day, analyzed the role that hunting plays in the conservation of Zimbabwe's elephants or described the role that sport hunters and sport hunting

DA 82

plays in discouraging elephant poaching.  http://www.fws.gov/international/pdf/questions-and-answers-suspension-of-elephant-sport-hunted-trophies.pdf.

45.     The press release and Q and A webpage explained that the FWS based its decision to suspend importation for African elephants from Zimbabwe on "limited" data and "anecdotal" evidence.  Neither the FWS's press release nor the Q and A page indicated that the FWS had obtained the data or evidence for Zimbabwe's suspension from the Scientific or Management Authorities of Zimbabwe.

46.     On April 17, 2014, Federal Defendants announced a modification of the suspension of legally taken African elephants.  By telephone message and letter to Safari Club, the FWS explained that Federal Defendants had revised Zimbabwe's importation ban and had removed the retroactive portion of the ban that had banned the importation of elephants from the period between January 1, 2014 and April 4, 2014.  "We will allow the import of any trophy taken in 2014 up until April 4.  The hunter will need to be able to demonstrate to our Office of Law Enforcement that the hunt occurred before that date in order to import the trophy."  Letter, dated April 18, 2014, from Robert R. Gabel, Chief, Division of Management Authority, U.S. Fish and Wildlife Service to Nelson Freeman, Deputy Director of Governmental Affairs, Safari Club International.  The April 18, 2014 letter offered no indication or evidence that Federal Defendants were aware of any difference in the status of elephants in Zimbabwe or in Zimbabwe's elephant management between April 3, 2014, when elephants were importable, and April 4, 2014, when they were not.

47.     On April 4, 2014, Federal Defendants sent a letter to the Zimbabwe Parks and Wildlife Management Authority, seeking information about the country's elephants.  This was Federal Defendants' first request for information from Zimbabwe in seven years.  On

information and belief, during the period between August 22, 1997 and April 4, 2014, Federal

Defendants had never given Zimbabwe any indication that they were considering banning the

importation of Zimbabwe's elephants.

48.     On April 17, 2014, Zimbabwe responded and sent the information requested by

Federal Defendants.

49.     On May 12, 2014, Federal Defendants published a Federal Register notice that

announced the April 4, 2014 (and April 17, 2014) decision to ban the importation of sport-hunted

elephants from Zimbabwe and Tanzania.  Federal Defendants admitted that their decision for

Zimbabwe was based on limited data and anecdotal evidence.  Federal Defendants further

implicitly admitted that they had failed their obligation 1) to base any change in their

enhancement finding for Zimbabwe and decision on importation on "new information" and 2) to

publish that change in the Federal Register.

50.     In the May 12, 2014 Federal Register notice, Federal Defendants characterized

the April 4, 2014 and April 17, 2014 decisions for Zimbabwe as "temporary" and "interim" and

promised to issue a decision by mid-July about whether to lift the April 4, 2014 importation ban

for Zimbabwe.  Federal Defendants offered no authority for issuing and implementing a

"temporary" determination and did not withdraw their illegal importation ban pending their

forthcoming mid-July decision.

51.     The May 12, 2014 characterization of the April 4, 2014 importation ban for

Zimbabwe increased the uncertainty faced by individuals with hunts planned for 2014.  Those

individuals had to decide whether to maintain their plans in the hope that Federal Defendants

would lift the ban or try to minimize their financial losses by cancelling their hunts.

**DA 84**

52.     On July 23, 2014, on the FWS website, Federal Defendants announced their decision not to lift the importation ban for Zimbabwe.  Federal Defendants released a new "Enhancement Finding for African Elephants Taken as Sport-Hunted Trophies" ("July 2014 Zimbabwe Enhancement Finding").  The July 2014 Zimbabwe Enhancement Finding, dated July 22, 2014, stated that Federal Defendants were unable to make a finding that the importation of sport-hunted elephants from Zimbabwe enhances the survival of the species.

53.     Federal Defendants published a notice of the July 2014 Zimbabwe Enhancement Finding in the Federal Register on July 31, 2014.  Federal Defendants did not retroactively allow the importation of elephants taken in Zimbabwe from April 4, 2014 through July 31, 2014.

54.     Federal Defendants' July 2014 Zimbabwe Enhancement Finding relied on a lack of information on the elephant population in Zimbabwe.  Although the July 2014 Zimbabwe Enhancement Finding was based on a greater number of documents than the April 4 decision, Federal Defendants still attributed their importation ban decision to the absence of new population data, rather than the existence of new information about the status of Zimbabwe's elephant populations.

55.      In addition, the July 2014 Zimbabwe Enhancement Finding directly contradicted Federal Defendants' own 1997 Zimbabwe Enhancement Finding.  The July 2014 decision found insufficient the same laws, plans and strategies that Federal Defendants considered sufficient for a positive determination from 1997 through April 2014 – that the importation of sport-hunted elephants from Zimbabwe enhances the survival of the species.

56.     When addressing the role that sport-hunters and sport-hunting businesses play in elephant conservation in Zimbabwe, the July 2014 Zimbabwe Enhancement Finding acknowledged that "it is clear that outstanding conservation work is being carried out in some

DA 85

areas that is funded solely or in major portions by private individuals or companies" and that these "pockets of conservation are greatly needed." Nevertheless, the July 2014 Zimbabwe Enhancement Finding determined that the importation of sport-hunted elephants does not enhance the survival of the species.

57.     The July 2014 Zimbabwe Enhancement Finding is based upon an illegal determination. Instead of determining *whether* the importation enhances the survival of the species, Federal Defendants based the importation ban on *how much* enhancement Federal Defendants believe sport hunting contributes. Federal Defendants have never established the standards upon which it measures enhancement of survival for African elephants and have never offered notice of or opportunity for the public to comment on standards or the threshold necessary for a positive determination of enhancement for Zimbabwe.

58.     Federal Defendants based their elephant importation ban for Tanzania on a February 21, 2014 determination from the Scientific Authority of the FWS not to issue an NDF for elephant importation from Tanzania ("2014 Tanzania NDF") and a March 27, 2014 determination from the Management Authority of the FWS that the importation of sport-hunted elephants from Tanzania is not likely to enhance the survival of the species ("2014 Tanzania Enhancement Finding").

59.     The 2014 Tanzania NDF discussed sport hunting but was not based on "a consideration of purpose for which the specimen will be used upon import into the United States." Instead of determining if the importation of sport-hunted elephants for the personal use of the hunters would pose a detriment to the species, the NDF advice document focused on the take of elephants generally, both for legal and illegal purposes.

> We recognize that sport-hunting, as part of a sound management program,
> can provide benefits to wildlife conservation and that sport-hunting of

> elephants is not the primary cause of the decline of elephant populations in
> Tanzania.  However, given the significant decline in the elephant
> population due to uncontrolled poaching and questionable management
> and governance, we are concerned that additional killing of elephants,
> even if legal, is not sustainable and will not support effective elephant
> population recovery efforts in Tanzania.

*Id.*

60.     The 2014 Tanzania NDF failed to examine the role that sport-hunting has in decreasing and discouraging poaching in Tanzania.  The 2014 Tanzania NDF did not address how the presence of hunters, outfitters and their staff in the field provides a deterrent to poachers or how the introduction of revenue generated by the hunting and other activities of U.S. hunters encourages local communities to guard against poaching.  The 2014 Tanzania NDF completely avoided this analysis and merely analyzed sport hunting as an "additional" source of take.

61.     Because U.S. hunters are no longer permitted to import their legally sport-hunted African elephants, some have cancelled their elephant hunts in Zimbabwe and Tanzania, and many more will cancel their hunts.  Instead of having the desired effect – to reduce "additional" take of elephants, the ban is likely to have the opposite effect.  The absence of hunters in the field is removing a major deterrent to poaching.  Poachers, freed from the risk of being discovered by hunters, outfitters and their staff, are being encouraged to illegally take more rather than fewer elephants.  Local residents who have generated income for their families and communities from jobs with hunting operations and other activities associated with the presence of U.S. hunters are losing that income.  As a consequence, the elephants that local residents protected for the benefit of the hunters are declining in value to local communities.  Poachers who offer money for protection from authorities and for the illegal killing of elephants are taking the place of hunters as the source of revenue for local communities.  As a result, more elephants are at risk of being poached and fewer elephants are likely to survive.

DA 87

62.     Sport hunters, with the help of their outfitters and professional hunters, donate much of the meat from the elephants they hunt to the local communities.  Poachers do not.  The loss of U.S. hunters means a loss of important food sources for local residents and increases the likelihood that local residents will themselves kill the elephants to feed their families and communities.

63.     Because the U.S. has no authority to control the number of elephants that can be taken or exported from Zimbabwe and Tanzania, the outfitters and professional hunters who depend on elephant hunts in these countries for their livelihoods are attempting to sell the cancelled hunts to other, non-U.S. hunters who are still able to import elephants into their home countries.  While some of the elephant hunts will be resold, the revenue generated from U.S. hunters will not.  Although residents of the United States are not the only hunters who pursue elephants in Zimbabwe and Tanzania, U.S. citizens often pay the highest fees for elephant hunts in Zimbabwe and Tanzania and bring in the most additional revenue to local communities by buying associated goods and services while present for the hunt.  Without the same number of U.S. hunters willing to pay for an elephant hunt, the market price for elephant hunts has and will go down.  The higher the cost of a hunt, the greater the value the animal has to the local community.  As a result, deterring Americans from hunting elephants in the two countries is lowering the value of the elephants.

64.     Because of the abruptness with which the U.S. announced the ban, some outfitters and professional hunting businesses in these two countries will not be able to survive the economic loss.  Many are likely to go out of business, leaving greater areas of the elephant range without people on the ground, who by their very presence, act as a deterrent to poaching.

**DA 88**

65.     In some areas of Zimbabwe, elephant populations are too large for the local communities to tolerate.  Because elephants damage crops and interfere with agricultural and other businesses, they are deemed a nuisance rather than a conservation asset.  Sport hunters bring value to the elephant and the revenue generated by sport hunting increases local tolerance for the species.  In addition, sport hunters help reduce overpopulations where they exist.  The loss of the U.S. hunter is eliminating local incentives to tolerate elephant behavior and is encouraging those troubled by elephants to kill the elephants themselves.

66.     Sport hunting discourages many reasons and sources for illegal elephant killings. Without U.S. hunters in the field, the African elephant populations in Zimbabwe and Tanzania are suffering and decreasing.

67.     The elephant importation bans affect only U.S. residents who seek to import their sport-hunted elephants into the U.S.  It has no impact on the export quotas established by Zimbabwe or Tanzania, or on the number of elephants that the governments of the two countries authorize for hunting annually.  Federal Defendants' bans on U.S. importation of African elephants do not control the number of elephants taken in each of those countries each year. Consequently, they punish those who engage in hunting and who assist in anti-poaching efforts and other elephant conservation strategies, and have little beneficial impact on reducing the risks to elephant conservation.

68.     Federal Defendants expressly implemented the importation bans for Zimbabwe and Tanzania to 1) discourage U.S. hunters from travelling to Zimbabwe and Tanzania to hunt elephants; 2) encourage U.S. hunters to cancel their planned elephant hunts in the two countries; and 3) attempt to reduce the number of elephants taken by U.S. hunters in the two countries.

DA 89

## RELEVANT LAW

**A.**     **The Endangered Species Act ("ESA") and the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES")**

69.     The ESA provides the FWS with the authority to classify African elephants as a threatened species.  16 U.S.C. §1533(a)(1).

70.     The ESA does not prohibit the importation of sport-hunted animals designated as threatened.  16 U.S.C. §1538((a)(1)(A).  Instead, the FWS, acting on behalf of the Secretary of the Interior, promulgates regulations governing the importation of threatened species.  16 U.S.C. §1538(a)(1)(G).

71.     Section 4(d) of the ESA authorizes the FWS to issue regulations pertaining to threatened species under limited circumstances.  "Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Accordingly, the FWS may not issue regulations without specifically determining that they are "necessary and advisable for conservation."

72.     In the African Elephant Conservation Act of 1989 ("AECA"), Congress adopted specific legislation intended to focus on the conservation of the species.  16 U.S.C. § 4201 *et seq.* In the AECA, Congress directed the FWS to impose moratoriums against the importation of ivory from countries that did not meet certain criteria, but prohibited the FWS from issuing moratoriums against the importation of sport-hunted elephants:

> Sport-hunted trophies
>
> Individuals may import sport-hunted elephant trophies that they have legally taken in an ivory producing country that has submitted an ivory quota. The Secretary ***shall not establish any moratorium*** under this section, pursuant to a petition or otherwise, which prohibits the importation into the United States of sport-hunted trophies from elephants that are legally taken by the importer or the

**DA 90**

importer's principal in an ivory producing country that has submitted an ivory quota.

16 U.S.C. § 4222(e) (emphasis added).

73.     In the AECA, Congress singled out the hunting and importation of African elephants as acts that benefit the survival of the species.  Congress specifically found that "[t]here is no evidence that sport hunting is part of the poaching that contributes to the illegal trade in African elephant ivory, and there is evidence that the proper utilization of well-managed elephant populations provides an important source of funding for African elephant conservation programs."  16 U.S.C. § 4202(9).

74.     The FWS does not rely on the AECA for its authority to regulate the importation of sport-hunted African elephants but instead takes that authority from the ESA. 16 U.S.C. § 4241.

75.     The FWS's regulation of the importation of African elephants relies on decisions made by both Congress, through the authority given to the FWS in the ESA, and by CITES, through resolutions and other decisions.  50 C.F.R. § 23.1.

76.     CITES is an international agreement between governments.  During conferences held between the party members to the agreement, the parties agree upon decisions and adopt resolutions designed to prevent international trade in specimens of wild animals and plants from threatening the survival of those species.

77.     The United States, Zimbabwe and Tanzania are all parties to CITES.

78.     The parties to CITES placed African elephants from Zimbabwe on Appendix II and those from Tanzania on Appendix I.

79.     Appendix I includes species that the parties to CITES have determined are threatened with extinction and that are or may be affected by trade of that species.  Appendix II

DA 91

includes species that the parties to CITES have determined are not presently threatened with extinction, but may become so if their trade is not regulated.  Appendix II also includes species that the parties to CITES consider in need of being regulated so that trade in certain other Appendix I or II species may be effectively controlled.  50 C.F.R. § 23.4

80.     The ESA and CITES direct the FWS to treat species classified as "threatened" in different ways, depending on whether the species are listed on CITES Appendix I or II.

81.     Article III of the CITES Treaty and CITES Resolution Conf. 10.3 recommend that, for species that are listed on CITES Appendix I, the importing country must make its own NDFs.  The FWS has promulgated regulations that require it to make NDFs for the import of Appendix I species.  50 C.F.R. § 23.61.

82.     Articles III and IV of the CITES Treaty and CITES Resolution Conf. 10.3 recommend that exporting countries make findings that the proposed trade of species on both CITES Appendix I and Appendix II will not be detrimental to the survival of the species.

83.      The FWS is required to make different types of NDFs, depending on whether the species in question is being imported or exported.  For NDFs for species being exported from the United States, the FWS examines the potential detriment that could be caused by the "take" of the species from the wild.  In contrast, NDFs for species being imported into the U.S. must examine the potential detriment to the species that could be caused by the purpose for which the animal is being imported into the U.S. The FWS has explained that "[t]he finding for the import of an Appendix-I species is based on a consideration of purpose for which the specimen will be used upon import into the United States."  71 Fed. Reg. 20168, 20195 (Apr. 19, 2006).  An NDF for a sport-hunted animal must therefore consider whether the personal possession by the hunter who took the animal will itself pose a detriment to the survival of the species.

84.     CITES does not require that the importing country conduct an NDF for species listed on Appendix II.

85.     The ESA states that, for species classified as threatened, that are listed on CITES Appendix II, where the take and exportation of the species comply with all CITES provisions and requirements, a presumption exists that the importation of the species for non-commercial purposes does not violate federal statute or regulation.  16 U.S.C. § 1538(c).

86.     Despite this presumption, the FWS has, by regulation, imposed additional requirements for the importation of sport-hunted elephants, whether they are listed on CITES Appendix I or II ("special rule").  50 C.F.R. § 17.40(e)(3)(iii).

Sport-hunted trophies may be imported into the United States provided:

(A) The trophy originates in a country for which the Service has received notice of that country's African elephant ivory quota for the year of export;

(B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied with;

(C) A determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and

(D) The trophy is legibly marked by means of punch-dies, under a marking and registration system established by the country of origin, that includes the following information: Country of origin represented by the two-letter code established by the International Organization for Standardization (see appendix A to chapter I) followed by the registration number assigned to the last two digits of the year of registration and the weight of raw ivory to the nearest kilogram. Any mark must be placed on the lip mark area and indicated by a flash of color which serves as a background for such mark.

87.     The FWS promulgated the special rule on August 10, 1992.  That regulation created the requirement that the take of the elephant to be imported would enhance the survival of the species.  57 Fed. Reg. 35473 (Aug. 10, 1992).  At the time that the FWS promulgated the rule, all African elephants were listed on CITES Appendix I.  In addition, at the time that the

DA 93

FWS promulgated the special rule, the CITES resolution pertaining to the importation of Appendix I species contained a requirement for a determination by the importing country that the take of the animal intended for importation enhanced the survival of the species by financially benefitting elephant conservation.

> CITES requirements included a determination that the killing of elephants for sport-hunting enhances the survival of the species by providing financial support programs for elephant conservation. This requirement is retained in the final revised special rule for the import of sport-hunted trophies from threatened populations that are on CITES appendix I.

57 Fed. Reg. at 35485; Res. Conf. 2.11. (Annex 1). The FWS's reason for including the enhancement of survival requirement was the parallel obligation adopted by CITES.

88.     Since the FWS promulgated the special rule, CITES changed the listing status of African elephants from Zimbabwe from Appendix I to Appendix II. Consequently, CITES would no longer have imposed an enhancement of survival requirement for the species once it was downlisted to Appendix II. In addition, at the CITES COP 9 in 1994 the parties to CITES amended Res. Conf. 2.11 and removed the enhancement of survival finding requirement entirely from the resolution. As a result, from that point forward CITES no longer required an enhancement of survival determination for the importation of sport-hunted elephants from either Appendix I or Appendix II species and therefore would not have required the finding for elephants from either Zimbabwe or Tanzania.

89.     The FWS has made no change to its special rule's enhancement of survival finding requirement for the importation of elephants since including those requirements in the rule in 1992, despite the fact that the criteria upon which the FWS based its finding requirement have all disappeared. The FWS has never explained why the retention of the enhancement requirement is necessary or advisable for the conservation of elephants listed on Appendix I or

DA 94

Appendix II of CITES or offered the public an opportunity to comment on the retention of the enhancement of survival requirement, despite the fact that the FWS's justification for the imposition of this requirement no longer exists.

90.     Since at least as early as 1993 until April 4, 2014, the FWS has consistently made NDFs for the importation of sport-hunted African elephants from Tanzania and has determined that all criteria identified in 50 C.F.R. § 17.40(e)(3)(iii) have been met.

**B.     The Administrative Procedure Act ("APA")**

91.     The APA provides for judicial review of final agency action by persons "aggrieved" by the action.  5 U.S.C. § 702.

92.     It also provides standards applicable when a Federal agency proposes and adopts final rules and regulations.  Those standards include formal notice of the proposed rulemaking and an opportunity to participate in the rulemaking by providing comments through the submission of data, views and/or arguments.  5 U.S.C. § 553; *id.* § 551(4).

93.     The APA authorizes a reviewing court to

> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
>> a.   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

5 U.S.C. § 706.

## CAUSES OF ACTION

### Count I - Violations of the ESA and APA:

**Federal Defendants Illegally Reversed a Longstanding Approach to Sport-hunted African Elephant Importation from Zimbabwe Based on a Lack of Information**

27

**DA 95**

94.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

95.     Federal Defendants abruptly suspended the importation of legally sport-hunted African elephants from Zimbabwe after consistently allowing such importations for over two decades.  On April 4, 2014, Federal Defendants made the decision to suspend importation of legally sport-hunted African elephants based on "limited" data and "anecdotal evidence" without first waiting to obtain comprehensive and substantiated data on the issues relevant to the continued importation of those elephants from the Scientific or Management Authorities of Zimbabwe or from others.

96.     Although Federal Defendants later attempted to rectify the illegalities of their decision-making by recharacterizing their importation ban decision as "temporary" and "interim," this increased the illegality of their actions.  Federal Defendants lacked authority to make a "temporary" or "interim" decision and to deprive SCI/NRA members of the ability to import their legally sport-hunted elephants during the period of time that Federal Defendants had not obtained the "new" information necessary to make a determination that the conditions of 50 C.F.R. §17.40(e)(3)(iii) had not been met.  When finalizing the decision to ban importation of Zimbabwe's elephants on July 22, 2014, Federal Defendants did not correct the errors they had made when they illegally banned importation on a temporary basis.  Federal Defendants continued to rely on a lack of information about the status of Zimbabwe's elephants, rather than on new information.

97.     These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

**DA 96**

98.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 16 U.S.C. §§ 1533(d) and 1538(c).

99.     If this Court determines the April 4, 2014 decision to be illegal, the Court should enjoin the importation ban for all sport-hunted elephants taken in Zimbabwe between April 4, 2014 and July 31, 2014.  If the Court determines the July 31, 2014 decision to be illegal, the Court should enjoin the importation ban for all sport-hunted elephants taken from April 4, 2014 until such date as Federal Defendants make a legally supportable decision concerning the importation of sport-hunted elephants from Zimbabwe.  The remedies requested would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

### Count II - Violations of the ESA and APA:

### Federal Defendants Applied an Illegal Standard for Determining Whether Importation of Sport-hunted Elephants from Zimbabwe Enhances the Survival of the Species

100.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

101.     Federal Defendants abruptly suspended the importation of legally hunted African elephants from Zimbabwe, first on a temporary, and then later on a final basis, without fully analyzing 1) the role that the presence of sport hunters in the field plays in reducing and discouraging the poaching of elephants in Zimbabwe and 2) the economic role that U.S. hunters play in providing Zimbabwe with the financial resources to combat poaching.  Federal Defendants did not sufficiently consider the harm to elephant conservation that will result from the absence of U.S. hunters in the field and the loss of revenue from U.S. hunters.

102.      Federal Defendants failed to consider that, instead of being additional to the illegal take of elephants by poachers, the legal sport hunting by U.S. hunters in fact reduces the number of elephants illegally killed in Zimbabwe.

**DA 97**

103.    Federal Defendants failed to adhere to the purpose for which the FWS included

the enhancement of survival requirement in the special rule for African elephant importation – to

determine whether the sport hunting "enhances the survival of the species by providing financial

support programs for elephant conservation."  57 Fed. Reg. 35473, 35485 (Aug. 10, 1992).

Instead of focusing on whether the sport hunting enhances the survival of the species, Federal

Defendants based its decision on *how much* sport hunting enhances elephant survival.

104.    These actions were arbitrary and capricious, not in accordance with law, and an

abuse of discretion.

105.    This maladministration of the law by Federal Defendants violated the ESA and

the APA.  5 U.S.C. § 706(2); 16 U.S.C. §§ 1533(d) and 1538(c).

106.    The remedies requested in this Complaint would redress the injuries of SCI/NRA

and their respective members, as outlined in this Complaint.

**Count III – Violations of the ESA and APA:**

**Federal Defendants Illegally Failed to Provide a Notice and Comment Opportunity on the
Importation Ban Decision**

107.    SCI/NRA reallege and incorporate by reference all the allegations of the

paragraphs preceding this Causes of Action section, as though fully set forth below.

108.    Federal Defendants abruptly changed their position on April 4, 2014 on the

legality of the importation of legally sport-hunted African elephants from Zimbabwe without

first notifying the public of the change of position and/or giving the public the opportunity a

formal opportunity to comment on the change in position.  Federal Defendants kept that

importation status in place from April 4, 2014 through July 31, 2014 and then reaffirmed that

decision on July 31, 2014, again without giving the public a formal opportunity to comment on

the change of position.

**DA 98**

109.     Despite notifying the public of their "temporary" and "interim" decision to ban the importation of elephants from Zimbabwe for 2014 in a Federal Register notice on May 12, 2014,  and later of their subsequent affirmation of that decision in a July 31, 2014 Federal Register Notice, Federal Defendants have never provided the public with notice of the standards that they have established for an enhancement finding for Zimbabwe's elephants or a formal opportunity to comment in order to demonstrate Zimbabwe's compliance with those standards.

110.     These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

111.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

112.     The remedies requested in this Complaint would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

### Count IV - Violations of the ESA and APA:

**Federal Defendants Illegally Imposed an Enhancement of Survival
Finding Requirement in the Special Rule Pertaining to
Importation of Sport-hunted African Elephants on CITES Appendix II**

113.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

114.     Federal Defendants failed to explain why the enhancement finding requirement included in 50 C.F.R. § 17.40(e)(3)(iii) is necessary and advisable for African elephant conservation.  For species classified as "threatened, the ESA authorizes Federal Defendants to issue such regulations deemed "necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Federal Defendants have not explained why the enhancement

**DA 99**

finding is "necessary and advisable" for African elephant conservation.  On August 10, 1992, Federal Defendants instituted the enhancement of survival finding requirement when all African elephants, including Zimbabwe's, were listed on CITES Appendix I and when CITES Res. Conf. 2.11. (Annex 1) required an enhancement finding for the importation of Appendix I species. Federal Defendants included the enhancement of survival finding requirement in 50 C.F.R. § 17.40(e)(3)(iii) to match that same CITES requirement for Appendix I species.  Despite the fact that in 1994 CITES removed the enhancement of survival finding requirement from its resolution applicable to Appendix I species and in 1997 CITES downlisted African elephants from Zimbabwe to CITES Appendix II, Federal Defendants have never deleted the enhancement of survival finding requirement from § 17.40(e)(3)(iii).  In addition, Federal Defendants have never published a public notice justifying the enhancement of survival requirement for African elephants listed on CITES Appendix II and have never given the public the opportunity to comment on the requirement.  Despite the fact that the status of the species changed and the FWS's original justification for the requirement disappeared, Federal Defendants have never provided proper justification, notice and an opportunity for comment on its decision to modify the basis for imposing an enhancement of survival requirement on an elephant population listed on CITES Appendix II.

115.    On April 4, 2014 on a temporary basis and then on July 22, 2014 on a final basis, for the first time since imposing the enhancement of survival requirement for the importation of legally sport-hunted African elephants from Zimbabwe, Federal Defendants determined that an enhancement of survival finding could not be made.  These April 4, 2014 and July 22, 2014 actions caused harm to SCI/NRA and their members for the first time since Federal Defendants illegally retained the requirement in the special rule.

DA 100

116.    These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

117.    This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

118.    The remedies requested in this Complaint would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

### Count V - Violation of the ESA and APA:

**Federal Defendants Illegally Refused to Determine That the Importation of Sport-hunted Elephants from Zimbabwe Enhances the Survival of the Species**

119.    SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

120.    On July 22, 2014, Federal Defendants illegally concluded that they could not find that the importation of sport-hunted elephants in Zimbabwe enhances the survival of the species. The Zimbabwe elephant conservation and management laws, plans and strategies that Federal Defendants found as sufficient proof of enhancement for its July 2, 1997 Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe and continued to hold sufficient proof until April 4, 2014, were the same laws, plans and strategies that Federal Defendants reported to be insufficient proof in their July 2014 Zimbabwe Enhancement Finding.

121.    These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

122.    This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

**DA 101**

123.    The remedies requested in this Complaint would remedy the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

## Count VI - Violation of the ESA and APA:

### Federal Defendants Illegally Failed to Provide the Public with Notice and the Opportunity to Comment on the Elephant Importation Ban for Tanzania

124.    SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

125.    Federal Defendants announced the elephant importation ban for Tanzania in a press release published on the FWS's website and implemented the ban immediately.  Despite the fact that the ban applied to the hunting public generally, and reversed an opportunity available to Safari Club members and others for decades, Federal Defendants failed to publish notice of the ban in the Federal Register and provide the public with an opportunity for comment on a proposed ban.

126.    These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

127.    This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

128.    The remedies requested in this Complaint would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

## Count VII - Violations of the ESA and APA:

### Federal Defendants Illegally Imposed an Enhancement of Survival Finding Requirement in the Special Rule Pertaining to Importation of Sport-hunted African Elephants on CITES Appendix I

**DA 102**

129.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

130.     Federal Defendants failed to explain why the enhancement finding requirement included in 50 C.F.R. § 17.40(e)(3)(iii) is necessary and advisable for African elephant conservation.  For species classified as "threatened," the ESA authorizes Federal Defendants to issue such regulations deemed "necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Federal Defendants have not explained why the enhancement finding is "necessary and advisable" for African elephants listed on CITES Appendix I.

131.     On August 10, 1992, Federal Defendants instituted the enhancement of survival finding requirement when CITES Res. Conf. 2.11. (Annex 1) required an enhancement finding for the importation of Appendix I species.  Federal Defendants included the enhancement of survival finding requirement in 50 C.F.R. § 17.40(e)(3)(iii) as a result of a parallel CITES requirement.  Despite the fact that in 1994 CITES removed the enhancement of survival finding requirement from its resolution applicable to Appendix I species, Federal Defendants never removed the enhancement of survival finding requirement from § 17.40(e)(3)(iii), never provided a public notice justifying the retention of the requirement for African elephants, including those from Tanzania, and never gave the public the opportunity to comment on the requirement when the reason for the requirement no longer existed.  On April 4, 2014, for the first time since imposing the enhancement of survival requirement for the importation of legally sport-hunted African elephants from Tanzania, Federal Defendants determined that an enhancement of survival finding could not be made.  These April 4, 2014 actions caused harm to SCI/NRA and their members for the first time since Federal Defendants illegally retained the requirement in the special rule.

DA 103

132.    These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

133.    This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

134.    The remedies requested in this Complaint would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

### Count VIII - Violation of the ESA and APA:

### Federal Defendants Illegally Applied the Incorrect Non-Detriment Standard to the Importation of Sport-hunted African Elephants from Tanzania

135.    SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

136.    Federal Defendants failed to conduct the proper NDF assessment for the importation of an Appendix I species.  When considering the potential detriment posed by U.S. importation of legally sport-hunted elephants from Tanzania, Federal Defendants applied the analysis authorized for exportation, rather than importation.

137.    Federal Defendants wrongfully assessed the potential detrimental impact of both legal and illegal (poaching) take of elephants in Tanzania rather than focusing their NDF assessment on the purpose for which sport-hunted elephant importations would be intended.  In doing so, Federal Defendants ignored and/or contradicted their own published conclusion that the "finding for the import of an Appendix-I species is based on a consideration of purpose for which the specimen will be used upon import into the United States." 71 Fed. Reg. 20168, 20195 (Apr. 19, 2006).  On April 4, 2014, Federal Defendants, for the first time since African elephants in Tanzania were listed as a threatened species, determined that it could not make an NDF for the

**DA 104**

importation of sport-hunted African elephants and caused SCI/NRA and their members harm for the first time.

138.    These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

139.    These actions by Federal Defendants violate the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

140.    The remedies requested in this Complaint would remedy the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

## PRAYER FOR RELIEF

For the reasons stated above, SCI/NRA respectfully request that the Court grant the following relief:

1.    Declare that Federal Defendants violated the ESA and the APA in suspending the importation of African elephants legally hunted in Zimbabwe between April 4, 2014 and December 31, 2014.

2.    Declare that Federal Defendants violated the ESA and APA in making a temporary decision to suspend importation of sport-hunted elephants from Zimbabwe on April 4, 2014, and leaving that ban in place through July 31, 2014.

3.    Declare that Federal Defendants violated the ESA and APA in making a decision to suspend importation of sport-hunted elephants from Zimbabwe on July 22, 2014.

4.    Declare that Federal Defendants violated the ESA and APA in suspending the importation of African elephants legally sport-hunted in Tanzania in 2014.

5.    Declare that Federal Defendants' decisions to suspend  the importation of legally sport-hunted African elephants from Zimbabwe on April 4, 2014 and on July 22, 2014 were

**DA 105**

arbitrary and capricious, contrary to law, and an abuse of discretion and therefore the suspension decisions were invalid.

6.     Declare that Federal Defendants' suspension of the importation of legally sport-hunted African elephants from Tanzania was arbitrary and capricious, contrary to law, and an abuse of discretion and therefore the suspension is invalid.

7.     Enjoin the Federal Defendants from continuing and/or enforcing the ban on importation of legally sport-hunted elephants from Zimbabwe in 2014.

8.     Enjoin the Federal Defendants from continuing and/or enforcing the ban on importation of legally sport-hunted elephants from Tanzania in 2014.

9.     Award SCI/NRA the costs of litigation, including reasonable attorneys' fees.

10.    Award SCI/NRA such other relief that is just and proper.

Dated this 1st day of August 2014.


                                 Respectfully submitted,


                                 /s/ Anna M. Seidman

                                 Anna M. Seidman, Esq. (DC Bar No. 417091)
                                 Douglas S. Burdin, Esq. (DC Bar No. 434107)
                                 Jeremy E. Clare, Esq. (DC Bar No. 1015688)
                                 Safari Club International
                                 501 2nd Street, NE
                                 Washington, DC 20002
                                 Telephone: (202) 543-8733
                                 Facsimile: (202) 543-1205
                                 aseidman@safariclub.org
                                 dburdin@safariclub.org
                                 jclare@safariclub.org

**DA 106**

*Counsel for Plaintiff,*
*Safari Club International*


Christopher A. Conte (DC Bar No. 43048)
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
Facsimile: (703) 267-1164
cconte@nrahq.org

*Counsel for Plaintiff,*
*National Rifle Association of America*

**DA 107**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                      )
SAFARI CLUB INTERNATIONAL, *et al.*,  )
                                      )
            Plaintiffs,               )
                                      )
      v.                              )          Civil Action No. 14-0670 (RCL)
                                      )
SALLY M. R. JEWELL, in her official   )
capacity as Secretary of the U.S.     )
Department of the Interior, *et al.*, )
                                      )
            Defendants.               )
_____)

## MEMORANDUM OPINION AND ORDER

This case involves a challenge by plaintiffs Safari Club International and the National Rifle Association of America to determinations by the United States Fish and Wildlife Service ("FWS" or "the Service") to suspend imports of sport-hunted elephants from Tanzania and Zimbabwe. Defendants moved to dismiss the lawsuit and on December 26, 2014, the Court dismissed the claims with respect to imports from Tanzania, but not with respect to imports from Zimbabwe. *Safari Club Int'l v. Jewell*, No. 14-0670 (ABJ), 2014 WL 7367007, at *8, *10 (D.D.C. Dec. 26, 2014). Following that ruling, plaintiffs filed a motion for the Court to certify the finality of the Court's dismissal of the Tanzania claims pursuant to Federal Rule of Civil Procedure 54(b). For the reasons set forth below, the Court will grant plaintiffs' motion.

## BACKGROUND

International trade of endangered species, like the African elephant, is governed by the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). Mar. 3, 1973, 27 U.S.T. 1087, T.I.A.S. No. 8249. Whether a species covered by CITES may be

DA 108

traded between countries depends, among other factors, on whether the species is listed under Appendix I or Appendix II of the treaty.  An import permit is required to import an Appendix I species, like African elephants from Tanzania, CITES Art. III(3), while no import permit is required to import an Appendix II species, like African elephants from Zimbabwe, CITES Art. IV(4).[1]  The United States has implemented CITES through the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1537a; 1538(c), and FWS is responsible for issuing the import permits required by treaty.

FWS previously allowed imports of legally sport-hunted African elephant trophies from Tanzania and Zimbabwe, but that changed in April 2014, when FWS issued determinations suspending these imports.  Press Release:  Service Suspends Import of Elephant Trophies from Tanzania and Zimbabwe, Ex. A to Mot. for Prelim. Inj. [Dkt. # 4-5].  Plaintiffs, who represent hunters and hunting outfitters, filed suit challenging the Service's actions, Compl. [Dkt. #1], Am. Compl. [Dkt. # 13], 2d Am. Compl. [Dkt. # 49], and defendants moved to dismiss, among other reasons, on the grounds that plaintiffs failed to exhaust their administrative remedies with respect to the Tanzania claims because they did not apply for and were not denied an import permit.  Mot. to Dismiss [Dkt. # 11]; Supplemental Mot. to Dismiss & Partial Opp. to Mot. to Am./Correct [Dkt. # 36].

---

1       CITES categorizes protected species into three appendices based on the level of protection required for the species.  27 U.S.T. 1087.  A fuller description of the treaty's requirements appears in the Court's December 26, 2014 decision.  *Safari Club Int'l*, 2014 WL 7367007, at *1.

**DA 109**

On December 26, 2014, the Court granted defendants' motion to dismiss the Tanzania claims (Counts 6–8),[2] ruling that plaintiffs had failed to exhaust their administrative remedies. *Safari Club Int'l*, 2014 WL 7367007, at *8, *10.  It denied the motion to dismiss the Zimbabwe claims. *Id.* at *10.

On January 22, 2015, plaintiffs filed a motion for certification from the Court that the dismissal of the Tanzania claims was a final judgment. Pls.' Mot. for Certification of Ruling [Dkt. # 53] ("Pls.' Mot.").  The parties have briefed the issue.  Defs.' Opp. to Pls.' Mot. [Dkt. # 59] ("Defs.' Opp."); Pls.' Reply in Supp. of Pls.' Mot. [Dkt. # 61] ("Pls.' Reply").  For the reasons set forth below, the Court will grant plaintiffs' motion.

## LEGAL STANDARD

In actions that present multiple claims for relief, Rule 54(b) authorizes a district court to "direct entry of a final judgment as to one or more, but fewer than all, claims."  Fed. R. Civ. P. 54(b).  The district court, in its discretion, is to determine the "appropriate time" when each final decision in a multiple-claims action is ready for appeal and "[t]his discretion is to be exercised 'in the interest of sound judicial administration.'"  *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980), quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 435 (1956).

The court must first determine whether the decision in question is a "final judgment," meaning "a decision upon a cognizable claim for relief" that is "'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'"  *Id.* at 7, quoting *Sears, Roebuck & Co.*, 351 U.S. at 436.  "'Absent an express direction for entry of judgment, an order

---

2       The count numbers for the Tanzania claims in the amended complaint were 4, 5, and 6, *see* Am. Compl. [Dkt. # 13], but plaintiffs moved for leave to file a second amended complaint, which changed the Tanzania claims to counts 6, 7, and 8, *see* 2d Am. Compl.  The Court granted plaintiffs' motion for leave to file a second amended complaint and dismissed the Tanzania claims, counts 6–8 of the second amended complaint. *Safari Club Int'l*, 2014 WL 7367007, at *5–*6, *10.

DA 110

that disposes of less than all the claims – no matter with what firmness and apparent finality – is not appealable.'" *Bldg. Indus. Ass'n of Superior Cal. v. Babbitt*, 161 F.3d 740, 743–44 (D.C. Cir. 1998), quoting *Everett v. U.S. Airways Grp., Inc.*, 132 F.3d 770, 773 (D.C. Cir. 1998).

If the court determines that the judgment is final, it must then "determine whether there is any just reason for delay, keeping in mind that '[n]ot all final judgments on individual claims should be immediately appealable, even if they are in some sense separable from the remaining unresolved claims.'" *Johnson v. Mukasey*, 248 F.R.D. 347, 355 (D.D.C. 2008), *aff'd in part sub nom. Johnson v. Holder*, No. 08-5157, 2009 WL 3568647 (D.C. Cir. Oct. 7, 2009), quoting *Bldg. Indus. Ass'n*, 161 F.3d at 744.   District courts have considerable discretion to determine the "exceptional cases qualifying for Rule 54(b) certification," *Bldg. Indus. Ass'n*, 161 F.3d at 743, so long as this discretion is "exercised 'in the interest of sound judicial administration.'" *Curtiss-Wright Corp.*, 446 U.S. at 8, quoting *Mackey*, 351 U.S. at 435.   In doing so, district courts must consider judicial administrative interests and the equities involved.   *Id.*   In considering judicial administrative interests, courts must consider administrative efficiency and the federal policy against piecemeal litigation.   *Id.*   It is proper for the court to consider "whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals."   *Id.*   But even if an appeal of the claims does not harm judicial administrative interests, "it is still within the court's discretion to grant or deny final judgment under 54(b) based on the equities involved." *Johnson*, 248 F.R.D. at 357, citing *Curtiss-Wright Corp.,* 446 U.S. at 10.

**DA 111**

## ANALYSIS

### I.      The Court's ruling on the Tanzania claims is a final judgment.

Plaintiffs argue that the ruling dismissing the Tanzania claims for failure to exhaust administrative remedies was final, stating that they could have filed the Tanzania lawsuit separately, and if they had, the ruling on the motion to dismiss would have been appealable.   Pls.' Mot. at 4–6.   Defendants do not dispute that the Tanzania ruling was final.   Defs.' Opp. at 1.   The Court agrees and finds that the ruling on the Tanzania claims is a final judgment as to those claims. The ruling was a decision upon plaintiffs' cognizable claim for relief with respect to imports of sport-hunted elephants from Tanzania, which disposed of those claims fully.   *See Curtiss-Wright Corp.*, 446 U.S. at 7.

### II.     There is no just reason for delay.

Given that the December 2014 decision constituted a final judgment on the Tanzania claims, the Court must next consider whether there is a just reason to delay an appeal of those claims.   *Id.* at 8.   Plaintiffs contend there is no just reason for delay, because the Tanzania and Zimbabwe rulings are distinct from each other, given the different regulatory regimes that govern imports from each country.   Pls.' Mot. at 8; Pls.' Reply at 1.   According to plaintiffs, the issue for appeal concerns elephants listed on Appendix I and not those listed on Appendix II, and the permit requirement for Tanzania eliminates any overlap between the two.   Pls.' Mot. at 8.   They assert that the ruling on the Tanzania permit requirement "has no impact on or relation to" the ongoing challenges to the Zimbabwe import suspension, and that the factual and legal issues related to the Tanzania appeal will have to be briefed and argued separately from the Zimbabwe issues.   *Id.* at 6.

Defendants counter that there is substantial overlap between the two sets of claims, emphasizing that plaintiffs' claims that FWS failed to provide notice and comment before issuing

**DA 112**

the challenged findings and their challenge to the validity of the enhancement finding requirement applies to both sets of claims. Defs.' Opp. at 3–4. According to defendants, it would be a waste of judicial resources to allow appeal of the Tanzania claims because these overlapping legal questions could be before this Court and the Court of Appeals at the same time. *Id.* at 4. Plaintiffs point out, however, that the issue the Court of Appeals would decide now is whether the Tanzania findings are final agency actions given the permit requirement and whether resort to that administrative process would be futile – not the merits questions of notice and comment or the validity of the enhancement finding requirement. Pls.' Reply at 2–3. Further, the appellate court will not have to decide any permit-related issues for the Zimbabwe claims, because there is no permit requirement for imports from that country. *Id.* at 3.

The Court finds that plaintiffs' appeal of the final judgment with respect to their Tanzania claims would not harm judicial administrative interests. *See Curtiss-Wright Corp.*, 446 U.S. at 8. The issues for appellate review involve plaintiffs' failure to apply for a permit and exhaust their administrative remedies, not the common merits questions on rulemaking and the validity of the enhancement finding requirement. Plaintiffs are correct that issue of finality and exhaustion of administrative remedies arises only with the respect to imports from Tanzania and would not be reviewed again in subsequent appeals of this case. Therefore, certification of these claims would not compromise the judicial interest against piecemeal litigation. *See id.*; *see also Am. Forest Res. Council v. Ashe*, 301 F.R.D. 14, 19 (D.D.C. 2014).

With respect to the equities involved, plaintiffs argue that an immediate appeal would be equitable because unless the decision is reversed on appeal, "issue preclusion, collateral estoppel, or at least stare decisis likely would prevent" them from litigating the issue of their ability to bring such a claim in any challenge against import bans imposed on a CITES Appendix I elephant. Pls.' Mot. at 7. While acknowledging that "this may be true," defendants counter that this case is not

**DA 113**

one of the "exceptional cases" in which an interlocutory appeal is appropriate.  Defs.' Opp. at 4.

Defendants quote *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981), for the proposition that

litigants must "show that an interlocutory order of the district court might have a serious, perhaps

irreparable, consequence" to obtain interlocutory appeal.  *Id.* at 4–5.  They also point out that the

consequence here was of plaintiffs' own making since they chose to file suit without identifying a

member to exhaust administrative remedies, and that plaintiffs could "correct the deficiency" by

finding a member who has applied for a permit or would be willing to do so, and then file a new

lawsuit once the permit is denied.  *Id.* at 5.

 The Court finds that the equities favor plaintiffs.  This case is procedurally unusual because

of the different regulatory requirements governing the same imports, albeit from different

countries.  And although plaintiffs knew these same imports were subject to different regulatory

requirements and proceeded to file suit anyway, the Court finds that the unique posture of the case

arising from the different regulatory regimes tilts this case toward being an "exceptional case"

qualifying for certification under Rule 54(b), particularly because the issues to be appealed are

separable from those that are unresolved.  *See Bldg. Indus. Ass'n*, 161 F.3d at 743; *see also Curtiss-*

*Wright Corp.*, 446 U.S. at 8.  Finally, the Court notes that the *Carson* case relied upon by

defendants involved 28 U.S.C. § 1291(a)(1), the statute that governs interlocutory appeals of

injunctions, which is not at issue in this case.  *See Carson*, 450 U.S. at 84.  Accordingly, the Court

finds that the equities favor granting plaintiffs' motion.

**DA 114**

## CONCLUSION

For the reasons set forth above, it is ORDERED that plaintiffs' motion for certification of ruling [Dkt. # 53] is GRANTED.  It is further ORDERED that pursuant to Federal Rule of Civil Procedure 54(b), the Court's Order of December 26, 2014 [Dkt. # 47] is a final judgment with respect to plaintiffs' Tanzania claims (Counts 6–8 of the second amended complaint).

**SO ORDERED.**

Signed by Royce C. Lamberth, United States District Judge, on April 9, 2015.

**DA 115**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| and | ) | |
| NATIONAL RIFLE ASSOCIATION OF | ) | |
| AMERICA | ) | |
| | ) | |
|       Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. 14-cv-00670 (RCL) |
| SALLY M. R. JEWELL, in her official | ) | |
| capacity as Secretary of the U.S. | ) | |
| Department of the Interior; | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| an agency of the United States; | ) | |
| DANIEL ASHE, in his official capacity as | ) | |
| Director of the U.S. Fish and Wildlife Service; and | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| an agency of the United States | ) | |
| | ) | |
|       Defendants. | ) | |

## <u>NOTICE OF APPEAL</u>

Pursuant to Rule 3 of the Federal Rules of Appellate Procedure, notice is given that Safari

Club International and the National Rifle Association of America ("SCI/NRA") appeal to the

United States Court of Appeals for the District of Columbia Circuit from the December 26, 2014

District Court Order (Dkt. 47) and Memorandum Opinion (Dkt. 48) that dismissed claims 6, 7,

and 8 of SCI/NRA's Second Amended Complaint.  In those claims SCI/NRA challenged the

April 4, 2014 decision of Defendants Sally S.M.R. Jewell, acting in her official capacity as

Secretary of the U.S. Department of the Interior; the U.S. Department of the Interior; Dan Ashe,

acting in his official capacity as the Director of the U.S. Fish and Wildlife Service; and the U.S.

Fish and Wildlife Service to ban the importation of elephants legally sport hunted in Tanzania

**DA 116**

after April 4, 2014.  On April 9, 2015, the District Court, in accordance with Fed. R. Civ. P.

54(b), certified the finality of the dismissal of those claims for purposes of appeal. (Dkt. 65).

Dated this 3rd day of June, 2015.

Respectfully submitted,

/s/Anna M. Seidman
Anna M. Seidman
D.C. Bar No. 417091
Douglas Burdin
D.C. Bar No. 434107
Jeremy Clare
D.C. Bar No. 1015688
501 2nd Street NE
Washington, D.C.
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org

*Counsel for Plaintiff/Appellant*
*Safari Club International*

Christopher A. Conte (DC Bar No. 43048)
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
Facsimile: (703) 267-1164
cconte@nrahq.org

*Counsel for Plaintiff/Appellant*
*National Rifle Association of America*

**DA 117**

**INFORMATION MEMORANDUM FOR THE DIRECTOR**

**FROM:**     Bryan Arroyo

**CC:**          Steve Guertin, Deputy Director

**SUBJECT:**  Suspension of imports of sport-hunted African elephant trophies taken in
Tanzania and Zimbabwe during calendar year 2014

## I.     SUMMARY

Based on our review of the best available information, the U.S. Fish and Wildlife Service
(Service) will be unable to make positive findings required under the Convention on
International Trade in Endangered Species (CITES) or the Endangered Species Act (Act) to
allow the import of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe
during calendar year 2014. The required findings are currently being finalized and will be
completed by late February 2014.

In Tanzania, recent information indicates a significant elephant population decline, primarily due
to poaching for ivory. In addition, we have growing concerns over the ability of the Government
of Tanzania to successfully manage its elephant hunting program to ensure that it provides a
clear benefit to the survival of elephants within the country. Given this information, the Division
of Scientific Authority (DSA) will not be able to find that the import of sport-hunted elephant
trophies taken in Tanzania will be for purposes that are not detrimental to the survival of the
species, as required under CITES. Likewise, the Division of Management Authority (DMA) will
not be able to find that the "the killing of the animal whose trophy is intended for import would
enhance the survival of the species" as required by the Act's special rule for African elephants
contained in 50 CFR 17.40(e). We recognize that sport hunting, as part of a sound management
program, can provide benefits to conservation and that sport hunting of elephants is not the
primary cause of the decline of elephant populations in Tanzania. However, given the significant
decline in the elephant population due to uncontrolled poaching and questionable management
practices, we are concerned that additional killing of elephants, even if legal, is not sustainable
and is not supporting effective management and community programs that enhance the survival
of the species in Tanzania.

For Zimbabwe, credible information about the status of elephants is extremely limited.
However, indications are that Zimbabwe's elephant population is also being affected by the
African elephant poaching crisis. In addition, there do not appear to be adequate governmental
controls in place in Zimbabwe to ensure that the "killing of the animal whose trophy is intended
for import would enhance the survival of the species" as required by the special rule for
elephants. Consequently, DMA is unlikely to be able to make such a determination. While
recognizing the potential benefits that the sport hunting of elephants could provide to elephant
conservation, we have insufficient information to determine how sport hunting is supporting
effective management and community programs that enhance the survival of the species in
Zimbabwe.

000851

We are raising this issue at this time due to the need for early engagement with the sport-hunting community to maintain positive relations and create opportunities for cooperative action to affect change. There are key hunting conventions upcoming where African elephant hunts costing tens of thousands of dollars, including in Tanzania and Zimbabwe, are booked by hunters, including the Dallas Safari Club Convention (January 9-12, 2014) and the Annual Safari Club International Convention (February 5-8, 2014). We recommend that high-level outreach be considered prior to these meetings. We recommend that outreach to the sport-hunting community be undertaken before any messages about suspension of elephant trophy imports from Tanzania and Zimbabwe are disseminated broadly.

As we finalize our negative findings, we will identify specific actions that can be taken by Tanzania and Zimbabwe that might allow the Service to reconsider its findings in the future. These actions, in addition to being provided to the Governments of Tanzania and Zimbabwe, could be shared with our Federal Government partners and leaders in the sport-hunting community with the idea that collaboration and partnership will be important to effect positive changes.

## II.    DISCUSSION

Import of African elephant hunting trophies into the United States is subject to FWS regulations implementing CITES and the ESA. The African elephant is listed as threatened (throughout its range) under the ESA and trade in African elephant specimens is regulated by a special rule under Section 4(d) of the Act (50 CFR 17.40(e)). The special rule allows for import of African elephant hunting trophies without an ESA permit, provided they are accompanied by the necessary CITES permits and a determination has been made that "the killing of the animal whose trophy is intended for import would enhance survival of the species." The African elephant population of Tanzania is listed in CITES Appendix I; therefore, elephant hunting trophies from Tanzania must be accompanied by a CITES export permit, issued by the country of origin, and a CITES import permit, issued by FWS. The African elephant population of Zimbabwe is listed in CITES Appendix II; therefore, only the CITES export permit issued by the country of origin is required. [Our regulations (50 CFR 17.8) also provide for the noncommercial import of any other threatened, CITES Appendix-II wildlife without an ESA permit when certain conditions are met.]

*Tanzania:* Tanzania's CITES annual export quota for elephants is 400 tusks (200 elephants). In the past, Tanzania typically has not exported its full quota. To issue a CITES Appendix-I import permit for sport-hunted elephant trophies taken in Tanzania, DSA must make a finding that the import is for purposes that are not detrimental to the survival of the species. In addition, under the special rule for African elephants, DMA must determine that the killing of the animal whose trophy is intended for import would enhance the survival of the species.

The Selous-Mikumi ecosystem was once an elephant stronghold, representing the second largest elephant population in Africa and about 40% of Tanzania's total elephant population. However, an October 2013 population survey conducted in that ecosystem indicates an 80% population decline has occurred in the last 3 years, from ~40,000 to ~13,000. In addition, while updated numbers are not readily available for many other areas in Tanzania, all indications are that those

2

DA 119

populations have experienced similarly drastic declines. With the precipitous decline of African elephants in the Selous-Mikumi ecosystem, and strong indications of similar declines in other Tanzanian populations, it is no longer possible for us conclude the national elephant population of Tanzania is stable.

According to an analysis of data from the Elephant Trade Information System (ETIS, a global illegal elephant trade tracking system) presented at CITES CoP16, both Zimbabwe and Tanzania are implicated as significant players in the illegal ivory trade. This is particularly true for Tanzania. In the ETIS analysis presented at CoP15, Tanzania was already identified as a country of concern with respect to large consignments of illicit ivory leaving the African continent. In the intervening three years, the ETIS data show that both Kenya and Tanzania continue to be the primary conduits for large shipments of ivory exported to Asia, together accounting for nearly half of the 34 large-scale ivory seizures by number and 58% of the associated weight of such seizures during the period 2009-2011. These two countries have been implicated in 16 of the world's largest ivory shipments, totaling some 35 tonnes of ivory, interdicted at, or successfully moved through, their Indian Ocean seaports of Mombasa, Dar es Salaam, and Zanzibar.

The CITES program known as Monitoring the Illegal Killing of Elephants (MIKE) also reported at CITES CoP16. MIKE monitors sites throughout Asia and Africa, and evaluates relative poaching levels based on the Proportion of Illegally Killed Elephants (PIKE), which is calculated as the number of illegally killed elephants found divided by the total number of elephant carcasses encountered by patrols or through other means, aggregated by year for each site. The data presented at CoP16 suggest an ongoing increase in levels of illegal killing of elephants since 2006, with 2011 displaying the highest levels of poaching since MIKE records began in 2002. This increase between 2010 and 2011 is statistically significant. Prior to 2011, 2010 had the highest levels on record. PIKE levels were above 0.5 in all four subregions in 2011, meaning that more than half of elephants found dead were deemed to have been illegally killed. A PIKE of 0.5 or higher exceeds maximum birth rate and means that the elephant population is very likely to be in net decline.

In Selous, Tanzania's sole World Heritage Site that is also a MIKE site, the 2011 PIKE was .64, a nearly 27% increase over the 2002-2010 average of .50. In Ruaha Rungwa, another MIKE site with a significant elephant population, the 2011 PIKE was .94, the highest ever recorded for that site.

In addition to concerns over the elephant population trend within Tanzania, there have been numerous recent reports of questionable government activities in regard to how the elephant hunting program is being managed, how hunting concessions are awarded and for how long, and how funds generated by the hunting program are used. While it is possible that a well-managed hunting program could provide conservation benefits to the species, there are clear indications that Tanzania's program is not being managed in a manner where the participation of U.S. hunters provides the benefits called for under the ESA. One recent news report reiterates our concerns. On December 20, 2013, *The Citizen*, a Tanzanian news outlet, reported that President Jakaya Kikwete had fired four ministers— the Ministers for Home Affairs, Defense and National Service, Natural Resources and Tourism, and Livestock Development and Fisheries—for failing to effectively manage the infamous *Operesheni Tokomeza Ujangili*, a government anti-poaching campaign that was suspended indefinitely due to claims of civilian abuse, torture, extortion, and

DA 120

murder. These reports led to further concerns about Tanzania's ability to safeguard their elephant population and implement effective sport-hunting programs such that the elephant populations are enhanced by those programs.

We have made positive findings and issued permits to allow the import of sport-hunted elephant trophies from Tanzania for more than 15 years. Recently, these findings have been based on information in the report of a Panel of Experts convened to evaluate Tanzania's CoP15 (2010) proposal to down list their elephant population from CITES Appendix I to Appendix II; the proposal was rejected. Despite reports of poaching and other wildlife management issues in Tanzania, available information had indicated that legal sport hunting within the declared quotas was not causing a population declines and, because of revenues generated by sport hunting, had the potential to provide conservation benefits to the species. However, given recent population survey numbers, it appears that the illegal offtake is so great that the legal offtake could be contributing to the ongoing population decline and may be detrimental to the survival of the species in Tanzania. Likewise, due to questionable management practices within the hunting program, it is now difficult to find that the killing of the animal whose trophy is intended for import would enhance the survival of the species, as required by the Act.

*Zimbabwe:* Zimbabwe's CITES annual export quota for elephants is 1,000 tusks (500 elephants). Although no U.S. CITES or ESA permits are required for the import of sport-hunted trophies from Zimbabwe, the special rule for African elephants requires that a determination be made that the killing of the animal whose trophy is intended for import would enhance the survival of the species. So, the Service does have the ability to suspend the import of elephant hunting trophies if it is unable to determine that the imports provide a clear benefit to the survival of the species within Zimbabwe.

While some popular reports continue to name Zimbabwe as the African country with the third-largest elephant populations, the current status of elephants in Zimbabwe is unknown. The International Union for Conservation of Nature (IUCN) reports that only a small portion of Zimbabwe's elephant habitat has been surveyed in recent years, resulting in an overall degradation in the quality of data. It is feared that due to government dysfunction and lack of effective protection, Zimbabwe's elephants have experienced severe declines in the past decade.

Further, MIKE data support the hypothesis that elephant populations in Zimbabwe are significantly declining. In Chewore, Zimbabwe's only World Heritage Site that is also a MIKE site; the 2011 PIKE was .67, a 180% increase over its 2002-2010 average of .24. In Nyami Nyami, Zimbabwe's only other MIKE site, the PIKE was .81, much higher than what could be considered a biologically sustainable level of poaching.

Without reliable population estimates, it is unclear how Zimbabwe's hunting offtake is determined to be biologically sustainable. Reports indicate that questionable hunting practices are taking place, including the shooting of female elephants, sport-hunting of crop-raiding animals, and accusations of hunting within protected areas.

Along with unknown population levels, we are concerned about the status of Zimbabwe's once well-managed hunting and community resource conservation programs. Recent information indicates that the newly appointed Minister of the Environment, Water, and Climate recognizes

deficiencies within Zimbabwe Parks and Wildlife Management Authority (ZPWMA) and the need to reinvigorate the country's Communal Areas Management Programme for Indigenous Resources (CAMPFIRE). In addition, there have been reports of government corruption, including politicization of hunting quota distribution and abuse of ration quotas (internal ZPWMA program to provide game meat to government employees), as well as purported direct and indirect participation in wildlife trafficking by Zimbabwean politicians, defense forces, and intelligence officers. Poaching is believed to be widespread. Recently, poachers used cyanide to poison over 90 elephants in Hwange National Park.

The U.S. Government has sanctions in place for individuals who are senior officials of the Government of Zimbabwe, have participated in human rights abuses related to political repression, and/or have engaged in activities facilitating public corruption by senior officials of the Government of Zimbabwe. U.S. sanctions also target entities owned or controlled by the Zimbabwean government or officials of the Zimbabwean government. Popular articles and unofficial reports indicate that Zimbabwean government officials may be financially linked to sport hunting in Zimbabwe, which raises concern about whether money intended to enhance the survival of elephants is being used for that purpose. An undated Safari Club International Foundation fact sheet that cites a 2007 report estimates that elephant hunting contributes $12 million annually to the economy in Zimbabwe. It is unclear how this money is being used, or if it provides any benefits to elephant conservation efforts within Zimbabwe. The lack of credible data undermines our ability to make positive findings with regard to whether sport hunting enhances the survival of the species.

In the past, we have not used the requirements of the elephant special rule as the basis for suspending imports for an Appendix-II population and have allowed elephant trophies to be imported from Zimbabwe since 1997. At this time, the other Appendix-II African elephant populations in South Africa, Botswana, and Namibia are stable or increasing. Because no U.S. permits are required for elephant trophies from Zimbabwe, outreach will be an important factor to ensure that the sport-hunting community is made aware of any prohibitions on imports.

**PREPARED BY:** Rosemarie Gnam, Ph.D., Chief, Division of Scientific Authority, and Roddy Gabel, Chief, Division of Management Authority.

**DATE:** January 3, 2014




# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

FEB 21 2014

**MEMORANDUM**

To:     Chief, Division of Management Authority

From:   Chief, Division of Scientific Authority *Rosemarie Gnam*

Subject: General Advice on Importation of Sport-hunted Trophies of African Elephants
        taken in Tanzania in the Calendar Year 2014

---

This General Advice represents our CITES finding for permit applications that you might receive for the import of sport-hunted trophies of African elephants (*Loxodonta africana*) taken in the United Republic of Tanzania (Tanzania) in calendar year 2014.

Please be advised that, based on the available information, we are **unable** to determine that the importation of sport-hunted trophies of African elephants taken in Tanzania during calendar year 2014 will be for purposes that are not detrimental to the survival of the species.

If permit applications are received that include new or additional information showing that elephant management practices by the Government of Tanzania have led to the sustainability of its elephant population on a nation-wide basis, these applications should be referred to the Division of Scientific Authority for consideration on a case-by-case basis.

BASIS FOR ADVICE:

Since our analysis for the General Advice issued for calendar year 2013, several sources of information have become available indicating a significant decline in Tanzania's elephant population primarily due to poaching for ivory, including:

- *Aerial census of large animals in the Selous-Mikumi ecosystem, population status of African elephant* (TAWIRI 2013a);
- *Aerial census of large animals in the Ruaha-Rungwa ecosystem, population status of African elephant* (TAWIRI 2013b);
- A written report, *Recognition and tackling of the current elephant poaching crisis in Tanzania* (TEPS 2013a) and PowerPoint presentation, *Tackling the elephant poaching crisis in Tanzania* (TEPS 2013b), by the Tanzania Elephant Protection Society (TEPS) Task Force presented to the Parliamentary Committee of Land, Natural Resources and Environment, April, 2013;

**DA 123**

- A report to the African Elephant Summit (Botswana, 2013), *Status of African elephant populations and levels of illegal killing and the illegal trade in ivory: A report to the African elephant summit* (CITES Secretariat *et al.* 2013);
- A report to the 16th Meeting of the CITES Conference of the Parties (CoP16 - Bangkok, Thailand, 2013), providing an update on Monitoring the Illegal Killing of Elephants (MIKE) (CoP16 Doc. 53.1), posted 11/30/2012, with an Addendum posted 2/19/2013; and
- A report to CoP16 (Bangkok, Thailand, 2013), providing an update on monitoring of illegal trade in ivory and other elephant specimens (CoP16 Doc. 53.2.2 (Rev. 1)), originally posted 12/12/2012, with a revision of the document posted 2/8/2013.

The new information provided by these sources is discussed below as it relates to our finding for the 2014 calendar year.

Conservation and Management

1. As recently as a few years ago, African elephants were considered to be widely distributed throughout Tanzania. As of 2009, they covered about 39% of the country's total land surface area (~370,000 square kilometers (km²) (TAWIRI 2010) within six ecosystems, including: Tarangire-Manyara, Serengeti, Selous-Mikumi, Ruaha-Rungwa, Katavi-Rukwa, and Moyowosi-Kigosi (CoP15 Doc. 68, Annex 6a). The Selous-Mikumi ecosystem represented about 40% of the total elephant population in Tanzania (CoP15 Doc. 68, Annex 6a). At 31,040 square miles, the Selous-Mikumi ecosystem is Africa's largest protected area, and historically held East Africa's largest elephant population, followed by Ruaha-Rungwa (13,384 square miles) (Jones and Nowak 2013).

2. According to the Government of Tanzania, about 50% of the elephant's range in that country is in protected areas (PA) (CoP16 Prop. 11). This proportion of protected range is relatively high compared to other African elephant range countries (Blanc *et al.* 2007). These protected areas comprise about 28% of the country's land area, and elephants receive full protection in 19% of Tanzania's total land surface area (CoP16 Prop. 11). The network of PAs includes national parks (NP), Ngorongoro Conservation Area, game reserves (GR), game controlled areas (GCA), and wildlife management areas (WMA) in village lands. In the year 2012, Tanzania put into place Wildlife Management Area Regulations (2012), which provided a legal mechanism to promote the establishment of wildlife conservation areas outside of PAs administered by the central government. These regulations allow local communities to establish wildlife management areas in village lands that offer conservation potential for wildlife. This legal mechanism has the potential to enable local communities to contribute to wildlife conservation and to benefit from conservation activities on their land (CoP16 Prop. 11). Concerns have been raised, however, that WMAs have not effectively contributed to conservation (TEPS 2013a). The legal process developed by the Wildlife Department has been criticized as being complicated, overregulated, and lengthy, resulting in high transaction costs and making

**DA 124**

compliance difficult. It is suggested that in order to make the WMA approach successful, it will need to be simplified (Baldus and Hahn 2009).

3. Historically, there have been transboundary elephant populations in the Kilimanjaro-Amboseli, the Serengeti-Mara, and Tsavo-Mkomazi ecosystems along the Tanzania-Kenya border (Blanc *et. al.* 2003), and elephants have moved between the Selous in Tanzania and the Niassa in Mozambique (Mpanduji *et al.* 2002). Tanzania also shares elephant populations with Rwanda – the Burigi Game Reserve in Tanzania and Akagera National Park in Rwanda (TAWIRI 2010). Tanzania cooperates with transboundary countries, especially Kenya and Mozambique, in cross-border law enforcement efforts (CoP16 Prop. 11); however, concern has been raised over the lack of effectiveness of cross-border cooperation in anti-poaching efforts (Baldus and Hahn 2009).

4. According to the Government of Tanzania (Tarimo, Severre, and Mduma, *in litt.* 2011), the following legal instruments govern wildlife conservation in Tanzania:
- Wildlife Policy, 2007, which provides guidelines for the management of African elephants through the development, review, and updating of specific management plans (CoP15 Doc. 68, Annex 6a);
- Wildlife Conservation Act No. 5 of 2009;
- Tanzania National Parks Act CAP. 282 (RE 2002); and
- Ngorongoro Conservation Area Act CAP. 284 (RE 2002).

5. Four different institutions have authority for management of wildlife in Tanzania:
- Tanzania National Parks (TANAPA), a Parastatal organization that manages 15 national parks (total area of 50,872 km$^2$);
- Ngorongoro Conservation Area Authority (NCAA), a Parastatal organization that manages the Ngorongoro Conservation Area (NCA) (total area of 8,300 km$^2$);
- Wildlife Division, an institution that manages 28 game reserves with an area of 112,564 km$^2$, about 38 game controlled areas with an area of about 161,521 km$^2$, and RAMSAR sites covering 249,856 km$^2$; and
- District Councils, local government institutions that collaborate with the Wildlife Division on wildlife conservation issues and facilitate the establishment and management of WMAs on village land (Tarimo, Severre, and Mduma, *in litt.* 2011).

6. Tanzania developed its country-level strategy and action plan, the "Tanzania National Elephant Management Plan 2010-2015" in 2010, and the plan was endorsed by the Minister for Natural Resources and Tourism on January 15, 2011. This plan provides updated information on several biological and ecological topics, including: distribution and range, abundance, population trends and demography, elephant corridors, and human-elephant conflicts. It identifies nine different strategic objectives, as well as numerous specific objectives and their associated targets, actions, timelines, actors, and indicators. The strategic objectives include: Human-Elephant Conflict, Elephant Corridors, Law Enforcement, Benefits and Sustainable Utilization, Ivory Stockpile and Management System, Research and Monitoring, Elephant Health

and Welfare, Cross-border Cooperation, and Elephant Information Management (TAWIRI 2010). It is unclear whether or to what extent the National Elephant Management Plan has been implemented to date.

7. The Tanzania National Elephant Management Plan 2010-2015 (TAWIRI 2010) identified that a substantial decrease in funding is an important factor that has influenced the protection of the elephant population in the Selous ecosystem. Prior to 2005, a Revenue Retention Scheme was being implemented in which 100% of the revenue from photographic tourism and 50% from hunting operations was retained for management of the Game Reserve (TAWIRI 2010). By 2003, the revenue had risen to USD 2,800,000, but following national budget reductions in 2004, the amount retained by the Reserve had dropped to about USD 800,000 by 2008 (UNEP 2008, as cited in TAWIRI 2010). The timing of the decrease in funding coincides with increased poaching in the Reserve, suggesting that anti-poaching operations are greatly under-funded (TAWIRI 2010). It has been reported that the Tanzanian Government terminated the Selous Revenue Retention Scheme following the end of the Tanzanian-German Selous Conservation Program in 2003 (Baldus and Hahn 2009).

8. In addition to concerns about the implementation of Strategic Objective 3, Law Enforcement, we are concerned about implementation of Strategic Objective 8, Elephant Utilization, which includes as an action item to, "Set realistic hunting quotas." Since 2007, the annual CITES export quota for Tanzania has been 400 tusks (sport-hunting quota of 200 elephants). During 2003-2006, the quota was 200 tusks from 100 individuals, while during 1997-2002 the quota was 100 tusks from 50 individuals (http://www.cites.org/eng/resources/quotas/index.php). Based on the available information, Tanzania's elephant population is now less than 70,000 elephants nation-wide (see paragraph 16), and according to the population trends shown in the Tanzania National Elephant Management Plan 2010-2015 (p. 10), the population has not been this low since the 1990's. According to the graph, the population in 1999 was estimated at about 75,000 elephants (TAWIRI 2010). During this time period, the quota was 100 tusks from 50 individuals, and the population appeared to be showing an increasing population trend. Despite the ongoing population decline and current estimated population figure, Tanzania has not adjusted its national export quota downward in response.

9. In Tanzania, the only consumptive use of African elephants is sport hunting (CoP16 Prop. 11), which is covered by The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Government of the United Republic of Tanzania 2010). These regulations control hunting by concession area, season, minimum trophy sizes (18 kg and 160 cm per tusk), annual quotas, post-hunt reporting, trophy registration, marking, and export requirements (CoP15 Doc. 68 Annex 6a; Part V, Regulation 24.-(5)(b)). According to the Government of Tanzania, sport hunting quota determinations for different areas take into account the density of elephants in those ecosystems (CoP16 Prop. 11).

10. According to Tanzania's proposal submitted (and later withdrawn) to CoP16 (CoP16 Prop. 11), 25% of the revenue accrued from the sport hunting and 100% of the revenue from resident

**DA 126**

hunting goes to District Councils to support community development projects and conservation activities. In addition, 65% of the revenue from photographic tourism and 75% of the block fee in WMAs is given back to local communities. More than 90% of the revenue of the Tanzania Wildlife Protection Fund is generated from fees associated with sport-hunting and the sale of trophies. Law enforcement activities for wildlife and wildlife products, including ivory, are largely subsidized by the Tanzania Wildlife Protection Fund (CoP16 Prop. 11).

11. Despite the legal and management tools available to Tanzania for managing its elephant populations, population trends and data collected under the CITES program known as Monitoring the Illegal Killing of Elephants (MIKE) show, as discussed below, that elephant populations throughout Tanzania are declining, primarily due to rampant poaching. This ongoing crisis raises questions about the effectiveness of Tanzania's management and governance to protect elephants, particularly with respect to Strategic Objective 3, Law Enforcement, in the National Elephant Management Plan. In its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II (Note: the proposal was rejected), the Panel of Experts questioned the commitment by Tanzania to combat poaching, raising concerns over the financial mechanism by which the Wildlife Division was funded. The Wildlife Division's revenue share is paid directly to the central Treasury, and the Treasury is then supposed to distribute the budgeted monies to the Wildlife Division. The Panel of Experts raised the concern that over a 3-year period (2007-2009), the Wildlife Division had received only 63% (USD 2,634,975 per year) of its approved budget from the central Treasury. The Panel noted that given these funding limitations, the Wildlife Division would not be able to meet its needs and obligations regarding the conservation, management, and protection of African elephants. The Panel of Experts also noted, however, that between 2005 and 2009, the Tanzania Wildlife Protection Fund contributed on average a total of USD 12,894,564 annually to the Wildlife Division. According to the Panel of Experts, these funds, when combined with the Treasury allocations, should have put the Wildlife Division in a "strong position" to meet its enforcement obligations, including containment of threats to elephants in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a). Reported elephant poaching levels in the Selous-Mikumi ecosystem, however, suggest that enforcement was inadequate.

12. Tanzania's high Proportion of Illegally Killed Elephants (PIKE) values indicate high poaching rates, which suggests weak governance in Tanzania (see paragraph 16 for PIKE values). Repeated analyses under the CITES MIKE program have identified that at the national level, governance, as measured by Transparency International's Corruption Perceptions Index (CPI), is the factor most strongly correlated with PIKE. Poaching levels are higher in countries where governance is weaker, and vice versa. It is suggested that poor governance likely facilitates the illegal killing of elephants and movement of illegal ivory by ineffective law enforcement and/or "active aiding and abetting by unscrupulous officials" (CITES Secretariat *et al.* 2013).

13. The MIKE analyses are consistent with information available from the Elephant Trade Information System (ETIS), a global illegal elephant trade tracking system operated by

TRAFFIC on behalf of the CITES Parties. According to an analysis of data from the ETIS presented at CITES CoP16, Tanzania was implicated as a significant player in the illegal ivory trade. In the ETIS analysis presented at CoP15, Tanzania was already identified as a country of concern with respect to large consignments of illicit ivory leaving the African continent. In the intervening three years, the ETIS data show that both Kenya and Tanzania continued to be the primary conduits for large shipments of ivory exported to Asia, together accounting for nearly half of the 34 large-scale ivory seizures by number and 58% of the associated weight of such seizures during the period 2009-2011(CoP16 Doc. 53.2.2 (Rev. 1). A recent TRAFFIC news article, drawing on ETIS data, reports that since 2009 Tanzania has made or been implicated in 18 large-scale ivory seizures (i.e., seizures that involved 500 kg or more in a single shipment). Of these seizures, Tanzania only made five, while the other 13 seizures were made outside of the country. In total, these seizures represented nearly 43 tons of ivory, representing the death of about 4,000 elephants (http://www.traffic.org/home/2014/1/27/tanzania-reshuffled-cabinet-should-address-poaching-urgently.html). Such large-scale transactions of ivory represent higher-level criminal activity, and the ETIS report to CoP16 suggests that governance issues could be responsible for Tanzania's low seizure and reporting rates (CoP16 Doc. 53.2.2 (Rev. 1)).

## Population Distribution, Status and Trends

14. New census information was made publicly available in early 2014. The results of back-to back aerial surveys of the Selous-Mikumi and Ruaha-Rungwa ecosystems in October through November of 2013 show significant population declines (TAWIRI 2013a and 2013b) in both of these ecosystems. The Selous-Mikumi survey revealed an estimate of 13,084 (±1,816 SE) elephants, the lowest figure reported in this area since surveys began in 1976 (TAWIRI 2013a). This figure is down from an estimated 38,975 (± 2,644 SE) elephants in 2009 (TAWIRI 2009, *as cited in* TAWIRI 2013a), a decline of about 66%, which is significant ($d$-test = 8.07, $p$>0.05) (TAWIRI 2013a). The Ruaha-Rungwa survey revealed an estimate of 20,090 (±3,282 SE) elephants (TAWIRI 2013b), down from an estimated 31,625 (±2,890 SE) elephants in 2009 (TAWIRI 2010, *as cited in* TAWIRI 2013b), a decline of about 36.5%, which is significant ($d$-test = 2.6, $p$>0.05) (TAWIRI 2013b).

15. The latest update to Tanzania's population information in the African Elephant Database (http://www.elephantdatabase.org/preview_report/2013_africa/Loxodonta_africana/2012/Africa/Eastern_Africa/Tanzania) provides a best estimate for the year 2012, but does not reflect the new survey information discussed above from 2013. According to the 2012 estimate, the "definite" category estimate was 95,351 elephants, in addition to 10,278 "probable," 10,927 "possible," and 900 "speculative" category estimates. The new survey information would reduce the population estimate by about 37,426 individuals. Additional information below suggests that an updated population estimate would be revised downward even further.

16. Other information that indicates elephant populations are declining throughout Tanzania, includes:

a) Demographic surveys of the Katavi-Rukwa and Ugalla populations in 2009-2010 suggested that these populations were in distress. Survey results revealed that in each of these populations, the proportion of the herd less than 5 years of age was below 30% (TAWIRI 2010). These results are indicative of low recruitment and growth rates, suggesting one or more population stressors, such as higher infant mortality or increased stress associated with human-elephant conflict or illegal activity (i.e., poaching) (CoP15 Doc. 68, Annex 6a).

b) Anecdotal reports presented at a stakeholders meeting[1] held in Dar es Salaam (January 2013) to address elephant and other wildlife poaching issues in Tanzania (TEPS 2013a and 2013b) indicate that:
   o the Moyowosi population in northwest Tanzania may have been extirpated;
   o the population in the Ugalla ecosystem in western Tanzania is becoming unviable, with less than 500 elephants left;
   o the Katavi-Rungwa-Ruaha population in central Tanzania has been decimated by poachers;
   o elephants are almost absent from the Matambwe photo-tourism sector of the Selous Game Reserve and from the Kilombero Valley in southern Tanzania;
   o elephants in the southern Selous Game Reserve and Selous-Niassa corridor are being decimated by poachers;
   o Tanzania has lost 50% of its elephant population since 2007; and
   o the national population estimate is <70,000[2] elephants (*versus* 109,000 elephants in 2009 (TAWIRI 2010) and that if this rate of poaching continues, it is estimated that elephants will be extirpated from Tanzania within seven years.

c) Although Tarangire National Park in northeast Tanzania was cited in 2010 as having one of the highest growth rates (6%) ever recorded for an African elephant population (Foley and Faust 2010), it has been reported that since December 2011, there has been ongoing massive organized poaching within the park that has resulted in the illegal killing of at least 30 elephants in the year 2012 alone (Kideghesho *et al.* 2013). Demographic surveys of elephants from the Serengeti ecosystem during 2009-2010 were also indicative of good growth rates; however, the January 24, 2014, seizure of six pieces of elephant tusks in the Tarime District bordering the northern part of Serengeti National Park is an indication that not even the Serengeti ecosystem is free from poachers (http://allafrica.com/stories/201402070291.html).

d) Consistent with the population and anecdotal information available, recent information from the CITES MIKE program also suggests widespread population declines in

---

[1] This meeting was convened by the Tanzanian Elephant Protection Society (TEPS) and was attended by representatives from the Tanzania Ministry of Natural Resources and Tourism (Wildlife Division, Tunduru District Council, Morogoro Region), Tanzania National Parks (NP) (Udzungwa Mountains NP, Ruaha NP, and Mikumi NP), Wildlife Management Areas (WMA), photographic safari operators, hunting safari operators, researchers, NGOs, foreign donors, the press, and other interested individuals (TEPS 2013a).

[2] Note: this estimate was suggested prior to receipt of new information resulting from the 2013 aerial surveys of the Selous-Mikumi and Ruaha-Rungwa ecosystems.

**DA 129**

Tanzania due to poaching. MIKE collects data at representative sites throughout Asia and Africa in order to measure trends in the levels of illegal killing of elephants and identifies factors associated with those trends. MIKE evaluates relative poaching levels based on the Proportion of Illegally Killed Elephants (PIKE), which is calculated as the number of illegally killed elephants found divided by the total number of elephant carcasses encountered by patrols or through other means, aggregated by year for each site (CITES Secretariat *et al.* 2013). A PIKE level of 0.5 or higher translates to a level of illegal annual offtake that is likely to be higher than the annual natural birth rate and, therefore, indicates that the elephant population is very likely to be in net decline (CoP16 Doc. 53.1). Within Tanzania, PIKE values suggest widespread population declines due to poaching. At the Selous-Mikumi MIKE site, Tanzania's sole World Heritage site, the 2011 PIKE was 0.64 (based on 224 carcasses), a nearly 27% increase over the 2002-2010 average of 0.50. At the Ruaha- Rungwa MIKE site, the 2011 PIKE was 0.94 (based on 34 carcasses), the highest ever recorded for that site. The PIKE was 0.86 (based on 29 carcasses) at the Katavi-Rukwa MIKE site (CoP16 Doc. 53.1).

17. Aside from concerns about population numbers, we are also concerned about the mobility of the African elephant populations in Tanzania. The Panel of Experts noted, for example, that associated human settlements were increasing in size and number around protected areas and were accompanied by increasing human-elephant conflicts. These settlements and the associated conflicts were probably the most important factors limiting the elephants' mobility and range. It was the opinion of the Panel of Experts that -- at the rates of habitat change and land conversion at the time -- the corridors that still remained in Tanzania would be converted to unsuitable habitat in less than 5 years (CoP15 Doc. 68, Annex 6a).

18. According to Jones *et al.* (2009), Tanzania was working to minimize risks to African elephants, other wildlife, people, and property through improvements in spatial planning involving the identification, maintenance, and restoration of wildlife corridors. The Tanzania National Elephant Management Plan lays out a strategic objective to restore lost corridors and to increase protection for corridors that are still in use (TAWIRI 2010). We do not have updated information on the status of the implementation of this strategic objective, but based on the information available we are particularly concerned about the viability of the Selous (Tanzania)-Niassa (Mozambique) corridor. According to the 2013 survey of the Selous ecosystem only 32 elephants were counted within the Selous portion of the corridor, resulting in an estimate of 1,006 ± 810 (SE) elephants (TAWIRI 2013a). In addition, poaching in the Niassa Reserve has reached crisis levels, as evidenced by high carcass ratios (18%; population of 12,000 elephants) observed during October 2011 aerial surveys (WCS Mozambique *in litt.* 2014) (see paragraph 24 for an explanation of carcass ratios).

Sustainability of Offtake

19. In Tanzania, African elephant deaths occur as a result of several factors, including: 1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching. In order to

evaluate whether offtake from trophy hunting is sustainable, all losses to the African elephant population must be considered.

Legal Offtake

20. Since 2007, the annual CITES export quota for Tanzania has been 400 tusks (sport-hunting quota of 200 elephants). During 2003-2006, the quota was 200 tusks from 100 individuals, while during 1997-2002 the quota was 100 tusks from 50 individuals. Tanzania, however, typically has not exported its full quota allotment in sport-hunted trophies or African elephant tusks. This may be an indication that the quota is set too high.

21. Although complete records on natural mortality for the entire country or on the killing of problem elephants were not available, the Panel of Experts were able to estimate the level of such offtake by analyzing the data from the ivory store databases of Tanzania. Based on 21 years of data for that country, an average of 231 elephants died annually from natural mortality, while another 287 individuals died annually from elephant control measures (CoP15 Doc. 68, Annex 6a). These annual mortality rates continue to be the best estimates available for Tanzania and are cited and used by the Government of Tanzania (TAWIRI 2010).

22. Based on a sport-hunting quota of 200 African elephants, as well as the estimates cited earlier for natural mortality and problem animal control in Tanzania, the overall legal offtake of African elephants in Tanzania is about 718 elephants annually. Considering the current population estimate to be 70,000 elephants, which we believe is a significant over-estimate because it did not consider the most recent survey figures, the legal annual offtake would be estimated at about 1% of the population. This figure is less than the annual population growth rate of 3-5% (CoP15 Doc. 68, Annex 6a) and in itself would be considered sustainable; however, sustainability is measured against total offtake, including illegal offtake, discussed below.

Illegal Offtake

23. Based on the MIKE report presented to CoP16 (Bangkok, Thailand, 2013), the levels of illegal killing across the African elephants' range are of serious and increasing concern. There has been an ongoing increase in the levels of illegal killing of elephants in Africa since 2006, with 2011 showing the highest levels of poaching since MIKE records began in 2002. The increase in poaching between 2010 and 2011 is statistically significant. As highlighted in paragraph 16, within Tanzania, PIKE values suggest widespread population declines due to illegal offtake. At the Selous-Mikumi MIKE site, Tanzania's sole World Heritage site, the 2011 PIKE was 0.64 (based on 224 carcasses), a nearly 27% increase over the 2002-2010 average of 0.50. At the Ruaha- Rungwa MIKE site, the 2011 PIKE was 0.94 (based on 34 carcasses), the highest ever recorded for that site. The PIKE was 0.86 (based on 29 carcasses) at the Katavi-Rukwa MIKE site (CoP16 Doc. 53.1). A PIKE level of 0.5 or higher translates to a level of illegal annual offtake that is likely to be higher than the annual natural birth rate, indicating that the elephant populations are very likely to be in net decline (CoP16 Doc. 53.1). In other words,

**DA 131**

the illegal offtake is unsustainable at these sites. Recent information presented at the African Elephant Summit (Botswana, 2013) indicates that in 2012 and the first six months of 2013, the trend in PIKE levels for Eastern Africa stabilized at levels close to those of 2011(CITES Secretariat *et al.* 2013), indicating that unsustainable illegal offtake levels are continuing.

24. Carcass analyses resulting from the 2013 Selous-Mikumi and Ruaha-Rungwa aerial surveys are consistent with MIKE data. Based on the surveys, there were an estimated 6,516 (± 534 SE) elephant carcasses in the Selous-Mikumi, spanning three years. Carcass analyses indicate that more than two thirds (67%) of these elephants were killed 18 to 30 months prior, with much fewer elephants being killed within the last 18 months (<5%). The carcass ratio for the Selous-Mikumi was calculated at 30%, which indicates unnaturally high mortality (TAWIRI 2013a). Natural mortality is represented by a ratio of about 7-8% (Douglas-Hamilton and Burrill 1991, *as cited in* TAWIRI 2013a). In the Ruaha-Rungwa ecosystem, there were an estimated 3,496 (±342 SE) elephant carcasses, spanning over a ten-year period. Carcass analyses indicate that relatively fewer elephants were killed in the last 12 months (<13%). The carcass ratio for the Ruaha-Rungwa was calculated at 14.6%, which indicates unnaturally high mortality (TAWIRI 2013b).

25. It is expected that data showing high levels of poaching would be concurrent with data showing high levels of illegal trade, and this is the case with Tanzania. As noted in paragraph 16, a recent TRAFFIC news article reports that since 2009 Tanzania has made or been implicated in 18 large-scale ivory seizures (i.e., seizures that involved 500 kg or more in a single shipment). Of these seizures, Tanzania only made five of these seizures, while the other 13 seizures were made outside of the country. In total, these seizures represented nearly 43 tons of ivory, representing the death of about 4,000 elephants (http://www.traffic.org/home/2014/1/27/tanzania-reshuffled-cabinet-should-address-poaching-urgently.html). Although information on the origin of ivory from these seizures is not yet available, a significant proportion of the large seizures of ivory made in Asia in 2006 have been traced by forensic DNA work to elephants killed in the Selous-Niassa ecosystem (Wasser *et al.* 2009).

Sustainability of All Offtake

26. In its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II (Note: the proposal was rejected), the Panel of Experts noted that illegal hunting can reduce the sustainability of legal offtakes, potentially negatively impacting the population as a whole. The Panel raised concerns that the poaching in the Selous-Mikumi ecosystem, which was happening at that time, could affect the long-term population sustainability. While the Panel concluded that the level of offtake in the Selous-Mikumi ecosystem was not sustainable at the time, the Panel asserted that legal and illegal offtake appeared to be sustainable for other elephant ecosystems where populations were stable or increasing, namely the Tarangire-Manyara, Ruaha-Rungwa, Katavi-Rukwa, Moyowosi-Kigosi and Serengeti (CoP15 Doc. 68, Annex 6a). In recent years our findings have been made under the supposition that the populations mentioned above were stable or increasing, rendering the

overall Tanzania elephant population to be sustainable. New information, however, indicates that the population decline is no longer restricted to the Selous-Mikumi ecosystem, but is occurring throughout Tanzania. Estimates are that Tanzania is losing about 30 elephants per day to poaching, a rate far greater than replacement through natural reproduction (TEPS 2013a and 2013b). This loss rate has recently been cited by TANAPA's Director General, Allan Kijazi (http://allafrica.com/stories/201402041257.html).

Conclusion

27. Although Tanzania has put into place legal instruments, wildlife management authorities, and a National Elephant Management Plan, the national elephant population has plummeted, primarily due to the ongoing illegal killing of elephants. Indications are that management resources have not been fully utilized and that governance in Tanzania is weak. In its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II, the Panel of Experts raised concerns about the mechanism Tanzania used for funding the conservation, management, and protection of African elephants; however, after reviewing the actual allocations to the Wildlife Division between 2005 and 2009, the Panel concluded that sufficient funding was available for Tanzania to meet its enforcement obligations during that time period. The Panel of Experts also raised concern that the levels of offtake in the Selous-Mikumi ecosystem due to poaching was not sustainable at the time and could potentially affect long-term population sustainability. At the time, the Panel asserted that legal and illegal offtake appeared to be sustainable for other ecosystems where elephant populations were stable or increasing, namely the Tarangire-Manyara, Ruaha-Rungwa, Katavi-Rukwa, Moyowosi-Kigosi and Serengeti.

28. Our recent non-detriment findings followed the rationale laid out by the Panel of Experts and concluded that the import of sport-hunted trophies from Tanzania would be for purposes that are not detrimental to the survival of the species. However, now new information indicates that the elephant declines in Tanzania are no longer restricted to the Selous-Mikumi ecosystem, but are occurring throughout the country. MIKE analyses showing high levels of poaching at sites throughout Tanzania and ETIS data showing rampant, large-scale illegal ivory trade involving Tanzania, point to weak governance.

29. We recognize that sport-hunting, as part of a sound management program, can provide benefits to wildlife conservation and that sport-hunting of elephants is not the primary cause of the decline of elephant populations in Tanzania. However, given the significant decline in the elephant population due to uncontrolled poaching and questionable management and governance, we are concerned that additional killing of elephants, even if legal, is not sustainable and will not support effective elephant population recovery efforts in Tanzania.

30. Therefore, we are **unable** to find that the importation of sport-hunted trophies of African elephants taken in Tanzania during calendar year 2014 will be for purposes that are not detrimental to the survival of the species.

REFERENCES:

Baldus, R.D. and R. Hahn. 2009. The Selous – Niassa Wildlife Corridor in Tanzania: Biodiversity Conservation from the Grassroots. Practical Experiences and Lessons from Integrating Local Communities into Trans-boundary Natural Resources Management. Joint publication of FAO and CIC. Budapest. 48 pp. Available online at: http://www.wildlife-baldus.com/download/transboundary.pdf.

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. African Elephant Status Report 2007: An Update from the African Elephant Database. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

Blanc, J.J., C.R. Thouless., J.A. Hart., H.T. Dublin., I. Douglas-Hamilton., C.G. Craig and R.F.W. Barnes. 2003. African Elephant Status Report-2002: An update from the African Elephant Database. IUCN/SSCAfrican Elephant Specialist Group, Tanzania, 112 -117, IUCN, Gland, Switzerland and Cambridge, UK. Available online at: http://african-elephant.org/aed/aesr2002.html.

CITES Secretariat, IUCN/SSC African Elephant Specialist Group, and TRAFFIC. 2013. Status of African elephant populations and levels of illegal killing and the illegal trade in ivory: A report to the African elephant summit, December 2013. 19pp. Available online at: https://cmsdata.iucn.org/downloads/african_elephant_summit_background_document_2013_en.pdf.

CoP15 Doc. 68 Annex 6a). 2010. Report of the Panel regarding the proposal of the United Republic of Tanzania. 19 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/15/doc/E15-68A06a_.pdf.

CoP16 Doc. 53.1. 2012. Monitoring the Illegal Killing of Elephants (MIKE). Sixteenth meeting of the Conference of the Parties, Bangkok (Thailand), 3-14 March 2013, 15 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-01.pdf.

CoP16 Doc. 53.2.2 (Rev. 1). 2013. ETIS Report of TRAFFIC. Sixteenth meeting of the Conference of the Parties, Bangkok (Thailand), 3-14 March 2013, 30 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-02-02.pdf.

CoP16 Prop. 11. 2012. Transfer the population of the African elephant, *Loxodonta africana*, of the United Republic of Tanzania from Appendix I to Appendix II (with an annotation) (Note: proposal withdrawn). Available online at: http://www.cites.org/sites/default/files/eng/cop/16/prop/E-CoP16-Prop-11.pdf.

**DA 134**

001782

Foley, C.A.H. and L.J. Faust. 2010. Rapid population growth in an elephant *Loxodonta africana* population recovering from poaching in Tarangire National Park, Tanzania. *Oryx* 44(2):205–212.

Government of the United Republic of Tanzania. 2010. The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010). Gazette of the United Republic of Tanzania (No. 27; Vol. 91):1—35.

Jones, T., T. Caro and T.R.B. Davenport (eds.). 2009. Wildlife Corridors in Tanzania. Unpublished Report. Tanzania Wildlife Research Institute (TAWARI), Arusha. Available online at: http://www.tzwildlifecorridors.org/TzWildlifeCorridors.pdf.

Jones, T. and K. Nowak. 2013. Elephant declines vastly underestimated. *A Voice for Elephants*. December 16, 2013. National Geographic Society. Available online at: http://newswatch.nationalgeographic.com/2013/12/16/elephant-declines-a-view-from-the-field/.

Kideghesho, J.R., A.A. Rija, K.A. Mwamende and I.S. Selemani. 2013. Emerging issues and challenges in conservation of biodiversity in the rangelands of Tanzania. *Nature Conservation* 6:1-29.

Mpanduji, D.G., H. Hofer, T.B. Hilderbrandt, F. Goeritz, M.L.East. 2002. Movement of elephants in the Selous-Niassa wildlife corridor, southern Tanzania. *Pachyderm* 33:18-31.

Tarimo, E.E., E.L.M. Severre, and S. Mduma. 2011. *in litt.* Elephant Management Plan and Law Enforcement in Tanzania: A report presented at the meeting between Ministry of Natural Resources and the Department of Interior, Fish and Wildlife Service, Washington, D.C., 17 February 2011. 16 pp.

TAWIRI. 2013a. Aerial census of large animals in the Selous-Mikumi ecosystem, dry season 2013, population status of African elephant. Arusha, Tanzania, 11pp.

TAWIRI. 2013b. Aerial census of large animals in the Ruaha-Rungwa ecosystem, dry season 2013, population status of African elephant. Arusha, Tanzania, 12pp.

TAWIRI. 2010. Tanzania Elephant Management Plan 2010-2015. TAWIRI, Arusha, Tanzania, 95 pp. Available online at: www.tawiri.or.tz/images/Conference/elephant_plan.pdf.

TEPS. 2013a. Recognition and tackling of the current elephant poaching crisis in Tanzania. Report by Tanzania Elephant Protection Society (TEPS) Task Force to the Parliamentary Committee of Land, Natural Resources and Environment. April 2013. Dar es Salaam, Tanzania, 18pp. Available online at:

DA 135

001783

http://www.tanzaniaelephantprotectionsociety.org/images/PDFs/TEPS_Elephant_Crisis_Report_BUNGE1_April_2013.pdf.

TEPS. 2013b. Tackling the elephant poaching crisis in Tanzania. Presentation to the Parliamentary Committee of Land, Natural Resources and Environment. 23rd April 2013. Task Force, Tanzania Elephant Protection Society. Dar es Salaam, Tanzania, 28pp.

Wasser, S.K., B. Clark and C. Laurie. 2009. The Ivory Trail. *Scientific American*, July 2009. Pp. 68-76.

WCS Mozambique. 2014. *in litt.* Niassa Reserve expanded elephant protection program. USFWS WWB-AECF FY14 grant proposal (F13AS00357).

**DA 136**

001784

  

**TARGETED COMMUNICATIONS STRATEGY**

*Suspension of Import of Elephant Hunting Trophies Taken
in Tanzania and Zimbabwe in 2014*

DTS #:                    Version #:                    Date:

1. **What Action is being taken? Please explain in no more than three sentences.** *(Additional background information may be included in a separate appendix)*

   Based on our review of available information, we are unable to make positive findings required under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) or the Endangered Species Act (ESA) to allow the import of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during calendar year 2014.

2. **What is the proposed date to announce this action? Why has that date been selected?**
   *(Please note whether this date is mandatory, or whether we have flexibility)*

   **March 27**- This date is not mandatory. However, the general advice that will prohibit import of sport-hunted elephant trophies from Tanzania has already been signed (2/21) and Zimbabwe's finding will be finalized by 3/12. We should advise the hunting community of this change in status for importation of elephant trophies as soon as possible.  Since import permits are required to import a sport-hunted elephant trophy from Tanzania, if an import permit application for an elephant trophy taken in 2014 is received, the application will be denied.  No import permit is required for sport-hunted trophies from Zimbabwe.  If a trophy were presented to the Wildlife Inspectors at a port of entry after this announcement, the trophy would either be refused entry or seized.

3. **What are our communications goals?** *(Please list no more than four)*

   - Inform the sport-hunting community that imports of elephant trophies taken during 2014 in Tanzania and Zimbabwe are currently suspended.
   - Approach the sport-hunting community and provide them with an opportunity to reinforce their role as conservationists and commit to hunting only in countries that have stable, well-managed elephant populations and strong governance.
   - Emphasize the message that sport hunting as part of a sound management plan can have benefits for conservation.
   - Inform CITES Parties of the U.S. decision to restrict imports of elephant trophies from Tanzania and Zimbabwe at this time, in the hopes that other Parties will join the United States in promoting clear conservation benefits through effective, scientifically based elephant management programs.

4. **Key Audiences:**

   - Sport-hunters

   - Sport-hunting groups: Safari Club International, Dallas Safari Club, Conservation Force

   - Congressional representatives

**DA 137**




- Foreign governments that currently allow import from TZ and ZW

**5. Key Messages:**

- Tanzania's and Zimbabwe's elephants face an uncertain future.
- Questionable management practices, a lack of effective law enforcement, and weak governance have resulted in uncontrolled poaching and catastrophic population declines in Tanzania.
- In Zimbabwe, available data, though limited, indicates a significant decline in the elephant population, while anecdotal evidence, such as the widely publicized poisoning of 300 elephants, suggests that Zimbabwe's elephants are under siege.
- Sport hunting, as part of a sound management program, can provide benefits to conservation. Yet, given the current situation in Tanzania and what we know of the situation in Zimbabwe for elephants, we don't believe that the benefits of sport hunting will be realized.
- We are concerned that additional killing of elephants in both Tanzania and Zimbabwe, even if legal, is not sustainable at this time.

**6. What is the strategy (or strategies) we plan to use to reach target audiences?**

- *Sport-hunters*: Engage with sport-hunting groups to push out the message to their membership. Issue a news bulletin to wildlife/hunting publications.

- *Sport-hunting groups—Safari Club International, Dallas Safari Club, Conservation Force:* Phone call from high-level Service representative

- *Congressional representatives:* Send news bulletin and link to Q&As

- *Foreign governments that currently allow import from TZ and ZW-* Issue a CITES Notification to the Parties

***We do not plan to use social media for this announcement. The majority of our online followers will not differentiate between legal hunting and poaching. We do not want to inadvertently link all sport-hunting to the current poaching situation. In future announcements, we can use this limitation on TZ and ZW elephant trophies as a talking point to reinforce the idea that we only support well-managed sport hunting programs that have benefits to conservation. We do not issue import permits as a matter of course; there is a rigorous evaluation process.

**7. What are the tactics we plan to employ in support of these strategies? What is the implementation timeline for these tactics?**

| Target Date | Activity | Responsible | Date Completed |
|---|---|---|---|
| 3/26 | Contact sport-hunting groups | High-level Service | Day before announcement |

**DA 138**



# TARGETED COMMUNICATIONS STRATEGY

*Suspension of Import of Elephant Hunting Trophies Taken
in Tanzania and Zimbabwe in 2014*

DTS #:                    Version #:                    Date:



|  |  |  |  |
|---|---|---|---|
|  |  | representative |  |
| 3/27 | Inform Congressional contacts | Angela Gustavson | Morning of announcement |
| 3/27 | Issue news bulletin | Claire Cassel | Day of announcement |
| 3/27 | Post additional information on the IA webpage | Danielle Kessler/Justin Chapman | Day of announcement |
| 3/27 | Inform CITES Parties |  | Day of announcement or shortly thereafter |
| 3/26 | Inform TZ & ZW governments |  | Day before announcement |

> **Comment [KDN1]:** Should this be done at the same time that sport-hunting groups are contacted?

8. **Which communications tools are needed to support these strategies and tactics?** *(Be as specific as possible about the products identified and who will produce them)*

| Tool | Responsible | Due Date | Status |
|---|---|---|---|
| News Bulletin | Danielle Kessler |  | In Progress |
| Q&As | Danielle Kessler |  | In Progress |
| Notification to the Parties | DMA/DSA |  | In Progress |
| Letter to TZ & ZW governments | DMA/DSA |  |  |
| IA homepage post | Danielle Kessler/Justin Chapman | 3/27 |  |
| Update relevant IA webpages | Danielle Kessler/Justin Chapman | 3/27 |  |
| OLE Public Bulletin | OLE | 3/27 |  |

**DA 139**



9.    **Who are the primary points of contact for this action?**

Subject Matter Experts:
DMA: Tim Van Norman
DSA: Rosemarie Gnam and Pamela Scruggs


Media Coordinators:
Claire Cassel  703-358-2357
Danielle Kessler  703-358-2644

**DA 140**



## Appendix I – Congressional Contacts

**Delegation Contacts**

| MEMBER FORMAL TITLE | FIRST NAME | LAST NAME | STAFF EMAIL |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Committee Contacts**

|  |  |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**DA 141**

 **TARGETED** COMMUNICATIONS STRATEGY

*Suspension of Import of Elephant Hunting Trophies Taken
in Tanzania and Zimbabwe in 2014*

DTS #:          Version #:          Date:          

## Appendix II – Assessment and After Action Report

**How will we measure the results of our communications efforts?** *(Please list measurable outcomes that will help you assess the effectiveness of your communications)*

The following measures will be assessed:

- Media penetration (Outlets covering this issue x readership/viewership)

- Percentage of stories including key messages

- Percentage of coverage positive or neutral in tone

- Social media engagement – views, likes, retweets.

- Feedback from Hill and partners

**How will we define success?**

- Resources available in a timely fashion on the public web page

- Independent media accurately portrays the proposed regulation changes

- Congressional offices understand the nature of the proposals and the impact on their constituents/ specific areas of interest

- Comments to the public docket are sent to the appropriate place and germane to the issue

**After Action Report:** *(Please detail the outcomes achieved, in light of the evaluation measures identified)*

**What worked well?** *(Summary of media report here – media penetration, number of articles, articles conveying key messages, etc.)*

**What strategies, tactics and/or messaging did not produce the expected results?**

**What conclusions can we draw? What lessons have we learned? How can we apply this information to future communications efforts?**

**DA 142**



## Appendix III- Background Information about this issue

*(Please limit background information to no more than two pages)*

**DA 143**

# Suspension of Import of Elephant Hunting Trophies
# Taken in Tanzania and Zimbabwe in 2014

## Talking Points for Director's Calls
## April 3, 2014

**Contact information for telephone calls:**

- Craig Kauffman, President, Safari Club International, (717) 314-0098 (Alternate: Melissa Simpson, Director of Government Affairs and Science Based Conservation, Safari Club International (SCI),  (202) 546-8733)
- Jeff Crane, President, Congressional Sportsman's Foundation, (202) 543-6850 x 12
- Ben F Carter, Executive Director, Dallas Safari Club (DSC), (972) 980-9800
- John J. Jackson, III, President, CONSERVATION FORCE, (504) 837-1233


- The Service is suspending imports of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during calendar year 2014.

- Questionable management practices, a lack of effective law enforcement, and weak governance have resulted in uncontrolled poaching and catastrophic population declines in Tanzania.

- In Zimbabwe, available data, though limited, indicates a significant decline in the elephant population, while anecdotal evidence, such as the widely publicized poisoning of 300 elephants, suggests that Zimbabwe's elephants are also under siege.

- Given the current situation on-the-ground in both Tanzania and Zimbabwe, the Service is unable to make positive findings required by CITES and/or the ESA to allow import of elephant trophies from these countries.

- Additional killing of elephants in these countries, even if legal, may not be sustainable and is not currently supporting conservation efforts or recovery of the species.

- Sport hunting, as part of a sound management program, can provide benefits to the conservation of listed species.

- We are seeking support from SCI, DSC, and Conservation Force, among others, to facilitate greater oversight and commitment by the Tanzania and Zimbabwe governments to elephant management and conservation.

**DA 144**

- At this time, we do not have conservation concerns with African elephant sport hunting in Namibia, South Africa, or Botswana; though it should be noted that Botswana is not currently open to sport hunting.

- We don't see an immediate solution to the challenges facing elephants in Tanzania, and for Zimbabwe, we just do not have the information needed to make a positive finding.

- The Service would like to work with you to affect positive change.

- We will reevaluate the situation in Tanzania and Zimbabwe for elephant trophies taken in calendar year 2015. If we receive information that indicates a significant improvement for elephants in these countries, we could reevaluate the suspension prior to calendar year 2015.


**TANZANIA:**

- For elephant imports from Tanzania, which require CITES and ESA findings, we will need to see that the total offtake from the elephant population (i.e., all sources of elephant deaths, including poaching, sport-hunting, problem animal control, and natural mortality) is below the elephant's annual population growth rate. In order for this to happen, the poaching rate must be significantly reduced, and we need to see results that will show this.

- We'll look to the following information sources to provide us with these results:
  - New population census information, demographic surveys, and carcass analyses;
  - Monitoring of Illegal Killing of Elephants (MIKE) and Elephant Trade Information System (ETIS) reports; and
  - Other relevant sources of information.

- In addition, in response to the drastic population decline, we need to see that Tanzania has appropriately adjusted its quotas downward.

- We would like to see management actions taken to address the poaching crisis, such as increased capacity for law enforcement, etc.

- We are also looking for information on how funds generated from the sport-hunting of elephants are used to support the long-term survival of the species.

- Such support could include on-the-ground conservation efforts, including surveys and anti-poaching efforts, or more indirect support through community development projects

2

**DA 145**

that are directly tied to the benefits generated by maintaining healthy elephant populations.

**ZIMBABWE**:

- We have very little substantive information for elephant imports from Zimbabwe, which require an ESA finding [Note: permits are not required].

- To assist us in making a positive finding under the ESA (i.e., enhancement), we need information on: the elephant population (trend and distribution data); level of human-elephant conflicts and how the government is addressing these issues; what government agencies manage elephant populations and how they interact with other agencies that manage national parks, hunting regulations, agricultural conflicts with elephants, etc.; how revenue generated through trophy hunting is utilized; how hunting quotas are established; and how concession areas are managed.

- In summary, with the current situation on-the-ground in both Tanzania and Zimbabwe, the Service is unable to make positive findings required by CITES and/or the ESA to allow import of elephant trophies from these countries.

- We encourage you to work with us in showing leadership for African elephant conservation by:
  - Committing to hunting only in countries that have stable, well-managed elephant populations and strong governance;
  - Mobilizing resources to assist Tanzania and Zimbabwe in anti-poaching efforts; and
  - Collaborating with partners in Tanzania and Zimbabwe to influence decisions that will lead to effective elephant conservation.

3

**DA 146**




# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Reply Refer To:
FWS/AIA/DMA

Memorandum

MAR 2 7 2014

To:         The File

From:       Chief, Branch of Permits

Subject:    Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in
            Tanzania during 2014

The African Elephant (<u>Loxodonta africana</u>) is listed as threatened under the U.S. Endangered Species Act (Act) with a special rule [50 CFR 17.40(e)]. In addition to other items, the special rule gives the requirements for the import of sport-hunted trophies. Under paragraph 17.40(e)(3)(iii)(C), the U.S. Fish and Wildlife Service (Service) must make a finding that the sport-hunting of elephants will enhance the survival of the species in the wild.

In a meeting in Washington, D.C. on February 17, 2011 between the Service and the Tanzania Ministry of Natural Resources and Tourism (MNRT), the Service was provided with a copy of Tanzania's Elephant Management Plan 2010 – 2015, signed and endorsed by the Minister for Natural Resources on January 15, 2011 (the last National Elephant Management Plan for Tanzania had been produced in 2001). The 2010 Elephant Plan identified nine (9) Strategic Objectives which needed to be address for the effective management of Tanzania's elephant population. The Plan also identified three major issues impacting Tanzania's ability to manage its elephants. The first was the growth in Tanzania's human population which had doubled in size since 1984, putting increased pressure on the country's natural resources and creating challenges in conserving its elephants, (e.g., increased human-elephant conflicts). The second was the threat to healthy and sustainable elephant populations from an increasing loss of connectivity between important wildlife habitat areas in Tanzania. Existing wildlife corridors where under increased pressure from expansion of agriculture lands, increased human settlement, and habitat destruction caused by logging and charcoal production. The third issue was the ability to provide increased protection for Tanzania's elephant population. There had been an upsurge in elephant poaching occurring across eastern and central African over the past three to five years, apparently fueled by the increased demand for ivory in Asia. This increase in demand had also impacted several distinct elephant populations within Tanzania. A 2009 national elephant census showed an overall decline in Tanzania's elephant population for the first time since 1989.

Since that time, the Service has received more recent population surveys and biological

DA 147

003047

information to indicate a continued decline in Tanzania's elephant population. One example is the Selous-Mikumi ecosystem that was once an elephant stronghold representing the second largest elephant population in Africa and approximately 40% of Tanzania's elephant population. An October 2013 population survey of that ecosystem indicated that an 80% population decline has occurred in the last three years, from a population of approximately 40,000 to 13,000. Of further concern are the numerous reports of questionable government activities relating to how the elephant hunting program is being managed. While the Service recognizes that a well-managed hunting program could provide a conservation benefit to Tanzania's elephant population, there are indications that Tanzania's program is being managed in a manner whereby participation by U.S. hunters may no longer provide a conservation benefit to the species as is required under the Act. In addition, information regarding financial resources and infrastructure indicates that the Tanzania Government may no longer have the ability to effectively manage and protect its elephant population. We have also received information to indicate that ivory poaching has continued to increase in some parts of the country, and that human-elephant conflict has continued to rise with an ever increasing human population and settlement into elephant habitat for agriculture use and livestock grazing. Therefore, the Service is ***unable to find*** that the taking of sport-hunted elephant trophies in Tanzania will enhance the survival of the species.

Basis for Finding:

***Management Plan***: On March 21, 2007, the Division of Management Authority (DMA) sent a letter to the Wildlife Division, MNRT, requesting updated information relating to their current management program for African elephants. This request was stimulated due to the Service not having any substantive communication with the government of Tanzania regarding their elephant management program and elephant hunting in Tanzania for several years. The DMA request related specifically to the following areas: (1) existence of an elephant management plan; (2) current population status of Tanzania elephants; (3) existing legislation and programs relating to elephant conservation and management; (4) elephant trophy hunting quotas for Tanzania; (5) threats of poaching and human-elephant conflicts; (6) revenue generated by trophy hunting; and (7) operations involving trophy hunting in Tanzania. The Service received an email response to this letter on July 1, 2008. While this communication indicated that Tanzania's original response had been sent to DMA on October 29, 2007, by an acting Director of Wildlife, Mr. F. Lyimo, the Service had no record of this official response having been received.

The 2008 e-mail indicated that Tanzania had an approved Policy and National Management Plan for African Elephant that was developed in 2001. This plan was also reviewed on a regular basis to accommodate new insight and other issues deemed pertinent to the conservation of the African elephant. The identified objectives of this elephant management plan were to increase elephant numbers and restore age and sex structures; promote economic value of elephants through tourist game viewing and sustainable harvest through tourist hunting; control elephant numbers where necessary and appropriate (mitigate human-elephant conflict); and incorporate community-based conservation whereby local communities realize a direct benefit from the sustainable utilization and management of elephants. This plan was intended to be implemented throughout the entire country.

**DA 148**

More recently, a February 17, 2011, meeting between the Service and the MNRT occurred in Washington, D.C. to discuss concerns by the Government of Tanzania and the Tanzania Hunting Operators Association (TAHAO) relating to potential changes the Service might implement regarding import permits issued to clients intending to hunt elephants in Tanzania in 2011. These concerns were based primarily on the July 23, 2010, Convention on International Trade in Endangered Species (CITES) non-detriment finding prepared by the Service's Division of Scientific Authority (DSA). In that finding, DSA raised several concerns, the first being the availability of future resources to the Wildlife Division to combat poaching in Tanzania, especially in the Selous-Mikumi ecosystem. The second involved the threats to wildlife corridors within Tanzania which allows for elephant movement throughout Tanzania and transboundary populations. These corridors were under increased pressure due to the rising human population in Tanzania, loss of these corridors due to the expansion of agricultural lands, and human expansion into elephant habitat. During this meeting, the Service received a copy of Tanzania's Elephant Management Plan 2010 - 2015, prepared by the Tanzania Wildlife Research Institute (TAWIRI) with the financial support of the Government of Tanzania. This document was endorsed by the Minister for Natural Resources and Tourism on January 15, 2010. The document identified nine key strategic objectives for a management plan: (1) human-elephant conflict; (2) elephant corridors; (3) law enforcement; (4) benefits/sustainable utilization; (5) management of ivory stockpiles; (6) research and monitoring; (7) elephant health and welfare; (8) cross-border cooperation; and (9) elephant information management.

In the 2011 meeting, Mr. Eramus Tarimo, Director of Wildlife, MNRT, provided a summary of the strategic objectives under the national elephant plan. Mr. Tarimo noted the many challenges to the plan, including: low human resources and financing; the large area covered by Tanzania; the high demand for ivory; an increase in poverty; increased frequency of human-elephant conflicts due to human population growth; political resistance to maintaining wildlife corridors; reversing attitudes people have towards elephants; and providing local communities with a stake in managing, protecting, and conserving elephants as both a natural and economic resource. Mr. Tarimo stated that major reforms were underway to improve the management of wildlife outside National Parks and the Ngorongoro Conservation Area and Game Reserves. He also stated that trophy hunting played a major role in wildlife conservation in Tanzania. Mr. Tarimo went on to state that the Government of Tanzania was in need of United States support to help strengthen their law enforcement capabilities in protected areas and to assist with anti-poaching operations.

Based on this discussion and the document provided to the Service, we have concluded that the "Elephant Management Plan 2010-2015" was a very good starting point for Tanzania, provided that the country strived to overcome the challenges presented by Mr. Tarimo and strived to fully implement the plan throughout Tanzania. However, the presences of a plan, particularly a plan that is not fully implemented, was not sufficient in and of itself to meet the criteria established by the ESA or CITES.

***Population Status***: Tanzania's Protected Area (PA) network for wildlife includes six ecosystems: Tarangire-Manyara, Serengeti, Selous-Mikumi, Ruaha-Rungwa, Katavi-Rukwa; and Moyowosi-Kigosi. In 2006, the Tanzania Wildlife Research Institute (TAWIRI 2007, as cited in CoP15 Doc. 68, Annex 6a) estimated the African elephant populations in these six ecosystems

within Tanzania at 139,915 ± 12,338 (SE) animals, based on census surveys covering 227,328 sq.km using both total and sample counts. This estimate was not significantly different from the 111,475 ± 18,728 (95% CL) elephants estimated in 2000-2003. It was noted that the 2006 estimate did not include 2,873 additional elephants from areas that had not been previously surveyed, providing a country-wide "best estimate" of 142,788 ± 12,405 (SE) elephants in 2006 (CoP15 Doc. 68, Annex 6a). According to the <u>IUCN SSC African Elephant Status Report 2007</u> (Blanc *et al.*, 2007), the 2006 elephant population in Tanzania was categorized as being an estimated 108,816 elephants identified as "definite," 27, 937 "probable," 29,350 "possible", and 900 "speculative". These estimates were based upon aerial or ground counts, direct sample counts, reliable dung counts, and informed guesses. This was a reported increase from the 2002 report, which estimated 92,453 elephants as "definite," an increase of 16,363 elephants. The report attributed this increase largely due to the results of new estimates from methodologically comparable surveys. The report stated that although over 60% of the country's estimated elephant range was covered by good quality counts, over a third of the estimated range still remained unassessed. According to the 2007 IUCN report, an aerial survey of the Ruaha-Rungwa Ecosystem conducted by the Tanzania Wildlife Research Institute (TAWIRI, 2007), found an estimated 35,409 ± 11,507 (95% CL) elephants. An aerial survey of the Selous Ecosystem (TAWIRI, 2007), found an estimated 70,406 ± 24,843 (95% CL) elephants. These areas account for the two largest elephant populations within Tanzania and Tanzania alone accounted for about 80 % of Eastern Africa's regional population.

In 2009, a similar survey was conducted across the same six ecosystems covering 229, 318 sq.km. This census produced a total population estimate of 105,439 ± 6, 080 (SE) African elephants (TAWIRI 2010a, as cited in CoP15 Doc. 68, Anex 6a). A "best estimate", which included an additional 3,583 elephants, provided a country-wide estimate of 109,022 ± 6,135 (SE) elephants in 2009. The results of this survey suggested a significant decline compared to the 2006 estimate of 142,788 elephants and that the decline could be attributed in large part to a downward population trend recorded in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a). According to the 2013 IUCN SSC Provisional African Elephant Status Report (AESR 2013), the 2012 elephant population in Tanzania was categorized as being an estimated 95,351 elephants defined as "definite," 10,278 "probable," 10,927 "possible," and 900 "speculative." These survey numbers were based upon the same methodology used in the 2007 report. There was a clear decrease in population from the 2007 report, which estimated 108,816 elephants as "definite," 13,465 elephants. According to the 2013 IUCN report, the 2009 aerial sample counts of the Ruaha-Rungwa and the Selous-Mikumi Ecosystems (TAWIRI, 2009), replaced the 2006 survey of those systems. The Rauha-Rungwa survey found an estimated 31,625 ± 5,665 (95% CL) elephants and the Selous-Mikumi survey found an estimated 38,997 ± 5,183 95% CL) elephants. Both surveys represented a decline in those populations, with the Selous-Mikumi ecosystem experiencing a significant decline of more than 30,000 elephants. According to TAWIRI, there were methodological issues during the 2006 survey that is believed to have resulted in an overestimate of this population. Taking several factors into account, TAWIRI estimated the actual population in the Selous ecosystem would have been approximately **50,000 elephants in 2006**. This still represents a significant decline (**approximately 11,000 elephants**) most likely resulting from illegal killing taking place in this area.

**DA 150**

Two more recent aerial surveys were undertaken by TAWIRI during the 2013 dry season, again looking at the Ruaha-Runga and Selous-Mikumi Ecosystems. The preliminary results of those surveys show a continued decline in those two populations. The census of the Ruaha-Rungwa ecosystem covered 50,889 sq.km. The results of this survey produced a total population estimate of 20,090 + 3,282 (SE) elephants. This represents a significant decline (over 11,500 elephants) from the 2009 estimates. This estimate was derived from a count of 1,247 live elephants recorded along 119 transects. In addition, a total of 214 elephant carcasses were also recorded during this survey. Using these two figures, the carcass ratio for the Ruaha-Rungwa ecosystem was 14.6%. This carcass ratio is indicative of a population suffering from unnaturally high mortality. A carcass ratio of about 7 to 8% is considered to represent natural mortality (Douglas-Hamilton and Burrill 1991).

The census of the Selous-Mikumi ecosystem covered 87,421 sq.km. The results of this survey produced a total population estimate of 13,084 ± 1,816 (SE) elephants, the lowest numbers ever recorded in this ecosystem. This represented another significant decline (over 25,000 elephants) from the 2009 estimates. This estimate was derived from a count of 712 live elephants recorded along 203 transects. In addition, a total of 314 elephant carcasses were also recorded during this survey. With these figures, the carcass ratio for the Selous-Mikumi ecosystem was calculated at 30%, twice that recorded in Ruaha-Rungwa, indicating an unnaturally high rate of mortality in the two most significant elephant populations within Tanzania. These numbers indicate significant and unsustainable levels of illegal killing taking place within the two largest elephant populations found in Tanzania.

Based on the most recent surveys, it seems apparent that Tanzania has experienced a significant increase in illegal offtake due to poaching and the increased demand for ivory in the Asian market. In response to the current conditions in Tanzania and the urgent need for wildlife protection, the Service, in collaboration with USAID-TZ, awarded $200,310 in U.S. Government funds, matched by $378,443 from other partners, to fund four African Elephant Conservation Fund (AFE) projects that will get underway in 2014. The first project will assess patterns of poaching risk in relation to resource-constrained distribution of Mikumi elephants, for a long-term elephant protection and management strategy in partnership with the Animal Behavior Research Unit in Mikumi National Park. This project will support TANAPA to help improve their ability to protect elephants by assessing elephant distribution and habitat use, threats and poaching activity, and deploying patrol efforts effectively within Mikumi National Park.

The second project will monitor the long-term effects of poaching of elephants in southern Tanzania in partnership with the Udzungwa Elephant Project. This organization, in response to widespread elephant poaching throughout southern Tanzania, is working to protect a key population near Tanzania's elephant strongholds of Selous and Ruaha. Activities will include training staff from TAWIRI, assessing four elephant populations for early warning signs of decline, and training national park staff in monitoring elephant populations and conducting anti-poaching activities.

The third project will support aerial operations and law enforcement activities for the Selous Game Reserve in partnership with the Frankfurt Zoological Society/Grzimek's Help for

Threatened Wildlife, Inc., and the Tanzania Wildlife Division. The Selous, formerly the second most numerous elephant population in Africa, has been heavily impacted by poaching for the past decade with the most recent survey indicating a population of only 13,084 elephants, the lowest levels ever recorded in that area. This project will reinvigorate anti-poaching efforts in the Selous by supporting operating expenses for an aircraft to conduct aerial surveillance, for patrol vehicles, and for basic equipment for rangers throughout the reserve.

The final project will support village game scouts on the Waga Wildlife Management Area, in the Ruaha ecosystem. This will be done in partnership with the Wildlife Conservation Society. In order to improve patrol efficiency, this project will fund village game scout anti-poaching patrols and the pilot phase of a spatially explicit law enforcement monitoring technique, SMART (Spatial Monitoring and Reporting Tool), in the community-owned Waga Wildlife Management Area bordering Ruaha National Park in Tanzania.

The significant decline in the elephant population throughout Tanzania raises grave concerns over the impact of any additional offtake, including sport-hunting, on the country's elephants and its continued survival in the country. These declines must be taken into consideration with any finding made by DMA in regards to trophy imports to ensure that U.S. hunters, while operating under the best intentions, do not adversely contribute to further elephant population declines in Tanzania.

***Regulations and Enforcement***: In Tanzania, wildlife resources are protected under several Acts of Parliament, providing the authority for all aspects of wildlife management, including law enforcement. The Wildlife Conservation Act (WCA) of 2009, which replaced the original WCA of 1974, provides the legal framework for operation of the Wildlife Division under the MNRT, including the appointment of the Director, as well as the establishment of Game Reserves, Game Controlled Areas, Wildlife Management Areas, and other protected areas such as wildlife corridors (not including national parks). The WCA also provides for the establishment of a Wildlife Authority to address the management of wildlife occurring outside the National Parks or the Ngorongoro Conservation Area, with the added responsibility for meeting international obligations involving wildlife conservation. There is also a Wildlife Protection Unit that is granted paramilitary status under the WCA, with the duty of protecting wildlife against unlawful utilization.

In addition, the National Parks Act (CAP 282 RE 2002) establishes the legal authority for the creation and management of national parks, granting powers to the Director General to enable maintenance and security within national parks, as well as the responsibility for the protection of their wildlife resources. The Ngorongoro Conservation Act (CAP 284 RE 2002) provides the legal framework for the existence of the multiple land use in the Ngorongoro Conservation Area and its management Authority under the direction of the Conservator, and also provides the authority for its maintenance and security. The Tanzania Wildlife Institute (TAWIRI, CAP 260 RE.2002), grants powers to the Director General who is responsible for research involving wildlife, and for providing this information to the Wildlife Authorities. The TAWIRI also functions as the CITES Scientific Authority for Tanzania.

**DA 152**

The responsibility for managing Tanzania's wildlife falls under four institutions. The first is the Tanzania National Parks (TANAPA). This Parastatal Organization is responsible for managing 15 National Parks with a total area of 50,872 sq.km. In the national parks, only the non-consumptive utilization (tourism game viewing) of wildlife resources is allowed. The second is the Ngorongoro Conservation Area Authority (NCAA). This is also a Parastatal Organization which is responsible for management of only one area, the Ngorongoro Conservation Area covering 8,300 sq.km. It is the only multiple land use wildlife area in Tanzania in which the consumptive utilization of wildlife is not permitted.

The Wildlife Division under the MNRT is responsible for the management of 28 Game Reserves (GRs) with an area of 112,564 sq.km., approximately 38 Game Controlled Areas (GCAs) covering about 161,521 sq.km, and Ramsar sites covering 249,856 sq.km. There are also District Councils, Local Government institutions that work in collaboration with the Wildlife Division. These Councils oversee wildlife conservation issues and facilitate the establishment and management of Wildlife Management Areas (WMAs) on village lands that are outside Protected Areas (PAs). The framework for WMAs was outlined in Tanzania's Wildlife Policy of 1998 (revised in 2007), with legislation established under the Wildlife Management Areas Regulations of 2002, authorizing the formal establishment of WMAs. The goal of this policy is to allow for rural communities and private land holders to manage wildlife on their land for their own benefit and to transferring management responsibilities of settled and unsettled areas outside PAs to rural people and the private sector.

The WMAs are used by communities for conservation and benefit sharing in conjunction with the Wildlife Division. These local communities run the WMAs as a business venture. However, 50% of any hunting revenue generated is retained by the Wildlife Division which also sets quotas and tariffs for any hunting that occurs in the WMAs. The facilitation of these WMAs commenced in 2003, with 12 of 16 original proposals achieving Authorized Association (AA) status. As of June 2010, there were an additional 12 proposals in process. The establishment of these WMAs has resulted in an additional 23,700 sq.km. of Tanzania's land area being added to its conservation network and increased capacity for protected area management through the training of village game scouts and WMA managers. As of June 2010, six out of the ten WMAs with user-rights had entered into business agreements with the private sector worth over $3.3 million, however, it appears that only a small proportion of this money is being been made available to the local communities. Over $1.7 million was allocated to nine WMAs and several districts in which hunting took place between 2005 -2008. However, there appears to be ongoing challenges that need to be addressed. Investment in training and capacity development needs to be increased as there is a shortage of qualified personnel with relevant skills to be able to manage the Community-based Organizations (CBOs) and AAs. The ability of the community to hold the CBO management accountable and ensure transparent decision-making processes is an issue. There is also a pressing need to increase the economic benefits realized by local communities from utilization of wildlife resources. Overall, the WMAs have a low capacity for generating income for socio-economic development, and as such, do not provide an incentive to local communities to support or even tolerate wildlife as a potential source of renewable revenue.

Both the consumptive and non-consumptive utilization of wildlife resources contributes to about

10% of Tanzania's annual Gross National Product. The tourist industry generates approximately 1.3 billion per year with about 80 million annually going to TANAPA, NCAA, and the Wildlife Division to fund their operations. The two parastatal organizations, TANAPA and NCAA retain 100% of their revenue share. As a result, both TANAPA and NCAA are generally self-sustaining and consequently, National Parks and equivalent areas such as Ngorongoro Conservation Area, with an area covering approximately 57,387 sq.km., or 38% of all PAs in Tanzania, are adequately funded.

By contrast, the Wildlife Division's revenue share is paid to the central treasury, and the Treasury is then responsible for distributing the budgeted monies to the Wildlife Division. The Wildlife Division is responsible for the management and protection of Game Reserves with an area covering approximately 109,471 sq.km., (62% of all PAs). The Wildlife Division over a three year period covering 2007-2009, received only 63% ($2,634,975 per year) of its approved budget from the central Treasury. This is equivalent to US$ 24 per sq.km which, when compared to the generally accepted norm of ca. US$ 200 per sq.km required to protect PAs across southern and eastern Africa (Cummings, 2004), is completely inadequate. With regards to the Selous Game Reserve, the equivalent figure is US$ 19 per sq.km based on an annual actual budget of $928,597. Based on this level of funding, it is apparent that the Wildlife Division has not had adequate resources to be able to meet its obligations to conserve, manage, and protecting Tanzania's wildlife resources.

Of further concern is the situation with the elephant population in the Selous-Mikumi ecosystem. Prior to 2005, a Revenue Retention Scheme was in operation in the Selous Game Reserve. This was an agreement between the Government of Tanzania and the German government aid agency, GTZ, whereby a special project status was granted to Selous GR (IUCN-UNESCO, 2007). This allowed for 100% of revenue from photographic tourism, and 50% of revenue from hunting operations to be retained for management of the area. Over the 10 year period from 1994-2004, this retention scheme provided and operational and development budget totaling $ 15.8 million, an average of $1,576,000 annually. However, following National budget reductions in 2004, this amount retained by the Reserve declined dramatically to approximately $800,000 in 2008. This drop in revenue coincides with a period of increased poaching in the Reserve suggesting that anti-poaching operations are severely underfunded.

The hunting of elephants is permitted in Game Reserves, Game Controlled Areas, and Wildlife Management Areas where designated hunting blocks exist. The trophy hunter is required to pay of a license fee that ranges from $7,500 to $25,000, the fee being determined by the tusk size of the animals shot and the type of weapon used. The minimum tusk size of a trophy animal is 15kg for males and females. In 2007, Tanzania notified the CITES Secretariat that it had established and export quota of 200 elephants (400 tusks), an increase of 100 bull elephants a year. However, since that time, the legal off-take has been less than 50% of the established quota.

U.S. hunters are the primary recipients of licenses in Tanzania. It is the belief of these hunters, as well as the DMA, that the funds generated from these licenses are being used for conservation purposes. If, however, only a limited portion of these funds are actually utilized for conservation,

it raises further concerns that U.S hunters are not actually contributing the level of conservation funding they are led to believe, and therefore, are not likely to meet the ESA criteria of showing that imports of their trophies contribute to the enhancement of the species.

***Sustainable Use***: The elephant deaths that occur in Tanzania are a result of several factors, including: 1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching. In considering whether any level of off-take from trophy hunting is sustainable, the level of both legal and illegal take, as well as the rate of natural mortality throughout the country, must be taken into consideration. As previously stated, since 2007, Tanzania has had an established export quota of 200 bull elephants (400 tusks). From 2003-2006, the export quota was set at 100 elephants (200 tusks). During the period from 1997-2002, the quota was set at 50 elephants (100 tusks). Typically, Tanzania has not exported its full quota allotment in sport-hunted trophies or tusks. During the period covering 1997-2009, elephant tusks exported annually amounted to about 40-45 % of the allowed quantities and never exceeded the approved annual quota. In 2010, in conjunction with Tanzania's request to have their elephant populations down-listed to Appendix II, a CITES Panel of Experts was convened to determine whether a down-listing was warranted. At the time, records of natural mortalities covering the entire country were not available and the MNRT Wildlife Division failed to provide data that the Panel requested on the killing of problem elephants. An analysis of the Wildlife Division and TANAPA ivory store databases in 2010 showed the accumulation of 9,705 whole tusks from natural mortality and 12,057 from Problem Animal Control (PAC) in the period from 1989-2009. When averaged over the 21-year period, this was equivalent to 231 elephants dying from natural causes and 287 elephants taken as problem elephants annually. Based on these numbers and the number of trophy animals taken each year, it was estimated that a minimum of 718 elephants were taken annually by legal means. This was equal to 0.7% of the 2009 elephant population estimate of 109,022. Based on what was considered very low carcass detection rates for the country overall, it is likely that the number of natural mortalities was much higher. However, the Panel believed that the level of offtake from legal killings still fell within the expected rate of increase of the elephant population, 3 to 5% annually, which was considered sustainable.

With regards to illegal off-take, official elephant poaching statistics provided to the Panel by the Wildlife Division indicated that 258 reported poaching incidents were documented during 2005-2009, including 82 poaching incidents in 2009. This was the highest reported number of elephants poached in any one year during that time period. The Panel noted, however, that total number of poaching incidents was considered to be greatly underestimated given the low elephant carcass detection rates for the country (CoP15 Doc. 68, Annex 6a). Evidence cited by the Panel showed that poaching had led to elephant population declines in the Selous-Mikumi ecosystem, based in part, on the Proportion of Illegally Killed Elephants (PIKE) values collected at the Selous Mikumi Monitoring Illegal Killing of Elephants (MIKE) site, showing a progressive increase in poaching activities between 2003 and 2009 (CITES Secretariat, 2010). In addition, the joint Wildlife Division/Selous Rhino Project aerial observations and foot patrols recorded more than a threefold increase in encounter rates of recently dead elephant carcasses between 2007 and 2008 (TAWIRI, 2010b). There had also been reports from tourism operators in the northern Selous of increased elephant and other wildlife poaching since 2007/2008, including several incidents close to tourist camps. There were also a significant proportion of the large

seizures of ivory made in Asia in 2006 that were traced by forensic DNA work to elephants killed in the Selous-Niassa area (Wasser et al., 2009). The ivory confiscations served to highlight that the Selous-Mikumi ecosystem was a hotspot for elephant poaching. In the Udzungwa National Park, all ivory collected by wildlife enforcement officials was from confiscations. According to wildlife officials, these confiscations consisted of illegally-sourced ivory coming out of nearby Kilombero Game Controlled Area in the Selous-Mikumi ecosystem. In addition, the highest numbers of tusks confiscated by field-based Wildlife Division offices were found to originate from Morogoro and Lindi, both areas which are adjacent to the Selous-Mikumi ecosystem (CoP15 Doc. 68 Annex 6a). Given these factors, the Panel of Experts came to the conclusion that the level of off-take at that time was not sustainable in the Selous-Mikumi ecosystem, an area containing about 40% of Tanzania's total elephant population. However, the Panel did note that the legal and illegal off-take appeared to be sustainable in the five other elephant ecosystem, including Ruaha-Rungwa, where populations were stable or increasing, but there were concerns that the situation in the Selous-Mikumi ecosystem could affect long-term elephant population sustainability.

MIKE collects data at representative sites throughout Asia and Africa to measure trends in the levels of illegal killing of elephants, as well as identifying factors associated with those trends. MIKE evaluates relative poaching levels based on the PIKE, which is calculated as the number of illegally killed elephants found divided by the total number of elephants carcasses encountered by patrols or through other means, aggregated by year for each site (CITES Secretariat *et. al.* 2013). A PIKE level of 0.5 or higher translates to a level of illegal annual off-take that is likely to be higher than the annual natural birth rate and, therefore, indicates that the elephant population is very likely to be in net decline (CoP16 Doc. 53.1). A more recent analysis of MIKE data indicates that the levels of killing across the African elephants' range are of serious and increasing concern, and populations throughout Tanzania are declining due primarily to rampant poaching. At the Selous-Mikumi MIKE site, the 2011 PIKE level was 0.64 (based on 224 carcasses), a nearly 27% increase over the 2002-2010 average of 0.50. At the Ruaha-Rungwa MIKE site, the 2011 PIKE was 0.94 (based on 34 carcasses), the highest ever recorded for that site. The PIKE was 0.86 (based on 29 carcasses) at the Katavi-Rukwa MIKE site (CoP16 Doc. 53.1). This trend raises concerns as to the effectiveness of Tanzania's management and enforcement capabilities in protecting their elephant populations and the country's wildlife resources in general.

Of additional concern is the distribution of elephants in relation to existing wildlife corridors in Tanzania, and the impact these corridors have on the mobility of these populations. These wildlife corridors are being destroyed by rapid agricultural expansion, unplanned land use, unsustainable resource utilization, and road construction, resulting in increased isolation of protected areas within Tanzania. The Panel of Experts noted that associated human settlements were increasing in size and number around protected areas, the result being increased human-elephant conflicts. These settlements and the associated conflicts were probably the most important factors limiting the elephant's mobility and range. It was the opinion of the Panel at the time, based on the rates of habitat change and land conversion, that those wildlife corridors still remaining in Tanzania would be converted to unsuitable habitat (would disappear) in less than 5 years (CoP15 Doc. 68, Annex 6a). The current National Elephant Management Plan lays

out a strategic objective to restore lost corridors and to increase protection for corridors that are still in use (TAWIRI 2010). The Wildlife Conservation Act (WCA) of 2009, Part IV (b), Section 22. (1-3), provides the legal framework for conserving Tanzania's wildlife corridors. However, it is not clear whether regulations for implementing this section of the Act were ever written, published, or are currently being implemented.

Based on the most current information available, there is particular concern about the viability of the Selous (Tanzania)-Niassa (Mozambique) corridor. The Selous-Niassa ecosystem extends across southern Tanzania and northern Mozambique, and is one of the largest trans-boundary ecosystems in Africa covering ca. 154,000 sq.km of diverse miombo woodland and supporting a rich mammalian and avian fauna (Jones *et al.*, 2009). According to the 2013 survey of the Selous ecosystem, there were only 32 elephants counted within the Selous portion of the corridor, which resulted in an estimate of $1,006 \pm 810$ (SE) elephants (TAWIRI 2013a). Additionally, poaching in the Niassa Reserve has reached crisis levels, as evidenced by high carcass ratios (18%; population of 12,000 elephants) observed during October 2011 aerial surveys (WCS Mozambique *in litt.* 2014).

***Summary:*** The most recent national elephant management plan, "Elephant Management Plan for Tanzania 2010-2015", was prepared by TAWIRI with the financial support of the Government of Tanzania. The Plan identified nine strategic objectives to be addressed in order to effectively manage Tanzania's elephant population. The Plan also identified three major issues impacting Tanzania's ability to manage its elephants: (1) the country's increasing human population which is putting pressure on natural resources and presenting challenges to conserving its elephants; (2) the threat to healthy and sustainable elephant populations from an increasing loss of connectivity (wildlife corridors) between important wildlife habitat areas in Tanzania; and (3) the ability to provide increased protection for Tanzania's elephant population. In a meeting between the Service and representatives from Tanzania that took place in Washington, D.C. in 2011, then Director of Wildlife, MNRT, Erasmus Tarimo, acknowledged that there were many challenges to the plan, including: low human resources and financing; the high demand for ivory; increase in the level of poverty; increased human-elephant conflicts related to human population growth; political resistance to maintaining wildlife corridors; and providing local communities with a stake in managing, protecting, and conserving elephant populations in Tanzania. Mr. Tarimo indicated at the time that major reforms were underway to improve the management of wildlife resources outside National Parks and Game Reserves.

However, since that time, the situation involving Tanzania's elephant population has grown increasingly worse based on current information from a number of sources. The most recent aerial surveys undertaken by TAWIRI conducted during the 2013 dry season covered the two most important ecosystems for elephants in Tanzania, the Ruaha-Rungwa and Selous-Mikumi Ecosystems. The resulting data shows a continued and rapid decline in the two largest elephant populations in Tanzania. The census of the Ruaha-Rungwa ecosystem showed a decline of over 11,500 elephants from the 2009 population estimate of 31,625. The census of the Selous-Mikumi ecosystem showed a decline of over 25,000 elephants from the 2009 survey estimate of 38,997. The carcass ratios resulting from the survey data from each area was indicative of populations suffering from unnaturally high mortality, with the Selous-Mikumi ecosystem having

a mortality rate twice that of the Ruaha-Rungwa ecosystem. These ratios indicate significant and unsustainable levels of illegal off-take occurring in these ecosystems.

In 2010, the CITES Panel of Experts, in its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II, raised concerns that the level of offtake due to poaching in the Selous-Mikumi ecosystem was not sustainable and could potentially affect long-term population sustainability throughout Tanzania. However, the Panel also determined that legal and illegal off-take appeared to be sustainable in other ecosystems where elephant populations were found to be stable or increasing, namely the Tarangire-Manyara, Katavi-Rukwa, Moyowosi-Kigosi, Serengeti, and including the Ruaha-Rungwa ecosystem. However, since that time, new information indicates that the elephant declines in Tanzania are no longer restricted to the Selous-Mikumi ecosystem. A more recent analysis of MIKE data indicates that the levels of killing across the elephant's range are serious and on the rise, and that elephant populations throughout Tanzania are declining due primarily to rampant poaching.

Of further concern are recent reports of political corruption at high levels within the government, as well as allegations of Wildlife Division staff within MNRT being in collusion with poachers in the illegal killing of elephants. In October of 2013, under orders from the President of Tanzania, Jakaya Kikwete, a countrywide anti-poaching operation was undertaken to combat the illegal taking of elephants. However, the operation, named "Operation Tokomeza", was suddenly terminated after human rights violations, including homicide and rape, were reported to have been committed during the operation, mainly by army personnel involved in the operation. The victims were semi-nomadic pastoralists who illegally, but quite often, utilize national parks and reserves for grazing their livestock. It was also reported that livestock was confiscated by force, and that unlawful collection of money from both farming communities and pastoralists occurred. On December 20, 2013, four cabinet ministers, including Ambassador Khamis Kagasheki, the Natural Resources and Tourism Minister, were forced to resign over this incident. Mr. Kagasheki assumed the political responsibility for the misdeeds of the army. However, it is not believed he was responsible for what occurred, based partly on his reputation for wanting to combat rampant poaching in Tanzania. There are concerns being voiced of strong political and business forces within Parliament, and elsewhere, possibly involved in local poaching or actively protecting such illegal operations.

There are also questions as to the ability of the Wildlife Division to combat poaching. It was announced in January of this year that MNRT had suspended 21 Wildlife Division staff for allegedly colluding with poachers to kill elephants. The Deputy Minister, Lazaro Nyalandu, MNRT, stated that investigations had shown certain members of the ministry's staff were directly involved in illegal acts in collaboration with wildlife criminals. The suspended staff were comprised of eleven individuals from the Anti-Poaching Unit in Arusha, four from the Rukwa-Lwari Forest Reserve, one from the Anti-Poaching Unit in Bunda, three from Maswa Forest Reserve, one from Selous Forest Reserve, and one from the Lukwika-Lumesule-Msanjesi Forest Reserve. These recent events put into question the county's commitment and ability to conserve and protect its natural resources, including elephants.

**DA 158**

It was announced in early January of 2014, that the government planned to establish a new agency, the Tanzania Wildlife Authority (TWA), charged with the security of wildlife within all game and forest reserves in the country. The TWA would be granted full authority to hire, fire, and carry out official functions as opposed to the present framework under the MNRT. This new body would be charged with eliminating poaching and other illegal acts harmful to the country's natural resources and would be given full autonomy to set its own salaries and provide incentives to staff to perform their duties efficiently and effectively. It would operate as a parastatal organization much like TANAPA and NCAA. It was estimated that over 4,000 new staff would be needed to cover the over 20 game reserves and 50 forest reserves country wide. This new organization awaits Parliamentary endorsement sometime this year. As a result, while hopeful that this organization will greatly improve the situation in Tanzania, it is too soon to determine what impact the creation of TWA will have on anti-poaching efforts in Tanzania.

While the Service recognizes that sport-hunting, when conducted as part of a sound management program, can provide an important conservation benefit to elephant populations, current conditions in Tanzania put into doubt whether any level of legal take is sustainable. The CITES Panel of Experts concluded in 2010, that the level of off-take occurring in the Selous-Mikumi ecosystem could not be considered sustainable based on a decreasing population and the high level of poaching taking place within that ecosystem. The panel further noted that the legal and illegal off-take appeared to be sustainable in the other five elephant ecosystems based on stable or increasing elephant populations, but voiced concerns that this situation could affect the long-term elephant population sustainability. Since that time, data has shown that populations throughout Tanzania are in severe decline and that poaching appears to be out of control. Based on these factors, DMA is **unable to find** that the sport-hunting of elephants in Tanzania in 2014, for import as personal trophies is likely to enhance the survival of the species. The Service will continue to monitor elephant population levels in Tanzania, progress made by the Government in implementing its management plan and addressing the strategic objectives identified in that plan, as well as efforts made to deal with rampant poaching and government corruption that is negatively affecting African elephants in Tanzania.

REFERENCES:

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. African Elephant Status Report 2007: An Update from the African Elephant Database. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

CITES Secretariat, IUCN/SSC African Elephant Specialist Group, and TRAFFIC. 2013. Status of African elephant populations and levels of illegal killing and the illegal trade in ivory: A report to the African elephant summit, December 2013. 19pp. Available online at: https://cmsdata.iucn.org/downloads/african_elephant_summit_background_document_2013_en.pdf.

CITES Secretariat (2010). *Monitoring of Illegal hunting in elephant range States*. Document CoP15 Doc. 44.2 presented at the 15ht meeting of the Conference of the Parties to CITES.

CoP15 Doc. 68 Annex 6a). 2010. Report of the Panel regarding the proposal of the United Republic of Tanzania. 19 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/15/doc/E15-68A06a_.pdf.

CoP16 Doc. 53.1. 2012. Monitoring the Illegal Killing of Elephants (MIKE). Sixteenth meeting of the Conference of the Parties, Bangkok (Thailand), 3-14 March 2013, 15 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-01.pdf.

Cumming, D.H.M (2004). Performance of Parks in a century of change. In: *Parks in transition: biodiversity, rural development and the bottom line*. Ed. B Child. Earthscan, London.

Douglas-Hamilton, I. and Burrill, A. (1991). Using elephant carcass ratios to determine population trends. *African Wildlife: Research and Management*, pp. 98-105. International Council of Scientific Unions.

IUCN Provisional African Elephant Status Report 2013: An Update from the African Elephant Database. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.elephantdatabase.org/preview_report/2013_africa/Loxodonta_africana/2012/.

IUCN-UNESCO (2007). *Report of the reactive monitoring mission: Selous Game Reserve*, United Republic of Tanzania.

Jones, T., T. Caro and T.R.B. Davenport (eds.). 2009. Wildlife Corridors in Tanzania. Unpublished Report. Tanzania Wildlife Research Institute (TAWARI), Arusha. Available online at: http://www.tzwildlifecorridors.org/TzWildlifeCorridors.pdf.

TAWIRI. 2013a. Aerial census of large animals in the Selous-Mikumi ecosystem, dry season 2013, population status of African elephant. Arusha, Tanzania, 11pp.

TAWIRI. 2010. Tanzania Elephant Management Plan 2010-2015. TAWIRI, Arusha, Tanzania, 95 pp. Available online at: www.tawiri.or.tz/images/Conference/elephant_plan.pdf.

TAWIRI. 2010b. Presentation to CITES Panel of Experts, 25 January, 2010, Dar es Salaam.

Wasser, S.K., B. Clark and C. Laurie. 2009. The Ivory Trail. *Scientific American*, July 2009. Pp. 68-76.

WCS Mozambique. 2014. *in litt*. Niassa Reserve expanded elephant protection program. USFWS WWB-AECF FY14 grant proposal (F13AS00357).

**DA 160**



Conserving the Nature of America External Affairs

| | Search |

| Search USFWS |



- - FWS Home
    - Newsroom Home
    - Offices

◀ Back

**Press Release**
Service Suspends Import of Elephant Trophies from Tanzania and Zimbabwe

**April 4, 2014**

**Contacts:**

Gavin Shire
703-346-9123
gavin_shire@fws.gov

---

The U.S. Fish and Wildlife Service today announced a suspension on imports of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during calendar year 2014. Questionable management practices, a lack of effective law enforcement and weak governance have resulted in uncontrolled poaching and catastrophic population declines of African elephants in Tanzania. In Zimbabwe, available data, though limited, indicate a significant decline in the elephant population. Anecdotal evidence, such as the widely publicized poisoning last year of 300 elephants in Hwange National Park, suggests that Zimbabwe's elephants are also under siege.

Given the current situation on the ground in both Tanzania and Zimbabwe, the Service is unable to make positive findings required under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) and the Endangered Species Act to allow import of elephant trophies from these countries. Additional killing of elephants in these countries, even if legal, is not sustainable and is not currently supporting conservation efforts that contribute towards the recovery of the species.

The decision to suspend the import of sport-hunted trophies from Tanzania and Zimbabwe applies to

DA 161

USCA Case #14-5152      Document #1503544            Filed: 07/18/2014      Page 65 of 182

elephants taken in 2014. The Service will reevaluate this suspension for calendar year 2015 or upon receipt of new information that demonstrates an improved situation for elephants in these countries.

Legal, well-regulated sport hunting, as part of a sound management program, can benefit the conservation of listed species by providing incentives to local communities to conserve the species and by putting much-needed revenue back into conservation. At this time, the Service does not have conservation concerns with African elephant sport hunting in Namibia, South Africa, or Botswana; though it should be noted that Botswana is not currently open to sport hunting.

For more information, please visit www.fws.gov/international/permits/by-activity/sport-hunted-trophies.html.

---

*The mission of the U.S. Fish and Wildlife Service is working with others to conserve, protect, and enhance fish, wildlife, plants, and their habitats for the continuing benefit of the American people. We are both a leader and trusted partner in fish and wildlife conservation, known for our scientific excellence, stewardship of lands and natural resources, dedicated professionals, and commitment to public service. For more information on our work and the people who make it happen, visit* www.fws.gov.

*For more information on our work and the people who make it happen, visit* http://www.fws.gov/. *Connect with our* Facebook page, *follow our* tweets, *watch our* YouTube Channel *and download photos from our* Flickr page.

U.S. Fish and Wildlife Service Home Page | Department of the Interior | USA.gov |
About the U.S. Fish and Wildlife Service | Accessibility | Privacy | Notices | Disclaimer | FOIA

## Suspension of Import of Elephant Hunting Trophies
## Taken in Tanzania and Zimbabwe in 2014

### Questions & Answers

### UPDATED ON 4/22/14

*On April 4, 2014, the U.S. Fish and Wildlife Service (Service) announced a suspension of imports of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during calendar year 2014. Although initially covering the entire year for both countries, the Service has revised the suspension to allow the import of legally taken elephant trophies from Zimbabwe if the importer can demonstrate that it was taken prior to the date of the finding leading to the suspension, which is April 4, 2014. Zimbabwe allows hunting year-round, so some hunters had actually hunted an elephant in that country in 2014 before the Service announced the suspension. Tanzania's hunting season does not begin until July 1st.*

**Why has the Service made this decision?**

Questionable management practices, a lack of effective law enforcement, and weak governance have resulted in uncontrolled poaching and catastrophic population declines in Tanzania. For example, the Selous, Africa's largest protected area, has lost 66 percent of its elephants in the past five years.

In Zimbabwe, available data, though limited, indicate a significant decline in the elephant population, while anecdotal evidence, such as the widely publicized poisoning of 150 to 300 elephants last year in Hwange National Park, suggests that Zimbabwe's elephants are also being impacted by the ongoing poaching crisis. The information readily available to us on the status of Zimbabwe's elephant population, management plans, hunting policies and regulations is limited. However, the information that we have raises significant concerns about the long-term survival of elephants in Zimbabwe.

Sport hunting, as part of a sound management program, can provide benefits to conservation. Yet, given the current situation in Tanzania, and given the uncertainty with regard to elephants in Zimbabwe, the Service is not assured that the benefits of sport hunting will be realized in those countries. Further, the Service is concerned that additional killing of elephants in Tanzania, even if legal, is not sustainable at this time, and the same may be true for Zimbabwe.

**Does the Service plan to shut down all sport-hunting of African elephants?**

No. Legal, well-regulated sport hunting, as part of a sound management program, can benefit the conservation of listed species by providing incentives to local communities to conserve the species and by putting much-needed revenue back into conservation. At this time, the Service does not have conservation concerns with sport hunting of African elephants in Namibia, South Africa, or Botswana, though it should be noted that Botswana is not currently open to sport hunting.

Hunters should choose to hunt in countries that have only strong governance, sound management practices, and healthy elephant populations.

**I hunted an elephant in Tanzania or Zimbabwe *prior* to 2014, but have not yet imported the trophy. Will I be able to do so?**

Yes. The decision to suspend the import of sport-hunted trophies from Tanzania applies only to elephants hunted in calendar year 2014. For Zimbabwe, the decision to suspend the import of trophies applies only to elephants hunted on or after April 4, 2014. If you plan to import an African elephant sport-hunted

trophy from either of these countries, you will need to provide documentation that the elephant was hunted prior to the effective date of this decision (January 1, 2014, for Tanzania; April 4, 2014, for Zimbabwe).

**I have already purchased a hunt in Tanzania or Zimbabwe.  How do I get my money back?**

We encourage you to contact your hunting outfitter to discuss options.  While you can still participate in a hunt in 2014, you currently are not able to import the trophy.  In addition, given the current conservation concerns for elephants in Tanzania and Zimbabwe, we strongly advise that you reconsider taking part in an elephant hunt in either of these countries at this time

**When will the Service reevaluate the suspension on imports of sport-hunted African elephant trophies from Tanzania and Zimbabwe?**

The findings for Tanzania are made on an annual basis.  We will reevaluate the situation in Tanzania for elephant trophies taken in calendar year 2015.  If the Service receives information that indicates a significant improvement for elephants in this country, or that the information on which we based the suspension was incomplete or inaccurate, we could reevaluate the suspension prior to 2015.

For Zimbabwe, we currently do not have sufficient information to make a positive finding under the Endangered Species Act (ESA). We are actively working with the Government of Zimbabwe, as well as a number of non-government agencies, to obtain additional information.  If this information demonstrates that elephant hunting in Zimbabwe during 2014 does meet the criteria under the ESA, we will be able to lift the suspension and allow imports of 2014 trophies.

**An import permit is not required to import an elephant trophy from Zimbabwe into the United States.  What authority does the Service have to restrict imports, and how would the restriction be enforced?**

African elephants from Zimbabwe are included in CITES Appendix II for the purpose of non-commercial trade in hunting trophies, among other things.  As with all CITES Appendix-II specimens, an import permit is not required.  However, the listing of African elephants under the Endangered Species Act (ESA) contains a provision that requires the Service to make a determination that the import of an elephant trophy would enhance the survival of the species.  The Service must make this enhancement finding to be able to allow the import of an African elephant trophy from any country. With the 2014 suspension of imports, the Fish and Wildlife Service Office of Law Enforcement would either refuse entry or seize any elephant trophy from Zimbabwe that was hunted on or after April 4, 2014 at the time of import. By announcing this suspension before trophies are sent to the United States, the Service hopes to avoid having to refuse or seize shipments upon importation.

**Where should I send additional questions?** If you have specific questions regarding the import of sport-hunted trophies, please send an email to <u>managementauthority@fws.gov</u> or call 1-800-358-2104.

For additional information on these decisions, please refer to the following web links:

- Zimbabwe - U.S. Endangered Species Act enhancement finding  posted at <u>http://www.fws.gov/international/pdf/enhancement-finding-2014-elephant-Zimbabwe.PDF</u>
- Tanzania - CITES non-detriment finding posted at <u>http://www.fws.gov/international/pdf/non-detriment-finding-2014-elephant-Tanzania.pdf</u>; U.S. Endangered Species Act enhancement finding posted at <u>http://www.fws.gov/international/pdf/enhancement-finding-2014-elephant-Tanzania.PDF</u>

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL )<br>                Plaintiff,    )<br>                           )<br>v.                        )<br>                           )<br>SALLY M. R. JEWELL, et al.  )<br>                           )<br>           Defendants    )<br>                           ) | Civ. No. 14-cv-00670(ABJ) |

## DECLARATION OF REW R. GOODENOW

I, Rew R. Goodenow, being first duly sworn on oath, depose and state as follows:

1. I am Chairman of the Legal Task Force of Safari Club International.

2. I am an attorney and principal in the law firm of Parsons, Behle and Latimer in Reno, Nevada.

3. Safari Club International (Safari Club) is a nonprofit corporation incorporated in the State of Arizona, operating under § 501(c)(4) of the Internal Revenue Code, with principal offices and places of business in Tucson, Arizona and Washington, D.C.

4. Safari Club's membership includes approximately 50,000 individuals from the United States and many other countries around the world

5. Its missions are the conservation of wildlife, protection of the hunter, and education of the public concerning hunting and its use as a conservation tool. Safari Club carries out its conservation mission through its sister organization, Safari Club International Foundation (SCIF).

6. SCIF'S missions include the conservation of wildlife, education of the public concerning hunting and its use as a conservation tool, and humanitarian services. More specifically, the conservation mission of SCIF is: (a) to support the conservation of the various species and populations of game animals and other wildlife and the habitats on which they depend; and (b) to demonstrate the importance of hunting as a conservation and management tool in the development, funding and operation of wildlife conservation programs.

1

DA 165

7. "Sustainable use" recognizes that the utilization of wildlife often produces benefits that provide incentives for conservation, that conservation does not require non-use of wildlife and that non-use can actually be counter-productive to conservation efforts. Well-managed hunting is and has been a valuable tool in conservation and protection of many game species and associated habitats, and biodiversity. The concept of sustainable use has been endorsed and adopted as a key principal of conservation by the International Union for the Conservation of Nature and Natural Resources -- the oldest and largest conservation organization in the world -- at its 2nd World Conservation Congress. Sustainable use is also one of the three primary principles of the Convention on Biological Diversity, commonly referred to as the Biodiversity Treaty, one of two major treaties opened for signature at the United Nations Conference on Environment and Development (UNCED) in 1992.

8. Safari Club is an organization that promotes the principle and practice of sustainable use conservation, including the ability of its members to participate in hunting and importation of foreign species in order to 1) increase social tolerance for the species' destructive behavior, 2) discourage and apprehend poachers, 3) contribute meat and other important resources and revenue to local communities, 4) reduce overpopulations in areas where the species has exceeded its carrying capacity, and 5) increase the value of the species.

9. On information and belief, Safari Club members have booked hunts for elephants in Zimbabwe and Tanzania for 2014 and beyond, have taken elephants in the two countries between April 4, 2014 and the date of this declaration and/or are presently engaged in elephant hunts in those countries.

10. On information and belief, Safari Club members include Professional Hunters, Outfitters, Booking Agents, Taxidermists and others whose businesses and livelihoods depend on U.S. hunters, including Safari Club members, to hunt African elephants.

11. On information and belief, Safari Club member Outfitters and Professional Hunters are conducting on-the-ground elephant conservation and anti-poaching efforts in Zimbabwe and Tanzania. These efforts are funded, at least in part, by income paid to them by Safari Club members for the opportunity to hunt elephants and import their elephant trophies.

12. The importation ban will prevent Safari Club members from importing their elephants from their successful hunts in Zimbabwe and Tanzania into the U.S. in 2014.

13. Safari Club member hunters who cannot import their trophies, as well as outfitters, professional hunters, booking agents, taxidermists and others, have all been harmed by the importation ban.

2

**DA 166**

14. Safari Club's own conservation interests and efforts are harmed by the loss of revenue that the importation ban will cause as it will result in a decrease in funding for anti-poaching efforts and a decline in the resources that have encouraged local communities to value and protect elephants.

15. Safari Club will suffer when these losses result in elephant overpopulations, damage to habitat and increased poaching.

16. Safari Club seeks to enjoin the U.S. Fish and Wildlife Service from continuing the importation bans and to have the Court declare the bans illegal.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, as provided by 28 U.S.C. § 1746.

Executed this 25th day of April 2014 in Reno, Nevada

By: _____

Rew R. Goodenow

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL                )
                                         )
     Plaintiff,                          )          Civ. No. 14-cv-00670(ABJ)
                                         )
v.                                       )
                                         )
SALLY M. R. JEWELL, et al.               )
                                         )
     Defendants                          )
_____      )

## DECLARATION OF ROBERT BRUCE RHYNE

I, Robert Bruce Rhyne, being first duly sworn on oath, depose and state as follows:

1. I am a resident of Sharon, South Carolina.

2. I am a member of Safari Club International and a past chapter president of the Carolinas Chapter of SCI.

3. I am 68 years old and have been hunting for 60 years. My father was the one to introduce me to hunting.

4. I have hunted in the U.S., Canada, Africa and Tajikistan.

5. I have previously hunted in Zimbabwe in 2005, 2006, and 2014.

6. I have been on several elephant hunts. In addition to my 2005, 2006 and 2014 in Zimbabwe, I hunted elephant in Botswana in 2009, 2010, 2011 and 2012.

7. During my April 2014 elephant hunt in Zimbabwe, I witnessed lots of elephants and did not see evidence of poaching.

8. My outfitter used poaching patrols.

9. I hunted elephant in Zimbabwe for my personal enjoyment, but also to provide meat to local communities, and to help combat against poaching.

1



APR-24-2014 06:39 PM                                                                    P.02

Case 1:14-cv-00670-ABJ   Document 4-32   Filed 04/30/14   Page 3 of 3
USCA Case #14-5152      Document #1503544      Filed: 07/18/2014      Page 8 of 196

10. I know from personal experience that elephant hunting gives value to the elephant and provides revenue to the local economies. If U.S. hunters are discouraged from going to Zimbabwe to hunt elephants, this will remove the funding used to support poaching patrols. Without hunters in the field and the poaching patrols that hunters finance, poaching will become rampant and Zimbabwe will soon resemble Kenya.

11. I have an elephant hunt booked for Tanzania in August of 2014. When I learned that I would be unable to import my elephant trophy, I contacted my outfitter and asked for a refund of the funds I had already invested. My outfitter would not issue a refund.

12. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this _24th_ day of April, 2014, at _Sharon, S.C.   USA_ .

Robert Bruce Rhyne

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## DECLARATION OF CRAIG M. MCDONNOLD

I, Craig M. McDonnold, being first duly sworn on oath, depose and state as follows:

1. I am a petroleum engineer and live in Midland, Texas.

2. I have been a member of Safari Club International for about 7 years.

3. I have been hunting for 50 years.  I started hunting with my father.

4. I have hunted the following species in the indicated area:  Lower-48 United States:  White-tail/Mule Deer, Pronghorn, and Elk; Alaska:  Brown bear, Caribou, Moose; Tanzania/Zimbabwe/Cameroon/Ethiopia: Elephant, Cape Buffalo, Lion, Leopard, Mountain Nyala, Bongo, Sable, Roan, Kudu, Hyena, Hippo, Oryx, and Crocodile.

5. Specific to Tanzania and Zimbabwe, I have hunted the following animals: Tanzania (2009, 2011, 2013), Elephant (Selous Game Reserve), Lion, Leopard, Hippopotamus, Crocodile, Cape Buffalo, Hyena, Sable, Kudu, Klipspringer, Dik Dik, Lesser Kudu, and Roan; Zimbabwe (1994), Sable, Kudu, Buffalo, Warthog, Impala, Wildebeest, and Leopard.

6. During my visit to Tanzania in 2011, I found poached elephants in the Selous Game Reserve.  During this trip I saw eight or nine legal bulls in the Selous U1 & U2 block.  We also found poached elephants in the Rungwa Area in 2013.  The Professional Hunter, my son, and I caught two poachers on that trip.  The game scouts caught four more that night.  During that trip, we did not see a legal bull in 21 days in Rungwa.

7. The owners of the game concessions, supported by U.S. hunter dollars, run and support private anti-poaching operations.  These operations tend to be more effective than government game officials and their programs.  The money I will spend on my hunt is

much greater than the value of the ivory.  Economic benefit to the local population can be a big deterrent to poaching and can generate support among the local population for sound management of elephants.

8.  I have plans for a 14-day elephant hunt with Desfountain and Jones, Ltd. in Zimbabwe, for Aug 10-28, 2014.  I have committed approximately $75,000.  I chose Zimbabwe because it still has a strong elephant population that requires culling in areas.  I have emailed my professional hunter about the ban.  He had only recently become aware of the ban right and is extremely concerned about losing my hunt as well as hunts by many other Americans hunting with him in 2014.  If I am unable to import my elephant trophy (a cherished symbol of my hunt) I do not know if I will continue with my hunt.  I have no firm commitment on a refund or not.

9.  I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _28_ day of April, 2014, at _10:37 Am CST_.

Craig M. McDonnold

04/26/2014  05:11  9187754259951          UNIT                    #2703 P.001/003

Case 1:14-cv-00670-ABJ  Document 4-41  Filed 04/30/14  Page 2 of 4
USCA Case #14-5152    Document #1503544    Filed: 07/18/2014    Page 30 of 196

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL<br>501 2nd Street NE<br>Washington, DC 20002,<br><br>    Plaintiff,<br><br>v.<br><br>SALLY M. R. JEWELL, in her official<br>capacity as Secretary of the U.S.<br>Department of the Interior;<br>U.S. DEPARTMENT OF THE INTERIOR,<br>an agency of the United States;<br>DANIEL ASHE, in his official capacity as<br>Director of the U.S. Fish and Wildlife Service; and<br>U.S. FISH AND WILDLIFE SERVICE,<br>an agency of the United States<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civ. No. 14-00670(ABJ)<br>   DECLARATION OF<br>   GRANT F. DENNISON |

I, Grant F. Dennison, being first duly sworn on oath, depose and state as follows:

1. I am a chemical process operator in Liberty, Texas.

2. I have been a life member of Safari Club International since 2012.

3. I am also a member of Rocky Mountain Elk Foundation, Dallas Safari Club, Grand Slam Club/Ovis, National Rifle Association, and Friends of the Trinity River National Wildlife Refuge.

4. I have been hunting for about 40 years. I started hunting with my father and grandfather when I was young.

5. In the United States I have hunted for white-tailed deer, elk, mule deer, ducks, geese, turkey, and other small game. In South Africa I have hunted for plains game. In Zimbabwe, I have hunted for Cape buffalo and impala.

1

6. While hunting in Zimbabwe in 2011, I observed numerous elephants and came upon them several times in the bush. After talking with my Professional Hunter and others who had previously hunted elephant in Zimbabwe, I decided that it was something that I would like to pursue as well. Especially after seeing the remains of three poached elephants and the remnants of two poachers' camps, I wanted to contribute to the conservation of the species with my own hunt.

7. At the 2012 Safari Club International Convention I booked an elephant hunt in Zimbabwe with Chifuti Safaris for August 2014. I have saved for several years and made monthly payments for the hunt until March 2014.

8. I have yet to try and receive a refund for the hunt because of the trophy importation ban. I am hoping that the U.S. Fish and Wildlife Service will reverse its decision before August. Due to financial obligations, I am unsure if I will be able to pay for another elephant hunt. I believe this will be my only opportunity to successfully hunt an elephant.

9. Sport hunting elephants places value on the species and that impacts the local economies. In addition to the revenue received from hunting fees, locals are employed in jobs related to the hunting operation as trackers, skinners, camp staff, etc. They earn wages that would otherwise not be available to them without the presence of hunters and hunting.

10. Without the value that sport hunters provide, elephants would become intolerable to the locals because their destructive behaviors. Local residents would lose their tolerance of the crop destruction caused by elephants and will resort to poaching the elephants. The trophy importation bans imposed by the U.S. Fish and Wildlife Service will increase illegal poaching of elephants in Zimbabwe and Tanzania and will be extremely detrimental to the species.

11. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _26_ day of April, 2014, at _Liberty, Texas_ .

2

210                                              DA 173

UNIT                                      #2703 P.003/003

Case 1:14-cv-00670-ABJ   Document 4-41   Filed 04/30/14   Page 4 of 4
USCA Case #14-5152    Document #1503544      Filed: 07/18/2014    Page 32 of 196

Grant F. Dennison

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| 501 2nd Street NE | ) | |
| Washington, DC 20002, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. 14-cv-00670(ABJ) |
| SALLY M. R. JEWELL, in her official | ) | DECLARATION OF |
| capacity as Secretary of the U.S. | ) | IVAN MURRAY CARTER |
| Department of the Interior; | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| an agency of the United States; | ) | |
| DANIEL ASHE, in his official capacity as | ) | |
| Director of the U.S. Fish and Wildlife Service; and | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| an agency of the United States | ) | |
| 1849 C Street, NW | ) | |
| Washington, DC 20240, | ) | |
| | ) | |
| Defendants. | ) | |

I, Ivan Murray Carter, being first duly sworn on oath, depose and state as follows:

1.   I am a resident of Freeport Bahamas.

2.   I am a booking agent for Africa, a professional hunter and a television show host.

3.   I am a life member of Safari Club International and have been a member for well over ten years.

4.   I am a life member of the mid-Michigan Chapter of SCI.

5.   I am also a member of Dallas Safari Club (over ten years), the Zimbabwe Professional Hunters and Guides Association (over ten years), the Tanzania Professional Hunters Association (two years), the African Professional Hunters Association (one year), Houston Safari Club (two years) and the International Professional Hunters Association (five years).

Page **1** of **4**

**DA 175**

6. I have a television show on the Outdoor Channel that is produced by Safari Classics Productions. Every episode highlights the value of hunting through conservation.

7. I write for African Outfitter Magazine on the role that hunting plays in the conservation of wildlife. I also write for Dallas Safari Club's Gametrails Online – a blog that deals with current wildlife issues and stories.

8. I am 43 years old and have been an outfitter for 23 years.

9. I provide or guide hunts in Zimbabwe, Tanzania, South Africa, eastern Cape Cameroon. northern Mozambique, northern and southeast Namibia and Caprivi. Until recently, I provided or guided hunts in Botswana as well.

10. Each year I guide a maximum of 20 elephant hunts. At a minimum, I guide eight elephant hunts a year.

11. Over the years, I have witnessed the population status and behavior of elephants. For example, in Zimbabwe, the elephant populations are stable and their behavior is generally unchanged. However, there is overpopulation in many areas that has led to the destruction of habitat. Although I have noticed an increased number of carcasses left by poachers, I have not noticed a population decline.

12. In Tanzania, I have witnessed that the elephant behavior has changed and that the elephants are more agitated, nervous and disturbed. I have also seen many carcasses left by poachers.

13. It is worth noting also that in Botswana, where elephant hunting is no longer possible, there is chronic elephant overpopulation which has led to much habitat loss.

14. Generally, local African populations consider elephants a nuisance because elephants interfere with green season crop cultivation. Various programs that invest hunter dollars in local economies changes local attitudes towards elephants. Hunter money helps the communities by employing local residents and in some cases through direct payments to the communities for the rights to hunt. Where elephants become worth protecting as a means of generating hunter revenue, local communities are far more willing to tolerate and protect these animals.

15. I have often witnessed the evidence of poaching and have seen many elephant carcasses with the ivory chopped out. Many, many of these scenes have been deep in hunting areas. Without the presence of hunters, this evidence of poaching would go unnoticed.

16. Guided sport-hunting is an important weapon against poaching. The mere presence of hunters (all of whom are accompanied by rangers/scouts) is a deterrent. In addition, sport-hunter dollars go a long way in financing outfitters' anti-poaching efforts.

17. It is a very, very simple fact that the value placed on an elephant by visiting hunters will enhance the livelihood of the outfitters. In particular, U.S. hunters generate the most revenue

for outfitters and for the wildlife that the outfitters want to protect for their hunting clients. Without the income generated by U.S. hunters, outfitters will have less money to use for their anti-poaching efforts.

18. Even though outfitters can and will attempt to book elephant hunts with hunters from countries other than the U.S., the U.S. economy is such that U.S. hunters are often in a position to pay more for elephant hunts than European and other hunters. So with the U.S. importation ban in effect, the same number of elephants will be available for hunting in Zimbabwe and Tanzania, but the revenue generated that will go towards elephant protection will be less.

19. The importation ban imposed by the U.S. government has already hurt my business. I have lost several hunts that were booked in Zimbabwe and Tanzania for elephant over the next few years. This has greatly impacted my personal income, the income of our company, Safari Classics as a whole, and the income of the outfitters on the ground that we support.

20. Many of the areas in which I guide elephant hunts will suffer from this ban. Many areas were specifically "sold" with elephant as the target species. These areas will severely diminish in financial returns. This may make the areas non-viable for future hunts. A non-viable hunting area sees no financial return and that, in turn, means no anti-poaching efforts, no employment and an area devoid of "legal" presence and wide open to poachers.

21. The importation ban is likely to harm elephant conservation. Taking away the value of an animal takes away its future. This is no different than what we saw with the imposition of restrictions on the scimitar-horned oryx. Once restrictions were imposed, the value dropped and the numbers of these animals dropped as well. We saw reduced numbers because there was no incentive to maintain healthy populations. In Africa, and in many other parts of the world, cash is king and where a resource cannot or does not generate financial return, it has no future. Elephants are just such a resource. Without sport hunters, there are many, many millions of acres across Africa that will soon be devoid of elephant.

22. It is a proven fact that in many parts of Southern Africa, the elephant numbers are grossly above the viable carrying capacity of the environment they live in. In Zimbabwe particularly, many, many thousands of elephants live in conflict with people and indeed in conflict with their environment. Worthy naturalists have cited that several thousand elephants should actually be culled. Removing the ability to import a few hundred elephants will not have a positive impact on elephant conservation in Zimbabwe. Instead, all it will do is diminish the return that these animals can generate and diminish their value in the eyes of the people and the government.

23. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this _24_ day of April, 2014, at _6:15 pm_____.

_____
Ivan Murray Carter

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL )
)
     Plaintiff, )   Civ. No. 14-cv-00670(ABJ)
)
v. )
)
SALLY M. R. JEWELL, et al. )
)
     Defendants )
_____ )

## DECLARATION OF WALTER ALLEN TARPLEY

I, Walter Allen Tarpley, being first duly sworn on oath, depose and state as follows:

1. I am the owner of two construction business and live in Crown Point, Indiana.

2. I have been a life member of Safari Club International for about 8 years.

3. I have been hunting for about 30 years. I started hunting with my father.

4. I have hunted all over the United States, British Columbia and Alberta in Canada, New Zealand, and Africa (South Africa and Tanzania). Among the species I have hunted are deer, elk, moose, bear, wolf, red stag, tar, stone sheep, dall sheep, goat, lion, leopard, and buffalo.

5. About two years ago, I hunted elephant in Tanzania and was successful in harvesting an elephant. I was able to import my trophy into the United States.

6. I have an elephant hunt booked for July 2014 in Tanzania with a professional guide. My hunt is schedule to take place in the Rungwa area and include elephant, lion, buffalo, leopard, and plains game. I have paid over $100,000 for my hunt and $10,000 for my plane ticket. There will also be approximately $50,000 in trophy fees and $50,000-70,000 in taxidermy costs (depending on what I harvest).

7. The elephant trophy (when I am fortunate enough to harvest an elephant) is an important memento of my hunting adventure. If I am unable to import my elephant trophy, I will not participate in the elephant portion of the hunt. I will be out the part of the fees attributable to the elephant hunt. I could have booked a cheaper hunt for the other animals in South Africa.

1

8. When I hunted in Tanzania (twice in the last three years), I saw at least 50-75 elephants per day in the Tundura area of Tanzania. Tanzania is my prime choice for hunting in Africa because there is good hunting for a range of big game animals and the country is relatively safe.

9. Based on my hunting experiences in Africa, I know that hunting helps support anti-poaching and other conservation efforts. In addition, the dollars that U.S. hunters bring to the areas, including much that is funneled to the local communities and residents, helps build schools, dig wells and feed people (including through the meat of the animal). If the animal (whether an elephant or another species) is not valuable to the local community, then the local residents will not support conservation efforts.

10. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _24_ day of April, 2014, at_____.


                                        Walter Allen Tarpley

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| 501 2nd Street NE | ) | |
| Washington, DC 20002, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. 14-cv-00670(ABJ) |
| SALLY M. R. JEWELL, in her official | ) | DECLARATION OF |
| capacity as Secretary of the U.S. | ) | SCOTT PETTY JR. |
| Department of the Interior; | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| an agency of the United States; | ) | |
| DANIEL ASHE, in his official capacity as | ) | |
| Director of the U.S. Fish and Wildlife Service; and | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| an agency of the United States | ) | |
| 1849 C Street, NW | ) | |
| Washington, DC 20240, | ) | |
| | ) | |
| Defendants. | ) | |

I, Scott Petty, Jr., being first duly sworn on oath, depose and state as follows:

1. I a resident of San Antonio, Texas.

2. I am a rancher, investor and a retired executive.

3. I am a life member of Safari Club International and have been for many years. I also have family members who are members of SCI.

4. I participate in the Austin Safari Club Chapter and recently joined the Alamo SCI Chapter in San Antonio.

5. I am a member of many hunting and conservation organizations, including the Texas Wildlife Association (over 30 years); Exotic Wildlife Association (over 30 years); United States Animal Health Association (over 30 years); Texas and Southwestern Cattle Raisers Association (50 years); Rocky Mountain Elk Foundation (over 20 years); U.S. Sportsmen's Alliance Foundation; Ducks Unlimited; The Explorer's Club (over 35 years); Society for Range Management; National Rifle Association of America; Atlantic

1

Salmon Federation; National Cattlemen's Beef Association; Independent Cattlemen's Association of Texas, Inc.; Ranching Heritage Association; Coastal Conservation Association; Texas Forestry Association; Deer Associates Program; Texas State Rifle Association; Quality Deer Management Association; National Wild Turkey Federation; Sportsmen Conservationist of Texas; and Caesar Kleberg Wildlife Research.

6. I participate in many activities related to hunting as a tool for wildlife conservation, both personally and through my ranch. We work with the Texas Parks & Wildlife on all of our ranches and hold Managed Lands Deer Permits (MLDP). We also have scimitar-horned oryxs on the ranch and have worked with the United States Fish & Wildlife Services on permits and annual reports on the herd. We have also donated to the conservation efforts for the scimitar-horned oryxs through the Exotic Wildlife Association and Conservation Force.

7. We are strong advocates for the conservation of animals as well as the land. I have served on the Texas and Southwestern Cattle Raisers Association's Animal Health Committee and Natural Resources and Environmental Committee for a number of years. We have held many studies with Texas A & M and Caesar Kleberg on the decrease in population of the white-tailed deer and axis deer in the Hill Country of Texas.

8. I am 77 years old and have been hunting for 71 of those years. I started hunting with my father.

9. I have hunted in North America for white-tailed deer, turkeys, mule deer, elk, and birds.

10. I have hunted in Africa since 1953 and have successfully taken many animals during those hunts.

11. I first hunted in Tanzania in 1953 and returned during the summer of 2013 to hunt elephant, but did not succeed in taking an elephant.

12. I have another elephant hunt booked for Tanzania to begin in September 2014.

13. During my 2013 hunt in Tanzania, I saw many elephants. While there, I watched numerous anti-poaching details that were supported by our Professional Hunter. Much of the money which we paid for our hunt went into anti-poaching efforts in all the areas where our Professional Hunter was operating. Everyone involved in the hunting of elephants was very involved in anti-poaching patrols and all efforts at preventing poaching of elephants.

14. I have been desirous of successfully hunting an elephant since my first time in Tanzania in 1953 and have only lately been able to go back to Tanzania and try for an elephant before I am too old to go on the hunt. The hunt I have planned for 2014 may be the last time that I can make such a trip while still in good health and condition to do so. For this reason, the harm from the trophy importation ban to me is much worse than monetary. For me, it is a lifelong dream that has been shattered.

2

15. I have booked an elephant hunt with Tanzania Big Game Safaris, Raoul Ramoni owner, for September 8 through October 1 for a 21 day Safari.  I have made financial commitments to our professional hunter for that trip and in addition have already purchased first class airline tickets for my wife and for me to travel to and from Tanzania for that particular time.

16. The inability to import the trophy from my successful hunt significantly diminishes the value of the hunt for me.  If I decide to cancel the hunt for that reason, I do not yet know whether I will be able to obtain refunds for the money I have already invested.

17. Although I do not know what financial harm I will sustain if I cancel my hunt, I do know the financial harm that will be sustained by the elephant anti-poaching patrols if hunters are discouraged from elephant hunting in Tanzania.  Without the revenue brought in by U.S. hunters, the anti-poaching patrols will not be able to do their jobs because of the absence of funding.

18. Poaching poses a risk to elephants.  Hunting does not.  It is through hunting that Tanzania can combat poaching.  The money received within Tanzania by the government and by the Professional Hunting Association as a result of the taking of elephants by legal *means* is being now used and will continued to be used wisely to deter poaching. Actually the numbers of elephants will increase through hunting of elephants.

19. I believe that elephant conservation has been devastated by the U.S. Fish and Wildlife Service.  The government's erroneous decision to ban the importation of legally hunted elephants will reduce the amount of funds available to combat elephant poaching which in turn will result in more poaching and fewer elephants.

20. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _23_ day of April, 2014, at ___San Antonio, Texas___.


___Scott Petty Jr___

Scott Petty Jr.

3

**242**                                                    **DA 183**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL ) | |
| ) | |
| Plaintiff, ) | Civ. No. 14-cv-00670(ABJ) |
| ) | |
| v. ) | |
| ) | |
| SALLY M. R. JEWELL, et al. ) | |
| ) | |
| Defendants ) | |
| _____ ) | |

### DECLARATION OF ROBERT JOSPEH JOHNSON

I, Robert Joseph Johnson, being first duly sworn on oath, depose and state as follows:

1. I am a car dealer in Austin, Texas.

2. I have been a life member of Safari Club International for 16 years. I have been a member of the Austin SCI Chapter since the mid-1980s.

3. I am also a life member of the Foundation of North American Wild Sheep, Texas Bighorn Society, Grand Slam Club/Ovis, and the Coastal Conservation Association.

4. I have been involved in the reintroduction of desert bighorn sheep in Texas at Beach Mountain Ranch from 1990 to the present.

5. I have been hunting for more than 50 years. I started hunting white-tailed deer and bird hunting in central Texas while in high school.

6. I have hunted numerous species in the United States, Mexico, Canada, Argentina, Tajikistan, China, Mongolia, South Africa, Mozambique, Botswana, Zambia, Zimbabwe, Tanzania, Central Africa and Ethiopia.

7. I hunted elephant in Ethiopia in 1986, Zimbabwe in 1995, Botswana in 2012 and Tanzania in 2008 and 2013. I was successful only in Ethiopia.

8. I saw many elephants in Zimbabwe. Most were not big enough or old enough to harvest. I was close to taking one, but did not have a good opportunity, so I did not take the shot. In Tanzania, I saw many elephants in 2008, but none big enough to hunt. In 2013, there were drought conditions where I was hunting in Tanzania. I did not see any elephants or signs of poaching.

1

9.  Hunting acts as a deterrent to poaching in several ways. First, if hunters find poaching camps, the camps are destroyed. Second, professional hunters and trackers employed by the hunters always talk to the local communities about poaching and where it might be happening. Third, everyone in hunting groups look out for non-hunting activities in the areas in which they hunt. Fourth, government game scouts, paid for by the hunter, accompany all hunts.

10. Trophy hunting provides a real economic value that cannot be dismissed. Without the value that trophy hunting places on the elephants, anti-poaching efforts will be minimized. Hunting also provides a profitable means to population control.

11. I purchased an elephant hunt in Tanzania at Safari Club's Convention in February 2014. I am scheduled to go hunting in October 2014. I have already spent about $12,000.00 in airfare and committed $42,000.00 for the hunt and $31,000.00 for a trophy fee if successful.

12. The ability to import the elephant that I successfully hunted is of great importance to me. It is a part and a symbol of the entire hunting experience. Without that ability, the hunt loses value to me, and for that reason, I am considering cancelling my hunt.

13. I have not discussed the trophy importation ban with my outfitter yet. Some of the money spent on airfare is non-refundable. My nephew and his mother had also planned to hunt at the same camp. My wife was also going to join me to hunt plains game. All of these hunts are now in limbo and may be cancelled due to the trophy importation ban imposed by the U.S. Fish and Wildlife Service.

14. More important than me losing money is the fact that I will lose the opportunity to hunt an elephant and Tanzania will lose a considerable sum of money for elephant conservation and anti-poaching efforts.

15. The importation ban will decrease the economic value of elephants and reduce the amount of money going toward conservation efforts. I believe that all game populations can be enhanced by hunting and sound management practices. The importation ban is not a sound management practice.

16. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 25 day of April, 2014, at _____ AUSTIN TEXAS _____.

_____
Robert Joseph Johnson

DA 186

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

### DECLARATION OF ROBERT ALLEN SAKUTA

I, Robert Allen Sakuta, being first duly sworn on oath, depose and state as follows:

1. I am a business owner and live in Plymouth, Michigan.

2. I have been a member of Safari Club International for about two years and have been a life member for about one year.

3. I have been bird hunting for 30 years and hunting game animals for three years. I was introduced to the hunting of game animals by a friend who has hunted for many years. He educated me on the value of managed hunting as a benefit to conserve and manage the populations of the animals. This enlightenment changed me from a person who was not a game animal hunter to someone who now spends any free time toward ethical, lawful hunting.

4. In North America, I have hunted in Texas for the last three years for Aoudad, Fallow, Axis, Blackbuck, sheep, wild pigs, and Markhor. I have hunted in Pennsylvania and Michigan for Whitetail deer; in South Dakota for Prairie Dog; and in Florida for Red Stag, Alligator, and wild pigs.

5. Although I have not yet hunted in Africa, I know that the taking of a trophy elephant will benefit the elephant population by giving the elephants a high value. Without the trophy fees the elephants are of little value to the locals who consider them a nuisance to crops and the area they share. The trophy fees are an important source of funds used to hire wildlife officers to prevent poaching. In addition, the meat is given to the locals for food. The locals are also employed during the hunt. All this creates local support and incentives for proper and sustainable management of elephants.

6. I signed a contract in November of 2013 for a 21-day elephant hunt in Tanzania for November 15 thru Dec 10, 2014 with Stone Safaris. I have to date given them $65,000 toward the $125,000 cost for the hunt, not including trophy or other fees. The trophy fee for the elephant should be approximately $50,000 depending on the size of the ivory. Other costs are air fare for myself and companion ($25,000); cost for the companion in camp ($11,500); and other permits, fees and costs (approximately $50,000). This brings the total cost to about $261,500.

7. Based on my financial situation, this is definitely the trip of a lifetime. Now that our government has taken away my ability to import any elephant trophy, I will be deprived of a very important symbol of this once-in-a-lifetime adventure.

8. I was in contact with the outfitter for the hunt. He told me there is no refund for the elephant hunt as the problem is not in Tanzania but with the U.S. government. He also told me the people in Tanzania are greatly disappointed by the actions of the U.S. Fish and Wildlife Service as it will undermine elephant conservation and harm the businesses and local residents who support that conservation.

9. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 25 day of April, 2014, at *PLYMOUTH   MI* .

Robert Allen Sakuta

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

**DECLARATION OF DEREK ANTHONY HURT**

I, Derek Anthony Hurt, being first duly sworn on oath, depose and state as follows:

1. I am a resident of Arusha, Tanzania.

2. I am a professional hunter and a director of Robin Hurt Limited.

3. Our company is a member of Safari Club International.

4. I am also a member of the African Professional Hunters Association (APHA), the Tanzania Professional Hunters Association (TPHA), and our company is a member of Tanzania Hunting Operators Association (TAHOA) and Tanzania Association of Tour Operators (TATO).

5. Our company, through the Robin Hurt Wildlife Foundation, has a very active community relationship and trophy related benefit scheme. We are engaged in anti-poaching efforts in conjunction with and with giving support to the Tanzanian government anti-poaching units.

6. I am 47 years old and have been a licensed professional hunter for 25 years.

7. I guide 4-5 hunts each year in which the clients may be entitled to hunt for elephant (if they chose to take this option).
   We have not actively sold elephant hunts in recent times, as a management decision, in order to try to encourage the stewardship of older bull for the future.

1

Unfortunately our efforts were undone by recent poaching, and in most of our areas, the very bulls we were looking after were poached in the wet off-seasons of November to April, when access into the remote areas is difficult.

8. Our business gives us the opportunity to view and assess several of the elephant populations of Tanzania.  In Masailand, elephants are few and seasonal.  In Luganzo and Mlele, elephants are few – there have never been more than 100-200 animals in each area.  In Rungwa South, there are healthy elephant populations of 200-300 animals.

9. The local communities near our areas generally tolerate the elephant populations, due greatly to our community benefits scheme (described above).  Because these communities are beneficiaries of revenue generated by hunted animals, they have a vested interest in those animals, and are pro-wildlife conservation for all species in respective areas.  Without benefit schemes such as ours, communities are not usually tolerant of direct wildlife clashes that cause crop and livestock damage.  Hunting and the revenue hunting brings contribute to help pacify these feelings.

10. We have witnessed elephant poaching in our areas.  Particularly in February 2011, one Professional Hunter with our company, Andre De Kock, was killed by elephant poachers in Maswa.  In 2012, we saw many freshly poached elephants.  I estimate the numbers were around 30 collectively in all of our blocks.  We (us hunters and our own village anti poaching patrols) avoided encounters with armed poaching gangs and called in government Zonal Anti-Poaching to take over.

11. Elephant hunting in Tanzania certainly enhances the survival of the species.  Hunters are the only ones in the remote wilderness areas who can deter poachers.  The hunting business is a huge employer and provider to the local economies.  For this reason, Tanzania can justify keeping wilderness as wilderness and therefore a home for all wildlife.  By depriving U.S. hunters of an important element of the elephant's value, the U.S. government has all but taken the hunter out of the field.  By removing the hunter and the money he brings into Tanzania, the U.S. government respectively reduces our financial ability to patrol and manage these areas.

    The hunting off-season has recently been shorted by three months, by the Tanzania Government, now allowing hunting companies to remain in their blocks for 9 months of the year being from July through to March inclusive. This should help with reducing poaching pressure as it is allowing more time for hunters in the field.

12. The U.S. elephant importation ban does not merely affect elephants.  A reduction of potential client (foreign tourist hunters) numbers in the field will have a negative impact on all wildlife.  Fewer clients means less revenue to be used to

2

help curtail poaching, community tolerance and overall area management for all species.

13. Unless it is reversed, I would consider the rash and poorly investigated importation suspension decision by the U.S. Fish and Wildlife Service to be a signature on the death warrant for tens of thousands of elephants. This decision could lead to and contribute to the loss of all wildlife in Tanzania, save for a few animals in safe sections within National Parks and private land. We could lose our wildlife in a short period of five years. If this importation suspension is not overturned, we could see a repeat of what has happened in Kenya with 70% of their wildlife lost since the hunting ban was instituted in 1977.

14. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 24 day of April, 2014, at _Arusha, Tanzania_ .

_D.A.H._

Derek Anthony Hurt

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**DECLARATION OF MICHAEL ANDREW ANGELIDES**

I, Michael Andrew Angelides, being first duly sworn on oath, depose and state as follows:

1. I am a professional hunter and General Manager of Danny McCallum Safaris Ltd/Old Nyika Safaris Ltd/Safari Royal Holdings in Arusha, Tanzania.

2. I have been a member of Safari Club International for 15 years.

3. I have been a member of the International Professional Hunters Association for 17 years, the African Professional Hunters Association for 17 years, and the Tanzania Professional Hunters Association for 18 years.

4. I am currently the Secretary General for the Tanzania Professional Hunters Association and the Executive Officer for the African Professional Hunters Association.

5. I have been an outfitter for 23 years. I provide hunts in several areas of Tanzania: Ikhuishibor Wildlife Management Area, Chunya Lukwatti, Pitti West, Lukwatti Game Reserve, Chunya Msami, and Burko Open Area. I have provided hunts in these areas for 15 years.

6. I usually provide one elephant hunt per year.

7. I recently gained the opportunity to hunt in a Wildlife Management Area with great potential for elephant hunting. The majority of the area would be

specifically used for elephant hunting because the vegetation is too thick to sustain most other species. If the U.S. Fish and Wildlife Service continues to impose a trophy importation ban, I may not take advantage of this opportunity. The area will be left without hunters and outfitters, available for poachers, charcoal burners and farmers to move in. If that happens, the area will likely not be able to sustain wildlife for more than 5 years.

8. The local villagers in the areas where I hunt and other areas have realized that having elephants in the area will benefit them because of the hunting. The terrain in many areas provides no other value aside from hunting.

9. The people in my areas are pastoralists, but their livestock cannot feed on the thick bush the elephant feed on so there is usually no conflict. However, with the increase in human population, the locals will start clearing land and other tribes will move in, and before long the bush will be cleared for farming. The wildlife, including elephants, will have nowhere to go and will come to the farms. This will result in an increase in conflicts and an increase in poaching of elephants and other wildlife species.

10. Poaching in my areas has escalated dramatically over the last four or five years. I discover new elephant carcasses each year, although very few, if any, during the hunting season. Poaching escalates when there is no professional hunting activity in the area – usually during the rainy season from December to July. This is also when the anti-poaching units have limited mobility.

11. When sport hunting is occurring in the area, vehicles patrol the area daily. This movement and the presence of others present a huge deterrent to poachers. Sport hunters are not restricted to roads or the inside of vehicles. Hunters and hunting groups are able to prevent poachers from hiding in the bush where patrols in vehicles cannot see.

12. Trophies from hunts are a valuable part of the experience for many hunters. For many, if they cannot obtain a trophy, they will not hunt the animal. This will have huge negative effects on the businesses and locals that depend on elephant hunting, not to mention the species itself.

13. I am not a big elephant outfitter, so the harm to my personal business will be minimal. However, I am likely not going to pursue obtaining the rights to hunt in a new area for elephants, and my business will not grow.

14. Elephant hunts are often booked years in advance. For many professional hunters, finding a hunter from somewhere other than the United States to fill the spaces left by U.S. hunters that cancelled their hunts will not be possible.

15. Many areas will no longer be hunted if elephant hunting is no longer economically viable. If an area does not bring in income, the outfitters will not stick around to protect it. There will be no one responsible for elephant conservation and anti-poaching efforts in those areas. Without the benefit of hunting in the area for the locals, they will not see the elephant as valuable. The locals will then poach the elephants for meat, ivory and to prevent damage to their farms.

16. When elephants are poached for ivory, the meat is left to rot. Villagers poach elephants because of the money they can receive for the ivory. Businessmen who pay for the ivory are not hunters. They need the villagers to do their dirty work. When a professional hunter leaves an area because he can no longer provide sustainable hunting in the area, the villagers that used to benefit from the hunts will then welcome the corrupt businessmen and poach in order to make a living. The ban on the importation of elephant trophies into the United States will stop the legal and controlled hunting of elephants and allow illegal, uncontrolled elephant killing to take over.

17. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 24 day of April, 2014, at ___Arusha, Tanzania___.

Michael Andrew Angelides

**DA 194**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **Safari Club International,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 14-cv-00670-ABJ |
| | ) |
| **S.M.R. Jewell,** in her official capacity as | ) |
| Secretary of the United States Department of | ) |
| Interior, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

## DECLARATION OF TIMOTHY J. VAN NORMAN

I, Timothy J. Van Norman, hereby declare as follows:

1.      I am the Chief, Branch of Permits, the Division of Management Authority

(DMA), of the United States Fish and Wildlife Service (FWS).  As Chief, Branch of

Permits, I am responsible to the FWS Director for the issuance of permits and certificates

to import, export, and re-export species that are protected by the Convention on

International Trade in Endangered Species of Wild Fauna and Flora (CITES) and by

various other wildlife conservation laws, including the Endangered Species Act (ESA).

2.      The African elephant *(Loxodonta africana)* is listed under the ESA as a threatened

species (50 CFR § 17.11(h)) with a special rule (50 CFR § 17.40(e)) issued under the

authority of ESA Section 4(d), 16 U.S.C. § 1533(d).  As relevant here, the special rule

1

DA 195

contains four conditions that must be met before the import of sport-hunted trophies is allowed in the United States. One of the four conditions is that FWS must make a finding that the killing of the animal whose trophy is intended for import would enhance the survival of the species (Enhancement Finding); 50 CFR § 17.40(e)(3)(iii)(C). The Branch of Permits is responsible under the ESA special rule for African elephants, for authorizing the import of sport-hunted elephant trophies by making the Enhancement Findings.

3.      In evaluating whether sport hunting of an elephant from a particular country contributes to the enhancement of African elephants, my office looks at a number of factors. We evaluate whether the country has a current national or regional management plan and if the country has the resources and political will to enact the plan. We review the plans to determine if they have clear, achievable objectives. We look at which government entities implement the plan and how often is it reviewed and updated. We also look at whether the plan incorporates an adaptive management approach so that enacting agencies can quickly respond to changing environmental or social issues.

4.      We also evaluate the status of the elephant population in that country and trends over time. In particular, we are interested in population numbers, sex and age-class distribution, and mortality rates (both natural and human-induced). We look to determine if there are standardized surveys being conducted and, if so, the timing, census methodology, and coverage of those surveys. Since elephant populations can move across international borders, we look to see what level of cooperation there is between neighboring countries in management and surveying efforts for shared populations. We also evaluate how poaching is accounted for within survey efforts.

5.      As with any wildlife species, the policies on how a country's central and regional governments address management efforts, human-elephant conflicts, poaching, and sport hunting greatly affect the long-term survival of elephant populations.  While recognizing that there may be limited resources available for elephant management, we consider what national policies are in place to address human-elephant conflicts and problem elephant control.  We are interested in policies on culling surplus animals and removal of nuisance animals.  We look at what other offtakes may be occurring, such as domestic harvesting of elephants for local consumption or use.  We also look at the amount of protected area that is either set aside for elephants or managed for elephant populations and the level of protection provided.  All of these are relevant to being able to assess whether the additional removal of elephants for sport hunting and associated import of trophies will enhance the survival of the species.

6.      Finally, we consider how sport hunting has been incorporated into the country's national/regional management strategies and the effectiveness of implementing hunting programs.  We look at whether the hunting program generates revenue for use in elephant management efforts or if it goes to a general treasury fund.  We evaluate if sport hunting provides a benefit to local communities through employment, community development projects, or other avenues.  We assess how hunting quotas are established and distributed. We also look to land tenure issues to determine if concession areas, areas managed by regional or national government, are tendered in a manner that would foster long-term sustainability of elephant populations.

7.      African elephants in Tanzania are listed in Appendix I of CITES.  In accordance with Article III of the CITES Treaty, a CITES export permit must be issued by the

CITES Management Authority of the exporting country and a CITES import permit must be issued by the CITES Management Authority of the importing country.  In order to issue a CITES export permit for a sport-hunted trophy, the Tanzanian CITES Authorities would need to make two findings, in addition to any stricter domestic legislation that might apply to exports: 1) the CITES Scientific Authority must find that the export would not be detrimental to the survival of the species; and 2) the CITES Management Authority must find that the specimen was not obtained in contravention of the laws of the exporting country (i.e., was legally acquired).  To issue the corresponding CITES import permit for a trophy to be imported into the United States, the U.S. CITES Scientific Authority, FWS's Division of Scientific Authority (DSA), would need to make a finding that the import was for purposes that are not detrimental to the species.  The U.S. CITES Management Authority, my office, would have to make a finding that the import was not for primarily commercial purposes.

8.      In addition, to authorize the import from Tanzania under the ESA, my office would have to make the required Enhancement Finding.

9.      In the case of imports of sport-hunted elephant trophies taken in Tanzania during the 2014 hunting season, DSA advised my office that it was not able to make the required non-detriment finding under CITES (please see the declaration submitted by Dr. Rosemarie Gnam on May 13, 2014, for additional information).

10.      While my office was able to make a finding under CITES that the import of a personally hunted elephant trophy from Tanzania by a U.S. citizen or resident would not be for primarily commercial purposes, I was not able to make a positive Enhancement

Finding under the ESA.  Please refer to the March 27, 2014, Enhancement Finding for the agency's specific rationale.

11.     The March 27, 2014, Enhancement Finding is valid only for elephants taken in the 2014 Tanzania hunting season, which begins in July.  It does not replace the previous positive enhancement finding, made on May 6, 1997, which is still applicable to any elephant taken in Tanzania before the 2014 hunting season.  While I believe we have made an effort to obtain all relevant information and data before making this finding, it is possible that additional information that was not available to us at the time the finding was made will become available.  If such information does become available, my office would evaluate the data to determine if the March 27, 2014, finding should be amended or replaced.

12.     Regardless of whether the March 27, 2014, finding is amended or replaced based on new information, my office will make a new enhancement finding that would cover the 2015 Tanzania elephant hunting season.

13.     Since Tanzanian elephants are listed as Appendix-I specimens under CITES and therefore require a U.S. import permit to be legally imported into the United States, the FWS has established a permit application process whereby individuals wishing to import a sport-hunted trophy are required to submit an "Import of Sport-hunted Trophies of Southern African Leopard, African Elephant, and Namibian Southern White Rhinceros" application, form 3-200-19, to my office for consideration.  Once received, information about the applicant, the activity that they are requesting to carry out (in this case, import of a trophy), and the species of trophy would be entered into the FWS's Servicewide Permit Information and Tracking System (SPITS), the computer system used by my

office to track and finalize all applications submitted to DMA.  The application would be assigned to one of my staff for processing, which consists of reviewing the submitted information and other available information to determine whether the applicant has met all of the issuance criteria under CITES, that are the responsibility of the U.S. Management Authority, and the conditions of the special rule under the ESA.

14.     For several species listed under CITES and the ESA, DSA and my office each may make a single finding that would apply to all applications received within a given time period for given activities that are otherwise prohibited under the ESA or CITES. These findings, called either general advices or findings, would be used for any applications that are received requesting to engage in the given activity.  This is the case with elephant trophy imports from Tanzania.  These findings would apply to any application that is received by FWS in which authorization is requested to import a sport-hunted elephant trophy taken in Tanzania during the 2014 hunting season.  At the time the March 27, 2014, Enhancement Finding was made for Tanzania, my office had received three applications from U.S. hunters requesting authorization to import a sport-hunted elephant trophy from Tanzania that was planned to be hunted in 2014.  On April 21, 2014, a fourth application to import an elephant trophy from Tanzania that was planned to be hunted in 2014 was received by my office.  It is not unusual for U.S. hunters to apply well before they travel to Africa to hunt to request the required import permit from my office.  By applying before traveling, the hunter can, in many cases, make adjustments to their hunting trip, if desired, based on the FWS determination on whether a permit can be issued.

15.     None of these applicants provided any additional information or any information that my office or DSA had not already considered.  Therefore, based on the finding produced by DSA and the Enhancement Finding made by my office, we denied two of the applications on April 4, 2014, and one on May 7, 2014.  The fourth application was denied on May 12, 2014.

16.     CITES import permits are valid for one year.  An import must be completed (i.e., cleared by FWS wildlife inspectors at the port of import) before the permit expires.  If a permit expires before it can be used, the permittee could request that the permit be reissued for an additional one year.  Reissuance of a permit, however, can only be authorized if the activity remains the same and the import has not already occurred. Therefore, a U.S. hunter that successfully hunted an elephant in 2012, but was unable to import the trophy within a year of receiving the import permit, could request that the permit be reissued.  However, a U.S. hunter who applied for an import permit in 2012, but was not successful in hunting an elephant in that year, could not have the 2012 permit reissued.

17.     Approximately 25% of all trophy import permits issued by my office in the last 4 years were renewed after the permit expired.  Since import permits are valid for one year, it is clear that at least 25% of U.S. hunters that had received an import permit were unable to import the trophy within one year of obtaining the import permit.

18.     As identified in the FWS regulations on permitting (50 CFR part 13), when an application is denied, the applicant is sent a letter identifying why the application was denied and  notifying the applicant that they have the option to have the decision reconsidered by the Chief, Division of Management Authority.  The applicant is informed

that the request for reconsideration must be submitted within 45 days of the date of the
FWS's denial letter.  Further, the applicant is instructed that if my office misunderstood
or misinterpreted the information that was provided with the application, the applicant
could clarify the information.

19.      Once the Service receives a request for reconsideration, my office would review
any additional or clarifying information.  If the original denial involved a negative
finding from DSA, the request for reconsideration would be provided to DSA as well.
Once my office, and DSA if appropriate, has reviewed the request, we would formulate a
recommendation on whether the original denial should be overturned or upheld.  This
recommendation, along with all application material, is provided to the Chief of the
Division of Management Authority for consideration.  If our recommendation is to
overturn the original denial and/or the Division Chief believes that the original denial
should be overturned, my office would issue the required import permit.  If the Division
Chief supports the original denial, a second letter is sent to the applicant informing them
that their request for reconsideration has been denied.  The applicant is again given 45
days to appeal the decision to the FWS Director.

20.      Once FWS receives an appeal request for an application that was denied at
reconsideration, my office, along with DSA if appropriate, would formulate a
recommendation that would be provided to the Director for consideration.  If the Director
decides to overturn the previous denial decisions, my office would issue the required
permit.  If the Director upholds the previous denials, a letter would be sent to the
applicant informing them of the final Agency decision to deny their appeal.

21.     Despite the suspension and permit denials, individual permit applications under

both CITES and the ESA to import sport-hunted elephant trophies from Tanzania will be

considered on a case by case basis for 2014 and permits will be granted if the applicants

can provide evidence that the findings under both laws can be made.

22.     Typically, FWS does not make public announcements on the findings made by

the DSA or my office. Applications are  processed by DMA on a case-by-case basis as

they are received. However, in the case of Tanzania elephant trophies, we decided to

make a public announcement of our findings so that U.S. hunters would have the most

current information, which could be useful when arranging to travel to Tanzania to

hunt. The April 4, 2014, announcement informed hunters that while they could still hunt

elephants in Tanzania in 2014, FWS was currently unable to making the findings that

would allow it to issue permits to import their trophies. FWS also stated that it would

make new findings for 2015 or upon receipt of new information that demonstrates an

improved situation for elephants in Tanzania. While it is possible that FWS could revise

its 2014 findings, such revision would only occur if an applicant, the Government of

Tanzania, a non-government organization, or some other person or entity was able to

provide additional information that would demonstrate that the import of an elephant

trophy taken in Tanzania in 2014 would meet the issuance criteria under the ESA and

CITES.

23.     African elephant in Zimbabwe are listed in Appendix II of CITES.  In accordance

with Article IV of the CITES Treaty, a CITES export permit must be issued by the

CITES Management Authority of the exporting country, but no CITES import permit is

required to be issued by the importing country.  In order to issue a CITES export permit

for a sport-hunted trophy, the Zimbabwe CITES Authorities would need to make two findings, in addition to any stricter domestic legislation that might apply to exports: 1) the Scientific Authority must find that the export would not be detrimental to the survival of the species; and 2) the Management Authority must find that the specimen was not obtained in contravention of the laws to the exporting country (i.e., was legally acquired).

24.      While no import permit, either under CITES or the ESA, is required, my office must make a finding under the ESA that the killing of the animal whose trophy is intended for import would enhance the survival of the species consistent with the requirements of the special rule.  If my office determines that imports of sport-hunted elephant trophies from Zimbabwe do not meet this criterion, imports cannot occur.

25.      On April 4, 2014, I signed a finding that stated that, at that time, we could not make the required Enhancement Finding under the ESA and that, until additional information was obtained, no elephant trophies taken during the 2014 season could be imported.  On April 17, 2014, the finding was revised to clarify that the finding only applied to elephants taken on or after April 4, 2014.  Any elephant taken before April 4, 2014, could be imported under the previous enhancement finding dated July 2, 1997. The April 17, 2014, finding is an interim finding that will be valid until a final finding is made by my office.

26.      Under section 9(c)(2) of the ESA, individuals that are importing a threatened species that are also listed in Appendix II of CITES for personal use, and that meet all provisions of CITES, do not need to obtain an ESA import permit.  This provision, however, can be overridden by a special rule established under section 4(d) of the ESA.

27.     While the special rule for African elephant does not require the issuance of a permit for the import of an elephant trophy from Zimbabwe, it does state that the FWS must make a finding that the killing of the animal whose trophy is intended for import would enhance the survival of the species.

28.     Therefore, while the FWS does not issue an ESA import permit for Zimbabwe elephant trophy imports, we are required to make a positive enhancement finding.  Since there is no permit application process, as there is with Tanzania elephants, we are unable to communicate directly with individual hunters to inform them that, while they could legally hunt a Zimbabwe elephant during the 2014 hunting season, they would be unable to import the trophy if taken after April 4.  The most appropriate venue to communicate this information, therefore, would be through a press release and posting on the Service's web page, and direct notice to organizations representing hunters.

29.     On April 4, 2014, the FWS issued a press release and posted a notice on its web page announcing the decision of the interim suspension on imports of sport-hunted elephant trophies from Zimbabwe (the posting was updated after the enhancement finding was revised on April 17).  The press release and web posting stated that the suspension would stay in place until the FWS received information that would allow it to make a final determination.

30.     On April 4, 2014, I sent a letter to the Director General of the Zimbabwe Parks and Wildlife Management Authority with a number of questions that would assist DMA to make a final determination on trophy imports.  The letter was e-mailed to the Director General and a copy was provided to the U.S. State Department for transmission through the U.S. Embassy in Harare.  While I did not receive a confirmation that the Director

General received the letter, I did receive communication from the U.S. Embassy in Harare on April 11, 2014, that indicates that the Zimbabwe Parks and Wildlife Management Authority was aware of the interim suspension and was working on a response.

31.     On April 14, via an e-mail from the U.S. Embassy in Harare, I received a letter from the Director General acknowledging the receipt of my letter and stating that his agency was working on a response.  On April 17, 2014, again through the U.S. Embassy in Harare, I received several documents from the Director General, including a 32-page response to my April 4 questions.  I also received a box of reports and other supporting documentation via the Embassy on May 8, 2014.  On May 8, 2014, Matt Eckert, a senior staff member of Safari Club International Foundation, delivered a second box of the same supporting material to my office.  The Director General accompanied Mr. Eckert.  Mr. Eckert asked if we could meet to discuss the suspension and the responses that the Zimbabwe Parks and Wildlife Management Authority had provided me.  Although I had not reviewed the supporting documentation sent through the U.S. Embassy at that time, I agreed to meet with the Director General to discuss the April 17 response from Zimbabwe.

32.     This discussion, lasting approximately 1 ½ hours, consisted primarily of the Director General providing a clarification of statements made in the 32-page response, as well as responding to some questions posed by the Director General to me.  The Director General appeared particularly interested in discussing more recent survey data on elephant populations, distribution of elephants within Zimbabwe, and the economic impact the interim suspension would have on the public and private sector within

Zimbabwe. The Director General expressed particular concern over the impact the interim suspension would have on local communities that rely on hunting, particularly elephant hunting, for their livelihoods.

33.    I am now reviewing the 32-page response to my April 4 questions, as well as the supporting documentation provided by the Zimbabwe Parks and Wildlife Management Authority. In addition, since the April 4 announcement, I have received a large number of letters and comments, primarily via e-mail, from professional hunter associations in Zimbabwe, individual safari outfitters, and non-government organizations with additional supporting information. It is my intent to review all of this material within the next two weeks in order to make a final determination on whether the April 4 interim suspension should be lifted. There is a possibility that, after reviewing the provided material, I will need to have additional communication with the Director General or his staff to clarify certain information.

34.    On May 12, 2014, a notice was published in the **Federal Register** also announcing the interim suspension (79 FR 26987, May 12, 2014).

35.    Assuming that subsequent communication with the Zimbabwe Parks and Wildlife Management Authority can be conducted in an expedited manner, I intend to complete a final determination by mid-July at the latest. At that time, another announcement will be made, through both public media and the **Federal Register**, announcing the decision.

36.    As stated in the May 12, 2014, **Federal Register** notice, if my office is able to make a positive Enhancement Finding for Zimbabwe for 2014, hunters will be able to import their sport-hunted elephant trophies taken from Zimbabwe after April 4, 2014 at that time.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Arlington, Virginia, on this ___13___ day of May, 2014.

Timothy J. Van Norman
Chief, Branch of Permits
Division of Management Authority
U.S. Fish and Wildlife Service
Department of the Interior



# United States Department of the Interior

### FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

FEB 2 6 2013

**MEMORANDUM**

To:        Chief, Division of Management Authority

From:      Chief, Division of Scientific Authority   *Rosemarie Gnam*

Subject:   General Advice on Importation of Sport-hunted Trophies and Articles for
           Personal Use or Display that Were Made from Sport-hunted Trophies of African
           Elephants from Tanzania, for the Calendar Year 2013

---

This General Advice responds to your request for a finding as required under the Convention on
International Trade in Endangered Species of Wild Fauna and Flora (CITES) on various
applications for the importation of sport-hunted trophies of African elephants (*Loxodonta
africana*) from the United Republic of Tanzania (Tanzania) for calendar year 2013. This
General Advice also includes our finding on applications for the import of articles for personal
use or display that were made from sport-hunted trophies of African elephants (*Loxodonta
africana*) taken in Tanzania during calendar year 2013.

**Please be advised that, with the information currently available, we are able to find that the
importation of sport-hunted trophies of African elephants from Tanzania will be for
purposes that are not detrimental to the survival of the species. This General Advice
applies only to sport-hunted trophies of African elephants that were lawfully taken in the
Tanzania during calendar year 2013 (i.e., January 1, 2013, through December 31, 2013),
provided that they are to be imported by the persons who hunted them for personal use or
personal display.**

**Also, please be advised that the importation of articles made from sport-hunted trophies of
African elephants from Tanzania, for personal use or display, will not be detrimental to the
survival of the species provided the following conditions are met:**

1. The article(s) being imported must be from a sport-hunted trophy that the applicant hunted
   him/herself during calendar year 2013 (i.e., January 1, 2013, through December 31, 2013).

2. Import is for personal use or display (not for commercial purposes).

3. An appropriate amount of time has elapsed since the hunting of the trophy to allow for
   drying, curing, processing, and/or working/manufacturing of the article(s).

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2013*

If the application **does not** meet the above criteria, it should then be referred to the Division of Scientific Authority for further review and a determination on whether this General Advice may be used or a specific advice is required.

If new information becomes available during 2013 that suggests that this General Advice is no longer valid, it will be suspended and reconsidered by the Division of Scientific Authority. If, after reconsideration, the Division of Scientific Authority believes that the General Advice is no longer valid, we will issue a new General Advice or require that subsequent permit applications be considered on a case-by-case basis.

BASIS FOR ADVICE:

A significant amount of updated information relevant to this General Advice was made available by Tanzania's proposal to transfer its population of African elephants from Appendix I to Appendix II (CoP16 Prop. 11), which was submitted to the Sixteenth Meeting of the Conference of the Parties to CITES (CoP16). Although Tanzania withdrew its proposal prior to CoP16 (http://www.cites.org/eng/news/sundry/2012/20121226_TZ_withdrawal.php), we used information from this proposal for the current finding, as noted below, because it represents the best available information. Since Tanzania withdrew its proposal prior to CoP16, a Panel of Experts was not convened. Therefore, as in our previous findings on this issue and as noted below, we have used relevant information from the Report on the Panel of Experts (CoP15 Doc. 68, Annex 6a) on Tanzania's proposal (CoP15 Prop. 4 (Rev.1)) that was submitted at the Fifteenth Meeting of the Conference of the Parties to CITES (CoP15).

In addition, since CoP15, a significant amount of new information relevant to this issue has become available, including:

- Documents from the 62nd Meeting of the CITES Standing Committee (Geneva 2012);
- Tanzania National Elephant Management Plan 2010-2015 (TAWIRI 2012);
- The Wildlife Conservation Act, 2009 (Government of the United Republic of Tanzania 2009a);
- The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009; Government of the United Republic of Tanzania 2009b);
- The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010; Government of the United Republic of Tanzania 2010); and
- Third African Elephant Meeting (1-3 November 2010; Gigiri, Kenya; various documents).

Much of the information used in making the current finding was derived from these sources, as noted below, as well as previously cited information (see AOSA106; dated July 23, 2010; Division of Scientific Authority 2010).

**DA 210**

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2013*

Conservation and Management

1. African elephants are widely distributed throughout Tanzania, covering approximately 39% of the country's total land surface area, an area of about 370,000 square kilometers ($km^2$) (TAWIRI 2010, *as cited in* CoP16 Prop. 11). About 50% of the elephant's range in that country is in protected areas (PA) (CoP16 Prop. 11). This proportion of protected range is relatively high compared to other African elephant range countries (Blanc *et al.* 2007). These protected areas comprise about 28% of the country's land area, and elephants receive full protection in 19% of Tanzania's total land surface area (CoP16 Prop. 11). Elephants occur within six ecosystems throughout the country, including: Tarangire-Manyara, Serengeti, Selous-Mikumi, Ruaha-Rungwa, Katavi-Rukwa, and Moyowosi-Kigosi (CoP15 Doc. 68, Annex 6a). The network of PAs includes national parks (NP), Ngorongoro Conservation Area, game reserves (GR), game controlled areas (GCA), and wildlife management areas (WMA) in village lands. Tanzania has recently put into place Wildlife Management Area Regulations (2012), a legal mechanism aimed at promoting the establishment of wildlife conservation areas outside of PAs administered by the central government. These regulations allow local communities to establish wildlife management areas in village lands that offer conservation potential for wildlife. This legal mechanism has enabled local communities to contribute to wildlife conservation and to benefit from conservation activities on their land. This strategy has increased Tanzania's PA network by 29,000 $km^2$ and is expected to continue to add more land for wildlife conservation. In Tanzania, elephants occur in 13 of the 15 national parks, in 24 of the 28 game reserves, in the Ngorongoro Conservation Area, and in some game controlled areas, forest reserves, wildlife management areas, and village lands (CoP16 Prop. 11).

2. In addition, there are transboundary elephant populations in the Kilimanjaro-Amboseli, the Serengeti-Mara, and Tsavo-Mkomazi ecosystems along the Tanzania-Kenya border, and elephants move between the Selous in Tanzania and the Niassa in Mozambique (Blanc *et. al.* 2003, *as cited in* CoP16 Prop. 11) and between Kimisi-Ibanda in Tanzania and Akagera in Rwanda. Tanzania cooperates with transboundary countries, especially Kenya and Mozambique, in cross-border law enforcement efforts (CoP16 Prop. 11).

3. In Tanzania, the only consumptive use of African elephants is sport hunting (CoP16 Prop. 11), which is covered by The Wildlife Conservation (Tourist Hunting) Regulations, 2010 – (Government of the United Republic of Tanzania 2010). These regulations control hunting by concession area, season, minimum trophy sizes (18 kg and 160 cm per tusk), annual quotas, post-hunt reporting, trophy registration, marking, and export requirements (CoP15 Doc. 68 Annex 6a; Part V, Regulation 24.-(5)(b)).

4. The trophy quota for African elephants is distributed among approximately 150 hunting concessions/blocks (Ministry of Natural Resources and Tourism (United Republic of Tanzania), *in litt.*, 2008) with the number of trophy permits allotted to each concession determined by elephant survey information (Ministry of Natural Resources and Tourism, *in litt.*, 2005).

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2013*

5. According to the Ministry of Natural Resources and Tourism (*in litt.*, 2008), 25% of the revenue accrued from the sport hunting of elephants goes to the conservation and protection of African elephants and other wildlife species through the Tanzania Wildlife Protection Fund, and 25% of the game fees received from hunters is given to the local communities in the areas where the sport hunting took place.  More than 90% of the revenue of the Tanzania Wildlife Protection Fund is generated from fees associated with sport-hunting activities.  Law enforcement for wildlife and wildlife products, including ivory, is primarily undertaken by a special anti-poaching unit, which is largely subsidized by the Tanzania Wildlife Protection Fund (CoP16 Prop. 11).

6. In addition to providing a source of revenue to local communities, sport hunting plays an important role in creating employment for the local community members, e.g., as trackers, skinners, tent and mess attendants, and guards (Ministry of Natural Resources and Tourism, *in litt.*, 2008).  The Ministry of Natural Resources and Tourism (*in litt.*, 2008) also reported that the sport-hunting program assisted in curbing illegal harvesting and developing infrastructure such as roads, hospitals, and schools, as well as creating a market for local artwork.

7. According to Tanzania's proposal submitted (and later withdrawn) to CoP16 (CoP16 Prop. 11), 100% of the revenue from resident hunting is provided to District Councils to support community development projects, and conservation activities at the District level has improved conservation efforts by local authorities.

8. The 1998 Wildlife Policy of the United Republic of Tanzania was revised in 2007 and provides guidelines for the management of African elephants through the development, review, and updating of specific management plans (CoP15 Doc. 68, Annex 6a).

9. In the year 2012, Tanzania published its country-level strategy and action plan, the "Tanzania National Elephant Management Plan 2010-2015." This plan provides updated information on several biological and ecological topics, including: distribution and range, abundance, population trends and demography, elephant corridors, and human-elephant conflicts. It identifies nine different strategic objectives, as well as numerous specific objectives and their associated targets, actions, timelines, actors, and indicators. The strategic objectives include: Human-Elephant Conflict, Elephant Corridors, Law Enforcement, Benefits and Sustainable Utilization, Ivory Stockpile and Management System, Research and Monitoring, Elephant Health and Welfare, Cross-border Cooperation, and Elephant Information Management (TAWIRI 2012).

Population Status and Trends

10. In 2006, the Tanzania Wildlife Research Institute (TAWIRI 2007, *as cited in* CoP15 Doc. 68, Annex 6a) estimated the African elephant populations of Tanzania at $139,915 \pm 12,338$ (SE) animals based on census surveys covering 227,328 km$^2$ conducted using both total and sample counts. According to the Panel of Experts, this estimate was not significantly different from that

of 111,475 ± 18,728 (95% CL) elephants estimated in 2000-2003. The Panel of Experts noted that the 2006 estimate did not include 2,873 additional elephants from areas not formally surveyed, which provided a country-wide "best estimate" of 142,788 ± 12,405 (SE) elephants in 2006 (CoP15 Doc. 68, Annex 6a). In 2006, according to the African Elephant Status Report (Blanc *et al.*, 2007), the "definite" category estimate was 108,816 elephants, in addition to 27,937 "probable," 29,350 "possible," and 900 "speculative" category estimates.

11. In 2009, a similar survey covering 229,318 km$^2$ across the same six ecosystems produced a total population estimate of 105,439 ± 6,080 (SE) African elephants (TAWIRI 2010a, *as cited in* CoP15 Doc. 68, Annex 6a). A "best estimate," which included an additional 3,583 elephants, provided a country-wide estimate of 109,022 ± 6,135 (SE) elephants in 2009. The Panel of Experts noted that these results suggested a significant decline compared to the 2006 estimate of 142,788 elephants and that the decline could be attributed largely to a downward population trend recorded in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a); however, Tanzania later clarified that the methodological issues during the 2006 survey is believed to have resulted in an overestimate, and therefore, the two years' results cannot be compared due to different study techniques. Although surveys were conducted in 2011 in the Selous-Mikumi and Ruaha-Rungwa ecosystems and 2012 in the Katavi-Rukwa, Burigi Biharamuro and Moyowosi-Kigosi ecosystems), the final survey results have not yet been made available (CoP16 Prop. 11).

12. Demographic parameters were calculated between 2009 — 2010 from 2,182 African elephants from six major elephant populations in Tarangire, Serengeti, Ruaha-Rungwa, Selous, Katavi-Rukwa, and Ugalla (TAWIRI 2012). This demographic survey of African elephants revealed that the proportion of the population < 5 years of age varied from 41% in Tarangire to 25% in Ugalla River Game Reserve, with values above 30% (Tarangire, Selous, Serengeti, and Ruaha-Rungwa). These results were indicative of good to high growth rates. The Panel of Experts, citing Foley and Faust (2010), further pointed out that Tarangire had a growth rate of > 6% and was one of the highest growth rates ever recorded for an African elephant population. It was noted that those populations with the proportion of their herds < 5 years of age below 30% (Katavi and Ugalla Game Reserve), which is indicative of low recruitment and growth rates, suggested one or more population stressors, such as higher infant mortality or increased stress associated with human-elephant conflict or illegal activity (i.e., poaching) (CoP15 Doc. 68, Annex 6a).

13. The Panel of Experts concluded that while estimates at that time suggested that the Tanzanian African elephant populations were stable or possibly decreasing, elephant populations still remained large (> 100,000 individuals) and were demographically healthy. The Panel of Experts noted that the populations of African elephants were geographically widespread across the country and occupied diverse ecosystems, and that a high proportion of the populations (> 80% individuals) occupied protected areas. In the overall opinion of the Panel of Experts, the African elephant populations in Tanzania were currently viable at the time of the analysis (CoP15 Doc. 68, Annex 6a).

14. The Panel of Experts, however, raised concerns about the future mobility of the African elephant populations in Tanzania. They noted, for example, that associated human settlements were increasing in size and number around protected areas and were accompanied by increasing human-elephant conflicts. These settlements and the associated conflicts were probably the most important factors limiting the elephants' mobility and range. It was the opinion of the Panel of Experts that -- at the rates of habitat change and land conversion at the time -- the corridors that still remained in Tanzania would be converted to unsuitable habitat in less than 5 years (CoP15 Doc. 68, Annex 6a).

15. According to Jones *et al.* (2009), Tanzania was working to minimize risks to African elephants, other wildlife, people, and property through improvements in spatial planning involving the identification, maintenance, and restoration of wildlife corridors. The "Tanzania National Elephant Management Plan 2010-2015" lays out a strategic objective to restore lost corridors and to increase protection for corridors that are still in use (TAWIRI 2012).

Sustainability of Off-Take

16. In Tanzania, African elephant deaths occur as a result of several factors, including: 1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching. In order to evaluate whether off-take from trophy hunting is sustainable, all losses to the African elephant population must be considered.

*Legal Off-Take*

17. Since 2007, the annual CITES Export Quota for Tanzania has been 400 tusks (sport-hunting quota of 200 elephants). During 2003-2006, the quota was 200 tusks from 100 individuals, while during 1997-2002 the quota was 100 tusks from 50 individuals. Tanzania, however, typically has not exported its full quota allotment in sport-hunted trophies or African elephant tusks. During 1997-2009, for example, annual tusk exports typically were about 40-45% of the allowed quantities and never exceeded the approved annual quota (UNEP-WCMC CITES Trade Database; available on the internet at: http://www.unep-wcmc.org/citestrade; accessed on 8 March 2010).

18. The Panel of Experts also assessed the sustainability of legal off-take from African elephant populations in Tanzania. Complete records on natural mortality for the entire country or on the killing of problem elephants were not available, but the Panel of Experts was able to estimate the level of such off-take by analyzing the data from the ivory store databases of Tanzania. Based on 21 years of data for that country, an average of 231 elephants died annually from natural mortality, while another 287 individuals died annually from elephant control measures (CoP15 Doc. 68, Annex 6a).

19. Based on a sport-hunting quota of 200 African elephants, as well as the estimates cited earlier for natural mortality and problem animal control in Tanzania, the Panel of Experts

estimated that the overall legal off-take of African elephants from the several populations in that country was about 718 annually, which was 0.7% of the 2009 elephant population estimate of 109,022 individuals.  Even if natural mortalities were considerably higher due, for example, to low carcass detection rates by observers in difficult terrain, the Panel of Experts believed that the legal off-take was still less than the annual population growth rate of 3-5% and, therefore, was sustainable (CoP15 Doc. 68, Annex 6a).

20.  The Panel of Experts also assessed whether the hunting of trophy-quality males in Tanzania was sustainable.  According to an earlier analysis by Martin (1986), an annual harvest rate of 0.5-1.0% of the total African elephant population was sustainable.  Based on the available population information, the Panel of Experts estimated that nationwide there was a potential off-take of 325 trophy-quality African elephant males (0.3% of the total population; CoP15 Doc. 68, Annex 6a).  The Panel of Experts noted that this value of 0.3% was less than the value of 0.5-1% of total African elephant numbers and concluded that the hunting was sustainable.

*Illegal Off-Take*

21.  According to the Panel of Experts, official poaching statistics provided by the Wildlife Division of Tanzania indicated 258 reported poaching incidents that were detected during 2005-2009, including 82 poaching incidents in 2009, the highest number poached annually during that time period.  The Panel of Exports noted, however, that the total number of poaching incidents was likely underestimated given low African elephant carcass detection rates (CoP15 Doc. 68, Annex 6a).

22.  The Panel of Experts cited the following evidence that poaching has led to elephant population declines in the Selous-Mikumi ecosystem:

> *a) PIKE values collected at the Selous-Mikumi MIKE site have progressively increased between 2003 and 2009 (CITES Secretariat, 2010).*

> *b) Joint Wildlife Division/Selous Rhino Project aerial observations and foot patrols recorded more than a threefold increase in encounter rates of recently dead elephant carcasses between 2007 and 2008 (TAWIRI, 2010b).*

> *c) Tourism operators operating in the northern Selous reported to the Panel an increase in elephant (and other wildlife) poaching since 2007/8, including several incidents close to tourist camps.*

> *d) A significant proportion of the large seizures of ivory made in Asia in 2006 have been traced by forensic DNA work to elephants killed in the Selous-Niassa area (Wasser et al., 2009).*

Note:  PIKE = Proportion of illegally killed elephants

**DA 215**

23.  The Panel of Experts also pointed to evidence that the Selous-Mikumi ecosystem was a "hotspot" for African elephant poaching.  They observed that the ivory that had been collected by wildlife enforcement officials at Udzungwa National Park was from confiscations.  According to these officials, the confiscations consisted of illegally-sourced ivory coming out of nearby Kilombero Game Controlled Area in the Selous-Mikumi ecosystem.  In addition, the highest number of tusks confiscated by field-based Wildlife Division offices originated from Morogoro and Lindi, which are adjacent to the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a).

24.  Given the factors discussed above, the Panel of Experts concluded that the level of off-take at that time was not sustainable in the Selous-Mikumi ecosystem, which represents about 40% of the total African elephant population in Tanzania.  They also noted, however, that legal and illegal off-take appeared to be sustainable in the five other elephant ecosystems where the populations were stable or increasing.  Expressing concern about the potential for off-take levels in the Selous-Mikumi ecosystem to have a future negative impact on the African elephant population as a whole, the Panel of Experts stated:

> *"Whilst not unequivocally substantiated, the Selous-Mikumi situation described above could affect long-term population sustainability."*
> (CoP15 Doc. 68, Annex 6a)"

25.  Based on a more recent analysis of MIKE data, the levels of illegal killing across the African elephants' range are of serious and increasing concern.  Between 2009 and 2011, PIKE values remained high at the Selous-Mikumi MIKE site (SC62 Inf. 1).  Moreover, a March 2012 IUCN African Elephant Specialist Group survey indicated that poaching over the previous 12 months had increased in sites in Tanzania (SC62 Doc. 46.1 (Rev. 1)).

26.  Another concern of the Panel of Experts, which relates to the commitment by Tanzania to combat poaching, was the financial mechanism by which the Wildlife Division was funded.  The Wildlife Division's revenue share is paid directly to the central Treasury, and the Treasury is then supposed to distribute the budgeted monies to the Wildlife Division. The Panel of Experts raised the concern that over a 3-year period (2007-2009), the Wildlife Division had received only 63% (USD 2,634,975 per year) of its approved budget from the central Treasury.  The Panel noted that given these funding limitations, the Wildlife Division would not be able to meet its needs and obligations regarding the conservation, management, and protection of African elephants.  The Panel of Experts also noted, however, that between 2005 and 2009, the Tanzania Wildlife Protection Fund contributed on average a total of USD 12,894,564 annually to the Wildlife Division.  According to the Panel of Experts, these funds, when combined with the Treasury allocations, should have put the Wildlife Division in a "strong position" to meet its enforcement obligations, including containment of threats to elephants in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a).  Reported elephant poaching levels in the Selous-Mikumi ecosystem, however, suggest that enforcement may have been inadequate.

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2013*

27.  The Panel of Experts also noted that the national parks and the Ngorongoro Conservation Area Authorities of Tanzania were adequately funded because they generated and retained 100% of their revenue share through park and conservation area fees (CoP15 Doc. 68, Annex 6a).

28.  Although the Panel of Experts raised concerns over the illegal killing of elephants in the Selous-Mikumi ecosystem, they also acknowledged the efforts by authorities of Tanzania to combat the increases in poaching.  For example, in July 2009, a series of planning meetings led to anti-poaching patrols that were joint and cooperative, and involved rangers and scouts from the Selous Game Reserve, the Udzungwa Mountains National Park, and the Mikumi National Park.  In December 2009, for example, the commander of special police operations led an anti-poaching operation, code-named "Operation Butterfly," in the Selous Game Reserve.  This operation led to the arrest of 70 poachers and the recovery of elephant and hippopotamus ivory (Midala 2010, *as cited in* TAWIRI 2012).  Noting these, as well as other anti-poaching efforts by the Tanzanian authorities, the Panel of Experts stated:

> *"There is a clear indication of concern by the authorities to minimize poaching of elephant and other wildlife species.  The various efforts to deploy staff and execute special anti-poaching operations in various parts of the country, particularly in the vast Selous Game Reserve, are noteworthy."*
> (CoP15 Doc. 68, Annex 6a).

29.  The Director of Wildlife of Tanzania informed the Panel of Experts that regulations were being finalized to implement The Wildlife Conservation Act, 2009, which would reportedly increase revenue retention, increase penalties up to 30 years, and provide additional powers to law enforcement personnel (CoP15 Doc. 68, Annex 6a).  Copies of those laws and regulations were provided to the U.S. Fish and Wildlife Service (Service) at a February 17, 2011, meeting with Tanzanian officials.

30.  The "Tanzania National Elephant Management Plan 2010-2015" is based on several new wildlife laws and implementing regulations (TAWIRI 2012): The Wildlife Conservation Act, 2009 (Government of the United Republic of Tanzania 2009a); The Wildlife Conservation Act, 2009 (Act Supplement No. 5;  20th March, 2009;  Government of the United Republic of Tanzania 2009b);  and The Wildlife Conservation (Tourist Hunting) Regulations, 2010   – (Subsidiary Legislation Supplement No. 25;  2nd July, 2010;  Government of the United Republic of Tanzania 2010).  During the February 2011 meeting, the Service received copies of these measures, but it was not clear when they would be fully implemented.  For example, the Subsidiary Legislation (Supplement No. 25;  2nd July, 2010) of The Wildlife Conservation (Tourist Hunting) Regulations, 2010, in Part V, 24.-(5)(b), directs that no person shall hunt an elephant with tusks weighing below 18 kg per tusk or measuring not less than 160 cm per tusk (Government of the United Republic of Tanzania 2010).  In another example, the Act Supplement (No. 5; 20th March, 2009) of The Wildlife Conservation Act, 2009, in Part IV, calls for the protection of wildlife corridors, dispersal areas, buffer zones, and migratory routes (Government of the United Republic of Tanzania 2009b).  Both of these measures are critically

important to the conservation of the African elephant, but it is not clear when they will become operational and backed by the force of law in Tanzania. Until the new laws are fully implemented, these African elephant conservation and management measures, while improving, are still in a transitional phase.

Conclusion

31.  With the information currently available, we believe that the status of the African elephant population in Tanzania and ongoing management efforts in that country are adequate to ensure that the sport hunting of African elephants, as administered by the Government of the United Republic of Tanzania, does not adversely affect the status of the species in Tanzania.

32.  Therefore, for calendar year 2013, we find that the import of sport-hunted trophies of African elephants taken in Tanzania will be for purposes that are not detrimental to the survival of the species.

33.  We acknowledge that applicants sometimes request authorization to import various articles that have been made from their sport-hunted trophies taken in Tanzania, yet the articles do not fall under the Service's current definition of "sport-hunted trophy" according to the Service's regulations at 50 CFR 23.74 (see AOSA 96, *General Advice on Import of Articles Made from Sport-hunted Trophies of African Elephant from Botswana, Namibia, South Africa, and Zimbabwe, for Personal Use or Display*).

34.  Such articles, when made from the applicant's personally sport-hunted trophy and are to be imported for the applicant's personal use, are not expected to negatively affect the conservation status of this species in the wild or stimulate additional trade in wild-taken specimens.

35.  Therefore, since we have found that the import of sport-hunted trophies of African elephants taken in Tanzania will be for purposes that are not detrimental to the survival of the species, we also find that the importation of articles made from sport-hunted trophies of African elephants from Tanzania, for personal use or display, will not be detrimental to the survival of the species provided the following conditions are met:

1.  The article(s) being imported must be from a sport-hunted trophy that the applicant hunted him/herself during calendar year 2013 (i.e., January 1, 2013, through December 31, 2013).

2.  Import is for personal use or display (not for commercial purposes).

3.  An appropriate amount of time has elapsed since the hunting of the trophy to allow for drying, curing, processing, and/or working/manufacturing of the article(s).

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2013*

CONCERNS:

Although we are able to make the current non-detriment finding, we still have concerns about the future sustainability of the total levels of off-take from the African elephant populations in Tanzania. These concerns – in part -- were also noted by the Panel of Experts (CoP15 Doc. 68, Annex 6a):

A.   Efforts have been made by Tanzania to combat poaching in the Selous-Mikumi ecosystem. We also acknowledge that additional resources are available to promote the conservation status of the African elephant in that country, including: "Tanzania National Elephant Management Plan 2010-2015" (TAWIRI 2012); The Wildlife Conservation Act, 2009 (Government of the United Republic of Tanzania 2009a); The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009; Government of the United Republic of Tanzania 2009b); and The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010; Government of the United Republic of Tanzania 2010). The Service is interested in receiving an update on whether the management and regulatory measures mentioned above have been fully implemented, and if not, the targeted time period for full implementation of these measures. In particular, we remain concerned about the availability of future resources to combat poaching in Tanzania, especially in the Selous-Mikumi ecosystem. In this regard, we are interested in receiving updated information on recent initiatives and their effectiveness in combating poaching in Tanzania, particularly in the Selous-Mikumi ecosystem.

B.   It is our understanding that elephant population surveys were conducted in Tanzania during 2011 and 2012, but the results have not yet been made available. We are interested in receiving these results as soon as they become available.

C.   We note that most of the 23 known elephant corridors in Tanzania are in poor condition (TAWIRI 2012). We recognize that the "Tanzania National Elephant Management Plan 2010-2015" includes a strategic framework for increasing protection for these corridors and for restoring lost corridors and that laws and regulations are available to protect these corridors. Given the importance of protecting these corridors from ongoing threats and the risks to the African elephant populations in the future as a result of human-elephant conflict in and around these areas, we are interested in receiving updated information on Taznania's success to date in achieving its objectives related to the protection of African elephant corridors, as laid out in the "Tanzania National Elephant Management Plan 2010-2015" (TAWIRI 2012).

D.   Given the uncertainty about the current population size and trends of African elephants in Tanzania, especially in the Selous-Mikumi ecosystem, we will continue to monitor African elephant population survey results, as well as overall harvest quotas and off-take levels for this species in Tanzania.

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2013*

REFERENCES:

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. *African Elephant Status Report 2007: An Update from the African Elephant Database*. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

CITES Secretariat. 2010. *Monitoring of Illegal hunting in elephant range States.* Document CoP15 Doc. 44.2 presented at the 15th meeting of the Conference of the Parties to CITES.

CoP15 Doc. 68 Annex 6a). 2010. Report of the Panel of Experts ... Appendix II (Tanzania). Available online at: http://www.cites.org/eng/cop/15/doc/E15-68A06a).pdf.

CoP15 Doc. 68 Annex 6b). 2010. Report of the Panel of Experts ... Appendix II (Zambia). Available online at: http://www.cites.org/eng/cop/15/doc/E15-68A06b).pdf.

CoP15 Prop. 4 (Rev. 1). 2010. Transfer the population of the United Republic of Tanzania from Appendix I to Appendix II with an annotation. Available online at: http://www.cites.org/eng/cop/15/prop/E-15-Prop-04.pdf.

CoP16 Prop. 11. 2012. Transfer the population of the African elephant, *Loxodonta africana*, of the United Republic of Tanzania from Appendix I to Appendix II (with an annotation) (Note: proposal withdrawn). Available online at: http://www.cites.org/eng/cop/16/prop/E-CoP16-Prop-11.pdf.

Department of Wildlife. 2001. Management Plan for the African Elephants, *Loxodonta africana* in Tanzania. Dar es Salaam, Tanzania.

Division of Scientific Authority. 2009. General advice on import of articles made from sport-hunted trophies of African elephant for personal use or display. U.S. Fish and Wildlife Service, Arlington, Virginia. [Reference: AOSA 96]

Division of Scientific Authority. 2010. General advice on import of sport-hunted trophies of African elephant from Tanzania for the calendar year 2010. U.S. Fish and Wildlife Service, Arlington, Virginia. [Reference: AOSA 106]

Foley, C.A.H., and Faust, L.J. 2010. Rapid population growth in an elephant *Loxodonta africana* population recovering from poaching in Tarangire National Park, Tanzania. *Oryx* 44(2):205–212.

Government of the United Republic of Tanzania. 2009a. The Wildlife Conservation Act, 2009. Available online: http://faolex.fao.org/docs/pdf/tan97858.pdf; accessed March 9, 2011.

Government of the United Republic of Tanzania. 2009b. The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009). Gazette of the United Republic of Tanzania (No. 12; Vol. 90):165—256.

Government of the United Republic of Tanzania. 2010. The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010). Gazette of the United Republic of Tanzania (No. 27; Vol. 91):1—35.

Jones, T., Caro, T. and Davenport, T.R.B. (eds.). 2009. Wildlife Corridors in Tanzania. Unpublished Report. Tanzania Wildlife Research Institute (TAWARI), Arusha.

Martin, R.B. 1986. *Establishment of African ivory export quotas and associated control procedures.* Report to CITES Secretariat.

Ministry of Natural Resources and Tourism (Tanzania). 2005. African Elephant Conservation in Tanzania. *in litt.*

Ministry of Natural Resources and Tourism (Tanzania). 2008. Questionnaire from US Fish and Wildlife Service on Elephants Conservation in Tanzania. *in litt.*

Nowak, R.M. 1999. Walker's mammals of the world. Sixth edition. Volume II. The Johns Hopkins University Press, Baltimore.

SC62 Doc. 46.1 (Rev. 1). 2012. Elephant Conservation, Illegal Killing, and Ivory Trade. Available online at: http://www.cites.org/eng/com/SC/62/E62-46-01.pdf.

SC62 Inf. 1. 2012. Supplementary information on document SC62 Doc. 46.1. Available online at: http://www.cites.org/eng/com/SC/62/Inf/E62i-01.pdf.

TAWIRI. 2007. *Elephant population estimates: Dry season 2006.* Tanzania Wildlife Research Institute in collaboration with NCAA, TANAPA and Wildlife Division. Commissioned by Wildlife Division. TAWARI, Arusha.

TAWIRI. 2010a. *Elephant population estimates: Dry season 2009.* Tanzania Wildlife Research Institute in collaboration with NCAA, TANAPA and Wildlife Division. Commissioned by Wildlife Division. TAWARI, Arusha.

TAWIRI. 2010b. *Status of the Major Elephant Populations of Tanzania 2009-2010.* TAWIRI Preliminary Report, 2010. Tanzania Elephant Management Plan Project. TAWIRI, Arusha.

TAWIRI. 2012. Tanzania Elephant Management Plan 2010-2015. TAWIRI, Arusha. Available online at: www.tawiri.or.tz/images/Conference/elephant_plan.pdf.

**DA 221**

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2013*

TEMP (Tanzania Elephant Management Plan).  2010.  *Status of the major elephant populations of Tanzania 2009-2010*.  Preliminary report January 2010, Tanzania Elephant Management Plan Project.  TAWIRI, Arusha.

Wasser, S.K., Clark, B. and Laurie, C.  2009.  The Ivory Trail.  *Scientific American*, July 2009 (68-76).

**DA 222**

# United States Department of the Interior

### FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Reply Refer To:
FWS/AIA/057087

**APR 0 4 2014**

Honorable Lazaro Nyalandu, Minister
Ministry of Natural Resources and Tourism
Wizara ya Maliasili na Utalii
S.L.P. 9372
Dar es Salaam
United Republic of Tanzania

Dear Honorable Lazaro Nyalandu:

As part of the U.S. Government's implementation of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) and the U.S. Endangered Species Act (ESA), the U.S. Fish and Wildlife Service has conducted evaluations that are required to issue import permits for sport-hunted African elephants taken in the United Republic of Tanzania (Tanzania) in 2014. As you are aware, for U.S. implementation of CITES, we must make a finding that the import of sport-hunted trophies of Appendix-I African elephants is for purposes that are not detrimental to the survival of the species. Under the U.S. Endangered Species Act, we must determine that the import of all sport-hunted elephant trophies will enhance the propagation or survival of the species.

The U.S. Government is gravely concerned about the escalation in poaching activity throughout Tanzania over the past several years, and we have expressed this concern in our CITES findings over the past few years. With new information now showing significant declines in key elephant populations in Tanzania, we are unable to make positive findings required by CITES and the ESA to allow import of elephant trophies taken in Tanzania during calendar year 2014 (see attachments). We recognize that sport-hunting, as part of a sound management program, can provide benefits to the conservation of species. However, because of the rampant elephant poaching in Tanzania, we are concerned that the additional killing of elephants, even if legal, is not sustainable and would not support effective management and community programs that enhance the survival of the species in Tanzania.

We will reevaluate the situation in Tanzania for elephant trophies taken in calendar year 2015 and beyond. When we receive information that indicates a significant improvement for elephants in Tanzania, we will re-consider the import suspension. In order to allow elephant trophies to be imported in the future, documented total offtake from the elephant population (i.e., all sources of elephant deaths, including poaching, sport-hunting, problem animal control, and natural mortality) would need to be below the elephant's annual population growth rate, requiring the

**DA 223**

CITES Secretariat (2010). *Monitoring of Illegal hunting in elephant range States*. Document CoP15 Doc. 44.2 presented at the 15ht meeting of the Conference of the Parties to CITES.

CoP15 Doc. 68 Annex 6a). 2010. Report of the Panel regarding the proposal of the United Republic of Tanzania. 19 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/15/doc/E15-68A06a_.pdf.

CoP16 Doc. 53.1. 2012. Monitoring the Illegal Killing of Elephants (MIKE). Sixteenth meeting of the Conference of the Parties, Bangkok (Thailand), 3-14 March 2013, 15 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-01.pdf.

Cumming, D.H.M (2004). Performance of Parks in a century of change. In: *Parks in transition: biodiversity, rural development and the bottom line*. Ed. B Child. Earthscan, London.

Douglas-Hamilton, I. and Burrill, A. (1991). Using elephant carcass ratios to determine population trends. *African Wildlife: Research and Management*, pp. 98-105. International Council of Scientific Unions.

IUCN Provisional African Elephant Status Report 2013: An Update from the African Elephant Database. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.elephantdatabase.org/preview_report/2013_africa/Loxodonta_africana/2012/.

IUCN-UNESCO (2007). *Report of the reactive monitoring mission: Selous Game Reserve*, United Republic of Tanzania.

Jones, T., T. Caro and T.R.B. Davenport (eds.). 2009. Wildlife Corridors in Tanzania. Unpublished Report. Tanzania Wildlife Research Institute (TAWARI), Arusha. Available online at: http://www.tzwildlifecorridors.org/TzWildlifeCorridors.pdf.

TAWIRI. 2013a. Aerial census of large animals in the Selous-Mikumi ecosystem, dry season 2013, population status of African elephant. Arusha, Tanzania, 11pp.

TAWIRI. 2010. Tanzania Elephant Management Plan 2010-2015. TAWIRI, Arusha, Tanzania, 95 pp. Available online at: www.tawiri.or.tz/images/Conference/elephant_plan.pdf.

TAWIRI. 2010b. Presentation to CITES Panel of Experts, 25 January, 2010, Dar es Salaam.

Wasser, S.K., B. Clark and C. Laurie. 2009. The Ivory Trail. *Scientific American*, July 2009. Pp. 68-76.

WCS Mozambique. 2014. *in litt*. Niassa Reserve expanded elephant protection program. USFWS WWB-AECF FY14 grant proposal (F13AS00357).

DA 252

poaching rate to be significantly reduced. We will look to the following sources of information to provide us with this documentation:

- New population census information, demographic surveys, and carcass analyses;
- Monitoring of Illegal Killing of Elephants (MIKE) and Elephant Trade Information System (ETIS) reports; and
- Other relevant sources of information.

In addition, in response to the drastic population decline, we hope that the Government of Tanzania will appropriately adjust its quotas downward and take management actions to address the poaching crisis, such as increased capacity for law enforcement. We would appreciate receiving information on how funds generated from the sport-hunting of elephants are used to support the long-term survival of the species. Such support could be in the way of on-the-ground conservation efforts, such as surveys and anti-poaching efforts, or more indirect support through community development projects that can be tied to the benefits that can be generated by maintaining healthy elephant populations.

We recognize the significant challenges that Tanzania and other African countries face in protecting elephants and other wildlife, given increasing poaching pressure. The U.S. Government works to actively assist the Government of Tanzania in protecting its wildlife resources through U.S. Agency for International Development investments in the wildlife management areas program, through U.S. Department of the Interior/U.S. Fish and Wildlife Service technical support, and through financial and technical support for capacity building and other key conservation and management objectives through the African Elephant and the Rhino/Tiger Conservation Funds. We are eager to discuss how we can further assist Tanzania in improving security for elephants.

If you have any questions, please feel free to contact me by mail, email, or telephone (Bryan_Arroyo@fws.gov; (202) 208-6394).

Sincerely,

Bryan Arroyo,
Assistant Director, International Affairs

Enclosures

376                                                              **DA 224**



# United States Department of the Interior

### FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

FEB 2 1 2014

**MEMORANDUM**

To:        Chief, Division of Management Authority

From:     Chief, Division of Scientific Authority *Rosemarie Gnam*

Subject:   General Advice on Importation of Sport-hunted Trophies of African Elephants
           taken in Tanzania in the Calendar Year 2014

---

This General Advice represents our CITES finding for permit applications that you might receive
for the import of sport-hunted trophies of African elephants (*Loxodonta africana*) taken in the
United Republic of Tanzania (Tanzania) in calendar year 2014.

Please be advised that, based on the available information, we are **unable** to determine that the
importation of sport-hunted trophies of African elephants taken in Tanzania during calendar year
2014 will be for purposes that are not detrimental to the survival of the species.

If permit applications are received that include new or additional information showing that
elephant management practices by the Government of Tanzania have led to the sustainability of
its elephant population on a nation-wide basis, these applications should be referred to the
Division of Scientific Authority for consideration on a case-by-case basis.

BASIS FOR ADVICE:

Since our analysis for the General Advice issued for calendar year 2013, several sources of
information have become available indicating a significant decline in Tanzania's elephant
population primarily due to poaching for ivory, including:

- *Aerial census of large animals in the Selous-Mikumi ecosystem, population status of
  African elephant* (TAWIRI 2013a);
- *Aerial census of large animals in the Ruaha-Rungwa ecosystem, population status of
  African elephant* (TAWIRI 2013b);
- A written report, *Recognition and tackling of the current elephant poaching crisis in
  Tanzania* (TEPS 2013a) and PowerPoint presentation, *Tackling the elephant poaching
  crisis in Tanzania* (TEPS 2013b), by the Tanzania Elephant Protection Society (TEPS)
  Task Force presented to the Parliamentary Committee of Land, Natural Resources and
  Environment, April, 2013;

- A report to the African Elephant Summit (Botswana, 2013), *Status of African elephant populations and levels of illegal killing and the illegal trade in ivory: A report to the African elephant summit* (CITES Secretariat *et al.* 2013);
- A report to the 16th Meeting of the CITES Conference of the Parties (CoP16 - Bangkok, Thailand, 2013), providing an update on Monitoring the Illegal Killing of Elephants (MIKE) (CoP16 Doc. 53.1), posted 11/30/2012, with an Addendum posted 2/19/2013; and
- A report to CoP16 (Bangkok, Thailand, 2013), providing an update on monitoring of illegal trade in ivory and other elephant specimens (CoP16 Doc. 53.2.2 (Rev. 1)), originally posted 12/12/2012, with a revision of the document posted 2/8/2013.

The new information provided by these sources is discussed below as it relates to our finding for the 2014 calendar year.

Conservation and Management

1. As recently as a few years ago, African elephants were considered to be widely distributed throughout Tanzania. As of 2009, they covered about 39% of the country's total land surface area (~370,000 square kilometers (km$^2$) (TAWIRI 2010) within six ecosystems, including: Tarangire-Manyara, Serengeti, Selous-Mikumi, Ruaha-Rungwa, Katavi-Rukwa, and Moyowosi-Kigosi (CoP15 Doc. 68, Annex 6a). The Selous-Mikumi ecosystem represented about 40% of the total elephant population in Tanzania (CoP15 Doc. 68, Annex 6a). At 31,040 square miles, the Selous-Mikumi ecosystem is Africa's largest protected area, and historically held East Africa's largest elephant population, followed by Ruaha-Rungwa (13,384 square miles) (Jones and Nowak 2013).

2. According to the Government of Tanzania, about 50% of the elephant's range in that country is in protected areas (PA) (CoP16 Prop. 11). This proportion of protected range is relatively high compared to other African elephant range countries (Blanc *et al.* 2007). These protected areas comprise about 28% of the country's land area, and elephants receive full protection in 19% of Tanzania's total land surface area (CoP16 Prop. 11). The network of PAs includes national parks (NP), Ngorongoro Conservation Area, game reserves (GR), game controlled areas (GCA), and wildlife management areas (WMA) in village lands. In the year 2012, Tanzania put into place Wildlife Management Area Regulations (2012), which provided a legal mechanism to promote the establishment of wildlife conservation areas outside of PAs administered by the central government. These regulations allow local communities to establish wildlife management areas in village lands that offer conservation potential for wildlife. This legal mechanism has the potential to enable local communities to contribute to wildlife conservation and to benefit from conservation activities on their land (CoP16 Prop. 11). Concerns have been raised, however, that WMAs have not effectively contributed to conservation (TEPS 2013a). The legal process developed by the Wildlife Department has been criticized as being complicated, overregulated, and lengthy, resulting in high transaction costs and making

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2014*

compliance difficult. It is suggested that in order to make the WMA approach successful, it will need to be simplified (Baldus and Hahn 2009).

3. Historically, there have been transboundary elephant populations in the Kilimanjaro-Amboseli, the Serengeti-Mara, and Tsavo-Mkomazi ecosystems along the Tanzania-Kenya border (Blanc *et. al.* 2003), and elephants have moved between the Selous in Tanzania and the Niassa in Mozambique (Mpanduji *et al.* 2002). Tanzania also shares elephant populations with Rwanda – the Burigi Game Reserve in Tanzania and Akagera National Park in Rwanda (TAWIRI 2010). Tanzania cooperates with transboundary countries, especially Kenya and Mozambique, in cross-border law enforcement efforts (CoP16 Prop. 11); however, concern has been raised over the lack of effectiveness of cross-border cooperation in anti-poaching efforts (Baldus and Hahn 2009).

4. According to the Government of Tanzania (Tarimo, Severre, and Mduma, *in litt.* 2011), the following legal instruments govern wildlife conservation in Tanzania:
- Wildlife Policy, 2007, which provides guidelines for the management of African elephants through the development, review, and updating of specific management plans (CoP15 Doc. 68, Annex 6a);
- Wildlife Conservation Act No. 5 of 2009;
- Tanzania National Parks Act CAP. 282 (RE 2002); and
- Ngorongoro Conservation Area Act CAP. 284 (RE 2002).

5. Four different institutions have authority for management of wildlife in Tanzania:
- Tanzania National Parks (TANAPA), a Parastatal organization that manages 15 national parks (total area of 50,872 km$^2$);
- Ngorongoro Conservation Area Authority (NCAA), a Parastatal organization that manages the Ngorongoro Conservation Area (NCA) (total area of 8,300 km$^2$);
- Wildlife Division, an institution that manages 28 game reserves with an area of 112,564 km$^2$, about 38 game controlled areas with an area of about 161,521 km$^2$, and RAMSAR sites covering 249,856 km$^2$; and
- District Councils, local government institutions that collaborate with the Wildlife Division on wildlife conservation issues and facilitate the establishment and management of WMAs on village land (Tarimo, Severre, and Mduma, *in litt.* 2011).

6. Tanzania developed its country-level strategy and action plan, the "Tanzania National Elephant Management Plan 2010-2015" in 2010, and the plan was endorsed by the Minister for Natural Resources and Tourism on January 15, 2011. This plan provides updated information on several biological and ecological topics, including: distribution and range, abundance, population trends and demography, elephant corridors, and human-elephant conflicts. It identifies nine different strategic objectives, as well as numerous specific objectives and their associated targets, actions, timelines, actors, and indicators. The strategic objectives include: Human-Elephant Conflict, Elephant Corridors, Law Enforcement, Benefits and Sustainable Utilization, Ivory Stockpile and Management System, Research and Monitoring, Elephant Health

**DA 227**

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2014*

and Welfare, Cross-border Cooperation, and Elephant Information Management (TAWIRI 2010). It is unclear whether or to what extent the National Elephant Management Plan has been implemented to date.

7. The Tanzania National Elephant Management Plan 2010-2015 (TAWIRI 2010) identified that a substantial decrease in funding is an important factor that has influenced the protection of the elephant population in the Selous ecosystem. Prior to 2005, a Revenue Retention Scheme was being implemented in which 100% of the revenue from photographic tourism and 50% from hunting operations was retained for management of the Game Reserve (TAWIRI 2010). By 2003, the revenue had risen to USD 2,800,000, but following national budget reductions in 2004, the amount retained by the Reserve had dropped to about USD 800,000 by 2008 (UNEP 2008, as cited in TAWIRI 2010). The timing of the decrease in funding coincides with increased poaching in the Reserve, suggesting that anti-poaching operations are greatly under-funded (TAWIRI 2010). It has been reported that the Tanzanian Government terminated the Selous Revenue Retention Scheme following the end of the Tanzanian-German Selous Conservation Program in 2003 (Baldus and Hahn 2009).

8. In addition to concerns about the implementation of Strategic Objective 3, Law Enforcement, we are concerned about implementation of Strategic Objective 8, Elephant Utilization, which includes as an action item to, "Set realistic hunting quotas." Since 2007, the annual CITES export quota for Tanzania has been 400 tusks (sport-hunting quota of 200 elephants). During 2003-2006, the quota was 200 tusks from 100 individuals, while during 1997-2002 the quota was 100 tusks from 50 individuals (http://www.cites.org/eng/resources/quotas/index.php). Based on the available information, Tanzania's elephant population is now less than 70,000 elephants nation-wide (see paragraph 16), and according to the population trends shown in the Tanzania National Elephant Management Plan 2010-2015 (p. 10), the population has not been this low since the 1990's. According to the graph, the population in 1999 was estimated at about 75,000 elephants (TAWIRI 2010). During this time period, the quota was 100 tusks from 50 individuals, and the population appeared to be showing an increasing population trend. Despite the ongoing population decline and current estimated population figure, Tanzania has not adjusted its national export quota downward in response.

9. In Tanzania, the only consumptive use of African elephants is sport hunting (CoP16 Prop. 11), which is covered by The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Government of the United Republic of Tanzania 2010). These regulations control hunting by concession area, season, minimum trophy sizes (18 kg and 160 cm per tusk), annual quotas, post-hunt reporting, trophy registration, marking, and export requirements (CoP15 Doc. 68 Annex 6a; Part V, Regulation 24.-(5)(b)). According to the Government of Tanzania, sport hunting quota determinations for different areas take into account the density of elephants in those ecosystems (CoP16 Prop. 11).

10. According to Tanzania's proposal submitted (and later withdrawn) to CoP16 (CoP16 Prop. 11), 25% of the revenue accrued from the sport hunting and 100% of the revenue from resident

hunting goes to District Councils to support community development projects and conservation activities.  In addition, 65% of the revenue from photographic tourism and 75% of the block fee in WMAs is given back to local communities.  More than 90% of the revenue of the Tanzania Wildlife Protection Fund is generated from fees associated with sport-hunting and the sale of trophies.  Law enforcement activities for wildlife and wildlife products, including ivory, are largely subsidized by the Tanzania Wildlife Protection Fund (CoP16 Prop. 11).

11.  Despite the legal and management tools available to Tanzania for managing its elephant populations, population trends and data collected under the CITES program known as Monitoring the Illegal Killing of Elephants (MIKE) show, as discussed below, that elephant populations throughout Tanzania are declining, primarily due to rampant poaching.  This ongoing crisis raises questions about the effectiveness of Tanzania's management and governance to protect elephants, particularly with respect to Strategic Objective 3, Law Enforcement, in the National Elephant Management Plan.  In its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II (Note: the proposal was rejected), the Panel of Experts questioned the commitment by Tanzania to combat poaching, raising concerns over the financial mechanism by which the Wildlife Division was funded.  The Wildlife Division's revenue share is paid directly to the central Treasury, and the Treasury is then supposed to distribute the budgeted monies to the Wildlife Division.  The Panel of Experts raised the concern that over a 3-year period (2007-2009), the Wildlife Division had received only 63% (USD 2,634,975 per year) of its approved budget from the central Treasury.  The Panel noted that given these funding limitations, the Wildlife Division would not be able to meet its needs and obligations regarding the conservation, management, and protection of African elephants.  The Panel of Experts also noted, however, that between 2005 and 2009, the Tanzania Wildlife Protection Fund contributed on average a total of USD 12,894,564 annually to the Wildlife Division.  According to the Panel of Experts, these funds, when combined with the Treasury allocations, should have put the Wildlife Division in a "strong position" to meet its enforcement obligations, including containment of threats to elephants in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a).  Reported elephant poaching levels in the Selous-Mikumi ecosystem, however, suggest that enforcement was inadequate.

12. Tanzania's high Proportion of Illegally Killed Elephants (PIKE) values indicate high poaching rates, which suggests weak governance in Tanzania (see paragraph 16 for PIKE values).  Repeated analyses under the CITES MIKE program have identified that at the national level, governance, as measured by Transparency International's Corruption Perceptions Index (CPI), is the factor most strongly correlated with PIKE.  Poaching levels are higher in countries where governance is weaker, and vice versa.  It is suggested that poor governance likely facilitates the illegal killing of elephants and movement of illegal ivory by ineffective law enforcement and/or "active aiding and abetting by unscrupulous officials" (CITES Secretariat *et al.* 2013).

13.  The MIKE analyses are consistent with information available from the Elephant Trade Information System (ETIS), a global illegal elephant trade tracking system operated by

DA 229

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2014*

TRAFFIC on behalf of the CITES Parties. According to an analysis of data from the ETIS presented at CITES CoP16, Tanzania was implicated as a significant player in the illegal ivory trade. In the ETIS analysis presented at CoP15, Tanzania was already identified as a country of concern with respect to large consignments of illicit ivory leaving the African continent. In the intervening three years, the ETIS data show that both Kenya and Tanzania continued to be the primary conduits for large shipments of ivory exported to Asia, together accounting for nearly half of the 34 large-scale ivory seizures by number and 58% of the associated weight of such seizures during the period 2009-2011(CoP16 Doc. 53.2.2 (Rev. 1). A recent TRAFFIC news article, drawing on ETIS data, reports that since 2009 Tanzania has made or been implicated in 18 large-scale ivory seizures (i.e., seizures that involved 500 kg or more in a single shipment). Of these seizures, Tanzania only made five, while the other 13 seizures were made outside of the country. In total, these seizures represented nearly 43 tons of ivory, representing the death of about 4,000 elephants (http://www.traffic.org/home/2014/1/27/tanzania-reshuffled-cabinet-should-address-poaching-urgently.html). Such large-scale transactions of ivory represent higher-level criminal activity, and the ETIS report to CoP16 suggests that governance issues could be responsible for Tanzania's low seizure and reporting rates (CoP16 Doc. 53.2.2 (Rev. 1)).

Population Distribution, Status and Trends

14. New census information was made publicly available in early 2014. The results of back-to-back aerial surveys of the Selous-Mikumi and Ruaha-Rungwa ecosystems in October through November of 2013 show significant population declines (TAWIRI 2013a and 2013b) in both of these ecosystems. The Selous-Mikumi survey revealed an estimate of 13,084 ($\pm$1,816 SE) elephants, the lowest figure reported in this area since surveys began in 1976 (TAWIRI 2013a). This figure is down from an estimated 38,975 ($\pm$ 2,644 SE) elephants in 2009 (TAWIRI 2009, *as cited in* TAWIRI 2013a), a decline of about 66%, which is significant ($d$-test = 8.07, $p$>0.05) (TAWIRI 2013a). The Ruaha-Rungwa survey revealed an estimate of 20,090 ($\pm$3,282 SE) elephants (TAWIRI 2013b), down from an estimated 31,625 ($\pm$2,890 SE) elephants in 2009 (TAWIRI 2010, *as cited in* TAWIRI 2013b), a decline of about 36.5%, which is significant ($d$-test = 2.6, $p$>0.05) (TAWIRI 2013b).

15. The latest update to Tanzania's population information in the African Elephant Database (http://www.elephantdatabase.org/preview_report/2013_africa/Loxodonta_africana/2012/Africa/Eastern_Africa/Tanzania) provides a best estimate for the year 2012, but does not reflect the new survey information discussed above from 2013. According to the 2012 estimate, the "definite" category estimate was 95,351 elephants, in addition to 10,278 "probable," 10,927 "possible," and 900 "speculative" category estimates. The new survey information would reduce the population estimate by about 37,426 individuals. Additional information below suggests that an updated population estimate would be revised downward even further.

16. Other information that indicates elephant populations are declining throughout Tanzania, includes:

---

a) Demographic surveys of the Katavi-Rukwa and Ugalla populations in 2009-2010 suggested that these populations were in distress. Survey results revealed that in each of these populations, the proportion of the herd less than 5 years of age was below 30% (TAWIRI 2010). These results are indicative of low recruitment and growth rates, suggesting one or more population stressors, such as higher infant mortality or increased stress associated with human-elephant conflict or illegal activity (i.e., poaching) (CoP15 Doc. 68, Annex 6a).

b) Anecdotal reports presented at a stakeholders meeting[1] held in Dar es Salaam (January 2013) to address elephant and other wildlife poaching issues in Tanzania (TEPS 2013a and 2013b) indicate that:

   o the Moyowosi population in northwest Tanzania may have been extirpated;
   o the population in the Ugalla ecosystem in western Tanzania is becoming unviable, with less than 500 elephants left;
   o the Katavi-Rungwa-Ruaha population in central Tanzania has been decimated by poachers;
   o elephants are almost absent from the Matambwe photo-tourism sector of the Selous Game Reserve and from the Kilombero Valley in southern Tanzania;
   o elephants in the southern Selous Game Reserve and Selous-Niassa corridor are being decimated by poachers;
   o Tanzania has lost 50% of its elephant population since 2007; and
   o the national population estimate is <70,000[2] elephants (*versus* 109,000 elephants in 2009 (TAWIRI 2010) and that if this rate of poaching continues, it is estimated that elephants will be extirpated from Tanzania within seven years.

c) Although Tarangire National Park in northeast Tanzania was cited in 2010 as having one of the highest growth rates (6%) ever recorded for an African elephant population (Foley and Faust 2010), it has been reported that since December 2011, there has been ongoing massive organized poaching within the park that has resulted in the illegal killing of at least 30 elephants in the year 2012 alone (Kideghesho *et al.* 2013). Demographic surveys of elephants from the Serengeti ecosystem during 2009-2010 were also indicative of good growth rates; however, the January 24, 2014, seizure of six pieces of elephant tusks in the Tarime District bordering the northern part of Serengeti National Park is an indication that not even the Serengeti ecosystem is free from poachers (http://allafrica.com/stories/201402070291.html).

d) Consistent with the population and anecdotal information available, recent information from the CITES MIKE program also suggests widespread population declines in

---

[1] This meeting was convened by the Tanzanian Elephant Protection Society (TEPS) and was attended by representatives from the Tanzania Ministry of Natural Resources and Tourism (Wildlife Division, Tunduru District Council, Morogoro Region), Tanzania National Parks (NP) (Udzungwa Mountains NP, Ruaha NP, and Mikumi NP), Wildlife Management Areas (WMA), photographic safari operators, hunting safari operators, researchers, NGOs, foreign donors, the press, and other interested individuals (TEPS 2013a).

[2] Note: this estimate was suggested prior to receipt of new information resulting from the 2013 aerial surveys of the Selous-Mikumi and Ruaha-Rungwa ecosystems.

Tanzania due to poaching.  MIKE collects data at representative sites throughout Asia and Africa in order to measure trends in the levels of illegal killing of elephants and identifies factors associated with those trends.  MIKE evaluates relative poaching levels based on the Proportion of Illegally Killed Elephants (PIKE), which is calculated as the number of illegally killed elephants found divided by the total number of elephant carcasses encountered by patrols or through other means, aggregated by year for each site (CITES Secretariat *et al.* 2013).  A PIKE level of 0.5 or higher translates to a level of illegal annual offtake that is likely to be higher than the annual natural birth rate and, therefore, indicates that the elephant population is very likely to be in net decline (CoP16 Doc. 53.1).  Within Tanzania, PIKE values suggest widespread population declines due to poaching.  At the Selous-Mikumi MIKE site, Tanzania's sole World Heritage site, the 2011 PIKE was 0.64 (based on 224 carcasses), a nearly 27% increase over the 2002-2010 average of 0.50.  At the Ruaha- Rungwa MIKE site, the 2011 PIKE was 0.94 (based on 34 carcasses), the highest ever recorded for that site.  The PIKE was 0.86 (based on 29 carcasses) at the Katavi-Rukwa MIKE site (CoP16 Doc. 53.1).

17.  Aside from concerns about population numbers, we are also concerned about the mobility of the African elephant populations in Tanzania.  The Panel of Experts noted, for example, that associated human settlements were increasing in size and number around protected areas and were accompanied by increasing human-elephant conflicts.  These settlements and the associated conflicts were probably the most important factors limiting the elephants' mobility and range.  It was the opinion of the Panel of Experts that -- at the rates of habitat change and land conversion at the time -- the corridors that still remained in Tanzania would be converted to unsuitable habitat in less than 5 years (CoP15 Doc. 68, Annex 6a).

18.  According to Jones *et al.* (2009), Tanzania was working to minimize risks to African elephants, other wildlife, people, and property through improvements in spatial planning involving the identification, maintenance, and restoration of wildlife corridors.  The Tanzania National Elephant Management Plan lays out a strategic objective to restore lost corridors and to increase protection for corridors that are still in use (TAWIRI 2010).  We do not have updated information on the status of the implementation of this strategic objective, but based on the information available we are particularly concerned about the viability of the Selous (Tanzania)-Niassa (Mozambique) corridor.  According to the 2013 survey of the Selous ecosystem only 32 elephants were counted within the Selous portion of the corridor, resulting in an estimate of 1,006 ± 810 (SE) elephants (TAWIRI 2013a).  In addition, poaching in the Niassa Reserve has reached crisis levels, as evidenced by high carcass ratios (18%; population of 12,000 elephants) observed during October 2011 aerial surveys (WCS Mozambique *in litt*. 2014) (see paragraph 24 for an explanation of carcass ratios).

Sustainability of Offtake

19.  In Tanzania, African elephant deaths occur as a result of several factors, including:  1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching.  In order to

DA 232

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2014*

evaluate whether offtake from trophy hunting is sustainable, all losses to the African elephant population must be considered.

Legal Offtake

20.  Since 2007, the annual CITES export quota for Tanzania has been 400 tusks (sport-hunting quota of 200 elephants).  During 2003-2006, the quota was 200 tusks from 100 individuals, while during 1997-2002 the quota was 100 tusks from 50 individuals.  Tanzania, however, typically has not exported its full quota allotment in sport-hunted trophies or African elephant tusks.  This may be an indication that the quota is set too high.

21.  Although complete records on natural mortality for the entire country or on the killing of problem elephants were not available, the Panel of Experts were able to estimate the level of such offtake by analyzing the data from the ivory store databases of Tanzania.  Based on 21 years of data for that country, an average of 231 elephants died annually from natural mortality, while another 287 individuals died annually from elephant control measures (CoP15 Doc. 68, Annex 6a).  These annual mortality rates continue to be the best estimates available for Tanzania and are cited and used by the Government of Tanzania (TAWIRI 2010).

22.  Based on a sport-hunting quota of 200 African elephants, as well as the estimates cited earlier for natural mortality and problem animal control in Tanzania, the overall legal offtake of African elephants in Tanzania is about 718 elephants annually.  Considering the current population estimate to be 70,000 elephants, which we believe is a significant over-estimate because it did not consider the most recent survey figures, the legal annual offtake would be estimated at about 1% of the population.  This figure is less than the annual population growth rate of 3-5% (CoP15 Doc. 68, Annex 6a) and in itself would be considered sustainable; however, sustainability is measured against total offtake, including illegal offtake, discussed below.

Illegal Offtake

23.  Based on the MIKE report presented to CoP16 (Bangkok, Thailand, 2013), the levels of illegal killing across the African elephants' range are of serious and increasing concern.  There has been an ongoing increase in the levels of illegal killing of elephants in Africa since 2006, with 2011 showing the highest levels of poaching since MIKE records began in 2002.  The increase in poaching between 2010 and 2011 is statistically significant.  As highlighted in paragraph 16, within Tanzania, PIKE values suggest widespread population declines due to illegal offtake.  At the Selous-Mikumi MIKE site, Tanzania's sole World Heritage site, the 2011 PIKE was 0.64 (based on 224 carcasses), a nearly 27% increase over the 2002-2010 average of 0.50.  At the Ruaha- Rungwa MIKE site, the 2011 PIKE was 0.94 (based on 34 carcasses), the highest ever recorded for that site.  The PIKE was 0.86 (based on 29 carcasses) at the Katavi-Rukwa MIKE site (CoP16 Doc. 53.1).  A PIKE level of 0.5 or higher translates to a level of illegal annual offtake that is likely to be higher than the annual natural birth rate, indicating that the elephant populations are very likely to be in net decline (CoP16 Doc. 53.1).  In other words,

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2014*

the illegal offtake is unsustainable at these sites. Recent information presented at the African Elephant Summit (Botswana, 2013) indicates that in 2012 and the first six months of 2013, the trend in PIKE levels for Eastern Africa stabilized at levels close to those of 2011(CITES Secretariat *et al.* 2013), indicating that unsustainable illegal offtake levels are continuing.

24. Carcass analyses resulting from the 2013 Selous-Mikumi and Ruaha-Rungwa aerial surveys are consistent with MIKE data. Based on the surveys, there were an estimated 6,516 (± 534 SE) elephant carcasses in the Selous-Mikumi, spanning three years. Carcass analyses indicate that more than two thirds (67%) of these elephants were killed 18 to 30 months prior, with much fewer elephants being killed within the last 18 months (<5%). The carcass ratio for the Selous-Mikumi was calculated at 30%, which indicates unnaturally high mortality (TAWIRI 2013a). Natural mortality is represented by a ratio of about 7-8% (Douglas-Hamilton and Burrill 1991, *as cited in* TAWIRI 2013a). In the Ruaha-Rungwa ecosystem, there were an estimated 3,496 (±342 SE) elephant carcasses, spanning over a ten-year period. Carcass analyses indicate that relatively fewer elephants were killed in the last 12 months (<13%). The carcass ratio for the Ruaha-Rungwa was calculated at 14.6%, which indicates unnaturally high mortality (TAWIRI 2013b).

25. It is expected that data showing high levels of poaching would be concurrent with data showing high levels of illegal trade, and this is the case with Tanzania. As noted in paragraph 16, a recent TRAFFIC news article reports that since 2009 Tanzania has made or been implicated in 18 large-scale ivory seizures (i.e., seizures that involved 500 kg or more in a single shipment). Of these seizures, Tanzania only made five of these seizures, while the other 13 seizures were made outside of the country. In total, these seizures represented nearly 43 tons of ivory, representing the death of about 4,000 elephants (http://www.traffic.org/home/2014/1/27/tanzania-reshuffled-cabinet-should-address-poaching-urgently.html). Although information on the origin of ivory from these seizures is not yet available, a significant proportion of the large seizures of ivory made in Asia in 2006 have been traced by forensic DNA work to elephants killed in the Selous-Niassa ecosystem (Wasser *et al.* 2009).

Sustainability of All Offtake

26. In its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II (Note: the proposal was rejected), the Panel of Experts noted that illegal hunting can reduce the sustainability of legal offtakes, potentially negatively impacting the population as a whole. The Panel raised concerns that the poaching in the Selous-Mikumi ecosystem, which was happening at that time, could affect the long-term population sustainability. While the Panel concluded that the level of offtake in the Selous-Mikumi ecosystem was not sustainable at the time, the Panel asserted that legal and illegal offtake appeared to be sustainable for other elephant ecosystems where populations were stable or increasing, namely the Tarangire-Manyara, Ruaha-Rungwa, Katavi-Rukwa, Moyowosi-Kigosi and Serengeti (CoP15 Doc. 68, Annex 6a). In recent years our findings have been made under the supposition that the populations mentioned above were stable or increasing, rendering the

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2014*

overall Tanzania elephant population to be sustainable. New information, however, indicates that the population decline is no longer restricted to the Selous-Mikumi ecosystem, but is occurring throughout Tanzania. Estimates are that Tanzania is losing about 30 elephants per day to poaching, a rate far greater than replacement through natural reproduction (TEPS 2013a and 2013b). This loss rate has recently been cited by TANAPA's Director General, Allan Kijazi (http://allafrica.com/stories/201402041257.html).

Conclusion

27.   Although Tanzania has put into place legal instruments, wildlife management authorities, and a National Elephant Management Plan, the national elephant population has plummeted, primarily due to the ongoing illegal killing of elephants. Indications are that management resources have not been fully utilized and that governance in Tanzania is weak. In its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II, the Panel of Experts raised concerns about the mechanism Tanzania used for funding the conservation, management, and protection of African elephants; however, after reviewing the actual allocations to the Wildlife Division between 2005 and 2009, the Panel concluded that sufficient funding was available for Tanzania to meet its enforcement obligations during that time period. The Panel of Experts also raised concern that the levels of offtake in the Selous-Mikumi ecosystem due to poaching was not sustainable at the time and could potentially affect long-term population sustainability. At the time, the Panel asserted that legal and illegal offtake appeared to be sustainable for other ecosystems where elephant populations were stable or increasing, namely the Tarangire-Manyara, Ruaha-Rungwa, Katavi-Rukwa, Moyowosi-Kigosi and Serengeti.

28.   Our recent non-detriment findings followed the rationale laid out by the Panel of Experts and concluded that the import of sport-hunted trophies from Tanzania would be for purposes that are not detrimental to the survival of the species. However, now new information indicates that the elephant declines in Tanzania are no longer restricted to the Selous-Mikumi ecosystem, but are occurring throughout the country. MIKE analyses showing high levels of poaching at sites throughout Tanzania and ETIS data showing rampant, large-scale illegal ivory trade involving Tanzania, point to weak governance.

29.   We recognize that sport-hunting, as part of a sound management program, can provide benefits to wildlife conservation and that sport-hunting of elephants is not the primary cause of the decline of elephant populations in Tanzania. However, given the significant decline in the elephant population due to uncontrolled poaching and questionable management and governance, we are concerned that additional killing of elephants, even if legal, is not sustainable and will not support effective elephant population recovery efforts in Tanzania.

30.   Therefore, we are **unable** to find that the importation of sport-hunted trophies of African elephants taken in Tanzania during calendar year 2014 will be for purposes that are not detrimental to the survival of the species.

**DA 235**

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2014*

REFERENCES:

Baldus, R.D. and R. Hahn. 2009. The Selous – Niassa Wildlife Corridor in Tanzania: Biodiversity Conservation from the Grassroots. Practical Experiences and Lessons from Integrating Local Communities into Trans-boundary Natural Resources Management. Joint publication of FAO and CIC. Budapest. 48 pp. Available online at: http://www.wildlife-baldus.com/download/transboundary.pdf.

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. African Elephant Status Report 2007: An Update from the African Elephant Database. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

Blanc, J.J., C.R. Thouless., J.A. Hart., H.T. Dublin., I. Douglas-Hamilton., C.G. Craig and R.F.W. Barnes. 2003. African Elephant Status Report-2002: An update from the African Elephant Database. IUCN/SSCAfrican Elephant Specialist Group, Tanzania, 112 -117, IUCN, Gland, Switzerland and Cambridge, UK. Available online at: http://african-elephant.org/aed/aesr2002.html.

CITES Secretariat, IUCN/SSC African Elephant Specialist Group, and TRAFFIC. 2013. Status of African elephant populations and levels of illegal killing and the illegal trade in ivory: A report to the African elephant summit, December 2013. 19pp. Available online at: https://cmsdata.iucn.org/downloads/african_elephant_summit_background_document_20 13_en.pdf.

CoP15 Doc. 68 Annex 6a). 2010. Report of the Panel regarding the proposal of the United Republic of Tanzania. 19 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/15/doc/E15-68A06a_.pdf.

CoP16 Doc. 53.1. 2012. Monitoring the Illegal Killing of Elephants (MIKE). Sixteenth meeting of the Conference of the Parties, Bangkok (Thailand), 3-14 March 2013, 15 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-01.pdf.

CoP16 Doc. 53.2.2 (Rev. 1). 2013. ETIS Report of TRAFFIC. Sixteenth meeting of the Conference of the Parties, Bangkok (Thailand), 3-14 March 2013, 30 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-02-02.pdf.

CoP16 Prop. 11. 2012. Transfer the population of the African elephant, *Loxodonta africana*, of the United Republic of Tanzania from Appendix I to Appendix II (with an annotation) (Note: proposal withdrawn). Available online at: http://www.cites.org/sites/default/files/eng/cop/16/prop/E-CoP16-Prop-11.pdf.

**DA 236**

Foley, C.A.H. and L.J. Faust. 2010. Rapid population growth in an elephant *Loxodonta africana* population recovering from poaching in Tarangire National Park, Tanzania. *Oryx* 44(2):205–212.

Government of the United Republic of Tanzania. 2010. The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010). Gazette of the United Republic of Tanzania (No. 27; Vol. 91):1–35.

Jones, T., T. Caro and T.R.B. Davenport (eds.). 2009. Wildlife Corridors in Tanzania. Unpublished Report. Tanzania Wildlife Research Institute (TAWARI), Arusha. Available online at: http://www.tzwildlifecorridors.org/TzWildlifeCorridors.pdf.

Jones, T. and K. Nowak. 2013. Elephant declines vastly underestimated. *A Voice for Elephants*. December 16, 2013. National Geographic Society. Available online at: http://newswatch.nationalgeographic.com/2013/12/16/elephant-declines-a-view-from-the-field/.

Kideghesho, J.R., A.A. Rija, K.A. Mwamende and I.S. Selemani. 2013. Emerging issues and challenges in conservation of biodiversity in the rangelands of Tanzania. *Nature Conservation* 6:1-29.

Mpanduji, D.G., H. Hofer, T.B. Hilderbrandt, F. Goeritz, M.L.East. 2002. Movement of elephants in the Selous-Niassa wildlife corridor, southern Tanzania. *Pachyderm* 33:18-31.

Tarimo, E.E., E.L.M. Severre, and S. Mduma. 2011. *in litt.* Elephant Management Plan and Law Enforcement in Tanzania: A report presented at the meeting between Ministry of Natural Resources and the Department of Interior, Fish and Wildlife Service, Washington, D.C., 17 February 2011. 16 pp.

TAWIRI. 2013a. Aerial census of large animals in the Selous-Mikumi ecosystem, dry season 2013, population status of African elephant. Arusha, Tanzania, 11pp.

TAWIRI. 2013b. Aerial census of large animals in the Ruaha-Rungwa ecosystem, dry season 2013, population status of African elephant. Arusha, Tanzania, 12pp.

TAWIRI. 2010. Tanzania Elephant Management Plan 2010-2015. TAWIRI, Arusha, Tanzania, 95 pp. Available online at:  www.tawiri.or.tz/images/Conference/elephant_plan.pdf.

TEPS. 2013a. Recognition and tackling of the current elephant poaching crisis in Tanzania. Report by Tanzania Elephant Protection Society (TEPS) Task Force to the Parliamentary Committee of Land, Natural Resources and Environment. April 2013. Dar es Salaam, Tanzania, 18pp. Available online at:

http://www.tanzaniaelephantprotectionsociety.org/images/PDFs/TEPS_Elephant_Crisis_Report_BUNGE1_April_2013.pdf.

TEPS. 2013b. Tackling the elephant poaching crisis in Tanzania. Presentation to the Parliamentary Committee of Land, Natural Resources and Environment. 23rd April 2013. Task Force, Tanzania Elephant Protection Society. Dar es Salaam, Tanzania, 28pp.

Wasser, S.K., B. Clark and C. Laurie. 2009. The Ivory Trail. *Scientific American*, July 2009. Pp. 68-76.

WCS Mozambique. 2014. *in litt.* Niassa Reserve expanded elephant protection program. USFWS WWB-AECF FY14 grant proposal (F13AS00357).

**DA 238**

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Reply Refer To:
FWS/AIA/DMA

Memorandum

MAR  2 7  2014

To:          The File

From:        Chief, Branch of Permits

Subject:     Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in
             Tanzania during 2014

The African Elephant (Loxodonta africana) is listed as threatened under the U.S. Endangered
Species Act (Act) with a special rule [50 CFR 17.40(e)]. In addition to other items, the special
rule gives the requirements for the import of sport-hunted trophies. Under paragraph
17.40(e)(3)(iii)(C), the U.S. Fish and Wildlife Service (Service) must make a finding that the
sport-hunting of elephants will enhance the survival of the species in the wild.

In a meeting in Washington, D.C. on February 17, 2011 between the Service and the Tanzania
Ministry of Natural Resources and Tourism (MNRT), the Service was provided with a copy of
Tanzania's Elephant Management Plan 2010 – 2015, signed and endorsed by the Minister for
Natural Resources on January 15, 2011 (the last National Elephant Management Plan for
Tanzania had been produced in 2001). The 2010 Elephant Plan identified nine (9) Strategic
Objectives which needed to be address for the effective management of Tanzania's elephant
population. The Plan also identified three major issues impacting Tanzania's ability to manage
its elephants. The first was the growth in Tanzania's human population which had doubled in
size since 1984, putting increased pressure on the country's natural resources and creating
challenges in conserving its elephants, (e.g., increased human-elephant conflicts). The second
was the threat to healthy and sustainable elephant populations from an increasing loss of
connectivity between important wildlife habitat areas in Tanzania. Existing wildlife corridors
where under increased pressure from expansion of agriculture lands, increased human settlement,
and habitat destruction caused by logging and charcoal production. The third issue was the
ability to provide increased protection for Tanzania's elephant population. There had been an
upsurge in elephant poaching occurring across eastern and central African over the past three to
five years, apparently fueled by the increased demand for ivory in Asia. This increase in demand
had also impacted several distinct elephant populations within Tanzania. A 2009 national
elephant census showed an overall decline in Tanzania's elephant population for the first time
since 1989.

Since that time, the Service has received more recent population surveys and biological

information to indicate a continued decline in Tanzania's elephant population. One example is the Selous-Mikumi ecosystem that was once an elephant stronghold representing the second largest elephant population in Africa and approximately 40% of Tanzania's elephant population. An October 2013 population survey of that ecosystem indicated that an 80% population decline has occurred in the last three years, from a population of approximately 40,000 to 13,000. Of further concern are the numerous reports of questionable government activities relating to how the elephant hunting program is being managed. While the Service recognizes that a well-managed hunting program could provide a conservation benefit to Tanzania's elephant population, there are indications that Tanzania's program is being managed in a manner whereby participation by U.S. hunters may no longer provide a conservation benefit to the species as is required under the Act. In addition, information regarding financial resources and infrastructure indicates that the Tanzania Government may no longer have the ability to effectively manage and protect its elephant population. We have also received information to indicate that ivory poaching has continued to increase in some parts of the country, and that human-elephant conflict has continued to rise with an ever increasing human population and settlement into elephant habitat for agriculture use and livestock grazing. Therefore, the Service is ***unable to find*** that the taking of sport-hunted elephant trophies in Tanzania will enhance the survival of the species.

Basis for Finding:

***Management Plan***: On March 21, 2007, the Division of Management Authority (DMA) sent a letter to the Wildlife Division, MNRT, requesting updated information relating to their current management program for African elephants. This request was stimulated due to the Service not having any substantive communication with the government of Tanzania regarding their elephant management program and elephant hunting in Tanzania for several years. The DMA request related specifically to the following areas: (1) existence of an elephant management plan; (2) current population status of Tanzania elephants; (3) existing legislation and programs relating to elephant conservation and management; (4) elephant trophy hunting quotas for Tanzania; (5) threats of poaching and human-elephant conflicts; (6) revenue generated by trophy hunting; and (7) operations involving trophy hunting in Tanzania. The Service received an email response to this letter on July 1, 2008. While this communication indicated that Tanzania's original response had been sent to DMA on October 29, 2007, by an acting Director of Wildlife, Mr. F. Lyimo, the Service had no record of this official response having been received.

The 2008 e-mail indicated that Tanzania had an approved Policy and National Management Plan for African Elephant that was developed in 2001. This plan was also reviewed on a regular basis to accommodate new insight and other issues deemed pertinent to the conservation of the African elephant. The identified objectives of this elephant management plan were to increase elephant numbers and restore age and sex structures; promote economic value of elephants through tourist game viewing and sustainable harvest through tourist hunting; control elephant numbers where necessary and appropriate (mitigate human-elephant conflict); and incorporate community-based conservation whereby local communities realize a direct benefit from the sustainable utilization and management of elephants. This plan was intended to be implemented throughout the entire country.

More recently, a February 17, 2011, meeting between the Service and the MNRT occurred in Washington, D.C. to discuss concerns by the Government of Tanzania and the Tanzania Hunting Operators Association (TAHAO) relating to potential changes the Service might implement regarding import permits issued to clients intending to hunt elephants in Tanzania in 2011. These concerns were based primarily on the July 23, 2010, Convention on International Trade in Endangered Species (CITES) non-detriment finding prepared by the Service's Division of Scientific Authority (DSA). In that finding, DSA raised several concerns, the first being the availability of future resources to the Wildlife Division to combat poaching in Tanzania, especially in the Selous-Mikumi ecosystem. The second involved the threats to wildlife corridors within Tanzania which allows for elephant movement throughout Tanzania and transboundary populations. These corridors were under increased pressure due to the rising human population in Tanzania, loss of these corridors due to the expansion of agricultural lands, and human expansion into elephant habitat. During this meeting, the Service received a copy of Tanzania's Elephant Management Plan 2010 - 2015, prepared by the Tanzania Wildlife Research Institute (TAWIRI) with the financial support of the Government of Tanzania. This document was endorsed by the Minister for Natural Resources and Tourism on January 15, 2010. The document identified nine key strategic objectives for a management plan: (1) human-elephant conflict; (2) elephant corridors; (3) law enforcement; (4) benefits/sustainable utilization; (5) management of ivory stockpiles; (6) research and monitoring; (7) elephant health and welfare; (8) cross-border cooperation; and (9) elephant information management.

In the 2011 meeting, Mr. Eramus Tarimo, Director of Wildlife, MNRT, provided a summary of the strategic objectives under the national elephant plan. Mr. Tarimo noted the many challenges to the plan, including: low human resources and financing; the large area covered by Tanzania; the high demand for ivory; an increase in poverty; increased frequency of human-elephant conflicts due to human population growth; political resistance to maintaining wildlife corridors; reversing attitudes people have towards elephants; and providing local communities with a stake in managing, protecting, and conserving elephants as both a natural and economic resource. Mr. Tarimo stated that major reforms were underway to improve the management of wildlife outside National Parks and the Ngorongoro Conservation Area and Game Reserves. He also stated that trophy hunting played a major role in wildlife conservation in Tanzania. Mr. Tarimo went on to state that the Government of Tanzania was in need of United States support to help strengthen their law enforcement capabilities in protected areas and to assist with anti-poaching operations.

Based on this discussion and the document provided to the Service, we have concluded that the "Elephant Management Plan 2010-2015" was a very good starting point for Tanzania, provided that the country strived to overcome the challenges presented by Mr. Tarimo and strived to fully implement the plan throughout Tanzania. However, the presences of a plan, particularly a plan that is not fully implemented, was not sufficient in and of itself to meet the criteria established by the ESA or CITES.

***Population Status***: Tanzania's Protected Area (PA) network for wildlife includes six ecosystems: Tarangire-Manyara, Serengeti, Selous-Mikumi, Ruaha-Rungwa, Katavi-Rukwa; and Moyowosi-Kigosi. In 2006, the Tanzania Wildlife Research Institute (TAWIRI 2007, as cited in CoP15 Doc. 68, Annex 6a) estimated the African elephant populations in these six ecosystems

within Tanzania at 139,915 ± 12,338 (SE) animals, based on census surveys covering 227,328 sq.km using both total and sample counts. This estimate was not significantly different from the 111,475 ± 18,728 (95% CL) elephants estimated in 2000-2003. It was noted that the 2006 estimate did not include 2,873 additional elephants from areas that had not been previously surveyed, providing a country-wide "best estimate" of 142,788 ± 12,405 (SE) elephants in 2006 (CoP15 Doc. 68, Annex 6a). According to the IUCN SSC African Elephant Status Report 2007 (Blanc *et al.*, 2007), the 2006 elephant population in Tanzania was categorized as being an estimated 108,816 elephants identified as "definite," 27, 937 "probable," 29,350 "possible", and 900 "speculative". These estimates were based upon aerial or ground counts, direct sample counts, reliable dung counts, and informed guesses. This was a reported increase from the 2002 report, which estimated 92,453 elephants as "definite," an increase of 16,363 elephants. The report attributed this increase largely due to the results of new estimates from methodologically comparable surveys. The report stated that although over 60% of the country's estimated elephant range was covered by good quality counts, over a third of the estimated range still remained unassessed. According to the 2007 IUCN report, an aerial survey of the Ruaha-Rungwa Ecosystem conducted by the Tanzania Wildlife Research Institute (TAWIRI, 2007), found an estimated 35,409 ± 11,507 (95% CL) elephants. An aerial survey of the Selous Ecosystem (TAWIRI, 2007), found an estimated 70,406 ± 24,843 (95% CL) elephants. These areas account for the two largest elephant populations within Tanzania and Tanzania alone accounted for about 80 % of Eastern Africa's regional population.

In 2009, a similar survey was conducted across the same six ecosystems covering 229, 318 sq.km. This census produced a total population estimate of 105,439 ± 6, 080 (SE) African elephants (TAWIRI 2010a, as cited in CoP15 Doc. 68, Anex 6a). A "best estimate", which included an additional 3,583 elephants, provided a country-wide estimate of 109,022 ± 6,135 (SE) elephants in 2009. The results of this survey suggested a significant decline compared to the 2006 estimate of 142,788 elephants and that the decline could be attributed in large part to a downward population trend recorded in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a). According to the 2013 IUCN SSC Provisional African Elephant Status Report (AESR 2013), the 2012 elephant population in Tanzania was categorized as being an estimated 95,351 elephants defined as "definite," 10,278 "probable," 10,927 "possible," and 900 "speculative." These survey numbers were based upon the same methodology used in the 2007 report. There was a clear decrease in population from the 2007 report, which estimated 108,816 elephants as "definite," 13,465 elephants. According to the 2013 IUCN report, the 2009 aerial sample counts of the Ruaha-Rungwa and the Selous-Mikumi Ecosystems (TAWIRI, 2009), replaced the 2006 survey of those systems. The Rauha-Rungwa survey found an estimated 31,625 ± 5,665 (95% CL) elephants and the Selous-Mikumi survey found an estimated 38,997 ± 5,183 95% CL) elephants. Both surveys represented a decline in those populations, with the Selous-Mikumi ecosystem experiencing a significant decline of more than 30,000 elephants. According to TAWIRI, there were methodological issues during the 2006 survey that is believed to have resulted in an overestimate of this population. Taking several factors into account, TAWIRI estimated the actual population in the Selous ecosystem would have been approximately **50,000 elephants in 2006.** This still represents a significant decline (**approximately 11,000 elephants**) most likely resulting from illegal killing taking place in this area.

Two more recent aerial surveys were undertaken by TAWIRI during the 2013 dry season, again looking at the Ruaha-Runga and Selous-Mikumi Ecosystems. The preliminary results of those surveys show a continued decline in those two populations. The census of the Ruaha-Rungwa ecosystem covered 50,889 sq.km. The results of this survey produced a total population estimate of 20,090 + 3,282 (SE) elephants. This represents a significant decline (over 11,500 elephants) from the 2009 estimates. This estimate was derived from a count of 1,247 live elephants recorded along 119 transects. In addition, a total of 214 elephant carcasses were also recorded during this survey. Using these two figures, the carcass ratio for the Ruaha-Rungwa ecosystem was 14.6%. This carcass ratio is indicative of a population suffering from unnaturally high mortality. A carcass ratio of about 7 to 8% is considered to represent natural mortality (Douglas-Hamilton and Burrill 1991).

The census of the Selous-Mikumi ecosystem covered 87,421 sq.km. The results of this survey produced a total population estimate of 13,084 + 1,816 (SE) elephants, the lowest numbers ever recorded in this ecosystem. This represented another significant decline (over 25,000 elephants) from the 2009 estimates. This estimate was derived from a count of 712 live elephants recorded along 203 transects. In addition, a total of 314 elephant carcasses were also recorded during this survey. With these figures, the carcass ratio for the Selous-Mikumi ecosystem was calculated at 30%, twice that recorded in Ruaha-Rungwa, indicating an unnaturally high rate of mortality in the two most significant elephant populations within Tanzania. These numbers indicate significant and unsustainable levels of illegal killing taking place within the two largest elephant populations found in Tanzania.

Based on the most recent surveys, it seems apparent that Tanzania has experienced a significant increase in illegal offtake due to poaching and the increased demand for ivory in the Asian market. In response to the current conditions in Tanzania and the urgent need for wildlife protection, the Service, in collaboration with USAID-TZ, awarded $200,310 in U.S. Government funds, matched by $378,443 from other partners, to fund four African Elephant Conservation Fund (AFE) projects that will get underway in 2014. The first project will assess patterns of poaching risk in relation to resource-constrained distribution of Mikumi elephants, for a long-term elephant protection and management strategy in partnership with the Animal Behavior Research Unit in Mikumi National Park. This project will support TANAPA to help improve their ability to protect elephants by assessing elephant distribution and habitat use, threats and poaching activity, and deploying patrol efforts effectively within Mikumi National Park.

The second project will monitor the long-term effects of poaching of elephants in southern Tanzania in partnership with the Udzungwa Elephant Project. This organization, in response to widespread elephant poaching throughout southern Tanzania, is working to protect a key population near Tanzania's elephant strongholds of Selous and Ruaha. Activities will include training staff from TAWIRI, assessing four elephant populations for early warning signs of decline, and training national park staff in monitoring elephant populations and conducting anti-poaching activities.

The third project will support aerial operations and law enforcement activities for the Selous Game Reserve in partnership with the Frankfurt Zoological Society/Grzimek's Help for

Threatened Wildlife, Inc., and the Tanzania Wildlife Division. The Selous, formerly the second most numerous elephant population in Africa, has been heavily impacted by poaching for the past decade with the most recent survey indicating a population of only 13,084 elephants, the lowest levels ever recorded in that area. This project will reinvigorate anti-poaching efforts in the Selous by supporting operating expenses for an aircraft to conduct aerial surveillance, for patrol vehicles, and for basic equipment for rangers throughout the reserve.

The final project will support village game scouts on the Waga Wildlife Management Area, in the Ruaha ecosystem. This will be done in partnership with the Wildlife Conservation Society. In order to improve patrol efficiency, this project will fund village game scout anti-poaching patrols and the pilot phase of a spatially explicit law enforcement monitoring technique, SMART (Spatial Monitoring and Reporting Tool), in the community-owned Waga Wildlife Management Area bordering Ruaha National Park in Tanzania.

The significant decline in the elephant population throughout Tanzania raises grave concerns over the impact of any additional offtake, including sport-hunting, on the country's elephants and its continued survival in the country. These declines must be taken into consideration with any finding made by DMA in regards to trophy imports to ensure that U.S. hunters, while operating under the best intentions, do not adversely contribute to further elephant population declines in Tanzania.

***Regulations and Enforcement***: In Tanzania, wildlife resources are protected under several Acts of Parliament, providing the authority for all aspects of wildlife management, including law enforcement. The Wildlife Conservation Act (WCA) of 2009, which replaced the original WCA of 1974, provides the legal framework for operation of the Wildlife Division under the MNRT, including the appointment of the Director, as well as the establishment of Game Reserves, Game Controlled Areas, Wildlife Management Areas, and other protected areas such as wildlife corridors (not including national parks). The WCA also provides for the establishment of a Wildlife Authority to address the management of wildlife occurring outside the National Parks or the Ngorongoro Conservation Area, with the added responsibility for meeting international obligations involving wildlife conservation. There is also a Wildlife Protection Unit that is granted paramilitary status under the WCA, with the duty of protecting wildlife against unlawful utilization.

In addition, the National Parks Act (CAP 282 RE 2002) establishes the legal authority for the creation and management of national parks, granting powers to the Director General to enable maintenance and security within national parks, as well as the responsibility for the protection of their wildlife resources. The Ngorongoro Conservation Act (CAP 284 RE 2002) provides the legal framework for the existence of the multiple land use in the Ngorongoro Conservation Area and its management Authority under the direction of the Conservator, and also provides the authority for its maintenance and security. The Tanzania Wildlife Institute (TAWIRI, CAP 260 RE.2002), grants powers to the Director General who is responsible for research involving wildlife, and for providing this information to the Wildlife Authorities. The TAWIRI also functions as the CITES Scientific Authority for Tanzania.

**DA 244**

The responsibility for managing Tanzania's wildlife falls under four institutions. The first is the Tanzania National Parks (TANAPA). This Parastatal Organization is responsible for managing 15 National Parks with a total area of 50,872 sq.km. In the national parks, only the non-consumptive utilization (tourism game viewing) of wildlife resources is allowed. The second is the Ngorongoro Conservation Area Authority (NCAA). This is also a Parastatal Organization which is responsible for management of only one area, the Ngorongoro Conservation Area covering 8,300 sq.km. It is the only multiple land use wildlife area in Tanzania in which the consumptive utilization of wildlife is not permitted.

The Wildlife Division under the MNRT is responsible for the management of 28 Game Reserves (GRs) with an area of 112,564 sq.km., approximately 38 Game Controlled Areas (GCAs) covering 161,521 sq.km, and Ramsar sites covering 249,856 sq.km. There are also District Councils, Local Government institutions that work in collaboration with the Wildlife Division. These Councils oversee wildlife conservation issues and facilitate the establishment and management of Wildlife Management Areas (WMAs) on village lands that are outside Protected Areas (PAs). The framework for WMAs was outlined in Tanzania's Wildlife Policy of 1998 (revised in 2007), with legislation established under the Wildlife Management Areas Regulations of 2002, authorizing the formal establishment of WMAs. The goal of this policy is to allow for rural communities and private land holders to manage wildlife on their land for their own benefit and to transferring management responsibilities of settled and unsettled areas outside PAs to rural people and the private sector.

The WMAs are used by communities for conservation and benefit sharing in conjunction with the Wildlife Division. These local communities run the WMAs as a business venture. However, 50% of any hunting revenue generated is retained by the Wildlife Division which also sets quotas and tariffs for any hunting that occurs in the WMAs. The facilitation of these WMAs commenced in 2003, with 12 of 16 original proposals achieving Authorized Association (AA) status. As of June 2010, there were an additional 12 proposals in process. The establishment of these WMAs has resulted in an additional 23,700 sq.km. of Tanzania's land area being added to its conservation network and increased capacity for protected area management through the training of village game scouts and WMA managers. As of June 2010, six out of the ten WMAs with user-rights had entered into business agreements with the private sector worth over $3.3 million, however, it appears that only a small proportion of this money is being been made available to the local communities. Over $1.7 million was allocated to nine WMAs and several districts in which hunting took place between 2005 -2008. However, there appears to be ongoing challenges that need to be addressed. Investment in training and capacity development needs to be increased as there is a shortage of qualified personnel with relevant skills to be able to manage the Community-based Organizations (CBOs) and AAs. The ability of the community to hold the CBO management accountable and ensure transparent decision-making processes is an issue. There is also a pressing need to increase the economic benefits realized by local communities from utilization of wildlife resources. Overall, the WMAs have a low capacity for generating income for socio-economic development, and as such, do not provide an incentive to local communities to support or even tolerate wildlife as a potential source of renewable revenue.

Both the consumptive and non-consumptive utilization of wildlife resources contributes to about

10% of Tanzania's annual Gross National Product. The tourist industry generates approximately 1.3 billion per year with about 80 million annually going to TANAPA, NCAA, and the Wildlife Division to fund their operations. The two parastatal organizations, TANAPA and NCAA retain 100% of their revenue share. As a result, both TANAPA and NCAA are generally self-sustaining and consequently, National Parks and equivalent areas such as Ngorongoro Conservation Area, with an area covering approximately 57,387 sq.km., or 38% of all PAs in Tanzania, are adequately funded.

By contrast, the Wildlife Division's revenue share is paid to the central treasury, and the Treasury is then responsible for distributing the budgeted monies to the Wildlife Division. The Wildlife Division is responsible for the management and protection of Game Reserves with an area covering approximately 109,471 sq.km., (62% of all PAs). The Wildlife Division over a three year period covering 2007-2009, received only 63% ($2,634,975 per year) of its approved budget from the central Treasury. This is equivalent to US$ 24 per sq.km which, when compared to the generally accepted norm of ca. US$ 200 per sq.km required to protect PAs across southern and eastern Africa (Cummings, 2004), is completely inadequate. With regards to the Selous Game Reserve, the equivalent figure is US$ 19 per sq.km based on an annual actual budget of $928,597. Based on this level of funding, it is apparent that the Wildlife Division has not had adequate resources to be able to meet its obligations to conserve, manage, and protecting Tanzania's wildlife resources.

Of further concern is the situation with the elephant population in the Selous-Mikumi ecosystem. Prior to 2005, a Revenue Retention Scheme was in operation in the Selous Game Reserve. This was an agreement between the Government of Tanzania and the German government aid agency, GTZ, whereby a special project status was granted to Selous GR (IUCN-UNESCO, 2007). This allowed for 100% of revenue from photographic tourism, and 50% of revenue from hunting operations to be retained for management of the area. Over the 10 year period from 1994-2004, this retention scheme provided and operational and development budget totaling $ 15.8 million, an average of $1,576,000 annually. However, following National budget reductions in 2004, this amount retained by the Reserve declined dramatically to approximately $800,000 in 2008. This drop in revenue coincides with a period of increased poaching in the Reserve suggesting that anti-poaching operations are severely underfunded.

The hunting of elephants is permitted in Game Reserves, Game Controlled Areas, and Wildlife Management Areas where designated hunting blocks exist. The trophy hunter is required to pay of a license fee that ranges from $7,500 to $25,000, the fee being determined by the tusk size of the animals shot and the type of weapon used. The minimum tusk size of a trophy animal is 15kg for males and females. In 2007, Tanzania notified the CITES Secretariat that it had established and export quota of 200 elephants (400 tusks), an increase of 100 bull elephants a year. However, since that time, the legal off-take has been less than 50% of the established quota.

U.S. hunters are the primary recipients of licenses in Tanzania. It is the belief of these hunters, as well as the DMA, that the funds generated from these licenses are being used for conservation purposes. If, however, only a limited portion of these funds are actually utilized for conservation,

it raises further concerns that U.S hunters are not actually contributing the level of conservation funding they are led to believe, and therefore, are not likely to meet the ESA criteria of showing that imports of their trophies contribute to the enhancement of the species.

***Sustainable Use***:  The elephant deaths that occur in Tanzania are a result of several factors, including: 1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching. In considering whether any level of off-take from trophy hunting is sustainable, the level of both legal and illegal take, as well as the rate of natural mortality throughout the country, must be taken into consideration.  As previously stated, since 2007, Tanzania has had an established export quota of 200 bull elephants (400 tusks).  From 2003-2006, the export quota was set at 100 elephants (200 tusks).  During the period from 1997-2002, the quota was set at 50 elephants (100 tusks).  Typically, Tanzania has not exported its full quota allotment in sport-hunted trophies or tusks.  During the period covering 1997-2009, elephant tusks exported annually amounted to about 40-45 % of the allowed quantities and never exceeded the approved annual quota.  In 2010, in conjunction with Tanzania's request to have their elephant populations down-listed to Appendix II, a CITES Panel of Experts was convened to determine whether a down-listing was warranted.  At the time, records of natural mortalities covering the entire country were not available and the MNRT Wildlife Division failed to provide data that the Panel requested on the killing of problem elephants.  An analysis of the Wildlife Division and TANAPA ivory store databases in 2010 showed the accumulation of 9,705 whole tusks from natural mortality and 12,057 from Problem Animal Control (PAC) in the period from 1989-2009.  When averaged over the 21-year period, this was equivalent to 231 elephants dying from natural causes and 287 elephants taken as problem elephants annually.  Based on these numbers and the number of trophy animals taken each year, it was estimated that a minimum of 718 elephants were taken annually by legal means.  This was equal to 0.7% of the 2009 elephant population estimate of 109,022.  Based on what was considered very low carcass detection rates for the country overall, it is likely that the number of natural mortalities was much higher.  However, the Panel believed that the level of offtake from legal killings still fell within the expected rate of increase of the elephant population, 3 to 5% annually, which was considered sustainable.

With regards to illegal off-take, official elephant poaching statistics provided to the Panel by the Wildlife Division indicated that 258 reported poaching incidents were documented during 2005-2009, including 82 poaching incidents in 2009.  This was the highest reported number of elephants poached in any one year during that time period.  The Panel noted, however, that total number of poaching incidents was considered to be greatly underestimated given the low elephant carcass detection rates for the country (CoP15 Doc. 68, Annex 6a).  Evidence cited by the Panel showed that poaching had led to elephant population declines in the Selous-Mikumi ecosystem, based in part, on the Proportion of Illegally Killed Elephants (PIKE) values collected at the Selous Mikumi Monitoring Illegal Killing of Elephants (MIKE) site, showing a progressive increase in poaching activities between 2003 and 2009 (CITES Secretariat, 2010).  In addition, the joint Wildlife Division/Selous Rhino Project aerial observations and foot patrols recorded more than a threefold increase in encounter rates of recently dead elephant carcasses between 2007 and 2008 (TAWIRI, 2010b).  There had also been reports from tourism operators in the northern Selous of increased elephant and other wildlife poaching since 2007/2008, including several incidents close to tourist camps.  There were also a significant proportion of the large

seizures of ivory made in Asia in 2006 that were traced by forensic DNA work to elephants killed in the Selous-Niassa area (Wasser et al., 2009). The ivory confiscations served to highlight that the Selous-Mikumi ecosystem was a hotspot for elephant poaching. In the Udzungwa National Park, all ivory collected by wildlife enforcement officials was from confiscations. According to wildlife officials, these confiscations consisted of illegally-sourced ivory coming out of nearby Kilombero Game Controlled Area in the Selous-Mikumi ecosystem. In addition, the highest numbers of tusks confiscated by field-based Wildlife Division offices were found to originate from Morogoro and Lindi, both areas which are adjacent to the Selous-Mikumi ecosystem (CoP15 Doc. 68 Annex 6a). Given these factors, the Panel of Experts came to the conclusion that the level of off-take at that time was not sustainable in the Selous-Mikumi ecosystem, an area containing about 40% of Tanzania's total elephant population. However, the Panel did note that the legal and illegal off-take appeared to be sustainable in the five other elephant ecosystem, including Ruaha-Rungwa, where populations were stable or increasing, but there were concerns that the situation in the Selous-Mikumi ecosystem could affect long-term elephant population sustainability.

MIKE collects data at representative sites throughout Asia and Africa to measure trends in the levels of illegal killing of elephants, as well as identifying factors associated with those trends. MIKE evaluates relative poaching levels based on the PIKE, which is calculated as the number of illegally killed elephants found divided by the total number of elephants carcasses encountered by patrols or through other means, aggregated by year for each site (CITES Secretariat *et. al.* 2013). A PIKE level of 0.5 or higher translates to a level of illegal annual off-take that is likely to be higher than the annual natural birth rate and, therefore, indicates that the elephant population is very likely to be in net decline (CoP16 Doc. 53.1). A more recent analysis of MIKE data indicates that the levels of killing across the African elephants' range are of serious and increasing concern, and populations throughout Tanzania are declining due primarily to rampant poaching. At the Selous-Mikumi MIKE site, the 2011 PIKE level was 0.64 (based on 224 carcasses), a nearly 27% increase over the 2002-2010 average of 0.50. At the Ruaha-Rungwa MIKE site, the 2011 PIKE was 0.94 (based on 34 carcasses), the highest ever recorded for that site. The PIKE was 0.86 (based on 29 carcasses) at the Katavi-Rukwa MIKE site (CoP16 Doc. 53.1). This trend raises concerns as to the effectiveness of Tanzania's management and enforcement capabilities in protecting their elephant populations and the country's wildlife resources in general.

Of additional concern is the distribution of elephants in relation to existing wildlife corridors in Tanzania, and the impact these corridors have on the mobility of these populations. These wildlife corridors are being destroyed by rapid agricultural expansion, unplanned land use, unsustainable resource utilization, and road construction, resulting in increased isolation of protected areas within Tanzania. The Panel of Experts noted that associated human settlements were increasing in size and number around protected areas, the result being increased human-elephant conflicts. These settlements and the associated conflicts were probably the most important factors limiting the elephant's mobility and range. It was the opinion of the Panel at the time, based on the rates of habitat change and land conversion, that those wildlife corridors still remaining in Tanzania would be converted to unsuitable habitat (would disappear) in less than 5 years (CoP15 Doc. 68, Annex 6a). The current National Elephant Management Plan lays

out a strategic objective to restore lost corridors and to increase protection for corridors that are still in use (TAWIRI 2010). The Wildlife Conservation Act (WCA) of 2009, Part IV (b), Section 22. (1-3), provides the legal framework for conserving Tanzania's wildlife corridors. However, it is not clear whether regulations for implementing this section of the Act were ever written, published, or are currently being implemented.

Based on the most current information available, there is particular concern about the viability of the Selous (Tanzania)-Niassa (Mozambique) corridor. The Selous-Niassa ecosystem extends across southern Tanzania and northern Mozambique, and is one of the largest trans-boundary ecosystems in Africa covering ca. 154,000 sq.km of diverse miombo woodland and supporting a rich mammalian and avian fauna (Jones *et al.*, 2009). According to the 2013 survey of the Selous ecosystem, there were only 32 elephants counted within the Selous portion of the corridor, which resulted in an estimate of $1,006\pm 810$ (SE) elephants (TAWIRI 2013a). Additionally, poaching in the Niassa Reserve has reached crisis levels, as evidenced by high carcass ratios (18%; population of 12,000 elephants) observed during October 2011 aerial surveys (WCS Mozambique *in litt.* 2014).

***Summary***: The most recent national elephant management plan, "Elephant Management Plan for Tanzania 2010-2015", was prepared by TAWIRI with the financial support of the Government of Tanzania. The Plan identified nine strategic objectives to be addressed in order to effectively manage Tanzania's elephant population. The Plan also identified three major issues impacting Tanzania's ability to manage its elephants: (1) the country's increasing human population which is putting pressure on natural resources and presenting challenges to conserving its elephants; (2) the threat to healthy and sustainable elephant populations from an increasing loss of connectivity (wildlife corridors) between important wildlife habitat areas in Tanzania; and (3) the ability to provide increased protection for Tanzania's elephant population. In a meeting between the Service and representatives from Tanzania that took place in Washington, D.C. in 2011, then Director of Wildlife, MNRT, Erasmus Tarimo, acknowledged that there were many challenges to the plan, including: low human resources and financing; the high demand for ivory; increase in the level of poverty; increased human-elephant conflicts related to human population growth; political resistance to maintaining wildlife corridors; and providing local communities with a stake in managing, protecting, and conserving elephant populations in Tanzania. Mr. Tarimo indicated at the time that major reforms were underway to improve the management of wildlife resources outside National Parks and Game Reserves.

However, since that time, the situation involving Tanzania's elephant population has grown increasingly worse based on current information from a number of sources. The most recent aerial surveys undertaken by TAWIRI conducted during the 2013 dry season covered the two most important ecosystems for elephants in Tanzania, the Ruaha-Rungwa and Selous-Mikumi Ecosystems. The resulting data shows a continued and rapid decline in the two largest elephant populations in Tanzania. The census of the Ruaha-Rungwa ecosystem showed a decline of over 11,500 elephants from the 2009 population estimate of 31,625. The census of the Selous-Mikumi ecosystem showed a decline of over 25,000 elephants from the 2009 survey estimate of 38,997. The carcass ratios resulting from the survey data from each area was indicative of populations suffering from unnaturally high mortality, with the Selous-Mikumi ecosystem having

a mortality rate twice that of the Ruaha-Rungwa ecosystem. These ratios indicate significant and unsustainable levels of illegal off-take occurring in these ecosystems.

In 2010, the CITES Panel of Experts, in its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II, raised concerns that the level of offtake due to poaching in the Selous-Mikumi ecosystem was not sustainable and could potentially affect long-term population sustainability throughout Tanzania. However, the Panel also determined that legal and illegal off-take appeared to be sustainable in other ecosystems where elephant populations were found to be stable or increasing, namely the Tarangire-Manyara, Katavi-Rukwa, Moyowosi-Kigosi, Serengeti, and including the Ruaha-Rungwa ecosystem. However, since that time, new information indicates that the elephant declines in Tanzania are no longer restricted to the Selous-Mikumi ecosystem. A more recent analysis of MIKE data indicates that the levels of killing across the elephant's range are serious and on the rise, and that elephant populations throughout Tanzania are declining due primarily to rampant poaching.

Of further concern are recent reports of political corruption at high levels within the government, as well as allegations of Wildlife Division staff within MNRT being in collusion with poachers in the illegal killing of elephants. In October of 2013, under orders from the President of Tanzania, Jakaya Kikwete, a countrywide anti-poaching operation was undertaken to combat the illegal taking of elephants. However, the operation, named "Operation Tokomeza", was suddenly terminated after human rights violations, including homicide and rape, were reported to have been committed during the operation, mainly by army personnel involved in the operation. The victims were semi-nomadic pastoralists who illegally, but quite often, utilize national parks and reserves for grazing their livestock. It was also reported that livestock was confiscated by force, and that unlawful collection of money from both farming communities and pastoralists occurred. On December 20, 2013, four cabinet ministers, including Ambassador Khamis Kagasheki, the Natural Resources and Tourism Minister, were forced to resign over this incident. Mr. Kagasheki assumed the political responsibility for the misdeeds of the army. However, it is not believed he was responsible for what occurred, based partly on his reputation for wanting to combat rampant poaching in Tanzania. There are concerns being voiced of strong political and business forces within Parliament, and elsewhere, possibly involved in local poaching or actively protecting such illegal operations.

There are also questions as to the ability of the Wildlife Division to combat poaching. It was announced in January of this year that MNRT had suspended 21 Wildlife Division staff for allegedly colluding with poachers to kill elephants. The Deputy Minister, Lazaro Nyalandu, MNRT, stated that investigations had shown certain members of the ministry's staff were directly involved in illegal acts in collaboration with wildlife criminals. The suspended staff were comprised of eleven individuals from the Anti-Poaching Unit in Arusha, four from the Rukwa-Lwari Forest Reserve, one from the Anti-Poaching Unit in Bunda, three from Maswa Forest Reserve, one from Selous Forest Reserve, and one from the Lukwika-Lumesule-Msanjesi Forest Reserve. These recent events put into question the county's commitment and ability to conserve and protect its natural resources, including elephants.

It was announced in early January of 2014, that the government planned to establish a new agency, the Tanzania Wildlife Authority (TWA), charged with the security of wildlife within all game and forest reserves in the country. The TWA would be granted full authority to hire, fire, and carry out official functions as opposed to the present framework under the MNRT. This new body would be charged with eliminating poaching and other illegal acts harmful to the country's natural resources and would be given full autonomy to set its own salaries and provide incentives to staff to perform their duties efficiently and effectively. It would operate as a parastatal organization much like TANAPA and NCAA. It was estimated that over 4,000 new staff would be needed to cover the over 20 game reserves and 50 forest reserves country wide. This new organization awaits Parliamentary endorsement sometime this year. As a result, while hopeful that this organization will greatly improve the situation in Tanzania, it is too soon to determine what impact the creation of TWA will have on anti-poaching efforts in Tanzania.

While the Service recognizes that sport-hunting, when conducted as part of a sound management program, can provide an important conservation benefit to elephant populations, current conditions in Tanzania put into doubt whether any level of legal take is sustainable. The CITES Panel of Experts concluded in 2010, that the level of off-take occurring in the Selous-Mikumi ecosystem could not be considered sustainable based on a decreasing population and the high level of poaching taking place within that ecosystem. The panel further noted that the legal and illegal off-take appeared to be sustainable in the other five elephant ecosystems based on stable or increasing elephant populations, but voiced concerns that this situation could affect the long-term elephant population sustainability. Since that time, data has shown that populations throughout Tanzania are in severe decline and that poaching appears to be out of control. Based on these factors, DMA is **unable to find** that the sport-hunting of elephants in Tanzania in 2014, for import as personal trophies is likely to enhance the survival of the species. The Service will continue to monitor elephant population levels in Tanzania, progress made by the Government in implementing its management plan and addressing the strategic objectives identified in that plan, as well as efforts made to deal with rampant poaching and government corruption that is negatively affecting African elephants in Tanzania.

REFERENCES:

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. African Elephant Status Report 2007: An Update from the African Elephant Database. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

CITES Secretariat, IUCN/SSC African Elephant Specialist Group, and TRAFFIC. 2013. Status of African elephant populations and levels of illegal killing and the illegal trade in ivory: A report to the African elephant summit, December 2013. 19pp. Available online at: https://cmsdata.iucn.org/downloads/african_elephant_summit_background_document_20 13_en.pdf.

**DA 251**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 8th day of April 2016, a true and correct copy of the Appendix for Appellants Safari Club International and National Rifle Association of America's appeal of the dismissal of their claims was electronically filed through the CM/ECF system, which caused all parties to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

/s/ Anna M. Seidman
Anna M. Seidman

*Counsel for Plaintiff/Appellant*
*Safari Club International*