No. 15-5170

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

SAFARI CLUB INTERNATIONAL and NATIONAL RIFLE ASSOCIATION OF AMERICA, Plaintiffs-Appellants,

v.

SALLY M. R. JEWELL, in her official capacity as
United States Secretary of the Interior, *et al.*,
Defendants-Appellees

On Appeal from the United States District Court for the District of Columbia
(No. 14-00670-RCL)

## FINAL REPLY BRIEF OF PLAINTIFFS-APPELLANTS
## SAFARI CLUB INTERNATIONAL AND
## NATIONAL RIFLE ASSOCIATION OF AMERICA

Anna M. Seidman
Douglas S. Burdin
Jeremy E. Clare
Safari Club International
501 Second Street NE
Washington, D.C. 20002
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org

*Counsel for Safari Club International*

Christopher A. Conte
Michael T. Jean
National Rifle Association of
America/ILA
11250 Waples Mill Rd., 5N
Fairfax, Virginia 22030
Tel: 703-267-1166
Fax: 703-267-1164
cconte@nrahq.org
mjean@nrahq.org

*Counsel for National Rifle
Association of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY OF TERMS ..................................................................... v

I.   INTRODUCTION ........................................................................ 1

II.  SUMMARY OF THE ARGUMENT ................................................ 2

III. ARGUMENT .............................................................................. 4

    A.    SCI/NRA Have Challenged Final Agency Action and
            Exhausting Administrative Remedies Would Be Futile
            and Inapplicable ........................................................ 4

          1.    The Importation Ban is Final as to Hunters Who
                Wished to Import Elephants ..................................... 4

          2.    The Importation Ban is Final as to Outfitters and
                Other Hunting Service Providers ............................. 8

          3.    The Importation Ban is Final Because Resort to
                Any Administrative Process Would be Futile ........... 10

          4.    The Exhaustion Requirement Does Not Apply Because
                the Permit Process Would Not Invoke SCI/NRA's Claims ..... 13

    B.    SCI/NRA Have Demonstrated Standing to Bring Their Claims ........ 15

    C.    The Court Should Not Dismiss SCI/NRA's Claims as Moot ............. 24

          1.    Two of SCI/NRA's Claims Are Viable and Not Moot ............. 24

          2.    Even if Moot, SCI/NRA's Claims Are Capable of
                Repetition Yet Will Evade Review ........................... 26

    D.    Amici's Attack on the Sport-Hunting of Elephants is
            Incorrect and Irrelevant ............................................ 28

IV. CONCLUSION ............................................................................ 30

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION ..... 32

CERTIFICATE OF SERVICE ........................................................... 33

## TABLE OF AUTHORITIES

Cases

Albuquerque Indian Rights v. Lujan, 930 F.2d 49 (D.C. Cir. 1991) ............... 17, 18

Bennett v. Spear, 520 U.S. 154 (1997) ................................................................5

Christian Knights of Ku Klux Klan Invisible Empire v. Dist. of
    Columbia, 972 F.2d 365 (D.C. Cir. 1992) .........................................................27

City of Houston, Tex. v. Dep't of Hous. and Urban Dev., 24 F.3d
    1421 (D.C. Cir. 1994) ......................................................................................25

City of New Haven, Conn. v. United States, 809 F.2d 900
    (D.C. Cir. 1987) ...............................................................................................26

Conservation Force v. Salazar, 919 F. Supp. 2d 85 (D.D.C. 2013) ........................14

*CropLife Am. v. EPA, 329 F.3d 876 (D.C. Cir. 2003)..........................................16

Cutler v. Hayes, 818 F.2d 879 (D.C. Cir. 1987)....................................................12

*Defenders of Wildlife v. Endangered Species Scientific Auth.,
    659 F.2d 168 (D.C. Cir. 1981)................................................................. 25, 27

Del Monte Fresh Produce Co. v. U.S., 570 F.3d 316 (D.C. Cir. 2009)...................27

Found. on Econ. Trends v. Heckler, 756 F.2d 143 (D.C. Cir. 1985) ............... 12, 13

Franks v. Salazar, 816 F. Supp. 2d 49 (D.D.C. 2011) ............................................13

Friends of Animals v. Kempthorne, 452 F. Supp. 2d 64 (D.D.C. 2006).................16

*Fund for Animals, Inc. v. Norton, 322 F.3d 728 (D.C. Cir. 2003)................. 15, 21

Gannet Co., Inc. v. DePasquale, 443 U.S. 368 (1979) ...........................................27

Hightower v. City of Boston, 693 F.3d 61 (1st Cir. 2012).....................................19

Holistic Candler & Consumers Ass'n v. Food & Drug Admin.
    664 F.3d 940 (D.C. Cir. 2012)...........................................................................8

In re Polar Bear Endangered Species Act Listing and 4(d) Litig.,
    627 F. Supp. 2d 16 (D.D.C. 2009).......................................................17

Jackson-Bey v. Hanslmaier, 115 F.3d 1091 (2nd Cir. 1997) ..................................19

Jud. Watch, Inc. v. Kerry, CV 15-1068 (JEB), 2016 WL 126349
    (D.D.C. Jan. 11, 2016) ......................................................................23

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) .............................................22

Lutheran Church-Missouri Synod v. F.C.C., 141 F.3d 344
    (D.C. Cir. 1998) ...............................................................................17

Marcum v. Salazar, 694 F.3d 123 (D.C. Cir. 2012) ...........................................8, 13

Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8
    (D.C. Cir. 2005) .................................................................................5

Nat'l Mining Ass'n v. McCarthy, 758 F.3d 243 (D.C. Cir. 2014) ....................7, 12

Nat'l Mining Ass'n v. Jackson, 768 F. Supp. 2d 34 (D.D.C. 2011) ........................16

Nat'l Parks Conservation Ass'n v. Manson, 414 F.3d 1 (D.C. Cir. 2005)...............22

Natural Res. Def. Council v. EPA, 559 F.3d 561 (D.C. Cir. 2009) .........................5

Parker v. D.C., 478 F.3d 370 (D.C. Cir. 2007) aff'd sub nom.
    D.C. v. Heller, 554 U.S. 570 (2008) .................................................18

Singh v. Ashcroft, 362 F.3d 1164 (9th Cir. 2004) ..................................................13

Super Tire Eng'g Co. v. McCorkle, 416 U.S. 115 (1974)................................ 25, 26

Texas v. United States, 523 U.S. 296 (1998)................................................... 19, 20

*United States v. Decastro, 682 F.3d 160 (2d Cir. 2012)................................ 19, 20

WildEarth Guardians v. Salazar, 272 F.R.D. 4 (D.D.C. 2010) ...............................17

*Authorities upon which we chiefly rely are marked with asterisks

# GLOSSARY OF TERMS

| | |
|---|---|
| Answering Br. | Federal Defendants-Appellees' Answering Brief (filed 3/4/16) |
| APA | Administrative Procedure Act |
| App. | Appendix from Preliminary Injunction appeal 14-5152 |
| AR | Administrative Record in the district court for the Tanzania importation decision |
| DA | Deferred Appendix |
| Decl. | Declaration |
| ESA | Endangered Species Act |
| Federal Appellees | Federal Defendant-Appellees Secretary of the Interior, Sally Jewell *et al.* |
| Mem. Opinion | Memorandum Opinion entered on December 26, 2014 (Docket No. 48) in Case No. 14-00670 |
| Opening Br. | Opening Brief of Plaintiffs-Appellants Safari Club International and National Rifle Association of America (filed 1/29/16) |
| SAC | Second Amended Complaint by SCI/NRA in district court |
| SCI/NRA | Safari Club International and the National Rifle Association of America |
| Service | United States Fish and Wildlife Service |
| 2014 Tanzania Non-detriment | General Advice on Importation of Sport-hunted Trophies of African |

| | |
|---|---|
| Finding | Elephants taken in Tanzania in Calendar Year 2014 |
| 2014 Tanzania Enhancement Finding | Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Tanzania during 2014 |

# I. INTRODUCTION

In 2014, members of Plaintiffs-Appellants Safari Club International and the National Rifle Association of America ("SCI/NRA") who had or were considering plans to sport-hunt elephants in Tanzania in 2014 and beyond faced a difficult decision after the U.S. Fish and Wildlife Service ("Service") abruptly announced that it was reversing a decades-long practice of allowing importation of sport-hunted elephants from Tanzania. Hunters had to decide whether to go forward with hunts already booked for 2014, plan hunts for future years, or abandon such plans. Many, acting upon the advice of the Service, chose not to hunt or plan hunts. They lost money and highly valued recreational opportunities. The professional hunting businesses that rely on the hunts that were cancelled or never booked lost revenue and resources to protect Tanzania's elephants.[1]

---

[1] Federal Appellees assert that that their April 4, 2014 announcement was intended to prevent "regulated parties" from being "caught off guard." Federal Appellees' Answering Brief ("Answering Br.") at 3. Instead, the Service knowingly waited to announce the importation ban decisions after SCI's and other annual hunting conventions, with full knowledge that this is where hunters book many hunts for the year. Deferred Appendix ("DA") 119, Administrative Record ("AR") 31 at 000852. In addition, the Service disclosed the decision on the same day they implemented it.

Federal Appellees' arguments (finality, exhaustion, standing, mootness) center on the fact that SCI/NRA members did not apply for import permits, which the Service maintains were still available despite the negative findings. In reality, hunters would be required, for the first time in almost 20 years, to comply with new, binding evidentiary burdens. They would have to engage in the futile process of trying to produce evidence to overcome predetermined negative findings as to whether hunting enhanced the survival of the species and importation was not detrimental to the species. Hunters would have to apply for a permit that the Service would not grant because the needed information did not exist. In the end, they would not be able to import any elephant they harvested. As the ability to import the elephant constitutes a significant part of the hunting experience, SCI/NRA members chose to cancel or not book their hunts. The decrease in elephant hunting also injured SCI/NRA members who are outfitters and guides who depend on the revenues from the hunts to conserve elephants and other wildlife.

## II.    SUMMARY OF THE ARGUMENT

For all of these hunter and outfitter SCI/NRA members, Federal Appellees' actions in banning importation of elephants from Tanzania were final. The Service's actions were the consummation of the decision-making process and changed binding norms concerning obtaining importation permits. Applying for a

permit would be futile.  Hunters had no reason to apply for a permit or exhaust any administrative remedies.  Moreover, the permit application process would not address the procedural claims SCI/NRA assert here.

SCI/NRA have standing.  These agency actions caused harm to SCI/NRA members (both hunters and outfitters) in the form of increased if not impossible evidentiary burdens in seeking importation and in the loss of highly valued hunting opportunities, cancelled or foregone hunts for 2014 and beyond, and loss of revenue necessary to protect elephants in Tanzania.  Vacatur of the findings and a remand to follow the proper procedures and standards could remedy their injuries because the Service could, upon complying with the law, make positive findings.  Positive findings would mean that obtaining import permits would be as certain as it had been for decades leading up to 2014.

Two of SCI/NRA's claims are not moot because these challenges are not limited to 2014, and the requested relief regarding the standards and procedures the Service would be required to apply will change future Tanzania importation decisions.  If any of the claims are moot, the Court should still resolve those claims as they are capable of repetition yet will evade review.

Finally, Amici raise incorrect and legally irrelevant arguments about elephant hunting in Tanzania.  SCI/NRA totally disagree with these arguments.[2]

## III.    ARGUMENT

### A.    SCI/NRA Have Challenged Final Agency Action and Exhausting Administrative Remedies Would Be Futile and Inapplicable

#### 1.    The Importation Ban is Final as to Hunters Who Wished to Import Elephants

The Service's April 4, 2014 decision to ban the importation of elephants constituted a final agency action for anyone who wished to import a legally harvested elephant from Tanzania.  SCI/NRA Opening Brief ("Opening Br.") at 24-30.  After that date, for the first time in decades, the Service required hunters to provide new data to overcome agency determinations that the hunting of elephants in Tanzania did not enhance the survival of the species and the importation of those elephants did not qualify as non-detrimental to the species' survival.

---

[2] The Court should not characterize or review the district court's dismissal as a grant of summary judgment, as Federal Appellees suggest.  Answering Br. at 20. Although both sides presented materials outside the pleadings, the district court only considered one extra-pleading document – Tim Van Norman's declaration – in dismissing the Tanzania claims.  Memorandum Op. (Docket 48) at 16.  The court discussed only the standards for a motion to dismiss, not for summary judgment.  *Id.* at 8.  SCI/NRA did not have all the opportunities involved in a full summary judgment proceeding, such as discovery and an opportunity to dispute the completeness of the administrative record.

Until April 4, 2014, hunters seeking to import elephants from Tanzania had been able to rely on the Service's positive country-wide findings that the hunting of elephants enhanced the survival of the species and the import was not detrimental to the species' survival. The Service's decision not to make those findings, and instead to require each hunter/importer to discover and produce independent data to overcome the negative findings, constituted the "consummation of the agency's decisionmaking process" as to the type and source of information sufficient to demonstrate enhancement and non-detriment. The decision established new "rights and obligations" for each hunter in terms of the type of evidence required. The Service's requirement that hunters independently obtain the information and satisfy these two evidentiary requirements created new "binding legal consequences" for those who would be unable to provide the Service with new data to overcome the agency's existing negative findings. *See Natural Res. Def. Council v. EPA*, 559 F.3d 561, 564 (D.C. Cir. 2009), *citing Bennett v. Spear,* 520 U.S. 154, 177-78 (1997). The "practical effect" of the Service's action amounted to a "certain change in the legal obligations" of hunters seeking to import elephants. *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005).

From April 4, 2014 onward, a hunter can be certain that his application will be denied if he submits a permit application with nothing more than the same

information that had satisfied the Service for decades. Although the Service repeatedly argues that the importation ban decision cannot be final because the Service intends to continue to review permit applications on a case-by-case basis (Answering Br. at 13), the agency's decision documents tell another story. The 2014 Tanzania Non-detriment Finding is very specific about what kinds of applications the Service will now consider.

> If permit applications are received that include new or additional information showing that elephant management practices by the Government of Tanzania have led to the sustainability of its elephant population on a nation-wide basis, these applications should be referred to the Division of Scientific Authority for consideration on a case-by-case basis.

DA123, AR159 at 1771. Accordingly, the Service will not only deny but will not even **consider** applications containing either no new information or types of new or additional information different than the kind specified above. The 2014 Tanzania Enhancement Finding contains no promise that the Service will consider applications on a case-by-case basis. After stating that the Division of Management Authority was "unable to find" that elephant hunting enhances the survival of the species, the finding states only that:

> The Service will continue to monitor elephant population levels in Tanzania, progress made by the Government in implementing its management plan and addressing the strategic objectives identified in that plan as well as efforts made to deal with rampant poaching and government corruption that is negatively affecting African elephants in Tanzania.

DA159, AR204 at 3059.  Contrary to Federal Appellees' assertion, nothing in that finding even remotely suggests that a hunter who submits an application with or without additional information has any chance of persuading the Service to reverse its negative enhancement determination.  Answering Br. at 13, 57.

Federal Appellees also contend that the Service's decision cannot be considered final until a hunter applies for a permit, the Service denies the permit, and the hunter completes the full administrative process for appealing the permit denial.  Answering Br. at 50-53.  This argument ignores the finality of the Service's 2014 decision to impose greater evidentiary requirements.  The Service cannot deny that, in contrast to the standards imposed for the previous two decades, hunters can no longer rely on findings provided by the Service itself to satisfy the Service's requirements.

Federal Appellees' reliance on two cases is unsupported.  Answering Br. at 51-52.  In *Nat'l Mining Ass'n v. McCarthy,* the Court found that "States and permit applicants may ignore the Final Guidance without suffering any legal penalties or disabilities, . . . and permit applicants ultimately may be able to obtain permits even if they do not meet the recommendations in the Final Guidance."  758 F.3d 243, 253 (D.C. Cir. 2014).  Here, if hunters do not provide the additional information required by the Service needed to overcome the negative findings, the Service **will not even consider** their applications.  Similarly, *Holistic Candler &*

*Consumers Ass'n v. Food & Drug Admin.* is not illustrative because the agency stated that violations for which warning letters are issued "may" lead to enforcement action. 664 F.3d 940, 943-44 (D.C. Cir. 2012). Here, applications that fail to include newly required independent proof to overcome negative findings will certainly be denied.

Federal Appellees also erroneously rely on *Marcum v. Salazar* to support their argument that plaintiffs who do not participate from start to finish in the Service's permit application and decision-making process cannot challenge any decision the Service makes about species importation. 694 F.3d 123 (D.C. Cir. 2012). *Marcum* differs significantly from the instant matter. Plaintiffs challenged the Service's refusal to authorize the import of elephants from Zambia. Unlike for Tanzania, the Service's decision for Zambia did not constitute the consummation of the agency's decision to reverse a decades-long practice of making country-wide positive enhancement and non-detriment findings and allowing importation. For Zambian elephants, the Service had not made any positive country-wide findings upon which hunters had previously relied. These differences highlight the finality of the Tanzania decision.

> ## 2. The Importation Ban is Final as to Outfitters and Other Hunting Service Providers

The importation ban decision was just as final and binding for the outfitters, professional hunters and other members of SCI/NRA detrimentally harmed by the

inability of U.S. hunters to import their legally hunted elephants. Opening Br. at 30-31; *see* Answering Br. at 15. Finality cannot be conditioned on their submission of import permit applications for elephants because they have no reason to import. Nor should they be required to await finality based on the submission to the permit application process by others who may never apply for a permit. They have been harmed and will continue to be harmed by the importation ban decisions and by the illegal requirements and standards underlying these decisions.[3] As explained by professional hunter and booking agent, Ivan Carter, the importation ban harms his business and his ability to protect Tanzania's elephants from poachers:

> 19. The importation ban imposed by the U.S. government has already hurt my business. I have lost several hunts that were booked in Zimbabwe and Tanzania for elephant over the next few years. This has greatly impacted my personal income, the income of our company, Safari Classics as a whole, and the income of the outfitters on the ground that we support.

> 20. Many of the areas in which I guide elephant hunts will suffer from this ban. Many areas were specifically "sold" with elephant as the target species. These areas will severely diminish in financial returns. This may make the areas non-viable for future hunts. A nonviable

---

[3] Any argument suggesting that hunters could travel to Tanzania to hunt elephants regardless of whether they could import their legally hunted elephants is undermined by the Service's efforts to discourage hunters from doing just that. On its website, the Service stated: "given the current conservation concerns for elephants in Tanzania and Zimbabwe, we strongly advise that you reconsider taking part in an elephant hunt in either of these countries at this time." DA164, App. at 61.

> hunting area sees no financial return and that, in turn, means no anti-poaching efforts, no employment and an area devoid of "legal" presence and wide open to poachers.

DA177, App. at 220. For hunting professionals like Ivan Carter, the importation ban decision marks the consummation of decision-making with very practical and detrimental impacts.

### 3. The Importation Ban is Final Because Resort to Any Administrative Process Would be Futile

SCI/NRA explained in detail that resort to any administrative process was not necessary because it would have been futile. Opening Br. at 31-40 (for 2014, hunter could not obtain permit absent providing new or different information, which did not exist). In response, Federal Appellees make a series of inaccurate arguments. They suggest that SCI/NRA's arguments are "at odds with its members' assertions that poaching rates and elephant mortality are, in fact, low, or that poaching may be easily remedied." Answering Br. at 57, *citing* App. 186–87, 209–10, 238–47. These documents say nothing of the sort. Appendix documents 186-87 and 209-10 are declarations that discuss **Zimbabwe** and the role of hunting in conservation. DA168-69,172-73. Appendix documents 238-47 are declarations that discuss hunting in Tanzania, but contain no information that poaching rates are low or easily remedied. DA179-188. Instead, they simply reiterate what the Service acknowledges – that hunting creates conservation and anti-poaching

benefits.  DA211-12, App. at 343-44 (discussing benefits); DA154,AR204 at 3054 (discussing U.S. hunters' beliefs).

SCI/NRA described a memorandum from a high-ranking Service official and Talking Points for the Director outlining what would be necessary to overcome the negative findings.  Opening Br. at 39 (Tanzania would have to modify its management approach to reduce poaching; offtake must be below population growth rate).  Federal Appellees try to recast these documents as simply "sources of concern and types of documentation that could indicate elephants' improved condition ... [and] illustrative examples of what a would-be importer could present to support his or her permit application."  Answering Br. at 57.  But the Service's memorandum did establish these conditions as importation prerequisites:  "[i]n order to allow elephant trophies to be imported in the future, ....".  Opening Br. at 39, citing App. at 375-76.  Federal Appellees never explain, in these documents or elsewhere, how an applicant can provide this information (modifications to management of elephants, offtake vs. birth rates) when the Service itself is unable to generate or obtain it.  An applicant could not and so trying would be futile.

For many of SCI/NRA's futility arguments, Federal Appellees have no response.  SCI/NRA argued that the Service's treatment of applications it did receive demonstrates that, absent new information, which does not exist, the response to any application is denial.  Opening Br. at 37 (discussing Service

employee describing denial of four applications that lacked new information and a "Targeted Communications Strategy" that both show the inevitable result of an application was denial). Federal Appellees' Answering Brief did not address these documents. Nor did it respond to the fact that prior to April 2014, applicants could rely on positive findings and comply with ministerial requirements on the permit form to receive a permit. This was no longer the case after April 4, 2014. Opening Br. at 32-34.

Federal Appellees try to refute SCI/NRA's argument by citing *Nat'l Mining Ass'n,* 758 F.3d at 253. Answering Br. at 53. The case is distinguishable. First, it was not a futility case. Instead, the Court was deciding whether a final guidance document was a legislative rule subject to pre-enforcement judicial review. *Id.* at 250-51 (EPA conceded document was the consummation of decisionmaking process; question was whether document was a legislative rule or a general statement of policy). Second, the guidance document did not compel an applicant to do anything. *Id.* at 251. In contrast, the 2014 Tanzania findings compel the hunter to present information to overcome the negative findings – with information that does not exist – or face a certain denial of the application.

SCI/NRA's cases address futility when obtaining relief from the process would be futile or impossible. Opening Br. at 31-32, 40, citing *Cutler v. Hayes*, 818 F.2d 879, 891-92 (D.C. Cir. 1987); *Found. on Econ. Trends v. Heckler*, 756

F.2d 143, 156 (D.C. Cir. 1985); *Singh v. Ashcroft*, 362 F.3d 1164, 1169 (9th Cir. 2004). Federal Appellees do not dispute *Cutler* or *Heckler,* and only try to distinguish *Singh* by claiming it involved a physical barrier to obtaining relief. Answering Br. at 57 n.25. It matters not whether the futility is from a physical barrier or, as here, an impossible informational barrier. These cases apply because the Service required information that did not exist, thus making the showing impossible.

### 4. The Exhaustion Requirement Does Not Apply Because the Permit Process Would Not Invoke SCI/NRA's Claims

SCI/NRA also explained that the courts have relieved any requirement to resort to an administrative process when legal claims, such as asserted here, would not be implicated by the permit application process and requiring exhaustion would not further the purposes of the doctrine. Opening Br. at 41. In response, Federal Appellees do not dispute the cases SCI/NRA cite. Instead, they simply present cases in which challenges to a permit process were brought in the context of a permit denial and argue that it is the only way to challenge the processes by which the Service issues import permits. Answering Br. at 58. Nothing in *Franks* or *Marcum* suggests that the ***only*** way to challenge a failure to conduct rulemaking is by challenging the denial of a permit. *See Franks v. Salazar,* 816 F. Supp. 2d 49, 59-61 (D.D.C. 2011) (claim that adjudication of permit application required rulemaking); *Marcum v. Salazar*, 810 F. Supp. 2d 56, 71-72 (D.D.C. 2011) *vacated*

*and remanded*, 694 F.3d 123 (D.C. Cir. 2012) (same).  A further distinction is that SCI/NRA is not claiming that the adjudication of an individual permit application requires rulemaking.  Here SCI/NRA assert that the adoption of the 2014 enhancement and non-detriment findings required rulemaking.  Second Amended Complaint ("SAC"), Count VI.

Similarly, in *Conservation Force v. Salazar,* the only claim before the court was that the import permit "denials were arbitrary, capricious and an abuse of discretion."  919 F. Supp. 2d 85, 88 (D.D.C. 2013).  The court dismissed the claims because the permit denials were not final, as an appeal to the Service Director was available.  The Service argued exhaustion is required "before a plaintiff may seek judicial review of ***an adverse permit decision***."  *Id.* at 90 (emphasis added).  As the claim involved the specific facts raised by the applications, exhaustion served the purposes of fully developing a full factual record.  *See* Opening Br. at 41.

In contrast, the application process would not develop a factual record relevant to SCI/NRA's challenges to the legal processes the Service employed in making the 2014 findings.  Even if some of SCI/NRA's claims could be raised in permit application proceedings as ancillary issues, the proceedings would not factually develop these legal claims.  Mandating exhaustion here would not serve the purposes of the exhaustion requirement.

## B. SCI/NRA Have Demonstrated Standing to Bring Their Claims

As explained in the Opening Brief, SCI/NRA's standing is based on (1) the new regulatory burdens placed on those wishing to apply for an importation permit for elephants sport-hunted in Tanzania; (2) U.S. hunters losing valued recreational opportunities and canceling or not booking hunts because of the importation ban and illegal requirements underlying it; and (3) outfitters and guides losing revenue that they use to conduct anti-poaching and other conservation efforts. Opening Br. at 43. The crux of Federal Appellees' response is similar to their finality/exhaustion arguments, that only by applying for and being denied a permit can SCI/NRA's members demonstrate standing. As with the finality argument, the Court should reject this argument because SCI/NRA have demonstrated standing for their members who face a more onerous burden to apply and the impossibility of obtaining a permit, lost hunts, and lost revenue for anti-poaching and conservation opportunities. The SAC, and declarations from the PI proceeding, alleged and substantiated these harms. SAC ¶¶14-15, 61, 63-64.[4]

---

[4] In a footnote, Federal Appellees suggest, without citing any caselaw, that foreigners are not regulated by the Service and cannot have standing in regards to any ESA issue. Answering Br. at 48 n.21. They only cite the ESA definition of a "person" and "take" provision, which is not at issue. If Federal Appellees are making an unstated "zone of interest" argument, it fails. Persons in foreign countries certainly are affected by the importation decisions the Service makes. This Court has found that a foreign government had standing to intervene as a defendant in an ESA importation case. *Fund for Animals, Inc. v. Norton,* 322 F.3d 728, 730 (D.C. Cir. 2003) (Mongolia).

SCI/NRA cited cases in which an increased regulatory burden established standing. Opening Br. at 43-45. Federal Appellees try to distinguish the finding of standing in *CropLife Am. v. EPA*, 329 F.3d 876, 883-84 (D.C. Cir. 2003) by asserting the agency "unambiguously" precluded the use of studies, which they previously allowed, in seeking authorization. Answering Br. at 42. But in *Croplife,* the agency action did not **preclude** the agency from granting the actual authorization. Instead, standing was present based on the mere fact that the preclusion of certain types of studies made the process of obtaining the authorization more onerous and uncertain. This is very similar to the increased burden on SCI/NRA members due to their inability to rely on the positive findings as they had before 2014.

In an attempt to distinguish *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 47 (D.D.C. 2011), Federal Appellees assert the Service did not change the permitting process or impose "additional processes" by making negative findings. Answering Br. at 42-43. This is not accurate. The negative findings do create "additional processes" because the hunters can no longer rely on the positive findings.

Federal Appellees try to distinguish other SCI/NRA's cases on the facts. Answering Br. at 43. But SCI/NRA cited *Friends of Animals v. Kempthorne*, 452 F. Supp. 2d 64, 70 (D.D.C. 2006) and *WildEarth Guardians v. Salazar*, 272 F.R.D.

4, 15 (D.D.C. 2010) for the well-established principle that an agency increasing the regulatory burden on the plaintiff, through illegal means, creates standing. *See, e.g., Lutheran Church-Missouri Synod v. F.C.C.*, 141 F.3d 344, 349 (D.C. Cir. 1998) (plaintiff had standing because agency action "increase[ed] an already significant regulatory burden"). Here, the 2014 negative findings increased the regulatory burden on anyone wishing to import an elephant from Tanzania or considering undertaking a hunt.

SCI/NRA's reliance on *In re Polar Bear Endangered Species Act Listing and 4(d) Litig.*, 627 F. Supp. 2d 16, 26 (D.D.C. 2009) also was proper. Opening Br. at 45. Federal Appellees argue that case involved a legal finding that was "determinative" of the outcome of any import permit application. SCI/NRA similarly allege that the only possible response to a Tanzania elephant import permit application is denial, just as in the polar bear case.

In contrast, the main case on which Federal Appellees seek to rely, decided on summary judgment, is distinguishable on several grounds. Answering Br. at 34, discussing *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49 (D.C. Cir. 1991). The Court faulted the plaintiff because it "never offered any evidence relating to the asserted 'futility' of applying at [defendant agency]" and "at no point in the proceedings below did appellant tender evidence that either of these members (or any others) actually applied for a position at OCM *or that to do so would have*

**resulted in a denial of their applications.**" *Id.* at 56 (emphasis added). Federal Appellees omit the phrase "or that to do so would have resulted in a denial of their application." Answering Br. at 34. Futility was particularly important because the disputed issue was the failure to apply an Indian hiring preference, not an outright ban on hiring the plaintiff's members. *Id.* at 55, 57. In contrast, SCI/NRA members allege both an increased burden to apply (not an issue in *Albuquerque*) and the futility of applying.

Federal Appellees also cite several firearm licensing cases in support of their assertion that SCI/NRA lack standing. *See* Answering Br. at 35-36. But those cases also are distinguishable. The cases did not involve an impossibility of obtaining a permit; instead, the plaintiffs in those cases chose not to apply based on unsupported hearsay that their applications would be denied.

In *Parker,* this Court found that "[t]he District does not *completely* prohibit handgun registration." *Parker v. D.C.*, 478 F.3d 370, 376 (D.C. Cir. 2007) *aff'd sub nom. D.C. v. Heller*, 554 U.S. 570 (2008) (emphasis in original). The Court noted that if Heller was a retired police officer or attempted to register a long gun, he would have presumably been granted a registration certificate. *Id*. The present case involves a **complete suspension** on imports of elephants from Tanzania because no individual can provide the information to overcome the negative findings.

The same is true for *Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012), and *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012). In fact, Hightower had a Class A firearms license. *Hightower*, 693 F.3d at 68. It was revoked when she made false statements on the renewal application. *Id.* She then filed suit challenging the validity of the entire Massachusetts firearms licensing scheme, including the Class B license. *Id.* at 70. But she never applied for a Class B license because she believed that the Boston Police Department did not issue them. *Id.* at 70 n.6. Similarly, the defendant in *Decastro* raised Second Amendment arguments challenging New York City's gun registration scheme. *Decastro*, 682 F.3d at 160. But he never applied for a New York City handgun license because he was allegedly told his application would not be approved. *Id.* at 161. Both courts found that these unsupported, hearsay allegations did not amount to a "'substantial showing' that submitting an application 'would have been futile.'" *Id.* at 164; *Hightower*, 693 F.3d at 70 n.6.[5]

In arguing standing, Federal Appellees chop up the Supreme Court's discussion of the "hardship to the parties" factor of the ripeness analysis on which the case turned in *Texas v. United States*, 523 U.S. 296, 301-02 (1998). Answering

---

[5] In *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1097-98 (2nd Cir. 1997), the plaintiff apparently did not make ***any*** effort to officially declare his religious affiliation with the prison administration prior to challenging the registration process as unconstitutional.

Br. at 36. Federal Appellees selectively quote words and phrases from the case: "where a party believes that it may, in theory, be harmed by an incorrect legal interpretation, it should 'go ahead' and act as it deems the law requires in order to transform that 'speculative' 'abstraction' into a reviewable claim." Answering Br. at 36. But the Court was discussing that Texas could "go ahead" with the action that posed the alleged risk to it and would only suffer hardship if a court ruled Texas' action violated the law. *Texas,* 523 U.S. at 301-02. Because of this and other factors, the Court concluded that Texas' alleged hardship was "speculative." The "abstraction" the Court discussed in a separate paragraph related to alleged "hardship of a 'threat to federalism.'" *Id.* at 302. This case does not support Federal Appellees' standing argument.

None of the cases cited by Federal Appellees stands for the proposition that a permit application provides the only means by which SCI/NRA members can demonstrate standing. Many hunters decided not to hunt because of the importation ban and the illegal requirements and standards associated with it, so they did not submit applications. Outfitters were harmed even though they will never need permits. As demonstrated above and in the Opening Brief, submission of an application would have been futile. *Decastro,* 682 F.3d at 164 (failure to apply does not defeat standing if plaintiff makes "substantial showing" that submitting an application "would have been futile.").

Although Federal Appellees try to distinguish *Fund for Animals*, Answering Br. at 39-40, it supports SCI/NRA's standing here. In *Fund*, the Natural Resources Department of Mongolia ("NRD") appealed a denial of their motion to intervene as a defendant in a case where the plaintiffs had challenged the Service's decision to issue permits for the importation of argali sheep hunted in Mongolia, Tajikistan and Kyrgyzstan. 322 F.3d at 730.[6] NRD argued that the plaintiff's success in preventing argali importation would discourage U.S. hunters from hunting sheep in Mongolia:

> fees paid by sport hunters are the primary source of funding for its argali conservation program. If the Fund succeeds in barring American hunters from bringing their trophies home, some hunters will not travel to Mongolia to hunt the argali, and the revenues that support the conservation program will decline.

*Id*. at 733. This Court held that NRD could intervene as of right and NRD's asserted injuries were so "self-evident" that factual declarations were deemed unnecessary. *Id.* at 734.[7]

Federal Appellees attempt to distinguish *Fund* based on the fact that NRD considered the argali to be "national property." Answering Br. at 40. Similarly,

_____

[6] The D.C. Circuit requires applicants for intervention as of right to demonstrate Article III standing. 322 F.3d at 732.

[7] The district court had already granted intervention to SCI and other hunting organizations based on injuries caused by the risk that the plaintiff's success would make it impossible for SCI's members to import legally hunted argali into the United States and many hunters would therefore not undertake the hunt. This Court took note of and expressed no question as to that ruling. *Id*. at 734.

professional outfitters in Tanzania consider the wildlife in the areas that they guide to be their responsibility. Hunting businesses purchase the areas that they are allowed to hunt and protect the wildlife in those areas. DA177, Ivan Carter Decl., App. 220 ¶20; DA189, Derek Hurt Decl., App. 248, ¶5. For that reason, they operate anti-poaching programs and other conservation efforts in the areas that they guide. Their loss of revenue due to the ban undermines their ability to conduct those anti-poaching efforts, just as the loss of revenue to NRD in *Fund* threatened to interfere with Mongolia's ability to conserve wildlife.

Finally, in a footnote, Federal Appellees argue that this Court cannot redress SCI/NRA's injuries because the Court cannot direct the Service to make positive findings. Answering Br. at 41 n.18. For procedural claims like asserted here, however, the plaintiff need not prove that the agency would change its decision on remand, only that it might after following the proper procedure. With procedural standing, "the case law relieves the plaintiff of the need to demonstrate that (1) the agency action would have been different but for the procedural violation, and (2) that court-ordered compliance with the procedure would alter the final result." *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 n.7 (1992) (discussing procedural standing doctrine's relaxation of redressability). With the enhancement

requirement eliminated (Count VII) and the non-detriment finding standard altered (Count VIII), it is at least possible the Service would allow these imports.

Additionally, standing is determined at the time the plaintiff files the complaint; if later in the case something changes so that the court no longer can redress the injury, the case may be moot, but that does not affect the original standing. *See, e.g., Jud. Watch, Inc. v. Kerry*, CV 15-1068 (JEB), 2016 WL 126349, at *3 (D.D.C. Jan. 11, 2016) ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).' … [S]tanding inquiry is concerned with the presence of injury, causation, and redressability at the time a complaint is filed ….") (citations omitted). When SCI/NRA filed this case in 2014, the Court could have redressed the injuries by setting aside the negative findings and remanding for new findings based on the proper requirements and standards, which could have led positive findings and the authorization of importation. This would have assured hunters who wanted to hunt in 2014 that they could import any harvested elephant. It also would have helped the outfitters who would provide services to these hunters. Thus, at the time of filing, the Court could have redressed the injuries and SCI/NRA had standing.

### C. The Court Should Not Dismiss SCI/NRA's Claims as Moot

Even though the 2014 Tanzania findings have expired, SCI/NRA's Counts VII and VIII are not moot. The Court should not dismiss Count VI because it is "capable of repetition yet evading review," as are Counts VII and VIII, if the Court finds that either or both of those claims are moot.

### 1. Two of SCI/NRA's Claims Are Viable and Not Moot

Contrary to Federal Appellees' arguments, Answering Br. at 24-31, two of SCI/NRA's claims against the importation ban for Tanzanian elephants are not moot because they challenge underlying requirements and standards applied by the Service when making enhancement and non-detriment findings for Tanzania's elephants. The Service continues to apply those standards and requirements each and every time it makes such findings. SAC Count VII alleges that the imposition of any enhancement requirement for importation of elephants from Tanzania violates the ESA and Administrative Procedure Act ("APA"). SCI/NRA raised this challenge in 2014 because this was the first year that the Service used the requirement in a way that harmed SCI/NRA. The claim remains valid after the expiration of the 2014 Enhancement Finding because the Service continues to impose an enhancement finding requirement for the importation of Tanzanian elephants. SAC Count VIII alleges that the Service applied an incorrect standard for the 2014 Non-detriment Finding in violation of the ESA and APA. This claim

remains valid beyond 2014 because the Service continues to apply that incorrect standard.

In a case with factual circumstances similar to this case, this Court held that a group's challenge to the Service's non-detriment findings that allowed the export of bobcats was not moot even though the group specifically challenged the export of bobcats from the 1979-80 season, which had subsequently ended.

> The mootness issue arises because the export of bobcats for the 1979-80 season is over. We construe the complaint, however, as amplified by the arguments in the [plaintiffs'] brief, as not limited to challenging the 1979-80 export determinations, but more broadly as attacking the standards federal agencies apply in approving bobcat exports. As thus interpreted, the case is not moot.

*Defenders of Wildlife v. Endangered Species Scientific Auth.*, 659 F.2d 168, 175 (D.C. Cir. 1981); *see also City of Houston, Tex. v. Dep't of Hous. and Urban Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994) ("It is well-established that if a plaintiff challenges both a specific agency action and the *policy* that underlies that action, the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot.") (emphasis in original).

Federal Defendants also argue that SCI/NRA's request for declaratory relief does not salvage their suit from mootness.  Answering Br. at 28, *citing Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115 (1974).  But in *Super Tire,* the Supreme Court held that if jurisdiction is proper, then declaratory relief may be granted whether or not further relief is or could be sought.  416 U.S. at 121-22 ("even

though the case for an injunction dissolved … the parties … may still retain sufficient interests and injury as to justify the award of declaratory relief.").  A case or controversy still existed because the challenged activity was not "contingent" and had "not evaporated or disappeared, and by its continuing and brooding presence" could have harmed the interests of the petitioners.  *Id.* at 122; *see also City of New Haven, Conn. v. United States*, 809 F.2d 900, 904-05 (D.C. Cir. 1987) (although "appellees' claim for injunctive relief is clearly moot, [Court] must still decide whether the appellees are entitled to declaratory relief").  SCI/NRA can maintain a claim for declaratory judgment.

SAC Counts VII and VIII challenge the enhancement requirement and the standard used in non-detriment findings.  The "brooding presence" of the requirement and standard persist and declaratory judgment can relieve SCI/NRA and their members of their continued harm.  These claims are not moot.

### 2. Even if Moot, SCI/NRA's Claims Are Capable of Repetition Yet Will Evade Review

If the Court determines that SCI/NRA's claims are moot, the Court should not dismiss the case because Federal Appellees' actions are capable of repetition yet will evade review.[8]  To assert this mootness exception, a party must

---

[8] SCI/NRA do not dispute that SAC Count VI is moot (because of redressability), but the challenged conduct is capable of repetition yet evades review.  SCI/NRA's argument in this section applies to all three Tanzania-based claims.

demonstrate that (1) the duration of the conduct being challenged is too short to allow for full litigation, and (2) there is a reasonable expectation that the party will be subject to the same conduct again. *Del Monte Fresh Produce Co. v. U.S.*, 570 F.3d 316, 322 (D.C. Cir. 2009). Full litigation requires the time necessary for Supreme Court review. *Christian Knights of Ku Klux Klan Invisible Empire v. Dist. of Columbia*, 972 F.2d 365, 369 (D.C. Cir. 1992). Conduct with a duration of less than two years qualifies if the duration of the challenged action is typical for that type of agency conduct. *Del Monte*, 570 F.3d at 322.

Federal Appellees argue that the findings from one year to the next do not qualify as "the same conduct" under the second prong of the exception. Answering Br. at 28-29. *Defenders of Wildlife* is again dispositive of the issue. This Court found that even if the plaintiff's challenges were to only a single season of bobcat exports, the capable of repetition yet evading review exception would apply.

> [I]n its recently published notice of preliminary findings for the export of bobcats (and other animals) for the 1980-81 season, the [Service] stated that it "is applying the same criteria and is seeking ***essentially the same types of information*** as requested by the [Service] in developing advice for the 1980-81 season on whether export will not be detrimental to survival of the species." ***These are the same criteria that [plaintiffs] challenge in this case.***

*Defenders of Wildlife*, 659 F.2d at 175 (emphasis added); *see also Gannet Co., Inc. v. DePasquale*, 443 U.S. 368, 377-78 (1979) (Supreme Court found it reasonable

to expect that petitioners would be "subjected to similar closure orders" unless court addressed merits of petitioner's argument).

Likewise, in this case, the 2014 findings lasted less than a year; the Service makes new non-detriment findings each year based on the same criteria used in the 2014 findings. The Service made another enhancement finding in 2015, and presumably intends to apply the same standards to future enhancement findings. The challenged actions are too short for full litigation, and there is a "reasonable expectation" that SCI/NRA and their members will continue to be subject to the same challenged actions. Both prongs of the test are satisfied. If this Court finds that any of SCI/NRA's claims are moot, it should also find that the claims are capable of repetition yet evade review.

### D. Amici's Attack on the Sport-Hunting of Elephants is Incorrect and Irrelevant

Amici's attack on SCI/NRA and the conservation values of sustainable elephant hunting in Tanzania are both inaccurate and irrelevant to the issues before the Court. SCI/NRA briefly respond here to make clear that SCI/NRA completely disagree with Amici. Among other errors, Amici's discussion ignores the accepted benefits of hunting.

Even the Service has acknowledged the value of well-regulated hunting. DA212, App. at 344; DA159, AR204, at 3059. In Tanzania, sustainable hunting plays a role in the financial support of local communities by providing

employment opportunities, decreasing livestock losses and bringing other additional resources to the communities (*e.g.,* meat from hunts). http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0117237; DA212, App. at 344. With these benefits comes local support for elephant conservation. Hunting is particularly essential in areas to which other tourists are unwilling or unable to travel.

Poaching, not hunting, is the primary cause of the decline of elephants. In fact, where hunting has been banned, overall wildlife populations suffer. For example, "[w]ildlife numbers in Kenya's Masai Mara region have declined by 70% since hunting was banned in 1978." Ogutu, J. O., et al. (2011), Continuing wildlife population declines and range contraction in the Mara region of Kenya during 1977–2009. Journal of Zoology, 285: 99–109.

Hunters provide support to anti-poaching efforts in several ways. Hunting outfitters invest in rangers and patrol their hunting concessions, providing an on-the-ground presence. Hunter-conservation groups provide targeted support for anti-poaching. For example, SCI Foundation has partnered with Friedkin Conservation Fund to cover the operation and maintenance of micro-light flyers in Tanzania, which have led to a number of successful ground operations. https://firstforwildlife.wordpress.com/2014/06/05/weekly-update-friedkin-flyer-project/. SCI Foundation also outfitted anti-poaching units with two fully-

equipped vehicles to monitor the Selous Game Reserve.

https://firstforwildlife.wordpress.com/2014/12/18/sci-foundations-hlf-aid-anti-poaching-efforts-in-tanzania/.[9]

The Court should disregard the one-sided picture painted by Amici as irrelevant to the legal issues, incomplete and inaccurate.

## IV. CONCLUSION

For the reasons provided above and in the Opening Brief, SCI/NRA ask the Court to reverse the portions of the district court's ruling related to the Tanzania claims and remand those claims back to the district court.

Dated: April 22, 2016

Respectfully submitted,

/s/Anna M. Seidman
Anna M. Seidman
Douglas Burdin
Jeremy E. Clare
501 Second Street NE
Washington, D.C.
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org

*Counsel for Plaintiff/Appellant*
*Safari Club International*

---

[9] All websites visited on March 29, 2016.

/s/ Christopher A. Conte
Christopher A. Conte
Michael T. Jean
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
Facsimile: (703) 267-1164
cconte@nrahq.org
mjean@nrahq.org

*Counsel for Plaintiff/Appellant*
*National Rifle Association of America*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> [X] this brief contains 6,984 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

> [  ] this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> [X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font, or

> [  ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

Dated:  April 22, 2016

> Respectfully submitted,
>
> /s/Anna M. Seidman
>
> *Counsel for Plaintiff/Appellant*
> *Safari Club International*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 22nd day of April 2016, a true and correct copy of the Reply Brief of Appellants Safari Club International and National Rifle Association of America was electronically filed through the CM/ECF system, which caused all parties to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

/s/ Anna M. Seidman
Anna M. Seidman

*Counsel for Plaintiff/Appellant*
*Safari Club International*