No. 15-5170

Oral Argument Not Yet Scheduled

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**SAFARI CLUB INTERNATIONAL, *et al.*,**

*Plaintiffs-Appellants*,

*v.*

**S.M.R. JEWELL, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE INTERIOR, *et al.*,**

*Defendants-Appellees.*

---

On Appeal from the United States District Court for the District of Columbia
(No. 14-0670, Hon. Royce C. Lamberth)

---

**ADDENDUM TO
FEDERAL DEFENDANTS-APPELLEES' ANSWERING BRIEF**

---

*Of Counsel:*
RUSSELL HUSEN
 U.S. Department of the Interior
 Office of the Solicitor
 Washington, D.C.

JOHN C. CRUDEN
 Assistant Attorney General

MATTHEW LITTLETON
MEREDITH L. FLAX
ANDREA GELATT
ERIKA B. KRANZ
 Attorneys, U.S. Dep't of Justice
 Environment & Natural Res. Div.
 P.O. Box 7415
 Washington, DC 20044
 (202) 307-6105
 erika.kranz@usdoj.gov

# ADDENDUM TABLE OF CONTENTS

| | |
|---|---|
| 16 U.S.C. § 1532 | 1–3 |
| 16 U.S.C. § 1533 | 3–4 |
| 16 U.S.C. § 1537a | 5–6 |
| 16 U.S.C. § 1538 | 6–8 |
| 16 U.S.C. § 1539 | 8–9 |
| 16 U.S.C. § 1540 | 10–11 |
| 50 C.F.R. § 13.11 | 12–13 |
| 50 C.F.R. § 13.29 | 14–15 |
| 50 C.F.R. § 17.9 | 16–17 |
| 50 C.F.R. § 17.11 | 17–19 |
| 50 C.F.R. § 17.31 | 20–21 |
| 50 C.F.R. § 17.40 | 22–24 |
| 50 C.F.R. §§ 23.1–23.92 | 25–94 |
| 50 C.F.R. § 23.6 | 30–31 |
| 50 C.F.R. § 23.7 | 31–32 |
| 50 C.F.R. § 23.13 | 32 |
| 50 C.F.R. §§ 23.13–23.36 | 32–53 |
| 50 C.F.R. § 23.20 | 37–39 |
| 50 C.F.R. § 23.33 | 49 |
| 50 C.F.R. § 23.35 | 50–51 |
| 50 C.F.R. § 23.61 | 72–74 |
| CITES preamble | 95 |
| CITES art. I | 95 |
| CITES art. II | 96 |
| CITES art. III | 96–97 |
| CITES art. IV | 97 |
| CITES art. XIV | 98 |
| 43 Fed. Reg. 20,499 | 99–104 |
| 57 Fed. Reg. 35,473 | 105–128 |
| 62 Fed. Reg. 44,627 | 129–142 |


(3) these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people;

(4) the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to—

(A) migratory bird treaties with Canada and Mexico;

(B) the Migratory and Endangered Bird Treaty with Japan;

(C) the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;

(D) the International Convention for the Northwest Atlantic Fisheries;

(E) the International Convention for the High Seas Fisheries of the North Pacific Ocean;

(F) the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and

(G) other international agreements; and

(5) encouraging the States and other interested parties, through Federal financial assistance and a system of incentives, to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants.

**(b) Purposes**

The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

**(c) Policy**

(1) It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.

(2) It is further declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

(Pub. L. 93–205, §2, Dec. 28, 1973, 87 Stat. 884; Pub. L. 96–159, §1, Dec. 28, 1979, 93 Stat. 1225; Pub. L. 97–304, §9(a), Oct. 13, 1982, 96 Stat. 1426; Pub. L. 100–478, title I, §1013(a), Oct. 7, 1988, 102 Stat. 2315.)

REFERENCES IN TEXT

This chapter, referred to in subsecs. (b) and (c)(1), was in the original "this Act", meaning Pub. L. 93–205, Dec. 28, 1973, 81 Stat. 884, as amended, known as the "Endangered Species Act of 1973", which is classified generally to this chapter. For complete classification of this Act to the Code, see Short Title note set out below and Tables.

AMENDMENTS

1988—Subsec. (a)(4)(G). Pub. L. 100–478 substituted ''; and'' for period at end.

1982—Subsec. (c). Pub. L. 97–304 designated existing provisions as par. (1) and added par. (2).

1979—Subsec. (a)(5). Pub. L. 96–159 substituted ''wildlife, and plants'' for ''wildlife''.

EFFECTIVE DATE

Section 16 of Pub. L. 93–205 provided that: "This Act [enacting this chapter, amending sections 460k–1, 460l–9, 668dd, 715i, 715s, 1362, 1371, 1372, and 1402 of this title and section 136 of Title 7, Agriculture, repealing sections 668aa to 668cc–6 of this title, and enacting provisions set out as notes under this section] shall take effect on the date of its enactment [Dec. 28, 1973]."

SHORT TITLE OF 1982 AMENDMENT

Section 1 of Pub. L. 97–304 provided: "That this Act [amending this section and sections 1532, 1533, 1535, 1536, 1537a, 1538, 1539, 1540, and 1542 of this title and enacting provisions set out as notes under sections 1533, 1537a, and 1539 of this title] may be cited as the 'Endangered Species Act Amendments of 1982'."

SHORT TITLE OF 1978 AMENDMENT

Pub. L. 95–632, §1, Nov. 10, 1978, 92 Stat. 3751, provided: "That this Act [amending sections 1532 to 1536, 1538 to 1540, and 1542 of this title] may be cited as the 'Endangered Species Act Amendments of 1978'."

SHORT TITLE

Section 1 of Pub. L. 93–205 provided: "That this Act [enacting this chapter, amending sections 460k–1, 460l–9, 668dd, 715i, 715s, 1362, 1371, 1372, and 1402 of this title and section 136 of Title 7, Agriculture, repealing sections 668aa to 668cc–6 of this title, and enacting provisions set out as notes under this section] may be cited as the 'Endangered Species Act of 1973'."

RELATIONSHIP TO ENDANGERED SPECIES ACT OF 1973

Pub. L. 102–251, title III, §305, Mar. 9, 1992, 106 Stat. 66, as amended by Pub. L. 104–208, div. A, title I, §101(a) [title II, §211(b)], Sept. 30, 1996, 110 Stat. 3009, 3009–41, provided that: "The special areas defined in section 3(24) of the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1802(24)) shall be considered places that are subject to the jurisdiction of the United States for the purposes of the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.)."

MINIMIZATION OF CONFLICTS WITH RECREATIONAL FISHERIES

For provision that all Federal agencies minimize conflicts between recreational fisheries and administration of this chapter, see Ex. Ord. No. 12962, §4, June 7, 1995, 60 F.R. 30770, set out as a note under section 1801 of this title.

**§ 1532. Definitions**

For the purposes of this chapter—

(1) The term "alternative courses of action" means all alternatives and thus is not limited to original project objectives and agency jurisdiction.

(2) The term "commercial activity" means all activities of industry and trade, including, but not limited to, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling: *Provided, however,* That it does not include exhibition of commodities by museums or similar cultural or historical organizations.

(3) The terms "conserve", "conserving", and "conservation" mean to use and the use of all

methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

(4) The term ''Convention'' means the Convention on International Trade in Endangered Species of Wild Fauna and Flora, signed on March 3, 1973, and the appendices thereto.

(5)(A) The term ''critical habitat'' for a threatened or endangered species means—

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

(B) Critical habitat may be established for those species now listed as threatened or endangered species for which no critical habitat has heretofore been established as set forth in subparagraph (A) of this paragraph.

(C) Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species.

(6) The term ''endangered species'' means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man.

(7) The term ''Federal agency'' means any department, agency, or instrumentality of the United States.

(8) The term ''fish or wildlife'' means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof.

(9) The term ''foreign commerce'' includes, among other things, any transaction—

(A) between persons within one foreign country;

(B) between persons in two or more foreign countries;

(C) between a person within the United States and a person in a foreign country; or

(D) between persons within the United States, where the fish and wildlife in question are moving in any country or countries outside the United States.

(10) The term ''import'' means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

(11) Repealed. Pub. L. 97–304, § 4(b), Oct. 13, 1982, 96 Stat. 1420.

(12) The term ''permit or license applicant'' means, when used with respect to an action of a Federal agency for which exemption is sought under section 1536 of this title, any person whose application to such agency for a permit or license has been denied primarily because of the application of section 1536(a) of this title to such agency action.

(13) The term ''person'' means an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.

(14) The term ''plant'' means any member of the plant kingdom, including seeds, roots and other parts thereof.

(15) The term ''Secretary'' means, except as otherwise herein provided, the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970; except that with respect to the enforcement of the provisions of this chapter and the Convention which pertain to the importation or exportation of terrestrial plants, the term also means the Secretary of Agriculture.

(16) The term ''species'' includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature.

(17) The term ''State'' means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, Guam, and the Trust Territory of the Pacific Islands.

(18) The term ''State agency'' means any State agency, department, board, commission, or other governmental entity which is responsible for the management and conservation of fish, plant, or wildlife resources within a State.

(19) The term ''take'' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

(20) The term ''threatened species'' means any species which is likely to become an endangered species within the foreseeable future

throughout all or a significant portion of its range.

(21) The term ''United States'', when used in a geographical context, includes all States.

(Pub. L. 93–205, §3, Dec. 28, 1973, 87 Stat. 885; Pub. L. 94–359, §5, July 12, 1976, 90 Stat. 913; Pub. L. 95–632, §2, Nov. 10, 1978, 92 Stat. 3751; Pub. L. 96–159, §2, Dec. 28, 1979, 93 Stat. 1225; Pub. L. 97–304, §4(b), Oct. 13, 1982, 96 Stat. 1420; Pub. L. 100–478, title I, §1001, Oct. 7, 1988, 102 Stat. 2306.)

REFERENCES IN TEXT

Reorganization Plan Numbered 4 of 1970, referred to in par. (15), is Reorg. Plan No. 4 of 1970, eff. Oct. 3, 1970, 35 F.R. 15627, 84 Stat. 2090, which is set out in the Appendix to Title 5, Government Organization and Employees.

AMENDMENTS

1988—Par. (13). Pub. L. 100–478, §1001(a), amended par. (13) generally. Prior to amendment, par. (13) read as follows: ''The term 'person' means an individual, corporation, partnership, trust, association, or any other private entity, or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State or political subdivision thereof, or of any foreign government.''

Par. (15). Pub. L. 100–478, §1001(b), inserted ''also'' before ''means the Secretary of Agriculture''.

1982—Par. (11). Pub. L. 97–304 struck out par. (11) which defined ''irresolvable conflict'' as, with respect to any action authorized, funded, or carried out by a Federal agency, a set of circumstances under which, after consultation as required in section 1536(a) of this title, completion of such action would violate section 1536(a)(2) of this title.

1979—Par. (11). Pub. L. 96–159 substituted ''action would violate section 1536(a)(2) of this title'' for ''action would (A) jeopardize the continued existence of an endangered or threatened species, or (B) result in the adverse modification or destruction of a critical habitat''.

1978—Pars. (1) to (4). Pub. L. 95–632, §2(1), (7), added par. (1) and redesignated former pars. (1) to (3) as (2) to (4), respectively. Former par. (4) redesignated (6).

Par. (5). Pub. L. 95–632, §2(2), (7), added par. (5). Former par. (5) redesignated (8).

Par. (6). Pub. L. 95–632, §2(7), redesignated former par. (4) as (6). Former par. (6) redesignated (9).

Par. (7). Pub. L. 95–632, §2(3), (7), added par. (7). Former par. (7) redesignated (10).

Pars. (8) to (10). Pub. L. 95–632, §2(7), redesignated former pars. (5) to (7) as (8) to (10), respectively. Former pars. (8) to (10) redesignated (13) to (15), respectively.

Pars. (11), (12). Pub. L. 95–632, §2(4), (7), added pars. (11) and (12). Former pars. (11) and (12) redesignated (16) and (17), respectively.

Pars. (13) to (15). Pub. L. 95–632, §2(7), redesignated former pars. (8) to (10) as (13) to (15), respectively. Former pars. (13) to (15) redesignated (18) to (20), respectively.

Par. (16). Pub. L. 95–632, §2(5), (7), redesignated former par. (11) as (16) and substituted ''and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature'' for ''and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature''. Former par. (16) redesignated (21).

Par. (17). Pub. L. 95–632, §2(7), redesignated former par. (12) as (17).

Par. (18). Pub. L. 95–632, §2(6), (7), redesignated former par. (13) as (18) and substituted ''fish, plant, or wildlife'' for ''fish or wildlife''.

Pars. (19) to (21). Pub. L. 95–632, §2(7), redesignated pars. (14) to (16) as (19) to (21), respectively.

1976—Par. (15). Pub. L. 94–359 inserted '': Provided, however, That it does not include exhibition of commodities by museums or similar cultural or historical organizations.'' after ''facilitating such buying and selling''.

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

§ 1533. Determination of endangered species and threatened species

(a) Generally

(1) The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

(2) With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970—

(A) in any case in which the Secretary of Commerce determines that such species should—

(i) be listed as an endangered species or a threatened species, or

(ii) be changed in status from a threatened species to an endangered species,

he shall so inform the Secretary of the Interior; who shall list such species in accordance with this section;

(B) in any case in which the Secretary of Commerce determines that such species should—

(i) be removed from any list published pursuant to subsection (c) of this section, or

(ii) be changed in status from an endangered species to a threatened species,

he shall recommend such action to the Secretary of the Interior, and the Secretary of the Interior, if he concurs in the recommendation, shall implement such action; and

(C) the Secretary of the Interior may not list or remove from any list any such species, and may not change the status of any such species which are listed, without a prior favorable determination made pursuant to this section by the Secretary of Commerce.

(3)(A) The Secretary, by regulation promulgated in accordance with subsection (b) of this section and to the maximum extent prudent and determinable—

(i) shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

(ii) may, from time-to-time thereafter as appropriate, revise such designation.

publication of the regulation in the Federal Register. Any regulation promulgated under the authority of this paragraph shall cease to have force and effect at the close of the 240-day period following the date of publication unless, during such 240-day period, the rulemaking procedures which would apply to such regulation without regard to this paragraph are complied with. If at any time after issuing an emergency regulation the Secretary determines, on the basis of the best appropriate data available to him, that substantial evidence does not exist to warrant such regulation, he shall withdraw it.

(8) The publication in the Federal Register of any proposed or final regulation which is necessary or appropriate to carry out the purposes of this chapter shall include a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulation; and if such regulation designates or revises critical habitat, such summary shall, to the maximum extent practicable, also include a brief description and evaluation of those activities (whether public or private) which, in the opinion of the Secretary, if undertaken may adversely modify such habitat, or may be affected by such designation.

**(c) Lists**

(1) The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b) of this section.

(2) The Secretary shall—

(A) conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

(B) determine on the basis of such review whether any such species should—

(i) be removed from such list;

(ii) be changed in status from an endangered species to a threatened species; or

(iii) be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b) of this section.

**(d) Protective regulations**

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case

of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

**(e) Similarity of appearance cases**

The Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species even though it is not listed pursuant to this section if he finds that—

(A) such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

(B) the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

(C) such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this chapter.

**(f) Recovery plans**

(1) The Secretary shall develop and implement plans (hereinafter in this subsection referred to as ''recovery plans'') for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable—

(A) give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

(B) incorporate in each plan—

(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

(iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

(2) The Secretary, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act.

(3) The Secretary shall report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Rep-



are of special significance to the health and stability of such species of sea turtles;

"(4) initiate the amendment of any existing international treaty for the protection and conservation of such species of sea turtles to which the United States is a party in order to make such treaty consistent with the purposes and policies of this section; and

"(5) provide to the Congress by not later than one year after the date of enactment of this section [Nov. 21, 1989]—

"(A) a list of each nation which conducts commercial shrimp fishing operations within the geographic range of distribution of such sea turtles;

"(B) a list of each nation which conducts commercial shrimp fishing operations which may affect adversely such species of sea turtles; and

"(C) a full report on—

"(i) the results of his efforts under this section; and

"(ii) the status of measures taken by each nation listed pursuant to paragraph (A) or (B) to protect and conserve such sea turtles.

"(b)(1) IN GENERAL.—The importation of shrimp or products from shrimp which have been harvested with commercial fishing technology which may affect adversely such species of sea turtles shall be prohibited not later than May 1, 1991, except as provided in paragraph (2).

"(2) CERTIFICATION PROCEDURE.—The ban on importation of shrimp or products from shrimp pursuant to paragraph (1) shall not apply if the President shall determine and certify to the Congress not later than May 1, 1991, and annually thereafter that—

"(A) the government of the harvesting nation has provided documentary evidence of the adoption of a regulatory program governing the incidental taking of such sea turtles in the course of such harvesting that is comparable to that of the United States; and

"(B) the average rate of that incidental taking by the vessels of the harvesting nation is comparable to the average rate of incidental taking of sea turtles by United States vessels in the course of such harvesting; or

"(C) the particular fishing environment of the harvesting nation does not pose a threat of the incidental taking of sea turtles in the course of such harvesting."

EXECUTIVE ORDER NO. 11911

Ex. Ord. No. 11911, Apr. 13, 1976, 41 F.R. 15683, which provided that for purposes of the Convention on International Trade in Endangered Species of Wild Fauna and Flora the Secretary of the Interior be designated as the Management Authority and established the Endangered Species Scientific Authority as the Scientific Authority, with the Secretary of the Interior designated to act on behalf of the United States in all regards as required by the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere, was revoked by Ex. Ord. No. 12608, Sept. 9, 1987, 52 F.R. 34617.

DELEGATION OF AUTHORITY REGARDING CERTIFICATION OF COUNTRIES EXPORTING SHRIMP TO UNITED STATES

Memorandum of the President of the United States, Dec. 19, 1990, 56 F.R. 357, provided:

Memorandum for the Secretary of State

By virtue of the authority vested in me by the Constitution and laws of the United States of America, including section 609 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1990 (Public Law 101–162) [set out above], and section 301 of title 3 of the United States Code, I hereby delegate to the Secretary of State the functions vested in me by section 609(b) of that Act. The authority delegated by this memorandum may be further redelegated within the Department of State.

The Secretary of State is authorized and directed to publish this memorandum in the Federal Register.

GEORGE BUSH.

## § 1537a. Convention implementation

### (a) Management Authority and Scientific Authority

The Secretary of the Interior (hereinafter in this section referred to as the "Secretary") is designated as the Management Authority and the Scientific Authority for purposes of the Convention and the respective functions of each such Authority shall be carried out through the United States Fish and Wildlife Service.

### (b) Management Authority functions

The Secretary shall do all things necessary and appropriate to carry out the functions of the Management Authority under the Convention.

### (c) Scientific Authority functions; determinations

(1) The Secretary shall do all things necessary and appropriate to carry out the functions of the Scientific Authority under the Convention.

(2) The Secretary shall base the determinations and advice given by him under Article IV of the Convention with respect to wildlife upon the best available biological information derived from professionally accepted wildlife management practices; but is not required to make, or require any State to make, estimates of population size in making such determinations or giving such advice.

### (d) Reservations by the United States under Convention

If the United States votes against including any species in Appendix I or II of the Convention and does not enter a reservation pursuant to paragraph (3) of Article XV of the Convention with respect to that species, the Secretary of State, before the 90th day after the last day on which such a reservation could be entered, shall submit to the Committee on Merchant Marine and Fisheries of the House of Representatives, and to the Committee on the Environment and Public Works of the Senate, a written report setting forth the reasons why such a reservation was not entered.

### (e) Wildlife preservation in Western Hemisphere

(1) The Secretary of the Interior (hereinafter in this subsection referred to as the "Secretary"), in cooperation with the Secretary of State, shall act on behalf of, and represent, the United States in all regards as required by the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere (56 Stat. 1354, T.S. 982, hereinafter in this subsection referred to as the "Western Convention"). In the discharge of these responsibilities, the Secretary and the Secretary of State shall consult with the Secretary of Agriculture, the Secretary of Commerce, and the heads of other agencies with respect to matters relating to or affecting their areas of responsibility.

(2) The Secretary and the Secretary of State shall, in cooperation with the contracting parties to the Western Convention and, to the extent feasible and appropriate, with the participation of State agencies, take such steps as are necessary to implement the Western Convention. Such steps shall include, but not be limited to—

(A) cooperation with contracting parties and international organizations for the purpose of

developing personnel resources and programs that will facilitate implementation of the Western Convention;

(B) identification of those species of birds that migrate between the United States and other contracting parties, and the habitats upon which those species depend, and the implementation of cooperative measures to ensure that such species will not become endangered or threatened; and

(C) identification of measures that are necessary and appropriate to implement those provisions of the Western Convention which address the protection of wild plants.

(3) No later than September 30, 1985, the Secretary and the Secretary of State shall submit a report to Congress describing those steps taken in accordance with the requirements of this subsection and identifying the principal remaining actions yet necessary for comprehensive and effective implementation of the Western Convention.

(4) The provisions of this subsection shall not be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate resident fish or wildlife under State law or regulations.

(Pub. L. 93–205, §8A, as added Pub. L. 96–159, §6(a)(1), Dec. 28, 1979, 93 Stat. 1228; amended Pub. L. 97–304, §5[(a)], Oct. 13, 1983, 96 Stat. 1421.)

AMENDMENTS

1982—Subsec. (c). Pub. L. 97–304, §5[(a)](1), designated existing provisions as par. (1) and added par. (2).

Subsec. (d). Pub. L. 97–304, §5[(a)](2), substituted provisions relating to reservations by the United States under the Convention for provisions which had established an International Convention Advisory Commission and had provided for its membership, staffing, and operation.

Subsec. (e). Pub. L. 97–304, §5[(a)](3), substituted provisions implementing the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere for provisions which had provided that the President shall designate those agencies of the Federal Government that shall act on behalf of, and represent, the United States in all regards as required by the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere.

EFFECTIVE DATE OF 1982 AMENDMENT

Section 5(b) of Pub. L. 97–304 provided that: "The amendment made by paragraph (1) of subsection (a) [amending this section] shall take effect January 1, 1981."

ABOLITION OF HOUSE COMMITTEE ON MERCHANT MARINE AND FISHERIES

Committee on Merchant Marine and Fisheries of House of Representatives abolished and its jurisdiction transferred by House Resolution No. 6, One Hundred Fourth Congress, Jan. 4, 1995. Committee on Merchant Marine and Fisheries of House of Representatives treated as referring to Committee on Resources of House of Representatives in case of provisions relating to fisheries, wildlife, international fishing agreements, marine affairs (including coastal zone management) except for measures relating to oil and other pollution of navigable waters, or oceanography by section 1(b)(3) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2. The Congress. Committee on Resources of House of Representatives changed to Committee on Natural Resources of House of Representatives by House Resolution No. 6, One Hundred Tenth Congress, Jan. 5, 2007.

ENDANGERED SPECIES SCIENTIFIC AUTHORITY; INTERIM PERFORMANCE OF FUNCTIONS OF COMMISSION

Section 6(b) of Pub. L. 96–159 provided that until such time as the Chairman, Members, and Executive Secretary of the International Convention Advisory Commission are appointed, but not later than 90 days after Dec. 28, 1979, the functions of the Commission be carried out by the Endangered Species Scientific Authority as established by Ex. Ord. No. 11911, formerly set out as a note under section 1537 of this title, with staff and administrative support being provided by the Secretary of the Interior as set forth in that Executive Order.

## § 1538. Prohibited acts

### (a) Generally

(1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to—

(A) import any such species into, or export any such species from the United States;

(B) take any such species within the United States or the territorial sea of the United States;

(C) take any such species upon the high seas;

(D) possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C);

(E) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(F) sell or offer for sale in interstate or foreign commerce any such species; or

(G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

(2) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of plants listed pursuant to section 1533 of this title, it is unlawful for any person subject to the jurisdiction of the United States to—

(A) import any such species into, or export any such species from, the United States;

(B) remove and reduce to possession any such species from areas under Federal jurisdiction; maliciously damage or destroy any such species on any such area; or remove, cut, dig up, or damage or destroy any such species on any other area in knowing violation of any law or regulation of any State or in the course of any violation of a State criminal trespass law;

(C) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(D) sell or offer for sale in interstate or foreign commerce any such species; or

(E) violate any regulation pertaining to such species or to any threatened species of plants listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.



**(b) Species held in captivity or controlled environment**

(1) The provisions of subsections (a)(1)(A) and (a)(1)(G) of this section shall not apply to any fish or wildlife which was held in captivity or in a controlled environment on (A) December 28, 1973, or (B) the date of the publication in the Federal Register of a final regulation adding such fish or wildlife species to any list published pursuant to subsection (c) of section 1533 of this title: *Provided*, That such holding and any subsequent holding or use of the fish or wildlife was not in the course of a commercial activity. With respect to any act prohibited by subsections (a)(1)(A) and (a)(1)(G) of this section which occurs after a period of 180 days from (i) December 28, 1973, or (ii) the date of publication in the Federal Register of a final regulation adding such fish or wildlife species to any list published pursuant to subsection (c) of section 1533 of this title, there shall be a rebuttable presumption that the fish or wildlife involved in such act is not entitled to the exemption contained in this subsection.

(2)(A) The provisions of subsection (a)(1) of this section shall not apply to—

(i) any raptor legally held in captivity or in a controlled environment on November 10, 1978; or

(ii) any progeny of any raptor described in clause (i);

until such time as any such raptor or progeny is intentionally returned to a wild state.

(B) Any person holding any raptor or progeny described in subparagraph (A) must be able to demonstrate that the raptor or progeny does, in fact, qualify under the provisions of this paragraph, and shall maintain and submit to the Secretary, on request, such inventories, documentation, and records as the Secretary may by regulation require as being reasonably appropriate to carry out the purposes of this paragraph. Such requirements shall not unnecessarily duplicate the requirements of other rules and regulations promulgated by the Secretary.

**(c) Violation of Convention**

(1) It is unlawful for any person subject to the jurisdiction of the United States to engage in any trade in any specimens contrary to the provisions of the Convention, or to possess any specimens traded contrary to the provisions of the Convention, including the definitions of terms in article I thereof.

(2) Any importation into the United States of fish or wildlife shall, if—

(A) such fish or wildlife is not an endangered species listed pursuant to section 1533 of this title but is listed in Appendix II to the Convention,

(B) the taking and exportation of such fish or wildlife is not contrary to the provisions of the Convention and all other applicable requirements of the Convention have been satisfied,

(C) the applicable requirements of subsections (d), (e), and (f) of this section have been satisfied, and

(D) such importation is not made in the course of a commercial activity,

be presumed to be an importation not in violation of any provision of this chapter or any regulation issued pursuant to this chapter.

**(d) Imports and exports**

**(1) In general**

It is unlawful for any person, without first having obtained permission from the Secretary, to engage in business—

(A) as an importer or exporter of fish or wildlife (other than shellfish and fishery products which (i) are not listed pursuant to section 1533 of this title as endangered species or threatened species, and (ii) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or plants; or

(B) as an importer or exporter of any amount of raw or worked African elephant ivory.

**(2) Requirements**

Any person required to obtain permission under paragraph (1) of this subsection shall—

(A) keep such records as will fully and correctly disclose each importation or exportation of fish, wildlife, plants, or African elephant ivory made by him and the subsequent disposition made by him with respect to such fish, wildlife, plants, or ivory;

(B) at all reasonable times upon notice by a duly authorized representative of the Secretary, afford such representative access to his place of business, an opportunity to examine his inventory of imported fish, wildlife, plants, or African elephant ivory and the records required to be kept under subparagraph (A) of this paragraph, and to copy such records; and

(C) file such reports as the Secretary may require.

**(3) Regulations**

The Secretary shall prescribe such regulations as are necessary and appropriate to carry out the purposes of this subsection.

**(4) Restriction on consideration of value or amount of African elephant ivory imported or exported**

In granting permission under this subsection for importation or exportation of African elephant ivory, the Secretary shall not vary the requirements for obtaining such permission on the basis of the value or amount of ivory imported or exported under such permission.

**(e) Reports**

It is unlawful for any person importing or exporting fish or wildlife (other than shellfish and fishery products which (1) are not listed pursuant to section 1533 of this title as endangered or threatened species, and (2) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or plants to fail to file any declaration or report as the Secretary deems necessary to facilitate enforcement of this chapter or to meet the obligations of the Convention.

**(f) Designation of ports**

(1) It is unlawful for any person subject to the jurisdiction of the United States to import into


or export from the United States any fish or wildlife (other than shellfish and fishery products which (A) are not listed pursuant to section 1533 of this title as endangered species or threatened species, and (B) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or plants, except at a port or ports designated by the Secretary of the Interior. For the purpose of facilitating enforcement of this chapter and reducing the costs thereof, the Secretary of the Interior, with approval of the Secretary of the Treasury and after notice and opportunity for public hearing, may, by regulation, designate ports and change such designations. The Secretary of the Interior, under such terms and conditions as he may prescribe, may permit the importation or exportation at nondesignated ports in the interest of the health or safety of the fish or wildlife or plants, or for other reasons, if, in his discretion, he deems it appropriate and consistent with the purpose of this subsection.

(2) Any port designated by the Secretary of the Interior under the authority of section 668cc–4(d)[1] of this title, shall, if such designation is in effect on December 27, 1973, be deemed to be a port designated by the Secretary under paragraph (1) of this subsection until such time as the Secretary otherwise provides.

**(g) Violations**

It is unlawful for any person subject to the jurisdiction of the United States to attempt to commit, solicit another to commit, or cause to be committed, any offense defined in this section.

(Pub. L. 93–205, §9, Dec. 28, 1973, 87 Stat. 893; Pub. L. 95–632, §4, Nov. 10, 1978, 92 Stat. 3760; Pub. L. 97–304, §9(b), Oct. 13, 1982, 96 Stat. 1426; Pub. L. 100–478, title I, §1006, title II, §2301, Oct. 7, 1988, 102 Stat. 2308, 2321; Pub. L. 100–653, title IX, §905, Nov. 14, 1988, 102 Stat. 3835.)

REFERENCES IN TEXT

Section 668cc–4 of this title, referred to in subsec. (f)(2), was repealed by Pub. L. 93–205, §14, Dec. 28, 1973, 87 Stat. 903.

AMENDMENTS

1988—Subsec. (a)(2)(B). Pub. L. 100–478, §1006, amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: "remove and reduce to possession any such species from areas under Federal jurisdiction;".

Subsec. (d). Pub. L. 100–478, §2301, amended subsec. (d) generally, revising and restating as pars. (1) to (4) provisions of former pars. (1) to (3).

Subsec. (d)(1)(A). Pub. L. 100–653 inserted "or plants" after "purposes".

1982—Subsec. (a)(2)(B) to (E). Pub. L. 97–304, §9(b)(1), added subpar. (B) and redesignated former subpars. (B), (C), and (D) as (C), (D), and (E), respectively.

Subsec. (b)(1). Pub. L. 97–304, §9(b)(2), substituted "The provisions of subsections (a)(1)(A) and (a)(1)(G) of this section shall not apply to any fish or wildlife which was held in captivity or in a controlled environment on (A) December 28, 1973, or (B) the date of the publication in the Federal Register of a final regulation adding such fish or wildlife species to any list published pursuant to subsection (c) of section 1533 of this

title: *Provided*, That such holding and any subsequent holding or use of the fish or wildlife was not in the course of a commercial activity. With respect to any act prohibited by subsections (a)(1)(A) and (a)(1)(G) of this section which occurs after a period of 180 days from (i) December 28, 1973, or (ii) the date of publication in the Federal Register of a final regulation adding such fish or wildlife species to any list published pursuant to subsection (c) of section 1533 of this title, there shall be a rebuttable presumption that the fish or wildlife involved in such act is not entitled to the exemption contained in this subsection" for "The provisions of this section shall not apply to any fish or wildlife held in captivity or in a controlled environment on December 28, 1973, if the purposes of such holding are not contrary to the purposes of this chapter; except that this subsection shall not apply in the case of any fish or wildlife held in the course of a commercial activity. With respect to any act prohibited by this section which occurs after a period of 180 days from December 28, 1973, there shall be a rebuttable presumption that the fish or wildlife involved in such act was not held in captivity or in a controlled environment on December 28, 1973".

Subsec. (b)(2)(A). Pub. L. 97–304, §9(b)(3), substituted "The provisions of subsection (a)(1) of this section shall not apply to" for "This section shall not apply to" in provisions preceding cl. (i).

1978—Subsec. (b). Pub. L. 95–632 designated existing provision as par. (1) and added par. (2).

HUMAN ACTIVITIES WITHIN PROXIMITY OF WHALES

Pub. L. 103–238, §17, Apr. 30, 1994, 108 Stat. 559, provided that:

"(a) LAWFUL APPROACHES.—In waters of the United States surrounding the State of Hawaii, it is lawful for a person subject to the jurisdiction of the United States to approach, by any means other than an aircraft, no closer than 100 yards to a humpback whale, regardless of whether the approach is made in waters designated under section 222.31 of title 50, Code of Federal Regulations, as cow/calf waters.

"(b) TERMINATION OF LEGAL EFFECT OF CERTAIN REGULATIONS.—Subsection (b) of section 222.31 of title 50, Code of Federal Regulations, shall cease to be in force and effect."

TERRITORIAL SEA OF UNITED STATES

For extension of territorial sea of United States, see Proc. No. 5928, set out as a note under section 1331 of Title 43, Public Lands.

## § 1539. Exceptions

### (a) Permits

(1) The Secretary may permit, under such terms and conditions as he shall prescribe—

(A) any act otherwise prohibited by section 1538 of this title for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j) of this section; or

(B) any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity.

(2)(A) No permit may be issued by the Secretary authorizing any taking referred to in paragraph (1)(B) unless the applicant therefor submits to the Secretary a conservation plan that specifies—

(i) the impact which will likely result from such taking;

(ii) what steps the applicant will take to minimize and mitigate such impacts, and the

<hr />

[1] See References in Text note below.

(A) terms and conditions which may be imposed on applicants for exemptions under this subsection (including, but not limited to, requirements that applicants register inventories, keep complete sales records, permit duly authorized agents of the Secretary to inspect such inventories and records, and periodically file appropriate reports with the Secretary); and

(B) terms and conditions which may be imposed on any subsequent purchaser of any pre-Act endangered species part covered by an exemption granted under this subsection;

to insure that any such part so exempted is adequately accounted for and not disposed of contrary to the provisions of this chapter. No regulation prescribed by the Secretary to carry out the purposes of this subsection shall be subject to section 1533(f)(2)(A)(i) of this title.

(6)(A) Any contract for the sale of pre-Act endangered species parts which is entered into by the Administrator of General Services prior to the effective date of this subsection and pursuant to the notice published in the Federal Register on January 9, 1973, shall not be rendered invalid by virtue of the fact that fulfillment of such contract may be prohibited under section 1538(a)(1)(F) of this title.

(B) In the event that this paragraph is held invalid, the validity of the remainder of this chapter, including the remainder of this subsection, shall not be affected.

(7) Nothing in this subsection shall be construed to—

(A) exonerate any person from any act committed in violation of paragraphs (1)(A), (1)(E), or (1)(F) of section 1538(a) of this title prior to July 12, 1976; or

(B) immunize any person from prosecution for any such act.

(8)(A)(i)[2] Any valid certificate of exemption which was renewed after October 13, 1982, and was in effect on March 31, 1988, shall be deemed to be renewed for a six-month period beginning on October 7, 1988. Any person holding such a certificate may apply to the Secretary for one additional renewal of such certificate for a period not to exceed 5 years beginning on October 7, 1988.

(B) If the Secretary approves any application for renewal of an exemption under this paragraph, he shall issue to the applicant a certificate of renewal of such exemption which shall provide that all terms, conditions, prohibitions, and other regulations made applicable by the previous certificate shall remain in effect during the period of the renewal.

(C) No exemption or renewal of such exemption made under this subsection shall have force and effect after the expiration date of the certificate of renewal of such exemption issued under this paragraph.

(D) No person may, after January 31, 1984, sell or offer for sale in interstate or foreign commerce, any pre-Act finished scrimshaw product unless such person holds a valid certificate of exemption issued by the Secretary under this subsection, and unless such product or the raw material for such product was held by such person on October 13, 1982.

**(g) Burden of proof**

In connection with any action alleging a violation of section 1538 of this title, any person claiming the benefit of any exemption or permit under this chapter shall have the burden of proving that the exemption or permit is applicable, has been granted, and was valid and in force at the time of the alleged violation.

**(h) Certain antique articles; importation; port designation; application for return of articles**

(1) Sections 1533(d) and 1538(a) and (c) of this title do not apply to any article which—

(A) is not less than 100 years of age;

(B) is composed in whole or in part of any endangered species or threatened species listed under section 1533 of this title;

(C) has not been repaired or modified with any part of any such species on or after December 28, 1973; and

(D) is entered at a port designated under paragraph (3).

(2) Any person who wishes to import an article under the exception provided by this subsection shall submit to the customs officer concerned at the time of entry of the article such documentation as the Secretary of the Treasury, after consultation with the Secretary of the Interior, shall by regulation require as being necessary to establish that the article meets the requirements set forth in paragraph (1)(A), (B), and (C).

(3) The Secretary of the Treasury, after consultation with the Secretary of the Interior, shall designate one port within each customs region at which articles described in paragraph (1)(A), (B), and (C) must be entered into the customs territory of the United States.

(4) Any person who imported, after December 27, 1973, and on or before November 10, 1978, any article described in paragraph (1) which—

(A) was not repaired or modified after the date of importation with any part of any endangered species or threatened species listed under section 1533 of this title;

(B) was forfeited to the United States before November 10, 1978, or is subject to forfeiture to the United States on such date of enactment, pursuant to the assessment of a civil penalty under section 1540 of this title; and

(C) is in the custody of the United States on November 10, 1978;

may, before the close of the one-year period beginning on November 10, 1978, make application to the Secretary for return of the article. Application shall be made in such form and manner, and contain such documentation, as the Secretary prescribes. If on the basis of any such application which is timely filed, the Secretary is satisfied that the requirements of this paragraph are met with respect to the article concerned, the Secretary shall return the article to the applicant and the importation of such article shall, on and after the date of return, be deemed to be a lawful importation under this chapter.

**(i) Noncommercial transshipments**

Any importation into the United States of fish or wildlife shall, if—

---

[2] So in original. No cl. (ii) has been enacted.

the carving of figures'' and inserted provision that, for purposes of this subsection, polishing or the adding of minor superficial markings does not constitute substantial etching, engraving, or carving.

Subsec. (f)(9). Pub. L. 97–304, §6(3)(B), added par. (9).

Subsec. (h)(1). Pub. L. 97–304, §6(4)(A), struck out ''(other than scrimshaw)'' after ''do not apply to any article'' in provisions preceding subpar. (A) and in subpar. (A) substituted ''is not less than 100 years of age'' for ''was made before 1830''.

Subsec. (i). Pub. L. 97–304, §6(5), substituted provisions covering noncommercial transshipments of fish or wildlife for provisions that had related to exemptions from the provisions of this title of the Tellico Dam and Reservoir Project and the Grayrocks Dam and Reservoir Project and to the operation of the Missouri Basin Power Project.

Subsec. (j). Pub. L. 97–304, §6(6), added subsec. (j).

1979—Subsec. (f)(4)(C). Pub. L. 96–159, §7(1), inserted ''unless such exemption is renewed under paragraph (8)'' after ''issuance of the certificate''.

Subsec. (f)(8). Pub. L. 96–159, §7(2), added par. (8).

1978—Subsecs. (h), (i). Pub. L. 95–632 added subsecs. (h) and (i).

1976—Subsec. (c). Pub. L. 94–359, §3, substituted ''section'' for ''subsection'' and inserted ''; except that such thirty-day period may be waived by the Secretary in an emergency situation where the health or life of an endangered animal is threatened and no reasonable alternative is available to the applicant, but notice of any such waiver shall be published by the Secretary in the Federal Register within ten days following the issuance of the exemption or permit.'' after ''every stage of the proceeding''.

Subsecs. (f), (g). Pub. L. 94–359, §2, added subsecs. (f) and (g).

EFFECTIVE DATE OF 1982 AMENDMENT

Section 6(4)(B) of Pub. L. 97–304 provided that: ''The amendment made by subparagraph (A) [amending this section] shall take effect January 1, 1981.''

TRANSFER OF FUNCTIONS

For transfer of functions, personnel, assets, and liabilities of the United States Customs Service of the Department of the Treasury, including functions of the Secretary of the Treasury relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 203(1), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

SCRIMSHAW EXEMPTIONS

Pub. L. 103–238, §18, Apr. 30, 1994, 108 Stat. 559, provided that: ''Notwithstanding any other provision of law, any valid certificate of exemption renewed by the Secretary (or deemed to be renewed) under section 10(f)(8) of the Endangered Species Act of 1973 (16 U.S.C. 1539(f)(8)) for any person holding such a certificate with respect to the possession of pre-Act finished scrimshaw products or raw material for such products shall remain valid for a period not to exceed 5 years beginning on the date of enactment of this Act [Apr. 30, 1994].''

## § 1540. Penalties and enforcement

### (a) Civil penalties

(1) Any person who knowingly violates, and any person engaged in business as an importer or exporter of fish, wildlife, or plants who violates, any provision of this chapter, or any provision of any permit or certificate issued hereunder, or of any regulation issued in order to implement subsection (a)(1)(A), (B), (C), (D), (E), or (F), (a)(2)(A), (B), (C), or (D), (c), (d) (other than regulation relating to recordkeeping or fil-

ing of reports), (f) or (g) of section 1538 of this title, may be assessed a civil penalty by the Secretary of not more than $25,000 for each violation. Any person who knowingly violates, and any person engaged in business as an importer or exporter of fish, wildlife, or plants who violates, any provision of any other regulation issued under this chapter may be assessed a civil penalty by the Secretary of not more than $12,000 for each such violation. Any person who otherwise violates any provision of this chapter, or any regulation, permit, or certificate issued hereunder, may be assessed a civil penalty by the Secretary of not more than $500 for each such violation. No penalty may be assessed under this subsection unless such person is given notice and opportunity for a hearing with respect to such violation. Each violation shall be a separate offense. Any such civil penalty may be remitted or mitigated by the Secretary. Upon any failure to pay a penalty assessed under this subsection, the Secretary may request the Attorney General to institute a civil action in a district court of the United States for any district in which such person is found, resides, or transacts business to collect the penalty and such court shall have jurisdiction to hear and decide any such action. The court shall hear such action on the record made before the Secretary and shall sustain his action if it is supported by substantial evidence on the record considered as a whole.

(2) Hearings held during proceedings for the assessment of civil penalties authorized by paragraph (1) of this subsection shall be conducted in accordance with section 554 of title 5. The Secretary may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and administer oaths. Witnesses summoned shall be paid the same fees and mileage that are paid to witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person pursuant to this paragraph, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Secretary or to appear and produce documents before the Secretary, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

(3) Notwithstanding any other provision of this chapter, no civil penalty shall be imposed if it can be shown by a preponderance of the evidence that the defendant committed an act based on a good faith belief that he was acting to protect himself or herself, a member of his or her family, or any other individual from bodily harm, from any endangered or threatened species.

### (b) Criminal violations

(1) Any person who knowingly violates any provision of this chapter, of any permit or certificate issued hereunder, or of any regulation issued in order to implement subsection (a)(1)(A), (B), (C), (D), (E), or (F), (a)(2)(A), (B),

shipped, exported, or imported contrary to the provisions of this chapter, any regulation made pursuant thereto, or any permit or certificate issued hereunder shall be subject to forfeiture to the United States.

(B) All guns, traps, nets, and other equipment, vessels, vehicles, aircraft, and other means of transportation used to aid the taking, possessing, selling, purchasing, offering for sale or purchase, transporting, delivering, receiving, carrying, shipping, exporting, or importing of any fish or wildlife or plants in violation of this chapter, any regulation made pursuant thereto, or any permit or certificate issued thereunder shall be subject to forfeiture to the United States upon conviction of a criminal violation pursuant to subsection (b)(1) of this section.

(5) All provisions of law relating to the seizure, forfeiture, and condemnation of a vessel for violation of the customs laws, the disposition of such vessel or the proceeds from the sale thereof, and the remission or mitigation of such forfeiture, shall apply to the seizures and forfeitures incurred, or alleged to have been incurred, under the provisions of this chapter, insofar as such provisions of law are applicable and not inconsistent with the provisions of this chapter; except that all powers, rights, and duties conferred or imposed by the customs laws upon any officer or employee of the Treasury Department shall, for the purposes of this chapter, be exercised or performed by the Secretary or by such persons as he may designate.

(6) The Attorney General of the United States may seek to enjoin any person who is alleged to be in violation of any provision of this chapter or regulation issued under authority thereof.

**(f) Regulations**

The Secretary, the Secretary of the Treasury, and the Secretary of the Department in which the Coast Guard is operating, are authorized to promulgate such regulations as may be appropriate to enforce this chapter, and charge reasonable fees for expenses to the Government connected with permits or certificates authorized by this chapter including processing applications and reasonable inspections, and with the transfer, board, handling, or storage of fish or wildlife or plants and evidentiary items seized and forfeited under this chapter. All such fees collected pursuant to this subsection shall be deposited in the Treasury to the credit of the appropriation which is current and chargeable for the cost of furnishing the services. Appropriated funds may be expended pending reimbursement from parties in interest.

**(g) Citizen suits**

(1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf—

(A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or

(B) to compel the Secretary to apply, pursuant to section 1535(g)(2)(B)(ii) of this title, the prohibitions set forth in or authorized pursuant to section 1533(d) or 1538(a)(1)(B) of this title with respect to the taking of any resident endangered species or threatened species within any State; or

(C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be. In any civil suit commenced under subparagraph (B) the district court shall compel the Secretary to apply the prohibition sought if the court finds that the allegation that an emergency exists is supported by substantial evidence.

(2)(A) No action may be commenced under subparagraph (1)(A) of this section—

(i) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation;

(ii) if the Secretary has commenced action to impose a penalty pursuant to subsection (a) of this section; or

(iii) if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress a violation of any such provision or regulation.

(B) No action may be commenced under subparagraph (1)(B) of this section—

(i) prior to sixty days after written notice has been given to the Secretary setting forth the reasons why an emergency is thought to exist with respect to an endangered species or a threatened species in the State concerned; or

(ii) if the Secretary has commenced and is diligently prosecuting action under section 1535(g)(2)(B)(ii) of this title to determine whether any such emergency exists.

(C) No action may be commenced under subparagraph (1)(C) of this section prior to sixty days after written notice has been given to the Secretary; except that such action may be brought immediately after such notification in the case of an action under this section respecting an emergency posing a significant risk to the well-being of any species of fish or wildlife or plants.

(3)(A) Any suit under this subsection may be brought in the judicial district in which the violation occurs.

(B) In any such suit under this subsection in which the United States is not a party, the Attorney General, at the request of the Secretary, may intervene on behalf of the United States as a matter of right.

(4) The court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

(5) The injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have under any

Management and Budget, Paperwork Reduction Project (1018–0092), Washington, DC 20603.

[63 FR 52634, Oct. 1, 1998]

## Subpart B—Application for Permits

### § 13.11  Application procedures.

The Service may not issue a permit for any activity authorized by this subchapter B unless the applicant has filed an application in accordance with the following procedures. Applicants do not have to submit a separate application for each permit unless otherwise required by this subchapter.

(a) *Forms.* Applications must be submitted in writing on a Federal Fish and Wildlife License/Permit Application (Form 3–200) or as otherwise specifically directed by the Service.

(b) *Forwarding instructions.* Applications for permits in the following categories should be forwarded to the issuing office indicated below.

(1) Migratory bird banding permits (50 CFR 21.22)—Bird Banding Laboratory, Office of Migratory Bird Management, U.S. Fish and Wildlife Service, Laurel, Maryland 20708. (Special application forms must be used for bird banding permits. They may be obtained by writing to the Bird Banding Laboratory).

(2) Exception to designated port (50 CFR part 14), import/export license (50 CFR 14.93), migratory bird permit, other than banding (50 CFR part 21) and Bald or Golden eagle permits (50 CFR part 22)—Assistant Regional Director for Law Enforcement of District in which the applicant resides (see 50 CFR 10.22 for addresses and boundaries of the Law Enforcement Districts).

(3) Feather quota (50 CFR part 15), injurious wildlife (50 CFR part 16), endangered and threatened species (50 CFR part 17), marine mammal (50 CFR part 18) and permits and certificates for the Convention on International Trade in Endangered Species (CITES) (50 CFR part 23)—U.S. Fish and Wildlife Service, Federal Wildlife Permit Office, P.O. Box 3654, Arlington, Virginia 22203.

(c) *Time notice.* The Service will process all applications as quickly as possible. However, it cannot guarantee final action within the time limits the applicant requests. Applicants for endangered species and marine mammal permits should submit applications to the Office of Management Authority which are postmarked at least 90 calendar days prior to the requested effective date. Applicants for all other permits should submit applications to the issuing office which are postmarked at least 60 days prior to the requested effective date.

(d) *Fees.* (1) Unless otherwise exempted by this paragraph, applicants for issuance or renewal of permits must pay the required permit processing fee at the time of application. Applicants should pay fees by check or money order made payable to "U.S. Fish and Wildlife Service." The Service will not refund any application fee under any circumstances if the Service has processed the application. However, the Service may return the application fee if the applicant withdraws the application before the Service has significantly processed it.

(2) Except as provided in paragraph (d)(4) of this section the fee for processing any application is $25.00. If regulations in this subchapter require more than one type of permit for an activity, and the permits are issued by the same office, the issuing office may issue one consolidated permit authorizing the activity. The issuing office may charge only the highest single fee for the activity permitted.

(3) A fee shall not be charged to any Federal, State or local government agency, nor to any individual or institution under contract to such agency for the proposed activities. The fee may be waived or reduced for public institutions (see 50 CFR 10.12). Proof of such status must accompany the application.

(4) *Nonstandard fees.*

| Type of permit | Fee |
|---|---|
| Import/Export License (Section 14.93) | $50. |
| Marine Mammal (Section 18.31) | $100. |
| Migratory Bird-Banding or Marking (21.22) | None. |
| Bald or Golden Eagles (Part 22) | None. |

(e) *Abandoned or incomplete applications.* Upon receipt of an incomplete or improperly executed application, or if the applicant does not submit the proper fees, the issuing office will notify the applicant of the deficiency. If the

Addendum 12

applicant fails to supply the correct information to complete the application or to pay the required fees within 45 calendar days of the date of notification, the Service will consider the application abandoned. The Service will not refund any fees for an abandoned application.

[47 FR 30785, July 15, 1982, as amended at 50 FR 52889, Dec. 26, 1985; 54 FR 4031, Jan. 27, 1989; 54 FR 38147, Sept. 14, 1989; 61 FR 31868, June 21, 1996]

### §13.12 General information requirements on applications for permits.

(a) *General information required for all applications.* All applications must contain the following information:

(1) Applicant's full name, mailing address, telephone number(s), and,

(i) If the applicant is an individual, the date of birth, height, weight, hair color, eye color, sex, and any business or institutional affiliation of the applicant related to the requested permitted activity; or

(ii) If the applicant is a corporation, firm, partnership, association, institution, or public or private agency, the name and address of the president or principal officer or of the registered agent for the service of process;

(2) Location where the requested permitted activity is to occur or be conducted;

(3) Reference to the part(s) and section(s) of this subchapter B as listed in paragraph (b) of this section under which the application is made for a permit or permits, together with any additional justification, including supporting documentation as required by the referenced part(s) and section(s);

(4) If the requested permitted activity involves the import or re-export of wildlife or plants from or to any foreign country, and the country of origin, or the country of export or re-export restricts the taking, possession, transportation, exportation, or sale of wildlife or plants, documentation as indicated in §14.52(c) of this subchapter B;

(5) Certification in the following language:

I hereby certify that I have read and am familiar with the regulations contained in title 50, part 13, of the Code of Federal Regulations and the other applicable parts in subchapter B of chapter I of title 50, Code of Federal Regulations, and I further certify that the information submitted in this application for a permit is complete and accurate to the best of my knowledge and belief. I understand that any false statement herein may subject me to suspension or revocation of this permit and to the criminal penalties of 18 U.S.C. 1001.

(6) Desired effective date of permit except where issuance date is fixed by the part under which the permit is issued;

(7) Date;

(8) Signature of the applicant; and

(9) Such other information as the Director determines relevant to the processing of the application.

(b) *Additional information required on permit applications.* As stated in paragraph (a)(3) of this section certain additional information is required on all applications. These additional requirements may be found by referring to the section of this subchapter B cited after the type of permit for which application is being made:

| Type of permit | Section |
|---|---|
| Importation at nondesignated ports: | |
| Scientific | 14.31 |
| Deterioration prevention | 14.32 |
| Economic hardship | 14.33 |
| Marking of package or container: | |
| Symbol marking | 14.83 |
| Import/export license | 14.93 |
| Feather import quota: Importation or entry | 15.21 |
| Injurious wildlife: Importation or shipment | 16.22 |
| Endangered wildlife and plant permits: | |
| Similarity of appearance | 17.52 |
| Scientific, enhancement of propagation or survival, incidental taking for wildlife | 17.22 |
| Scientific, propagation, or survival for plants | 17.62 |
| Economic hardship for wildlife | 17.23 |
| Economic hardship for plants | 17.63 |
| Threatened wildlife and plant permits: | |
| Similarity of appearance | 17.52 |
| General for wildlife | 17.32 |
| American alligator–buyer or tanner | 17.42(a) |
| General for plants | 17.72 |
| Marine mammals permits: | |
| Scientific research | 18.31 |
| Public display | 18.31 |
| Migratory bird permits: | |
| Banding or marking | 21.22 |
| Scientific collecting | 21.23 |
| Taxidermist | 21.24 |
| Waterfowl sale and disposal | 21.25 |
| Special aviculturist | 21.26 |
| Special purpose | 21.27 |
| Falconry | 21.28 |
| Raptor propagation permit | 21.30 |
| Depredation control | 21.41 |
| Eagle permits: | |
| Scientific or exhibition | 22.21 |
| Indian religious use | 22.22 |
| Depredation control | 22.23 |
| Falconry purposes | 22.24 |

issuing officer. If a permittee files a timely request for reconsideration of a proposed revocation, such permittee may retain possession of any wildlife held under authority of the permit until final disposition of the appeal process.

[54 FR 38149, Sept. 14, 1989, as amended at 64 FR 32711, June 17, 1999]

### § 13.29 Review procedures.

(a) *Request for reconsideration.* Any person may request reconsideration of an action under this part if that person is one of the following:

(1) An applicant for a permit who has received written notice of denial;

(2) An applicant for renewal who has received written notice that a renewal is denied;

(3) A permittee who has a permit amended, suspended, or revoked, except for those actions which are required by changes in statutes or regulations, or are emergency changes of limited applicability for which an expiration date is set within 90 days of the permit change; or

(4) A permittee who has a permit issued or renewed but has not been granted authority by the permit to perform all activities requested in the application, except when the activity requested is one for which there is no lawful authority to issue a permit.

(b) *Method of requesting reconsideration.* Any person requesting reconsideration of an action under this part must comply with the following criteria:

(1) Any request for reconsideration must be in writing, signed by the person requesting reconsideration or by the legal representative of that person, and must be submitted to the issuing officer.

(2) The request for reconsideration must be received by the issuing officer within 45 calendar days of the date of notification of the decision for which reconsideration is being requested.

(3) The request for reconsideration shall state the decision for which reconsideration is being requested and shall state the reason(s) for the reconsideration, including presenting any new information or facts pertinent to the issue(s) raised by the request for reconsideration.

(4) The request for reconsideration shall contain a certification in substantially the same form as that provided by § 13.12(a)(5). If a request for reconsideration does not contain such certification, but is otherwise timely and appropriate, it shall be held and the person submitting the request shall be given written notice of the need to submit the certification within 15 calendar days. Failure to submit certification shall result in the request being rejected as insufficient in form and content.

(c) *Inquiry by the Service.* The Service may institute a separate inquiry into the matter under consideration.

(d) *Determination of grant or denial of a request for reconsideration.* The issuing officer shall notify the permittee of the Service's decision within 45 days of the receipt of the request for reconsideration. This notification shall be in writing, shall state the reasons for the decision, and shall contain a description of the evidence which was relied upon by the issuing officer. The notification shall also provide information concerning the right to appeal, the official to whom an appeal may be addressed, and the procedures for making an appeal.

(e) *Appeal.* A person who has received an adverse decision following submission of a request for reconsideration may submit a written appeal to the Regional Director for the region in which the issuing office is located, or to the Director for offices which report directly to the Director. An appeal must be submitted within 45 days of the date of the notification of the decision on the request for reconsideration. The appeal shall state the reason(s) and issue(s) upon which the appeal is based and may contain any additional evidence or arguments to support the appeal.

(f) *Decision on appeal.* (1) Before a decision is made concerning the appeal the appellant may present oral arguments before the Regional Director or the Director, as appropriate, if such official judges oral arguments are necessary to clarify issues raised in the written record.

(2) The Service shall notify the appellant in writing of its decision within 45 calendar days of receipt of the appeal,

unless extended for good cause and the appellant notified of the extension.

(3) The decision of the Regional Director or the Director shall constitute the final administrative decision of the Department of the Interior.

[54 FR 38149, Sept. 14, 1989]

## Subpart D—Conditions

### §13.41  Humane conditions.

Any live wildlife possessed under a permit must be maintained under humane and healthful conditions.

[54 FR 38150, Sept. 14, 1989]

### §13.42  Permits are specific.

The authorizations on the face of a permit which set forth specific times, dates, places, methods of taking, numbers and kinds of wildlife or plants, location of activity, authorize certain circumscribed transactions, or otherwise permit a specifically limited matter, are to be strictly construed and shall not be interpreted to permit similar or related matters outside the scope of strict construction.

[39 FR 1161, Jan. 4, 1974, as amended at 42 FR 32377, June 24, 1977]

### §13.43  Alteration of permits.

Permits shall not be altered, erased, or mutilated, and any permit which has been altered, erased, or mutilated shall immediately become invalid. Unless specifically permitted on the face thereof, no permit shall be copied, nor shall any copy of a permit issued pursuant to this subchapter B be displayed, offered for inspection, or otherwise used for any official purpose for which the permit was issued.

### §13.44  Display of permit.

Any permit issued under this part shall be displayed for inspection upon request to the Director or his agent, or to any other person relying upon its existence.

### §13.45  Filing of reports.

Permittees may be required to file reports of the activities conducted under the permit. Any such reports shall be filed not later than March 31 for the preceding calendar year ending December 31, or any portion thereof, during which a permit was in force, unless the regulations of this subchapter B or the provisions of the permit set forth other reporting requirements.

### §13.46  Maintenance of records.

From the date of issuance of the permit, the permittee shall maintain complete and accurate records of any taking, possession, transportation, sale, purchase, barter, exportation, or importation of plants obtained from the wild (excluding seeds) or wildlife pursuant to such permit. Such records shall be kept current and shall include names and addresses of persons with whom any plant obtained from the wild (excluding seeds) or wildlife has been purchased, sold, bartered, or otherwise transferred, and the date of such transaction, and such other information as may be required or appropriate. Such records shall be legibly written or reproducible in English and shall be maintained for five years from the date of expiration of the permit.

[39 FR 1161, Jan. 4, 1974, as amended at 42 FR 32377, June 24, 1977; 54 FR 38150, Sept. 14, 1989]

### §13.47  Inspection requirement.

Any person holding a permit under this subchapter B shall allow the Director's agent to enter his premises at any reasonable hour to inspect any wildlife or plant held or to inspect, audit, or copy any permits, books, or records required to be kept by regulations of this subchapter B.

[39 FR 1161, Jan. 4, 1974, as amended at 42 FR 32377, June 24, 1977]

### §13.48  Compliance with conditions of permit.

Any person holding a permit under subchapter B and any person acting under authority of such permit must comply with all conditions of the permit and with all applicable laws and regulations governing the permitted activity.

[54 FR 38150, Sept. 14, 1989]

(c) Non-edible by-products of endangered or threatened wildlife taken or imported pursuant to paragraph (a) of this section may be sold in interstate commerce when made into authentic native articles of handicrafts and clothing.

## § 17.6 State cooperative agreements. [Reserved]

## § 17.7 Raptor exemption.

(a) The prohibitions found in §§ 17.21 and 17.31 do not apply to any raptor [a live migratory bird of the Order *Falconiformes* or the Order *Strigiformes*, other than a bald eagle (*Haliaeetus leucocephalus*) or a golden eagle (*Aquila chrysaetos*)] legally held in captivity or in a controlled environment on November 10, 1978, or to any of its progeny, which is:

(1) Possessed and banded in compliance with the terms of a valid permit issued under part 21 of this chapter; and

(2) Identified in the earliest applicable annual report required to be filed by a permittee under part 21 of this chapter as in a permittee's possession on November 10, 1978, or as the progeny of such a raptor.

(b) This section does not apply to any raptor intentionally returned to the wild.

[48 FR 31607, July 8, 1983]

## § 17.8 Import exemption for threatened, CITES Appendix-II wildlife.

(a) Except as provided in a special rule in §§ 17.40 through 17.48 or in paragraph (b) of this section, all provisions of §§ 17.31 and 17.32 apply to any specimen of a threatened species of wildlife that is listed in Appendix II of the Convention.

(b) *Import.* Except as provided in a special rule in §§ 17.40 through 17.48, any live or dead specimen of a fish and wildlife species listed as threatened under this part may be imported without a threatened species permit under § 17.32 provided all of the following conditions are met:

(1) The specimen was not acquired in foreign commerce or imported in the course of a commercial activity;

(2) The species is listed in Appendix II of the Convention.

(3) The specimen is imported and subsequently used in accordance with the requirements of part 23 of this subchapter, except as provided in paragraph (b)(4) of this section.

(4) Personal and household effects (see § 23.5) must be accompanied by a CITES document.

(5) At the time of import, the importer must provide to the FWS documentation that shows the specimen was not acquired in foreign commerce in the course of a commercial activity.

(6) All applicable requirements of part 14 of this subchapter are satisfied.

[72 FR 48446, Aug. 23, 2007]

## § 17.9 Permit applications and information collection requirements.

(a) Address permit applications for activities affecting species listed under the Endangered Species Act, as amended, as follows:

(1) Address activities affecting endangered and threatened species that are native to the United States to the Regional Director for the Region in which the activity is to take place. You can find addresses for the Regional Directors in 50 CFR 2.2. Send applications for interstate commerce in native endangered and threatened species to the Regional Director with lead responsibility for the species. To determine the appropriate region, call the nearest Regional Office:

Region 1 (Portland, OR): 503–231–6241
Region 2 (Albuquerque, NM): 505–248–6920
Region 3 (Twin Cities, MN): 612–713–5343
Region 4 (Atlanta, GA): 404–679–7313
Region 5 (Hadley, MA): 413–253–8628
Region 6 (Denver, CO): 303–236–8155, ext 263
Region 7 (Anchorage, AK): 907–786–3620
Headquarters (Washington, DC): 703–358–2106

(2) Submit permit applications for activities affecting native endangered and threatened species in international movement or commerce, and all activities affecting nonnative endangered and threatened species to the Director, U.S. Fish and Wildlife Service, (Attention Office of Management Authority), 4401 N. Fairfax Drive, Room 700, Arlington, VA 22203.

(b) The Office of Management and Budget approved the information collection requirements contained in this part 17 under 44 U.S.C. 3507 and assigned OMB Control Numbers 1018–0093

and 1018–0094. The Service may not conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a currently valid OMB control number. We are collecting this information to provide information necessary to evaluate permit applications. We will use this information to review permit applications and make decisions, according to criteria established in various Federal wildlife conservation statutes and regulations, on the issuance, suspension, revocation, or denial of permits. You must respond to obtain or retain a permit. We estimate the public reporting burden for these reporting requirements to vary from 2 to 2½ hours per response, including time for reviewing instructions, gathering and maintaining data, and completing and reviewing the forms. Direct comments regarding the burden estimate or any other aspect of these reporting requirements to the Service Information Collection Control Officer, MS–222 ARLSQ, U.S. Fish and Wildlife Service, Washington, DC 20240, or the Office of Management and Budget, Paperwork Reduction Project (1018–0093/0094), Washington, DC 20603.

[63 FR 52635, Oct. 1, 1998. Redesignated at 72 FR 48446, Aug. 23, 2007]

## Subpart B—Lists

**§ 17.11 Endangered and threatened wildlife.**

(a) The list in this section contains the names of all species of wildlife which have been determined by the Services to be Endangered or Threatened. It also contains the names of species of wildlife treated as Endangered or Threatened because they are sufficiently similar in appearance to Endangered or Threatened species (see § 17.50 *et seq.*).

(b) The columns entitled "Common Name," "Scientific Name," and "Vertebrate Population Where Endangered or Threatened" define the species of wildlife within the meaning of the Act. Thus, differently classified geographic populations of the same vertebrate subspecies or species shall be identified by their differing geographic boundaries, even though the other two columns are identical. The term "Entire" means that all populations throughout the present range of a vertebrate species are listed. Although common names are included, they cannot be relied upon for identification of any specimen, since they may vary greatly in local usage. The Services shall use the most recently accepted scientific name. In cases in which confusion might arise, a synonym(s) will be provided in parentheses. The Services shall rely to the extent practicable on the *International Code of Zoological Nomenclature.*

(c) In the "Status" column the following symbols are used: "E" for Endangered, "T" for Threatened, and "E [or T] (S/A)" for similarity of appearance species.

(d) The other data in the list are nonregulatory in nature and are provided for the information of the reader. In the annual revision and compilation of this title, the following information may be amended without public notice: the spelling of species' names, historical range, footnotes, references to certain other applicable portions of this title, synonyms, and more current names. In any of these revised entries, neither the species, as defined in paragraph (b) of this section, nor its status may be changed without following the procedures of part 424 of this title.

(e) The "historic range" indicates the known general distribution of the species or subspecies as reported in the current scientific literature. The present distribution may be greatly reduced from this historic range. This column does not imply any limitation on the application of the prohibitions in the Act or implementing rules. Such prohibitions apply to all individuals of the species, wherever found.

(f)(1) A footnote to the FEDERAL REGISTER publication(s) listing or reclassifying a species is indicated under the column "When listed." Footnote numbers to §§ 17.11 and 17.12 are in the same numerical sequence, since plants and animals may be listed in the same FEDERAL REGISTER document. That document, at least since 1973, includes a statement indicating the basis for the listing, as well as the effective date(s) of said listing.

(2) The "Special rules" and "Critical habitat" columns provide a cross reference to other sections in parts 17, 222, 226, or 227. The "Special rules" column will also be used to cite the special rules that describe experimental populations and determine if they are essential or nonessential. Separate listing will be made for experimental populations, and the status column will include the following symbols: "XE" for an essential experimental population and "XN" for a nonessential experimental population. The term "NA" (not applicable) appearing in either of these two columns indicates that there are no special rules and/or critical habitat for that particular species. However, all other appropriate rules in parts 17, 217 through if, and 402 still apply to that species. In addition, there may be other rules in this title that relate to such wildlife, e.g., port-of-entry requirements. It is not intended that the references in the "Special rules" column list all the regulations of the two Services which might apply to the species or to the regulations of other Federal agencies or State or local governments.

(g) The listing of a particular taxon includes all lower taxonomic units. For example, the genus *Hylobates* (gibbons) is listed as Endangered throughout its entire range (China, India, and SE Asia); consequently, all species, subspecies, and populations of that genus are considered listed as Endangered for the purposes of the Act. In 1978 (43 FR 6230–6233) the species *Haliaeetus leucocephalus* (bald eagle) was listed as Threatened in "USA (WA, OR, MN, WI, MI)" rather than its entire population; thus, all individuals of the bald eagle found in those five States are considered listed as Threatened for the purposes of the Act.

(h) The "List of Endangered and Threatened Wildlife" is provided below:

| Species | | Historic Range | Vertebrate population where endangered or threatened | Status | When listed | Critical habitat | Special rules |
|---|---|---|---|---|---|---|---|
| Common name | Scientific name | | | | | | |
| Dibbler | Antechinus apicalis | Australia | ...do | E | 4 | NA | NA |
| Dog, African wild | Lycaon pictus | Sub-Saharan Africa | ...do | E | 139 | NA | NA |
| Dolphin, Chinese river | Lipotes vexillifer | China | ...do | E | 350 | NA | NA |
| Dolphin, Indus River | Platanista minor | Pakistan (Indus R. and tributaries). | ...do | E | 417 | NA | NA |
| Drill | Mandrillus (=Papio) leucophaeus | Equatorial West Africa | ...do | E | 16 | NA | NA |
| Dugong | Dugong dugon | East Africa to southern Japan, including Palau. | ...do | E | 4,740 | NA | NA |
| Duiker, Jentink's | Cephalophus jentinki | Sierra Leone, Liberia, Ivory Coast. | ...do | E | 50 | NA | NA |
| Eland, western giant | Taurotragus derbianus derbianus | Senegal to Ivory Coast. | ...do | E | 50 | NA | NA |
| Elephant, African | Loxodonta africana | Africa | ...do | T | 40 | NA | 17.40(e) |
| Elephant, Asian | Elephas maximus | South-central and southeastern Asia. | ...do | E | 15 | NA | NA |
| Ferret, black-footed | Mustela nigripes | Western U.S.A., Western Canada. | Entire, except where listed as an experimental population. | E | 1, 3, 433, 545, 546, 582, 646, 703, 737 | NA | NA |
| ...do | ...do | ...do | U.S.A. (specified portions of AZ, CO, MT, SD, UT, and WY; see 17.84(j)(9)). | XN | 433, 545, 546, 582, 646, 703, 737 | NA | 17.84(g) |
| Fox, northern swift | Vulpes velox hebes | U.S.A. (northern plains), Canada | Canada | E | 3 | NA | NA |
| Fox, San Joaquin kit | Vulpes macrotis mutica | U.S.A. (CA) | Entire | E | 1 | NA | NA |
| Fox, San Miguel Island | Urocyon littoralis littoralis | ...do | ...do | E | 742 | 17.95(a) | NA |
| Fox, Santa Catalina Island | Urocyon littoralis catalinae | ...do | ...do | E | 742 | 17.95(a) | NA |
| Fox, Santa Cruz Island | Urocyon littoralis santacruzae | ...do | ...do | E | 742 | 17.95(a) | NA |
| Fox, Santa Rosa Island | Urocyon littoralis santarosae | ...do | ...do | E | 742 | 17.95(a) | NA |
| Fox, Simien | Canis simensis | Ethiopia | ...do | E | 50 | NA | NA |
| Gazelle, Arabian | Gazella gazella | Arabian Peninsula, Palestine, Sinai. | ...do | E | 50 | NA | NA |
| Gazelle, Clark's | Ammodorcas clarkei | Somalia, Ethiopia | ...do | E | 3 | NA | NA |
| Gazelle, dama | Gazella dama | North Africa | ...do | E | 3 | NA | NA |
| Gazelle, Moroccan | Gazella dorcas massaesyla | Morocco, Algeria, Tunisia | ...do | E | 3 | NA | NA |
| Gazelle, mountain (=Cuvier's) | Gazella cuvieri | ...do | ...do | E | 3 | NA | NA |
| Gazelle, Pelzeln's | Gazella dorcas pelzelni | Somalia | ...do | E | 50 | NA | NA |
| Gazelle, sand | Gazella subgutturosa marica | Jordan, Arabian Peninsula | ...do | E | 50 | NA | NA |
| Gazelle, Saudi Arabian | Gazella dorcas saudiya | Israel, Iraq, Jordan, Syria, Arabian Peninsula. | ...do | E | 50 | NA | NA |
| Gazelle, slender-horned | Gazella leptoceros | Sudan, Egypt, Algeria, Libya | ...do | E | 3 | NA | NA |

Addendum 19



(i) Deals specifically with the wildlife sought to be covered by the permit;

(ii) Became binding prior to the date when the notice of a review of the status of the species or the notice of proposed rulemaking proposing to list such wildlife as endangered was published in the FEDERAL REGISTER, whichever is earlier; and

(iii) Will cause monetary loss of a given dollar amount if the permit sought under this section is not granted.

(b) *Issuance criteria.* Upon receiving an application completed in accordance with paragraph (a) of this section, the Director will decide whether or not a permit should be issued under any of the three categories of economic hardship, as defined in section 10(b)(2) of the Act. In making his decisions, the Director shall consider, in addition to the general criteria in § 13.21(b) of this subchapter, the following factors:

(1) Whether the purpose for which the permit is being requested is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

(2) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;

(3) The economic, legal, subsistence, or other alternatives or relief available to the applicant;

(4) The amount of evidence that the applicant was in fact party to a contract or other binding legal obligation which;

(i) Deals specifically with the wildlife sought to be covered by the permit; and

(ii) Became binding prior to the date when the notice of a review of the status of the species or the notice of proposed rulemaking proposing to list such wildlife as endangered was published in the FEDERAL REGISTER, whichever is earlier;

(5) The severity of economic hardship which the contract or other binding legal obligation referred to in paragraph (b)(4) of this section would cause if the permit were denied;

(6) Where applicable, the portion of the applicant's income which would be lost if the permit were denied, and the relationship of that portion to the balance of his income;

(7) Where applicable, the nature and extent of subsistence taking generally by the applicant; and

(8) The likelihood that applicant can reasonably carry out his desired activity within one year from the date a notice is published in the FEDERAL REGISTER to review status of such wildlife, or to list such wildlife as endangered, whichever is earlier.

(c) *Permit conditions.* In addition to the general conditions set forth in part 13 of this subchapter, every permit issued under this section shall be subject to the following special conditions:

(1) In addition to any reporting requirements contained in the permit itself, the permittee shall also submit to the Director a written report of his activities pursuant to the permit. Such report must be postmarked or actually delivered no later than 10 days after completion of the activity.

(2) The death or escape of all living wildlife covered by the permit shall be immediately reported to the Service's office designated in the permit.

(d) Duration of permits issued under this section shall be designated on the face of the permit. No permit issued under this section, however, shall be valid for more than one year from the date a notice is published in the FEDERAL REGISTER to review status of such wildlife, or to list such wildlife as endangered, whichever is earlier.

[40 FR 44415, Sept. 26, 1975, as amended at 40 FR 53400, Nov. 18, 1975; 40 FR 58307, Dec. 16, 1975; 50 FR 39688, Sept. 30, 1985]

## Subpart D—Threatened Wildlife

### § 17.31 Prohibitions.

(a) Except as provided in subpart A of this part, or in a permit issued under this subpart, all of the provisions in § 17.21 shall apply to threatened wildlife, except § 17.21(c)(5).

(b) In addition to any other provisions of this part 17, any employee or agent of the Service, of the National Marine Fisheries Service, or of a State conservation agency which is operating a conservation program pursuant to the terms of a Cooperative Agreement with the Service in accordance with

Addendum 20

section 6(c) of the Act, who is designated by his agency for such purposes, may, when acting in the course of his official duties, take those threatened species of wildlife which are covered by an approved cooperative agreement to carry out conservation programs.

(c) Whenever a special rule in §§ 17.40 to 17.48 applies to a threatened species, none of the provisions of paragraphs (a) and (b) of this section will apply. The special rule will contain all the applicable prohibitions and exceptions.

[43 FR 18181, Apr. 28, 1978, as amended at 44 FR 31580, May 31, 1979; 70 FR 10503, Mar. 4, 2005]

## § 17.32  Permits—general.

Upon receipt of a complete application the Director may issue a permit for any activity otherwise prohibited with regard to threatened wildlife. Such permit shall be governed by the provisions of this section unless a special rule applicable to the wildlife, appearing in §§ 17.40 to 17.48, of this part provides otherwise. Permits issued under this section must be for one of the following purposes: Scientific purposes, or the enhancement of propagation or survival, or economic hardship, or zoological exhibition, or educational purposes, or incidental taking, or special purposes consistent with the purposes of the Act. Such permits may authorize a single transaction, a series of transactions, or a number of activities over a specific period of time.

(a)(1) *Application requirements for permits for scientific purposes, or the enhancement of propagation or survival, or economic hardship, or zoological exhibition, or educational purposes, or special purposes consistent with the purposes of the Act.* A person wishing to get a permit for an activity prohibited by § 17.31 submits an application for activities under this paragraph. The Service provides Form 3–200 for the application to which as much of the following information relating to the purpose of the permit must be attached:

(i) The Common and scientific names of the species sought to be covered by the permit, as well as the number, age, and sex of such species, and the activity sought to be authorized (such as

taking, exporting, selling in interstate commerce);

(ii) A statement as to whether, at the time of application, the wildlife sought to be covered by the permit (A) is still in the wild, (B) has already been removed from the wild, or (C) was born in captivity;

(iii) A resume of the applicant's attempts to obtain the wildlife sought to be covered by the permit in a manner which would not cause the death or removal from the wild of such wildlife;

(iv) If the wildlife sought to be covered by the permit has already been removed from the wild, the country and place where such removal occurred; if the wildlife sought to be covered by permit was born in captivity, the country and place where such wildlife was born;

(v) A complete description and address of the institution or other facility where the wildlife sought to be covered by the permit will be used, displayed, or maintained;

(vi) If the applicant seeks to have live wildlife covered by the permit, a complete description, including photographs or diagrams, of the facilities to house and/or care for the wildlife and a resume of the experience of those persons who will be caring for the wildlife;

(vii) A full statement of the reasons why the applicant is justified in obtaining a permit including the details of the activities sought to be authorized by the permit;

(viii) If the application is for the purpose of enhancement of propagation, a statement of the applicant's willingness to participate in a cooperative breeding program and to maintain or contribute data to a studbook;

(2) *Issuance criteria.* Upon receiving an application completed in accordance with paragraph (a)(1) of this section, the Director will decide whether or not a permit should be issued. In making this decision, the Director shall consider, in addition to the general criteria in § 13.21(b) of this subchapter, the following factors:

(i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

Addendum 21



reason set forth in §13.28(a)(1) through (4) of this subchapter. The Director may revoke a permit if continuation of the permitted activity would either appreciably reduce the likelihood of survival and recovery in the wild of any listed species or directly or indirectly alter designated critical habitat such that it appreciably diminishes the value of that critical habitat for both the survival and recovery of a listed species. Before revoking a permit for either of the latter two reasons, the Director, with the consent of the permittee, will pursue all appropriate options to avoid permit revocation. These options may include, but are not limited to: extending or modifying the existing permit, capturing and relocating the species, compensating the landowner to forgo the activity, purchasing an easement or fee simple interest in the property, or arranging for a third-party acquisition of an interest in the property.

(8) *Duration of the Candidate Conservation Agreement.* The duration of a Candidate Conservation Agreement covered by a permit issued under this paragraph (d) must be sufficient to enable the Director to determine that the benefits of the conservation measures in the Agreement, when combined with those benefits that would be achieved if it is assumed that the conservation measures would also be implemented on other necessary properties, would preclude or remove any need to list the species covered by the Agreement.

[50 FR 39689, Sept. 30, 1985, as amended at 63 FR 8871, Feb. 23, 1998; 63 FR 52635, Oct. 1, 1998; 64 FR 32714, June 17, 1999; 64 FR 52676, Sept. 30, 1999; 69 FR 24093, May 3, 2004; 69 FR 29670, May 25, 2004; 69 FR 71731, Dec. 10, 2004]

## § 17.40 Special rules—mammals.

(a) [Reserved]

(b) Grizzly bear (*Ursus arctos horribilis*)—(1) *Prohibitions.* The following prohibitions apply to the grizzly bear:

(i) *Taking.* (A) Except as provided in paragraphs (b)(1)(i)(B) through (F) of this section, no person shall take any grizzly bear in the 48 contiguous states of the United States.

(B) Grizzly bears may be taken in self-defense or in defense of others, but such taking shall be reported, within 5

days of occurrence, to the Assistant Regional Director, Division of Law Enforcement, U.S. Fish and Wildlife Service, P.O. Box 25486, Denver Federal Center, Denver, Colorado 80225 (303/236–7540 or FTS 776–7540), if occurring in Montana or Wyoming, or to the Assistant Regional Director, Division of Law Enforcement, U.S. Fish and Wildlife Service, Lloyd 500 Building, Suite 1490, 500 Northeast Multnomah Street, Portland, Oregon 97232 (503/231–6125 or FTS 429–6125), if occurring in Idaho or Washington, and to appropriate State and Indian Reservation Tribal authorities. Grizzly bears or their parts taken in self-defense or in defense of others shall not be possessed, delivered, carried, transported, shipped, exported, received, or sold, except by Federal, State, or Tribal authorities.

(C) *Removal of nuisance bears.* A grizzly bear consituting a demonstrable but non immediate threat to human safety or committing significant depredations to lawfully present livestock, crops, or beehives may be taken, but only if:

(1) It has not been reasonably possible to eliminate such threat or depredation by live-capturing and releasing unharmed in a remote area the grizzly bear involved; and

(2) The taking is done in a humane manner by authorized Federal, State, or Tribal authorities, and in accordance with current interagency guidelines covering the taking of such nuisance bears; and

(3) The taking is reported within 5 days of occurrence to the appropriate Assistant Regional Director, Division of Law Enforcement, U.S. Fish and Wildlife Service, as indicated in paragraph (b)(1)(i)(B) of this section, and to appropriate State and Tribal authorities.

(D) *Federal, State, or Tribal scientific or research activities.* Federal, State, or Tribal authorities may take grizzly bears for scientific or research purposes, but only if such taking does not result in death or permanent injury to the bears involved. Such taking must be reported within 5 days of occurrence to the appropriate Assistant Regional Director, Division of Law Enforcement, U.S. Fish and Wildlife Service, as indicated in paragraph (b)(1)(i)(B) of this

*Saguinus leucopus*; black howler monkey, *Alouatta pigra*; stump-tailed macaque, *Macaca arctoides*; gelada baboon, *Theropithecus gelada*; Formosan rock macaque, *Macaca cyclopis*; Japanese macaque, *Macaca fuscata*; Toque macaque, *Macaca sinica*; long-tailed langur, *Presbytis potenziani*; purple-faced langur, *Presbytis senex*; Tonkin snub-nosed langur, *Pygathrix (Rhinopithecus) avunculus*; and, in captivity only, chimpanzee, *Pan troglodytes.*

(2) The prohibitions referred to above do not apply to any live member of such species held in captivity in the United States on the effective date of the final rulemaking, or to the progeny of such animals, or to the progeny of animals legally imported into the United States after the effective date of the final rulemaking, *Provided,* That the person wishing to engage in any activity which would otherwise be prohibited must be able to show satisfactory documentary or other evidence as to the captive status of the particular member of the species on the effective date of this rulemaking or that the particular member of the species was born in captivity in the United States after the effective date of this rulemaking. Identification of the particular member to a record in the International Species Inventory System (ISIS), or to a Federal, State or local government permit, shall be deemed to be satisfactory evidence. Records in the form of studbooks or inventories, kept in the normal course of business, shall be acceptable as evidence, provided that a notarized statement is inserted in such record to the effect that:

(i) The records were kept in the normal course of business prior to November 18, 1976, and accurately identify (by use of markers, tags, or other acceptable marking devices) individual animals; or

(ii) That the individual animal identified by the records was born in captivity on _____ (Date).

The notarized statement in paragraph (c)(2)(i) of this section, shall be acceptable only if the notarization is dated on or before January 3, 1977. The notarized statement in paragraph (c)(2)(ii), of this section, shall be acceptable only

if the notarization is dated within 15 days of the date of birth of the animal.

(3) The provisions of §§ 17.21, 17.22, and 17.23 shall apply to any individual chimpanzee (*Pan troglodytes*) within the historic range of the species, regardless of whether in the wild or captivity, and also shall apply to any individual chimpanzee not within this range, but which has originated within this range after the effective date of these regulations, and also shall apply to the progeny of any such chimpanzee, other than to the progeny of animals legally imported into the United States after the effective date of these regulations. For the purposes of this paragraph, the historic range of the chimpanzee shall consist of the following countries: Angola, Benin, Burkina Faso, Burundi, Cameroon, Central African Republic, Congo, Cote d'Ivoire, Equatorial Guinea, Gabon, Gambia, Ghana, Guinea, Guinea-Bissau, Liberia, Mali, Nigeria, Rwanda, Senegal, Sierra Leone, Sudan, Tanzania, Togo, Uganda, and Zaire.

(d) [Reserved]

(e) African elephant (*Loxodonta africana*)—(1) *Definitions.* For the purposes of this paragraph (e):

(i) *African elephant* shall mean any member of the species *Loxodonta africana,* whether live or dead, and any part or product thereof.

(ii) *Raw ivory* means any African elephant tusk, and any piece thereof, the surface of which, polished or unpolished, is unaltered or minimally carved.

(iii) *Worked ivory* means any African elephant tusk, and any piece thereof, which is not raw ivory.

(iv) *Lip mark area* means that area of a whole African elephant tusk where the tusk emerges from the skull and which is usually denoted by a prominent ring of staining on the tusk in its natural state.

(2) *Prohibitions.* Except as provided in the exceptions in paragraph (e)(3) of this section, it shall be unlawful for any person to:

(i) Import or export any African elephant,

(ii) Possess, sell or offer for sale, receive, deliver, transport ship, or export any African elephant which was illegally imported into the United States,

(iii) Sell or offer for sale any sport-hunted trophy imported into the United States in violation of permit conditions.

(3) *Exceptions.* (i) African elephants, other than sport-hunted trophies and raw and worked ivory, may be imported or exported provided all permit requirements of 50 CFR parts 13 and 23 have been complied with.

(ii) *Ivory.* (A) Raw or worked ivory (other than sport-hunted trophies) may be imported only if:

(*1*) It is a bona fide antique of greater than 100 years of age on the day of import, or

(*2*) It was exported from the United States after being registered with the U.S. Fish and Wildlife Service.

(B) Worked ivory may be exported in accordance with the permit requirements of 50 CFR parts 13 and 23.

(C) Raw ivory may not be exported from the United States for commercial purposes under any circumstances.

(iii) Sport-hunted trophies may be imported into the United States provided:

(A) The trophy originates in a country for which the Service has received notice of that country's African elephant ivory quota for the year of export;

(B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied with;

(C) A determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and

(D) The trophy is legibly marked by means of punch-dies, under a marking and registration system established by the country of origin, that includes the following information: Country of origin represented by the two-letter code established by the International Organization for Standardization (see appendix A to chapter I) followed by the registration number assigned to the last two digits of the year of registration and the weight of raw ivory to the nearest kilogram. Any mark must be placed on the lip mark area and indicated by a flash of color which serves as a background for such mark.

(f) *Leopard.* (1) Except as noted in paragraph (f)(2) of this section, all prohibitions of §17.31 of this part and ex-

emptions of §17.32 of this part shall apply to the leopard populations occurring in southern Africa to the south of a line running along the borders of the following countries: Gabon/Rio Muni; Gabon/Cameroon; Congo/Cameroon; Congo/Central African Republic; Zaire/Central African Republic; Zaire/Sudan; Uganda/Sudan; Kenya/Sudan; Kenya/Ethiopia; Kenya/Somalia.

(2) A sport-hunted leopard trophy legally taken after the effective date of this rulemaking, from the area south of the line delineated above, may be imported into the United States without a Threatened Species permit pursuant to §17.32 of this part, provided that the applicable provisions of 50 CFR part 23 have been met.

(g) Utah prairie dog (*Cynomys parvidens*).

(1) Except as noted in paragraphs (g)(2) through (g)(6) of this section, all prohibitions of §17.31(a) and (b) and exemptions of §17.32 apply to the Utah prairie dog.

(2) A Utah prairie dog may be directly or intentionally taken as described in paragraphs (g)(3) and (4) of this section on agricultural lands, properties within 0.8 kilometers (km) (0.5 miles (mi)) of conservation lands, and areas where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites.

(3) *Agricultural lands and properties near conservation lands.* When permitted by the Utah Division of Wildlife Resources (UDWR), or other parties as authorized in writing by the Service, direct or intentional take is allowed on private properties that are located within 0.8 km (0.5 mi) of conservation land, and on agricultural land. Records on permitted take will be maintained by the State (or other parties as authorized in writing by the Service), and made available to the Service upon request.

(i) *Agricultural land.* (A) Take may be permitted only on agricultural land being physically or economically affected by Utah prairie dogs, and only when the spring count on the agricultural lands is seven or more individuals, and only during the period of June 15 to December 31; and

(B) The land must:



23.54  How long is a U.S. or foreign CITES document valid?
23.55  How may I use a CITES specimen after import into the United States?
23.56  What U.S. CITES document conditions do I need to follow?

### Subpart D—Factors Considered in Making Certain Findings

23.60  What factors are considered in making a legal acquisition finding?
23.61  What factors are considered in making a non-detriment finding?
23.62  What factors are considered in making a finding of not for primarily commercial purposes?
23.63  What factors are considered in making a finding that an animal is bred in captivity?
23.64  What factors are considered in making a finding that a plant is artificially propagated?
23.65  What factors are considered in making a finding that an applicant is suitably equipped to house and care for a live specimen?

### Subpart E—International Trade in Certain Specimens

23.68  How can I trade internationally in roots of American ginseng?
23.69  How can I trade internationally in fur skins and fur skin products of bobcat, river otter, Canada lynx, gray wolf, and brown bear?
23.70  How can I trade internationally in American alligator and other crocodilian skins, parts, and products?
23.71  How can I trade internationally in sturgeon caviar?
23.72  How can I trade internationally in plants?
23.73  How can I trade internationally in timber?
23.74  How can I trade internationally in personal sport-hunted trophies?

### Subpart F—Disposal of Confiscated Wildlife and Plants

23.78  What happens to confiscated wildlife and plants?
23.79  How may I participate in the Plant Rescue Center Program?

### Subpart G—CITES Administration

23.84  What are the roles of the Secretariat and the committees?
23.85  What is a meeting of the Conference of the Parties (CoP)?
23.86  How can I obtain information on a CoP?
23.87  How does the United States develop documents and negotiating positions for a CoP?

23.88  What are the resolutions and decisions of the CoP?

### Subpart H—Lists of Species

23.89  What are the criteria for listing species in Appendix I or II?
23.90  What are the criteria for listing species in Appendix III?
23.91  How do I find out if a species is listed?
23.92  Are any wildlife or plants, and their parts, products, or derivatives, exempt?

AUTHORITY: Convention on International Trade in Endangered Species of Wild Fauna and Flora (March 3, 1973), 27 U.S.T. 1087; and Endangered Species Act of 1973, as amended, 16 U.S.C. 1531 *et seq.*

SOURCE: 72 FR 48448, Aug. 23, 2007, unless otherwise noted.

## Subpart A—Introduction

### § 23.1  What are the purposes of these regulations and CITES?

(a) *Treaty.* The regulations in this part implement the Convention on International Trade in Endangered Species of Wild Fauna and Flora, also known as CITES, the Convention, the Treaty, or the Washington Convention, TIAS (Treaties and Other International Acts Series) 8249.

(b) *Purpose.* The aim of CITES is to regulate international trade in wildlife and plants, including parts, products, and derivatives, to ensure it is legal and does not threaten the survival of species in the wild. Parties, recognize that:

(1) Wildlife and plants are an irreplaceable part of the natural systems of the earth and must be protected for this and future generations.

(2) The value of wildlife and plants is ever-growing from the viewpoints of aesthetics, science, culture, recreation, and economics.

(3) Although countries should be the best protectors of their own wildlife and plants, international cooperation is essential to protect wildlife and plant species from over-exploitation through international trade.

(4) It is urgent that countries take appropriate measures to prevent illegal trade and ensure that any use of wildlife and plants is sustainable.

(c) *National legislation.* We, the U.S. Fish and Wildlife Service (FWS), implement CITES through the Endangered Species Act (ESA).

**§ 23.2  How do I decide if these regulations apply to my shipment or me?**

Answer the following questions to decide if the regulations in this part apply to your proposed activity:

| Question on proposed activity | Answer and action |
|---|---|
| (a) Is the wildlife or plant species (including parts, products, derivatives, whether wild-collected, or born or propagated in a controlled environment) listed in Appendix I, II, or III of CITES (see § 23.91)? | (1) **YES**. Continue to paragraph (b) of this section.<br>(2) **NO**. The regulations in this part do not apply. |
| (b) Is the wildlife or plant specimen exempted from CITES (see § 23.92)? | (1) **YES**. The regulations in this part do not apply.<br>(2) **NO**. Continue to paragraph (c) of this section. |
| (c) Do you want to import, export, re-export, engage in international trade, or introduce from the sea? | (1) **YES**. The regulations in this part apply.<br>(2) **NO**. Continue to paragraph (d) of this section. |
| (d) Was the specimen that you possess or want to enter into intrastate or interstate commerce unlawfully acquired, illegally traded, or otherwise subject to conditions set out on a CITES document that authorized import? | (1) **YES**. The regulations in this part apply. See § 23.13(c) and (d) and sections 9(c)(1) and 11(a) and (b) of the ESA (16 U.S.C. 1538(c)(1) and 1540(a) and (b)).<br>(2) **NO**. The regulations in this part do not apply. |

**§ 23.3  What other wildlife and plant regulations may apply?**

(a) You may need to comply with other regulations in this subchapter that require a permit or have additional restrictions. Many CITES species are also covered by one or more parts of this subchapter or title and have additional requirements:

(1) Part 15 (exotic birds).

(2) Part 16 (injurious wildlife).

(3) Parts 17 of this subchapter and 222, 223, and 224 of this title (endangered and threatened species).

(4) Parts 18 of this subchapter and 216 of this title (marine mammals).

(5) Part 20 (migratory bird hunting).

(6) Part 21 (migratory birds).

(7) Part 22 (bald and golden eagles).

(b) If you are applying for a permit, you must comply with the general permit procedures in part 13 of this subchapter. Definitions and a list of birds protected under the Migratory Bird Treaty Act can be found in part 10 of this subchapter.

(c) If you are importing (including introduction from the sea), exporting, or re-exporting wildlife or plants, you must comply with the regulations in part 14 of this subchapter for wildlife or part 24 of this subchapter for plants. Activities with plants are also regulated by the U.S. Department of Agriculture, Animal and Plant Health Inspection Service (APHIS) and Department of Homeland Security, U.S. Customs and Border Protection (CBP), in 7 CFR parts 319, 355, and 356.

(d) You may also need to comply with other Federal, State, tribal, or local requirements.

**§ 23.4  What are Appendices I, II, and III?**

Species are listed by the Parties in one of three Appendices to the Treaty (see subpart H of this part), each of which provides a different level of protection and is subject to different requirements. Parties regulate trade in specimens of Appendix-I, -II, and -III species and their parts, products, and derivatives through a system of permits and certificates (CITES documents). Such documents enable Parties to monitor the effects of the volume and type of trade to ensure trade is legal and not detrimental to the survival of the species.

(a) *Appendix I* includes species threatened with extinction that are or may be affected by trade. Trade in Appendix-I specimens may take place only in exceptional circumstances.

(b) *Appendix II* includes species that are not presently threatened with extinction, but may become so if their trade is not regulated. It also includes species that need to be regulated so that trade in certain other Appendix-I or -II species may be effectively controlled; these species are most commonly listed due to their similarity of

appearance to other related CITES species.

(c) *Appendix III* includes species listed unilaterally by a range country to obtain international cooperation in controlling trade.

### §23.5 How are the terms used in these regulations defined?

In addition to the definitions contained in part 10 of this subchapter, and unless the context otherwise requires, in this part:

*Affected by trade* means that either a species is known to be in trade and the trade has or may have a detrimental impact on the status of the species, or a species is suspected to be in trade or there is demonstrable potential international demand for the species that may be detrimental to the survival of the species in the wild.

*Annotation* means an official footnote to the listing of a species in the CITES Appendices. A reference annotation provides information that further explains the listing (such as "p.e." for possibly extinct). A substantive annotation is an integral part of a species listing. It designates whether the listing includes or excludes a geographically separate population, subspecies, species, group of species, or higher taxon, and the types of specimens included in or excluded from the listing, such as certain parts, products, or derivatives. A substantive annotation may designate export quotas adopted by the CoP. For species transferred from Appendix I to II subject to an annotation relating to specified types of specimens, other types of specimens that are not specifically included in the annotation are treated as if they are Appendix-I specimens.

*Appropriate and acceptable destination*, when used in an Appendix-II listing annotation for the export of, or international trade in, live animals, means that the Management Authority of the importing country has certified, based on advice from the Scientific Authority of that country, that the proposed recipient is suitably equipped to house and care for the animal (see criteria in §23.65). Such certification must be provided before a CITES document is issued by the Management Authority

of the exporting or re-exporting country.

*Artificially propagated* means a cultivated plant that meets the criteria in §23.64.

*ATA carnet* means a type of international customs document (see §23.50). ATA is a combination of the French and English words "Admission Temporaire/Temporary Admission."

*Bred for commercial purposes* means any specimen of an Appendix-I wildlife species bred in captivity for commercial purposes. Any Appendix-I specimen that does not meet the definition of "bred for noncommercial purposes" is considered to be bred for commercial purposes.

*Bred for noncommercial purposes* means any specimen of an Appendix-I wildlife species bred in captivity for noncommercial purposes, where each donation, exchange, or loan of the specimen is noncommercial and is conducted between facilities that are involved in a cooperative conservation program.

*Bred in captivity* means wildlife that is captive-bred and meets the criteria in §23.63.

*Captive-bred* means wildlife that is the offspring (first (F1) or subsequent generations) of parents that either mated or otherwise transferred egg and sperm under controlled conditions if reproduction is sexual, or of a parent that was maintained under controlled conditions when development of the offspring began if reproduction is asexual, but does not meet the bred-in-captivity criteria (see §23.63).

*Certificate* means a CITES document or CITES exemption document that identifies on its face the type of certificate it is, including re-export certificate, introduction-from-the-sea certificate, and certificate of origin.

*CITES document or CITES exemption document* means any certificate, permit, or other document issued by a Management Authority of a Party or a competent authority of a non-Party whose name and address is on file with the Secretariat to authorize the international movement of CITES specimens.

*Commercial* means related to an activity, including actual or intended import, export, re-export, sale, offer for

sale, purchase, transfer, donation, exchange, or provision of a service, that is reasonably likely to result in economic use, gain, or benefit, including, but not limited to, profit (whether in cash or in kind).

*Cooperative conservation program* means a program in which participating captive- breeding facilities produce Appendix-I specimens bred for noncommercial purposes and participate in or support a recovery activity for that species in cooperation with one or more of the species' range countries.

*Coral (dead)* means pieces of coral in which the skeletons of the individual polyps are still intact, but which contain no living coral tissue.

*Coral fragments*, including coral gravel and coral rubble, means loose pieces of broken finger-like coral between 2 and 30 mm in diameter that contain no living coral tissue (see § 23.92 for exemptions).

*Coral (live)* means pieces of coral that are alive.

*Coral rock* means hard consolidated material greater than 30 mm in diameter that consists of pieces of coral and possibly also cemented sand, coralline algae, or other sedimentary rocks that contain no living coral tissue. Coral rock includes *live rock* and *substrate*, which are terms for pieces of coral rock to which are attached live specimens of other invertebrate species or coralline algae that are not listed in the CITES Appendices.

*Coral sand* means material that consists entirely, or in part, of finely crushed coral no larger than 2 mm in diameter and that contains no living coral tissue (see § 23.92 for exemptions).

*Country of origin* means the country where the wildlife or plant was taken from the wild or was born or propagated in a controlled environment, except in the case of a plant specimen that qualified for an exemption under the provisions of CITES, the country of origin is the country in which the specimen ceased to qualify for the exemption.

*Cultivar* means a horticulturally derived plant variety that has been selected for specific morphological, physiological, or other characteristics, such as color, a large flower, or disease resistance.

*Cultivated* means a plant grown or tended by humans for human use. A cultivated plant can be treated as artificially propagated under CITES only if it meets the criteria in § 23.64.

*Export* means to send, ship, or carry a specimen out of a country (for export from the United States, see part 14 of this subchapter).

*Flasked* means plant material obtained *in vitro*, in solid or liquid media, transported in sterile containers.

*Household effect* means a dead wildlife or plant specimen that is part of a household move and meets the criteria in § 23.15.

*Hybrid* means any wildlife or plant that results from a cross of genetic material between two separate taxa when one or both are listed in Appendix I, II, or III. See § 23.42 for plant hybrids and § 23.43 for wildlife hybrids.

*Import* means to bring, ship, or carry a specimen into a country (for import into the United States, see part 14 of this subchapter).

*International trade* means the import, introduction from the sea, export, or re-export across jurisdictional or international boundaries for any purpose whether commercial or noncommercial.

*In-transit shipment* means the transshipment of any wildlife or plant through an intermediary country when the specimen remains under customs control and either the shipment meets the requirements of § 23.22 or the sample collection covered by an ATA carnet meets the requirements of § 23.50.

*Introduction from the sea* means transportation into a country of specimens of any species that were taken in the marine environment not under the jurisdiction of any country.

*ISO country code* means the two-letter country code developed by the International Organization for Standardization (ISO) to represent the name of a country and its subdivisions.

*Live rock* see the definition for *coral rock*.

*Management Authority* means a governmental agency officially designated by, and under the supervision of, either a Party to implement CITES, or a non-

Addendum 28

Party to serve in the role of a Management Authority, including the issuance of CITES documents on behalf of that country.

*Noncommercial* means related to an activity that is not commercial. Noncommercial includes, but is not limited to, personal use.

*Non-Party* means a country that has not deposited an instrument of ratification, acceptance, approval, or accession to CITES with the Depositary Government (Switzerland), or a country that was a Party but subsequently notified the Depositary Government of its denunciation of CITES and the denunciation is in effect.

*Offspring of first generation (F1)* means a wildlife specimen produced in a controlled environment from parents at least one of which was conceived in or taken from the wild.

*Offspring of second generation (F2) or subsequent generations* means a wildlife specimen produced in a controlled environment from parents that were also produced in a controlled environment.

*Parental stock* means the original breeding or propagating specimens that produced the subsequent generations of captive or cultivated specimens.

*Party* means a country that has given its consent to be bound by the provisions of CITES by depositing an instrument of ratification, acceptance, approval, or accession with the Depositary Government (Switzerland), and for which such consent is in effect.

*Permit* means a CITES document that identifies on its face import permit or export permit.

*Personal effect* means a dead wildlife or plant specimen, including a tourist souvenir, that is worn as clothing or accessories or is contained in accompanying baggage and meets the criteria in § 23.15.

*Personal use* means use that is not commercial and is for an individual's own consumption or enjoyment.

*Precautionary measures* means the actions taken that will be in the best interest of the conservation of the species when there is uncertainty about the status of a species or the impact of trade on the conservation of a species.

*Pre-Convention* means a specimen that was acquired (removed from the wild or born or propagated in a controlled environment) before the date the provisions of the Convention first applied to the species and that meets the criteria in § 23.45, and any product (including a manufactured item) or derivative made from such specimen.

*Primarily commercial purposes* means an activity whose noncommercial aspects do not clearly predominate (see § 23.62).

*Propagule* means a structure, such as a cutting, seed, or spore, which is capable of propagating a plant.

*Readily recognizable* means any specimen that appears from a visual, physical, scientific, or forensic examination or test; an accompanying document, packaging, mark, or label; or any other circumstances to be a part, product, or derivative of any CITES wildlife or plant, unless such part, product, or derivative is specifically exempt from the provisions of CITES or this part.

*Re-export* means to send, ship, or carry out of a country any specimen previously imported into that country, whether or not the specimen has been altered since import.

*Reservation* means the action taken by a Party to inform the Secretariat that it is not bound by the effect of a specific listing (see § 23.21).

*Scientific Authority* means a governmental or independent scientific institution or entity officially designated by either a Party to implement CITES, or a non-Party to serve the role of a Scientific Authority, including making scientific findings.

*Secretariat* means the entity designated by the Treaty to perform certain administrative functions (see § 23.84).

*Shipment* means any CITES specimen in international trade whether for commercial or noncommercial use, including any personal item.

*Species* means any species, subspecies, hybrid, variety, cultivar, color or morphological variant, or geographically separate population of that species.

*Specimen* means any wildlife or plant, whether live or dead. This term includes any readily recognizable part, product, or derivative unless otherwise annotated in the Appendices.

*Sustainable use* means the use of a species in a manner and at a level that

maintains wild populations at biologically viable levels for the long term. Such use involves a determination of the productive capacity of the species and its ecosystem to ensure that utilization does not exceed those capacities or the ability of the population to reproduce, maintain itself, and perform its role or function in its ecosystem.

*Trade* means the same as international trade.

*Transit* see the definition for *in-transit shipment.*

*Traveling exhibition* means a display of live or dead wildlife or plants for entertainment, educational, cultural, or other display purposes that is temporarily moving internationally.

## § 23.6  What are the roles of the Management and Scientific Authorities?

Under Article IX of the Treaty, each Party must designate a Management and Scientific Authority to implement CITES for that country. If a non-Party wants to trade with a Party, it must also designate such Authorities. The names and addresses of these offices must be sent to the Secretariat to be included in the Directory. In the United States, different offices within the FWS have been designated the Scientific Authority and Management Authority, which for purposes of this section includes FWS Law Enforcement. When offices share activities, the Management Authority is responsible for dealing primarily with management and regulatory issues and the Scientific Authority is responsible for dealing primarily with scientific issues. The offices do the following:

| Roles | U.S. Scientific Authority | U.S. Management Authority |
|---|---|---|
| (a) Provide scientific advice and recommendations, including advice on biological findings for applications for certain CITES documents, registrations, and export program approvals. Evaluate the conservation status of species to determine if a species listing or change in a listing is warranted. Interpret listings and review nomenclatural issues. | x | |
| (b) Review applications for CITES documents and issue or deny them based on findings required by CITES. | | x |
| (c) Communicate with the Secretariat and other countries on scientific, administrative, and enforcement issues. | x | x |
| (d) Ensure that export of Appendix-II specimens is at a level that maintains a species throughout its range at a level consistent with its role in the ecosystems in which it occurs and well above the level at which it might become eligible for inclusion in Appendix I. | x | |
| (e) Monitor trade in all CITES species and produce annual reports on CITES trade. | | x |
| (f) Collect the cancelled foreign export permit or re-export certificate and any corresponding import permit presented for import of any CITES specimen. Collect a copy of the validated U.S. export permit or re-export certificate presented for export or re-export of any CITES specimen. | | x |
| (g) Produce biennial reports on legislative, regulatory, and administrative measures taken by the United States to enforce the provisions of CITES. | | x |
| (h) Coordinate with State and tribal governments and other Federal agencies on CITES issues, such as the status of native species, development of policies, negotiating positions, and law enforcement activities. | x | x |
| (i) Communicate with the scientific community, the public, and media about CITES issues. Conduct public meetings and publish notices to gather input from the public on the administration of CITES and the conservation and trade status of domestic and foreign species traded internationally. | x | x |
| (j) Represent the United States at the meetings of the CoP, on committees (see subpart G of this part), and on CITES working groups. Consult with other countries on CITES issues and the conservation status of species. Prepare discussion papers and proposals for new or amended resolutions and species listings for consideration at the CoP. | x | x |
| (k) Provide assistance to APHIS and CBP for the enforcement of CITES. Cooperate with enforcement officials to facilitate the exchange of information between enforcement bodies and for training purposes. | x | x |

| Roles | U.S. Scientific Authority | U.S. Management Authority |
|---|---|---|
| (l) Provide financial and technical assistance to other governmental agencies and CITES officials of other countries. | x | x |

### § 23.7   What office do I contact for CITES information?

Contact the following offices to receive information about CITES:

| Type of information | Office to contact |
|---|---|
| (a) *CITES administrative and management issues*:<br>(1) CITES documents, including application forms and procedures; lists of registered scientific institutions and operations breeding Appendix-I wildlife for commercial purposes; and reservations<br>(2) Information on the CoP<br>(3) List of CITES species<br>(4) Names and addresses of other countries' Management and Scientific Authority offices<br>(5) Notifications, resolutions, and decisions<br>(6) Standing Committee documents and issues<br>(7) State and tribal export programs | U.S. Management Authority<br>U.S. Fish and Wildlife Service<br>4401 North Fairfax Drive, Room 700<br>Arlington, Virginia 22203<br>Toll Free: (800) 358-2104/permit questions<br>Tel: (703) 358-2095/other questions<br>Fax: (703) 358-2281/permits<br>Fax: (703) 358-2298/other issues<br>E-mail: *managementauthority@fws.gov*<br>Website:  *http://www.fws.gov/international*  and  *http://www.fws.gov/permits* |
| (b) *Scientific issues:*<br>(1) Animals and Plants Committees documents and issues<br>(2) Findings of non-detriment and suitability of facilities, and other scientific findings<br>(3) Listing of species in the Appendices and relevant resolutions<br>(4) Names and addresses of other countries' Scientific Authority offices and scientists involved with CITES-related issues<br>(5) Nomenclatural issues | U.S. Scientific Authority<br>U.S. Fish and Wildlife Service<br>4401 North Fairfax Drive, Room 750<br>Arlington, Virginia 22203<br>Tel: (703) 358-1708<br>Fax: (703) 358-2276<br>E-mail: *scientificauthority@fws.gov*<br>Website: *http://www.fws.gov/international* |
| (c) *Wildlife clearance procedures:*<br>(1) CITES replacement tags<br>(2) Information about wildlife port office locations<br>(3) Information bulletins<br>(4) Inspection and clearance of wildlife shipments involving import, introduction from the sea, export, and re-export, and filing a Declaration of Importation or Exportation of Fish or Wildlife (Form 3–177)<br>(5) Validation, certification, or cancellation of CITES wildlife documents | Law Enforcement<br>U.S. Fish and Wildlife Service<br>4401 North Fairfax Drive, Mail Stop LE–3000<br>Arlington, Virginia 22203<br>Tel: (703) 358-1949<br>Fax: (703) 358-2271<br>Website: *http://www.fws.gov/le* |
| (d) *APHIS plant clearance procedures:*<br>(1) Information about plant port office locations<br>(2) Inspection and clearance of plant shipments involving:<br>(i) Import and introduction from the sea of living plants<br>(ii) Export and re-export of living and non-living plants<br>(3) Validation or cancellation of CITES plant documents for the type of shipments listed in paragraph (d)(2) of this section | U.S. Department of Agriculture APHIS/PPQ<br>4700 River Road<br>Riverdale, Maryland 20737–1236<br>Toll Free: (877) 770-5990/permit questions<br>Tel: (301) 734-8891/other CITES issues<br>Fax: (301) 734-5786/permit questions<br>Fax: (301) 734-5276/other CITES issues<br>Website: *http://www.aphis.usda.gov/plant_health* |
| (e) *CBP plant clearance procedures:*<br>(1) Inspection and clearance of plant shipments involving:<br>(i) Import and introduction from the sea of nonliving plants<br>(ii) Import of living plants from Canada at designated border ports (7 CFR 319.37–14(b) and 50 CFR 24.12(d))<br>(2) Cancellation of CITES plant documents for the type of shipments listed in paragraph (e)(1) of this section | Department of Homeland Security<br>U.S. Customs and Border Protection<br>Office of Field Operations<br>Agriculture Programs and Liaison<br>1300 Pennsylvania Avenue, NW, Room 2.5 B<br>Washington, DC 20229<br>Tel: (202) 344-3298<br>Fax: (202) 344-1442 |

| Type of information | Office to contact |
|---|---|
| (f) *General information on CITES:*<br>　(1) CITES export quota information<br>　(2) CITES *Guidelines for transport and preparation for shipment of live wild animals and plants*<br>　(3) Information about the Secretariat<br>　(4) Names and addresses of other countries' Management and Scientific Authority offices<br>　(5) Official documents, including resolutions, decisions, notifications, CoP documents, and committee documents<br>　(6) Official list of CITES species and species database<br>　(7) Text of the Convention | CITES Secretariat<br>Website: *http://www.cites.org* |

## § 23.8　What are the information collection requirements?

The Office of Management and Budget approved the information collection requirements for application forms and reports contained in this part and assigned OMB Control Numbers 1018–0093 and 1018–0137. We cannot collect or sponsor a collection of information and you are not required to provide information unless it displays a currently valid OMB control number.

## Subpart B—Prohibitions, Exemptions, and Requirements

## § 23.13　What is prohibited?

Except as provided in § 23.92, it is unlawful for any person subject to the jurisdiction of the United States to conduct any of the following activities unless they meet the requirements of this part:

(a) Import, export, re-export, or engage in international trade with any specimen of a species listed in Appendix I, II, or III of CITES.

(b) Introduce from the sea any specimen of a species listed in Appendix I or II of CITES.

(c) Possess any specimen of a species listed in Appendix I, II, or III of CITES imported, exported, re-exported, introduced from the sea, or traded contrary to the provisions of CITES, the ESA, or this part.

(d) Attempt to commit, solicit another to commit, or cause to be committed any of the activities described in paragraphs (a) through (c) of this section.

## § 23.14　[Reserved]

## § 23.15　How may I travel internationally with my personal or household effects, including tourist souvenirs?

(a) *Purpose.* Article VII(3) of the Treaty recognizes a limited exemption for the international movement of personal and household effects.

(b) *Stricter national measures.* The exemption for personal and household effects does not apply if a country prohibits or restricts the import, export, or re-export of the item.

(1) You or your shipment must be accompanied by any document required by a country under its stricter national measures.

(2) In the United States, you must obtain any permission needed under other regulations in this subchapter (see § 23.3).

(c) *Required CITES documents.* You must obtain a CITES document for personal or household effects and meet the requirements of this part if one of the following applies:

(1) The Management Authority of the importing, exporting, or re-exporting country requires a CITES document.

(2) You or your shipment does not meet all of the conditions for an exemption as provided in paragraphs (d) through (f) of this section.

(3) The personal or household effect for the following species exceeds the quantity indicated in paragraphs (c)(3)(i) through (vi) in the table below:

| Major group | Species (Appendix II only) | Type of specimen | Quantity [1] |
|---|---|---|---|
| Fishes | (i) Acipenseriformes (sturgeon, including paddlefish) | Sturgeon caviar (see § 23.71) | 125 gm |

Addendum 32

| Major group | Species (Appendix II only) | Type of specimen | Quantity [1] |
|---|---|---|---|
| Fishes | (ii) *Hippocampus* spp. (seahorses) | Dead specimens, parts, products (including manufactured items), and derivatives | 4 |
| Reptiles | (iii) Crocodylia (alligators, caimans, crocodiles, gavial) | Dead specimens, parts, products (including manufactured items), and derivatives | 4 |
| Molluscs | (iv) *Strombus gigas* (queen conch) | Shells | 3 |
| Molluscs | (v) Tridacnidae (giant clams) | Shells, each of which may be one intact shell or two matching halves | 3 shells, total not exceeding 3 kg |
| Plants | (vi) Cactaceae (cacti) | Rainsticks | 3 |

[1] To import, export, or re-export more than the quantity listed in the table, you must have a valid CITES document for the entire quantity.

(d) *Personal effects.* You do not need a CITES document to import, export, or re-export any legally acquired specimen of a CITES species to or from the United States if all of the following conditions are met:

(1) No live wildlife or plant (including eggs or non-exempt seeds) is included.

(2) No specimen from an Appendix-I species is included, except for certain worked African elephant ivory as provided in paragraph (f) of this section.

(3) The specimen and quantity of specimens are reasonably necessary or appropriate for the nature of your trip or stay and, if the type of specimen is one listed in paragraph (c)(3) of this section, the quantity does not exceed the quantity given in the table.

(4) You own and possess the specimen for personal use, including any specimen intended as a personal gift.

(5) You are either wearing the specimen as clothing or an accessory or taking it as part of your personal baggage, which is being carried by you or checked as baggage on the same plane, boat, vehicle, or train as you.

(6) The specimen was not mailed or shipped separately.

(e) *Household effects.* You do not need a CITES document to import, export, or re-export any legally acquired specimen of a CITES species that is part of a shipment of your household effects when moving your residence to or from the United States, if all of the following conditions are met:

(1) The provisions of paragraphs (d)(1) through (3) of this section are met.

(2) You own the specimen and are moving it for personal use.

(3) You import or export your household effects within 1 year of changing your residence from one country to another.

(4) The shipment, or shipments if you cannot move all of your household effects at one time, contains only specimens purchased, inherited, or otherwise acquired before you changed your residence.

(f) *African elephant worked ivory.* You may export or re-export from the United States worked African elephant (*Loxodonta africana*) ivory and then re-import it without a CITES document if all of the following conditions are met:

(1) The worked ivory is a personal or household effect that meets the requirements of paragraphs (c) through (e) of this section and you are a U.S. resident who owned the worked ivory before leaving the United States and intend to bring the item back to the United States.

(2) The ivory is pre-Convention (see §23.45). (The African elephant was first listed in CITES on February 26, 1976.)

(3) You may not sell or transfer the ivory while outside the United States.

(4) The ivory is substantially worked and is not raw. *Raw ivory* means an African elephant tusk, or any piece of tusk, the surface of which, polished or unpolished, is unaltered or minimally carved, including ivory mounted on a stand or part of a trophy.

(5) When you return, you are able to provide records, receipts, or other documents to show that the ivory is pre-Convention and that you owned and registered it before you left the United States. To register such an item you

163

must obtain one of the following documents:

(i) U.S. CITES pre-Convention certificate.

(ii) FWS Declaration of Importation or Exportation of Fish or Wildlife (Form 3–177).

(iii) Customs and Border Protection Certificate of Registration for Personal Effects Taken Abroad (Form 4457).

[72 FR 48448, Aug. 23, 2007, as amended at 73 FR 40986, July 17, 2008]

### § 23.16  What are the U.S. CITES requirements for urine, feces, and synthetically derived DNA?

(a) *CITES documents.* We do not require CITES documents to trade in urine, feces, or synthetically derived DNA.

(1) You must obtain any collection permit and CITES document required by the foreign country.

(2) If the foreign country requires you to have a U.S. CITES document for these kinds of samples, you must apply for a CITES document and meet the requirements of this part.

(b) *Urine and feces.* Except as provided in paragraph (a) of this section, we consider urine and feces to be wildlife byproducts, rather than parts, products, or derivatives, and exempt them from the requirements of CITES and this part.

(c) *DNA.* We differentiate between DNA directly extracted from blood and tissue and DNA synthetically derived as follows:

(1) A DNA sample directly derived from wildlife or plant tissue is regulated by CITES and this part.

(2) A DNA sample synthetically derived that does not contain any part of the original template is exempt from the requirements of CITES and this part.

### § 23.17  What are the requirements for CITES specimens traded internationally by diplomatic, consular, military, and other persons exempt from customs duties or inspections?

A specimen of a CITES species imported, introduced from the sea, exported, or re-exported by a person receiving duty-free or inspection exemption privileges under customs laws must meet the requirements of CITES and the regulations in this part.

### § 23.18  What CITES documents are required to export Appendix-I wildlife?

Answer the questions in the following decision tree to find the section in this part that applies to the type of CITES document you need to export Appendix-I wildlife. See § 23.20(d) for CITES exemption documents or § 23.92 for specimens that are exempt from the requirements of CITES and do not need CITES documents.



Decision Tree for Export of Appendix-I Wildlife

Addendum 35

**§ 23.19  What CITES documents are required to export Appendix-I plants?**

Answer the questions in the following decision tree to find the section in this part that applies to the type of CITES document you need to export Appendix-I plants. See § 23.20(d) for CITES exemption documents or § 23.92 for specimens that are exempt from the requirements of CITES and do not need CITES documents.



Decision Tree for Export of Appendix-I Plants

¹ Cultivated specimens (see § 23.5) that do not meet the criteria as artificially propagated are treated as wild.

B

§23.20 **What CITES documents are required for international trade?**

(a) *Purpose.* Articles III, IV, and V of the Treaty give the types of standard CITES documents that must accompany an Appendix-I, -II, or -III specimen in international trade. Articles

VII and XIV recognize some exemptions and provide that a CITES document must accompany most exempt specimens.

(b) *Stricter national measures.* Before importing, introducing from the sea, exporting, or re-exporting a specimen, check with the Management Authorities of all countries concerned to obtain any documentation required under stricter national measures.

(c) *CITES documents.* Except as provided in the regulations in this part, you must have a valid CITES document to engage in international trade in any CITES specimen.

(d) *CITES exemption documents.* The following table lists the CITES exemption document that you must obtain before conducting a proposed activity with an exempt specimen (other than specimens exempted under § 23.92). If one of the exemptions does not apply to the specimen, you must obtain a CITES document as provided in paragraph (e) of this section. The first column in the following table alphabetically lists the type of specimen or activity that may qualify for a CITES exemption document. The last column indicates the section of this part that contains information on the application procedures, provisions, criteria, and conditions specific to each CITES exemption document, as follows:

| Type of specimen or activity | Appendix | CITES exemption document | Section |
|---|---|---|---|
| (1) Artificially propagated plant (see paragraph (d)(4) of this section for an Appendix-I plant propagated for commercial purposes) | I, II, or III | CITES document with source code "A"[1] | 23.40 |
| (2) Artificially propagated plant from a country that has provided copies of the certificates, stamps, and seals to the Secretariat | II or III | Phytosanitary certificate with CITES statement [1] | 23.23(f) |
| (3) Bred-in-captivity wildlife (see paragraph (d)(5) of this section for Appendix-I wildlife bred in captivity for commercial purposes) | I, II, or III | CITES document with source code "C"[1] | 23.41 |
| (4) Commercially propagated Appendix-I plant | I | CITES document with source code "D"[1] | 23.47 |
| (5) Commercially bred Appendix-I wildlife from a breeding operation registered with the CITES Secretariat | I | CITES document with source code "D"[1] | 23.46 |
| (6) Export of certain marine specimens protected under a pre-existing treaty, convention, or international agreement for that species | II | CITES document indicating that the specimen was taken in accordance with provisions of the applicable treaty, convention, or international agreement | 23.36(e) 23.39(e) |
| (7) Hybrid plants | I, II, or III | CITES document unless the specimen qualifies as an exempt plant hybrid | 23.42 |
| (8) Hybrid wildlife | I, II, or III | CITES document unless the specimen qualifies as an exempt wildlife hybrid | 23.43 |
| (9) In-transit shipment (see paragraph (d)(14) of this section for sample collections covered by an ATA carnet) | I, II, or III | CITES document designating importer and country of final destination | 23.22 |
| (10) Introduction from the sea under a pre-existing treaty, convention, or international agreement for that species | II | Document required by applicable treaty, convention, or international agreement, if appropriate | 23.39(d) |
| (11) Noncommercial loan, donation, or exchange of specimens between scientific institutions registered with the CITES Secretariat | I, II, or III | A label indicating CITES and the registration codes of both institutions and, in the United States, a CITES certificate of scientific exchange that registers the institution [3] | 23.48 |

| Type of specimen or activity | Appendix | CITES exemption document | Section |
|---|---|---|---|
| (12) Personally owned live wildlife for multiple cross-border movements | I, II, or III | CITES certificate of ownership [2] | 23.44 |
| (13) Pre-Convention specimen | I, II, or III | CITES document indicating pre-Convention status [1] | 23.45 |
| (14) Sample collection covered by an ATA carnet | I [4], II, or III | CITES document indicating sample collection [2] | 23.50 |
| (15) Traveling exhibition | I, II, or III | CITES document indicating specimens qualify as pre-Convention, bred in captivity, or artificially propagated [2] | 23.49 |

[1] Issued by the Management Authority in the exporting or re-exporting country.
[2] Issued by the Management Authority in the owner's country of usual residence.
[3] Registration codes assigned by the Management Authorities in both exporting and importing countries.
[4] Appendix-I species bred in captivity or artificially propagated for commercial purposes (see §§23.46 and 23.47).

(e) *Import permits, export permits, re-export certificates, and certificates of origin.* Unless one of the exemptions under paragraph (d) of this section or §23.92 applies, you must obtain the following CITES documents before conducting the proposed activity:

| Appendix | Type of CITES document(s) required |
|---|---|
| I | Import permit (§23.35) and either an export permit (§23.36) or re-export certificate (§23.37) |
| II | Export permit (§23.36) or re-export certificate (§23.37) |
| III | Export permit (§23.36) if the specimen originated in a country that listed the species; certificate of origin (§23.38) if the specimen originated in a country other than the listing country, unless the listing annotation indicates otherwise; or re-export certificate for all re-exports (§23.37) |

(f) *Introduction-from-the-sea certificates.* For introduction from the sea of Appendix-I or Appendix-II specimens, you must obtain an introduction-from-the-sea certificate before conducting the proposed activity, unless the exemption in paragraph (d)(10) of this section applies (see §23.39). The export of a specimen that was previously introduced from the sea will be treated as an export (see §23.36 for export, §23.36(e) and §23.39(e) for export of exempt specimens, or §23.37 for re-export). Although an Appendix-III specimen does not require a CITES document to be introduced from the sea, the subsequent international trade of the specimen would be considered an export. For export of an Appendix-III specimen that was introduced from the sea you must obtain an export permit (§23.36) if the export is from the country that listed the species in Appendix III, a certificate of origin (§23.38) if the export is from a country other than the listing country, or a re-export certificate for all re-exports (§23.37).

**§23.21 What happens if a country enters a reservation for a species?**

(a) *Purpose.* CITES is not subject to general reservations. Articles XV, XVI, and XXIII of the Treaty allow a Party to enter a specific reservation on a species listed in Appendix I, II, or III, or on parts, products, or derivatives of a species listed in Appendix III.

(b) *General provision.* A Party can enter a reservation in one of the following ways:

(1) A Party must provide written notification to the Depositary Government (Switzerland) on a specific new or amended listing in the Appendices within 90 days after the CoP that adopted the listing, or at any time for Appendix-III species.

(2) A country must provide written notification on a specific species listing when the country ratifies, accepts, approves, or accedes to CITES.

(c) *Requesting the United States take a reservation.* You may submit information relevant to the issue of whether the United States should take a reservation on a species listing to the U.S.

169

Management Authority. The request must be submitted within 30 calendar days after the last day of the CoP where a new or amended listing of a species in Appendix I or II occurs, or at any time for a species (or its parts, products, or derivatives) listed in Appendix III.

(d) *Required CITES documents.* Except as provided in paragraph (d)(2) of this section, Parties treat a reserving Party as if it were a non-Party for trade in the species concerned (including parts, products, and derivatives, as appropriate). The following table indicates when CITES documents must accompany a shipment and which Appendix should appear on the face of the document:

| If | Then |
|---|---|
| (1) The shipment is between a Party and a reserving Party, or the shipment is from a non-Party to a reserving Party and is in transit through a Party | The shipment must be accompanied by a valid CITES document(s) (see § 23.26) that indicates the CITES Appendix in which the species is listed. |
| (2) The shipment is from a reserving Party to another reserving Party [1] or non-Party and is in transit through a Party | The shipment must be accompanied by a valid CITES document(s) (see § 23.26) that indicates the CITES Appendix in which the species is listed. [2] |
| (3) The shipment is between a reserving Party and another reserving Party [1] or non-Party and is not in transit through a Party | No CITES document is required. [2] |

[1] Both reserving Parties must have a reservation for the same species, and if the species is listed in Appendix III, a reservation for the same parts, products, and derivatives.
[2] CITES recommends that reserving Parties treat Appendix-I species as if listed in Appendix II and issue CITES documents based on Appendix-II permit criteria (see § 23.36). However, the CITES document must show the specimen as listed in Appendix I. If the United States entered a reservation, such a CITES document would be required.

(e) *Reservations taken by countries.* You may consult the CITES website or contact us (see § 23.7) for a list of countries that have taken reservations and the species involved.

### § 23.22  What are the requirements for in-transit shipments?

(a) *Purpose.* Article VII(1) of the Treaty allows for a shipment to transit an intermediary country that is a Party before reaching its final destination without the need for the intermediary Party to issue CITES documents. To control any illegal trade, Parties are to inspect, to the extent possible under their national legislation, specimens in transit through their territory to verify the presence of valid documentation. See § 23.50 for in-transit shipment of sample collections covered by an ATA carnet.

(b) *Document requirements.* An in-transit shipment does not require a CITES document from an intermediary country, but must be accompanied by all of the following documents:

(1) Unless the specimen qualifies for an exemption under § 23.92, a valid original CITES document, or a copy of the valid original CITES document, that designates the name of the importer in the country of final destination and is issued by the Management Authority of the exporting or re-exporting country. A copy of a CITES document is subject to verification.

(2) For shipment of an Appendix-I specimen, a copy of a valid import permit that designates the name of the importer in the country of final destination, unless the CITES document in paragraph (b)(1) of this section is a CITES exemption document (see § 23.20(d)).

(3) Transportation and routing documents that show the shipment has been consigned to the same importer and country of final destination as designated on the CITES document.

(c) *Shipment requirements.* An in-transit shipment, including items in an on-board store, must meet the following:

(1) When in an intermediary country, an in-transit shipment must stay only for the time needed to immediately transfer the specimen to the mode of transport used to continue to the final destination and remain under customs control. Other than during immediate transfer, the specimen may not be stored in a duty-free, bonded, or other kind of warehouse or a free trade zone.

(2) At any time during transit, an in-transit shipment must not be sold, manipulated, or split unless authorized by the Management Authority of the intermediary country for inspection or enforcement purposes.

(d) *Reserving Party or non-Party.* All the requirements of this section apply to shipments to or from a reserving Party or non-Party that are being transshipped through a Party. The CITES document must treat the specimen as listed in the Appendix as provided in § 23.21(d).

(e) *Specimen protected by other regulations.* Shipment of a specimen that is also listed as a migratory bird (part 10 of this subchapter), injurious wildlife (part 16 of this subchapter), endangered or threatened species (parts 17 of this subchapter and 222–224 of this title), marine mammal (parts 18 of this subchapter and 216 of this title), or bald or golden eagle (part 22 of this subchapter), and is moving through the United States is considered an import, and cannot be treated as an in-transit shipment (see § 23.3).

§ 23.23 **What information is required on U.S. and foreign CITES documents?**

(a) *Purpose.* Article VI of the Treaty provides standard information that must be on a permit and certificate issued under Articles III, IV, and V. To identify a false or invalid document, any CITES document, including a CITES exemption document issued under Article VII, must contain standardized information to allow a Party to verify that the specimen being shipped is the one listed on the document and that the trade is consistent with the provisions of the Treaty.

(b) *CITES form.* A CITES document issued by a Party must be on a form printed in one or more of the three working languages of CITES (English, Spanish, or French). A CITES document from a non-Party may be in the form of a permit or certificate, letter, or any other form that clearly indicates the nature of the document and includes the information in paragraphs (c) through (e) of this section and the additional information in § 23.25.

(c) *Required information.* Except for a phytosanitary certificate used as a CITES certificate for artificially propagated plants in paragraph (f) of this section, or a customs declaration label used to identify specimens being moved between registered scientific institutions (§ 23.48(e)(5)), a CITES document issued by a Party or non-Party must contain the information set out in this paragraph (listed alphabetically). Specific types of CITES documents must also contain the additional information identified in paragraph (e) of this section. A CITES document is valid only when it contains the following information:

| Required information | Description |
| --- | --- |
| (1) Appendix | The CITES Appendix in which the species, subspecies, or population is listed (see § 23.21 when a Party has taken a reservation on a listing). |
| (2) Applicant's signature | The applicant's signature if the CITES document includes a place for it. |
| (3) Bill of lading, air waybill, or flight number | As applicable for export or re-export: (i) by ocean or air cargo, the bill of lading or air waybill number or (ii) in accompanying baggage, the flight number, as recorded on the CITES document by the inspecting official at the port, if known at the time of validation or certification. |
| (4) Dates | Date of issue and date of expiration ("valid until" date on the standardized CITES form), which is midnight of the date on the CITES document. See § 23.54 for the length of validity for different types of CITES documents. |
| (5) Description of the specimen | A complete description of the specimen, including whether live or the type of goods. The sex and age of a live specimen should be recorded, if possible. Such information must be in English, Spanish, or French on a CITES document from a Party. If a code is used to indicate the type of specimen, it must agree with the *Guidelines for preparation and submission of CITES annual reports* available from the CITES website or us (see § 23.7). |
| (6) Document number | A unique control number. We use a unique 12-character number. The first two characters are the last two digits of the year of issuance, the next two are the two-letter ISO country code, followed by a six-digit serial number, and two digits or letters used for national informational purposes. |

| Required information | Description |
|---|---|
| (7) Humane transport of live wildlife | If the CITES document authorizes the export or re-export of live wildlife, a statement that the document is valid only if the transport conditions comply with CITES' *Guidelines for transport and preparation for shipment of live wild animals and plants*, or in the case of air transport of wildlife, with the *International Air Transport Association Live Animals Regulations*. The shipment must comply with the requirements of CITES' *Guidelines for transport and preparation for shipment of live wild animals and plants*, adopted by the Parties in 1979 and revised in 1981, or, in the case of air transport of wildlife, the Live Animals Regulations (LAR), 33rd edition, October 1, 2006, by the International Air Transport Association (IATA), Reference Number: 9105-33, ISBN 92-9195-818-2. The incorporation by reference of these documents was approved by the Director of the Office of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. Copies of CITES' *Guidelines for transport and preparation for shipment of live wild animals and plants* may be obtained from the CITES Secretariat, International Environment House, Chemin des Anémones, CH-1219, Châtelaine, Geneva, Switzerland, or through the Internet at *http://www.cites.org/eng/resources/transport/ E-TranspGuide.pdf*. Copies of the IATA LAR may be obtained from IATA, 800 Place Victoria, P.O. Box 113, Montreal, Quebec, Canada H4Z 1M1, by calling 1-800-716-6326, or ordering through the Internet at *http://www.iata.org*. Copies of these documents may be inspected at the U.S. Management Authority, Fish and Wildlife Service, 4401 N. Fairfax Dr., Arlington, VA 22203 or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: *http:// www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html*. |
| (8) Identification of the specimen | Any unique identification number or mark (such as a tag, band, ring, microchip, label, or serial number), including any mark required under these regulations or a CITES listing annotation. For a microchip, the microchip code, trademark of the transponder manufacturer and, where possible, the location of the microchip in the specimen. If a microchip is used, we may, if necessary, ask the importer, exporter, or re-exporter to have equipment on hand to read the microchip at the time of import, export, or re-export. |
| (9) Management Authority | The complete name and address of the issuing Management Authority as included in the CITES directory, which is available from the CITES website or us (see § 23.7). |
| (10) Name and address | The complete name and address, including country, of the exporter and importer. |
| (11) Purpose of transaction | The purpose of the transaction identified either through a written description of the purpose of the transaction or by using one of the codes given in paragraph (d) of this section. The code is determined by the issuing Management Authority through information submitted with an application. This is not required for a certificate of origin. |
| (12) Quantity | The quantity of specimens authorized in the shipment and, if appropriate, the unit of measurement using the metric system:<br>(i) The unit of measurement should be appropriate to the type of specimen and agree with the *Guidelines for the preparation and submission of CITES annual reports* available from the CITES website or us (see § 23.7). General descriptions such as "one case" or "one batch" are not acceptable.<br>(ii) Weight should be in kilograms. If weight is used, net weight (weight of the specimen alone) must be stated, not gross weight that includes the weight of the container or packaging.<br>(iii) Volume should be in cubic meters for logs and sawn wood and either square meters or cubic meters for veneer and plywood.<br>(iv) For re-export, if the type of good has not changed since being imported, the same unit of measurement as on the export permit must be used, except to change to units that are to be used in the CITES annual report. |
| (13) Scientific name | The scientific name of the species, including the subspecies when needed to determine the level of protection of the specimen under CITES, using standard nomenclature as it appears in the CITES Appendices or the references adopted by the CoP. A list of current references is available from the CITES website or us (see § 23.7). A CITES document may contain higher-taxon names in lieu of the species name only under one of the following circumstances:<br>(i) The CoP has agreed that the use of a higher-taxon name is acceptable for use on CITES documents.<br>   (A) If the genus cannot be readily determined for coral rock, the scientific name to be used is the order Scleractinia.<br>   (B) Live and dead coral must be identified to the level of species except where the CoP has agreed that identification to genus is acceptable. A current list of coral taxa identifiable to genus is available from the CITES website or us (see § 23.7).<br>   (C) Re-export of worked skins or pieces of *Tupinambis* species that were imported before August 1, 2000, may indicate *Tupinambis* spp.<br>(ii) The issuing Party can show the use of a higher-taxon name is well justified and has communicated the justification to the Secretariat.<br>(iii) The item is a pre-Convention manufactured product containing a specimen that cannot be identified to the species level. |

Addendum 42

| Required information | Description |
|---|---|
| (14) Seal or stamp | The embossed seal or ink stamp of the issuing Management Authority. |
| (15) Security stamp | If a Party uses a security stamp, the stamp must be canceled by an authorized signature and a stamp or seal, preferably embossed. The number of the stamp must also be recorded on the CITES document. |
| (16) Signature | An original handwritten signature of a person authorized to sign CITES documents for the issuing Management Authority. The signature must be on file with the Secretariat. |
| (17) Signature name | The name of the person who signed the CITES document. |
| (18) Source | The source of the specimen. For re-export, unless there is information to indicate otherwise, the source code on the CITES document used for import of the specimen must be used. See § 23.24 for a list of codes. |
| (19) Treaty name | Either the full name or acronym of the Treaty, or the CITES logo. |
| (20) Type of CITES document | The type of CITES document (import, export, re-export, or other):<br>(i) If marked ''other,'' the CITES document must indicate the type of document, such as certificate for artificially propagated plants, certificate for wildlife bred in captivity, certificate of origin, certificate of ownership, introduction-from-the-sea certificate, pre-Convention certificate, sample collection covered by an ATA carnet, scientific exchange certificate, or traveling-exhibition certificate.<br>(ii) If multiple types are authorized on one CITES document, the type that applies to each specimen must be clearly indicated. |
| (21) Validation or certification | The actual quantity of specimens exported or re-exported:<br>(i) Using the same units of measurement as those on the CITES document.<br>(ii) Validated or certified by the stamp or seal and signature of the inspecting authority at the time of export or re-export. |

(d) *Purpose of transaction.* If the purpose is not identified by a written description, the CITES document must contain one of the following codes:

| Code | Purpose of transaction | Code | Purpose of transaction |
|---|---|---|---|
| B | Breeding in captivity or artificial propagation | N | Reintroduction or introduction into the wild |
| E | Education | P | Personal |
| G | Botanical garden | Q | Circus and traveling exhibition |
| H | Hunting trophy | S | Scientific |
| L | Law enforcement/judicial/forensic | T | Commercial |
| M | Medical research (including biomedical research) | Z | Zoo |

(e) *Additional required information.* The following describes the additional information that is required for specific types of documents (listed alphabetically):

| Type of document | Additional required information |
|---|---|
| (1) Annex (such as an attached inventory, conditions, or continuation pages of a CITES document) | The page number, document number, and date of issue on each page of an annex that is attached as an integral part of a CITES document. An authorized signature and ink stamp or seal, preferably embossed, of the Management Authority issuing the CITES document must also be included on each page of the annex. The CITES document must indicate an attached annex and the total number of pages. |
| (2) Certificate of origin (see § 23.38) | A statement that the specimen originated in the country that issued the certificate. |
| (3) Copy when used in place of the original CITES document | (i) Information required in paragraph (e)(7) of this section when the document authorizes export or re-export.<br>(ii) A statement by the Management Authority on the face of the document authorizing the use of a copy when the document authorizes import. |
| (4) Export permit for a registered commercial breeding operation or nursery for Appendix-I specimens (see § 23.46) | The registration number of the operation or nursery assigned by the Secretariat, and if the exporter is not the registered operation or nursery, the name of the registered operation or nursery. |

| Type of document | Additional required information |
|---|---|
| (5) Export permit with a quota | Number of specimens, such as 500/1,000, that were:<br>(i) Exported thus far in the current calendar year, including those covered by the current permit (such as 500), and<br>(ii) Included in the current annual quota (such as 1,000). |
| (6) Import permit (Appendix-I specimen) (see § 23.35) | A certification that the specimen will not be used for primarily commercial purposes and, for a live specimen, that the recipient has suitable facilities and expertise to house and care for it. |
| (7) Replacement CITES document (see § 23.52) | When a CITES document replaces an already issued CITES document that was lost, damaged, stolen, or accidentally destroyed:<br>(i) If a newly issued CITES document, indication it is a "replacement," the number and date of issuance of the CITES document that was replaced, and reason for replacement.<br>(ii) If a copy of the original CITES document, indication it is a "replacement" and a "true copy of the original," a new original signature of a person authorized to sign CITES documents for the issuing Management Authority, the date signed, and reason for replacement. |
| (8) Partially completed documents (see § 23.51) | (i) A list of the blocks that must be completed by the permit holder.<br>(ii) If the list includes scientific names, an inventory of approved species must be included on the face of the CITES document or in an attached annex.<br>(iii) A signature of the permit holder, which acts as a certification that the information entered is true and accurate. |
| (9) Pre-Convention document (see § 23.45) | (i) An indication on the face of the CITES document that the specimen is pre-Convention.<br>(ii) A date that shows the specimen was acquired before the date the Convention first applied to it. |
| (10) Re-export certificate (see § 23.37) | (i) The country of origin, the export permit number, and the date of issue.<br>(ii) If previously re-exported, the country of last re-export, the re-export certificate number, and the date of issue.<br>(iii) If all or part of this information is not known, a justification must be given. |
| (11) Retrospective CITES document (see § 23.53) | A clear statement that the CITES document is issued retrospectively and the reason for issuance. |
| (12) Sample collection covered by an ATA carnet (see § 23.50) | (i) A statement that the document covers a sample collection and is invalid unless accompanied by a valid ATA carnet.<br>(ii) The number of the accompanying ATA carnet recorded by the Management Authority, customs, or other responsible CITES inspecting official. |

(f) *Phytosanitary certificate.* A Party may use a phytosanitary certificate as a CITES document under the following conditions:

(1) The Party has provided copies of the certificate, stamps, and seals to the Secretariat.

(2) The certificate is used only when all the following conditions are met:

(i) The plants are being exported, not re-exported.

(ii) The plants are Appendix-II species, or are hybrids of one or more Appendix-I species or taxa that are not annotated to include hybrids.

(iii) The plants were artificially propagated in the exporting country.

(3) The certificate contains the following information:

(i) The scientific name of the species, including the subspecies when needed to determine the level of protection of the specimen under CITES, using standard nomenclature as it appears in the CITES Appendices or the references adopted by the CoP.

(ii) The type (such as live plant or bulb) and quantity of the specimens authorized in the shipment.

(iii) A stamp, seal, or other specific indication stating that the specimen is artificially propagated (see § 23.64).

§ 23.24   What code is used to show the source of the specimen?

The Management Authority must indicate on the CITES document the source of the specimen using one of the following codes, except the code ''O'' for pre-Convention, which should be used in conjunction with another code:

| Source of specimen | Code |
|---|---|
| (a) *Artificially propagated plant (see § 23.40):*<br>(1) An Appendix-II or -III artificially propagated specimen.<br>(2) An Appendix-I plant specimen artificially propagated for noncommercial purposes or certain Appendix-I hybrids (see § 23.42) propagated for commercial purposes. | A |
| (b) *Bred-in-captivity wildlife (see § 23.41):*<br>(1) An Appendix-II or -III specimen bred in captivity. (See paragraph (d)(1) of this section for wildlife that does not qualify as bred in captivity.)<br>(2) An Appendix-I specimen bred for noncommercial purposes. (See paragraph (c)(1) of this section for an Appendix-I specimen bred for commercial purposes.) | C |
| (c) *Bred in captivity or artificially propagated for commercial purposes (see §§ 23.46 and 23.47):*<br>(1) An Appendix-I wildlife specimen bred in captivity for commercial purposes at an operation registered with the Secretariat.<br>(2) An Appendix-I plant specimen artificially propagated for commercial purposes at a nursery that is registered with the Secretariat or a commercial propagating operation that meets the requirements of § 23.47. | D |
| (d) *Captive-bred wildlife (§ 23.36):*<br>(1) An Appendix-II or -III wildlife species that is captive-bred.<br>(2) An Appendix-I wildlife species that is one of the following:<br>(i) Captive-bred.<br>(ii) Bred for commercial purposes, but the commercial breeding operation is not registered with the Secretariat.<br>(iii) Bred for noncommercial purposes, but the facility does not meet the definition in § 23.5 because it is not involved in a cooperative conservation program. | F |
| (e) *Confiscated or seized specimen (see § 23.78).* | I |
| (f) *Pre-Convention specimen (see § 23.45)* (code to be used in conjunction with another code). | O |
| (g) *Ranched wildlife* (wildlife that originated from a ranching operation). | R |
| (h) *Source unknown* (must be justified on the face of the CITES document). | U |
| (i) *Specimen taken from the wild:*<br>(1) For wildlife, this includes a specimen born in captivity from an egg collected from the wild or from wildlife that mated or exchanged genetic material in the wild.<br>(2) For a plant, it includes a specimen propagated from a propagule collected from a wild plant, except as provided in § 23.64. | W |

## § 23.25  What additional information is required on a non-Party CITES document?

(a) *Purpose.* Under Article X of the Treaty, a Party may accept a CITES document issued by a competent authority of a non-Party only if the document substantially conforms to the requirements of the Treaty.

(b) *Additional certifications.* In addition to the information in § 23.23(c) through (e), a CITES document issued by a non-Party must contain the following certifications on the face of the document:

| Activity by a non-Party | Certification |
|---|---|
| (1) Export | (i) For Appendix-I and -II specimens, the Scientific Authority has advised that the export will not be detrimental to the survival of the species.<br>(ii) The Management Authority is satisfied that the specimen was legally acquired. |
| (2) Import | For Appendix-I specimens, the import will be for purposes that are not detrimental to the survival of the species. |

## § 23.26  When is a U.S. or foreign CITES document valid?

(a) *Purpose.* Article VIII of the Treaty provides that Parties take appropriate measures to enforce the Convention to prevent illegal trafficking in wildlife and plants.

(b) *Original CITES documents.* A separate original or a true copy of a CITES document must be issued before the

import, introduction from the sea, export, or re-export occurs, and the document must accompany each shipment. No copy may be used in place of an original except as provided in § 23.23(e)(3) or when a shipment is in transit (see § 23.22). Fax or electronic copies are not acceptable.

(c) *Acceptance of CITES documents.* We will accept a CITES document as valid for import, introduction from the sea, export, or re-export only if the document meets the requirements of this section, §§ 23.23 through 23.25, and the following conditions:

| Key phrase | Conditions for an acceptable CITES document |
|---|---|
| (1) Altered or modified CITES document | The CITES document has not been altered (including by rubbing or scratching out), added to, or modified in any way unless the change is validated on the document by the stamp and authorized signature of the issuing Management Authority, or if the document was issued as a partially completed document, the Management Authority lists on the face of the document which blocks must be completed by the permit holder. |
| (2) Annual reports | The Party issuing the CITES document has submitted annual reports and is not subject to any action under Article VIII paragraph 7(a) that would not allow trade in CITES species. |
| (3) CITES document | U.S. and foreign CITES documents must meet the general provisions and criteria in subparts C and E. |
| (4) Conditions | All conditions on the CITES document are met. |
| (5) Convention implementation | The Party issuing the CITES document is not subject to any action under Article VIII or Article XIII paragraph 3 that would not allow trade in the species. |
| (6) Extension of validity | The validity of a CITES document may not be extended except as provided in § 23.73 for certain timber species. |
| (7) Fraudulent CITES document or CITES document containing false information | The CITES document is authentic and does not contain erroneous or misleading information. |
| (8) Humane transport | Live wildlife or plants were transported in compliance with CITES' *Guidelines for transport and preparation for shipment of live wild animals and plants* or, in the case of air transport of wildlife, the *International Air Transport Association Live Animals Regulations.* (See § 23.23(c)(7).) |
| (9) Legal acquisition | The Party or non-Party issuing the CITES document has made the required legal acquisition finding. |
| (10) Management Authority and Scientific Authority | The CITES document was issued by a Party or non-Party that has designated a Management Authority and Scientific Authority and has provided information on these authorities to the Secretariat. |
| (11) Name of importer and exporter | A CITES document is specific to the name on the face of the document and may not be transferred or assigned to another person. |
| (12) Non-detriment | The Party or non-Party issuing the CITES document has made the required non-detriment finding. |
| (13) Phytosanitary certificate | A phytosanitary certificate may be used to export artificially propagated plants only if the issuing Party has provided copies of the certificates, stamps, and seals to the Secretariat. |
| (14) Quota | For species with a quota on file with the Secretariat, the quantity exported from a country does not exceed the quota. |
| (15) Registered commercial breeding operation for Appendix-I wildlife | (i) The operation is included in the Secretariat's register. <br> (ii) Each specimen is specifically marked, and the mark is described on the CITES document. |
| (16) Registered commercial nursery for Appendix-I plants | The operation is included in the Secretariat's register. |
| (17) Retrospective CITES documents | A CITES document was not issued retrospectively except as provided in § 23.53. |
| (18) Shipment contents | The contents of the shipment match the description of specimens provided on the CITES document, including the units and species. A shipment cannot contain more or different specimens or species than certified or validated on the CITES document at the time of export or re-export; the quantity of specimens validated or certified may be less, but not more, than the quantity stated at the time of issuance. |

| Key phrase | Conditions for an acceptable CITES document |
|---|---|
| (19) Wild-collected specimen | A wild-collected specimen (indicated on the CITES document with a source code of "W") is not coming from a country that is outside the range of the species, unless we have information indicating that the species has been established in the wild in that country through accidental introduction or other means. |

(d) *Verification of a CITES document.* We may request verification of a CITES document from the Secretariat or a foreign Management Authority before deciding whether to accept it under some circumstances, including, but not limited to, the following:

(1) We receive reliable information that indicates the need for CITES document verification.

(2) We have reasonable grounds to believe that a CITES document is not valid or authentic because the species is being traded in a manner detrimental to the survival of the species or in violation of foreign wildlife or plant laws, or any applicable Management or Scientific Authority finding has not been made.

(3) The re-export certificate refers to an export permit that does not exist or is not valid.

(4) We have reasonable grounds to believe that the document is fraudulent, contains false information, or has unauthorized changes.

(5) We have reasonable grounds to believe that the specimen identified as bred in captivity or artificially propagated is a wild specimen, was produced from illegally acquired parental stock, or otherwise does not qualify for these exemptions.

(6) The import of a specimen designated as bred in captivity or artificially propagated is from a non-Party. For an Appendix-I specimen, we must consult with the Secretariat.

(7) For a retrospectively issued CITES document, both the importing and exporting or re-exporting countries' Management Authorities have not agreed to the issuance of the document.

(8) For a replacement CITES document, we need clarification of the reason the document was issued.

## §23.27 What CITES documents do I present at the port?

(a) *Purpose.* Article VIII of the Treaty provides that Parties establish an inspection process that takes place at a port of exit and entry. Inspecting officials must verify that valid CITES documents accompany shipments and take enforcement action when shipments do not comply with the Convention.

(b) *U.S. port requirements.* In the United States, you must follow the clearance requirements for wildlife in part 14 of this subchapter and for plants in part 24 of this subchapter and 7 CFR parts 319, 352, and 355, and the specific requirement in paragraphs (c) and (d) of this section.

(c) *General validation or certification process.* Officials in each country inspect the shipment and validate or certify the CITES document. The table in this paragraph (c) provides information on:

(1) The types of original CITES documents you must present to be validated or certified by the inspecting official to export or re-export from a country.

(2) When you need to surrender a copy of the original CITES document to the inspecting official at the time of export or re-export.

(3) When you need to surrender the original CITES document to the inspecting official at the time of import or introduction from the sea.

| Type of CITES document | Present original for export or re-export validation or certification | Surrender copy upon export or re-export | Surrender original upon import or introductionfrom the sea |
|---|---|---|---|
| Bred-in-captivity certificate | Required | Required | Required |
| Certificate for artificially propagated plants | Required | Required | Required |
| Certificate of origin | Required | Required | Required |

| Type of CITES document | Present original for export or re-export validation or certification | Surrender copy upon export or re-export | Surrender original upon import or introductionfrom the sea |
|---|---|---|---|
| Certificate of ownership | Required | Required | Not required; submit copy |
| Export permit | Required | Required | Required |
| Import permit | Not required | Required | Required |
| Introduction-from-the-sea certificate | Not applicable | Not applicable | Required |
| Multiple-use document | Required [1] | Required | Not required; submit copy |
| Phytosanitary certificate | Required | Required | Not required; submit copy |
| Pre-Convention document | Required | Required | Required |
| Re-export certificate | Required | Required | Required |
| Registered Appendix-I commercial breeding operation, export permit | Required | Required | Required |
| Registered Appendix-I nursery, export permit | Required | Required | Required |
| Replacement document where a shipment has been made and is in a foreign country | Not required | Not required | Required |
| Replacement document where a shipment has not left the United States | Required | Required | Required |
| Retrospective document | Not required | Not required | Required |
| Sample collection covered by an ATA carnet, CITES document | Required | Required | Not required; submit copy |
| Traveling-exhibition certificate | Required | Required | Not required; submit copy |

[1] Original must be available for inspection, but permit conditions will indicate whether an original or copy is to be validated.

(d) *Customs declaration labels.* The customs declaration label used to identify specimens being moved between registered scientific institutions (§ 23.48) must be affixed to the shipping container. The label does not require export or re-export validation or certification at the port.

## Subpart C—Application Procedures, Criteria, and Conditions

### § 23.32  How do I apply for a U.S. CITES document?

(a) To apply for a U.S. CITES document, you must complete a standard application form and submit it to the appropriate office shown on the top of the form.

(b) To determine the type of CITES document needed for your shipment, go to §§ 23.18 through 23.20 for further guidance.

(c) If a species is also regulated under another part of this subchapter (such as endangered or threatened species, see § 23.3), the requirements of all parts must be met. You may submit a single application that contains all the information needed to meet the requirements of CITES and other applicable parts.

(d) You must also follow the general permit procedures in part 13 of this subchapter.

(e) You should review the criteria in all applicable regulations in this subchapter that apply to the type of permit you are seeking before completing the application form.

(f) We will review your application to assess whether it contains the information needed to make the required findings.

(1) Based on available information, we will decide if any of the exemptions

Addendum 48

apply and what type of CITES document you need.

(2) If we need additional information, we will contact you. If you do not provide the information within 45 calendar days, we will abandon your application. If your application is abandoned and you wish to apply for a permit at a later time, you must submit a new application.

### § 23.33 How is the decision made to issue or deny a request for a U.S. CITES document?

(a) Upon receiving a complete application, we will decide whether to issue a CITES document by considering:

(1) The general criteria in §13.21(b) of this subchapter and, if the species is protected under a separate law or treaty, criteria in any other applicable parts.

(2) The CITES issuance criteria provided in this subpart (see subpart D of this part for factors we consider in making certain findings).

(b) As needed, the U.S. Management Authority, including FWS Law Enforcement, will forward a copy of the application to the U.S. Scientific Authority; State, tribal, or other Federal government agencies; or other applicable experts. We may also query the Secretariat and foreign Management and Scientific Authorities for information to use in making the required findings.

(c) You must provide sufficient information to satisfy us that all criteria specific to the proposed activity are met before we can issue a CITES document.

(d) We will base our decision on whether to issue or deny the application on the best available information.

### § 23.34 What kinds of records may I use to show the origin of a specimen when I apply for a U.S. CITES document?

(a) When you apply for a U.S. CITES document, you will be asked to provide information on the origin of the specimen that will be covered by the CITES document.

(1) You need to provide sufficient information for us to determine if the issuance criteria in this part are met (see the sections in this subpart for each type of CITES document).

(2) We require less detailed information when the import, introduction from the sea, export, or re-export poses a low risk to a species in the wild and more detailed information when the proposed activity poses greater risk to a species in the wild (see Subpart D of this part for factors we consider in making certain findings).

(b) Information you may want to provide in a permit application includes, but is not limited to, the following:

| Source of specimen | Types of records |
|---|---|
| (1) Captive-bred or cultivated [1] | (i) Records that identify the breeder or propagator of the specimens that have been identified by birth, hatch, or propagation date and for wildlife by sex, size, band number, or other mark, or for plants by size or other identifying feature: |
| | (A) Signed and dated statement by the breeder or propagator that the specimen was bred or propagated under controlled conditions. |
| | (B) Name and address of the breeder or propagator as shown by documents such as an International Species Information System (ISIS) record, veterinary certificate, or plant nursery license. |
| | (ii) Records that document the breeding or propagating of specimens at the facility: |
| | (A) Number of wildlife (by sex and age- or size-class) or plants at the facility. |
| | (B) How long the facility has been breeding or propagating the species. |
| | (C) Annual production and mortalities. |
| | (D) Number of specimens sold or transferred annually. |
| | (E) Number of specimens added from other sources annually. |
| | (F) Transaction records with the date, species, quantity of specimens, and name and address of seller. |
| | (G) Marking system, if applicable. |
| | (H) Photographs or video of facility, including for wildlife any activities during nesting and production and rearing of young, and for plants, different stages of growth. |

| Source of specimen | Types of records |
|---|---|
| (2) Confiscated or seized | Copy of remission decision, legal settlement, or disposal action after forfeiture or abandonment, which demonstrates the applicant's legal possession. |
| (3) Exempt plant material | Records that document how you obtained the exempt plant material, including the name and address of the person from whom you received the plant material. |
| (4) Imported previously | (i) A copy of the cancelled CITES document that accompanied the shipment into the United States.<br>(ii) For wildlife, copies of cleared Declarations for Importation or Exportation of Fish or Wildlife (Form 3–177) associated with each specimen. |
| (5) Pre-Convention | Records that show the specimen was acquired before the date the provisions of the Convention first applied to it, such as:<br>(i) Receipt or invoice.<br>(ii) Catalog, inventory list, photograph, or art book.<br>(iii) Statement from a qualified appraiser attesting to the age of a manufactured product.<br>(iv) CBP (formerly U.S. Customs Service) import documents.<br>(v) Phytosanitary certificate.<br>(vi) Veterinary document or breeding or propagation logs. |
| (6) Sequential ownership or purchase | (i) Records that specifically identify the specimen, give the name and address of the owner, and show the specimen's origin (pre-Convention, previously imported, wild-collected, or born or propagated in a controlled environment in the United States).<br>(ii) Records that document the history of all transfers in ownership (generally not required for pre-Convention specimens). |
| (7) Unknown origin, for noncommercial purposes | A complete description of the circumstances under which the specimen was acquired (where, when, and from whom the specimen was acquired), including efforts made to obtain information on the origin of the specimen. |
| (8) Wild-collected | Records, such as permits, licenses, and tags, that demonstrate the specimen or the parental stock was legally removed from the wild under relevant foreign, Federal, tribal, State, or local wildlife or plant conservation laws or regulations:<br>(i) If taken on private or tribal land, permission of the landowner if required under applicable law.<br>(ii) If taken in a national, State, or local park, refuge, or other protected area, permission from the applicable agency, if required. |

[1] If the wildlife was born in captivity from an egg collected from the wild or from parents that mated or exchanged genetic material in the wild, or the plant was propagated from a non-exempt propagule collected from a wild plant, see paragraph (b)(8) of this section.

(c) If you intend to engage in international trade with a CITES specimen in the future, you should keep sufficient records to establish your eligibility for a CITES document for as long as you possess the specimen, and if you sell, donate, or transfer ownership of the specimen, you should provide such records on the origin of the specimen to the new owner.

## § 23.35  What are the requirements for an import permit?

(a) *Purpose.* Article III(3) of the Treaty sets out the conditions under which a Management Authority can issue an import permit.

(b) *U.S. application forms.* Complete the appropriate form for the proposed activity and submit it to the U.S. Management Authority:

| Type of application for an import permit for an Appendix-I specimen | Form no. |
|---|---|
| (1) CITES: | |
| Southern African Leopard, African Elephant, and Namibian Southern White Rhinoceros Sport-hunted Trophies | 3–200–19 |
| Appendix-I Plants | 3–200–35 |
| Appendix-I Wildlife | 3–200–37 |
| Appendix-I Biological Samples | 3–200–29 |

| Type of application for an import permit for an Appendix-I specimen | Form no. |
|---|---|
| (2) Endangered Species Act and CITES:<br>    ESA Plants<br>    ESA Sport-hunted Trophies<br>    ESA Wildlife | <br>3–200–36<br>3–200–20<br>3–200–37 |
| (3) Marine Mammal Protection Act and CITES:<br>    Marine Mammals | <br>3–200–43 |
| (4) Wild Bird Conservation Act and CITES:<br>    Personal Pet Bird<br>    Under an Approved Cooperative Breeding Program<br>    Scientific Research or Zoological Breeding/Display | <br>3–200–46<br>3–200–48<br>3–200–47 |

(c) *Criteria.* The criteria in this paragraph (c) apply to the issuance and acceptance of U.S. and foreign import permits. When applying for a U.S. import permit, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

| Criteria for an import permit for an Appendix-I specimen | Section |
|---|---|
| (1) The proposed import would be for purposes that are not detrimental to the survival of the species. | 23.61 |
| (2) The specimen will not be used for primarily commercial purposes. | 23.62 |
| (3) The recipients are suitably equipped to house and care for any live wildlife or plant to be imported. | 23.65 |
| (4) The scientific name of the species is the standard nomenclature in the CITES Appendices or the references adopted by the CoP. | 23.23 |

(d) *U.S. standard conditions.* You must meet all of the provisions on use after import in §23.55 and the standard conditions in §23.56.

(e) *Prior issuance of an import permit.* For Appendix-I specimens, the Management Authority of the exporting country may:

(1) Issue an export permit for live or dead specimens or a re-export certificate for live specimens only after the Management Authority of the importing country has either issued an import permit or confirmed in writing that an import permit will be issued.

(2) Accept oral confirmation from the Management Authority of the importing country that an import permit will be issued in an emergency situation where the life or health of the specimen is threatened and no means of written communication is possible.

(3) Issue a re-export certificate for a dead specimen without confirmation that the import permit has been issued.

§ **23.36   What are the requirements for an export permit?**

(a) *Purposes.* Articles III, IV, and V of the Treaty set out the conditions under which a Management Authority may issue an export permit for an Appendix-I, -II, or -III specimen. Article XIV sets out the conditions under which a Management Authority may issue a document for export of certain Appendix-II marine specimens protected under a pre-existing treaty, convention, or international agreement.

(b) *U.S. application forms.* Complete the appropriate form for the proposed activity and submit it to the U.S. Management Authority. Form 3–200–26 may also be submitted to FWS Law Enforcement at certain ports or regional offices:

| Type of application for an export permit | Form no. |
|---|---|
| (1) CITES: | |
| American Ginseng | 3–200–34 |
| Appendix-I Plants Artificially Propagated for Commercial Purposes | 3–200–33 |
| Biological Specimens | 3–200–29 |
| Captive-born Raptors | 3–200–25 |
| Captive-born Wildlife (except raptors) | 3–200–24 |
| Caviar/Meat of Paddlefish or Sturgeon, Removed from the Wild | 3–200–76 |
| Export of Skins/Products of Bobcat, Canada Lynx, River Otter, Brown Bear, Gray Wolf, and American Alligator Taken under an Approved State or Tribal Program | 3–200–26 |
| Personal Pets, One-time Export | 3–200–46 |
| Plants | 3–200–32 |
| Registration of a Native Species Production Facility | 3–200–75 |
| Single-use Permits under a Master File or an Annual Program File | 3–200–74 |
| Trophies by Taxidermists | 3–200–28 |
| Wildlife, Removed from the Wild | 3–200–27 |
| (2) Endangered Species Act and CITES: | |
| ESA Plants | 3–200–36 |
| ESA Wildlife | 3–200–37 |
| (3) Marine Mammal Protection Act and CITES: | |
| Biological Samples | 3–200–29 |
| Live Captive-held Marine Mammals | 3–200–53 |
| Take from the Wild for Export | 3–200–43 |

(c) *Criteria.* The criteria in this paragraph (c) apply to the issuance and acceptance of U.S. and foreign export permits except as provided for certain marine specimens in paragraph (d) of this section. When applying for a U.S. permit or certificate, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

| Criteria for an export permit | Appendix of the specimen | | | Section |
|---|---|---|---|---|
| | I | II | III | |
| (1) The wildlife or plant was legally acquired. | Yes | Yes | Yes | 23.60 |
| (2) The proposed export would not be detrimental to the survival of the species. | Yes | Yes | n/a | 23.61 |
| (3) An import permit has already been issued or the Management Authority of the importing country has confirmed that it will be issued. | Yes | n/a | n/a | 23.35 |
| (4) The scientific name of the species is the standard nomenclature in the CITES Appendices or the references adopted by the CoP. | Yes | Yes | Yes | 23.23 |
| (5) Live wildlife or plants will be prepared and shipped so as to minimize risk of injury, damage to health, or cruel treatment of the specimen. | Yes | Yes | Yes | 23.23 |
| (6) The specimen originated in a country that listed the species. | n/a | n/a | Yes | 23.20 |
| (7) For wildlife with the source code "W" or "F," the export is for noncommercial purposes. (See § 23.46 for the export of specimens that originated at a commercial breeding operation for Appendix-I wildlife that is registered with the Secretariat.) | Yes | n/a | n/a | – |

(d) *Export of certain exempt marine specimens.* Article XIV(4) and (5) of the Treaty provide a limited exemption for Appendix-II marine species that are protected under another treaty, convention, or international agreement that was in force at the time CITES entered into force. When all of the following conditions are met, export of exempt Appendix-II marine wildlife or plants requires only that the shipment is accompanied by a document issued

by the Management Authority of the exporting country indicating that the specimens were taken in accordance with the provisions of the other international treaty, convention, or agreement:

(1) The exporting country is a CITES Party and is a party to an international treaty, convention, or agreement that affords protection to the species and was in force on July 1, 1975.

(2) The ship that harvested the specimen is registered in the exporting country.

(3) The specimen was taken within waters under the jurisdiction of the exporting country or in the marine environment not under the jurisdiction of any country.

(4) The specimen was taken in accordance with the other international treaty, convention, or agreement, including any quotas.

(5) The shipment is accompanied by any official document required under the other international treaty, convention, or agreement or otherwise required by law.

(e) *Export of exempt specimens from the United States.* To export a specimen exempted under paragraph (d) of this section, you must obtain a CITES document from the U.S. Management Authority that indicates the specimen was taken in accordance with the provisions of another international treaty, convention, or agreement that was in force on July 1, 1975.

(f) *U.S. application for export of exempt specimens.* To apply for a CITES exemption document under paragraph (e) of this section, complete the appropriate form for your activity and submit it to the U.S. Management Authority.

(g) *Criteria for certain exempt marine specimens.* The criteria in this paragraph (g) apply to the issuance and acceptance of U.S. and foreign export documents. To obtain a U.S. CITES document for export of specimens exempted under paragraph (d) of this section you must provide sufficient information for us to find that your proposed export meets all of the following issuance criteria:

(1) The specimen was taken in accordance with the provisions of an applicable international treaty, convention, or agreement that was in force on July 1, 1975.

(2) The scientific name of the CITES species is in the standard nomenclature in the CITES Appendices or references adopted by the CoP (see § 23.23).

(3) The ship that harvested the specimen is registered in the exporting country.

(4) The specimen was taken within waters under the jurisdiction of the exporting country or in the marine environment not under the jurisdiction of any country.

## § 23.37 What are the requirements for a re-export certificate?

(a) *Purposes.* Articles III, IV, and V of the Treaty set out the conditions under which a Management Authority may issue a re-export certificate for an Appendix-I, -II, or -III specimen.

(b) *U.S. application forms.* Complete the appropriate form for the proposed activity and submit it to the U.S. Management Authority. Form 3–200–73 may also be submitted to Law Enforcement at certain ports or regional offices:

| Type of application for a re-export certificate | Form no. |
|---|---|
| (1) CITES: | |
| Biological Specimens | 3–200–29 |
| Plants | 3–200–32 |
| Single-use Permits under a Master File or an Annual Program File | 3–200–74 |
| Trophies by Taxidermists | 3–200–28 |
| Wildlife | 3–200–73 |
| (2) Endangered Species Act and CITES: | |
| ESA Plants | 3–200–36 |
| ESA Wildlife | 3–200–37 |
| (3) Marine Mammal Protection Act and CITES: | |
| Biological Samples | 3–200–29 |
| Live Captive-held Marine Mammals | 3–200–53 |

183

(c) *Criteria.* The criteria in this paragraph (c) apply to the issuance and acceptance of U.S. and foreign re-export certificates. When applying for a U.S.

certificate, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

| Criteria for a re-export certificate | Appendix of the specimen | | | Section |
|---|---|---|---|---|
| | I | II | III | |
| (1) The wildlife or plant was legally acquired. | Yes | Yes | Yes | 23.60 |
| (2) The scientific name of the species is the standard nomenclature in the CITES Appendices or the references adopted by the CoP. | Yes | Yes | Yes | 23.23 |
| (3) For a live specimen, an import permit has already been issued or the Management Authority of the importing country has confirmed that it will be issued. This criterion does not apply to a specimen with the source code "D." | Yes | n/a | n/a | 23.35 |
| (4) Live wildlife or plants will be prepared and shipped so as to minimize risk of injury, damage to health, or cruel treatment of the specimen. | Yes | Yes | Yes | 23.23 |
| (5) For re-export of a confiscated specimen, the proposed re-export would not be detrimental to the survival of the species. | Yes | Yes | n/a | 23.61 |
| (6) For wildlife with the source code "W" or "F," the re-export is for noncommercial purposes. | Yes | n/a | n/a | – |

## § 23.38 What are the requirements for a certificate of origin?

(a) *Purpose.* Article V(3) of the Treaty requires that a shipment of Appendix-III specimens be accompanied by a certificate of origin when the shipment is not from a country that listed the species in Appendix III and is not a re-export.

(b) *U.S. application forms.* For a certificate of origin, complete one of the following forms and submit it to the U.S. Management Authority:

(1) Form 3–200–27 for wildlife removed from the wild.

(2) Form 3–200–24 for captive-born wildlife.

(3) Form 3–200–32 for plants.

(c) *Criteria.* The criteria in this paragraph (c) apply to the issuance and acceptance of U.S. and foreign certificates of origin. When applying for a U.S. certificate, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

(1) The specimen originated in the country of export, which is not a country that listed the species in Appendix III. In the case of a listing that is annotated to cover only a certain population, no CITES document is required

if the listed population does not occur in the country of export. For U.S. applicants, the country of origin must be the United States.

(2) The scientific name of the species is the standard nomenclature in the CITES Appendices or the references adopted by the CoP (see § 23.23).

(3) Live wildlife or plants will be prepared and shipped so as to minimize risk of injury, damage to health, or cruel treatment of the specimen (see § 23.23).

## § 23.39 What are the requirements for an introduction-from-the-sea certificate?

(a) *Purpose.* Articles III(5), IV(6), and IV(7) of the Treaty set out the conditions under which a Management Authority may issue an introduction-from-the-sea certificate.

(b) *U.S. application form.* Complete Form 3–200–31 and submit it to the U.S. Management Authority.

(c) *Criteria.* The criteria in this paragraph (c) apply to the issuance and acceptance of U.S. certificates. You must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

| Criteria for an introduction-from-the-sea certificate | Appendix of the specimen | | Section |
|---|---|---|---|
| | I | II | |
| (1) The specimen was taken in the marine environment not under the jurisdiction of any country. | Yes | Yes | – |
| (2) The proposed introduction from the sea would not be detrimental to the survival of the species. | Yes | Yes | 23.61 |
| (3) The specimen will not be used for primarily commercial purposes. | Yes | n/a | 23.62 |
| (4) The recipients are suitably equipped to house and care for live wildlife or plants. | Yes | n/a | 23.65 |
| (5) The scientific name of the species is the standard nomenclature in the CITES Appendices or the references adopted by the CoP. | Yes | Yes | 23.23 |
| (6) Live wildlife or plants will be prepared and shipped so as to minimize risk of injury, damage to health, or cruel treatment of the specimen. | Yes | Yes | 23.23 |

(d) *Exemption.* As allowed under Article XIV(4) and (5) of the Treaty, you may directly introduce into the United States any Appendix-II wildlife or plant taken in the marine environment that is not under the jurisdiction of any country without a CITES document when all of the following conditions are met:

(1) The United States is a party to an international treaty, convention, or agreement that affords protection to the species and was in force on July 1, 1975.

(2) The ship that harvested the specimen is registered in the United States.

(3) The specimen was taken in accordance with the other international treaty, convention, or agreement, including any quotas.

(4) The shipment is accompanied by any official document required under the other international treaty, convention, or agreement or otherwise required by U.S. law.

(e) *Export of exempt specimens.* To export a specimen exempted under paragraph (d) of this section, you must obtain a CITES document from the U.S. Management Authority that indicates the specimen was taken in accordance with the provisions of the other international treaty, convention, or agreement that was in force on July 1, 1975. See requirements in §23.36 (e) through (g).

(f) *Appendix III.* Appendix-III species introduced from the sea do not require introduction-from-the-sea certificates. However, the subsequent international trade of an Appendix-III specimen introduced from the sea would be considered an export requiring a CITES document (see §23.20(f)).

## §23.40 What are the requirements for a certificate for artificially propagated plants?

(a) *Purpose.* Article VII(5) of the Treaty grants an exemption to plants that are artificially propagated when a Management Authority issues a certificate.

(b) *U.S. and foreign general provisions.* The following provisions apply to the issuance and acceptance of a certificate for artificially propagated Appendix-I, -II, or -III plants:

(1) The certificate for artificially propagated plants and any subsequent re-export certificate must show the source code as "A" for artificially propagated.

(2) For an Appendix-I specimen that satisfies the requirements of this section, no CITES import permit is required.

(c) *U.S. application form.* Complete Form 3–200–33 and submit it to the U.S. Management Authority.

(d) *Criteria.* The criteria in this paragraph (d) apply to the issuance and acceptance of U.S. and foreign certificates. When applying for a U.S. certificate, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

185

| Criteria for a certificate for artificially propagated plants | Appendix of the specimen | | | Section |
|---|---|---|---|---|
| | I | II | III | |
| (1) The plant was artificially propagated. | Yes | Yes | Yes | 23.64 |
| (2) The plant specimen is one of the following:<br>(i) Was propagated for noncommercial purposes.<br>(ii) Is part of a traveling exhibition.<br>(iii) Is a hybrid of one or more Appendix-I species or taxa that is not annotated to include hybrids in the listing and was propagated for commercial or non-commercial purposes. | Yes | n/a | n/a | |
| (3) The scientific name of the species is the standard nomenclature in the CITES Appendices or the references adopted by the CoP. | Yes | Yes | Yes | 23.23 |
| (4) The live plant will be prepared and shipped so as to minimize risk of injury, damage to health, or cruel treatment of the specimen. | Yes | Yes | Yes | 23.23 |

(e) *U.S. standard conditions.* In addition to the conditions in § 23.56, you must meet all of the following conditions:

(1) You may not export or re-export a plant (including its parts, products, or derivatives) under this certificate if the plant was removed from the wild or grown directly from a wild seed, except for plants grown from exempt plant materials that qualify as artificially propagated.

(2) You may not export an Appendix-I species that was propagated for commercial purposes under this certificate, except for hybrids of one or more Appendix-I species or taxa that are not annotated to include hybrids in the listing.

(3) You may export a native plant under this certificate only when specifically approved for export and listed on the certificate, inventory sheet, or an approved species list.

(4) You may export a specimen under a higher-taxon name only if you identified the taxon in your application and we approved it on this certificate.

### § 23.41  What are the requirements for a bred-in-captivity certificate?

(a) *Purpose.* Article VII(5) of the Treaty grants an exemption to wildlife that is bred in captivity when a Management Authority issues a certificate.

(b) *U.S. and foreign general provisions.* The following provisions apply to the issuance and acceptance of a certificate for Appendix-I, -II, or -III wildlife that was bred in captivity:

(1) The certificate and any subsequent re-export certificate must show the source code as ''C'' for bred in captivity.

(2) For an Appendix-I specimen that satisfies the requirements of this section, no CITES import permit is required.

(c) *U.S. application form.* Complete Form 3–200–24 and submit it to the U.S. Management Authority.

(d) *Criteria.* The criteria in this paragraph (d) apply to the issuance and acceptance of U.S. and foreign certificates. When applying for a U.S. certificate, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

| Criteria for a bred-in-captivity certificate | Appendix of the specimen | | | Section |
|---|---|---|---|---|
| | I | II | III | |
| (1) The wildlife was bred in captivity. | Yes | Yes | Yes | 23.63 |

| Criteria for a bred-in-captivity certificate | Appendix of the specimen | | | Sec-tion |
|---|---|---|---|---|
| | I | II | III | |
| (2) The wildlife specimen was bred for noncommercial purposes or is part of a traveling exhibition. | Yes | n/a | n/a | 23.5 |
| (3) The scientific name of the species is the standard nomenclature in the CITES Appendices or the references adopted by the CoP. | Yes | Yes | Yes | 23.23 |
| (4) Live wildlife will be prepared and shipped so as to minimize risk of injury, damage to health, or cruel treatment of the specimen. | Yes | Yes | Yes | 23.23 |

## §23.42 What are the requirements for a plant hybrid?

*General provisions.* Except as provided in §23.92, the export, re-export, or im-port of a plant hybrid of a CITES spe-cies must be accompanied by a valid CITES document that shows the Ap-pendix of the specimen as follows:

| Question on a plant hybrid | Answer and status of specimen |
|---|---|
| (a) Is the specimen an artificially propagated hybrid of one or more Appendix-I species or taxa? | (1) **YES**. Continue to paragraph (b) of this section. (2) **NO**. Continue to paragraph (c) of this section. |
| (b) Is one or more of the Appendix-I species or taxa in para-graph (a) of this section annotated to include hybrids? | (1) **YES**. The hybrid is listed in Appendix I. (2) **NO**. The hybrid is listed in Appendix I, but may be granted a certificate for artificially propagated plants even if propa-gated for commercial purposes. |
| (c) Is the specimen a hybrid that includes two or more CITES species or taxa in its lineage? | (1) **YES**. Consider the specimen to be listed in the more re-strictive Appendix, with Appendix I being the most restrictive and Appendix III the least. (2) **NO**. Continue to paragraph (d) of this section. |
| (d) Is the specimen a hybrid that includes one CITES species or taxon in its lineage? | (1) **YES**. Consider the specimen to be listed in the Appendix in which the species or taxon is listed in the CITES Appen-dices. (2) **NO**. The hybrid is not regulated by CITES. |

## §23.43 What are the requirements for a wildlife hybrid?

(a) *Definition.* For the purposes of this section, recent lineage means the last four generations of a specimen's ancestry (direct line of descent).

(b) *U.S. and foreign general provisions.* Except as provided in paragraph (f) of this section, the import, export, or re-export of a hybrid CITES wildlife speci-men must be accompanied by a valid CITES document.

(c) *CITES documents.* All CITES docu-ments must show the wildlife hybrid listed in the following Appendix:

| If at least one specimen in the recent lineage is listed in: | Then the specimen is listed in: |
|---|---|
| (1) Appendix I | Appendix I |
| (2) Appendix II, and an Appendix-I species is not included in the recent lineage | Appendix II |
| (3) Appendix III, and an Appendix-I or -II species is not included in the recent lineage | Appendix III |

(d) *U.S. application for wildlife hybrid.* To apply for a CITES document, com-plete the appropriate form for the pro-posed activity (see §§23.18 through 23.20) and submit it to the U.S. Man-agement Authority.

(e) *Criteria.* For export of a hybrid that contains a CITES species in its re-cent lineage, you must meet the re-quirements of §23.36.

187

Addendum 57

(f) *Exempt wildlife hybrids.* The following provisions apply to import, export, or re-export of exempt wildlife hybrids:

(1) A hybrid between a CITES species and a non-CITES species may be exempt from CITES document requirements if there are no purebred CITES species in the previous four generations of the specimen's ancestry (direct line of descent). Under this section, a hybrid between two CITES species is not exempt.

(2) For import, export, or re-export of an exempt wildlife hybrid without CITES documents, you must provide information at the time of import or export to clearly demonstrate that your specimen has no purebred CITES species in the previous four generations of its ancestry. Although a CITES document is not required, you must follow the clearance requirements for wildlife in part 14 of this subchapter, including the prior notification requirements for live wildlife.

### § 23.44 What are the requirements to travel internationally with my personally owned live wildlife?

(a) *Purpose.* A Management Authority may use the exemption in Article VII(3) of the Treaty to issue a certificate of ownership that authorizes frequent cross-border movements of personally owned live wildlife for personal use.

(b) *U.S. and foreign general provisions.* The following provisions apply to the issuance and acceptance of a certificate of ownership for frequent international travel with live wildlife for personal use:

(1) The certificate must be obtained from the Management Authority in the country of the owner's primary residence.

(2) Parties should treat the certificate like a passport for import to and export or re-export from each country and should not collect the original certificate at the border.

(3) If offspring are born or an additional specimen is acquired while the owner is outside his or her country of primary residence, the owner must obtain the appropriate CITES document for the export or re-export of the wildlife, not a certificate of ownership,

from the Management Authority of that country.

(4) Upon returning home, the owner may apply for a certificate of ownership for wildlife born or acquired overseas.

(c) *U.S. application form.* Complete Form 3–200–64 and submit it to the U.S. Management Authority.

(d) *Criteria.* The criteria in this paragraph (d) apply to the issuance and acceptance of U.S. and foreign certificates. When applying for a U.S. certificate, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

(1) The traveler owns the live wildlife and it will accompany the owner.

(2) The cross-border movement will be frequent and for personal use, including, but not limited to, companionship or use in a noncommercial competition such as falconry.

(3) To apply for a U.S. certificate, the owner resides in the United States.

(4) The wildlife was legally acquired (see § 23.60).

(5) The owner does not intend to sell, donate, or transfer the wildlife while traveling internationally.

(6) The scientific name of the species is the standard nomenclature in the CITES Appendices or the references adopted by the CoP (see § 23.23).

(7) The Management Authority of the country of import has agreed to the cross-border movement.

(8) The wildlife is securely marked or uniquely identified in such a manner that the border official can verify that the specimen and CITES document correspond.

(9) The wildlife is transported and cared for in a way that minimizes risk of injury, damage to health, or cruel treatment of the specimen (see § 23.23).

(e) *U.S. standard conditions.* In addition to the conditions in § 23.56, all of the following conditions must be met:

(1) You must accompany the wildlife during any cross-border movement.

(2) You must transport the wildlife for personal use only.

(3) You must not sell, donate, or transfer the specimen while traveling internationally.

188

(4) You must present the certificate to the official for validation at each border crossing.

(5) If the certificate is lost, stolen, or accidentally destroyed, you must obtain a replacement certificate from the issuing Management Authority.

(6) If you no longer own the live wildlife, you must immediately return the original document to the issuing Management Authority and report on the disposition of the wildlife, such as death, sale, or transfer.

### §23.45 What are the requirements for a pre-Convention specimen?

(a) *Purpose.* Article VII(2) of the Treaty exempts a pre-Convention specimen from standard permitting requirements in Articles III, IV, and V of the Treaty when the exporting or re-exporting country is satisfied that the specimen was acquired before the provisions of CITES applied to it and issues a CITES document to that effect.

(b) *U.S. and foreign general provisions.* The following general provisions apply to the issuance and acceptance of pre-Convention documents:

(1) Trade in a specimen under the pre-Convention exemption is allowed only if the importing country will accept a pre-Convention certificate.

(2) The pre-Convention date is the date the species was first listed under CITES regardless of whether the species has subsequently been transferred from one Appendix to another.

(3) For a pre-Convention Appendix-I specimen, no CITES import permit is required.

(4) The pre-Convention exemption does not apply to offspring or cell lines of any wildlife or plant born or propagated after the date the species was first listed under CITES.

(c) *U.S. application form.* Complete Form 3–200–23 (wildlife) or Form 3–200–32 (plants) and submit it to the U.S. Management Authority.

(d) *Criteria.* The criteria in this paragraph (d) apply to the issuance and acceptance of U.S. and foreign certificates. When applying for a U.S. certificate, you must provide sufficient information for us to find that the specimen meets all of the following criteria:

(1) The specimen was removed from the wild or born or propagated in a controlled environment before the date CITES first applied to it, or is a product (including a manufactured item) or derivative made from such specimen.

(2) The scientific name of the species is the standard nomenclature in the CITES Appendices or the references adopted by the CoP (see §23.23).

(3) Live wildlife or plants will be prepared and shipped so as to minimize risk of injury, damage to health, or cruel treatment of the specimen.

(4) For the re-export of a pre-Convention specimen previously imported under a CITES document, the wildlife or plant was legally imported.

### §23.46 What are the requirements for registering a commercial breeding operation for Appendix-I wildlife and commercially exporting specimens?

(a) *Purpose.* Article VII(4) of the Treaty provides that Appendix-I specimens that are bred in captivity for commercial purposes shall be deemed to be listed in Appendix II. This means that an Appendix-I specimen originating from a commercial breeding operation that is registered with the CITES Secretariat may be traded under an export permit or re-export certificate based on Appendix-II criteria. The specimen is still listed in Appendix I and is not eligible for any exemption granted to an Appendix-II species or taxon, including any exemption granted by an annotation (see §23.92).

(b) *U.S. and foreign general provisions.* The following provisions apply to the registration of U.S. and foreign commercial breeding operations for Appendix-I wildlife:

(1) If the Management Authority is satisfied that the operation in its country meets the conditions for registration in paragraph (d) of this section, it will send the request to register a breeding operation to the Secretariat.

(2) The Secretariat will verify that the application is complete and notify the Parties of the request.

(3) If any Party objects to or expresses concern about the registration within 90 days from the date of the Secretariat's notification, the Secretariat will refer the application to the

189

Animals Committee. The Committee has 60 days to respond to objections. The Secretariat will provide the recommendations of the Committee to the Management Authority of the Party that submitted the application and the Party that objected to the registration, and will facilitate a dialogue for resolution of the identified problems within 60 days.

(4) If the objection is not withdrawn or the identified problems are not resolved, approval of the registration will require a two-thirds majority vote by the Parties at the next CoP or by a postal vote.

(5) If other operations have already been registered for the species, the Secretariat may send the request to appropriate experts for advice only if significant new information is available or if there are other reasons for concern.

(6) If the Secretariat is not satisfied that the operation meets the conditions for registration, it will provide the Management Authority that submitted the registration request with a full explanation of the reasons for rejection and indicate the specific conditions that must be met before the registration can be resubmitted for further consideration.

(7) When the Secretariat is satisfied that the operation meets the registration requirements, it will include the operation in its register.

(8) Operations are assigned an identification number and listed in the official register. Registration is not final until the Secretariat notifies all Parties.

(9) If a Party believes that a registered operation does not meet the bred-in-captivity requirements, it may, after consultation with the Secretariat and the Party concerned, propose that

the CoP delete the operation from the register by a two-thirds vote of the Parties. Once an operation has been deleted, it must re-apply and meet the registration requirements to be reinstated.

(10) The Management Authority, in collaboration with the Scientific Authority, of a country where any registered operation is located must monitor the operation to ensure that it continues to meet the registration requirements. The Management Authority will advise the Secretariat of any major change in the nature of the operation or in the types of products being produced for export, and the Animals Committee will review the operation to determine whether it should remain registered.

(11) A Party may unilaterally request the removal of a registered operation within its jurisdiction by notifying the Secretariat.

(12) An Appendix-I specimen may not be imported for purposes of establishing or augmenting a commercial breeding operation, unless the specimen is pre-Convention (see § 23.45) or was bred at a commercial breeding operation that is registered with the CITES Secretariat as provided in this section.

(c) *U.S. application to register*. Complete Form 3–200–65 and submit it to the U.S. Management Authority.

(d) *Criteria*. The criteria in this paragraph (d) apply to the registration of U.S. and foreign commercial breeding operations for Appendix-I wildlife. For your breeding operation to be registered in the United States, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

| Criteria for registering a commercial breeding operation for Appendix-I wildlife | Section |
|---|---|
| (1) The operation breeds wildlife for commercial purposes. | 23.5 |
| (2) The parental stock was legally acquired. | 23.60 |
| (3) The wildlife meets bred-in-captivity criteria. | 23.63 |
| (4) Where the establishment of a breeding operation involves the removal of animals from the wild (allowable only under exceptional circumstances and only for native species), the operation must demonstrate to the satisfaction of the Management Authority, on advice of the Scientific Authority and of the Secretariat, that the removal is or was not detrimental to the conservation of the species. | – |
| (5) The potential escape of specimens or pathogens from the facility does not pose a risk to the ecosystem and native species. | – |

Addendum 60

| Criteria for registering a commercial breeding operation for Appendix-I wildlife | Section |
|---|---|
| (6) The scientific name of the species is the standard nomenclature in the CITES Appendices or the references adopted by the CoP. | 23.23 |
| (7) The breeding operation will make a continuing, meaningful contribution to the conservation of the species according to the conservation needs of the species. | – |
| (8) The operation will be carried out at all stages in a humane (non-cruel) manner. | – |

(e) *Standard conditions of the registration.* In addition to the conditions in §23.56, you must meet all of the following conditions:

(1) You must uniquely mark all specimens from the breeding operation in the manner proposed at the time of registration. Birds may be marked with closed bands, although other methods may be used.

(2) You may not import Appendix-I specimens for primarily commercial purposes (such as to establish a commercial captive-breeding operation) except from breeding operations registered for that species.

(3) You must provide information to the Management Authority each year on the year's production and your current breeding stock. You may provide the information by mail, fax, or e-mail.

(4) You must allow our agents to enter the premises at any reasonable hour to inspect wildlife held or to inspect, audit, or copy applicable records.

(f) *U.S. and foreign general provisions for export of specimens that originated in a registered breeding operation.* The following provisions apply to the issuance and acceptance of export permits for Appendix-I specimens bred at an operation registered with the CITES Secretariat:

(1) An export permit may be issued to the registered operation or to persons who have purchased a specimen that originated at the registered operation if the specimen has the unique mark applied by the operation. If a microchip is used, we may, if necessary, ask the importer, exporter, or re-exporter to have equipment on hand to read the microchip at the time of import, export, or re-export.

(2) The export permit, and any subsequent re-export certificate, must show the specimen as listed in Appendix I and the source code as "D," and give the identification number of the registered breeding operation where the specimen originated.

(3) No CITES import permit is required for a qualifying specimen.

(g) *U.S. application form.* Complete Form 3–200–24 and submit it to the U.S. Management Authority.

(h) *Criteria.* The criteria in this paragraph (h) apply to the issuance and acceptance of U.S. and foreign export permits. When applying for a U.S. permit, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

| Criteria for an export permit | Section |
|---|---|
| (1) The specimen was bred at a commercial operation for Appendix-I wildlife that is registered with the CITES Secretariat. | 23.46 |
| (2) The proposed export would not be detrimental to the survival of the species. | 23.61 |
| (3) Live wildlife will be prepared and shipped so as to minimize risk of injury, damage to health, or cruel treatment of the specimen. | 23.23 |

## §23.47 What are the requirements for export of an Appendix-I plant artificially propagated for commercial purposes?

(a) *Purpose.* Article VII(4) of the Treaty provides that Appendix-I plants artificially propagated for commercial purposes shall be deemed to be listed in Appendix II. This means that an Appendix-I specimen originating from a commercial nursery that is registered with the CITES Secretariat or that

191

meets the requirements of this section may be traded under an export permit or re-export certificate based on Appendix-II criteria. The specimen is still listed in Appendix I and is not eligible for any exemption granted to an Appendix-II species or taxon, including any exemption granted by an annotation.

(b) *U.S. and foreign general provisions.* The following provisions apply to the issuance and acceptance of export permits for Appendix-I specimens artificially propagated for commercial purposes:

(1) An Appendix-I specimen may not be imported for purposes of establishing or augmenting a nursery or commercial propagating operation, unless the specimen is pre-Convention (see § 23.45) or was propagated at a nursery that is registered with the CITES Secretariat or a commercial propagating operation that qualifies under paragraph (d) of this section, and the CITES document indicates the source code as ''D.''

(2) An export permit may be issued to a CITES-registered nursery, to a commercial propagating operation that qualifies under paragraph (d) of this section, or to persons who have acquired a specimen that originated at such a nursery or operation. No CITES import permit is required for a qualifying specimen.

(3) The export permit, and any subsequent re-export certificate, must show the specimen as listed in Appendix I and the source code as ''D,'' and if from a nursery registered with the Secretariat, give the identification number of the registered nursery where the specimen originated.

(c) *U.S. application form.* Complete Form 3–200–33 or Form 3–200–74 (for additional single-use permits under a master file or an annual export program file). Complete Form 3–200–32 for one-time export. Submit the completed form to the U.S. Management Authority.

(d) *Criteria.* The criteria in this paragraph (d) apply to the issuance and acceptance of U.S. and foreign export permits. When applying for a U.S. permit, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

| Criteria for an export permit | Section |
|---|---|
| (1) The specimen was propagated for commercial purposes. | 23.5 |
| (2) The parental stock was legally acquired. | 23.60 |
| (3) The proposed export would not be detrimental to the survival of the species. | 23.61 |
| (4) The plant was artificially propagated. | 23.64 |
| (5) The scientific name of the species is the standard nomenclature in the CITES Appendices or the references adopted by the CoP. | 23.23 |
| (6) The live plant will be prepared and shipped so as to minimize risk of injury, damage to health, or cruel treatment of the specimen. | 23.23 |

(e) *Nursery registration.* [Reserved]

## § 23.48 What are the requirements for a registered scientific institution?

(a) *Purpose.* Article VII(6) of the Treaty grants an exemption that allows international trade in certain specimens for noncommercial loan, donation, or exchange between registered scientific institutions.

(b) *U.S. and foreign general provisions.* The following provisions apply to the registration of scientific institutions and acceptance of shipments from registered scientific institutions:

(1) The receiving and sending scientific institutions must be registered with the Management Authority in their country. Scientists who wish to use this exemption must be affiliated with a registered scientific institution.

(i) When a Management Authority is satisfied that a scientific institution has met the criteria for registration, it

will assign the institution a five-character code consisting of the ISO country code and a unique three-digit number. In the case of a non-Party, the Secretariat will ensure that the institution meets the standards and assign it a unique code.

(ii) The Management Authority must communicate the name, address, and assigned code to the Secretariat, which maintains a register of scientific institutions and provides that information to all Parties.

(2) A registered scientific institution does not need separate CITES documents for the noncommercial loan, donation, or exchange of preserved, frozen, dried, or embedded museum specimens, herbarium specimens, or live plant material with another registered institution. The shipment must have an external label that contains information specified in paragraph (e)(5) of this section.

(c) *U.S. application to register as a scientific institution.* To register, complete Form 3–200–39 and submit it to the U.S. Management Authority.

(d) *Criteria.* The criteria in this paragraph (d) apply to the registration of U.S. and foreign institutions for scientific exchange. To be issued a certificate of scientific exchange as a registered U.S. scientific institution, you must provide sufficient information for us to find that your institution meets all of the following criteria:

(1) Collections of wildlife or plant specimens are permanently housed and professionally curated, and corresponding records are kept.

(2) Specimens are accessible to all qualified users, including those from other institutions.

(3) Specimens are properly accessioned in a permanent catalog.

(4) Records are permanently maintained for loans and transfers to and from other institutions.

(5) Specimens are acquired primarily for research that is to be reported in scientific publications, and CITES specimens are not used for commercial purposes or as decorations.

(6) Collections are prepared and arranged in a way that ensures their accessibility to researchers.

(7) Specimen labels, permanent catalogs, and other records are accurate.

(8) Specimens are legally acquired and lawfully possessed under a country's wildlife and plant laws.

(9) Appendix-I specimens are permanently and centrally housed under the direct control of the institution.

(e) *U.S. standard conditions.* In addition to the conditions in § 23.56, any activity conducted under a certificate of scientific exchange must meet all of the following conditions:

(1) Both scientific institutions involved in the exchange must be registered by the applicable Management Authorities (or the Secretariat in the case of a non-Party), and be included in the Secretariat's register of scientific institutions.

(2) An institution may send and receive only preserved, frozen, dried, or embedded museum specimens, herbarium specimens, or live plant materials that have been permanently and accurately recorded by one of the institutions involved in the exchange and that are traded as a noncommercial loan, donation, or exchange.

(3) An institution may use specimens acquired under a certificate of scientific exchange and their offspring only for scientific research or educational display at a scientific institution and may not use specimens for commercial purposes.

(4) The institution must keep records to show that the specimens were legally acquired.

(5) A customs declaration label must be affixed to the outside of each shipping container or package that contains all of the following:

(i) The acronym ''CITES.''

(ii) A description of the contents (such as ''herbarium specimens'').

(iii) The names and addresses of the sending and receiving registered institutions.

(iv) The signature of a responsible officer of the sending registered scientific institution.

(v) The scientific institution codes of both registered scientific institutions involved in the loan, donation, or exchange.

(6) A registered institution may destroy samples during analysis, provided that a portion of the sample is maintained and permanently recorded at a

registered scientific institution for future scientific reference.

**§ 23.49 What are the requirements for an exhibition traveling internationally?**

(a) *Purpose.* Article VII(7) of the Treaty grants an exemption for specimens that qualify as bred in captivity, artificially propagated, or pre-Convention and are part of a traveling exhibition.

(b) *U.S. and foreign general provisions.* The following general provisions apply to the issuance and acceptance of a certificate for live wildlife and plants, or their parts, products, or derivatives in an exhibition that travels internationally:

(1) The Management Authority in the country of the exhibitor's primary place of business must have determined that the specimens are bred in captivity, artificially propagated, or pre-Convention and issued a traveling-exhibition certificate.

(2) The certificate must indicate that the wildlife or plant is part of a traveling exhibition.

(3) A separate certificate must be issued for each live wildlife specimen; a CITES document may be issued for more than one specimen for a traveling exhibition of live plants and dead parts, products, or derivatives of wildlife and plants.

(4) The certificate is not transferable.

(5) Parties should treat the certificate like a passport for import and export or re-export from each country, and should not collect the original certificate at the border.

(6) Parties should check specimens closely to determine that each specimen matches the certificate and ensure that each live specimen is being transported and cared for in a manner that minimizes the risk of injury, damage to health, or cruel treatment of the specimen.

(7) If offspring are born or a new specimen is acquired while the traveling exhibition is in another country, the exhibitor must obtain the appropriate CITES document for the export or re-export of the specimen from the Management Authority of that country.

(8) Upon returning home, the exhibitor may apply for a traveling-exhibition certificate for wildlife born overseas or for wildlife or plants acquired overseas.

(c) *U.S. application form.* Complete Form 3–200–30 for wildlife and Form 3–200–32 for plants, and submit it to the U.S. Management Authority.

(d) *Criteria.* The criteria in this paragraph (d) apply to the issuance and acceptance of U.S. and foreign certificates. When applying for a U.S. certificate, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

(1) The traveling exhibition makes multiple cross-border movements, and will return to the country in which the exhibition is based before the certificate expires.

(2) The cross-border movement must be for exhibition, and not for breeding, propagating, or activities other than exhibition.

(3) The traveling exhibition is based in the country that issued the certificate.

(4) The specimen meets the criteria for a bred-in-captivity certificate, certificate for artificially propagated plants, or pre-Convention certificate.

(5) The exhibitor does not intend to sell or otherwise transfer the wildlife or plant while traveling internationally.

(6) The wildlife or plant is securely marked or identified in such a way that border officials can verify that the certificate and specimen correspond. If a microchip is used, we may, if necessary, ask the importer, exporter, or re-exporter to have equipment on hand to read the microchip at the time of import, export, or re-export.

(e) *U.S. standard conditions.* In addition to the conditions in § 23.56, you must meet all of the following conditions:

(1) The certificate may be used by you, and you must not transfer or assign it to another person or traveling exhibition.

(2) You must transport the specimen internationally only for exhibition, not for breeding, propagating, or activities other than exhibition.

(3) You must present the certificate to the official for validation at each border crossing.

194

(4) For live plants, the quantity of plants must be reasonable for the purpose of the traveling exhibition.

(5) You must not sell or otherwise transfer the specimen, or any offspring born to such specimen, while traveling internationally.

(6) If the certificate is lost, stolen, or accidentally destroyed, you may obtain a replacement certificate only from the U.S. Management Authority.

(7) If you no longer own the wildlife or plants, or no longer plan to travel as a traveling exhibition, the original certificate must be immediately returned to the U.S. Management Authority.

(8) You must return the traveling exhibition to the United States before the certificate expires.

### § 23.50 What are the requirements for a sample collection covered by an ATA carnet?

(a) *Purpose.* Article VII(1) of the Treaty allows for the transit of specimens through or within a Party country while the specimens remain under customs control.

(b) *Definition.* For purposes of this section, *sample collection* means a set of legally acquired parts, products, or derivatives of Appendix-II or -III species, or Appendix-I species bred in captivity or artificially propagated for commercial purposes, that will:

(1) Cross international borders only for temporary exhibition or display purposes and return to the originating country.

(2) Be accompanied by a valid ATA carnet and remain under customs control.

(3) Not be sold or otherwise transferred while traveling internationally.

(c) *U.S. and foreign general provisions.* The following general provisions apply to the issuance and acceptance of a CITES document for the movement of sample collections:

(1) The Management Authority in the country where the sample collection originated must issue a CITES document that:

(i) Clearly specifies that the document was issued for a "sample collection."

(ii) Includes the condition in block 5, or an equivalent place, of the document that it is valid only if the shipment is accompanied by a valid ATA carnet and that the specimens must not be sold, donated, or otherwise transferred while outside the originating country.

(2) The number of the accompanying ATA carnet must be recorded on the CITES document, and if this number is not recorded by the Management Authority, it must be entered by a customs or other CITES enforcement official responsible for the original endorsement of the CITES document.

(3) The name and address of the exporter or re-exporter and importer must be identical, and the names of the countries to be visited must be indicated in block 5 or an equivalent place.

(4) The date of validity must not be later than that of the ATA carnet and the period of validity must not exceed 6 months from the date of issuance.

(5) At each border crossing, Parties must verify the presence of the CITES document, but allow it to remain with the shipment, and ensure that the ATA carnet is properly endorsed with an authorized stamp and signature by a customs official.

(6) The exporter or re-exporter must return the sample collection to the originating country prior to the expiration of the CITES document.

(7) Parties should check the CITES document and sample collection closely at the time of first export or re-export and upon its return to ensure that the contents of the sample collection have not been changed.

(8) For import into and export or re-export from the United States, the shipment must comply with the requirements for wildlife in part 14 of this subchapter and for plants in part 24 of this subchapter and 7 CFR parts 319, 352, and 355.

(d) *U.S. application form.* Complete Form 3–200–29 for wildlife and Form 3–200–32 for plants, and submit it to the U.S. Management Authority.

(e) *Criteria.* The criteria in this paragraph (e) apply to the issuance and acceptance of U.S. and foreign documents. When applying for a U.S. document, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

(1) The specimens meet the definition of a sample collection as provided in paragraph (b) of this section.

(2) The wildlife or plant specimens must be securely marked or identified in such a way that border officials can verify that the CITES document, ATA carnet, and specimens correspond.

(f) *U.S. standard conditions.* In addition to the conditions in § 23.56, you must meet all of the following conditions:

(1) You must transport the sample collection only for temporary exhibition or display purposes.

(2) You must not transfer or assign the CITES document to another person.

(3) You must not sell, donate, or transfer specimens while traveling internationally.

(4) You must present the CITES document and the ATA carnet to the official for validation at each border crossing.

(5) You must return the sample collection to the United States prior to the expiration of the CITES document.

(6) If the CITES document is lost, stolen, or accidentally destroyed, you may obtain a replacement certificate only from the U.S. Management Authority.

(7) If you no longer own the sample collection, or no longer plan to travel with the sample collection, you must immediately return the original document to the U.S. Management Authority.

### § 23.51 What are the requirements for issuing a partially completed CITES document?

(a) *Purpose.* Under Article VIII(3), Parties are to ensure that CITES specimens are traded with a minimum of delay.

(b) *U.S. and foreign general provisions.* The following provisions apply to the issuance and acceptance of partially completed CITES documents.

(1) A Management Authority may issue partially completed CITES documents only when:

(i) The permitted trade will have a negligible impact or no impact on the conservation of the species.

(ii) All provisions of CITES have been met.

(iii) The specimens are one of the following:

(A) Biological samples.

(B) Pre-Convention specimens.

(C) Specimens that qualify as bred in captivity or artificially propagated.

(D) Appendix-I specimens from registered commercial breeding operations.

(E) Appendix-I plants artificially propagated for commercial purposes.

(F) Other specimens that the Management Authority determines qualify for partially completed documents.

(2) A Management Authority may register applicants for species that may be traded under partially completed documents.

(3) Partially completed CITES documents require the permit holder to:

(i) Enter specific information on the CITES document or its annex as conditioned on the face of the CITES document.

(ii) Enter scientific names on the CITES document only if the Management Authority included an inventory of approved species on the face of the CITES document or an attached annex.

(iii) Sign the CITES document, which acts as a certification that the information entered is true and accurate.

(4) CITES documents issued for biological samples may be validated at the time of issuance provided that upon export the container is labeled with the CITES document number and indicates it contains CITES biological samples.

(c) *U.S. application form.* Complete the appropriate form for the proposed activity (see §§ 23.18 through 23.20) and submit it to the U.S. Management Authority.

(d) *Criteria.* The criteria in this paragraph (d) apply to the issuance and acceptance of U.S. and foreign CITES documents. When applying for a U.S. CITES document, you must provide sufficient information for us to find that your proposed activity meets the criteria in subpart C for the appropriate CITES document and the following criteria:

(1) The use of partially completed documents benefits both the permit holder and the issuing Management Authority.

(2) The proposed activity will have a negligible impact or no impact upon the conservation of the species.

(e) *U.S. standard conditions.* In addition to the conditions in § 23.56 and any standard conditions in this part that apply to the specific CITES document, the following conditions must be met:

(1) You must enter the information specified in block 5, either on the face of the CITES document or in an annex to the document.

(2) You may not alter or enter any information on the face of the CITES document or in an annex to the document that is not authorized in block 5 or an equivalent place.

(3) If you are authorized to enter a scientific name, it must be for a species authorized in block 5 or an equivalent place, or in an attached annex of the CITES document.

(4) You must sign the CITES document to certify that all information entered by you is true and correct.

### § 23.52  What are the requirements for replacing a lost, damaged, stolen, or accidentally destroyed CITES document?

(a) *Purpose.* A Management Authority may issue a duplicate document, either a copy of the original or a reissued original, when a CITES document has been lost, damaged, stolen, or accidentally destroyed. These provisions do not apply to a document that has expired or that requires amendment. To amend or renew a CITES document, see part 13 of this subchapter.

(b) *U.S. and foreign general provisions.* The following provisions apply to the issuance and acceptance of a replacement CITES document:

(1) The permittee must notify the issuing Management Authority that the document was lost, damaged, stolen, or accidentally destroyed.

(2) The issuing Management Authority must be satisfied that the CITES document was lost, damaged, stolen, or accidentally destroyed.

(3) The issuing Management Authority should immediately inform the Management Authority in the country of destination and, for commercial shipments, the Secretariat.

(4) If the replacement CITES document is a copy, it must indicate that it is a "replacement" and a "true copy of the original," contain a new dated original signature of a person authorized to sign CITES documents for the issuing Management Authority, and give the reason for replacement.

(5) If the replacement CITES document is a newly issued original document, it must indicate that it is a "replacement," include the number and date of issuance of the document being replaced, and give the reason for replacement.

(c) *U.S. application procedures.* To apply for a replacement CITES document, you must do all of the following:

(1) Complete application Form 3–200–66 and submit it to the U.S. Management Authority.

(2) Consult the list to find the types of information you need to provide (more than one circumstance may apply to you):

| If | Then |
|---|---|
| (i) The shipment has already occurred | Provide copies of:<br>(A) Any correspondence you have had with the shipper or importing country's Management Authority concerning the shipment.<br>(B) For wildlife, the validated CITES document and cleared Declaration for Importation or Exportation of Fish or Wildlife (Form 3–177).<br>(C) For plants, the validated CITES document. |
| (ii) The original CITES document no longer exists | Submit a signed, dated, and notarized statement that:<br>(A) Provides the CITES document number and describes the circumstances that resulted in the loss or destruction of the original CITES document.<br>(B) States whether the shipment has already occurred.<br>(C) Requests a replacement U.S. CITES document. |
| (iii) An original CITES document exists but has been damaged | Submit the original damaged CITES document and a signed, dated, and notarized statement that:<br>(A) Describes the circumstances that resulted in the CITES document being damaged.<br>(B) States whether the shipment has already occurred.<br>(C) Requests a replacement U.S. CITES document. |

(d) *Criteria.* The criteria in this paragraph (d) apply to the issuance and acceptance of U.S and foreign documents. When applying for a U.S. replacement document, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

(1) The circumstances for the lost, damaged, stolen, or accidentally destroyed CITES document are reasonable.

(2) If the shipment has already been made, the wildlife or plant was legally exported or re-exported, and the Management Authority of the importing country has indicated it will accept the replacement CITES document.

(e) *U.S. standard conditions.* In addition to the conditions in § 23.56, the following conditions apply:

(1) If the original CITES document is found, you must return it to the U.S. Management Authority.

(2) A CITES document issued for a shipment that has already occurred does not require validation.

(f) *Validation.* For an export or re-export that has not left the United States, follow the procedures in § 23.27. If the shipment has left the United States and is in a foreign country, submit the unvalidated replacement CITES document to the appropriate foreign authorities. We will not validate the replacement CITES document for a shipment that has already been shipped to a foreign country. We do not require validation on replacement documents issued by foreign Management Authorities.

## § 23.53 What are the requirements for obtaining a retrospective CITES document?

(a) *Purpose.* Retrospective CITES documents may be issued and accepted in certain limited situations to authorize an export or re-export after that activity has occurred, but before the shipment is cleared for import.

(b) *U.S. and foreign general provisions.* The following provisions apply to the issuance and acceptance of a retrospective CITES document:

(1) A retrospective document may not be issued for Appendix-I specimens except for certain specimens for personal use as specified in paragraph (d)(7) of this section.

(2) The exporter or re-exporter must notify the Management Authority in the exporting or re-exporting country of the irregularities that have occurred.

(3) A retrospective document may be one of the following:

(i) An amended CITES document where it can be shown that the issuing Management Authority made a technical error that was not prompted by the applicant.

(ii) A newly issued CITES document where it can be shown that the applicant was misinformed by CITES officials or the circumstances in (d)(7) of this section apply and a shipment has occurred without a document.

(4) Retrospective documents can only be issued after consultation between the Management Authorities in both the exporting or re-exporting country and the importing country, including a thorough investigation of circumstances and agreement between them that criteria in paragraph (d) of this section have been met.

(5) The issuing Management Authority must provide all of the following information on any retrospective CITES document:

(i) A statement that it was issued retrospectively.

(ii) A statement specifying the reason for the issuance.

(iii) In the case of a document issued for personal use, a condition restricting sale of the specimen within 6 months following the import of the specimen.

(6) The issuing Management Authority must send a copy of the retrospective CITES document to the Secretariat.

(7) In general, except when the exporter or re-exporter and importer have demonstrated they were not responsible for the irregularities, any person who has been issued a CITES document in the past will not be eligible to receive a retrospective document.

(c) *U.S. application.* Complete application Form 3–200–58 and submit it to the U.S. Management Authority. In addition, submit one of the following:

(1) For a shipment that occurred under a document containing a technical error, the faulty CITES document.

(2) For a shipment that occurred without a CITES document, a completed application form for the type of activity you conducted (see §§ 23.18 through 23.20).

(d) *Criteria.* The criteria in this paragraph (d) apply to the issuance and acceptance of U.S. and foreign documents. When applying for a U.S. document, you must provide sufficient information for us to find that your activity meets all of the following criteria:

(1) The specimens were exported or re-exported without a CITES document or with a CITES document that contained technical errors as provided in paragraph (d)(6)(ii) of this section.

(2) The specimens were presented to the appropriate official for inspection at the time of import and a request for a retrospective CITES document was made at that time.

(3) The export or re-export and import of the specimens was otherwise in compliance with CITES and the relevant national legislation of the countries involved.

(4) The importing Management Authority has agreed to accept the retrospectively issued CITES document.

(5) The specimens must be Appendix-II or -III wildlife or plants, except as provided in paragraph (d)(7) of this section.

(6) Except as provided in paragraph (d)(7) of this section, the exporter or re-exporter and importer were not responsible for the irregularities that occurred and have demonstrated one of the following:

(i) The Management Authority or officials designated to clear CITES shipments misinformed the exporter or re-exporter or the importer about the CITES requirements. In the United States, this would be an employee of the FWS (for any species) or APHIS or CBP (for plants).

(ii) The Management Authority unintentionally made a technical error that was not prompted by information provided by the applicant when issuing the CITES document.

(7) In the case of specimens for personal use, you must either show that you qualify under paragraph (d)(6) of this section, or that a genuine error was made and that there was no attempt to deceive. The following specimens for personal use may qualify for issuance of a retrospective document:

(i) Personal or household effects.

(ii) Live Appendix-II or -III specimens or live pre-Convention Appendix-I specimens that you own for your personal use, accompanied you, and number no more than two.

(iii) Parts, products, or derivatives of an Appendix-I species that qualify as pre-Convention when the following conditions are met:

(A) You own and possess the specimen for personal use.

(B) You either wore the specimen as clothing or an accessory or took it as part of your personal baggage, which was carried by you or checked as baggage on the same plane, boat, car, or train as you.

(C) The quantity is reasonably necessary or appropriate for the nature of your trip or stay.

(e) *U.S. standard conditions.* In addition to the conditions in § 23.56, the following condition applies: A CITES document issued for a shipment that has already occurred does not require validation.

(f) *Validation.* Submit the original unvalidated retrospective CITES document to the appropriate foreign authority. We will not validate the retrospective CITES document for a shipment that has already been shipped to a foreign country, and we do not require validation on retrospective documents issued by foreign Management Authorities.

§ 23.54 **How long is a U.S. or foreign CITES document valid?**

(a) *Purpose.* Article VI(2) of the Treaty sets the time period within which an export permit is valid. Validity periods for other CITES documents are prescribed in this section.

(b) *Period of validity.* CITES documents are valid only if presented for import or introduction from the sea within the period of validity (before midnight on the expiration date) noted on the face of the document.

(1) An export permit and re-export certificate will be valid for no longer than 6 months from the issuance date.

(2) An import permit, introduction-from-the-sea certificate, and certificate of origin will be valid for no longer than 12 months from the issuance date.

(3) A traveling-exhibition certificate and certificate of ownership will be valid for no longer than 3 years from the issuance date.

(4) Other CITES documents will state the period of their validity, but no U.S. CITES document will be valid for longer than 3 years from the issuance date.

(c) *Extension of validity.* The validity of a CITES document may not be extended beyond the expiration date on the face of the document, except under limited circumstances for certain timber species as outlined in § 23.73.

## § 23.55  How may I use a CITES specimen after import into the United States?

You may use CITES specimens after import into the United States for the following purposes:

| If the species is listed in | Allowed use after import |
| --- | --- |
| (a) Appendix I, except for specimens imported with a CITES exemption document listed in paragraph (d) of this section. <br> (b) Appendix II with an annotation for noncommercial purposes where other specimens of that species are treated as if listed in Appendix I. <br> (c) Appendix II and threatened under the ESA, except as provided in a special rule in §§ 17.40 through 17.48 or under a permit granted under §§ 17.32 or 17.52. | The specimen may be used, including a transfer, donation, or exchange, only for noncommercial purposes. |
| (d) Appendix I, and imported with a CITES exemption document as follows: <br>    (1) U.S-issued certificate for personally owned wildlife. <br>    (2) Pre-Convention certificate. <br>    (3) Export permit or re-export certificate for wildlife from a registered commercial breeding operation. <br>    (4) Export permit or re-export certificate for a plant from a registered nursery or under a permit with a source code of "D." <br>    (5) U.S.-issued traveling-exhibition certificate. <br> (e) Appendix II, other than those in paragraphs (b) and (c) of this section. <br> (f) Appendix III. | The specimen may be used for any purpose, except if the regulations in this part or other parts of this subchapter or a permit condition allowed the import only for noncommercial purposes, then the import and subsequent use must be only for noncommercial purposes. |

## § 23.56  What U.S. CITES document conditions do I need to follow?

(a) *General conditions.* The following general conditions apply to all U.S. CITES documents:

(1) You must comply with the provisions of part 13 of this subchapter as conditions of the document, as well as other applicable regulations in this subchapter, including, but not limited to, any that require permits. You must comply with all applicable local, State, Federal, tribal, and foreign wildlife or plant conservation laws.

(2) For export and re-export of live wildlife and plants, transport conditions must comply with CITES'*Guidelines for transport and preparation for shipment of live wild animals and plants*or, in the case of air transport of live wildlife, with *International Air Transport Association Live Animals Regulations.*

(3) You must return the original CITES document to the issuing office if you do not use it, it expires, or you request renewal or amendment.

(4) When appropriate, a Management Authority may require that you identify Appendix-II and -III wildlife or plants with a mark. All live Appendix-I wildlife must be securely marked or uniquely identified. Such mark or identification must be made in a way that the border official can verify that the specimen and CITES document correspond. If a microchip is used, we may, if necessary, ask the importer, exporter, or re-exporter to have equipment on hand to read the microchip at the time of import, export, or re-export.

(b) *Standard conditions.* You must comply with the standard conditions provided in this part for specific types of CITES documents.

(c) *Special conditions.* We may place special conditions on a CITES document based on the needs of the species or the proposed activity. You must comply with any special conditions contained in or attached to a CITES document.

## Subpart D—Factors Considered in Making Certain Findings

### § 23.60 What factors are considered in making a legal acquisition finding?

(a) *Purpose.* Articles III, IV, and V of the Treaty require a Management Authority to make a legal acquisition finding before issuing export permits and re-export certificates. The Parties have agreed that a legal acquisition finding must also be made before issuing certain CITES exemption documents.

(b) *Types of legal acquisition.* Legal acquisition refers to whether the specimen and its parental stock were:

(1) Obtained in accordance with the provisions of national laws for the protection of wildlife and plants. In the United States, these laws include all applicable local, State, Federal, tribal, and foreign laws; and

(2) If previously traded, traded internationally in accordance with the provisions of CITES.

(c) *How we make our findings.* We make a finding that a specimen was legally acquired in the following way:

(1) The applicant must provide sufficient information (see § 23.34) for us to make a legal acquisition finding.

(2) We make this finding after considering all available information.

(3) The amount of information we need to make the finding is based on our review of general factors described in paragraph (d) of this section and additional specific factors described in paragraphs (e) through (k) of this section.

(4) As necessary, we consult with foreign Management and Scientific Authorities, the CITES Secretariat, State conservation agencies, Tribes, FWS Law Enforcement, APHIS or CBP, and other appropriate experts.

(d) *Risk assessment.* We review the general factors listed in this paragraph and additional specific factors in paragraphs (e) through (k) of this section to assess the level of scrutiny and amount of information we need to make a finding of legal acquisition. We give less scrutiny and require less-detailed information when there is a low risk that specimens to be exported or re-exported were not legally acquired, and give more scrutiny and require more detailed information when the proposed activity poses greater risk. We consider the cumulative risks, recognizing that each aspect of the international trade has a continuum of risk from high to low associated with it as follows:

(1) *Status of the species*: From Appendix I to Appendix III.

(2) *Origin of the specimen*: From wild-collected to born or propagated in a controlled environment to bred in captivity or artificially propagated.

(3) *Source of the propagule used to grow the plant*: From documentation that the plant was grown from a non-exempt seed or seedling to documentation that the plant was grown from an exempt seed or seedling.

(4) *Origin of the species*: From species native to the United States or its bordering countries of Mexico or Canada to nonnative species from other countries.

(5) *Volume of illegal trade*: From high to low occurrence of illegal trade.

(6) *Type of trade*: From commercial to noncommercial.

(7) *Trade by range countries*: From range countries that do not allow commercial export, or allow only limited noncommercial export of the species, to range countries that allow commercial export in high volumes.

(8) *Occurrence of the species in a controlled environment in the United States*: From uncommon to common in a controlled environment in the United States.

(9) *Ability of the species to be bred or propagated readily in a controlled environment*: From no documentation that the species can be bred or propagated readily in a controlled environment to widely accepted information that the species is commonly bred or propagated.

(10) *Genetic status of the specimen*: From a purebred species to a hybrid.

(e) *Captive-bred wildlife or a cultivated plant.* For a specimen that is captive-bred or cultivated, we may consider whether the parental stock was legally acquired.

(f) *Confiscated specimen.* For a confiscated Appendix-II or -III specimen, we consider whether information shows that the transfer of the confiscated specimen or its offspring met the conditions of the remission decision, legal settlement, or disposal action after forfeiture or abandonment.

(g) *Donated specimen of unknown origin.* For an unsolicited specimen of unknown origin donated to a public institution (see §10.12 of this subchapter), we consider whether:

(1) The public institution follows standard recordkeeping practices and has made reasonable efforts to obtain supporting information on the origin of the specimen.

(2) The public institution provides sufficient information to show it made a reasonable effort to find a suitable recipient in the United States.

(3) The export will provide a conservation benefit to the species.

(4) No persuasive information exists on illegal transactions involving the specimen.

(5) The export is noncommercial, with no money or barter exchanged except for shipping costs.

(6) The institution has no history of receiving a series of rare and valuable specimens or a large quantity of wildlife or plants of unknown origin.

(h) *Imported previously.* For a specimen that was previously imported into the United States, we consider any reliable, relevant information we receive concerning the validity of a CITES document, regardless of whether the shipment was cleared by FWS, APHIS, or CBP.

(i) *Personal use.* For a wildlife or plant specimen that is being exported or re-exported for personal use by the applicant, we consider whether:

(1) The specimen was acquired in the United States and possessed for strictly personal use.

(2) The number of specimens is reasonably appropriate for the nature of your export or re-export as personal use.

(3) No persuasive evidence exists on illegal transactions involving the specimen.

(j) *Sequential ownership.* For a specimen that was previously possessed by someone other than the applicant, we may consider the history of ownership for a specimen and its parental stock, breeding stock, or cultivated parental stock.

(k) *Wild-collected in the United States.* For a specimen collected from the wild in the United States, we consider the site where the specimen was collected, whether the species is known to occur at that site, the abundance of the species at that site, and, if necessary, whether permission of the appropriate management agency or landowner was obtained to collect the specimen.

## § 23.61 What factors are considered in making a non-detriment finding?

(a) *Purpose.* Articles III and IV of the Treaty require that, before we issue a CITES document, we find that a proposed export or introduction from the sea of Appendix-I or -II specimens is not detrimental to the survival of the species and that a proposed import of an Appendix-I specimen is for purposes that would not be detrimental to the survival of the species.

(b) *Types of detriment.* Detrimental activities, depending on the species, could include, among other things, unsustainable use and any activities that would pose a net harm to the status of the species in the wild. For Appendix-I species, it also includes use or removal from the wild that results in habitat loss or destruction, interference with recovery efforts for a species, or stimulation of further trade.

(c) *General factors.* The applicant must provide sufficient information for us to make a finding of non-detriment. In addition to factors in paragraphs (d) and (e) of this section, we will consider whether:

(1) Biological and management information demonstrates that the proposed activity represents sustainable use.

(2) The removal of the animal or plant from the wild is part of a biologically based sustainable-use management plan that is designed to eliminate over-utilization of the species.

(3) If no sustainable-use management plan has been established, the removal of the animal or plant from the wild would not contribute to the over-utilization of the species, considering both domestic and international uses.

(4) The proposed activity, including the methods used to acquire the specimen, would pose no net harm to the status of the species in the wild.

(5) The proposed activity would not lead to long-term declines that would place the viability of the affected population in question.

(6) The proposed activity would not lead to significant habitat or range loss or restriction.

(d) *Additional factor for Appendix-II species.* In addition to the general factors in paragraph (c) of this section, we will consider whether the intended export of an Appendix-II species would cause a significant risk that the species would qualify for inclusion in Appendix I.

(e) *Additional factors for Appendix-I species.* In addition to the general factors in paragraph (c) of this section, we will consider whether the proposed activity:

(1) Would not cause an increased risk of extinction for either the species as a whole or the population from which the specimen was obtained.

(2) Would not interfere with the recovery of the species.

(3) Would not stimulate additional trade in the species. If the proposed activity does stimulate trade, we will consider whether the anticipated increase in trade would lead to the decline of the species.

(f) *How we make our findings.* We base the non-detriment finding on the best available biological information. We also consider trade information, including trade demand, and other scientific management information. We make a non-detriment finding in the following way:

(1) We consult with the States, Tribes, other Federal agencies, scientists, other experts, and the range countries of the species.

(2) We consult with the Secretariat and other Parties to monitor the level of trade that is occurring in the species.

(3) Based on the factors in paragraphs (c) through (e) of this section, we evaluate the biological impact of the proposed activity.

(4) In cases where insufficient information is available or the factors above are not satisfactorily addressed, we take precautionary measures and would be unable to make the required finding of non-detriment.

(g) *Risk assessment.* We review the status of the species in the wild and the degree of risk the proposed activity poses to the species to determine the level of scrutiny needed to make a finding. We give greater scrutiny and require more detailed information for activities that pose a greater risk to a species in the wild. We consider the cumulative risks, recognizing that each aspect of international trade has a continuum of risk (from high to low) associated with it as follows:

(1) *Status of the species:* From Appendix I to Appendix II.

(2) *Origin of the specimen:* From wild-collected to born or propagated in a controlled environment to bred in captivity or artificially propagated.

(3) *Source of the propagule used to grow the plant:* From documentation that the plant was grown from a non-exempt seed or seedling to documentation that the plant was grown from an exempt seed or seedling.

(4) *Origin of the species:* From native species to nonnative species.

(5) *Volume of legal trade:* From high to low occurrence of legal trade.

(6) *Volume of illegal trade:* From high to low occurrence of illegal trade.

(7) *Type of trade:* From commercial to noncommercial.

(8) *Genetic status of the specimen:* From a purebred species to a hybrid.

(9) *Risk of disease transmission:* From high to limited risk of disease transmission.

(10) *Basis for listing:* From listed under Article II(1) or II(2)(a) of the Treaty to listed under Article II(2)(b).

(h) *Quotas for Appendix-I species.* When an export quota has been set by the CoP for an Appendix-I species, we

203

will consider the scientific and management basis of the quota together with the best available biological information when we make our non-detriment finding. We will contact the Scientific and Management Authorities of the exporting country for further information if needed.

### § 23.62 What factors are considered in making a finding of not for primarily commercial purposes?

(a) *Purpose.* Under Article III(3(c)) and (5(c)) of the Treaty, an import permit or an introduction-from-the-sea certificate for Appendix-I species can be issued only if the Management Authority is satisfied that the specimen is not to be used for primarily commercial purposes. Trade in Appendix-I species must be subject to particularly strict regulation and authorized only in exceptional circumstances.

(b) *How we make our findings.* We must find that the intended use of the Appendix-I specimen is not for primarily commercial purposes before we can issue a CITES document.

(1) We will make this decision on a case-by-case basis considering all available information.

(2) The applicant must provide sufficient information to satisfy us that the intended use is not for primarily commercial purposes.

(3) The definitions of "commercial" and "primarily commercial purposes" in § 23.5 apply.

(4) We will look at all aspects of the intended use of the specimen. If the noncommercial aspects do not clearly predominate, we will consider the import or introduction from the sea to be for primarily commercial purposes.

(5) While the nature of the transaction between the owner in the country of export and the recipient in the country of import or introduction from the sea may have some commercial aspects, such as the exchange of money to cover the costs of shipment and care of specimens during transport, it is the intended use of the specimen, including the purpose of the export, that must not be for primarily commercial purposes.

(6) We will conduct an assessment of factors listed in paragraph (d) of this section. For activities involving an anticipated measurable increase in revenue and other economic value associated with the intended use, we will conduct an analysis as described in paragraph (e) of this section.

(7) All net profits generated in the United States from activities associated with the import of an Appendix-I species must be used for conservation of that species.

(c) *Examples.* The following are examples of types of transactions in which the noncommercial aspects of the intended use of the specimen may predominate depending on the facts of each situation. The discussions of each example provide further guidance in assessing the actual degree of commerciality on a case-by-case basis. These examples outline circumstances commonly encountered and do not cover all situations where import or introduction from the sea could be found to be not for primarily commercial purposes.

(1) *Personal use.* Import or introduction from the sea of an Appendix-I specimen for personal use generally is considered to be not for primarily commercial purposes. An example is the import of a personal sport-hunted trophy by the person who hunted the wildlife for display in his or her own home.

(2) *Scientific purposes.* The import or introduction from the sea of an Appendix-I specimen by a scientist or scientific institution may be permitted in situations where resale, commercial exchange, or exhibit of the specimen for economic benefit is not the primary intended use.

(3) *Conservation, education, or training.* Generally an Appendix-I specimen may be imported or introduced from the sea by government agencies or nonprofit institutions for purposes of conservation, education, or training. For example, a specimen could be imported or introduced from the sea primarily to train customs staff in effective CITES control, such as for identification of certain types of specimens.

(4) *Biomedical industry.* Import or introduction from the sea of an Appendix-I specimen by an institution or company in the biomedical industry is initially presumed to be commercial since specimens are typically imported or introduced from the sea to develop

and sell products that promote public health for profit. However, if the importer clearly shows that the sale of products is only incidental to public health research and not for the primary purpose of economic benefit or profit, then such an import or introduction from the sea could be considered as scientific research under paragraph (c)(2) of this section if the principles of paragraph (b) of this section are met.

(5) *Captive-breeding or artificial propagation programs.* The import of an Appendix-I specimen for purposes of establishing a commercial operation for breeding or artificial propagation is considered to be for primarily commercial purposes. As a general rule, import or introduction from the sea of an Appendix-I specimen for a captive-breeding or artificial propagation program must have as a priority the long-term protection and recovery of the species in the wild. The captive-breeding or artificial propagation program must be part of a program aimed at the recovery of the species in the wild and be undertaken with the support of a country within the species' native range. Any profit gained must be used to support this recovery program. If a captive-breeding or artificial propagation operation plans to sell surplus specimens to help offset the costs of its program, import or introduction from the sea would be allowed only if any profit would be used to support the captive-breeding or artificial propagation program to the benefit of the Appendix-I species, not for the personal economic benefit of a private individual or shareholder.

(6) *Professional dealers.* Import or introduction from the sea by a professional dealer who states a general intention to eventually sell the specimen or its offspring to an undetermined recipient would be considered to be for primarily commercial purposes. However, import or introduction from the sea through a professional dealer by a qualified applicant may be acceptable if the ultimate intended use would be for one of the purposes set out in paragraphs (c)(2), (3), and (5) of this section and where a binding contract, conditioned on the issuing of permits, is in place.

(d) *Risk assessment.* We review the factors listed in this paragraph (d) to assess the level of scrutiny and amount of information we need to make a finding of whether the intended use of the specimen is not for primarily commercial purposes. We give less scrutiny and require less detailed information when the import or introduction from the sea poses a low risk of being primarily commercial, and give more scrutiny and require more detailed information when the proposed activity poses greater risk. We consider the cumulative risks, recognizing that each aspect of the international trade has a continuum of risk from high to low associated with it as follows:

(1) *Type of importer*: From for-profit entity to private individual to non-profit entity.

(2) *Ability of the proposed uses to generate revenue*: From the ability to generate measurable increases in revenue or other economic value to no anticipated increases in revenue or other economic value.

(3) *Appeal of the species*: From high public appeal to low public appeal.

(4) *Occurrence of the species in the United States*: From uncommon to common in a controlled environment in the United States.

(5) *Intended use of offspring*: From commercial to noncommercial.

(e) *Analysis of anticipated revenues and other economic value.* We will analyze revenues and other economic value anticipated to result from the use of the specimen for activities with a high risk of being primarily commercial.

(1) We will examine the proposed use of any net profits generated in the United States. We consider net profit to include all funds or other valuable considerations (including enhanced value of common stock shares) received or attained by you or those affiliated with you as a result of the import or introduction from the sea, to the extent that such funds or other valuable considerations exceed the reasonable expenses that are properly attributable to the proposed activity.

(2) We will consider any conservation project to be funded and, if the species was or is to be taken from the wild, how the project benefits the species in its native range, including agreements,

205

timeframes for accomplishing tasks, and anticipated benefits to the species.

(3) We will consider any plans to monitor a proposed conservation project, including expenditure of funds or completion of tasks.

(4) In rare cases involving unusually high net profits, we will require the applicant to provide a detailed analysis of expected revenue (both direct and indirect) and expenses to show anticipated net profit, and a statement from a licensed, independent certified public accountant that the internal accounting system is sufficient to account for and track funds generated by the proposed activities.

### § 23.63 What factors are considered in making a finding that an animal is bred in captivity?

(a) *Purpose.* Article VII(4) and (5) of the Treaty provide exemptions that allow for the special treatment of wildlife that was bred in captivity (see §§ 23.41 and 23.46).

(b) *Definitions.* The following terms apply when determining whether specimens qualify as "bred in captivity":

(1) A *controlled environment* means one that is actively manipulated for the purpose of producing specimens of a particular species; that has boundaries designed to prevent specimens, including eggs or gametes, from entering or leaving the controlled environment; and has general characteristics that may include artificial housing, waste removal, provision of veterinary care, protection from predators, and artificially supplied food.

(2) *Breeding stock* means an ensemble of captive wildlife used for reproduction.

(c) *Bred-in-captivity criteria.* For a specimen to qualify as bred in captivity, we must be satisfied that all the following criteria are met:

(1) If reproduction is sexual, the specimen was born to parents that either mated or transferred gametes in a controlled environment.

(2) If reproduction is asexual, the parent was in a controlled environment when development of the offspring began.

(3) The breeding stock meets all of the following criteria:

(i) Was established in accordance with the provisions of CITES and relevant national laws.

(ii) Was established in a manner not detrimental to the survival of the species in the wild.

(iii) Is maintained with only occasional introduction of wild specimens as provided in paragraph (d) of this section.

(iv) Has consistently produced offspring of second or subsequent generations in a controlled environment, or is managed in a way that has been demonstrated to be capable of reliably producing second-generation offspring and has produced first-generation offspring.

(d) *Addition of wild specimens.* A very limited number of wild specimens (including eggs or gametes) may be introduced into a breeding stock if all of the following conditions are met (for Appendix-I specimens see also § 23.46(b)(12)):

(1) The specimens were acquired in accordance with the provisions of CITES and relevant national laws.

(2) The specimens were acquired in a manner not detrimental to the survival of the species in the wild.

(3) The specimens were added either to prevent or alleviate deleterious inbreeding, with the number of specimens added as determined by the need for new genetic material, or to dispose of confiscated animals.

### § 23.64 What factors are considered in making a finding that a plant is artificially propagated?

(a) *Purpose.* Article VII(4) and (5) of the Treaty provide exemptions that allow for special treatment of plants that were artificially propagated (see §§ 23.40 and 23.47).

(b) *Definitions.* The following terms apply when determining whether specimens qualify as "artificially propagated":

(1) *Controlled conditions* means a nonnatural environment that is intensively manipulated by human intervention for the purpose of plant production. General characteristics of controlled conditions may include, but are not limited to, tillage, fertilization, weed and pest control, irrigation, or nursery operations such as potting, bedding, or protection from weather.

206

(2) *Cultivated parental stock* means the ensemble of plants grown under controlled conditions that are used for reproduction.

(c) *Artificially propagated criteria.* Except as provided in paragraphs (f) and (g) of this section, for a plant specimen to qualify as artificially propagated, we must be satisfied that the plant specimen was grown under controlled conditions from a seed, cutting, division, callus tissue, other plant tissue, spore, or other propagule that either is exempt from the provisions of CITES or has been derived from cultivated parental stock. The cultivated parental stock must meet all of the following criteria:

(1) Was established in accordance with the provisions of CITES and relevant national laws.

(2) Was established in a manner not detrimental to the survival of the species in the wild.

(3) Is maintained in sufficient quantities for propagation so as to minimize or eliminate the need for augmentation from the wild, with such augmentation occurring only as an exception and limited to the amount necessary to maintain the vigor and productivity of the cultivated parental stock.

(d) *Cutting or division.* A plant grown from a cutting or division is considered to be artificially propagated only if the traded specimen does not contain any material collected from the wild.

(e) *Grafted plant.* A grafted plant is artificially propagated only when both the rootstock and the material grafted to it have been taken from specimens that were artificially propagated in accordance with paragraph (c) of this section. A grafted specimen that consists of taxa from different Appendices is treated as a specimen of the taxon listed in the more restrictive Appendix.

(f) *Timber.* Timber taken from trees planted and grown in a monospecific plantation is considered artificially propagated if the seeds or other propagules from which the trees are grown were legally acquired and obtained in a non-detrimental manner.

(g) *Exception for certain plant specimens grown from wild-collected seeds or spores.* Plant specimens grown from wild-collected seeds or spores may be considered artificially propagated only when all of the following conditions have been met:

(1) Establishment of a cultivated parental stock for the taxon presents significant difficulties because specimens take a long time to reach reproductive age.

(2) The seeds or spores are collected from the wild and grown under controlled conditions within a range country, which must also be the country of origin of the seeds or spores.

(3) The Management Authority of the range country has determined that the collection of seeds or spores was legal and consistent with relevant national laws for the protection and conservation of the species.

(4) The Scientific Authority of the range country has determined that collection of the seeds or spores was not detrimental to the survival of the species in the wild, and allowing trade in such specimens has a positive effect on the conservation of wild populations. In making these determinations, all of the following conditions must be met:

(i) The collection of seeds or spores for this purpose must be limited in such a manner as to allow regeneration of the wild population.

(ii) A portion of the plants produced must be used to establish plantations to serve as cultivated parental stock in the future and become an additional source of seeds or spores and thus reduce or eliminate the need to collect seeds from the wild.

(iii) A portion of the plants produced must be used for replanting in the wild, to enhance recovery of existing populations or to re-establish populations that have been extirpated.

(5) Operations propagating Appendix-I species for commercial purposes must be registered with the CITES Secretariat in accordance with the Guidelines for the registration of nurseries exporting artificially propagated specimens of Appendix-I species.

§ 23.65 **What factors are considered in making a finding that an applicant is suitably equipped to house and care for a live specimen?**

(a) *Purpose.* Under Article III(3)(b) and (5)(b) of the Treaty, an import permit or introduction-from-the-sea certificate for live Appendix-I specimens

207

can be issued only if we are satisfied that the recipients are suitably equipped to house and care for them.

(b) *General principles.* We will follow these general principles in making a decision on whether an applicant has facilities that would provide proper housing to maintain the specimens for the intended purpose and the expertise to provide proper care and husbandry or horticultural practices.

(1) All persons who would be receiving a specimen must be identified in an application and their facilities approved by us, including persons who are likely to receive a specimen within 1 year after it arrives in the United States.

(2) The applicant must provide sufficient information for us to make a finding, including, but not limited to, a description of the facility, photographs, or construction plans, and resumes of the recipient or staff who will care for the specimen.

(3) We use the best available information on the requirements of the species in making a decision and will consult with experts and other Federal and State agencies, as necessary and appropriate.

(4) The degree of scrutiny that we give an application is based on the biological and husbandry or horticultural needs of the species.

(c) *Specific factors considered for wildlife.* In addition to the general provisions in paragraph (e) of this section, we consider the following factors in evaluating suitable housing and care for wildlife:

(1) Enclosures constructed and maintained so as to provide sufficient space to allow each animal to make normal postural and social adjustments with adequate freedom of movement. Inadequate space may be indicated by evidence of malnutrition, poor condition, debility, stress, or abnormal behavior patterns.

(2) Appropriate forms of environmental enrichment, such as nesting material, perches, climbing apparatus, ground substrate, or other species-specific materials or objects.

(3) If the wildlife is on public display, an off-exhibit area, consisting of indoor and outdoor accommodations, as appropriate, that can house the wildlife on a long-term basis if necessary.

(4) Provision of water and nutritious food of a nature and in a way that are appropriate for the species.

(5) Staff who are trained and experienced in providing proper daily care and maintenance for the species being imported or introduced from the sea, or for a closely related species.

(6) Readily available veterinary care or veterinary staff experienced with the species or a closely related species, including emergency care.

(d) *Specific factors considered for plants.* In addition to the general provisions in paragraph (e) of the section, we consider the following factors in evaluating suitable housing and care for plants:

(1) Sufficient space, appropriate lighting, and other environmental conditions that will ensure proper growth.

(2) Ability to provide appropriate culture, such as water, fertilizer, and pest and disease control.

(3) Staff with experience with the imported species or related species with similar horticultural requirements.

(e) *General factors considered for wildlife and plants.* In addition to the specific provisions in paragraphs (c) or (d) of this section, we will consider the following factors in evaluating suitable housing and care for wildlife and plants:

(1) Adequate enclosures or holding areas to prevent escape or unplanned exchange of genetic material with specimens of the same or different species outside the facility.

(2) Appropriate security to prevent theft of specimens and measures taken to rectify any previous theft or security problem.

(3) A reasonable survival rate of specimens of the same species or, alternatively, closely related species at the facility, mortalities for the previous 3 years, significant injuries to wildlife or damage to plants, occurrence of significant disease outbreaks during the previous 3 years, and measures taken to prevent similar mortalities, injuries, damage, or diseases. Significant injuries, damage, or disease outbreaks are those that are permanently debilitating or re-occurring.

(4) Sufficient funding on a long-term basis to cover the cost of maintaining the facility and the specimens imported.

(f) *Incomplete facilities or insufficient staff.* For applications submitted to us before the facilities to hold the specimen are completed or the staff is identified or properly trained, we will:

(1) Review all available information, including construction plans or intended staffing, and make a finding based on this information.

(2) Place a condition on any permit that the import cannot occur until the facility has been completed or the staff hired and trained, and approved by us.

## Subpart E—International Trade in Certain Specimens

### § 23.68 How can I trade internationally in roots of American ginseng?

(a) *U.S. and foreign general provisions.* Whole plants and roots (whole, sliced, and parts, excluding manufactured parts, products, and derivatives, such as powders, pills, extracts, tonics, teas, and confectionery) of American ginseng (*Panax quinquefolius*), whether wild or artificially propagated, are included in Appendix II. Cultivated American ginseng that does not meet the requirements of artificially propagated will be considered wild for export and re-export purposes. The import, export, or re-export of ginseng roots must meet the requirements of this section and other requirements of this part (see subparts B and C for prohibitions and application procedures). For specimens that were harvested from a State or Tribe without an approved CITES export program, see § 23.36 for export permits and § 23.37 for re-export certificates.

(b) *Export approval of State and tribal programs.* States and Tribes set up and maintain ginseng management and harvest programs designed to monitor and protect American ginseng from over-harvest. When a State or Tribe with a management program provides us with the necessary information, we make programmatic findings and have specific requirements that allow export under CITES. For wild ginseng, a State or Tribe must provide sufficient information for us to determine that its management program and harvest controls are appropriate to ensure that ginseng harvested within its jurisdiction is legally acquired and that export will not be detrimental to the survival of the species in the wild. For artificially propagated ginseng, a State or Tribe must provide sufficient information for us to determine that ginseng grown within its jurisdiction meets the definition of artificially propagated and the State or Tribe must have procedures in place to minimize the risk that the roots of wild-collected plants would be claimed as artificially propagated.

(1) A State or Tribe seeking initial CITES export program approval for wild or artificially propagated American ginseng must submit the following information on the adoption and implementation of regulatory measures to the U.S. Management Authority:

(i) Laws or regulations mandating licensing or registration of persons buying and selling ginseng in that State or on tribal lands.

(ii) A requirement that ginseng dealers maintain records and provide copies of those records to the appropriate State or tribal management agency upon request. Dealer records must contain: the name and address of the ginseng seller, date of transaction, whether the ginseng is wild or artificially propagated and dried or green at time of transaction, weight of roots, State or Tribe of origin of roots, and identification numbers of the State or tribal certificates used to ship ginseng from the State or Tribe of origin.

(iii) A requirement that State or tribal personnel will inspect roots, ensure legal harvest, and have the ability to determine the age of roots of all wild-collected ginseng harvested in the State or on tribal lands. State or tribal personnel may accept a declaration statement by the licensed or registered dealer or grower that the ginseng roots are artificially propagated.

(iv) A requirement that State or tribal personnel will weigh ginseng roots unsold by March 31 of the year after harvest and give a weight receipt to the owner of the roots. Future export certification of this stock must be issued against the weight receipt.

(v) A requirement that State or tribal personnel will issue certificates for wild and artificially propagated ginseng. These certificates must contain at a minimum:

(A) State of origin.

(B) Serial number of certificate.

(C) Dealer's State or tribal license or registration number.

(D) Dealer's shipment number for that harvest season.

(E) Year of harvest of ginseng being certified.

(F) Designation as wild or artificially propagated.

(G) Designation as dried or fresh (green) roots.

(H) Weight of roots.

(I) Statement of State or tribal certifying official verifying that the ginseng was obtained in that State or on those tribal lands in accordance with all relevant laws for that harvest year.

(J) Name and title of State or tribal certifying official.

(2) In addition, a State or Tribe seeking initial CITES export program approval for wild American ginseng must submit the following information to the U.S. Management Authority:

(i) An assessment of the condition of the population and trends, including a description of the types of information on which the assessment is based, such as an analysis of population demographics; population models; or analysis of past harvest levels or indices of abundance independent of harvest information, such as field surveys.

(ii) Historic, present, and potential distribution of wild ginseng on a county-by-county basis.

(iii) Phenology of ginseng, including flowering and fruiting periods.

(iv) Habitat evaluation.

(v) If available, copies of any ginseng management or monitoring plans or other relevant reports that the State or Tribe has prepared as part of its existing management program.

(3) A State or Tribe with an approved CITES export program must complete Form 3–200–61 and submit it to the U.S. Management Authority by May 31 of each year to provide information on the previous harvest season.

(c) *U.S. application process.* Application forms and a list of States and Tribes with approved ginseng programs

can be obtained from our website or by contacting us (see § 23.7).

(1) To export wild or artificially propagated ginseng harvested under an approved State or tribal program, complete Form 3–200–34 or Form 3–200–74 for additional single-use permits under an annual program file.

(2) To export wild ginseng harvested from a State or Tribe that does not have an approved program, complete Form 3–200–32. To export artificially propagated ginseng from a State or Tribe that does not have an approved program, complete Form 3–200–33.

(3) To re-export ginseng, complete Form 3–200–32.

(4) For information on issuance criteria for CITES documents, see § 23.36 for export permits, § 23.37 for re-export certificates, and § 23.40 for certificates for artificially propagated plants.

(d) *Conditions for export.* Upon export, roots must be accompanied by a State or tribal certificate containing the information specified in paragraph (b)(1)(v) of this section.

### § 23.69  How can I trade internationally in fur skins and fur skin products of bobcat, river otter, Canada lynx, gray wolf, and brown bear?

(a) *U.S. and foreign general provisions.* For purposes of this section, CITES furbearers means bobcat (*Lynx rufus*), river otter (*Lontra canadensis*), and Canada lynx (*Lynx canadensis*), and the Alaskan populations of gray wolf (*Canis lupus*), and brown bear (*Ursus arctos*). These species are included in Appendix II based on Article II(2)(b) of the Treaty (see § 23.89). The import, export, or re-export of fur skins and fur skin products must meet the requirements of this section and the other requirements of this part (see subparts B and C for prohibitions and application procedures). For specimens that were harvested from a State or Tribe without an approved CITES export program, see § 23.36 for export permits and § 23.37 for re-export certificates.

(b) *Export approval of State and tribal programs.* States and Tribes set up and maintain management and harvest programs designed to monitor and protect CITES furbearers from over-harvest. When a State or Tribe with a management program provides us with the

necessary information, we make programmatic findings and have specific requirements that allow export under CITES. A State or Tribe must provide sufficient information for us to determine that its management program and harvest controls are appropriate to ensure that CITES furbearers harvested within its jurisdiction are legally acquired and that export will not be detrimental to the survival of the species in the wild.

(1) A State or Tribe seeking initial CITES export program approval must submit the following information to the U.S. Management Authority, except as provided in paragraph (b)(2) of this section:

(i) An assessment of the condition of the population and a description of the types of information on which the assessment is based, such as an analysis of carcass demographics, population models, analysis of past harvest levels as a function of fur prices or trapper effort, or indices of abundance independent of harvest information, such as scent station surveys, archer surveys, camera traps, track or scat surveys, or road kill counts.

(ii) Current harvest control measures, including laws regulating harvest seasons and methods.

(iii) Total allowable harvest of the species.

(iv) Distribution of harvest.

(v) Indication of how frequently harvest levels are evaluated.

(vi) Tagging or marking requirements for fur skins.

(vii) Habitat evaluation.

(viii) If available, copies of any furbearer management plans or other relevant reports that the State or Tribe has prepared as part of its existing management program.

(2) If the U.S. Scientific Authority has made a range-wide non-detriment finding for a species, a State or Tribe seeking initial approval for a CITES export program for that species need only submit the information in (b)(1)(ii) and (vi) of this section.

(3) A State or Tribe with an approved CITES export program must submit a CITES furbearer activity report to the U.S. Management Authority by October 31 of each year that provides information as to whether or not the popu-

lation status or management of the species has changed within the State or tribal lands. This report may reference information provided in previous years if the information has not changed. Except as provided in paragraph (b)(4) of this section, a furbearer activity report should include, at a minimum, the following:

(i) For each species, the number of specimens taken and the number of animals tagged, if different.

(ii) An assessment of the condition of the population, including trends, and a description of the types of information on which the assessment is based. If population levels are decreasing, the activity report should include the State or Tribe's professional assessment of the reason for the decline and any steps being taken to address it.

(iii) Information on, and a copy of, any changes in laws or regulations affecting these species.

(iv) If available, copies of relevant reports that the State or Tribe has prepared during the year in question as part of its existing management programs for CITES furbearers.

(4) When the U.S. Scientific Authority has made a range-wide non-detriment finding for a species, the annual furbearer activity report from a State or Tribe with an approved export program for that species should include, at a minimum, a statement indicating whether or not the status of the species has changed and the information in paragraph (b)(3)(iii) and (iv) of this section. Range-wide non-detriment findings will be re-evaluated at least every 5 years, or sooner if information indicates that there has been a change in the status or management of the species that might lead to different treatment of the species. When a range-wide non-detriment finding is re-evaluated, States and Tribes with an approved export program for the species must submit information that allows us to determine whether our finding remains valid.

(c) *CITES tags.* Unless an alternative method has been approved, each CITES fur skin to be exported or re-exported must have a U.S. CITES tag permanently attached.

(1) The tag must be inserted through the skin and permanently locked in

211

place using the locking mechanism of the tag.

(2) The legend on the CITES tag must include the US-CITES logo, an abbreviation for the State or Tribe of harvest, a standard species code assigned by the Management Authority, and a unique serial number.

(3) Fur skins with broken, cut, or missing tags may not be exported. Replacement tags must be obtained before the furs are presented for export or re-export. To obtain a replacement tag, either from the State or Tribe that issued the original tag or from us, you must provide information to show that the fur was legally acquired.

(i) When a tag is broken, cut, or missing, you may contact the State or Tribe of harvest for a replacement tag. If the State or Tribe cannot replace it, you may apply to FWS Law Enforcement for a replacement tag. If the tag is broken or cut, you must give us the tag. If the tag is missing, you must provide details concerning how the tag was lost. If we are satisfied that the fur was legally acquired, we will provide a CITES replacement tag.

(ii) A replacement tag must meet all of the requirements in paragraph (c) of this section, except the legend will include only the US-CITES logo, FWS-REPL, and a unique serial number.

(4) Tags are not required on fur skin products.

(d) *Documentation requirements.* The U.S. CITES export permit or an annex attached to the permit must contain all information that is given on the tag.

(e) *U.S. application process.* Application forms and a list of States and Tribes with approved furbearer programs can be obtained from our website or by contacting us (see § 23.7).

(1) To export fur skins taken under an approved State or tribal program, complete Form 3–200–26 and submit it to either FWS Law Enforcement or the U.S. Management Authority.

(2) To export fur skins that were not harvested under an approved program, complete Form 3–200–27 and submit it to the U.S. Management Authority.

(3) To re-export fur skins, complete Form 3-200-73 and submit it either to FWS Law Enforcement or the U.S. Management Authority.

(4) For information on issuance criteria for CITES documents, see § 23.36 for export permits and § 23.37 for re-export certificates.

(f) *Conditions for export.* Upon export, each fur skin, other than a fur skin product, must be clearly identified in accordance with paragraph (c) of this section.

### § 23.70  How can I trade internationally in American alligator and other crocodilian skins, parts, and products?

(a) *U.S. and foreign general provisions.* For the purposes of this section, *crocodilian* means all species of alligator, caiman, crocodile, and gavial of the order Crocodylia. The import, export, or re-export of any crocodilian skins, parts, or products must meet the requirements of this section and the other requirements of this part (see subparts B and C for prohibitions and application procedures). For American alligator (*Alligator mississippiensis*) specimens harvested from a State or Tribe without an approved CITES export program, see § 23.36 for export permits and § 23.37 for re-export certificates.

(b) *Definitions.* Terms used in this section are defined as follows:

(1) *Crocodilian skins* means whole or partial skins, flanks, chalecos, and bellies (including those that are salted, crusted, tanned, partially tanned, or otherwise processed), including skins of sport-hunted trophies.

(2) *Crocodilian parts* means body parts with or without skin attached (including tails, throats, feet, meat, skulls, and other parts) and small cut skin pieces.

(c) *Export approval of State and tribal programs for American alligator.* States and Tribes set up and maintain management and harvest programs designed to monitor and protect American alligators from over-harvest. When a State or Tribe with a management program provides us with the necessary information, we make programmatic findings and have specific requirements that allow export under CITES. A State or Tribe must provide sufficient information for us to determine that its management program and harvest controls are appropriate to

ensure that alligators harvested within its jurisdiction are legally acquired and that the export will not be detrimental to the survival of the species in the wild.

(1) A State or Tribe seeking initial CITES export program approval must submit the following to the U.S. Management Authority:

(i) An assessment of the condition of the wild population and a description of the types of information on which the assessment is based, such as an analysis of carcass demographics, population models, analysis of past harvest levels as a function of skin prices or harvester effort, or indices of abundance independent of harvest information, such as nest surveys, spotlighting surveys, or nuisance complaints.

(ii) Current harvest control measures, including laws regulating harvest seasons and methods.

(iii) Total allowable harvest of the species.

(iv) Distribution of harvest.

(v) Indication of how frequently harvest levels are evaluated.

(vi) Tagging or marking requirements for skins and parts.

(vii) Habitat evaluation.

(viii) Information on nuisance alligator management programs.

(ix) Information on alligator farming programs, including whether collecting and rearing of eggs or hatchlings is allowed, what factors are used to set harvest levels, and whether any alligators are returned to the wild.

(x) If available, copies of any alligator management plans or other relevant reports for American alligator that the State or Tribe has prepared as part of its existing management program.

(2) A State or Tribe with an approved CITES export program must submit an American alligator activity report to the U.S. Management Authority by July 1 of each year to provide information regarding harvests during the previous year. This report may reference information provided in previous years if the information has not changed. An American alligator activity report, at a minimum, should include the following:

(i) The total number of skins from wild or farmed alligators that were tagged by the State or Tribe.

(ii) An assessment of the status of the alligator population with an indication of whether the population is stable, increasing, or decreasing, and at what rate (if known). If population levels are decreasing, activity reports should include the State or Tribe's professional assessment of the reason for the decline and any steps being taken to address it.

(iii) For wild alligators, information on harvest, including harvest of nuisance alligators, methods used to determine harvest levels, demographics of the harvest, and methods used to determine the total number and population trends of alligators in the wild.

(iv) For farmed alligators, information on whether collecting and rearing of eggs or hatchlings is allowed, what factors are used to set harvest levels, and whether any alligators are returned to the wild.

(v) Information on, and a copy of, any changes in laws or regulations affecting the American alligator.

(vi) If available, copies of relevant reports that the State or Tribe has prepared during the reporting period as part of its existing management program for the American alligator.

(3) We provide CITES export tags to States and Tribes with approved CITES export programs. American alligator skins and parts must meet the marking and tagging requirements of paragraphs (d), (e), and (f) of this section.

(d) *Tagging of crocodilian skins.* You may import, export, or re-export any crocodilian skin only if a non-reusable tag is inserted though the skin and locked in place using the locking mechanism of the tag. A mounted sport-hunted trophy must be accompanied by the tag from the skin used to make the mount.

(1) Except as provided for a replacement tag in paragraph (d)(3)(ii) of this section, the tag must:

(i) Be self-locking, heat resistant, and inert to chemical and mechanical processes.

(ii) Be permanently stamped with the two-letter ISO code for the country of origin, a unique serial number, a standardized species code (available on our

213

website; see § 23.7), and the year of production or harvest. For American alligator, the export tags include the US-CITES logo, an abbreviation for the State or Tribe of harvest, a standard species code (MIS = *Alligator mississippiensis*), the year of taking, and a unique serial number.

(iii) If the year of production or harvest and serial number appear next to each other on a tag, the information should be separated by a hyphen.

(2) Skins and flanks must be individually tagged, and chalecos must have a tag attached to each flank.

(3) Skins with broken, cut, or missing tags may not be exported. Replacement tags must be obtained before the skins are presented for import, export, or re-export. To obtain a replacement tag, either from the State or Tribe of harvest (for American alligator) or from us, you must provide information to show that the skin was legally acquired.

(i) In the United States, when an American alligator tag is broken, cut, or missing, you may contact the State or Tribe of harvest for a replacement tag. If the State or Tribe cannot replace it, you may apply to FWS Law Enforcement for a replacement tag. To obtain replacement tags for crocodilian skins other than American alligator in the United States, contact FWS Law Enforcement. If the tag is broken or cut, you must give us the tag. If the tag is missing, you must provide details concerning how the tag was lost. If we are satisfied that the skin was legally acquired, we will provide a CITES replacement tag.

(ii) A replacement tag must meet all of the requirements in paragraph (d)(1) of this section except that the species code and year of production or harvest will not be required, and for re-exports the country of re-export must be shown in place of the country of origin. In the United States, the legend will include the US-CITES logo, FWS-REPL, and a unique serial number.

(e) *Meat and skulls.* Except for American alligator, you may import, export, or re-export crocodilian meat and skulls without tags or markings. American alligator meat and skulls may be imported, exported, or re-exported if packaged and marked or

tagged in accordance with State or tribal laws as follows:

(1) Meat from legally harvested and tagged alligators must be packed in permanently sealed containers and labeled as required by State or tribal laws or regulations. Bulk meat containers must be marked with any required State or tribal parts tag or bulk meat tag permanently attached and indicating, at a minimum, State or Tribe of origin, year of take, species, original U.S. CITES tag number for the corresponding skin, weight of meat in the container, and identification of State-licensed processor or packer.

(2) Each American alligator skull must be marked as required by State or tribal law or regulation. This marking must include, at a minimum, reference to the corresponding U.S. CITES tag number on the skin.

(f) *Tagging or labeling of crocodilian parts other than meat and skulls.* You may import, export, or re-export crocodilian parts other than meat and skulls when the following conditions are met:

(1) Parts must be packed in transparent sealed containers.

(2) Containers must be clearly marked with a non-reusable parts tag or label that includes all of the information in paragraph (d)(1)(ii) of this section and a description of the contents, the total weight (contents and container), and the number of the CITES document.

(3) Tags are not required on crocodilian products.

(4) Tags are not required on scientific specimens except as required in paragraphs (d) and (e) of this section.

(g) *Documentation requirements.* The CITES document or an annex attached to the document must contain all information that is given on the tag or label.

(h) *U.S. application process.* Application forms and a list of States and Tribes with approved American alligator programs can be obtained from our website or by contacting us (see § 23.7).

(1) To export American alligator specimens taken under an approved State or tribal program, complete Form 3–200–26 and submit it to either FWS Law Enforcement or the U.S. Management Authority.

(2) To export American alligator specimens that are not from an approved program, complete Form 3–200–27 and submit it to the U.S. Management Authority.

(3) For information on issuance criteria for CITES documents, see §23.36 for export permits and §23.37 for re-export certificates.

(i) *Conditions for import, export, or re-export.* Upon import, export, or re-export, each crocodilian specimen must meet the applicable tagging requirements in paragraphs (d), (e), and (f) of this section.

### §23.71 How can I trade internationally in sturgeon caviar?

(a) *U.S. and foreign general provisions.* For the purposes of this section, *sturgeon caviar* means the processed roe of any species of sturgeon, including paddlefish (Order Acipenseriformes). The import, export, or re-export of sturgeon caviar must meet the requirements of this section and the other requirements of this part (see subparts B and C for prohibitions and application procedures).

(b) *Labeling.* You may import, export, or re-export sturgeon caviar only if labels are affixed to containers prior to export or re-export in accordance with this paragraph.

(1) The following definitions apply to caviar labeling:

(i) *Non-reusable label* means any label or mark that cannot be removed without being damaged or transferred to another container.

(ii) *Primary container* means any container in direct contact with the caviar.

(iii) *Secondary container* means the receptacle into which primary containers are placed.

(iv) *Processing plant* means a facility in the country of origin responsible for the first packaging of caviar into a primary container.

(v) *Repackaging plant* means a facility responsible for receiving and repackaging caviar into new primary containers.

(vi) *Lot identification number* means a number that corresponds to information related to the caviar tracking system used by the processing plant or repackaging plant.

(2) The caviar-processing plant in the country of origin must affix a non-reusable label on the primary container that includes all of the following information:

(i) Standardized species code; for hybrids, the species code for the male is followed by the code for the female and the codes are separated by an ''x'' (codes are available on our website; see §23.7).

(ii) Source code.

(iii) Two-letter ISO code of the country of origin.

(iv) Year of harvest.

(v) Processing plant code and lot identification number.

(3) If caviar is repackaged before export or re-export, the repackaging plant must affix a non-reusable label to the primary container that includes all of the following information:

(i) The standardized species code, source code, and two-letter ISO code of the country of origin.

(ii) Year of repackaging and the repackaging plant code, which incorporates the two-letter ISO code for the repackaging country if different from the country of origin.

(iii) Lot identification number or CITES document number.

(4) The exact quantity of caviar must be indicated on any secondary container along with a description of the contents in accordance with international customs regulations.

(c) *Documentation requirements.* Unless the sturgeon caviar qualifies as a personal or household effect under §23.15, the CITES document or an annex attached to the document must contain all information that is given on the label. The exact quantity of each species of caviar must be indicated on the CITES document.

(d) *Export quotas.* Commercial shipments of sturgeon caviar from stocks shared between different countries may be imported only if all of the following conditions have been met:

(1) The relevant countries have established annual export quotas for the shared stocks that were derived from catch quotas agreed among the countries. The quotas are based on an appropriate regional conservation strategy and monitoring regime and are not

215

detrimental to the survival of the species in the wild.

(2) The quotas have been communicated to the CITES Secretariat and the Secretariat has communicated the annual export quotas to CITES Parties.

(3) The caviar is exported during the quota year (March 1 – last day of February) in which it was harvested and processed.

(e) *Re-exports.* Any re-export of sturgeon caviar must occur within 18 months from the date of issuance of the original export permit.

(f) *Pre-Convention.* Sturgeon caviar may not be imported, exported, or re-exported under a pre-Convention certificate.

(g) *Mixed caviar.* Caviar and caviar products that consist of roe from more than one species may only be imported into or exported from the United States if the exact quantity of roe from each species is known and is indicated on the CITES document.

(h) *U.S. application forms.* Application forms can be obtained from our website or by contacting us (see § 23.7). For CITES document requirements, see § 23.36 for export permits and § 23.37 for re-export certificates. For export, complete Form 3–200–76 and submit it to the U.S. Management Authority. For re-export, complete Form 3–200–73 and submit it to FWS Law Enforcement.

[72 FR 48448, Aug. 23, 2007, as amended at 73 FR 40986, July 17, 2008]

## § 23.72 How can I trade internationally in plants?

(a) *U.S. and foreign general provisions*: In addition to the requirements of this section, the import, export, or re-export of CITES plant specimens must meet the other requirements of this part (see subparts B and C for prohibitions and application procedures).

(b) *Seeds.* International shipments of seeds of any species listed in Appendix I, except for seeds of certain artificially propagated hybrids (see § 23.92), or seeds of species listed in Appendix II or III with an annotation that includes seeds, must be accompanied by a valid CITES document. International shipments of CITES seeds that are artificially propagated also must be accompanied by a valid CITES document.

(c) *A plant propagated from exempt plant material.* A plant grown from exempt plant material is regulated by CITES.

(1) The proposed shipment of the specimen is treated as an export even if the exempt plant material from which it was derived was previously imported. The country of origin is the country in which the specimen ceased to qualify for the exemption.

(2) Plants grown from exempt plant material qualify as artificially propagated provided they are grown under controlled conditions.

(3) To export plants grown from exempt plant material under controlled conditions, complete Form 3–200–33 for a certificate for artificially propagated plants.

(d) *Salvaged plants.*

(1) For purposes of this section, *salvaged plant* means a plant taken from the wild as a result of some environmental modification in a country where a Party has done all of the following:

(i) Ensured that the environmental modification program does not threaten the survival of CITES plant species, and that protection of Appendix-I species *in situ* is considered a national and international obligation.

(ii) Established salvaged specimens in cultivation after concerted attempts have failed to ensure that the environmental modification program would not put at risk wild populations of CITES species.

(2) International trade in salvaged Appendix-I plants, and Appendix-II plants whose entry into trade might otherwise have been considered detrimental to the survival of the species in the wild, may be permitted only when all the following conditions are met:

(i) Such trade would clearly benefit the survival of the species in the wild or in cultivation.

(ii) Import is for the purposes of care and propagation.

(iii) Import is by a *bona fide* botanic garden or scientific institution.

(iv) Any salvaged Appendix-I plant will not be sold or used to establish a commercial operation for artificial propagation after import.

216

**§ 23.73  How can I trade internationally in timber?**

(a) *U.S. and foreign general provisions*: In addition to the requirements of this section, the import, export, or re-export of timber species listed under CITES must meet the other requirements of this part (see subparts B and C for prohibitions and application procedures).

(b) *Definitions*. The following definitions apply to parts, products, and derivatives that appear in the annotations to certain timber species in the CITES Appendices. These definitions are based on the tariff classifications of the Harmonized System of the World Customs Organization.

(1) *Logs* means all wood in the rough, whether or not stripped of bark or sapwood, or roughly squared for processing, notably into sawn wood, pulpwood, or veneer sheets.

(2) *Sawn wood* means wood simply sawn lengthwise or produced by a profile-chipping process. Sawn wood normally exceeds 6 mm in thickness.

(3) *Veneer sheets* means thin layers or sheets of wood of uniform thickness, usually 6 mm or less, usually peeled or sliced, for use in making plywood, veneer furniture, veneer containers, or similar products.

(4) *Plywood means* wood material consisting of three or more sheets of wood glued and pressed one on the other and generally disposed so that the grains of successive layers are at an angle.

(c) The following exceptions apply to Appendix-II or -III timber species that have a substantive annotation that designates either logs, sawn wood, and veneer sheets, or logs, sawn wood, veneer sheets, and plywood:

(1) *Change in destination*. When a shipment of timber destined for one country is redirected to another, the Management Authority in the country of import may change the name and address of the importer indicated on the CITES document under the following conditions:

(i) The quantity imported is the same as the quantity certified by a stamp or seal and authorized signature of the Management Authority on the CITES document at the time of export or re-export.

(ii) The number of the bill of lading for the shipment is on the CITES document, and the bill of lading is presented at the time of import.

(iii) The import takes place before the CITES document expires, and the period of validity has not been extended.

(iv) The Management Authority of the importing country includes the following statement in block 5, or an equivalent place, of the CITES document: ''Import into [name of country] permitted in accordance with [cite the appropriate section number from the current permit and certificate resolution] on [date].'' The modification is certified with an official stamp and signature.

(v) The Management Authority sends a copy of the amended CITES document to the country of export or re-export and the Secretariat.

(2) *Extension of CITES document validity*. A Management Authority in the country of import may extend the validity of an export permit or re-export certificate beyond the normal maximum of 6 months after the date of issue under the following conditions:

(i) The shipment has arrived in the port of final destination before the CITES document expires, is being held in customs bond, and is not considered imported.

(ii) The time extension does not exceed 6 months from the date of expiration of the CITES document and no previous extension has been issued.

(iii) The Management Authority has included in block 5, or an equivalent place, of the CITES document the date of arrival and the new date of expiration on the document, and certified the modification with an official stamp and signature.

(iv) The shipment is imported into the country from the port where the Management Authority issued the extension and before the amended CITES document expires.

(v) The Management Authority sends a copy of the amended CITES document to the country of export or re-export and to the Secretariat.



§ 23.74   How can I trade internationally in personal sport-hunted trophies?

(a) *U.S. and foreign general provisions.* Except as provided for personal and household effects in § 23.15, the import, export, or re-export of sport-hunted trophies of species listed under CITES must meet the requirements of this section and all the other requirements of this part (see subparts B and C for prohibitions and application procedures).

(b) *Sport-hunted trophy* means raw or tanned parts of a specimen that was taken by a hunter, who is also the importer, exporter, or re-exporter, during a sport hunt for personal use. It may include the bones, claws, hair, head, hide, hooves, horns, meat, skull, teeth, tusks, or any taxidermied part, including, but not limited to, a rug or taxidermied head, shoulder, or full mount. It does not include articles made from a trophy, such as worked, manufactured, or handicraft items for use as clothing, curios, ornamentation, jewelry, or other utilitarian items.

(c) *Use after import.* You may use your sport-hunted trophy after import into the United States as provided in § 23.55.

(d) *Quantity and tagging.* The following provisions apply to the issuance and acceptance of U.S. and foreign CITES documents:

(1) The number of trophies that one hunter may import in any calendar year for the following species is:

(i) No more than two leopard (*Panthera pardus*) trophies.

(ii) No more than one markhor (*Capra falconeri*) trophy.

(iii) No more than one black rhinoceros (*Diceros bicornis*) trophy.

(2) Each trophy imported, exported, or re-exported must be marked or tagged in the following manner:

(i) Leopard and markhor: Each raw or tanned skin must have a self-locking tag inserted through the skin and permanently locked in place using the locking mechanism of the tag. The tag must indicate the country of origin, the number of the specimen in relation to the annual quota, and the calendar year in which the specimen was taken in the wild. A mounted sport-hunted trophy must be accompanied by the tag from the skin used to make the mount.

(ii) Black rhinoceros: Parts of the trophy, including, but not limited to, skin, skull, or horns, whether mounted or loose, should be individually marked with reference to the country of origin, species, the number of the specimen in relation to the annual quota, and the year of export.

(3) The export permit or re-export certificate or an annex attached to the permit or certificate must contain all the information that is given on the tag.

## Subpart F—Disposal of Confiscated Wildlife and Plants

§ 23.78   What happens to confiscated wildlife and plants?

(a) *Purpose.* Article VIII of the Treaty provides for confiscation or return to the country of export of specimens that are traded in violation of CITES.

(b) *Disposal options.* Part 12 of this subchapter provides the options we have for disposing of forfeited and abandoned live and dead wildlife and plants. These include maintenance in captivity either in the United States or in the country of export, return to the wild under limited circumstances, and sale of certain Appendix-II or -III specimens. Under some conditions, euthanasia or destruction may be necessary.

(1) We use a plant rescue center program to dispose of confiscated live plants. Participants in this program may also assist APHIS, CBP, and FWS Law Enforcement in holding seized specimens as evidence pending any legal decisions.

(2) We dispose of confiscated live wildlife on a case-by-case basis at the time of seizure and forfeiture, and consider the quantity, protection level, and husbandry needs of the wildlife.

(c) *Re-export.* We may issue a re-export certificate for a CITES specimen that was forfeited or abandoned when the certificate indicates the specimen was confiscated and when the re-export meets one of the following purposes:

(1) For any CITES species, the return of a live specimen to the Management Authority of the country of export, placement of a live specimen in a rescue center, or use of the specimen for law enforcement, judicial, or forensic purposes.

(2) For an Appendix-II or -III species, the disposal of the specimen in an appropriate manner that benefits enforcement and administration of the Convention.

(d) *Consultation process.* FWS and APHIS may consult with the Management Authority in the country of export or re-export and other relevant governmental and nongovernmental experts before making a decision on the disposal of confiscated live specimens that have been forfeited or abandoned to the FWS, APHIS, or CBP.

### § 23.79  How may I participate in the Plant Rescue Center Program?

(a) *Purpose.* We have established the Plant Rescue Center Program to place confiscated live plants quickly to prevent physical damage to the plants.

(b) *Criteria.* Institutions interested in participating in this program must be:

(1) Nonprofit, open to the public, and have the expertise and facilities to care for confiscated exotic plant specimens. A participating institution may be a botanical garden, arboretum, zoological park, research institution, or other qualifying institution.

(2) Willing to transfer confiscated plants from the port where they were confiscated to their facilities at their own expense.

(3) Willing to return the plants to the U.S. Government if the country of export has requested their return. The U.S. Government will then coordinate the plants' return to the country of export.

(4) Willing to accept and maintain a plant shipment as a unit until it has received authorization from us to incorporate the shipment into its permanent collection or transfer a portion of it to another participating institution.

(c) *Participation.* Institutions wishing to participate in the Plant Rescue Center Program should contact the U.S. Management Authority (see § 23.7). They must provide a brief description of the greenhouse or display facilities, the names and telephone numbers of any individuals authorized to accept plants on behalf of the institution, and the mailing address where the plants should be sent. In addition, interested institutions must indicate if they are limited with regard to the type of plants they are able to maintain or the quantities of plants they can handle at one time.

## Subpart G—CITES Administration

### § 23.84  What are the roles of the Secretariat and the committees?

(a) *Secretariat.* The Secretariat is headed by the Secretary-General. Its functions are listed in Article XII of the Treaty and include:

(1) Arranging and staffing meetings of the Parties.

(2) Performing functions as requested in relation to listings in the Appendices.

(3) Undertaking scientific and technical studies, as authorized by the CoP, to contribute to implementation of the Convention.

(4) Studying reports of the Parties and requesting additional information as appropriate to ensure effective implementation of the Convention.

(5) Bringing to the attention of the Parties matters relevant to the Convention.

(6) Periodically publishing and distributing to the Parties current editions of the Appendices as well as information on the identification of specimens of species listed in the Appendices.

(7) Preparing annual reports to the Parties on its work and on the implementation of the Convention.

(8) Making recommendations for the implementation of the aims and provisions of the Convention, including the exchange of scientific and technical information.

(9) Performing other functions entrusted to it by the Parties.

(b) *Committees.* The Parties have established four committees to provide administrative and technical support to the Parties and to the Secretariat. The CoP may charge any of these committees with tasks.

(1) The Standing Committee steers the work and performance of the Convention between CoPs.

(i) This committee oversees development and execution of the Secretariat's budget, advises other committees, appoints working groups, and carries out activities on behalf of the Parties between CoPs.

(ii) Regional representatives are countries that are elected by their respective geographic regions at the CoP.

(2) The Animals Committee and the Plants Committee provide advice and guidance to the CoP, the other committees, working groups, and the Secretariat on all matters relevant to international trade in species included in the Appendices.

(i) These committees also assist the Nomenclature Committee in the development and maintenance of a standardized list of species names; provide assistance with regard to identification of species listed in the Appendices; cooperate with the Secretariat to assist Scientific Authorities; compile and evaluate data on Appendix-II species that are considered significantly affected by trade; periodically review the status of wildlife and plant species listed in the Appendices; advise range countries on management techniques when requested; draft resolutions on wildlife and plant matters for consideration by the Parties; deal with issues related to the transport of live specimens; and report to the CoP and the Standing Committee.

(ii) Regional representatives are individuals, who are elected by their respective geographic regions at the CoP.

(3) The Nomenclature Committee is responsible for developing or identifying standard nomenclature references for wildlife and plant taxa and making recommendations on nomenclature to Parties, the CoP, other committees, working groups, and the Secretariat. The Nomenclature Committee is made up of one zoologist and one botanist, who are appointed by the CoP.

### § 23.85 What is a meeting of the Conference of the Parties (CoP)?

(a) *Purpose.* Article XI of the Treaty provides general guidelines for meetings of the countries that have ratified, accepted, approved, or acceded to CITES. The Parties currently meet for 2 weeks every 3 years. At these meetings, the Parties consider amendments to the Appendices and resolutions and decisions to improve the implementation of CITES. The Parties adopt amendments to the lists of species in Appendix I and II and resolutions by a two-thirds majority of Parties present and voting. The Secretariat or any Party may also submit reports on wildlife and plant trade for consideration.

(b) *CoP locations and dates.* At a CoP, Parties interested in hosting the next meeting notify the Secretariat. The Parties vote to select the location of the next CoP. Once a country has been chosen, it works with the Secretariat to set the date and specific venue. The Secretariat then notifies the Parties of the date for the next CoP.

(c) *Attendance at a CoP.* All Parties may participate and vote at a CoP. Non-Party countries may participate, but may not vote. Organizations technically qualified in protection, conservation, or management of wildlife or plants may participate in a CoP as observers if they are approved, but they are not eligible to vote.

(1) International organizations must apply to the CITES Secretariat for approval to attend a CoP as an observer.

(2) National organizations must apply to the Management Authority of the country where they are located for approval to attend a CoP as an observer.

### § 23.86 How can I obtain information on a CoP?

As we receive information on an upcoming CoP from the CITES Secretariat, we will notify the public either through published notices in the FEDERAL REGISTER or postings on our website (see § 23.7). We will provide:

(a) A summary of the information we have received with an invitation for the public to comment and provide information on the agenda, proposed amendments to the Appendices, and proposed resolutions that they believe the United States should submit for consideration at the CoP.

(b) Information on times, dates, and locations of public meetings.

(c) Information on how international and national organizations may apply to participate as observers.

### § 23.87 How does the United States develop documents and negotiating positions for a CoP?

(a) In developing documents and negotiating positions for a CoP, we:

(1) Will provide for at least one public meeting.

(2) Consult with appropriate Federal, State, and tribal agencies; foreign governmental agencies; scientists; experts; and others.

(3) Seek public comment through published FEDERAL REGISTER notices or postings on our website that:

(i) Solicit recommendations on potential proposals to amend the Appendices, draft resolutions, and other documents for U.S. submission to the CoP.

(ii) Announce proposals to amend the Appendices, draft resolutions, and other documents that the United States is considering submitting to the CoP.

(iii) Provide the CoP agenda and a list of the amendments to the Appendices proposed for the CoP, a summary of our proposed negotiating positions on these items, and the reasons for our proposed positions.

(4) Consider comments received in response to notices or postings provided in paragraph (a)(3) of this section.

(b) We submit the following documents to the Secretariat for consideration at the CoP:

(1) Draft resolutions and other documents at least 150 days before the CoP.

(2) Proposals to amend the Appendices at least 150 days before the CoP if we have consulted all range countries, or 330 days before the CoP if we have not consulted the range countries. For the latter, the additional time allows for the range countries to be consulted through the Secretariat.

(c) The Director may modify or suspend any of these procedures if they would interfere with the timely or appropriate development of documents for submission to the CoP and U.S. negotiating positions.

(d) We may receive additional information at a CoP or circumstances may develop that have an impact on our tentative negotiating positions. As a result, the U.S. representatives to a CoP may find it necessary to modify, reverse, or otherwise change any of those positions when to do so would be in the best interests of the United States or the conservation of the species.

§ 23.88 **What are the resolutions and decisions of the CoP?**

(a) *Purpose.* Under Article XI of the Treaty, the Parties agree to resolutions and decisions that clarify and interpret the Convention to improve its effectiveness. Resolutions are generally intended to provide long-standing guidance, whereas decisions typically contain instructions to a specific committee, Parties, or the Secretariat. Decisions are often intended to be implemented by a specific date, and then they expire.

(b) *Effective date.* A resolution or decision adopted by the Parties becomes effective 90 days after the last day of the meeting at which it was adopted, unless otherwise specified in the resolution or decision.

## Subpart H—Lists of Species

§ 23.89 **What are the criteria for listing species in Appendix I or II?**

(a) *Purpose.* Article XV of the Treaty sets out the procedures for amending CITES Appendices I and II. A species must meet trade and biological criteria listed in the CITES resolution for amendment of Appendices I and II. When determining whether a species qualifies for inclusion in or removal from Appendix I or II, or transfer from one Appendix to another, we will:

(1) Consult with States, Tribes, range countries, relevant experts, other Federal agencies, and the general public.

(2) Utilize the best available biological information.

(3) Evaluate that information against the criteria in paragraphs (b) through (f) of this section.

(b) *Listing a species in Appendix I.* Any species qualifies for inclusion in Appendix I if it is or may be affected by trade and meets, or is likely to meet, at least one biological criterion for Appendix I.

(1) These criteria are:

(i) The size of the wild population is small.

(ii) Area of distribution is restricted.

(iii) There is an observed, inferred, or projected marked decline in the population size in the wild.

(2) Factors to be considered include, but are not limited to, population and

221

range fragmentation; habitat availability or quality; area of distribution; taxon-specific vulnerabilities due to life history, behavior, or other intrinsic factors, such as migration; population structure and niche requirements; threats from extrinsic factors such as the form of exploitation, introduced species, habitat degradation and destruction, and stochastic events; or decreases in recruitment.

(c) *Listing a species in Appendix II due to actual or potential threats.* Any species qualifies for inclusion in Appendix II if it is or may be affected by trade and meets at least one of the criteria for listing in Appendix II based on actual or potential threats to that species. These criteria are:

(1) It is known, or can be inferred or projected, that the regulation of trade is necessary to avoid the species becoming eligible for inclusion in Appendix I in the near future.

(2) It is known, or can be inferred or projected, that the regulation of trade in the species is required to ensure that the harvest of specimens from the wild is not reducing the wild population to a level at which its survival might be threatened by continued harvest or other influences.

(d) *Listing a species in Appendix II due to similarity of appearance or other factors.* Any species qualifies for inclusion in Appendix II if it meets either of the criteria for listing in Appendix II due to similarity of appearance or other factors. These criteria are:

(1) The specimens of the species in the form in which they are traded resemble specimens of a species listed in Appendix II due to criteria in paragraph (c) of this section or in Appendix I, such that enforcement officers who encounter specimens of such similar CITES species are unlikely to be able to distinguish between them.

(2) There are compelling reasons other than those in paragraph (d)(1) of this section to ensure that effective control of trade in currently listed species is achieved.

(e) *Other issues.* We will evaluate any potential changes to the Appendices, taking into consideration other issues, including but not limited to, split-listing, annotation, listings of higher taxa and hybrids, and specific listing issues

related to plants and commercially exploited aquatic species.

(f) *Precautionary measures.* We will evaluate any potential transfers from Appendix I to II or removal of species from the Appendices in the context of precautionary measures.

(g) *Proposal.* If a Party determines that a taxon qualifies for inclusion in or removal from Appendix I or II, or transfer from one Appendix to another, a proposal may be submitted to the Secretariat for consideration by the CoP.

(1) The proposal should indicate the intent of the specific action (such as inclusion in Appendix I or II); be specific and accurate as to the parts and derivatives to be included in the listing; ensure that any proposed annotation is consistent with existing annotations; state the criteria against which the proposal is to be judged; and provide a justification for the basis on which the species meets the relevant criteria.

(2) The proposal must be in a prescribed format. Contact the U.S. Scientific Authority for a copy (see § 23.7).

### § 23.90  What are the criteria for listing species in Appendix III?

(a) *Purpose.* Article XVI of the Treaty sets out the procedures for amending Appendix III.

(b) *General procedure.* A Party may unilaterally, at any time, submit a request to list a species in Appendix III to the CITES Secretariat. The listing will become effective 90 days after the Secretariat notifies the Parties of the request.

(c) *Criteria for listing.* For a Party to list a species in Appendix III, all of the following criteria must be met:

(1) The species must be native to the country listing the species.

(2) The species must be protected under that country's laws or regulations to prevent or restrict exploitation and control trade, and the laws or regulations are being implemented.

(3) The species is in international trade, and there are indications that the cooperation of other Parties would help to control illegal trade.

(4) The listing Party must inform the Management Authorities of other

range countries, the known major importing countries, the Secretariat, and the Animals Committee or the Plants Committee that it is considering the listing and seek their opinions on the potential effects of the listing.

(d) *Annotation.* The listing Party may annotate the Appendix-III listing to include only specific parts, products, derivatives, or life stages, as long as the Secretariat is notified of the annotation.

(e) *U.S. procedure.* The procedure to list a species native to the United States in Appendix III is as follows:

(1) We will consult with and solicit comments from all States and Tribes where the species occurs and all other range countries.

(2) We will publish a proposed rule in the FEDERAL REGISTER to solicit comments from the public.

(3) If after evaluating the comments received and available information we determine the species should be listed in Appendix III, we will publish a final rule in the FEDERAL REGISTER and notify the Secretariat of the listing.

(f) *Removing a species from Appendix III.* We will monitor the international trade in Appendix-III species listed by us and periodically evaluate whether each species continues to meet the listing criteria in paragraph (c) of this section. We will remove a species from Appendix III provided all of the following criteria are met:

(1) International trade in the species is very limited. As a general guide, we will consider removal when exports involve fewer than 5 shipments per year or fewer than 100 individual animals or plants.

(2) Legal and illegal trade in the species, including international trade or interstate commerce, is determined not to be a concern.

(g) *Transferring a species from Appendix III to Appendix I or II.* If, after monitoring the trade and evaluating the status of an Appendix-III species we listed, we determine that the species meets the criteria in § 23.89(b) through (d) of this section for listing in Appendix I or II, we will consider whether to submit a proposal to amend the listing at the next CoP.

**§ 23.91 How do I find out if a species is listed?**

(a) *CITES list.* The official CITES list includes species of wildlife and plants placed in Appendix I, II, and III in accordance with the provisions of Articles XV and XVI of the Treaty. This list is maintained by the CITES Secretariat based on decisions of the Parties. You may access the official list from the CITES website (see § 23.7).

(b) *Effective date.* Amendments to the CITES list are effective as follows:

(1) Appendix-I and -II species listings adopted at the CoP are effective 90 days after the last day of the CoP, unless otherwise specified in the proposal.

(2) Appendix-I and -II species listings adopted between CoPs by postal procedures are effective 120 days after the Secretariat has communicated comments and recommendations on the listing to the Parties if the Secretariat does not receive an objection to the proposed amendment from a Party.

(3) Appendix-III species listings are effective 90 days after the date the Secretariat has communicated such listings to the Parties. A listing Party may withdraw a species from the list at any time by notifying the Secretariat. The withdrawal is effective 30 days after the Secretariat has communicated the withdrawal to the Parties.

**§ 23.92 Are any wildlife or plants, and their parts, products, or derivatives, exempt?**

(a) All living or dead wildlife and plants in Appendix I, II, and III and all their readily recognizable parts, products, and derivatives must meet the requirements of CITES and this part, except as indicated in paragraph (b) of this section.

(b) The following are exempt from the requirements of CITES and do not need CITES documents. You may be required to demonstrate that your specimen qualifies as exempt under this section. For specimens that are exempt from CITES requirements, you must still follow the clearance requirements for wildlife in part 14 of this subchapter and for plants in part 24 of this subchapter and 7 CFR parts 319, 352, and 355.

(1) *Appendix-III wildlife and Appendix-II or -III plants.* (i) Where an annotation

designates what is excluded from CITES requirements, any part, product, or derivative that is specifically excluded.

(ii) Where an annotation designates what is covered by the Treaty, all parts, products, or derivatives that are not designated.

(2) *Plant hybrids.* (i) Seeds and pollen (including pollinia), cut flowers, and flasked seedlings or tissue cultures of hybrids that qualify as artificially propagated (see §23.64) and that were produced from one or more Appendix-I species or taxa that are not annotated to specifically include hybrids in the CITES list.

(ii) Specimens of an Appendix-II or -III plant taxon with an annotation that specifically excludes hybrids.

(3) *Flasked seedlings of Appendix-I orchids.* Flasked seedlings of an Appendix-I orchid species that qualify as artificially propagated (see §23.64).

(4) *Marine specimens listed in Appendix II that are protected under another treaty, convention, or international agreement which was in force on July 1, 1975* as provided in §23.39(d).

(5) *Coral sand and coral fragments* as defined in §23.5.

(6) *Personal and household effects* as provided in §23.15.

(7) *Urine, feces, and synthetically derived DNA* as provided in §23.16.

(8) *Certain wildlife hybrids* as provided in §23.43.

## PART 24—IMPORTATION AND EXPORTATION OF PLANTS

### Subpart A—Introduction

Sec.
24.1　Purpose of regulations.
24.2　Scope of regulations.

**Subpart B—Importation and Exportation at Designated Ports**

24.11　General restrictions.
24.12　Designated ports.

AUTHORITY: Secs. 9(f)(1), 11(f), Pub. L. 93–205, 87 Stat 893, 897 (16 U.S.C. 1538(f)(1), 1540(f)).

SOURCE: 49 FR 42941, Oct. 25, 1984, unless otherwise noted.

## Subpart A—Introduction

### §24.1　Purpose of regulations.

The regulations contained in this part are for the purpose of establishing ports for the importation, exportation and reexportation of plants.

### §24.2　Scope of regulations.

The provisions in this part are in addition to, and do not supersede, other regulations in this chapter. Also, the U.S. Department of Agriculture administers the Plant Quarantine Act, as amended (7 U.S.C. 151 *et seq.*), the Federal Plant Pest Act, as amended (7 U.S.C. 150aa *et seq.*), and the Federal Noxious Weed Act of 1974 (7 U.S.C. 2801 *et seq.*), which contain authority for additional prohibitions and restrictions, including additional port of entry requirements, for the importation or exportation of plants (See 7 CFR chapter III for regulations containing prohibitions and restrictions under these authorities).

## Subpart B—Importation and Exportation at Designated Ports

### §24.11　General restrictions.

No person shall import, export, or reexport plants at any place other than at a port designated in 24.12 (hereinafter "designated port") in accordance with the provisions of this part, unless otherwise specifically authorized by the Service at a nondesignated port in accordance with section 9(f)(1) of the Endangered Species Act of 1973, as amended.

### §24.12　Designated ports.

(a) The following U.S. Department of Agriculture ports are designated ports for the importation, exportation, or reexportation of plants which are listed in 50 CFR 17.12 and/or 23.23 and which are required to be accompanied by documentation under 50 CFR part 17 and/or 23:

Nogales, Arizona
Los Angeles, California
San Diego, California
San Francisco, California
Miami, Florida
Orlando, Florida
Honolulu, Hawaii
New Orleans, Louisiana

# Convention on International Trade
# in Endangered Species of Wild Fauna and Flora

**Signed at Washington, D.C., on 3 March 1973**
**Amended at Bonn, on 22 June 1979**
**Amended at Gaborone, on 30 April 1983**

The Contracting States,

*Recognizing* that wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems of the earth which must be protected for this and the generations to come;

*Conscious* of the ever-growing value of wild fauna and flora from aesthetic, scientific, cultural, recreational and economic points of view;

*Recognizing* that peoples and States are and should be the best protectors of their own wild fauna and flora;

*Recognizing*, in addition, that international co-operation is essential for the protection of certain species of wild fauna and flora against over-exploitation through international trade;

*Convinced* of the urgency of taking appropriate measures to this end;

*Have agreed* as follows:

# Article I                                           Definitions

For the purpose of the present Convention, unless the context otherwise requires:

(a) "Species" means any species, subspecies, or geographically separate population thereof;

(b) "Specimen" means:

    (i) any animal or plant, whether alive or dead;

    (ii) in the case of an animal: for species included in Appendices I and II, any readily recognizable part or derivative thereof; and for species included in Appendix III, any readily recognizable part or derivative thereof specified in Appendix III in relation to the species; and

    (iii) in the case of a plant: for species included in Appendix I, any readily recognizable part or derivative thereof; and for species included in Appendices II and III, any readily recognizable part or derivative thereof specified in Appendices II and III in relation to the species;

(c) "Trade" means export, re-export, import and introduction from the sea;

(d) "Re-export" means export of any specimen that has previously been imported;

(e) "Introduction from the sea" means transportation into a State of specimens of any species which were taken in the marine environment not under the jurisdiction of any State;

(f) "Scientific Authority" means a national scientific authority designated in accordance with Article IX;

(g) "Management Authority" means a national management authority designated in accordance with Article IX;

(h) "Party" means a State for which the present Convention has entered into force.

# Article II

# Fundamental principles

1. Appendix I shall include all species threatened with extinction which are or may be affected by trade. Trade in specimens of these species must be subject to particularly strict regulation in order not to endanger further their survival and must only be authorized in exceptional circumstances.

2. Appendix II shall include:

    (a) all species which although not necessarily now threatened with extinction may become so unless trade in specimens of such species is subject to strict regulation in order to avoid utilization incompatible with their survival; and

    (b) other species which must be subject to regulation in order that trade in specimens of certain species referred to in sub-paragraph (a) of this paragraph may be brought under effective control.

3. Appendix III shall include all species which any Party identifies as being subject to regulation within its jurisdiction for the purpose of preventing or restricting exploitation, and as needing the co-operation of other Parties in the control of trade.

4. The Parties shall not allow trade in specimens of species included in Appendices I, II and III except in accordance with the provisions of the present Convention.

# Article III

# Regulation of trade in specimens of species included in Appendix I

1. All trade in specimens of species included in Appendix I shall be in accordance with the provisions of this Article.

2. The export of any specimen of a species included in Appendix I shall require the prior grant and presentation of an export permit. An export permit shall only be granted when the following conditions have been met:

    (a) a Scientific Authority of the State of export has advised that such export will not be detrimental to the survival of that species;

    (b) a Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora;

    (c) a Management Authority of the State of export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment; and

    (d) a Management Authority of the State of export is satisfied that an import permit has been granted for the specimen.

3. The import of any specimen of a species included in Appendix I shall require the prior grant and presentation of an import permit and either an export permit or a re-export certificate. An import permit shall only be granted when the following conditions have been met:

    (a) a Scientific Authority of the State of import has advised that the import will be for purposes which are not detrimental to the survival of the species involved;

    (b) a Scientific Authority of the State of import is satisfied that the proposed recipient of a living specimen is suitably equipped to house and care for it; and

    (c) a Management Authority of the State of import is satisfied that the specimen is not to be used for primarily commercial purposes.

4. The re-export of any specimen of a species included in Appendix I shall require the prior grant and presentation of a re-export certificate. A re-export certificate shall only be granted when the following conditions have been met:

(a) a Management Authority of the State of re-export is satisfied that the specimen was imported into that State in accordance with the provisions of the present Convention;

(b) a Management Authority of the State of re-export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment; and

(c) a Management Authority of the State of re-export is satisfied that an import permit has been granted for any living specimen.

5. The introduction from the sea of any specimen of a species included in Appendix I shall require the prior grant of a certificate from a Management Authority of the State of introduction. A certificate shall only be granted when the following conditions have been met:

(a) a Scientific Authority of the State of introduction advises that the introduction will not be detrimental to the survival of the species involved;

(b) a Management Authority of the State of introduction is satisfied that the proposed recipient of a living specimen is suitably equipped to house and care for it; and

(c) a Management Authority of the State of introduction is satisfied that the specimen is not to be used for primarily commercial purposes.

# Article IV                    Regulation of trade in specimens of species included in Appendix II

1. All trade in specimens of species included in Appendix II shall be in accordance with the provisions of this Article.

2. The export of any specimen of a species included in Appendix II shall require the prior grant and presentation of an export permit. An export permit shall only be granted when the following conditions have been met:

(a) a Scientific Authority of the State of export has advised that such export will not be detrimental to the survival of that species;

(b) a Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora; and

(c) a Management Authority of the State of export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment.

3. A Scientific Authority in each Party shall monitor both the export permits granted by that State for specimens of species included in Appendix II and the actual exports of such specimens. Whenever a Scientific Authority determines that the export of specimens of any such species should be limited in order to maintain that species throughout its range at a level consistent with its role in the ecosystems in which it occurs and well above the level at which that species might become eligible for inclusion in Appendix I, the Scientific Authority shall advise the appropriate Management Authority of suitable measures to be taken to limit the grant of export permits for specimens of that species.

4. The import of any specimen of a species included in Appendix II shall require the prior presentation of either an export permit or a re-export certificate.

(e)   to invite the attention of the Parties to any matter pertaining to the aims of the present Convention;

(f)   to publish periodically and distribute to the Parties current editions of Appendices I, II and III together with any information which will facilitate identification of specimens of species included in those Appendices;

(g)   to prepare annual reports to the Parties on its work and on the implementation of the present Convention and such other reports as meetings of the Parties may request;

(h)   to make recommendations for the implementation of the aims and provisions of the present Convention, including the exchange of information of a scientific or technical nature;

(i)   to perform any other function as may be entrusted to it by the Parties.

## Article XIII                                International measures

1.   When the Secretariat in the light of information received is satisfied that any species included in Appendix I or II is being affected adversely by trade in specimens of that species or that the provisions of the present Convention are not being effectively implemented, it shall communicate such information to the authorized Management Authority of the Party or Parties concerned.

2.   When any Party receives a communication as indicated in paragraph 1 of this Article, it shall, as soon as possible, inform the Secretariat of any relevant facts insofar as its laws permit and, where appropriate, propose remedial action. Where the Party considers that an inquiry is desirable, such inquiry may be carried out by one or more persons expressly authorized by the Party.

3.   The information provided by the Party or resulting from any inquiry as specified in paragraph 2 of this Article shall be reviewed by the next Conference of the Parties which may make whatever recommendations it deems appropriate.

## Article XIV                   Effect on domestic legislation and international conventions

1.   The provisions of the present Convention shall in no way affect the right of Parties to adopt:

(a)   stricter domestic measures regarding the conditions for trade, taking, possession or transport of specimens of species included in Appendices I, II and III, or the complete prohibition thereof; or

(b)   domestic measures restricting or prohibiting trade, taking, possession or transport of species not included in Appendix I, II or III.

2.   The provisions of the present Convention shall in no way affect the provisions of any domestic measures or the obligations of Parties deriving from any treaty, convention, or international agreement relating to other aspects of trade, taking, possession or transport of specimens which is in force or subsequently may enter into force for any Party including any measure pertaining to the Customs, public health, veterinary or plant quarantine fields.

3.   The provisions of the present Convention shall in no way affect the provisions of, or the obligations deriving from, any treaty, convention or international agreement concluded or which may be concluded between States creating a union or regional trade agreement establishing or maintaining a common external Customs control and removing Customs control between the

12. *It is further ordered,* That this proceeding is terminated.

(Secs. 4, 5, 303, 48 Stat., as amended, 1066, 1068, 1082; (47 U.S.C. 154, 155, 303).)

FEDERAL COMMUNICATIONS
COMMISSION,
WALLACE E. JOHNSON,
*Chief, Broadcast Bureau.*

[FR Doc. 78-13007 Filed 5-11-78; 8:45 a.m.]

[Docket No. 21511; RM-2752]

## PART 73—RADIO BROADCAST SERVICES

### FM Broadcast Station Harrison, Ark.; Changes Made in Table of Assignments

AGENCY: Federal Communications Commission.

ACTION: Report and Order.

SUMMARY: Action taken herein assigns a Class A FM channel to Harrison, Ark. The channel assignment provides for a second FM station which could provide a third local aural broadcast service to the community.

EFFECTIVE DATE: June 19, 1978.

ADDRESS: Federal Communications Commission, Washington, D.C. 20554.

FOR FURTHER INFORMATION CONTACT:

Mildred B. Nesterak, Broadcast Bureau, 202-632-7792.

SUPPLEMENTARY INFORMATION:
REPORT AND ORDER—PROCEEDING
TERMINATED

Adopted: May 5, 1978.

Released: May 8, 1978.

In the matter of amendment of § 73.202(b), Table of Assignments, FM Broadcast Stations (Harrison, Ark.), Docket No. 21511, RM-2752.

1. The Commission has before it the *Notice of Proposed Rulemaking,* 42 FR 1513, proposing the assignment of Channel 244A to Harrison, Ark., as its second FM assignment. The proceeding was instituted on the basis of a petition filed by Charles E. Bowman and Don E. Loveland ("petitioners"). Supporting comments were filed by petitioners reaffirming their intention to file for the channel, if assigned, and their willingness to compete under such circumstances. No oppositions were received.

2. Harrison (pop. 7,239), in Boone County (pop. 19,073),[1] is located in northwestern Arkansas, 176 kilometers (110 miles) northwest of Little Rock. It presently receives local service from Station KHOZ-FM (Channel 275), and daytime-only AM Station KHOZ, both licensed to Harrison Broadcasting Corp.

3. Petitioners state that Harrison's

[1]Population figures are taken from the 1970 U.S. Census.

population has increased 23 percent during the last 5 years. They assert that the area's economy depends on agriculture, light manufacturing and leisure industry. Petitioners note that food processing, wood products, apparel, electrical, and plastic manufacturing are the major industries. In support of its proposal, petitioners have submitted letters from local officials and citizens indicating their support for the proposed assignment.

4. Petitioners show that there is no Class C channel available for assignment to Harrison, but they state that the proposed Class A FM channel could be used to provide a second FM and second nighttime aural service to 10,800 persons residing in an area of 15,000 square kilometers (580 square miles). Preclusion would occur only on Channel 244A, affecting a small area in which Harrison is located.

5. While the proposed assignment would contravene the usual policy of avoiding intermixture of a Class A with a Class C channel in a particular community, we have deviated from this policy when there is no Class C channel available for assignment and there is a demand for a Class A channel and there is a willingness to compete under such circumstances. Yakima, Wash., 42 FCC 2d 548, 550 (1973); Key West, Fla., 45 FCC 2d 142, 145 (1974). There is no Class C FM channel that could be assigned to Harrison, and petitioner has expressed a desire to apply for Channel 244A at Harrison in spite of the intermixture situation. We believe it is in the public interest to make the assignment which would provide a second local FM service to the community.

6. In view of the foregoing: *It is ordered,* That effective June 19, 1978, §73.202(b) of the Commission's rules, the FM Table of Assignments, is amended to read as follows for the community listed below:

*City and Channel No.*

Harrison, Ark.; 244A, 275.

7. Authority for the action taken herein is contained in Sections 4(i), 5(d)(1), 303 (g) and (r), and 307(b) of the Communications Act of 1934, as amended, and §0.281 of the Commission's rules.

8. *It is further ordered,* That this proceeding is terminated.

(Secs. 4, 5, 303, 48 Stat., as amended, 1066, 1068, 1082; (47 U.S.C. 154, 155, 303).)

FEDERAL COMMUNICATIONS
COMMISSION.

WALLACE E. JOHNSON,
*Chief, Broadcast Bureau.*

[FR Doc. 78-13008 Filed 5-11-78; 8:45 am]

[4310-55]

### Title 50—Wildlife and Fisheries

## CHAPTER I—UNITED STATES FISH AND WILDLIFE SERVICE, DEPARTMENT OF THE INTERIOR

### PART 17—ENDANGERED AND THREATENED WILDLIFE AND PLANTS

### Listing of the African Elephant as a Threatened Species

AGENCY: Fish and Wildlife Service, Interior.

ACTION: Final rule.

SUMMARY: The Service determines the African elephant (*Loxodonta africana*) to be a Threatened species. Special regulations are issued for importation of and interstate commerce in this species. These regulations represent a modified and more restrictive version of Option II of the Service's proposed rulemaking of January 16, 1978. Ivory and other African elephant products will be able to enter the U.S. only if exported under specified conditions from countries that are parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora. A review of the status of the African elephant has shown that it is declining in many parts of its range and that illegal poaching for ivory is a factor in the decline. It is anticipated that this rule will provide additional protection to the species.

DATE: This rule will become effective on June 11, 1978.

FOR FURTHER INFORMATION CONTACT:

Mr. Keith M. Schreiner, Associate Director—Federal Assistance, Fish and Wildlife Service, U.S. Department of the Interior, Washington, D.C. 20240, telephone 202-343-4646.

SUPPLEMENTARY INFORMATION:

BACKGROUND

The African elephant has a long history of conflict with and exploitation by man. Even during the era of the Romans some elephant populations were depleted through the taking of animals for ivory or entertainment purposes. In modern times, elephants were exterminated in large parts of their range by ivory hunters and pressure from growing human populations. After passage of the Endangered Species Act of 1973, the Service came to consider the African elephant as a possible candidate for listing in the new Threatened category provided by the Act. The Service has been especially concerned about reports that the species was declining rapidly in some

areas, partly because of intensified killing for ivory.

On August 18, 1977, the Service was petitioned by the Fund for Animals (1765 P Street NW., Washington, D.C. 20036) to "protect the African elephant as an endangered species." The Service decided that this petition presented insufficient data on which to base an immediate proposed rulemaking, and also rejected the idea that the status of the species was so desperate as to warrant listing in the highly restrictive Endangered category. The best available information indicates that there are at least 1.3 million of these animals still in existence, and that there still are some large, apparently well-protected populations.

On November 23, 1977, the Service telegrammed Dr. Iain Douglas-Hamilton, Chairman of the Elephant Specialist Group of the International Union for Conservation of Nature and Natural Resources (IUCN). Dr. Douglas-Hamilton has completed two years of a three-year survey of the African elephant, sponsored by the IUCN and World Wildlife Fund. He is a highly respected authority on the biology and conservation of the species, and is in continuous contact with numerous other experts. Through detailed correspondence and his own field investigations, he has assembled an immense amount of information, covering all major parts of the range of the elephant. The Service considers him to be the best available source for data on the general status of the species. On December 8, 1977, Douglas-Hamilton cabled a summary of his data to the Service, and subsequently, at the expense of the U.S. Government, he personally traveled to Washington, D.C., to present information to the House Merchant Marine and Fisheries Committee, and to the staff of the Service's Office of Endangered Species. On the basis of this information and the Service's own review of pertinent literary references, the African elephant was proposed for listing as a Threatened species in the FEDERAL REGISTER of January 16, 1978 (43 FR 2193–2196). New information and comments received following the proposal have not altered the Service's view that this classification is warranted for the elephant, because of its history of exploitation, considerable loss of habitat and range, and recent drastic declines in some areas.

In its proposal, the Service stated that it recognized "that the conservation of the elephant is intimately associated with the ivory trade. It would be advisable to carefully control commercial activity for the welfare of the species, and quite possibly for the ultimate benefit of the trade itself. Nevertheless, it may not be advisable to completely stop commerce or, insofar as can be accomplished by the Service,

importation into the United States. Substantial amounts of ivory are collected from elephants that die of natural causes or are killed legally to protect human life or property. A limited number of elephants can be killed each year, and their ivory used, without detriment to overall populations. The sale of such ivory could result in extra funds for conservation programs, or at least could provide an economic incentive for such programs. On the other hand, legal sales may stimulate poaching, and it may be impossible to determine how a particular product was obtained."

Because of the difficulty in formulating appropriate conservation measures, the Service issued a series of options that could be considered by the public, scientific community, government officials, and commercial interests. The Service indicated that in any final rulemaking it might issue a variation of one or more of these options, or other reasonable measures that were in accord with sound conservation principles.

Option I simply would have applied all the standard prohibitions (and permit exceptions) for Threatened species to the African elephant, and so essentially would have ended legal commercial import of ivory and other elephant products into the United States. Option II would have allowed importation and other utilization of elephant products from nations that were party to the Convention on International Trade in Endangered Species of Wild Fauna and Flora. Option III would have allowed importation only from nations providing satisfactory certification and evidence that exports to the United States were consistent with effective conservation programs for the elephant. Option IV would have provided for importation from countries meeting the criteria of Option II or III, and from countries that might not have elephant populations, but which could demonstrate that the product involved originated in a nation meeting the criteria of Option II or III.

SUMMARY OF COMMENTS

Approximately 580 of the persons who responded to the proposal during the designated comment period supported Option I or even more restrictive measures for the protection of the African elephant. Approximately 207 persons indicated that their livelihood was totally or partly dependent on ivory, and that they were opposed to a complete ban on its importation and interstate movement. Almost all of these persons, however, observed that they did not consider their business to be detrimental to the elephant, and that they would favor measures to insure that only ivory taken legally and in accordance with sound conser-

vation practices could be imported; about 155 of these persons indicated support for Option III. Approximately 90 other parties also supported Option III. In addition, about 50 persons wrote to express concern that a ban on ivory importation would adversely affect the economic status of some people, but did not indicate that they were referring to themselves, and did not express support for a particular option. Approximately 35 parties suggested that any ban on importation of elephant products should not apply to trophies taken legally by big game hunters. Approximately 50 persons expressed the view that the elephant was not Endangered or Threatened, and did not indicate that they preferred any particular option for regulation.

Among the parties supporting Option I, or comparative measures, were the Defenders of Wildlife; Earthforce Environmental Society (which, based on extensive interviews with authorities in Kenya, Tanzania, and Zambia, recommended a total ban for six months, followed by implementation of Option II); Elsa Wild Animal Appeal; Fund for Animals; Natural Resources Defense Council; Mr. Thomas O. Nicholson, Director of the American Museum of Natural History; Mr. R. Marlin Perkins, Acting Director of the Wild Canid Survival and Research Center; U.S. Representative Anthony C. Beilenson of California; U.S. Representative G. William Whitehurst of Virginia; State Senator George Rogers of New Bedford, Massachusetts; and the following member organizations of the Monitor Consortium: Fund for Animals, Animal Welfare Institute, Humane Society of the United States, Rare Animal Relief Effort, National Parks and Conservation Association, Society for Animal Protective Legislation, Let Live, Washington Humane Society, International Primate Protection League, Committee for the Preservation of the Tule Elk, Massachusetts Audubon Society, and Connecticut Cetacean Society. Most of these parties pointed out that any option, other than Option I, might allow opportunity for considerable smuggling and other abuse of the regulations. Congressman Beilenson, for example, wrote that the basic problem with the other options "arises from the difficulty in obtaining satisfactory documentation showing that the product came from an elephant killed legally in an exempt country of origin. Efforts to enforce a selective prohibition on imports would depend entirely on the ability of Customs and the U.S. Fish and Wildlife Service inspectors to determine the authenticity and accuracy of the required documents * * *. The enforcement officials feel that there is a much higher incidence of falsified or inaccurate documents than they can

uncover. Thus, efforts to implement regulations requiring documentation are difficult, and the difficulties may be insurmountable". Congressman Beilenson, however, also recommended "that the Department establish a procedure under which African nations with legitimate claims of hardship can petition for an exemption. These can then be dealt with on a case-by-case basis, and precise quotas for direct shipment of ivory and other products could be established in line with those nations' conservation programs."

Such an approach would seem to be a modified version of Option III, and would involve U.S. analyses and approval or disapproval of the conservation programs of foreign nations. As stated above, there is no established mechanism for such procedures, and the Service does not consider them to be necessary at this time.

Although nearly all African nations, and several of the major ivory reexporting countries, were officially notified of the proposal, responses were received from only eight foreign governments. Liberia, noting that the elephant had become rare because of poaching, favored Option I. Botswana, Mozambique, and Rhodesia stated that the elephant was not endangered or threatened in their territory, that they had effective conservation programs for the species, and that a ban on ivory export would be detrimental to their economics. Support for Option II was received from the following parties in the Republic of South Africa: Secretary for Planning and the Environment, National Parks Board of Trustees, and Kruger National Park. Tanzania, which reported a large, adequately protected elephant population, indicated preference for both Options II and III, and noted that it would very soon ratify the Convention on International Trade in Endangered Species of Wild Fauna and Flora. Zambia stated that it had a large elephant population that could sustain a considerable annual take for ivory, and that Option III would be most suitable. Hong Kong supported Option IV, observing that its ivory carving industry provided employment for 3,000 craftsmen and had sent 30 percent of its $24,000,000 of exports in 1977 to the United States.

Option IV also was supported by the Endangered Wildlife Trust (Republic of South Africa), the American Association of Zoological Parks and Aquariums, and the IUCN Elephant Specialist Group. The comments of the latter party, submitted by Dr. Iain Douglas-Hamilton, explained that it would be preferable for the United States to remain involved with the ivory trade, and so have the means of helping to regulate and control such trade.

The National Wildlife Federation suggested that the United States limit its importation of ivory to raw ivory directly from the country of origin, and accompanied by export permits and documentation showing that such export would not be detrimental to the population. It was pointed out that whole tusks, unlike manufactured products, can be easily traced and their movement controlled. It also was explained that such tusks often became available through natural death, necessary cropping, or confiscation, and that their sale could provide funds for conservation measures. The Service understands this position, but considers that any plan involving required documentation for a conservation program essentially involves a version of Option III, which has been rejected for reasons set forth above. Limitation of import to whole tusks may indeed make enforcement easier, but the Service is not at this time prepared to state that a ban on manufactured products is in itself necessary for the conservation of the elephant. Reexporting nations, that are willing to follow the provisions of the International Convention, as implemented by the regulations issued herewith, in their own importation and utilization of ivory, should not be denied the opportunity to trade with the United States, unless specific circumstances warrant a change in policy.

The National Rifle Association of America opposed the proposed listing measure, because of the following given reasons: (1) the proposal allegedly stated that the ivory trade was the principal reason for the decline of the elephant, when actually other major factors were involved; (2) the proposal did not present substantial evidence warranting a threatened listing; (3) the draft impact assessment prepared in conjunction with the proposal was inadequate, and an environmental impact statement was required; (4) the Service did not prepare a "regulatory analysis" as was allegedly required by a Proposed Executive Order issued November 18, 1977; and (5) all four of the published options were defective as a matter of law or should be rejected as a matter of policy. In response, the Service considers that the information contained in the proposal, and in this rulemaking, adequately supports the listing measures, and makes it clear that the ivory trade is not the only major factor of concern. The Service feels that all requirements of law have been met in the preparation of the final rulemaking, and that the regulations selected are both legally appropriate and meaningful to the conservation of the elephant. The points made by the National Rifle Association have been considered in the preparation of the final version of the impact assessment.

The Safari Club International, the Safari Club International Conservation Fund, and the American Hunters' Educational and Legal Protection Fund submitted a joint response. A total ban on importation of elephant products was opposed as being detrimental to the economies of several African countries and unnecessarily restrictive to American trophy hunters. Legitimate sport hunting was not considered a threat to the elephant and was said to actually be beneficial to the species by providing an economic incentive to maintain populations and a means of guarding against poaching. It was proposed that the elephant be listed as threatened only in certain African countries where the situation reportedly warranted such a measure, and that export from such countries be allowed in the case of legitimate trophy hunters, nations that had ratified the International Convention, and nations that provided certification of adequate conservation programs. The Service appreciates the effort involved in preparing this detailed plan, but does not consider it more advantageous than that published herein. The Service prefers to deal with the African elephant as a single entity and to determine a classification expressing its overall status. The history and current problems of the species call for a threatened listing. The International Convention provides a mechanism for controlling the export of the elephant, and so long as this mechanism is functioning properly, there is no call for the United States to set up more, or less restrictive measures.

The American Ivory Importers Association, one concern of which is the movement of ivory products from Hong Kong, opposed Options I and II as being unnecessary and possibly detrimental to the conservation of the elephant, and as adversely affecting the economic interests of some African countries. The Association suggested a modified version of Option III, which would add provisions for reexport. There would be an initial U.S. evaluation of the conservation programs of African nations, and export would be allowed only directly from those countries approved, or from reexporting nations that could demonstrate that the product involved had originated from an approved African country. It was suggested that certificates of origin be issued by the U.S. consulate in the source country, and that all manufacturers and importers be required to maintain detailed records to facilitate investigation. The Service appreciates the interest of the Association in insuring that ivory exports are not detrimental to elephant populations, but considers that the existing control mechanism of the International Convention would be more advantageous than newly imposed measures. The suggestion that manufacturers and importers maintain adequate rec-

Addendum 101

ords could just as well apply to an Option II situation.

Mr. Kenneth N. Enright, managing director of Midwest Distributors of Urbana, Ill., a firm involved in the importation of raw ivory, submitted a detailed response stating that the African elephant was not seriously threatened and that claims of the detrimental effects of the ivory trade had been greatly exaggerated. He pointed out that warnings of the imminent extinction of the elephant, because of the take for ivory, had been made nearly a century ago, but that the species was still abundant and even increasing in some areas. The utilization of ivory was said to have actually declined in recent years, and since the 1960's many firms involved in the trade reportedly had left the business. Within the United States, however, there still were about 3,170 persons said to be "engaged, wholly or in part, in the manufacture of articles, artwork or jewelry based on raw ivory." Mr. Enright disputed widely circulated statements that the price of ivory had increased tenfold in recent years, and stated that the Service should not have based its proposal on such a factor. He presented documentation suggesting that the average price paid by his own firm had increased only about fourfold since the late 1960's, and noted that part of the increase had been caused by such factors as rising taxes and transport costs, rather than higher profits for suppliers. Although acknowledging that there were problems in some parts of the elephant's range, he stated that the amount of ivory being used in the trade was not excessive. He recommended that the U.S. continue to allow the importation of legally taken whole tusks from African nations, and from those reexporting nations that had ratified the International Convention. He observed that it would be easy to control commerce in whole tusks, but that there should be a temporary ban on the importation of manufactured goods from reexporting countries.

The Service is impressed with the effort that undoubtedly went into Mr. Enright's response, but disagrees with the suggestion, to which much of this response is devoted, that the proposed rulemaking was based mainly on the belief that rising prices were jeopardizing the African elephant. The proposal and this final rulemaking make it clear that the elephant is considered threatened because of a decline in numbers and distribution resulting from a variety of factors, among which is exploitation for ivory. The price being paid for the ivory is an incidental factor and is not in itself a major reason for listing. The Service continues to hold that available evidence shows that exploitation for ivory has been and is a problem for some elephant populations, and that it is advisable to place controls on commercial activity involving the United States.

#### CONCLUSION

The Service has decided to reject Option I, considering that a total ban on international and interstate commercial activity in ivory and other products is not in itself necessary for the conservation of the African elephant. If such factors as natural mortality and the need to relieve excessive population pressures in certain areas are taken into account, there seems no doubt that a substantial amount of ivory and other products, and a certain number of big game trophies could be taken on a regular basis without being detrimental to the overall status of the species. The Service recognizes that problems could develop in verifying that the particular items to be imported or sold were taken in accordance with proper conservation programs, and that there may be some basis for the argument that merely allowing the ivory trade to function will encourage some poaching and ill-advised exploitation. No substantive basis, however, has been presented to show that such problems, particularly if mitigated by the regulatory measures herewith provided, would be insurmountable or would result in significant declines of elephant populations. The Service also has considered the argument that some commercial and sporting take gives an economic incentive for the maintenance of the species. While not yet convinced that such a position is fully valid, the Service is willing to allow the benefit of the doubt, within the scope of the regulations now being issued.

Option III, and the several variations thereof suggested by respondents, also have been rejected. Option IV likewise has been rejected, because it incorporated the provisions of Option III. No mechanism has been established to implement such measures, and they would have put the United States in the difficult position of evaluating and passing judgement on the conservation and law enforcement policies of foreign nations. The comments of some respondents, including certain African governments, suggest that the Service did not sufficiently explain the implications of Option III. This measure would not have required simply a certificate stating that export of a particular item was in accord with an effective conservation program, but probably would have involved detailed U.S. investigation of the involved program. It is likely that the immediate effect of Option III would have been a total ban on importation of elephant products. Individual nations then would have had to provide evidence to the Service, which could have been used for an assessment and decision on whether import could be allowed. The Service now thinks that such measures would not be practical, and would not be necessary since the means of receiving certification of the effectiveness of foreign conservation and legal policies already exists in the form of the International Convention.

The Service has decided to adopt a modified version of Option II, which will allow importation to the U.S. of African elephants and products thereof which have originated in the wild in a country that is a party to the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and have been exported from such country of origin, and in any case of reexportation have been reexported, in accordance with Article IV of such Convention (compliance with Article VII, Paragraphs 2 or 3 of such Convention will not constitute compliance with this provision); and have remained in customs control and in an unaltered condition in any country not a party to such Convention that they enter while in transit to the United States. A special purpose permit may be issued in accordance with the provisions of 50 CFR 17.32 authorizing any activity otherwise prohibited with regard to the African elephant, upon submission of proof that such wildlife was already in the United States on the effective date of this rulemaking, or was imported into the United States in accordance with the above provisions.

The African elephant is on Appendix II of the Convention, which means that when exported from a member nation a permit must be issued certifying that the item involved was taken legally and that its export is not detrimental to the survival of the species. Article IV, however, does more than merely require issuance of a written certificate. It calls for the establishment of a scientific authority in the nation of origin, which is to advise on whether export is detrimental, and for the establishment of a management authority to determine that the laws of the nation are followed.

The regulations issued herewith take advantage of the mechanism established by the Convention. Moreover, these regulations specify that the original export and any subsequent reexports must comply with Article IV. A nation that is a party to the Convention may reexport elephant products to the United States, but only if the involved material had been derived from an African country that had wild elephants and that was party to the Convention, and had been exported from such country of origin in accordance with Article IV. No ivory should enter the United States that is not derived from elephants living wild in nations that are party to the Con-

vention. In the case of African elephants and products thereof that enter the U.S. in accordance with these provisions, or which already are in the U.S. on the effective date of this rulemaking, permits may be issued to allow interstate commerce or any activity otherwise prohibited.

The Service is aware that there have been questions regarding the validity and substance of some export permits issued relative to the Convention. At this time, however, there is no basis for restricting the importation of elephant products from any current or future Convention member, so long as the provisions of the regulations are followed. The Service considers that the pledges made by a sovereign nation, when entering into an agreement with fellow countries for the common good of all, are not to be taken lightly, and that any member nation must be assumed to intend to comply fully with the obligations imposed by Article IV and the other portions of the Convention.

It is not the intent of the Service to either deny commerce to any particular nation that is not a Convention member, or to attempt to pressure any nation to become a member. The Service does encourage all nations to consider membership and establishment of the regulatory bodies called for by the Convention. The immediate objective of the Service, however, is only to find a practical means of insuring that the entry of African elephant products into the United States is not detrimental to the survival of wild populations. The Convention, through its provisions for an international framework of control, the establishment of a common system of regulatory authorities in all member nations, and pledges made at the highest level of Government to numerous fellow nations, now appears to offer the best method.

SUMMARY OF FACTORS AFFECTING THE SPECIES

Section 4(a) of the Act states that the Secretary of the Interior may determine a species to be Endangered or Threatened because of any of five factors. These factors, and their application to the African elephant, are listed below.

1. *The present or threatened destruction, modification or curtailment of its habitat or range.* The African elephant originally occupied all of Africa, except for extremely dry areas, and it probably inhabited the territory of every existing nation on the continent. Its range once included the Mediterranean coast, the lower Nile Valley, and possibly parts of southwestern Asia, but it probably had been exterminated in these areas by about 2,000 years ago. More recently, the species has disappeared in the countries of Afars and Issas, Gambia, Guinea-Bissau, Le-

sotho, Swaziland, and Western Sahara. The elephant still occurs in all other African countries to the south of the Sahara Desert, but its range has been restricted considerably in most of them. This is especially true in western and southern Africa, where the species has held out in remote border areas or in small, isolated patches of suitable habitat. Throughout nearly its entire remaining range, however, the elephant is progressively losing habitat to the expanding human population and associated agricultural development. Many elephants are killed directly because they are considered a threat to man and his crops and settlements, and others die because remaining habitat cannot support them. Certain elephant "population explosions" have received much publicity, but these often are associated with forced crowding imposed by man, and, in any case, represent only a small percentage of the overall range of the species.

According to information provided by Douglas-Hamilton, the African elephant is known to be declining in 18 of 33 countries where it still survives, and in five of these the decrease is rapid. In two other countries, with comparatively small remaining populations, there is a decline in some areas, but an increase in others. Of the other countries, no data are available for eight, populations are reportedly stable in four (though three of these have only small remnant populations), and numbers are increasing in one (Somalia).

2. *Overutilization for commercial, sporting, scientific, or educational purposes.* Because of its ivory, the African elephant is among the world's most commercially valuable animals. The species has been hunted for this purpose since ancient times, but exploitation greatly increased as Africa was opened to the outside world in the nineteenth and twentieth centuries. According to Douglas-Hamilton, ivory hunting, mainly illegal, is the greatest immediate threat to the species. For example, poaching appears to have been largely responsible for a drastic reduction of elephants in Uganda, and for eliminating about half of the elephants in Kenya, since the early 1970's. The still substantial populations in eastern and central Africa are threatened with further reduction, and the remnant populations in western Africa could be entirely wiped out, if large scale poaching continues.

3. *Disease or predation.* Not major factors in current situation.

4. *The inadequacy of existing regulatory mechanisms.* It always has been difficult for most African nations to enforce wildlife laws, because of a lack of funds and trained personnel, and because of the vast, remote areas that are involved. With a considerable rise in the price of ivory in the early 1970's, there was a greater incentive

for many more people to carry out illegal hunting and trade, and local enforcement measures became ineffective in some areas. In addition, there seems to be little regulation of international commerce. Large quantities of illegally taken ivory apparently have been sent out of African countries and purchased overseas. According to Douglas-Hamilton, the ivory trade is not well understood and is in need of extensive investigation. He states that strict application of the provisions of the Convention on International Trade in Endangered Species of Wild Fauna and Flora would be helpful. Relatively few of the major ivory exporting and importing countries, however, are now members of the Convention. If through the Convention or other procedures, means could be found to insure that only lawfully taken ivory could be imported by other countries, the incentive for poaching would be greatly reduced.

5. *Other natural or manmade factors affecting its continued existence.* None now known to be significant.

EFFECTS OF THE RULEMAKING

This rulemaking designates the African elephant as a threatened species, and promulgates a special regulation applying the provisions of 50 CFR 17.31, and additional provisions relative to the importation and utilization of elephant products. The prohibitions of 50 CFR 17.31, with respect to foreign species, are essentially the same as those for endangered species, as set forth in Section 9(a)(1) of the Act and implemented by 50 CFR 17.21. These prohibitions, in part, will make it illegal for any person subject to the jurisdiction of the United States to take, import or export, ship in interstate or foreign commerce in the course of a commercial activity, or sell or offer for sale in interstate or foreign commerce this species (except as provided in the regulation). It also will be illegal to possess, sell, deliver, carry, transport, or ship any such wildlife which was illegally taken. In accordance with 50 CFR 17.32, permits for threatened wildlife are available for scientific purposes, enhancement of propagation or survival, economic hardship, zoological exhibition, educational purposes, or special purposes consistent with the purposes of the Act. Economic hardship permits could, under certain conditions, allow persons who had already contracted to perform an otherwise prohibited action to carry out the terms of their contract.

The prohibition against importation incorporated into 50 CFR 17.31 will not apply to African elephants and products thereof which have originated in the wild in a country that is a party to the Convention on International Trade in Endangered Species of Wild Fauna and Flora; *and* have been

Addendum 103

exported from such country of origin, and in any case of reexportation have been reexported, in accordance with Article IV of such Convention (compliance with Article VII, Paragraphs 2 or 3 of such Convention will not constitute compliance with this provision); *and* have remained in customs control and in an unaltered condition in any country not a party to such Convention that they enter while in transit to the United States. A special purpose permit may be issued in accordance with the provisions of 50 CFR 17.32 authorizing any activity otherwise prohibited with regard to the African elephant, upon submission of proof that such wildlife was already in the United States on the effective date of this rulemaking, or was imported into the United States in accordance with the above provisions.

Therefore, the rulemaking provides for possible interstate commerce and other use of future imports, as well as for continued utilization of existing ivory stocks and other products now in the United States. There will be no effect on importation of African elephants and products thereof that originated in nations that are party to the Convention, provided that exportation from such nations complied with Article IV of the Convention. Reexporting countries that are Convention members will be able to continue to send products to the United States, if it can be demonstrated that such products had originated in the wild in a country that is a party of the Convention, and that the original export had been in accordance with Article IV.

These exemptions, none of which are expected to adversely affect wild elephant populations, will allow continued importation of ivory and hunting trophies under prescribed conditions. It is likely, however, that there will be an initial reduction in the amount of raw and worked ivory entering the United States, because some of the major exporting and reexporting nations are not Convention members. The only nations with populations of African elephants, that are Convention members, are Nigeria, Republic of South Africa, Niger, Ghana, Zaire, Senegal, and Botswana. Tanzania, however, has informed the Service that it will ratify the Convention very soon. When it does, two of the three countries (Tanzania, Zaire, Zambia) with the largest elephant populations will be eligible to export to the United States. As additional African nations join the Convention, the potential supply of exports would increase. Hong Kong, which is covered by the Convention through the membership of the United Kingdom, is currently the largest reexporter of ivory to the United States.

NATIONAL ENVIRONMENTAL POLICY ACT

An environmental assessment has been prepared in conjunction with this rulemaking. It is on file in the Service's Office of Endangered Species, 1612 K Street NW., Washington, D.C., and may be examined during regular business hours. The assessment is the basis for a decision that this rulemaking is not a major Federal action which would significantly affect the quality of the human environment within the meaning of Section 102(2)(C) of the National Environmental Policy Act of 1969.

The primary author of this rulemaking is Ronald M. Nowak, Office of Endangered Species, U.S. Fish and Wildlife Service, 202–343–7814.

REGULATIONS PROMULGATION

Accordingly, Subparts B and D of Part 17, Title 50 of the Code of Federal Regulations, are amended as set forth below:

1. Section 17.11 is amended by adding, in alphabetical order under "MAMMALS," the following to the List of Endangered and Threatened Wildlife and Plants:

§ 17.11 Endangered and threatened wildlife.

| Species | | Range | | | | | |
|---------|---------------|------------|-------------------|----------------------|--------|-------------|---------------|
| Common name | Scientific name | Population | Known distribution | Portion endangered | Status | When listed | Special rules |
| Mammals: | | | | | | | |
| * | * | * | * | * | * | * | * |
| Elephant, African. | *Loxodonta africana* | N/A | Africa | Entire | T | | 17.40(e) |

2. Section 17.40 is amended by adding a new paragraph (e) which reads as follows:

§ 17.40 Special Rules—Mammals.

* * * * *

(e) African elephant (*Loxodonta africana*)—(1) Except as provided in subparagraphs (2) or (3) of this paragraph, the prohibitions incorporated into § 17.31(a) shall apply to any African elephant, alive or dead, and to any part, product, or offspring thereof.

(2) The prohibition against importation referred to in paragraph (e)(1) of this section shall not apply to any such wildlife which:

(A) Has originated in the wild in a country that is a party to the Convention on International Trade in Endangered Species of Wild Fauna and Flora, March 3, 1973, TIAS No. 8249; and

(B) Has been exported from such country of origin, and, in any case of reexportation has been reexported, in accordance with Article IV of such Convention: *Provided that:* Neither compliance with Article VII, Paragraph 2 of such Convention nor compliance with Article VII, Paragraph 3 of such Convention shall constitute compliance with this subparagraph (2)(B); and

(C) Has remained in customs control and in an unaltered condition in any country not a party to such Convention that it enters while in transit to the United States.

(3) A special purpose permit may be issued in accordance with the provisions of § 17.32 authorizing any activity otherwise prohibited with regard to such wildlife, upon submission of proof that such wildlife was already in the United States on June 11, 1978 or that such wildlife was imported into the United States in accordance with subparagraph (2).

Dated: May 8, 1978.

LYNN A. GREENWALT,
*Director, Fish and Wildlife Service.*

[FR Doc. 78-12854 Filed 5-11-78; 8:45 am]

57 FR 35473-01, 1992 WL 188531(F.R.)

RULES and REGULATIONS

DEPARTMENT OF THE INTERIOR

Fish and Wildlife Service

50 CFR Part 17

RIN 1018-AB42

Endangered and Threatened Wildlife and Plants; Retention of
Threatened Status for the Continental Population of the African Elephant

Monday, August 10, 1992

**\*35473**  AGENCY: Fish and Wildlife Service, Interior.

ACTION: Final rule.

SUMMARY: The Fish and Wildlife Service announces its final decision on a February 16, 1989 petition requesting that all populations of the African elephant (Loxodonta africana) be elevated to endangered status under the U.S. Endangered Species Act. The Service has determined, based on the most current data available, that the most appropriate classification of the continental population of the African elephant is that it remain listed as threatened. The Service has also modified the current special rule to prohibit the import of African elephant ivory into the United States (this effectively reenforces the June 9, 1989 moratorium on the importation of African elephant ivory into the United States under authority of the African Elephant Conservation Act); to not prohibit the possession of or interstate commerce in legally imported elephants or their products or parts; and to allow the importation of sport-hunted elephant trophies into the United States under prescribed conditions.

EFFECTIVE DATE: September 9, 1992.

ADDRESSES: The complete file for this rule is available for public inspection, by appointment, from 8 a.m. to 4 p.m., Monday through Friday, in Room 750, 4401 North Fairfax Drive, Arlington, Virginia 22203.

FOR FURTHER INFORMATION CONTACT: Dr. Charles W. Dane, Chief, Office of Scientific Authority; Mail Stop: Arlington Square, room 725; U.S. Fish and Wildlife Service; Washington, DC 20240 (phone 703-358-1708, FAX 703-358-2276).

SUPPLEMENTARY INFORMATION:

**Background**

The Fish and Wildlife Service (Service) was petitioned by Fund for Animals on August 18, 1977, to list the African elephant (Loxodonta africana) as endangered under the Endangered Species Act (Act), based primarily on the threat resulting from the commercial trade in elephant ivory. The Service, in response to that petition, conducted a status review and published a final rule on May 12, 1978 (43 FR 20499-20504) determining that the African elephant more appropriately met the criteria for a threatened species. The Environmental Impact Assessment prepared for that final rule stated that even though "the African elephant had been eliminated from much of its original range and is subject to severe overexploitation, there still are relatively large populations, some of them stable and well protected. An endangered classification thus would not accurately express the situation of this species * * *" A special rule provided for the importation of African elephants and products thereof into the United States, for primarily commercial purposes, in accordance with an ivory control system established under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES).

The continental elephant population at that time was believed to total about 1.3 million animals with some populations stable and well-protected. Elephant populations in west Africa were considered fragmented, as populations occurred in remote border areas and/or in small isolated patches of suitable habitat. Elephant populations throughout the rest of Africa were **\*35474** considered to be progressively losing land to expanding human populations and associated agricultural development. The offtake of elephants in 1978 clearly exceeded recruitment and the continental elephant population was diminishing. Few elephant management plans were developed or implemented and elephant protection and the ivory marketing control mechanisms were clearly inadequate.

The Service was again petitioned, on February 16, 1989, by the Humane Society of the United States, Animal Welfare Institute, International Wildlife Coalition, Animal Protection Institute, Society for Animal Protective Legislation, Friends of Animals, Inc., with support from other organizations, to reclassify the African elephant from threatened to endangered. The petition described continued declines in elephant populations because of continued illegal killing of elephants for the ivory trade and argued that the African elephant was endangered because of the continued threats resulting from that trade.

A variety of conservation efforts to curtail the illegal killing of elephants were initiated before and shortly after the petition was filed. Those actions, described below, included increased efforts by individual range countries to curtail poaching; ivory importation moratoria imposed by the United States, much of western Europe and Japan; and the transfer of the African elephant to CITES appendix I, which became effective in January 1990 and continues in effect.

The Service, in response to the February 1989 petition, conducted a status review and published a proposed rule (56 FR 11392-11401, March 18, 1991) stating that most populations of the African elephant (except for those in Botswana, South Africa and Zimbabwe, which remained as threatened) appeared endangered. Based on information available to the Service during its initial status review, the Service determined in the proposed rule that overutilization of the African elephant for commercial purposes was of sufficient threat to warrant reclassification of most populations to endangered. The Service evaluated this threat on a state by state basis, even though it was well-understood that elephants were not confined to political boundaries, because the level of protection provided to elephants and consequently the likelihood of overutilization varied between range states. The proposed rule indicated that the illegal killing of elephants to satisfy a worldwide demand for ivory severely impacted and endangered many elephant populations. Both elephant population and tusk weight data indicated or suggested population declines, although it was pointed out that many data sets were anecdotal accounts of former populations and somewhat precise statements of present populations. Records of ivory commerce indicated that the kill of elephants in the 1970s and 1980s was at levels that could not be sustained by the continental elephant population. It was pointed out that overutilization was both a cause for placing a population in an endangered status and a factor which if controlled could result in that population being retained in a threatened status.

A second major threat identified in the proposed rule was the inadequacy of existing regulatory mechanisms within the range states. It was pointed out that the establishment and implementation of elephant conservation plans to help develop management and enhance the protection of elephants would benefit many populations. The Service additionally acknowledged that information describing the effects of the most recent actions to control the ivory trade was not available at the time that the status review was conducted, and that the Service required additional information about those effects before preparing the final rule. The Service indicated that if substantial new information became available during the comment period the final rule could be substantially different from the proposed rule. In order to facilitate this process, the comment period on the proposed rule was extended, and because substantial conflicts existed in the newly acquired information, the Service extended the 12-month deadline for making the final determination on the proposed rule.

During the extended comment period, over 50,500 comments were received including: Extensive new information from African elephant conservation plans and the African Elephant Conservation Review of elephant management in 30 range states; extensive materials provided by several African range states; updated editions of the African Elephant Database; current information about the extent of the illegal killing of African elephants after enhanced elephant protection measures and the

Addendum 106

January 1990 CITES international ivory trade ban were implemented; and reports of the CITES Panel of Experts on the African Elephant on their evaluation of the management of the species in southern Africa.

The final rule is different from the proposed rule. Foremost, the elephant population is considered on a continental basis and it is determined that its most appropriate classification is threatened. In 1992, the continental elephant population totals about 600,000 but the critical factor of overexploitation seems to be controlled because of: (1) Enhanced anti-poaching activities, (2) the CITES appendix I listing, and (3) various ivory import moratoria. There is substantial evidence that the illegal offtake of elephants on a continent-wide basis is significantly reduced and is probably somewhat less than recruitment. At present, several elephant populations remain stable and well-protected and other elephant populations seem to be increasing and perhaps are beginning to recolonize their former range. Elephant conservation plans have been developed for most range states and some plans are presently being implemented. Elephant protection has been enhanced in many areas and the ivory control mechanisms in the form of import moratoria and the control of international trade through CITES is determined to be functional and adequate. Generally, the same habitat threats exist in 1992 as existed in 1978 and continue to threaten the continental population of the African elephant. The west African elephant populations remain fragmented in isolated habitats and habitat loss still occurs throughout the remainder of the elephant's range because of expanding human populations and the increasing encroachments of agricultural development. Although elephant populations in 1992 are less than half those of 1978, a substantial elephant population of 600,000 still exists and the protection and management of those elephants is superior in 1992 to the conditions that existed in 1978, when the species was classified as threatened, and in 1989, when the Service was petitioned to reclassify. Just as in 1978, an endangered classification would not accurately express the situation of this species.

**Summary of Comments and Recommendations**

The initial 90-day comment period in the proposed rule published on March 18, 1991 (56 FR 11392-11401) was extended for 13 months (56 FR 33241, July 19, 1991; 57 FR 658-659, January 8, 1992; and 57 FR 9681-9682, March 20, 1992), to allow for receipt of information for development of a final rule and to resolve issues of conflicting data. State Department cables were sent to **\*35475** American embassies in 26 range countries asking that the appropriate agencies in the range countries be officially notified of the proposed rule and requesting official comments. Copies of the proposed rule were also sent to each range country by diplomatic pouch. Representatives from 19 range countries in attendance at the African Elephant and Rhino Specialist Group Meeting in Gaborone, Botswana, on July 2-5, 1991, were also personally notified about the proposed rule.

A total of over 50,500 comments were received about a variety of issues pertinent to elephants. Most comments expressed concern and requested that the Service: (1) Provide endangered status for all populations of the African elephant (13,020 comments); (2) retain the importation ban on ivory and ivory products into the United States (17,625); (3) provide endangered status for all populations of the African elephant and keep the species on appendix I of CITES at the March 1992 CITES Conference (9,570); (4) retain the importation ban on ivory and ivory products and keep the species on appendix I of CITES (1,415); (5) provide endangered status for all populations of the African elephant and retain the importation ban on ivory and ivory products (270); (6) retain legally imported pre-ban (June 9, 1989) ivory in unrestricted interstate commerce and pre-empt individual states from enacting more restrictive regulation than those of the Federal government (630); (7) not place further restrictions on captive elephants (105); (8) retain threatened status for all populations of the African elephant (185); and (9) provide for the legal sport-hunting of African elephants (105). In addition, the Service received over 7,500 comments on the unrelated issue of retaining the African elephant on Appendix I at the March 1992 CITES Conference of Parties. The specific issues of interest varied through time. For example, the preponderance of responses received 2-4 months after publication of the proposed rule addressed listing preferences for the African elephant under the Act while most responses received eight or more months after the publication of the proposed rule addressed listing preferences for the African elephant under CITES.

A second and much smaller group of comments provided biological information that could be used in formulating this final rule (they are identified in References Cited) or which raised specific issues that required individual responses. The format of the final rule is substantially different from that of the proposed rule and many comments that pertained to the logic used to develop the assessment process or the assessments made for individual countries in the proposed rule are only generally addressed in the following responses.

Addendum 107

Comment 1.—Several comments criticized the proposed rule because it treated elephant populations as if they were contained within the borders of individual range states when in fact populations frequently move to or within two or more range states. They further argued that the Service should treat the continental elephant population as a single entity and provide a single classification that best represents the overall status of the elephant. The continental elephant population was said to face common threats and should be evaluated with regard to those threats.

Service Response.—The Service agrees the elephant population should be considered at the continental level. The proposed rule treated elephant populations on a range state by range state basis because the extent of exploitation and the quality of regulatory mechanisms varied among range states. It was an attempt to emphasize differences that existed at that time between states. Best data available at the time of the proposed rule indicated that only Botswana, South Africa and Zimbabwe had sufficient capabilities to control the overexploitation of elephants. Best data currently available suggest that overexploitation generally is controlled throughout the continent. Elephant conservation plans have been developed for most range states and have been implemented in varying degrees throughout the continent.

There is precedent for treating the African elephant on a continental basis. The 1978 final rule (43 FR 20499-20504), for example, treated the continental population as a single entity and found a threatened classification for the continental African elephant population. An additional reason for treating the African elephant as a single population is that controversy still exists about the systematics of the African elephant. For example, Smithers (1983) reviews taxonomic opinions on African elephants that variously describe (1) the forest elephant (L. cyclotis) as specifically distinct from the savannah, or bush, elephant (L. africana); (2) the two forms as conspecific because intergrading occurs where distributions overlap; and (3) a single species of African elephant with two subspecies, L. a. africana and L. a. cyclotis. Ansell (1971) states there may be five surviving subspecies of L. africana. These are cyclotis in the forested areas of central Africa and four subspecies of the L. africana section: africana in southern Africa, knochenhaueri in eastern Africa, orleans which may still occur in Ethiopia, and oxyotis south of the Sahara and north of the equatorial lowland forest zones where cyclotis occurs. The Service, because of the imprecision in defining the range of individual elephant populations, the dissention about the taxonomy of the African elephant, and the new information available since the publication of the proposed rule, has assessed the African elephant as a single entity within the African continent.

Comment 2.—Several commentators questioned the accuracy of population estimates and the stated population levels within individual range states.

Service Response.—The Service used the best information available to develop the proposed rule. Significant new information has since become available and has been used to develop the final rule. The Service has, in the final rule, relied on data from the African Elephant Database (GRID, 1991; Douglas-Hamilton et al., 1992) and from the conservation plans for individual range states for numerical estimates of populations. The African Elephant Database is coordinated by the European Commission African Elephant Survey and Conservation Project, in collaboration with the United Nations Environment Programme, the African Elephant Specialist Group and the World Conservation Monitoring Centre at Cambridge. The elephant conservation plans for individual states were produced with assistance from the African Elephant Conservation Coordinating Group with financial assistance from the U.S. Agency for International Development, the European Commission, the World Wildlife Fund and the U.S. Fish and Wildlife Service. It is generally accepted that these data sources are the best estimates of elephant populations currently available.

Comment 3.—The final rule under the Endangered Species Act should be consistent with the CITES classification.

Service Response.—The CITES appendix I listing for the African elephant was determined by an international vote under rules governing an international trade agreement. Appendix I status was maintained at the Kyoto, Japan, meeting in March 1992 because it did not seem possible, to a majority of the voting members, to market elephant products in a manner **\*35476** that would not cause endangerment to the species. The listing of the African elephant under the Act is a biological assessment of the

present threats to the species. CITES and the Endangered Species Act listings are not necessarily joined actions. The African elephant is being retained as threatened under the Act partly because of the effectiveness of the CITES appendix I listing in reducing pressures causing overexploitation of the African elephant resource.

Comment 4.—Several comments questioned the finding in the proposed rule that elephant populations in Botswana, South Africa, and Zimbabwe were threatened.

Service Response.—The elephant population in the three southern African countries was found to be threatened in the proposed rule using the best information then available. Since the publication of the proposed rule, the CITES Panel of Experts on the African Elephant (1991) found the South African elephant population to be viable, stable and under no current threat. The elephant population in Kruger National Park was acknowledged as one of the best monitored elephant populations in Africa and the resources and measures deployed to combat the illegal killing of elephants were found to be effective. The CITES Panel of Experts on the African Elephant (1992) found that Botswana's elephant population was viable and the panel identified no specific risks. Botswana was additionally found to have an acceptable population sampling system, a low level of poaching activity, and current anti-poaching measures that successfully kept poaching at low levels. Botswana's past and intended levels of offtake were found to be sustainable and the current illegal offtake was found to be negligible. Zimbabwe's national elephant population was also considered viable and the potential risks to that population were negligible (CITES Panel of Experts on the African Elephant, 1992). The panel found that Zimbabwe's Department of National Parks and Wild Life Management had a qualified staff and its aerial survey techniques were of high quality. Zimbabwe's current anti-poaching measures were considered the best in the region. Their effectiveness is indicated by the generally low numbers of elephants reported illegally killed over the last few years. The continuing stability of the southern African elephant populations and the reduced levels of overexploitation in other elephant populations are basic to the decision to retain the current continental elephant population as threatened.

Comment 5.—Comments in petition forms were received from Zimbabwe and South Africa to delist the populations of African elephants within their borders.

Service Response.—The Office of the Solicitor has determined that petitions received on a species during an open comment period established for that species should be treated as comments. Consequently, the Service utilized the substantial information submitted about the status of elephants in Zimbabwe and South Africa in the formulation of the final rule but made no individual listing decision for elephants within those two range states. The Service has chosen not to evaluate populations in individual range countries in this finding. This action is consistent with the Service position described in response to Comment 1.

Comment 6.—The continental elephant population should be classified as endangered because it may only be about one half of that which existed in 1978 when the continental population was listed as threatened and/or its current range is only about 25 percent of its historic range.

Service Response.—About six hundred thousand elephants still occur on over 5 million square kilometers (2 million square miles) of suitable habitat, there is no substantial evidence that current offtake on a continental basis exceeds rates of elephant recruitment, and elephant management in individual range states varies from inadequate to very good across the continent. Populations with these characteristics are best classified as threatened.

Comment 7.—Some comments opposed the retention of a domestic United States interstate trade in legal pre-ban ivory.

Service Response.—The Service has no evidence that the continued interstate trade within the United States of legally imported African elephants and their parts and products will lead to ivory smuggling into the United States or fuel elephant poaching in Africa. The lack of a prohibition against interstate commerce does not imply support by the Service either for the resumption of the import of ivory into the United States or for the resumption of ivory trade in the world market.

Addendum 109

Comment 8.—No sale of elephant products should be considered beneficial to conservation because realized funds are usually returned to the general treasury rather than directly applied to elephant management.

Service Response.—The most beneficial use of funds generated from the sale of any elephant product is their direct application to elephant management. Benefits also accrue to conservation, however, if monies returned to the general treasury cause governments to support effective elephant management in order to generate needed foreign exchange.

Comment 9.—The Service should support the nonconsumptive use of elephants throughout Africa by promoting ecotourism.

Service Response.—The Service supports both non-consumptive uses of African elephants as well as certain carefully regulated consumptive uses of African elephants as mechanisms for attaining revenues to enhance elephant and wildlife management throughout the African continent.

Comment 10.—Endangered species status is necessary because any other listing will lead to a reopening of the world trade in elephant products, especially ivory, which will lead to the extinction of the species. A threatened status would encourage the international trade in elephant products.

Service Response.—Maintaining threatened status for the African elephant under the Act effectively prohibits the importation of ivory or any elephant product into the United States unless an exception to that prohibition is provided by a special rule. The importation of worked or raw elephant ivory (except for sport-hunted trophies) into the United States is specifically prohibited by the moratorium established under the African Elephant Conservation Act (54 FR 24758-24761) and the present final rule creates no exceptions to the import prohibition. Neither a threatened nor an endangered listing under the Act would have any direct impact on international commerce that is not under United States jurisdiction. International commerce in African elephant products is regulated by the CITES appendix I listing.

**Summary of Factors Affecting the Species**

Section 4(a)(1) of the Act (16 U.S.C. 1531 et seq.) and regulations (50 CFR part 424) promulgated to implement the listing provisions of the Act set forth the procedures for adding species to the Federal lists. A species may be determined to be endangered or threatened on the basis of one or more of the five following evaluation factors: (A) The present or threatened destruction, modification, or curtailment of its habitat or range; (B) over utilization for commercial, recreational, **\*35477** scientific, or educational purposes; (c) disease or predation; (D) the inadequacy of existing regulatory mechanisms; and (E) other natural or manmade factors affecting its continued existence.

The following assessment is largely based on new information that has become available to the Service since the publication of the proposed rule.

*A. Present or Threatened Destruction, Modification or Curtailment of Its Habitat or Range.*

Elephant range may at one time have extended over 21,250,000 square kilometers (8,202,500 square miles) of the African continent. This assumes that the 9,000,000 square kilometers (3,475,000 square miles) of Sahara Desert was never elephant habitat but assumes that all other land areas of the continent could have been elephant habitat. Ansell (1971) states that within the last three centuries the species occupied virtually all of sub-saharan Africa except the very dry sub-desert steppe of the Sudanese Arid zone, the desert and sub-desert parts of the Somali Arid zone and the coastal desert of the South West Arid Zone. The petitioners note (Humane Society of the United States et al., 1989:29) that by the Middle Ages elephants had been exterminated from their habitats in North Africa by ivory hunters. Ansell (1971) states that the species became extinct north of the Sahara by the sixth century A.D. Douglas-Hamilton (1987) states that most elephants were eradicated from West Africa in the early years of the twentieth century. The ivory trade may have caused a population crash in west Africa by 1914. These conditions for northern and western Africa also existed in 1978 when the continental population of the African elephant was classified as threatened. The present elephant range is estimated to be about 5,188,000 square kilometers (2,002,500 square

Addendum 110

miles) (Douglas-Hamilton et al., 1992) so the present elephant range is about 25 percent of the range that existed before the sixth century A.D. The present elephant range is still a vast area, nearly the size of the 39 states ranging from North and South Dakota, Wyoming, Colorado, Oklahoma and Texas east to the eastern coast of the United States. This is an area elephants can be expected to occur, not the bounds of an area containing fragments of habitats suitable for elephants. This vast area also contains a variety of cover types used by elephants. For example Douglas Hamilton et al. (1992) state that forest and forest-grasslands are the dominant habitat types in central Africa, bushland-thicketed mosaic and miombo woodlands predominate in eastern Africa, miombo woodland and woodland mosaics predominate in southern Africa and Sudanian woodland and forests predominate in west Africa.

Cumming et al. (1990) describe the history of the elephant in Africa and link the historical decline of the elephant to the following three major factors: (1) The demand for ivory, which has often been at a level that is totally unsustainable; (2) desertification which has clearly been a major cause for the disappearance of the species in North Africa and the Sahara and continues to impact the small remaining populations in the Sahel; and (3) conflicts between elephant and humans for the use of the land. Although factor 3 may ultimately come to limit elephant populations, it is the ivory trade that historically has had the greatest impact on elephants.

Any assessment of the habitat of the continental population of the African elephant must consider the question of scale. Types of impacts are discussed below but often no quantifiable mention is made of the extent of an impact. The inability to discuss rates and extent of deforestation or rates and extent of habitat loss to agriculture, etc., further justifies evaluating the status of the African elephant on a continental basis. The discussion indicates that man's impact on the environment and elephant habitat is widely evident. Still, habitat destruction, modification or curtailment does not presently endanger the continental population of the African elephant. Expanded elephant populations could and probably would be tolerated in many African habitats.

**East Africa**

Seven eastern African countries presently have an estimated 96,000-134,000 elephants on about 1.1 million square kilometers (about 425,000 square miles) of habitat (Douglas-Hamilton et al., 1992). A significant portion of this extensive habitat is in National Parks, Game Reserves and other protected areas.

Perhaps 2,000-2,450 elephants occur on about 119,000 square kilometers (46,000 square miles) of habitat mostly in forested areas in southwestern Ethiopia (AECCG Ethiopia, 1991). Elephants were widely distributed until the turn of the century so the present distribution is much reduced from historical levels. Problems of land-use conflicts between people and elephants are complicated by rapidly increasing human populations, poverty, civil unrest, inadequate protection and management of elephants, and a lack of public awareness of the need for conservation. Land degradation has occurred because the dense human populations have put extensive pressures on natural resources and because of outdated agricultural practices.

About 25,800 elephants (Poole, 1992) presently occur in Kenya on about 413,000 square kilometers (159,000 square miles) of habitat. Elephants in some areas may become confined in Parks and Reserves surrounded by cultivation so that some populations may eventually have to be regulated (AECCG Kenya, 1991). Elephant range is extensive in Kenya and several communal lands, National Parks and Game Reserves provide important habitats for elephants. A new Community Wildlife Program has been initiated to enhance acceptance and management of wildlife species on private lands and communal lands around parks and Reserves. Kenya can probably support an elephant population twice the present population without adversely impacting available habitats or rural Kenyans.

National parks and reserves occupy more than 10 percent of the land area of Rwanda (AECCG Review, 1991). GRID (1991) lists the total protected area as about 2,700 square kilometers (about 1,050 square miles) and the Elephant Conservation Plan for Rwanda lists an elephant population of 80-100 animals. Rwanda is one of the most densely populated countries in Africa. The pressure of human populations and demands for cultivatable lands threaten the security of protected lands and the long term future of elephants in Rwanda.

Addendum 111

Somalia represents the eastern extremity of the range of the African elephant. Elephant range has been significantly reduced since 1979 so that elephants now occur in about 56,000 square kilometers (21,600 square miles) of habitat in southern Somalia (AECCG Somalia, 1991). The surviving population of elephants numbering between 1,000-2,000 animals live within a 100 km-wide strip along the Kenyan border. The present range includes four dry season concentration areas and the swampy creeks of Bush Bush National park. This part of Somalia still contains sizeable areas of good habitat with adequate forage, water and shade that can support far larger elephant populations than presently occur.

Sudan is the largest country in Africa with 2.5 million square kilometers (965,000 square miles) of desert, savanna, bush, forest, mountain and swamp (AECCG Sudan, 1991). Sudan has a population of 27 million people and an elephant population that is variously estimated at 22,000-44,600. Several set-aside areas are protected by **\*35478** remoteness, harsh climate and rugged terrain. Other areas are impacted by grazing, firewood harvesting, agriculture and general human encroachment. Sudan still provides extensive habitat for elephants, has ample set-aside areas that could be useful for elephant protection and management, and remains a potentially important habitat for elephants and other wildlife in the northern portion of Africa.

Elephant range presently occupies about 50 percent (501,000 square kilometers or 193,400 square miles) of the land area of Tanzania. About 25 percent of the total land area (245,000 square kilometers, 94,560 square miles) is designated to provide some degree of protective status to wildlife species like elephants (AECCG Tanzania, 1991). The growth of human populations and of agricultural developments around conservation areas have led to increased levels of human-elephant interactions and crop depredation which in turn directly leads to elephant mortality. The present elephant population in Tanzania is estimated at 44,000-57,000. The Wildlife Division believes it is appropriate to manage about 70,000 elephants in Tanzania (Mlay, 1992).

The political and conservation situation in Uganda has improved significantly since 1986 and efforts are being made to restore protected areas and the tourist industry based on those protected areas (AECCG Uganda, 1991). The Ugandan elephant population is believed to number 1,200-1,900 animals and to include both savanna and forest elephants. The preservation of habitat for the two forms will preserve habitat for many species. The intended policy of the government is to transfer the ownership of wildlife outside of reserves to the local people so they may manage their wildlife, with government advice, along the tenets of Zimbabwe's CAMPFIRE program.

**Central Africa**

About 268,000 elephants (Douglas-Hamilton et al., 1992) are estimated to occur in Central Africa. GRID (1991) lists 1.7 million square kilometers of forest habitat and 1.2 million square kilometers of savanna habitat within the 7 countries of central Africa, a total habitat area equal to about 1.12 million square miles. More current data (Douglas-Hamilton et al., 1992) indicate that the total elephant habitat in Central Africa is 2,560,000 square kilometers (988,000 square miles). Central Africa presents great potential but poses some serious problems for elephant management. Barnes (1991a) states that in the long term, threats to forest elephants include: The expansion of roads, railways and pipelines; commercial plantations; logging; mining; and an expanding human population with its subsistence agriculture. Barnes (op. cit.) states that all these activities destroy potential elephant habitat, compete with elephants for land, fragment elephant habitats or provide access for poachers into otherwise inaccessible habitats. He considers the elephant to be a vital part of the forest ecosystem because it influences the structure and floristic composition of the forest and promotes biological diversity within the forest.

Cameroon has an area of 475,000 square kilometers (183,000 square miles) and a human population of 11.6 million (AECCG Cameroon, 1991). About 7,000 savanna elephants (Douglas-Hamilton et al., 1992) may dwell in the thorny wooded savannas of middle Cameroon and in the grasslands of the floodplain south of Lake Chad in northern Cameroon. Perhaps 20,000 forest elephants (Douglas-Hamilton et al., 1992) inhabit the dense, humid evergreen forest of extreme western Cameroon and the dense humid Congo forest of southern Cameroon. The evergreen Atlantic zone of low and mid-level forests in extreme western Cameroon has been extensively impacted by logging and human population pressures which have fragmented elephant habitats and reduced elephant populations. The evergreen cameroon-congolese zone of medium altitude forest in southern and southeastern Cameroon which covers about 111,000 square kilometers (42,800 square miles) remains a stronghold for a substantial population of forest elephants.

Addendum 112

Information about the status of the elephant in the Central African Republic (CAR) is fragmentary. The CAR contains 304,000 square kilometers (117,300 square miles) of savanna habitat and 40,000 square kilometers (15,500 square miles) of suitable forest habitat (GRID 1991). That publication lists an estimated elephant population of 14,500 in the CAR. Douglas-Hamilton et al. (1992) lists a population of 18,500. The CAR is subject to the same habitat problems as are other states in central Africa.

Elephant range formerly extended throughout much of southern Chad. Chad is one of the more northerly limits of present elephant habitat in Africa and shares savanna elephant populations with northern Cameroon and the Central African Republic. Fewer than 2,500 elephants are estimated to occur in 202,000 square kilometers (78,000 square miles) of potential habitat. Human population pressures and desertification associated with the southward extension of the Sahara have pushed agriculture into southern Chad where human-elephant conflicts are increasing (AECCG Review, 1991).

The elephant historically occurred throughout the Congo but at present is found is only about 40 percent of the country. The present elephant population is estimated at about 49,000 animals and perhaps 40,000 of these are forest elephants that occur in the northern forest massif bordering Gabon, Cameroon and Zaire (AECCG Review, 1991). Human populations are low and concentrated along communication corridors in the dense, humid, evergreen forest. Principal threats to elephants in the Congo include growing human populations in the south and timber exploitation and habitat fragmentation associated with oil exploration and development. Timber exploitation is not now a threat but logging is increasing and could become a threat in the future.

Equatorial Guinea is a small country of 28,000 square kilometers (10,800 square miles) with a sparse human population (350,000) living within dense forest habitats. Most persons depend on traditional agricultural activities with major commercial products being cocoa, coffee, palm oil, cassava and timber. The country lies within the Congo rainforest and much of the forest remains intact as logging has not yet made serious impacts on forest resources (AECCG Equatorial Guinea, 1991). Elephants are concentrated in southern Equatorial Guinea in areas of primary forest. Elephants have shifted from the northern portion of the country because of agricultural practices and logging activities which have modified elephant habitat and created disturbances. The elephant population is listed at about 600 animals by Douglas-Hamilton et al. (1992).

Gabon probably has one of the largest populations of elephants (50,000-87,000) in Africa (AECCG Gabon, 1991). Approximately 85 percent of Gabon's 267,000 square kilometers (103,000 square miles) is covered in tropical forests. Lahm and Barnes (1991) state that elephants are found in large forested blocks unpopulated by humans in the center of the country. The vast forests are largely uninhabited by man because the sparse human population is concentrated along the main roads. The forests have a potential to support a very large elephant population. Deforestation rates are very low (<0.1 percent per annum) and Gabon is expected to lose a smaller portion of its forested area than will any other **\*35479** African country within the next 50 years.

The construction of the trans-Gabon railway has opened up virgin forests for logging, and planned or actual mineral and oil exploitation activities have introduced roads and human disturbances into areas that were formerly isolated and uninhabited. Slash and burn agricultural practices minimally impact protected areas and overall habitat. Rural human population densities are low so community oriented elephant management programs have been slow to evolve.

Zaire formerly was the most important habitat of the African elephant on the continent. Even today this country may provide 600,000 square kilometers (231,000 square miles) of habitat for the savanna elephant and 866,000 square kilometers (334,000 square miles) of habitat for the forest elephant (GRID 1991). The AECCG Review (1991) lists 25,000 elephants occurring in savanna habitats and 65,000 elephants living in forest habitats. That plan also states that these population figures may grossly underestimate the elephant population of Zaire because the elephants in the forest habitats have been little studied. On the other hand, Douglas-Hamilton et al. (1992) quote studies that suggest Zaire's total elephant population may only be 63,000. Barnes (1991a) states that the greatest threats to the extensive habitats of Zaire are forest fragmentation and deforestation caused by logging activities.

## Southern Africa

Eight southern African countries provide 1,300,000 square kilometers (502,000 square miles) of elephant range and support between 169,000 and 245,000 (Douglas-Hamilton et al., 1992).

Angola is one of the largest countries in sub-saharan Africa and is presently in a transition mode from civil war to democratic government (AECCG Angola, 1991). Wildlife habitats are varied, ranging from lowland rainforests, deserts, and miombo woodlands phasing into forest-savanna in the north and mopane woodlands in the south. Angola possesses great biotic diversity and is in the paradoxical situation of possessing one of the richest and most varied, yet least well known wildlife resources in Africa. Angola is the only elephant range in Africa to include desert and rainforest biomes and the savanna, forest and rare desert-dwelling elephant. Information about elephants in Angola is indirect, crude and unreliable. This is reflected in estimates of elephant range as between 200,000-400,000 square kilometers and of the elephant population as being between 10,000 and 50,000. Habitat loss or conflicts over land-use are not expected to be near-future threats to Angola's elephants.

The major elephant range in Botswana encompasses an area of 80,000 square kilometers (30,800 square miles) north of latitude 20 degrees (Department of Wildlife and National Parks, Botswana, 1991). This area contains an elephant population estimated at 54,600 (46,000-63,000) which is about 99 percent of the country's total African elephant population. Seventy-five percent of the population withdraws into about 16 percent of this northern range during the dry season. These dry season core areas contain riverine habitats which are the rarest and most diverse habitats in the country. These elephant concentrations may produce sufficient foraging pressures to cause significant habitat damage. Botswana believes it is necessary to pursue the active management of elephants so that important habitats will not be destroyed.

Botswana's elephant management policy is to maintain elephants at their 1990 population level (about 55,000), maintain the quality of elephant habitat at an acceptable state, preserve biodiversity within major habitats and to reduce conflicts between elephants and humans. Botswana may develop watering points to try and lure elephants from riverine habitats and to reduce habitat degradation.

Malawi's elephant range is about 9,000 square kilometers (3,400 square miles) which is restricted to protected areas in national parks, game reserves and forest reserves (AECCG Malawi, 1991) Malawi has a rapidly increasing human population, a shortage of agricultural land and one of the highest human population densities in Africa. There is a growing conflict in Malawi over land-use, the major problem facing protected area management and elephant conservation. A sustainable population of perhaps 2,500 elephants could be maintained within the established protected areas if effective fencing was installed to separate elephant habitats and agricultural activities.

The total elephant population in Mozambique was estimated at perhaps 13,350 animals in 1990 (AECCG Mozambique, 1991). Potential elephant range is extensive and habitat is contiguous in large areas of Mozambique. All protected areas, however, have been severely impacted by the continuing civil conflict which has now lasted for 26 years. Negotiations are ongoing with South Africa to establish a large common national park that will include Kruger and a comparable area in the Limpopo Valley in Mozambique.

Elephants were formerly distributed throughout much of Namibia but agricultural settlements and unrestricted hunting in the late 19th century and agricultural developments in the early and mid-20th century forced elephant populations into their present distribution. The elephant populations and their distribution patterns have been largely unchanged in the last two decades (AECCG Namibia, 1991). More elephants occur outside protected areas than within and elephants generally move freely in and out of parks and reserves. The future of elephants outside parks and reserves and the key to enlarging protected areas lies in allowing local communities to utilize elephants or share in revenues from the harvest of elephants. The Ministry of Wildlife, Conservation and Tourism is striving to initiate a community outreach program to promote programs of sustainable utilization of wildlife. Habitats available to elephants can be substantially increased in the future by introducing elephants into

Addendum 114

suitable protected areas outside the present elephant range, by establishing additional areas of protection, and by allowing the introduction of elephants into privately owned nature reserves and game farms.

The Caprivi strip and northern and northeastern Namibia share borders and elephant populations with Angola, Zambia, and Botswana. Some elephant passage corridors in the Caprivi are protected and Namibia has already established regional coordination efforts with Botswana. The continued existence of the northeastern portion of Namibia's elephant population may well depend on the success of game management programs in neighboring countries.

Seventy-five percent of the elephant range and 85 percent of the elephants in South Africa are within Kruger National Park (National Parks Board of South Africa, 1991a). Other elephant ranges are composed of state and private lands located both near Kruger and in small scattered blocks elsewhere in South Africa. Range available to elephants has increased by about 3,900 square kilometers (1,500 square miles) since 1979.

Management for elephants in Kruger National Park has provided a water stabilization program by building dams on watercourses and providing wind driven water pumping devices. Facilities are in place to control wildfires and to **\*35480** allow for controlled burning of vegetation. Kruger has an elephant proof fence along the boundary with Mozambique and a variety of cross fences and boundary fences to control movements and foraging pressures.

Zambia provides about 211,000 square kilometers (81,400 square miles) of elephant habitat and possess a population of 32,000 elephants (GRID 1991). The AECCG Zambia (1992) estimates the African elephant population to be less than 25,000 with 50 percent occurring within the National Parks in the Luangwa Valley. Most human-elephant conflicts center around agricultural areas, although mining also impacts elephant habitat. Recent efforts have indicated that wildlife management and the acceptance of wildlife as a legitimate land use are enhanced when local residents share in management responsibilities (Lewis et al., 1990).

Zimbabwe provides 113,000 square kilometers (43,500 square miles) of elephant habitat and has an elephant population estimated at 51,700 (GRID 1991). The Zimbabwe Department of National Parks and Wild Life Management believes the present elephant population may be about 70,000 and has stated that their elephant management goal is about 43,000 animals (Nduku 1991). Douglas-Hamilton et al. (1992) list an elephant population of 49,700-68,400. Over 12 percent of Zimbabwe's surface area is dedicated to national parks, safari areas, sanctuaries, recreational parks, botanic reserves and botanic gardens. The management objectives in these lands are to: Manage wildlife species including elephants; preserve representative examples of Zimbabwe's aquatic and terrestrial flora and fauna and their physical environments; protect areas of scenic beauty and special interest; preserve rare, endangered and endemic species; conserve water catchments; and to provide opportunities for public education and the advancement of scientific knowledge. All significant physical developments in these areas require an environmental impact assessment, and careful environmental planning is undertaken to minimize environmental impacts when development is inevitable (Zimbabwe Department of National Parks and Wild Life Management, 1991).

An additional 20 percent of the surface area of Zimbabwe has become dedicated to wildlife management since 1980 because of the Communal Areas Management Programme for Indigenous Resources (CAMPFIRE). This program is an important new-political-economic-sociological institution that has developed an environmental ethic, restored the perception of wildlife as a valuable resource, advocated wildlife management as an adjunct to subsistence agriculture, and encouraged the conservation of natural ecosystems and wildlife habitats on tribal trust lands (Anon, 1990).

### West Africa

An estimated 10,000-16,000 African elephants presently dwell in a series of highly fragmented habitats that are estimated to total about 229,000 square kilometers (88,400 square miles) throughout western Africa (Douglas-Hamilton et al., 1992). Increasing human population pressures and declining natural productivity (two decades of drought) in dry savanna habitats have confined remaining elephant populations to isolated pockets of habitat largely in parks and other reserves (Cumming et al., 1990). Douglas-Hamilton (1987) indicated that most elephants were eradicated from west Africa in the early twentieth century. The 1978 Federal Register notice (43 FR 20503) listing the continental African elephant population as threatened indicated that

the elephant in west Africa occurred in remote border areas or in small isolated patches of suitable habitat. That is essentially the present condition.

Agricultural development and logging are serious agents of habitat destruction in Sierra Leone (AECCG Sierra Leone, 1991), Togo (AECCG Review, 1991), Liberia (AECCG Liberia, 1991), Guinea (AECCG Review, 1991), Ghana (AECCG Ghana, 1991), and the Ivory Coast (AECCG Review, 1991). The AECCG Review (1991) cites desertification as an important agent of habitat destruction in Burkina Faso, Mali and Niger. Drought and bush burning have adversely impacted habitats in northern Nigeria and deforestation and mineral exploitation have adversely impacted habitats in southern Nigeria (AECCG Review, 1991). That publication also states that habitat destruction is not considered the major limiting factor in Benin, Guinea Bissau and Senegal at this time. The small regional population of African elephants has apparently remained stable throughout most of this century and is not expected to increase in the foreseeable future. Habitat destruction and modification provide a greater threat to elephants in west Africa than to any other portion of the continental African elephant population.

### *B. Overutilization for Commercial, Recreational, Scientific or Educational Purposes*
The present estimate of the continental African elephant population is 549,000-652,000. The methods for estimating these elephant numbers are described in detail in GRID (1991) and by Douglas-Hamilton et al. (1992), and those authors have carefully expressed the reservations associated with different data sources. Some critics have suggested that the estimates of the continental elephant population are too high. Douglas-Hamilton et al. (1992) state that there are no better estimates of elephant populations that are based on field measurements than those recorded in the African Elephant Database. They indicate (Douglas-Hamilton et al., 1992:7) that the lower estimates proposed by their critics seem to be pure guess-work. Douglas-Hamilton et al. (1992) acknowledge the problems associated with building the African Elephant Database. The vastness of the elephant range and the difficulty of assessing numbers in forest habitats and in range states with political unrest have made data collection arduous and expensive and have limited the quantity of high quality data available for analysis. The latest edition of the African Elephant Database (Douglas-Hamilton et al., 1992) lists only 54 percent of the elephant numerical data entries as being of quality "1" or "2" (best or medium quality).

Elephant populations seem to have fluctuated wildly through time because man has periodically been a persistent and proficient predator. Ansell (1971) stated that the elephant was exterminated from north of the Sahara by the sixth century AD and Douglas-Hamilton (1987) stated that most elephants were eradicated from west Africa by 1914.

Populations in west Africa were reduced to fragments of their former size and range and they have remained stable since that time (Cumming et al., 1990). An historical account of elephant numbers in South Africa (National Parks Board of South Africa, 1991a) indicates that elephants occupied much of present day South Africa, especially in the high rainfall areas, in the mid-seventeenth century. A hundred thousand elephants may have existed in the country in 1650. The decline in the elephant population between 1650 and 1790 is believed due to human settlement and population growth. Later declines from 1790 to 1870 were due to a massive elephant kill for the ivory trade, and from 1870-1920 **\*35481** were caused because occasional elephants were killed because of crop depredation. Possibly only 100 elephants remained in 1920 when protective and management policies were established and enforced. Elephant populations in South Africa have since recovered to the presently managed population of about 8,000 animals. Similar trends in elephant populations have occurred in other areas of Africa as well.

Cumming et al. (1990) indicate that the combination of legislation, a fall in the price of ivory, and a drop in the demand for ivory associated with World War I allowed elephant populations to recover. Elephant populations had substantially recovered, by mid-century, in eastern, central and southern Africa so that some culling had to be undertaken to prevent habitat damage and human-elephant conflicts. The ivory trade increased substantially in the early 1970s as demand and supply pressures soared so that ivory exports from Africa reached pre-1914 levels. Douglas-Hamilton (1988) stated that the wave of elephant killing for ivory in the 1970s and 1980s was the second of its kind in recorded history. The first essentially wiped out elephants in much of east Africa by the end of the nineteenth century. Douglas-Hamilton (1988) stressed that in 1990, when it was feared that the elephant would become extinct, game laws were enforced and populations began to increase.

Addendum 116

There were several conservation efforts implemented in the 1970s when it was realized that the illegal killing of elephants was widespread and that many elephant populations, especially in east Africa, were in decline. The elephant was put on appendix II of CITES in 1977 and was classified as threatened by the Service in 1978 which at that time issued regulations that allowed the importation of ivory into the United States in accordance with the CITES ivory control system (43 FR 20499-20504). The elephant was also listed as vulnerable by the International Union for Conservation of Nature and Natural Resources (IUCN) in 1978. There conservation efforts were deemed as failures in the late 1980s when the illegal killing of elephants for ivory commerce was considered out-of-control. Many elephant populations were believed to be in substantial decline and alternative conservation measures were necessary when the petition to reclassify the African elephant as endangered was filed in February 1989. The petitioners identified the ivory trade as the single most important factor threatening the elephant. This was supported by Douglas-Hamilton (1988) who stated that even a very cautious scientist would (at that time) recognize that the elephant would become an endangered species if the offtake of ivory continued at the rate observed from the 1970s through his reporting period. His assessment was based on: (1) Population trends from throughout the continent (except in parts of southern and western Africa) that showed declines in elephant numbers coupled with high carcass counts; (2) ivory export curves that collapsed after the mid-eighties because elephants were becoming scarce which suggested overutilization; and (3) a diminished average tusk weight that also suggested overutilization. It seemed likely that one-half the elephant population, perhaps 700,000 animals, was lost in the decade 1979-1988.

Several conservation efforts to curtail the illegal killing of elephants were initiated in 1989. Individual range countries increased their efforts to protect elephants and the international community began to contribute substantially to anti-poaching campaigns. Tanzania organized Operation Uhai in 1989 to deal forcefully with elephant poaching activities and Kenya substantially reorganized its conservation agency into a more effective Kenya Wildlife Service in 1990. The United States, on June 9, 1989, established a moratorium on the importation of raw and worked African elephant ivory from all ivory producing and intermediary nations (54 FR 24758-24761). The action was taken under authority of sections 2202(a) and 2202(b) of the African Elephant Conservation Act. A number of other major ivory consuming nations, most notably those in western Europe and Japan, enacted similar legislation.

The African elephant was transferred from appendix II to appendix I at the seventh meeting of the Conference of Parties to CITES (October 1989). This occurred after a provision was approved that provided for a panel of experts to convene after a proposal had been received to transfer any elephant population back to appendix II. The panel of experts would recommend to the Parties whether specific biological and trade criteria were met for any populations later nominated for downlisting to appendix II. The change in status for the African elephant became enforceable on January 18, 1990 (55 FR 5847-5851, February 20, 1990; corrected March 5, 1990, 55 FR 7714-7716). The appendix I listing was continued by the Conference of the Parties to CITES that convened in Kyoto, Japan, in March 1992.

The Service based its proposed rule on the best information then available. Few data were available to judge whether the conservation actions undertaken in 1989-90 were effective. The 12-month finding (February 16, 1990) was made eight months after the United States ivory importation moratorium was imposed and one month after the elevation of the elephant to appendix I became enforceable. The proposed rule indicated that levels of protection and quality of management varied widely among individual range states and that most range state populations seemed best classified as endangered because they might still be subject to overutilization. New information available since publication of the proposed rule indicates that most populations of the African elephant presently are not being overutilized.

The following review is chronological and describes an increasing tendency toward control of the illegal killing of elephants throughout Africa. Many populations of the elephant are currently stabilized or perhaps are increasing. The steep rate of decline observed from the 1970s up to the mid-or late-1980s has been halted for most populations.

The several conservation activities that were implemented just before and just after the February 1989 petition was filed seem to be working as intended. The United States Government queried 33 American embassies in African range states in April 1990 to determine, among other things, if elephant poaching had slowed, increased or remained unchanged since the implementation

of the CITES ban in January 1990. Embassy officials in May-July 1990, reported that elephant poaching was undiminished in Cameroon, Niger, Sudan and Zaire, while officials in Burundi, Ethiopia, Kenya and Zambia believe that poaching was diminished since the appendix I classification. Poaching may have increased but was still low in Botswana, and was low and remained so in Burkina Faso, Gabon, Liberia, Mali, Togo, Uganda and Zimbabwe. Poaching still occurred, but was likely more for meat than ivory, in Benin, Equatorial Guinea, Ghana, Cote d' Ivorie and Nigeria. No pertinent responses were received from other embassies.

O'Connell and Sutton (1990) state that although some illegal killing continued, elephant poaching seemed to be decreasing in many African countries because of a lack of financial incentives and an increased vigor and effectiveness of government anti-poaching activities. They further state that if these trends hold, depleted **\*35482** populations can reasonably be expected to begin recovery.

Dougherty (1991) evaluated the status of elephant conservation in 10 African range states. Elephant poaching was never intense in Burkina Faso except near the borders with Ghana and the Ivory Coast where poaching may frequently be for meat. There is a prohibition against ivory commerce because elephant populations are fragmented and could be subject to extinction even under low poaching intensities. There are no reports of poaching where law enforcement is good but poaching may occur where protection is poor.

Elephant conservation in Cameroon varies by province. Overall, there was a significant decline in poaching in 1990. This trend is believed due to the reduced price for ivory. Elephants are still poached for ivory in extreme northern Cameroon but anti-poaching efforts may keep illegal killing below recruitment levels. The elephant is not in trouble where anti-poaching efforts are substantial.

There is no way to quantify and statistically compare poaching level before and after the ban in the Central African Republic (CAR). Improved conservation may be expected to occur in southwest CAR because of the strengthening of protection capabilities, new conservation initiatives stressing the sustained use of wildlife, and the ivory trade ban. The elephant appears safe where anti-poaching protection is good. Elephants in forest habitats may have fared better than those in savanna habitats although some poaching of elephants especially for meat still occurs within forest habitats. Large-scale conservation efforts, rural development and monitoring programs occur in northern CAR where poaching is presently under control.

The number of elephants in Ghana diminished in the past because of ivory poaching. Elephants is southwestern forests continue to be poached. The level of poaching within protected populations has dropped since 1988 and these elephant populations are currently slowly expanding.

Kenya's capability to conserve elephants is among the best in Africa. There is a general political stability which provides a good environment for the uninterrupted support of conservation, and wildlife and protected areas are perceived as important to the country's economy and balance of trade. The appendix I listing is believed responsible for the reduction in poaching, and elephants seem well protected from poaching at this time.

An ivory trade may still exist in Nigeria and poaching may still impact some populations especially those near the border with Chad.

Elephant poaching for ivory is now at insignificant levels throughout Tanzania. Operation Uhai was initiated in 1989 and was very effective. Present anti-poaching efforts also seem to be effective.

Poaching has been curtailed under the present government in Uganda and elephant numbers are slowly recovering.

Poaching has not stopped in Zaire but is possibly slowed.

More recently, Dublin and Jachmann (1992) evaluated the impact of the ivory ban on elephant poaching in six target states. Zambia experienced an overall decline in poaching in 1990-1991 compared to levels observed from 1987-1989. Although poaching rates were at the same rate or higher in some areas there have been significant reductions in poaching in the more important populations. These dramatic drops were due to increased law enforcement actions funded by external donors before the ban was established.

Dublin and Jachmann (1992) agreed with Dougherty (1991) that poaching in Tanzania was diminished because of Operation Uhai and because of an increased law-enforcement capability.

Illegal hunting decreased in three of seven, but increased in four of seven, conservation areas in Malawi. One significant cause of increased poaching may be the one million Mozambican displaced persons now living in southern Malawi. Illegal killing and culling of elephants for crop damage are harvesting some populations at unsustainable rates.

There has been a minor effect of the ban on the illegal killing of elephants in Cameroon. The illegal killing of elephants continues in the northern savanna zone because an ivory market remains in Nigeria. A domestic but limited ivory market may also exist in Cameroon. Poaching rates are somewhat reduced in the forest zone where most elephants occur in Cameroon.

The illegal hunting of elephants in savanna habitats in the Ivory Coast continues at the same low levels as during the pre-ban era. Poaching in that country's forest zone is probably reduced because of increased law enforcement efforts.

Elephant populations in Zaire have declined by about 75 percent since 1981 and the ivory harvested from that country was sufficient to supply 30-40 percent of the ivory on the world market during the decade of the 1980s. Elephant poaching is still a major problem in the unprotected savanna zones of Zaire. Elephant poaching was reduced to low levels in protected savanna areas by the mid-1980s. The poaching situation has improved substantially in some forest zones in the last two years. The infusion of substantial funds from external sources in the mid-1980s has resulted in a rapid but localized reduction in illegal activity. The present illegal hunting of elephants seems lower in the rainforest zone than in unprotected savanna areas.

A major co-signatory to the February 16, 1989, petition (Humane Society of the United States, 1992) provided comments on January 30, 1992, on proposals by several southern African range states to transfer their populations of the African elephant from CITES appendix I to II.

The Humane Society quoted sources that indicated that the poaching of elephants had been greatly reduced in Kenya, Tanzania, Chad, Gabon, Burkina Faso, Zaire and the Congo. They especially emphasized the very substantial reductions in illegal killing in Kenya and Tanzania. The Environmental Investigation Agency (1992) also reported that elephant poaching has steeply fallen in east and central Africa and that elephants have started to re-colonize their former ranges.

Douglas-Hamilton et al. (1992) indicated that Gabon has retained relatively undisturbed populations of forest elephants because organized poaching has never become a way of life in that sparsely populated country. They also state that recent censuses in Kenya, Uganda and Tanzania show an arrest in rates of population decline. Sightings of carcasses declined in Tsavo National Park which contains one-third of Kenya's elephants. Similarly, poaching levels are reported to have decreased since 1989 in Tanzania. The positive change in population trends is attributed to massive investments in security as well as a reduction in the demand for ivory following the appendix I listing. Elephant populations in west Africa could still be declining because of the encroachment into elephant habitat because of human population increases and the hunting of elephants for bush meat. Poaching for ivory has been a problem in the past but this stimulus to poaching seems reduced compared to years prior to 1989. Elephant populations in South Africa, Namibia, Botswana and Zimbabwe were believed to have been increasing even during the decade of the 1980s.

The CITES Panel of Experts on the African Elephant (1991, 1992) evaluated several southern African elephant populations. The African elephant populations in Botswana, South Africa, **\*35483** and Zimbabwe were found to be viable, and potential risks

Addendum 119

or threats to those populations were found to be negligible. Malawi's elephant populations were found to be viable only in the short or medium term, and Namibia's elephant population was found to be subject to fluctuations as a result of natural mortality due to periodic drought and disease. The Panel found that Zambia's national elephant population had declined dramatically but three potentially viable sub-populations remained. The greater Luangwa Valley population numbering some 10,000 elephants shows no evidence of significant poaching over the past three years and its prospects are good if poaching remains contained. The other two sub-populations still have significant numbers of elephants but have experienced heavy poaching.

There is also a question of scale when evaluating Factor B. The fact that some legal and illegal killing of elephants continues to exist does not constitute overutilization of the species if total mortality does not exceed recruitment. Man has historically been the chief predator of elephants. Barnes (1991b) has pointed out that many rural Africans, especially in central Africa, are hunters and not pastoralists. Hunting is a cultural heritage of many native Africans. Opportunistic hunting often to provide meat or to protect agricultural crops can impact fragmented or local elephant populations but does not endanger the continental elephant population.

The Service finds that the present rate of utilization, because the several conservation measures instituted in 1989 and thereafter appear to be effective, does not endanger the continental population of the African elephant at the present time. This evaluation could change if a large scale illegal killing of elephants to satisfy an unregulated ivory trade once again occurred.

### C. Disease or Predation

Some reports exist of lion predation on very young calves and of anthrax as an agent controlling some specific elephant populations, perhaps most notably the elephant population in Etosha National Park, Namibia. Namibia's elephant population may be considered to be subject to fluctuations as a result of natural mortality due to periodic drought and disease (CITES Panel of Experts on the African Elephant, 1992). Disease or predation, however, are not factors that threaten the continental population of the African elephant.

### D. The Inadequacy of Existing Regulatory Mechanisms.

Information available to the Service at the time of the 12-month finding and of the publication of the proposed rule indicated that the management infrastructure in most range countries was inadequate to control the overutilization of the elephant. New information since the publication of the proposed rule indicates the increased effectiveness of enhanced anti-poaching activities and the effectiveness of the various ivory importation moratoria and of the CITES appendix I ban in dampening the international demand for elephant ivory. The African elephant is not being overutilized at the present time because of the adequacy of these international, continental, regional, and state regulatory mechanisms.

Most range countries have now developed elephant conservation plans. Five range countries (South Africa, Namibia, Zimbabwe, Botswana and Tanzania) have individually described a specific long-term population goal for elephants and determined planned actions to achieve those goals. The five countries are each members of CITES and believe they can eventually support a population that could total about 191,000 elephants without destroying agricultural based economies, habitat quality, or threatening human populations. These five countries already have substantial investments in wildlife management but will continue to need external aid to purchase additional elephant habitat; provide, improve and maintain anti-poaching equipment; improve salaries for wildlife personnel; and to generally improve the infrastructure associated with elephant management. These countries possess some of the greatest opportunities for consumptive and non-consumptive tourism in Africa.

The potential maximum elephant population in South Africa is about 13,000 if funds become available for purchasing additional habitats and improving present habitats (National Parks Board of South Africa, 1991b). Namibia has established a provisional elephant goal of 10,000 animals which will require the establishment of additional protected areas, the establishment of sustainable wildlife management programs with native persons, and perhaps the introduction of elephants into suitable habitats outside the present elephant range. Several thousands of the 10,000 animals could be seasonal visitors only, as is true for the present elephant herd in Namibia (AECCG Namibia, 1991). Zimbabwe could support 43,000 elephants and sustain a desired

Addendum 120

degree of woodland cover (Nduku 1991). Botswana's elephant management objectives include maintaining elephant populations at their 1990 levels which total about 55,000 animals (Department of Wildlife and National Parks, Botswana, 1991). Zimbabwe and Botswana could presently have elephant populations in excess of their respective management goals. Tanzania's elephant management goal is about 70,000 animals (May 1992).

A sixth country, Kenya, also has extensive regulatory mechanisms in place. Kenya is unwilling to commit to a numerical elephant management goal but seems to want to attain and maintain elephant numbers that are about double the present elephant population. Conflicts between people and elephants already exist in some areas of the country because of a rapidly growing human population (Poole, 1992). Kenya plans to maintain elephants at present levels where people and elephants coexist and to allow elephants to increase in numbers, especially in those protected areas where poaching severely reduced elephant numbers in the 1970s and 1980s.

Perhaps the most significant difference in an elephant management program in these six African range states and a big game management program in North America is that African elephant management programs are usually significantly underfunded. Otherwise the quality of management and science seems comparable.

The remaining range states may presently support about 400,000 elephants (Douglas-Hamilton et al., 1992). Most of these states have established game departments, are developing an environmental ethic, and intend to develop wildlife conservation as a legitimate land use. Their management infrastructure suffers because of inadequate funding. Indeed, the under-funding of Africa's wildlife departments is the most pervasive and fundamental problem facing the elephant at the present time (AECCG Review, 1991).

Elephant management in most states in 1992 is equal or superior to that which existed in 1978 when the elephant was classified as threatened. The knowledge base about elephants and techniques for censuring and protecting elephants are superior to 1978 conditions. The recently developed conservation plans have helped range states develop their elephant management programs and to compete for funding from external donors. A fundamental priority within the elephant conservation plans is for **\*35484** range states to increase their operating capability and their professional proficiency.

All legal international trade in elephant products virtually ceased as of January 1990. The global demand and the price of ivory has virtually collapsed (AECCG Review, 1991). Many range states outside of southern Africa favored retention of the elephant on CITES Appendix I because that action would lead to a diminished international demand for ivory and to reduced poaching pressures on elephants within their countries. More effective law enforcement has also had a great influence on the suppression of poaching (Dublin and Jachmann 1992). Financial support for wildlife departments to increase protective actions is considered an action that can go an enormous way towards curing Africa's wildlife conservation crisis, at least in the short and medium terms (AECCG Review, 1991).

Willdlife departments in several range states realize the need to further codify the traditional rights of rural people to make use of wildlife and to profit from its presence. A basic common deficiency in the enforcement of present status has been weak support from the judiciary and a lack of support from customs officials and the police (AECCG Review, 1991).

The short term aims in the elephant conservation plans are to protect elephants from illegal killing, to improve the management of protected areas and to strengthen the management capability of wildlife departments. The AECCG Review (1991) suggests these are feasible when political stability exists and if sufficient financial support arises. The long term goals are to balance wildlife and human needs. This requires that sufficient returns be realized from the sustainable utilization of wildlife so that wildlife conservation is easily perceived as an important land use. The CAMPFIRE program in Zimbabwe is an excellent example of a social program built on values obtained from the sustainable utilization of wildlife resources.

*E. Other Natural or Manmade Factors Affecting its Continued Existence.*

The African elephant, like many terrestrial species, is adversely impacted by natural factors such as desertification and periodic drought. Desertification associated with the southward extension of the Sahara and periodic drought like that presently impacting many habitats in southern Africa may cause elephant mortality, limit recruitment, cause local or regional range contraction, and may increase competition among other wildlife species and man for dwindling resources. Civil unrest in several range states also adversely affects elephant populations. Both political unrest and environmental stresses may impact local or regional elephant populations but neither threatens the continental elephant population at this time.

**Available Conservation Measures**

Conservation measures provided to species listed as endangered or threatened under the Endangered Species Act include recognition, recovery actions, requirements for Federal protection, and prohibitions against certain practices. Recognition through listing encourages conservation measures by Federal, international, and private agencies, groups, and individuals.

Section 7(a) of the Act, as amended, and as implemented by regulations at 50 CFR part 402, requires Federal agencies to evaluate their actions conducted within the United States or on the high seas, with respect to any species that is proposed or listed as endangered or threatened and with respect to its proposed or designated critical habitat (if any). Section 7(a)(2) requires Federal agencies to ensure that activities they authorize, fund, or carry out are not likely to jeopardize the continued existence of a listed species or to destroy or adversely modify its critical habitat.

If a proposed Federal action may affect a listed species, the responsible Federal agency must enter into formal consultation with the Service. Because the African elephant is presently listed as threatened, it is already fully covered by section 7(a), and no new requirements are added by the present listing action.

Section 8(a) of the Act authorizes the provision of limited financial assistance for the development and management of programs that the Secretary of the Interior determines to be necessary or useful for the conservation of endangered species in foreign countries. Sections 8(b) and 8(c) of the Act authorize the Secretary to encourage conservation programs for foreign endangered species, and to provide assistance for such programs, in the form of personnel, and assistance for research, conservation, management, or protection of the species.

These actions are also conducted under the authorization of section 2101 of the African Elephant Conservation Act (AECA) that provides, through the African Elephant Conservation Fund, a means to provide financial assistance for elephant conservation to African government agencies responsible for African elephant conservation and protection. This fund provides significant financial assistance to range states to develop scientific information for habitat conditions and elephant numbers and trends, to control the take of African elephants, and to implement conservation programs to provide for healthy and sustainable populations of African elephants.

Permits may be issued to carry out otherwise prohibited activities involving threatened species, including individuals, their parts and products thereof, under certain circumstances. Regulations governing permits for threatened species on CITES Appendices are listed in 50 CFR parts 13, 17, and 23, and must be met before the permit can be issued.

**Revision of the Special Rule**

The final revised special rule provides for basically the same prohibitions and exceptions as did the proposed revised special rule (56 FR 11399-11401). The current special rule (50 CFR 17.40(e)) provides exceptions which allowed for the import and export of raw and worked ivory and other parts from threatened populations for commercial and other purposes under certain conditions. These exceptions were superseded by the June 9, 1989 ivory moratorium (54 FR 23758) imposed under the AECA and the January 18, 1990 transfer of the African elephant to CITES appendix I. Neither the proposed revised special rule nor the final revised special rule have provided general exceptions to the prohibition against the import of raw and worked ivory into the United States. The Service believes the general prohibitions against the ivory trade can help reduce any future overutilization of the African elephant resource. The final revised special rule does contain limited exceptions that allow the import of ivory

Addendum 122

that is either bona fide antique, or that has first been registered with the U.S. Fish and Wildlife Service, legally exported, and is being legally reimported. No exception is granted to the prohibition against the export from the United States of any African elephant raw ivory for commercial purposes. The exception granted for the export of worked ivory requires that permit criteria in 50 CFR parts 13 and 23 be met.

The AECA specifically allows individuals to import sport-hunted elephant trophies that have been legally taken in an ivory producing country that has submitted an ivory quota, even if a moratorium on ivory imports from that country has been established under the **\*35485** AECA. The Service notes that both this form of consumptive utilization, as well as forms of non-consumption utilization, as well as forms on non-consumptive utilization, provide important revenues for elephant conservation to range states. The proposed revised special rule allowed the import of sport-hunted elephant trophies from threatened populations if general Act permit procedures and CITES requirements were met. CITES requirements included a determination that the killing of elephants for sport-hunting enhances the survival of the species by providing financial support programs for elephant conservation. This requirement is retained in the final revised special rule for the import of sport-hunted trophies from threatened populations that are on CITES appendix I. A CITES appendix I import permit is required and can only be issued after the Service has determined that the import is non-detrimental to the species and that the killing of the animal whose trophy is intended for import would enhance the survival of the species. A separate permit under the Act is not required. No specific criteria for satisfying the CITES I import requirements are listed in the final revised special rule and the criteria listed in the proposed revised special rule have been deleted. The final revised special rule contains an exception to the import prohibition which allows the import of sport-hunted trophies when the following conditions have been met: (1) The trophy was taken in a country that has established a sport-hunting quota for the year of export; (2) a CITES appendix I import permit has been provided after all necessary requirements have been fulfilled; and (3) the trophy has been legibly marked. The sale or offer for sale of such trophies is prohibited by permit conditions.

The proposed revised special rule included an exemption from general prohibitions in the Act regarding interstate transactions in non-antique ivory from endangered populations. This was included because of the split-listing status that was proposed for the African elephant. The Service has no evidence that the continued interstate commerce within the United States in legally imported African elephant ivory contributes in any way to illegal killing and the overutilization of the African elephant resource. Consequently, the Service, in the final revised special rule, includes an exemption from the general prohibitions to allow the possession and interstate commerce of legally imported African elephants and their products and parts. This remains unchanged from the existing special rule, and includes not only ivory but also live animals and all African elephant parts and products that were legally imported.

## National Environmental Policy Act

The Service has determined that an Environmental Assessment, as defined under the authority of the National Environmental Policy Act of 1969, need not be prepared in connection with regulations adopted pursuant to section 4(a) of the Endangered Species Act, as amended. A notice outlining the Service's reasons for this determination was published in the Federal Register of October 25, 1983 (48 FR 492440).

## References Cited

AECCG Angola. 1991. Elephant conservation plan for Angola. Instituto de Desenvolvimento Florestal, Ministerio da Agricultura e do Desenvolvimento Rural. Luanda, Angola. 49pp.

AECCG Cameroon. 1991. Elephant conservation plan for Cameroon. Ministere du Tourisme, Direction de la Faune et des Parcs Nationaux. Yaounde, Cameroon. 89pp.

AECCG Equatorial Guinea. 1991. Elephant conservation plan for Equatorial Guinea. Ministry of Agriculture, Livestock, Fisheries and Forestry. Malabo, Equatorial Guinea. 44pp.

Addendum 123

AECCG Ethiopia. 1991. Elephant conservation plan for Ethiopia. Ministry of Agriculture, Nature Conservation and Development, Ethiopian Wildlife Conservation Organisation. Addis Ababa, Ethiopia. 49pp.

AECCG Gabon. 1991. Elephant conservation plan for Gabon. Ministere des Eaux et Forets, Direction de la Faune et de la Chasse. Libreville, Gabon. 77pp.

AECCG Ghana. 1991. Elephant conservation plan for Ghana. Department of Game and Wildlife, Ministry of Lands and Natural Resources. Accra, Ghana. 49pp.

AECCG Kenya. 1991. Elephant conservation plan for Kenya. Kenya Wildlife Service. Nairobi, Kenya. 90pp.

AECCG Liberia. 1991. Elephant conservation plan for Liberia. Forestry Development Authority. Monrovia, Liberia. 47pp.

AECCG Malawi. 1991. Elephant conservation plan Malawi. Department of National Parks, Wildlife and Tourism. Lilongwe, Malawi. 55pp.

AECCG Mozambique. 1991. Elephant conservation plan for Mozambique. Ministerio de Agricultura, Direccao Nacional de Florestas e Fauna Bravia. Maputo, Mozambique. 45pp.

AECCG Namibia. 1991. Elephant conservation and management plan for Namibia. Ministry of Wildlife, Conservation and Tourism. Windhoek, Namibia. 100pp.

AECCG Review. 1991. The African elephant conservation review. Oxford, England. 66pp.

AECCG Sierra Leone. 1991. Elephant conservation plan for Sierra Leone. Ministry of Agricuture, Natural Resources and Forestry. Freetown, Siera Leone. 68pp.

AECCG Somalia. 1991. Elephant conservation plan for Somalia. Ministry of Livestock, Range and Forestry. National Range Agency. Mogadishu, Somalia. 47pp.

AECCG Sudan. 1991. Elephant conservation plan for Sudan. Wildlife Conservation and National Parks Forces. Central Administration. Khartoum, Sudan. 39pp.

AECCG Tanzania. 1991. Elephant conservation plan for Tanzania. Wildlife Division, Ministry of Tourism, Natural Resources and the Environment. Dar-es-Salaam, Tanzania. 152pp.

AECCG Uganda. 1991. Elephant conservation plan for Uganda. Uganda National Parks. Kampala, Uganda. 55 pp.

AECCG Zambia 1992. Elephant conservation plan for Zambia. Ministry of Lands and Natural Resources, National Parks and Wildlife Service. Chilanga, Zambia. 31pp.

Anon. 1990. People, wildlife and natural resources—the CAMPFIRE approach to rural development in Zimbabwe. Zimbabwe Trust and the Department of National Parks and Wild Life Management. Harare, Zimbabwe. 25pp.

Ansell, W.F.H. 1971. Order Proboscidea. Part 11, pages 1-5 in J. Meester and H.W. Setzer (eds). The Mammals of Africa: an identification manual. Smithsonian Institution Press. Washington, D.C.

Barnes, R.F.W. 1991a. Forest elephants in central Africa. Comments in relation to the proposal to change the status of certain populations of elephants. Comments submitted to U.S. Fish and Wildlife, 26 June 1991.

Barnes, R.F. W. 1991b. Letter submitted to U.S. Fish and Wildlife Service, 26 August 1991.

CITES Panel of Experts on the African Elephant. 1991. Report of the CITES Panel of Experts on the African Elephant on the proposal of South Africa to transfer the population of Loxodonta africana of South Africa from CITES appendix I to appendix II. Report to the CITES Secretariat. 23pp.

CITES Panel of Experts on the African Elephant. 1992. Report of the CITES Panel of Experts on the African Elephant on the proposals to transfer from CITES appendix I to appendix II the populations of Loxodonta africana of Botswana, Malawi, Namibia Zambia and Zimbabwe. Unpublished Report to the CITES Secretariat. 44 pp.

Cumming, D.H.M., R.F. Du Toit, and S.N. Stuart, 1990. African elephants and rhinos. Status survey and converstaion action plan. IUCN/SSC African Elephant and Rhino Specialist group. Gland, Switzerland, 72pp.

Department of Wildlife and National Parks, Botswana. 1991. The conservation and management of elephants in Botswana. Ministry of Commerce and Industry, Department of Wildlife and National Parks. Gaborbone, Botswana 13pp.

Dougherty, N.C. 1991. An appraisal of the status of elephant conservation in ten African countries. Ele-Drive Charitable Trust. Final Report. Nairobi, Kenya. 183p.

 **\*35486**  Douglas-Hamilton, I. 1987. African elephants: population trends and their causes. Oryx 21(1):11-24.

Douglas-Hamilton, I. 1988. The great east African elephant disaster. SWARA 11(2):8-12.

Douglas-Hamilton, I., F. Michelmore, and A. Inamdar. 1992. African elephant database. United Nations Environment Programme. Nairobi, Kenya. 165pp.

Dublin, H.T., and H. Jachmann. 1992. The impact of the ivory ban on illegal killing of elephants in six range states in Africa. World Wildlife Fund International. Research Report. 75pp.

Environmental Investigation Agency. 1992. Under fire—elephants in the front line. The Environmental Investigation Agency. London 57pp.

GRID. 1991. Technical Report on the African elephant database. Global Resource Information Database, Case studies Series No. 5. United Nations Environment Programme. Nairobi, Kenya. 173pp.

Humane Society of the United States. 1992. Comments of the HSUS regarding proposals by Zimbabwe, Botswana, South Africa, Namibia, Malawi, and Zambia to transfer populations of the African elephant from CITES appendix I and II. 30 January 1992. 20pp + addenda.

Humane Society of the United States et al. 1989. Petition to upgrade the African elephant (Loxodonta africana) from threatened to endangered status. 16 February 1989. Washington, D.C. 39pp + 11 Appendices.

Lahm, S.A., and R.F.W. Barnes. 1991. The status of elephants in Gabon. Comments submitted to U.S. Fish and Wildlife Service, June 1991.

Lewis, D., G.B. Kaweche, and A. Mwenya. 1990. Wildlife conservation outside protected areas—lessons from an experiment in Zambia. Conservation Biology 4:171-180.

Mlay, C.A. 1992. Letter to Henry L. Short. 4 February 1992.

National Parks Board of South Africa. 1991a. Draft elephant conservation plan for South Africa. Kruger National Park, Skukuza, South Africa. 29pp.

Addendum 125

National Parks Board of South Africa. 1991b. Proposed endangered status for certain populations of the African elephant and revision of special rule (56 FR 11392-11401). Comments submitted Dec. 13, 1991. National Parks Board, Kruger National Park, Skukuza, South Africa. 44pp.

Nduku, W.K. 1991. Response to request for comments FR 56(52): African elephant and submission of petition. Comment submitted to U.S. Fish and Wildlife Service, 2 July 1991. 13pp + 20 Annexes.

O'Connell, M.A., and M. Sutton. 1990. The effects of trade moratoria on international commerce in African elephant ivory. World Wildlife Fund and the Conservation Foundation. Washington, D.C. 36pp.

Poole, Joyce H. 1992. Letter to Henry L. Short. 18 March 1992.

Smithers, R.H.N. 1983. The mammals of the southern African subregion. University of Pretoria, Pretoria, South Africa. xxii + 736pp.

Zimbabwe Department of National Parks and Wild Life Management. 1991. Policy for Wild Life. 5th draft. Department of National Parks and Wild Life Management. Harare, Zimbabwe. 39pp.

**Author**

The primary author of this final rule is Dr. Henry L. Short, Office of Scientific Authority, U.S. Fish and Wildlife Service, Washington, DC 20240 (703-358-1708).

**List of Subjects in 50 CFR Part 17**

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

**Regulation Promulgation**

**PART 17—(AMENDED)**

Accordingly, part 17, subchapter B of chapter I, title 50 of the Code of Federal Regulations, is hereby amended as set forth below:

1. The Authority citation for part 17 continues to read as follows:

Authority:16 U.S.C. 1361-1407; 16 U.S.C. 1531-1544; 16 U.S.C. 4201- 4245; Pub. L. 99-625, 100 Stat. 3500; unless otherwise noted.

50 CFR § 17.40
2. Section 17.40 is amended by revising paragraph (e) to read as follows:

50 CFR § 17.40

**§ 17.40 Special rules—mammals.**

* * * * *

(e) African elephant (Loxodonta africana)—(1) Definitions. For the purposes of this paragraph (e):

(i) African elephant shall mean any member of the species Loxodonta africana, whether live or dead, and any part or product thereof.

(ii) Raw ivory means any African elephant tusk, and any piece thereof, the surface of which, polished or unpolished, is unaltered or minimally carved.

(iii) Worked ivory means any African elephant tusk, and any piece thereof, which is not raw ivory.

Addendum 126

(iv) Lip mark area means that area of a whole African elephant tusk where the tusk emerges from the skull and which is usually denoted by a prominent ring of staining on the tusk in its natural state.

(2) Prohibitions. Except as provided in the exceptions in paragraph (e)(3) of this section, it shall be unlawful for any person to:

(i) Import or export any African elephant,

(ii) Possess, sell or offer for sale, receive, deliver, transport ship, or export any African elephant which was illegally imported into the United States,

(iii) Sell or offer for sale any sport-hunted trophy imported into the United States in violation of permit conditions.

(3) Exceptions. (i) African elephants, other than sport-hunted trophies and raw and worked ivory, may be imported or exported provided all permit requirements of 50 CFR parts 13 and 23 have been complied with.

(ii) Ivory. (A) Raw or worked ivory (other than sport-hunted trophies) may be imported only if:

(1) it is a bona fide antique of greater than 100 years of age on the day of import, or

(2) It was exported from the United States after being registered with the U.S. Fish and Wildlife Service.

(B) Worked ivory may be exported in accordance with the permit requirements of 50 CFR parts 13 and 23.

(C) Raw ivory may not be exported from the United States for commercial purposes under any circumstances.

(iii) Sport-hunted trophies may be imported into the United States provided:

(A) The trophy originates in a country for which the Service has received notice of that country's African elephant ivory quota for the year of export;

(B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied with;

(C) A determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and

(D) The trophy is legibly marked by means of punch-dies, under a marking and registration system established by the country of origin, that includes the following information: Country of origin represented by the two-letter code established by the International Organization for Standardization (see appendix A to chapter I) followed by the registration number assigned to the last two digits of the year of registration and the weight of raw ivory to the nearest kilogram. Any mark must be placed on the lip mark area and indicated by a flash of color which serves as a background for such mark.

Dated: July 10, 1992.

John Turner,

Director.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

(FR Doc. 92-18861 Filed 8-7-92; 8:45 am)

BILLING CODE 4310-55-M

**End of Document**                                                                © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Addendum 128

62 FR 44627-01, 1997 WL 475265(F.R.)

PROPOSED RULES

DEPARTMENT OF THE INTERIOR

Fish and Wildlife Service

50 CFR Part 23

RIN 1018-AE16

Changes in List of Species in Appendices to the Convention on
International Trade in Endangered Species of Wild Fauna and Flora

Friday, August 22, 1997

**\*44627**  AGENCY: Fish and Wildlife Service, Interior.

ACTION: Proposed rule.

SUMMARY: The Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES, or "the Convention") regulates international trade in certain animals and plants. Species for which such trade is controlled are listed in Appendices I, II, and III to the Convention.

This document announces decisions by the Conference of the Parties to CITES on amendments to Appendices I and II, and repeats a previous request (62 FR 31054) for comment on whether the United States should enter reservations on any of the amendments. The effect of a reservation would be to exempt this country from implementing CITES for a particular species. However, even if a reservation were taken, many importing countries would require comparable documents, and many importers to the United States would be required, under the Lacey Act Amendments of 1981, to obtain permits issued by foreign countries. The CITES amendments to Appendices I and II described in this document will enter into effect on September 18, 1997, unless specifically indicated otherwise. Reference is also made here to establishment by the Parties of an export quota for the markhor, a species both included in Appendix I and listed as Endangered under the Endangered Species Act, and the implications for the importation of markhor sport-hunted trophies into the United States.

DATES: The amendments to Appendices I and II adopted at the recent meeting of the Conference of the Parties become effective 90 days after their adoption under the terms of CITES and therefore are enforceable as of September 18, 1997, with the exception of the amendments concerning sturgeons, which will take effect on April 1, 1998. The Service will consider all comments received by September 12, 1997, in determining whether the United States should enter any reservations.

ADDRESSES: Please send correspondence concerning this proposed rule to Chief, Office of Scientific Authority; 4401 North Fairfax Drive, Room 750; Arlington, Virginia 22203. Fax number: 703-358-2276. Comments and other information received are available for public inspection by appointment, from 8 a.m. to 4 p.m. Monday through Friday, at the Arlington, Virginia address.

FOR FURTHER INFORMATION CONTACT: Dr. Charles W. Dane, Office of Scientific Authority, U.S. Fish and Wildlife Service, Arlington, Virginia, telephone 703-358-1708.

SUPPLEMENTARY INFORMATION:

**Background**

CITES regulates import, export, reexport, and introduction from the sea of certain animal and plant species. Species for which the trade is controlled are included in three Appendices. Appendix I includes species threatened with extinction that are or

Addendum 129

may be affected by trade. Appendix II includes species that, although not necessarily now threatened with extinction, may become so unless trade in them is strictly controlled. It also lists species that must be subject to regulation in order that trade in other listed species may be brought under effective control (e.g., because of similarity-of-appearance problems). Appendix III includes species that any Party identifies as being subject to regulation within its jurisdiction for purposes of preventing or restricting exploitation, and for which it needs the cooperation of other Parties to control trade. Any Party may propose amendments to Appendices I and II for consideration at meetings of the Conference of the Parties. The text of any proposal must be communicated to the CITES Secretariat at least 150 days before the meeting. The Secretariat must then consult the other Parties and appropriate intergovernmental agencies, and communicate their responses to all Parties no later than 30 days before the meeting.

**Recent Decisions**

The tenth meeting of the Conference of the Parties to CITES (COP10) was held June 9-20, 1997, in Harare, Zimbabwe. At the meeting, the Parties considered 62 different animal proposals and 13 different plant proposals to amend the Appendices. These were described in the Federal Register on April 16, 1997, for proposals submitted by the United States (62 FR 18559), and on June 6, 1997, for proposals submitted by other Parties (62 FR 31054). All proposed amendments not withdrawn by the proponents were considered and acted upon by Committee I during the Conference, with each accredited attending Party having one vote. Adoption of amendments by Committee I requires either consensus or, in case of a vote, a two-thirds majority of those Parties present and voting (abstentions not included). Action by Committee I on species proposals was accepted by the Plenary session, unless a motion to reopen debate was put to vote and approved by one-third of the non-abstaining Parties voting.

Debate was reopened and votes recast on the following proposals that had not received the required two-thirds majority in Committee I: the proposal on the southern white rhinoceros (Ceratotherium simum simum) by South Africa; the proposal on the ultramarine lorikeet (Vini ultramarina) by Germany; and an amended proposal on the hawksbill sea turtle (Eretmochelys imbricata) by Cuba. The proposal on the ultramarine lorikeet was adopted in Plenary. The proposal on the southern white rhinoceros and the amended proposal on the hawksbill sea turtle, however, were rejected.

The use of the secret ballot process for voting on species proposals was more widespread at COP10 than at past conferences. This was due in part to a change in the Rules of Procedure adopted at COP9, which reduced the number of seconding Parties required to sustain a motion for a secret ballot, and in part to the number of controversial proposals up for consideration. Secret ballots were cast in Committee I on all whale proposals, the hawksbill turtle proposal, all elephant proposals, and the proposal on bigleaf mahogany. A call by Panama for a secret ballot on the United States' proposal to include the sawfishes in Appendix I was rejected. **\*44628** One secret ballot was also cast in Committee II. All proposals brought to a vote in Plenary, except that on the ultramarine lorikeet, were conducted by secret ballot. The United States believes that the position of CITES Parties on species proposals should be public and the voting process transparent. Consequently, the United States delegation announced on the floor or in other public fora its vote on species proposals conducted by secret ballot at COP10. The United States in Committee I voted for the proposal on bigleaf mahogany and against all other proposals voted on by secret ballot.

Species proposals advanced by the United States met with mixed results. Proposals on the green-cheeked parrot (Amazona viridigenalis), straw-headed bulbul (Pycnonotus zeylanicus), sturgeons (Acipenseriformes), three species of mussels (Unionidae), and Tweedy's bitterroot (Lewisia tweedyi) were adopted by consensus, and goldenseal (Hydrastis canadensis) by vote. The effective date of the sturgeon proposal was amended to April 1, 1998, to allow enough time for identification techniques to be refined and made operational. The proposal to include all sawfishes (Pristiformes) in Appendix I encountered bloc opposition from Parties concerned about CITES involvement in marine species issues and was defeated. The United States was persuaded by arguments from other Parties that, in light of the endemic status of the alligator snapping turtle (Macroclemys temminckii) and timber rattlesnake (Crotalus horridus) in the United States and apparently low levels of international trade in both species, the conservation value of an Appendix II listing was questionable. The United States therefore withdrew these proposals and stated that it will consider, at least for the alligator snapping turtle, whether an Appendix III listing will provide the insights needed into the effect of international trade on its conservation status. State wildlife agencies will be fully consulted in the process of considering this approach. The proposal on nine species of map turtles (Graptemys spp.), though supported

Addendum 130

by a majority of the Parties, fell one vote short of the required two-thirds majority. Nonetheless, the Service will continue its cooperative approach with the States to identify appropriate conservation strategies for these and other native reptile species that are involved in international trade.

Although disappointed with the close negative vote on inclusion of bigleaf mahogany (Swietenia macrophylla) in Appendix II (the vote was 67 Parties in favor, 45 opposed, failing by 8 votes to reach the required two-thirds majority), the United States looks forward to progress in the conservation of this species, in the context of a number of range States' Appendix III listings and other efforts. Brazil, Bolivia, and Mexico stated in Plenary that they would include their populations in Appendix III. (Costa Rica included the species in Appendix III in 1995—see 61 FR 6793.) In addition, a mahogany working program is being established for 18 months (through 1998) that will provide for discussion among all range States, major importing countries, and pertinent organizations on conservation and sustainable trade of bigleaf mahogany.

The Conference of the Parties also accepted a determination by the Nomenclature Committee that the CITES listing of the urial sheep, Ovis vignei, in Appendix I only applies to the subspecies Ovis vignei vignei and that other subspecies of Ovis vignei are not presently listed. This determination reverses an earlier decision of the Nomenclature Committee (reported in 61 FR 67293, December 10, 1996) that the entire species must be considered listed, because the taxon originally intended for listing could not be determined with certainty. The reversal was made on the basis of compelling evidence provided by the Depositary Government (Switzerland) from transcripts of committee discussions during the Plenipotentiary meeting (in 1973) and COP1 (in 1976). This interpretation is consistent with the interpretation long held by the United States. It is anticipated that Germany will submit a proposal to COP11 to include the other subspecies in Appendix II and that such a proposal will be supported by the range States.

Although there are no CITES listing implications, the Service wishes to note the action of the Parties at COP10 in adopting a resolution submitted by Pakistan to establish an annual export quota of six markhor (Capra falconeri) sport-hunted trophies. This species is included in Appendix I. Although adoption by the Parties of a quota for export of an Appendix I species normally constitutes assurance to the exporting country that exports within the established quota will be accepted by importing countries, stricter domestic measures may in some cases override such assurances. In the case of the markhor, two subspecies, Capra falconeri megaceros (includes C. f. jerdoni) and Capra falconeri chialtanensis (= C. aegagrus), are listed as Endangered under the U.S. Endangered Species Act (ESA). A finding of enhancement completely independent of any CITES finding would have to be made for import of either of these ESA-listed subspecies into the United States.

Results of actions by the Conference of the Parties on the proposed amendments to the Appendices are given in the table below:

| Species | Proposed amendment | Proponent | Decision of the parties |
| --- | --- | --- | --- |
| Mammals | | | |
| Order Diprotodontia: | | | |
| Burramys parvus (Mountain pygmy possum)....................... | Deletion from Appendix II | Australia | Adopted. |
| Dendrolagus bennettianus and D. lumholtzi (Bennett's and Lumholtz's tree kangaroos)...... | Deletion from Appendix II | Australia | Adopted. |
| Order Xenarthra: | | | |
| Chaetophractus nationi (Hairy armadillo)................................ | Inclusion in Appendix I | Bolivia | Adopted as amended to include in Appendix II. |

Addendum 131

Order Cetacea:

| | | | |
|---|---|---|---|
| Eschrichtius robustus (Gray whale)...................................... | Transfer of the Eastern Pacific stock from Appendix I to II | Japan | Rejected. |
| Balaenoptera acutorostrata (Minke whale)......................... | Transfer of the Okhotsk Sea West Pacific stock from Appendix I to II | Japan | Rejected. |
| Balaenoptera acutorostrata (Minke whale)......................... | Transfer of the Southern Hemisphere stock from Appendix I to II | Japan | Rejected |
| Balaenoptera acutorostrata (Minke whale)......................... | Transfer of the Northeast Atlantic and the North Atlantic Central stocks from Appendix I to II | Norway | Rejected. |
| Balaenoptera edeni (Bryde's whale)...................................... | Transfer of the North Pacific Western stock from Appendix I to II | Japan | Withdrawn. |

Order Carnivora:

| | | | |
|---|---|---|---|
| Ursus arctos (Brown bear)....... | Transfer of all Asian and European populations from Appendix II to I | Finland, Bulgaria, and Jordan | Rejected. |
| Panthera onca (Jaguar)............. | Establishment of annual export quotas for hunting trophies of zero in 1997, 1998, and 1999 and of 50 thereafter | Venezuela | Withdrawn. |

Order Proboscidea:

| | | | |
|---|---|---|---|
| Loxodonta africana (African elephant).................................. | Transfer of the Botswanan population from Appendix I to II, with certain annotations | Botswana, Namibia, and Zimbabwe | Adopted as amended. [1] |
| Loxodonta africana (African elephant).................................. | Transfer of the Namibian population from Appendix I to II, with certain annotations | Botswana, Namibia, and Zimbabwe | Adopted as amended. [2] |
| Loxodonta africana (African elephant).................................. | Transfer of the Zimbabwean population from Appendix I to II, with certain annotations | Botswana, Namibia, and Zimbabwe | Adopted as amended. [3] |

Order Perissodactyla:

| | | | |
|---|---|---|---|
| Ceratotherium simum simum (Southern white rhinoceros)..... | Amendment to annotation 503 in the CITES Appendice) to allow trade | South Africa | Rejected. |

Addendum 132

in parts and derivatives but
with a zero export quota

Order Artiodactyla:

| | | | |
|---|---|---|---|
| Pecari tajacu (Collared peccary) .................................. | Deletion from Appendix II (Mexican population) | Mexico | Adopted. |
| Vicugna vicugna (Vicun6a) .... | Annotated transfer of certain populations to Appendix II [4] | Argentina | Adopted. |
| Vicugna vicugna (Vicun6a) .... | Annotated transfer of certain populations to Appendix II | Bolivia | Adopted as amended. [5] |
| Vicugna vicugna (Vicun6a) .... | Amendment to annotation 504 in the CITES Appendices list to replace the words "VICUN6ANDES-CHILE" and "VICUN6ANDES-PERU" with the words "VICUN6A-COUNTRY OF ORIGIN" | Peru | Adopted. |
| Vicugna vicugna (Vicun6a) .... | Amendments to annotation 504 (in the CITES Appendices list) to allow also the countries that are members of the Vicun6a Convention to utilize the term VICUN6A-PAIS DE ORIGEN-ARTESANIA, along with the authorized trademark, on luxury handicrafts and knitted articles made of wool sheared from live vicun6as from Appendix II populations | Peru | Adopted. |
| Elaphurus davidianus (Pe2re David's deer) .......................... | Inclusion in Appendix II | Argentina and China | Withdrawn. |
| Bison bison athabascae (Wood bison) ..................................... | Transfer from Appendix I to II in accordance with precautionary measure B.2.b) of Resolution Conf. 9.24, Annex 4 | Canada | Adopted. |
| Bos javanicus (Banteng) ......... | Inclusion in Appendix I | Thailand | Withdrawn. |
| Bubalus arnee (Water buffalo) | Inclusion in Appendix I | Thailand | Withdrawn. |
| Ovis Ammon nigrimontana (Kara Tau argali) .................... | Transfer from Appendix II to I | Germany | Adopted. |

Birds

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Order Galliformes:

| | | | |
|---|---|---|---|
| Pauxi pauxi (Northern Helmeted curassow) ................ | Inclusion in Appendix II | Netherlands | Withdrawn. |
| Pauxi unicornis (Horned curassow) ............................. | Inclusion in Appendix II | Netherlands | Withdrawn. |

Order Gruiformes:

| | | | |
|---|---|---|---|
| Turnix melanogaster (Black-breasted button-quail) ............. | Deletion from Appendix II | Australia | Adopted. |
| Pedionomus torquatus (Plains wanderer) ............................... | Deletion from Appendix II | Australia | Adopted. |
| Gallirallus australis hectori (Eastern weka rail) .................. | Deletion from Appendix II | New Zealand | Adopted. |

Order Psittaciformes:

| | | | |
|---|---|---|---|
| Amazona agilis (Black-billed parrot) ..................................... | Transfer from Appendix II to I | Germany | Withdrawn. |
| Amazona viridigenalis (Red-crowned parrot) ...................... | Transfer from Appendix II to I | Mexico, United States, and Germany | Adopted. |
| Cacatua sulphurea (Lesser sulphur-crested cockatoo) ....... | Transfer from Appendix II to I | Germany | Withdrawn. |
| Eunymphicus cornutus uvaeensis (Ouvea horned parakeet)................................... | Transfer from Appendix II to I | Germany | Withdrawn. |
| Vini kuhlii (Kuhl's lorikeet)..... | Transfer from Appendix II to I | Germany | Rejected. |
| Vinni peruviana (Tahitian lorikeet)................................... | Transfer from Appendix II to I | Germany | Rejected. |
| Vini ultramarina (Ultramarine lorikeet)................................... | Transfer from Appendix II to I | Germany | Adopted |

Order Caraciiformes:

| | | | |
|---|---|---|---|
| Aceros waldeni (Writhed-billed hornbill)........................... | Transfer from Appendix II to I | Germany | Withdrawn. |

Order Passeriformes:

| | | | |
|---|---|---|---|
| Pycnonotus zeylanicus (Straw-headed bulbul).......................... | Inclusion in Appendix II | Netherlands and the United States | Adopted. |
| Leiothrix argentauris (Silver-eared mesia)............................. | Inclusion in Appendix II | Netherlands | Adopted. |
| Leiothrix lutea (Pekin robin).... | Inclusion in Appendix II | Netherlands | Adopted. |

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

| | | | |
|---|---|---|---|
| Liocichla omeiensis (Omei Shan liochichla)........................ | Inclusion in Appendix II | Netherlands | Adopted. |
| Tangara fastuosa (Seven-colored tanager)........................ | Inclusion in Appendix II | Germany and the Netherlands | Adopted. |
| Amandava formosa (Green avadavat)................................. | Inclusion in Appendix II | Netherlands | Adopted. |
| Padda oryzivora (Java sparrow).................................... | Inclusion in Appendix II | Netherlands | Adopted. |
| Gracula religiosa (Hill mynah). | Inclusion in Appendix II | Netherlands and the Philippines | Adopted. |

Reptiles

Order Testudinata:

| | | | |
|---|---|---|---|
| Macroclemys temminckii (Alligator snapping turtle)........ | Inclusion in Appendix II | United States | Withdrawn. |
| Callagur borneoensis (Painted terrapin)................................... | Inclusion in Appendix II | Germany | Adopted. |
| Graptemys (Map turtles).......... | Inclusion of nine species in Appendix II | United States | Rejected. |
| Eretmochelys imbricata (Hawksbill sea turtle)............... | Transfer of the Cuban population from Appendix I to II with certain annotations | Cuba | Rejected. |

Order Crocodylia:

| | | | |
|---|---|---|---|
| Caiman latirostris (Broad-snouted caiman)....................... | Transfer of the Argentine population from Appendix I to II, for purpose of ranching | Argentina | Adopted. |
| Crocodylus niloticus (Nile crocodile)................................. | Maintenance of the Malagasy population in Appendix II, for purpose of ranching | Madagascar | Adopted. |
| Crocodylus niloticus (Nile crocodile)................................. | Establishment of an annual export quota of 1,000 skins and 100 hunting trophies from wild animal for years 1998-2000 | Tanzania | Adopted. |
| Crocodylus noloticus (Nile crocodile)................................. | Maintenance of the Ugandan population in Appendix II, for purpose of ranching | Uganda | Adopted. |

Order Sauria:

| | | | |
|---|---|---|---|
| Varanus bengalensis (Indian monitor).................................... | Transfer of the population of Bangladesh from Appendix I | Bangladesh | Rejected. |

Addendum 135

| | | | |
|---|---|---|---|
| | to II subject to annual export quotas of 150,000 skins in 1997 and 225,000 in 1998 and 1999 | | |
| Varanus flavescens (Yellow monitor) ................................... | Transfer of the population of Bangladesh from Appendix I to II subject to annual export quotas of 100,000 skins in 1997, 1998, and 1999 | Bangaladesh | Rejected. |
| Order Serpentes: | | | |
| Crotalus horridus (Timber rattlesnake) .............................. | Inclusion in Appendix II | United States | Withdrawn. |
| Amphibians | | | |
| Order Anura: | | | |
| Mantella bernhardi, M. cowani, M. viridis, and M. haraldmeieri (Golden mantella frogs) ....................................... | Inclusion in Appendix II | Netherlands | Withdrawn. |
| Fishes | | | |
| Order Acipenseriformes (Sturgeons) ............................. | Inclusion of all presently unlisted species in Appendix II | Germany and the United States | Adopted as amended. [6] |
| Order Pristiformes (Sawfishes) .................................................. | Inclusion in Appendix I | United States | Rejected. |
| Mollusks | | | |
| Fusconaia subrotunda, Lampsilis brevicula, and Lexingtonia dolabelloides (Unionid mussels).................... | Deletion from Appendix II | United States | Adopted. |
| Paryphanta spp. (New Zealand amber snails) .......................... | Deletion from Appendix II | Switzerland | Adopted. |
| Other Animal Proposals | | | |
| Plants—General | | | |
| Araliaceae: Panax quinquefolius (American ginseng) ................................... | Amend the Appendix II listing of this species (cf. current annotation #3), to include only the followiong parts: "Whole and sliced roots and parts of roots, excluding manufactured, processed products such as powders, extracts, | Switzerland | Adopted as amended. [8] |

Addendum 136

| | | | |
|---|---|---|---|
| | pills, tonics, teas and confectionary" | | |
| Cactaceae spp. (Cacti): Mexican cacti ......................... | Amend the Appendix II listing for this family (cf. current annotation #4), to include seeds from Mexican cacti originating in Mexico | Mexico | Adopted as amended. [9] |
| Leguminosae (Fabaceae): Pericopsis elata (Afrormosia), and Meliaceae: Swietenia mahagoni (Caribbean mahogany) .............................. | Amend the Appendix II listing of these two species (cf. current annotation #5), to include only the following parts: "Logs, sawn wood and veneer sheets" | Switzerland | Adopted. |
| Meliaceae: Swietenia macrophylla (Bigleaf mahogany).............................. | Include in Appendix II with an annotation to cover logs, sawn wood, and veneer sheets only | United States and Bolivia | Rejected as amended. [8] |
| Portulacaceae: Lewisia tweedyi (Tweedy's bitterroot)... | Delete from Appendix II | United States | Adopted. |
| Proteaceae: Orothamnus zeyheri (Marsh-rose)................ | Transfer from Appendix I to Appendix II, in accordance with precautionary measure B.2.b of Resol. Conf. 9.24, Annex 4 | South Africa | Adopted. |
| Protea odorata (Ground-rose or Swartland sugarbush)............... | Transfer from Appendix I to Appendix II, in accordance with precautionary measure B.2.b of Resol. Conf. 9.24, Annex 4 | South Africa | Adopted. |
| Ranunculaceae: Hydrastis canadensis (Goldenseal)........... | Include in Appendix II, along with only the following parts: "Roots, rhizomes or rootstocks, and specimens recognizable as being parts thereof" | United States | Adopted as amended. [8] |
| Scrophulariaceae: Picrorhiza kurrooa (Kutki)....................... | Include in Appendix II, along with only the following parts: "Roots and readily recognizable parts thereof" | India | Adopted. |
| Theaceae: Camellia chrysantha, which is Camellia petelotii in part (Golden-flowered camellia).................... | Delete from Appendix II | China | Adopted. |
| Valerianaceae: Nardostachys grandiflora (=Nardostachys jatamansi misapplied) (Himalayan nard or spikenard). | Include in Appendix II, along with only the following parts: "Whole and sliced roots and | India | Adopted as amended. [8] |

Addendum 137

|  |  |  |  |
|---|---|---|---|
|  | parts of roots, excluding manufactured, processed products such as powders, extracts, pills, tonics, teas and confectionary" |  |  |
| Plants—Artificial Propagation |  |  |  |
| Families other than Orchidaceae (Orchids)............. | Amend the listings of most plant families now in Appendix II (current annotations #1, #2, #4, and #8), to also exclude the following part: "Cut flowers of artificially propagated plants" | Switzerland | Adopted. |
| Cactaceae spp. (Cacti): (1) Hybrid Easter cactus; (2) Crab cactus, Christmas cactus; (3) Red cap cactus, Oriental moon cactus; and (4) Bunny ears cactus........................................ | Amend the Appendix II listing for this family (cf. current annotation #4), to exclude artificially propagated specimens of the following hybrids and/or cultivars: (1) Hatiora graeseri (=H. gaertneri H. rosea); (2) Schlumbergera (=Zygocactus) truncata cultivars, and its hybrids with S. opuntioides (=S. exotica), S. orssichiana, and S. russelliana (=S. buckleyi); (3) Gymnocalycium mihanovichii cultivars lacking chlorophyll, grafted to Hatiora 'Jusbertii', Hylocereus trigonus or H. undatus; and (4) Opuntia microdasys | Denmark | Adopted as amended. [8,10] |
| Euphorbiaceae: Succulent Euphorbia spp. (Succulent euphorbs): Three-ribbed milk tree............................................ | Amend the Appendix II listing of succulent Euphorbia spp., with an annotation to exclude artificially propagated specimens of Euphorbia trigona cultivars | Denmark | Adopted |
| Primulaceae: Cyclamen spp. (Cyclamens): Florist's cyclamen ................................. | Amend the Appendix II listing of Cyclamen spp., with an annotation to exclude artificially propagated specimens of the cultivars of Cyclamen persicum, except when traded as dormant tubers | Denmark | Adopted as amended. [8] , [10] |

Addendum 138

**Adopted.[FN7]  \*44632  Consequences of Amendments to Appendices I and II**

All proposals in the preceding table that were approved by the Conference of the Parties will enter into effect 90 days after the meeting (i.e., on September 18, 1997) under the terms of the CITES treaty (except for the listing of sturgeons, which has a delayed effective date of April 1, 1998). Article XV of CITES enables any Party to exempt itself from implementing CITES for any particular species, if it enters a reservation with respect to that species. A Party desiring to enter a reservation must do so during the 90-day period immediately following the close of the meeting at which the Parties voted to include the species in Appendix I or II. If the United States should decide to enter any reservation, this action must be transmitted to the Depositary Government (Switzerland) by September 18, 1997.

The Service now repeats its request published earlier (62 FR 31054, June 6, 1997) for public comment/recommendations concerning reservations to be taken by the United States on any amendments to the Appendices adopted by the Parties at COP10. Recommendations or comments regarding reservations must be received by September 12, 1997, so that all comments can be carefully considered and the Depositary Government and the Secretariat can be informed by September 18, 1997 if appropriate. The Service proposes not to recommend any reservations. It will consider doing so only if evidence is presented to show that implementation of an amendment would be contrary to the interests or law of the United States. If the United States should enter any reservations, they will be announced in a Federal Register notice as soon as possible after the decisions are made. Any reservations announced would be tentative, pending full consideration of public comments.

Reservations, if entered, may do little to relieve importers in the United States from the need for foreign export permits, because the U.S. Lacey Act Amendments of 1981 (16 U.S.C. 3371 et seq.) make it a Federal offense to import into the United States any animals taken, possessed, transported, or sold in violation of foreign conservation laws. If a foreign country has enacted CITES as part of its positive law, and that country has not taken a reservation with regard to the animal or plant, or its parts or  \*44633  derivatives, the United States (even if it had taken a reservation on a species) would continue to require CITES export documents as a condition of import. Any reservation by the United States would provide exporters in this country with little relief from the need for U.S. export documents. Importing countries that are party to CITES would generally require CITES-equivalent documentation from the United States, even if it enters a reservation, because the Parties have agreed to allow trade with non-Parties (including reserving Parties) only if they issue documents containing all the information required in CITES permits or certificates. In addition, if a reservation is taken on a species listed in Appendix I, the species should still be treated by the reserving Party as in Appendix II according to Resolution Conf. 4.25, thereby still requiring CITES documents for export. The United States has never entered a reservation to a CITES listing. It is the policy of the United States that commercial trade in Appendix I species for which a country has entered a reservation undermines the effectiveness of CITES.

**Requirements of Other Laws**

Changes in the CITES listing status of species as a consequence of actions taken at COP10 do not supersede import or export requirements pursuant to other wildlife conservation laws. For example, import or export of species listed as Threatened or Endangered under the U.S. Endangered Species Act (ESA) still must meet the provisions of that law and its implementing regulations in 50 CFR Part 17, even if those species have been transferred to a less protective CITES Appendix or removed from the Appendices entirely. The most noteworthy of the species downlisted to Appendix II at COP10 but still subject to stricter ESA provisions are the African elephant, the Argentinian and Bolivian populations of the vicun6a, the wood bison, and the broad-snouted caiman. The African elephant is also subject to provisions of the U.S. African Elephant Conservation Act (AECA). Because of the high public interest in this species and the complexity of the terms of the CITES downlistings, the effects of the downlistings on trade in African elephant products is treated separately in more detail below. Species of birds included in the CITES Appendices for the first time (straw-headed bulbul, silver-eared mesia, Pekin robin, Omei Shan leiocichla, seven-colored tanager, green avadavat, Java sparrow, and hill mynah) are now subject to the terms of the U.S. Wild Bird Conservation Act (WBCA) and its regulations in 50 CFR Part 15. This will result in a prohibition on the importation of these species unless they qualify for exemptions established by regulation. Copies of these implementing regulations are available from the Service's Office of Management Authority. Importation into the United States of Sport-hunted Trophies of African Elephants from Namibia, Botswana, and Zimbabwe.

The African elephant is listed as Threatened under the ESA with a special rule at 50 CFR 17.40(e). Under the special rule, a personally taken sport-hunted trophy may be imported into the United States when it has (1) originated in a country for which the Service has received notice for that country's African elephant ivory quota for the year of export; (2) the permit requirements of the regulations for CITES permits (50 CFR 13 and 23) have been met; (3) the Service has determined that the take of the trophy for import would enhance the survival of the species; and (4) the ivory has been marked as outlined in the special rule. All these conditions will continue to apply after the Appendix II listing for the elephant populations of Botswana, Namibia, and Zimbabwe enters into effect on September 18, 1997. In making the required enhancement findings, the Service reviews the status of the population and the total management program for the elephant in each country to ensure the program is promoting the conservation of the species. The Service will make such findings on a periodic basis upon receipt of new information on the species' population or management. The enhancement findings for importation of sport-hunted elephant trophies from Botswana, Namibia, and Zimbabwe are on file in the Office of Management Authority and remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published a notice of any change in the Federal Register.

The practical effect of the downlistings of these three populations for sport hunters is that an import permit will no longer be required for non-commercial imports of African elephant sport-hunted trophies from these countries only. Only a CITES export permit from the country of origin or a re-export certificate from an intermediate country will be required. Populations of African elephants in all other countries, however, remain in Appendix I. Therefore, importation into the United States of sport-hunted elephant trophies from these other countries will continue to require prior issuance of both an import and export permit. As in the past, no sport trophies of African elephants, or ivory from sport trophies, whether from Appendix I or Appendix II populations, may be exported from the United States.

### Importation of Live African Elephants, Ivory, and Other African Elephant Products

When the downlistings of the elephant populations of Botswana, Namibia, and Zimbabwe become effective on September 18, 1997, it will be possible to import live elephants from any of these countries into the United States "to appropriate and acceptable destinations" without an import permit and without need for an enhancement finding. Only an export permit from the country of origin, or a re-export certificate from an intermediate country, will be necessary. For elephants from Zimbabwe only, commercial trade in hides will be allowed. However, the terms of the downlisting of the Zimbabwean population are ambiguous regarding future commercial trade in leather products. The United States intends to seek clarification on the scope of the leather goods and hides annotations from the CITES Standing Committee. Hides or leather products from elephant populations other than those of Zimbabwe are still considered to be specimens included in Appendix I and cannot be imported by any CITES Party for commercial purposes.

Regardless of any provisions of the African elephant downlistings at COP10 for export of elephant ivory or ivory products, import of worked ivory into the United States continues to be prohibited under the terms of the African Elephant Conservation Act (AECA), as interpreted by the ESA 4(d) special rule, unless they meet any of the following exceptions: (1) Bonafide antiques more than 100 years old; (2) personal and household effects registered with U.S. Customs on export and now being reimported; or (3) pre-Convention items for non-commercial use acquired prior to the first listing of the elephants under CITES in 1977. With the exception of appropriately marked sport-hunted trophies, import of raw ivory is strictly prohibited.

Note: The Department has determined that amendments to CITES Appendices, which result from actions of the Parties to the Convention, do not require the preparation of Environmental Assessments as defined under authority of the National Environmental Policy Act (42 U.S.C. 4321-4347). This rule was not subject to Office of Management and Budget review under Executive Order 12866. Because these amendments are simply **\*44634** notifications of actions taken by the CITES Parties, they are not "rules" as defined in 5 U.S.C. 551. Similarly, the Regulatory Flexibility Act (5 U.S.C. 601) does not apply to the CITES listing process. The proposed adjustments to the list in 50 CFR 23.23 are solely informational to provide the public with accurate data on the species covered by CITES. With the exception of the sturgeon species listed on the basis of the proposal by Germany and the United States, the listing changes adopted by the Parties will take effect on September 18, 1997, under the

terms of CITES. The sturgeon listings take effect on April 1, 1998, as provided for in the amended language of the proposal. This proposed rule does not contain information collection requirements that require approval by the Office of Management and Budget under 44 U.S.C. 3501 et seq.

The Service finds that the public comment period must close 15 days from publication, in order to provide the necessary time to review and, if appropriate, act on any comments requesting the entering of reservations. Any such reservations must be submitted to the Depositary Government (and CITES Secretariat) by September 18, 1997.

**List of Subjects in 50 CFR Part 23**

Endangered and threatened species, Exports, Fish, Imports, Marine mammals, Plants (agriculture), Treaties.

This document is issued under authority of the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq. and 87 Stat. 884, as amended). It was prepared by Dr. Marshall A. Howe and Dr. Bruce MacBryde, Office of Scientific Authority.

**Proposed Regulation Promulgation**

50 CFR § 23.23

The Service proposes to amend the list of species contained in §23.23 of title 50 of the Code of Federal Regulations by incorporating all changes in CITES Appendices I and II that were approved by the Conference of the Parties, as set forth in the Supplementary Information section of this proposed rule.

Dated: August 15, 1997.

Donald J. Barry,

Acting Assistant Secretary for Fish and Wildlife and Parks.

[FR Doc. 97-22402 Filed 8-21-97; 8:45 am]

BILLING CODE 4310-55-U

Footnotes

1    Originally annotated to allow: a) the direct export of registered stocks of whole raw tusks of Botswana origin to one trading partner (Japan) subject to annual quotas of 12.68 tons in 1998 and 1999; b) international trade in hunting trophies; and c) international trade in live animals to appropriate and acceptable destinations. Amended to qualify the provision for export of sport-hunting trophies with the phrase "for non-commercial purposes." Further amended to qualify the provision for export of ivory stockpiles as follows: "No international trade in ivory before 18 months after the transfer to Appendix II comes into effect. Thereafter an experimental quota for raw ivory not exceeding 25.3 tons may be traded with Japan subject to conditions established in Decision No. XX to the Conference of the Parties." (Note: Decision No. XX establishes nine conditions that need to be met before trade in raw ivory can be resumed; directs the CITES Standing Committee to make available the evaluation of legal and illegal trade and legal offtake as established through Resolution Conf. 9.16(Rev.) as soon as possible after the experimental trade has taken place; and further directs the Standing Committee to identify in cooperation with the range States any negative impacts of the resumption of trade and determine and propose corrective measures. A copy of Decision No. XX may be obtained from the Office of Scientific Authority.)

2    Originally annotated to allow: a) the direct export of registered stocks of whole raw tusks of Namibian origin owned by the government of Namibia to one trading partner (Japan) that will not re-export, subject to annual quotas that will not exceed 6,900 kg. between September 1997 and August 1998 and between September 1998 and August 1999; b) international trade in live animals to appropriate and acceptable destinations for non-commercial purposes; and c) international trade in hunting trophies for non-commercial purposes. Amended to qualify the provision for export of sport-hunting trophies with the phrase "for non-commercial purposes." Further

Addendum 141

amended to qualify the provision for export of ivory stockpiles as follows: "No international trade in ivory before 18 months after the transfer to Appendix II comes into effect. Thereafter an experimental quota for raw ivory not exceeding 13.8 tons may be traded with Japan subject to conditions established in Decision No. XX to the Conference of the Parties." (Note: see footnote #1 for a summary of Decision No. XX.)

3    Originally annotated to allow: a) the direct export of registered stocks of whole raw tusks to one trading partner (Japan) subject to annual quotas of 10 tons in 1998 and 1999; b) international trade in hunting trophies; c) international trade in live animals to appropriate and acceptable destinations; d) international trade in non-commercial shipments of leather articles and ivory carvings; and e) export of hides. Amended to qualify the provision for export of sport-hunting trophies with the phrase "for non-commercial purposes." Further amended to qualify the provision for export of ivory stockpiles as follows: "No international trade in ivory before 18 months after the transfer to Appendix II comes into effect. Thereafter an experimental quota for raw ivory not exceeding 20 tons may be traded with Japan subject to conditions established in Decision No. XX to the Conference of the Parties." (Note: see footnote #1 for a summary of Decision No. XX.)

4    Transfer of the population of the Province of Jujuy and of the semicaptive populations of the Provinces of Jujuy, Salta, Catamarca, La Rioja, and San Juan, Argentina, from Appendix I to II, with an annotation to allow only the international trade in wool sheared from live vicunas, and in cloth and manufactured items made thereof, under the mark "VICUN6A-ARGENTINA."

5    Transfer of the populations of the Conservation Units of Mauri-Desaguadero, Ulla Ulla, and Lipez-Chicas, Bolivia, from Appendix I to II, with an annotation to allow only the international trade in cloth and manufactured items made thereof, under the mark "VICUN6A-BOLIVIA." Amended to establish an initial export quota of zero.

6    Amended to establish a delayed effective date of April 1, 1998. The Parties passed a resolution in association with this amendment to the Appendices that recognizes the conservation problems facing Caspian Sea sturgeons and the need for assistance in that region to assure effective implementation of the listings. It further advocates accedence of key sturgeon range States to CITES and the formulation of a management plan for the Caspian Sea sturgeon fishery.

7    In a related Decision passed by the Parties, it was agreed that a working group would be established under the aegis of the Standing Committee to study the expanding array of problems and confusion arising from the use of product annotations in the Appendices. The working group will report to COP11.

8    The text in the amendment column at left gives the result as amended at COP10, which differs from that provided in the Federal Register notice of June 6, 1997 (62 FR 31054) with regard to the parts and/or derivatives included. The amendments were either minor changes in wording to clarify the proposal's intent, or involved additional parts and/or derivatives that were excluded.

9    The text in the amendment column at left gives the result as amended at COP10, which differs from that provided in the Federal Register notice of June 6, 1997 (62 FR 31054) by also including the seeds originating in Mexico from artificial propagation. This revision was recommended by the CITES Secretariat in Doc. 10.89, Annex 1. The seeds of Mexican cacti from artificial propagation that originate elsewhere than Mexico remain unregulated by CITES.

10    The text in the amendment column at left gives the results as amended at COP10, which adopted the clarifications and suggestions regarding taxa and hybrid specimens as analyzed by the United States—see the Federal Register notice of June 6, 1997 (62 FR 31054).

---

End of Document    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.  14